Barbara **SCHWAB** et al., individually and on behalf of all others similarly situated, Plaintiffs,

v.

**PHILIP MORRIS USA, INC., R.J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp., Lorillard Tobacco Co., Ligget Group, Inc., American Tobacco Co., Altria Group, Inc., British American Tobacco (Investments) Ltd., Defendants.**

No. 04–CV–1945(JBW).

United States District Court, E.D. New York.

Sept. 25, 2006.

---

Cohen, Milstein, Hausfeld & Toll, Washington, DC by Benjamin D. Brown, Paul T. Gallagher, Michael D. Hausfeld, Andrea L. Hertzfeld, Brent W. Landau, Douglas J. McNamara, Linda P. Nussbaum, James J. Pizzirusso, Susan Rogers Schwaiger, Finkelstein, Thompson & Loughran, Washington, DC by William P. Butterfield, Hilary K. Ratway, Richard M. Volin, Smoger & Associates, P.C., Oakland, CA by Gerson H. Smoger, for Plaintiffs.

Arnold & Porter, Washington, DC by Judith Bernstein–Gaeta, Anthony D. Boccanfuso, Susan B. Cassidy, Brian Thomas Edmunds, Murray R. Garnick, Edward Gehres, Jennifer Ann Karmonick, Courtney E. Smothers, Kirkland & Ellis, Chicago, IL by David M. Bernick, Renee D. Honigberg, for Defendant Philip Morris USA, Inc.

Jones Day, Cleveland, OH and New York City, By Mark A. Belasic, Harold Keith Gordon, Theodore M. Grossman, Steven P. Harte, Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC by Gusti W. Frankel, for Defendant R.J. Reynolds Tobacco Company.

Chadbourne & Parke, New York City by Joseph Gerard Falcone, Philip A. Pfeffer, for Defendant British American Tobacco Ltd.

Chadbourne & Parke, New York City by Thomas Edward Riley, for Defendant British American Tobacco, P.L.C.

Kasowitz, Benson, Torres & Friedman, New York City by Leonard A. Feiwus, Julie R. Fischer, Aaron H. Marks, for Defendant Liggett Group, Inc.

Kirkland & Ellis, New York City, by Peter A. Bellacosa, for Defendant Brown & Williamson Tobacco Corp.

Greenberg Traurig, L.L.P., New York City by Alan Mansfield, Joanne M. McLar-en, Stephen L. Saxl, for Defendant Lorillard Tobacco Company.

## MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

I. Introduction ...........................................................1018

II. Allegations............................................................1025
 A. Burden of Proof....................................................1025
 1. Class Certification ............................................1025
 2. Summary Judgment ..........................................1025
 B. Sources of Proof ..................................................1026
 C. Overview of the Conspiracy and Fraud .........................1028
 D. Other "Light" Cigarette Fraud Actions ........................1029

III. Racketeer Influenced and Corrupt Organizations Act.............1031
 A. Violation of Criminal RICO ......................................1032
 1. Conduct of a Racketeering Enterprise (§ 1962(c)) ............1032
 a. Enterprise ..............................................1032
 b. Conduct ................................................1033
 c. Racketeering activity ...................................1033
 d. Pattern ................................................1034
 2. Conspiracy (§ 1962(d)) .......................................1035
 a. *Cofacredit* ............................................1035
 b. Supreme Court precedent...............................1036
 c. Subsequent decisions of the Second Circuit and district courts....1038
 d. Other circuits .........................................1038
 e. Conclusion on conspiracy requirements .................1039
 B. Injury to Property ...............................................1039
 1. Law ..........................................................1039
 2. Defendants' Motion for Summary Judgment on Injury...............1039
 a. Proprietary injury .....................................1040
 b. Personal injury ........................................1042
 3. Conclusion on Injury ........................................1043
 C. Causation and Reliance ..........................................1043
 1. Law ..........................................................1043
 a. Factual causation ......................................1043
 b. Proximate causation....................................1043
 c. Reliance ...............................................1044
 i. Reliance is required...................................1044
 ii. Role of reliance .....................................1045
 (a) Direct reliance.......................................1045
 (b) Third-party reliance .................................1045
 d. Transaction causation and loss causation ...............1045
 2. Defendants' Motion for Summary Judgment on Causation.............1046
 a. Reliance ...............................................1046
 i. Plaintiffs' claims of reliance .........................1046
 ii. Reliance showing required in this case....................1047
 iii. Plaintiffs have demonstrated reliance....................1048
 b. Indirect purchaser rule ................................1050
 i. *Illinois Brick* .......................................1052
 ii. Inapplicability of *Illinois Brick* rule .................1053
 3. Conclusion on Causation .....................................1056
 D. Computation of Total Damages ...................................1056

1. Plaintiffs' Models . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1057
 a. "Loss of market" model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1057
 b. "Loss of value" model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1057
 c. "Price impact" model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1058
2. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1058
 a. Practice under common law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1058
 b. Practice under securities law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059
 i. 1933 Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1060
 ii. 1934 Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1060
 (a) Explicit rights of action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1060
 (b) Implied rights of action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1060
 c. Practice under antitrust law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1061
3. Application of Law to Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1063
 a. Appropriate measure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1063
 b. Degree of precision required . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1065
4. Equitable Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1067
5. Conclusion on Computation of Total Damages . . . . . . . . . . . . . . . . . . . . . 1067
E. Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1067
 1. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1067
 a. Accrual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1068
 b. Equitable tolling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1068
 2. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1068
 3. Application of Law to Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1070
 a. Actual knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1070
 b. Imputed knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1070
 i. Class counsel's knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1071
 ii. Class members' knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1072
 c. Separate accrual . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1074
 d. Equitable tolling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1074
 4. Conclusion on Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1075

IV. Collateral Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1076
 A. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1076
 B. Preclusive Effect in Possible Future Bodily Injury Cases . . . . . . . . . . . . . . 1076
 C. Claim Splitting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1077
 D. Preclusive Effect of *United States v. Philip Morris* . . . . . . . . . . . . . . . . . . . . 1077
 E. Preclusive Effect of Overlapping Class Actions . . . . . . . . . . . . . . . . . . . . . . . 1079

V. Defendants' Other Summary Judgment Motions . . . . . . . . . . . . . . . . . . . . . . . . 1079
 A. Mutagenicity of "Light" Cigarettes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1079
 B. Defendant BATCo's Separate Motion for Summary Judgment on All
 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1080
 1. Extraterritoriality of RICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1081
 a. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1081
 b. Application of law to facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1081
 2. BATCo's Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1082
 a. BATCo's conduct of the enterprise . . . . . . . . . . . . . . . . . . . . . . . . . . . 1082
 b. BATCo's participation in the conspiracy . . . . . . . . . . . . . . . . . . . . . 1083
 c. Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1083
 d. BATCo's association with Brown & Williamson . . . . . . . . . . . . . . . . 1083
 3. Conclusion on BATCo's Separate Motion . . . . . . . . . . . . . . . . . . . . . . . . . 1084
 C. Defendant Philip Morris' Separate Motion for Summary Judgment on
 All Claims After November 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1084
 1. Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1084
 a. PM USA's disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1084
 b. Plaintiffs' "concession" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1085
 2. Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1086
 3. Application of Law to Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1086
 a. Absence of a scheme to defraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1086

 b. Reasonable reliance ........................................1087

 c. Judicial estoppel ..........................................1088

 d. Findings on continued increases in nicotine inhaled from "light" cigarettes ........................................1089

 4. Conclusion on Philip Morris' Separate Motion ......................1089

VI. Plaintiffs' Motions for Summary Judgment...............................1089

 A. FTC Defense ..............................................1089

 1. Facts ..................................................1089

 a. FTC action ..........................................1089

 b. Procedural history ....................................1091

 2. Law ...................................................1092

 3. Application of Law to Facts .................................1092

 a. "New" evidence ......................................1092

 b. Defendants' stated position...............................1093

 4. Conclusion on FTC Defense .................................1094

 B. Compensation Defense .......................................1094

 C. Compliance with Public Health Community Defense ....................1096

 D. Meaning of "Lights" Descriptor .................................1097

VII. Plaintiffs' Motion for Class Certification .................................1097

 A. Class Certification Under Rule 23 ...............................1097

 1. Burden of Proof ........................................1097

 2. Purpose of Rule 23.......................................1098

 B. Rule 23(a) Prerequisites......................................1101

 1. Numerosity ............................................1101

 a. Law....................................................1101

 b. Application of law to facts ...............................1101

 2. Commonality...........................................1101

 a. Law....................................................1101

 b. Application of law to facts ...............................1103

 3. Typicality..............................................1104

 a. Law....................................................1104

 i. Unique defenses.................................1104

 ii. Subclasses ....................................1105

 b. Application of law to facts ...............................1105

 4. Adequacy of Representation ................................1106

 a. Law....................................................1106

 i. Class counsel ..................................1106

 ii. Class representatives lacking interests antagonistic to the class........................................1107

 iii. Other factors...................................1108

 (a) Knowledge of the case and ability to supervise counsel ....................................1108

 (b) Credibility of representatives .........................1109

 b. Application of law to facts ...............................1109

 i. Named plaintiffs................................1109

 ii. Proposed class counsel ...........................1112

 C. Rule 23(b)(2): Injunctive or Declaratory Relief.......................1112

 1. Law ..................................................1112

 2. Application of Law to Facts .................................1113

 D. Rule 23(b)(3): Money Damages .................................1114

 1. Law ..................................................1114

 a. Predominance of common questions of law or fact ..............1114

 i. Violation of RICO mail or wire fraud .....................1115

 ii. Causation and reliance ...........................1115

 (a) General proof of reliance ............................1115

 (b) Individual proof of reliance ..........................1117

 iii. Injury to property and damages .........................1119

 b. Superiority .................................................1120
 2. Application of Law to Facts ........................................1121
 a. Class action is superior method of adjudication .................1121
 b. Common questions of law or fact predominate ...................1123
 i. Reliance..............................................1124
 ii. Injury to property and damages ........................1127
 iii. Statute of limitations .................................1130
 E. Rule 23(g): Adequacy of Class Counsel ............................1131
 F. RICO and Class Certification .....................................1131
 G. Conclusion on Certification of Class................................1131

VIII. Admissibility of Expert Evidence .......................................1132
 A. Motions Regarding Admissibility of Expert Reports .................1132
 B. Rules 702 and 703 of the Federal Rules of Evidence ...............1132
 C. Qualifications of Expert Witnesses.................................1133
 D. Helpfulness and Relevance .......................................1133
 E. Reliability .......................................................1135
 F. Individual Experts' Reports ......................................1137
 1. Challenges to Plaintiffs' Experts ................................1138
 a. John C. Beyer .....................................1138
 b. David M. Burns ...................................1149
 c. Joel B. Cohen .....................................1150
 d. K. Michael Cummings ..............................1153
 e. Michael J. Dennis.................................1157
 f. Robbin Derry ....................................1159
 g. Marvin E. Goldberg ...............................1159
 h. Jeffrey Harris ....................................1163
 i. John R. Hauser....................................1166
 j. Katherine Kinsella ................................1170
 k. Matthew L. Myers ................................1172
 l. Blaine F. Nye .....................................1177
 m. Richard W. Pollay .................................1184
 n. Robert N. Proctor .................................1193
 o. Paul Slovic........................................1209
 p. Joseph E. Stiglitz .................................1215
 2. Challenges to Defendants' Experts ..............................1221
 a. Michael Dixon ....................................1221
 b. Jeffery Gentry ....................................1222
 c. Jane E. Lewis .....................................1222
 d. Arnold T. Mosberg ................................1223
 e. Kenneth R. Podraza...............................1224
 f. Graham A. Read ..................................1225
 g. Edward A. Robinson ..............................1225
 h. William Wecker ...................................1226
 3. Minor or No Challenges to Plaintiffs' and Defendants' Experts .......1226
 a. Neal L. Benowitz .................................1226
 b. Michael F. Borderding ............................1227
 c. Gregory N. Connolly ..............................1227
 d. Richard Cox ......................................1227
 e. Wayne S. Desaro .................................1227
 f. Peter C. English..................................1227
 g. Barry E. Goodstadt ...............................1227
 h. Stephen Hecht ...................................1228
 i. Lucy L. Henke ...................................1228
 j. Jack E. Henningfield ..............................1228
 k. Jacob Jacoby......................................1228
 l. James A. Langenfeld .............................1228
 m. Nancy A. Mathiowetz ............................1229
 n. Kenneth A. Mundt ...............................1229

o. Kevin M. Murphy ........................................1230
p. Bruce Neidle ............................................1230
q. Bruce M. Owen ..........................................1230
r. Stanley Presser .........................................1231
s. Michael Schaller ........................................1231
t. George Seiden ...........................................1231
u. Peter G. Shields ........................................1232
v. David W. Stewart .......................................1232
w. Charles R. Taylor .......................................1233
x. Michael Thun ...........................................1233
y. Peter A. Valberg ........................................1233
z. W. Kip Viscusi ..........................................1234
aa. Errol Zeiger ...........................................1234
G. Plaintiffs' Motion to Exclude Expert Testimony that "Light" Cigarettes are Safer ..........................................................1236
H. Defendants' Motion to Exclude Expert Evidence of Impact of Marketing of "Light" Cigarettes on Smoking Rates ....................1236
 1. Relevance ...............................................1236
 2. Reliability ..............................................1236
I. Defendants' Motion to Exclude Expert Testimony Regarding Mutagenicity of "Light" Cigarettes ..............................1239
J. Further Rulings as Case Develops ...............................1239

IX. Management Issues ...........................................1239
A. Aggregate Proof ............................................1239
 1. Federal Rules of Civil Procedure and Evidence .......................1241
 2. Appropriateness of Sampling and Survey Techniques .................1244
 3. Due Process ............................................1246
 4. Jury Right..............................................1248
B. Distribution of Any Damages ................................1251
 1. Fluid Recovery ..........................................1252
 a. Nature and use .....................................1252
 b. Interaction with procedural and substantive law ...............1254
 c. General law .......................................1255
 2. Second Circuit Law on Fluid Recovery ...........................1260
 3. Application of Law to Facts ..................................1268
 a. *Eisen* and *Van Gemert* ..................................1269
 b. Due process and Seventh Amendment issues ..................1270
 c. Rules Enabling Act ..................................1271
 4. Conclusion on Fluid Recovery .................................1272
C. Allocation of Damages Among Defendants ...........................1272
 1. National Common Law ....................................1273
 2. Joint and Several Liability ..................................1273
 3. Market Share ..........................................1274
 4. Other Systems .........................................1276

X. Certification of Interlocutory Appeal ..............................1276

XI. Stay .......................................................1277

XII. Conclusion .................................................1277

Appendix A: *United States v. Philip Morris* .........................1278

Appendix B: *Blue Cross & Blue Shield of New Jersey v. Philip Morris* ...............1278

Appendix C: *Price v. Philip Morris* ................................1279

Appendix D: *In re Simon II Litigation* .............................1298

**1018**

Appendix E: Monograph 13 ............................................... 1298

Appendix F: Report of Massachusetts Department of Health ....................... 1351

## I. Introduction

Tobacco has been woven into the fabric of American history and society since the 1620's when, as the first cash crop, it saved the colony of Virginia and then, together with cotton, established the economic base for slavery. Edmund S. Morgan, *American Slavery, American Freedom, The Ordeal of Colonial Virginia* 112, 310 (Francis Parkman Prize Ed., 2005).

In more recent times, through cigarettes—produced and allegedly fraudulently merchandised on a massive scale—it has become the basis for a pandemic, causing the premature deaths of tens of millions of Americans. This case represents one event in this long narrative: the alleged successful effort of defendants to cozen smokers into continuing to buy their products by convincing them that smoking "light" cigarettes was safer for their health.

It is plaintiffs' view that this campaign caused smokers to buy "light" cigarettes, in large amounts, at a price greater than they would have paid had the truth been acknowledged by defendants. Defendants' acts, plaintiffs contend, constituted a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *ff*, warranting trebled money damages. 18 U.S.C. § 1964(c). Class action status is sought to bring to bear, on a consolidated basis, the weight of all United States smokers' claims.

It is charged—with substantial evidence to support the contention—that plaintiff smokers bought cigarettes characterized as "light," on the suggestion of defendants—the major cigarette manufacturers—that they were less harmful than "regular" cigarettes, when in fact they were at least as dangerous and defendants knew of their dangers. The claim is that the carcinogenic and other adverse effects smokers sought to avoid were not reduced by smoking "light" rather than other cigarettes; that defendants knew this was the case; that they concealed this fact; that they urged plaintiffs—through advertising and other public statements—to smoke these "lights" knowing smokers were being misled; and that they defrauded purchasers of billions of dollars spent for light cigarettes worth less than their purchase price.

On behalf of a prospective class, the named plaintiffs seek class certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (3) on behalf of the class of persons defined as:

> All United States residents who purchased in the United States, not for resale, cigarettes labeled as "Lights" and/or "Light" (collectively "light cigarettes") that were manufactured and/or sold by Defendants during the period commencing on the first date that Defendants began selling light cigarettes until the date trial commences (the "Class Period"), and who are not, as of the date of trial, members of a certified state class seeking economic damages stemming from their purchases of light cigarettes or having obtained an award of, or a denial of, such damages. Excluded from the Class are individuals who are directors and officers of the Defendants' corporations, their parents, subsidiaries and/or affiliates.

This litigation is another in the continuing battle of plaintiffs' lawyers and their clients with the cigarette industry. While

limited success by smokers in some suits—and the cost of litigating—have probably had some deterrent effect on aggressive marketing of a product defendants now partly acknowledge to be dangerous, this, and other suits like it, probably have had only a minimal value in reducing what even defendants now concede are the enormous costs to public health of widespread cigarette smoking. More effective in alleviating smoking dangers are probably such legislative and administrative efforts as prohibiting smoking in public and commercial areas, and raising prices, primarily through taxes. Nevertheless, where a cigarette smoker can demonstrate that he or a group of smokers has been damaged by the cigarette industry, the help of the court in resolving the claim and defenses is mandatory. The independent political-economic arrangement defendants made with the states to pay them billions of dollars over many years has not compensated smokers for the individual damages they have allegedly suffered.

Early in our history the Supreme Court ruled that a federal court must decide cases properly brought. It:

> must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution. Questions may occur which we would gladly avoid; but we cannot avoid them.

*Cohens v. Virginia,* 19 U.S. 264, 6 Wheat. 264, 404, 5 L.Ed. 257 (1821).

While "the federal courts may, in their discretion, [in some narrowly specified classes of cases,] properly withhold the exercise of the jurisdiction conferred upon them where there is no want of another suitable forum," *Massachusetts v. Missouri,* 308 U.S. 1, 19, 60 S.Ct. 39, 84 L.Ed. 3 (1939), the choice in the present case under the federal RICO statute is not between a United States district court and some other forum, but between this court and *no effective forum at all.*

Plaintiffs have proposed an elegant analysis of the law and facts as a rationale for certifying this litigation as a class action. Their claim is that they, and a class consisting of tens of millions of smokers, were induced by fraud to buy a kind of cigarettes, "lights," and that they suffered financial damage because they did not get what they thought they were getting—a more valuable, safer cigarette. By relying on federal substantive statutes—the combined "RICO" and Mail and Wire Fraud Acts, 18 U.S.C. §§ 1341, 1343—they seek to avoid one of the serious difficulties with national class cigarette actions: the tort law in the fifty states is not uniform.

They also propose to avoid the other main problem with smokers' class actions: conduct and motive differences among members of the class. Individuals start and quit smoking and choose various types of cigarettes for different reasons and suffer wide variations in possible harm, creating different specific causation and damage issues attributable to each class member. If plaintiffs' experts are to be credited in the testimony promised by plaintiffs' counsel, economic loss of value in purchases of cigarettes allegedly touted as "lighter" when they are not safer avoids this problem of human diversity: first, by the equivalent of statistical averaging and, second, should the jury determine total damages to the class, division of the damages

based on claims of smokers for the relative number of cigarettes they bought during the applicable liability period, with unclaimed proceeds to be distributed on a cy pres basis.

Defendants, by contrast, in powerful briefs and arguments, point to what they believe are critical defects in the plaintiffs' case on the facts and the law requiring not only denial of class certification, but dismissal of the case. They contend that they committed no fraud, that the statute of limitations has run, and that class action procedures are not applicable. Accordingly, they move to dismiss and to deny class certification.

In considering the matter as it now stands, two powerful factors should be kept in mind: First, is the jury's constitutional role and its vast discretion in evaluating evidence in a civil suit of this kind under Amendment VII of the United States Constitution. The jury's power and capacity to deal with complex facts and come to a reasonable resolution of a dispute should not be underestimated.

Second, is the power of the American legal system to overcome a defense that plaintiffs' claims are so enormous in scope and time, and in diverse persons affected, that they can never be fairly adjudicated in a reasonably comprehensive and relatively inexpensive way. In this connection it is well to recall a central theme of our American legal system: *ubi jus, ibi remedium*—each right has a remedy. Every violation of a right should have a remedy in court, if that is possible.

> The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection....
>
> "[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." ...
>
> "[E]very right, when withheld, must have a remedy, and every injury its proper redress." The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right.

*Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 163, 2 L.Ed. 60 (1803) (quoting 3 William Blackstone, Commentaries 23, 109).

In modern times, at least since adoption of the Federal Rules of Civil Procedure and Evidence, the ancient maxim is modified to read, "each violation of a right should have a practicable remedy." A remedy that is impracticable in execution is—for those whose legal rights have been violated—no remedy at all. Procedures developed through American class action jurisprudence should not be frustrated when a large number of small claims can be aggregated and tried in a way fair to both plaintiffs and defendants. Current widespread partial acknowledgment by defendants of the dangers of their product and alleged efforts to reduce smoking by minors and others does not negate any liability for past delicts not subject to the statute of limitations.

Resolution of many of the factual disputes in the case depends upon widely divergent possible inferences that may be drawn from a huge amount of already available evidence of activities by defendants and members of the putative class. While the American jury has been more and more controlled by devices such as summary judgment, the strong policy embodied in Amendment VII, and the pre-

sumption that the system can provide a practical remedy for a widespread violation of a right, requires allowing jurors to draw necessary operative factual conclusions wherever reasonable minds could differ.

In the instant case the wisdom embodied in the Constitution is reflected in the ability of a fair cross section of the community to appreciate and understand evidence of why people smoke, why they do it in certain ways, and what impact actions and policies of defendants in such matters as advertising have had in influencing behavior. The federal petty civil jury provides the ultimate focus group of the law.

In deciding the balance between plaintiffs and defendants, the scale tips heavily in the instant case in favor of allowing a jury rather than a judge to decide the case. Here, in a litigation that arguably might go either way on inferences and facts, the Constitution and basic principle point to certification of the class, allowing the matter to proceed before a jury in a way that is practicable. Denial of motions to dismiss and to exclude relevant and reliable proof, scientific and otherwise, will permit the jury to decide the dispute fairly.

Whether plaintiffs can overcome the defendants' objections to their proof is subject to trial by jury. There is enough merit to both plaintiffs' and defendants' contentions to permit the litigation to go forward. If, as contended by plaintiffs, a huge fraud was perpetrated on tens of millions of people causing them billions of dollars in loss—measured largely by the difference between the value people were led to believe they were getting when they bought "light" cigarettes for safety, and what they received, a non-safe product—recovery dependent on proof should be allowed. The extensive evidence introduced on preliminary motions supports certification of the class and denial of defendants' motions for summary judgment.

While evidence of fraud on the class appears to be quite strong—and defendants have been less than candid in insisting that there was no fraud—evidence of the percentage of the class which was defrauded and the amount of economic damages it suffered appears to be quite weak—and plaintiffs have been less than candid in failing to acknowledge that deficiency in their proof.

The court in *United States v. Philip Morris,* 449 F.Supp.2d 1 (D.D.C.2006), described in Part II.D, *infra* and excerpted in Appendix A, *supra,* has estimated that some fifty percent of those who smoked "light" cigarettes would not have done so had they known the truth. *See* Appendix A at 449 F.Supp.2d at 280, *supra.* This estimate, strongly relied on by plaintiffs in argument, *see* Transcript of Sept. 13, 2006, at 52:5–13, 157:22–159:7, does not fill the gap in their proof since, even if the court was right in *United States v. Philip Morris*, a significant portion of that fifty percent might have smoked other types of cigarettes purchased at the same price "lights" were selling for. Contrasting the real diverse universe of "lights" smokers with the counterfactual universe of fully advised "lights" smokers to determine the impact of the fraud on the size of the market and its nature for damage purposes is a daunting enterprise even with the many proffered experts holding up their statistical lanterns to help in the search for the truth.

There is considerable merit to defendants' experts' position that many, if not all, the plaintiffs would have bought these light cigarettes even if they knew they provided no health advantage over regular cigarettes, and that they received full value for their money. There are also serious

objections to the plaintiffs' plan to divide any damages based on the relative number of cigarettes claimed to have been bought by claimants during the period found applicable by the jury, with cy pres division of the remainder. This form of fluid recovery tends—like almost all aggregate litigation—to overcompensate some and undercompensate other members of the class who may have relied differently on the "lights" designation and may have acted differently and for different reasons relevant to damages. Nevertheless, serious and unique factual-substantive issues now presented can be resolved by the jury with the aid of experts and statistical proof. If plaintiffs are right, they should not be fobbed off by real and imagined barriers of proof and management problems that can be circumvented in a fair adjudication.

Essentially, the issue before the court is not whether a fraud case be proven, but whether damages can be proven for the period since each smoker started smoking, failed to stop, switched to, or started with "lights" rather than the standard cigarettes in vogue up to the introduction of "lights" on a large scale. That introduction to "light" smoking and encouragement of continued use by defendants was allegedly in response to a widespread fright induced by the Surgeon General's reports and other warnings of hundreds of thousands of deaths caused yearly by cancer attributable to smoking.

Plaintiffs have demonstrated that they may be able to produce sufficient proof to satisfy a jury as to damages based largely on statistics, the law of large numbers, and their experts' analyses to show a reasonable estimate of total damages, without producing proof of reliance and fraud as to each of millions of smokers, with a damage figure assigned to each smoker and each year that he or she smoked.

If each smoker must be considered separately, as defendants suggest is the case, it would be impossible to proceed with a suit of this nature even if it were absolutely clear that each plaintiff had been damaged in the manner plaintiffs allege. The transactional costs and the relatively small recovery for the difference in value between what an individual smoker paid for and what he received would result in damages measured in tens or hundreds of dollars. The huge costs in bringing this action could not be supported by such individual adjudications.

The question then becomes whether the American legal system, faced with an alleged massive fraud, must throw up its hands and conclude that it has no effective remedy for what at this stage of the litigation must be assumed to be a huge continuing violation of consumers' rights. In the American legal system, whose watchword has been, as already noted, "no right without a remedy," the answer is that modern civil procedure, scientific analysis, and the law of large numbers used by statisticians provide a legal basis for a practical and effective remedy. The plaintiffs are entitled to the chance to prove their allegations.

Candor impels recognition of the fact that the Courts of Appeals have not been kind to massive claims against tobacco companies. Despite repeated findings of fact by judges and juries supporting claims of fraud, appellate courts have repeatedly dismissed such cases whether the claim was for consumer fraud, personal injury, or third party damages for costs of medical treatment. The defendants make a strong case that this suit, too, must founder on that appellate predilection for individual suits.

The case comes down to the role of the jury: should it be permitted to decide this vexing private litigation on the basis of

somewhat dubious arguments and questionable proofs when the decision has so many important public social overtones, or should the judges themselves decide by holding that the matter is beyond the ken of a reasonable jury? Here, the fundamentals of the Constitution provide the answer. The first Congress and the States that then constituted the Union still speak clearly enough:

## AMENDMENT VII

### RIGHTS IN CIVIL CASES

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law. *See also Brink's Inc. v. City of New York,* 717 F.2d 700, 711 (2d Cir.1983) ("There is no bright line that divides evidence worthy of consideration by a jury, although subject to heavy counter-attack, from evidence that is not. Especially because of the guaranty of the Seventh Amendment, a federal court must be exceedingly careful not to set the threshold to the jury room too high.") (quoting *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 912 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962)).

If this case presents issues for the jury—as is now the decision of this court—then both the certification question and defense motions for summary judgment should be—and now are—decided in plaintiffs' favor. That the court believes, on the evidence thus far produced, that the amount of possible damages has been grossly exaggerated by plaintiffs is not a basis for denying their right to a jury trial. Adjustments to damages can be made after all the evidence is in and the jury has

made its decision, if that decision is unreasonable.

In Part II and Appendices A, B, C, and D, allegations and prior findings of fact against the tobacco companies on the fraud issue are sampled: First, is the general fraud in hiding the dangers of smoking, and second, is the particular fraud respecting lights. Appendix E includes portions of a Untied States Surgeon General's report on the health risks posed by "light" cigarettes and the history of their development. Appendix F includes portions of a recent Commonwealth of Massachusetts report on continuing increases in nicotine inhaled from cigarettes, including those designated as "light." In Part III, the law of RICO is analyzed and defendants' central motions for dismissal considered.

In Part IV the court considers the role of collateral estoppel in this litigation. Whether an adjudication against either side would be binding on collateral estoppel grounds in suits based on substantive theories similar to the one implicated in the present litigation when recovery is sought for physical injury to smokers rather than economic loss from the purchase of overpriced cigarettes is important. Recoveries for medical damage to the person of smokers are enormously higher than those sought now. This legal problem and the related problem of splitting a cause of action, also discussed in Part IV, do not trump class action advantages since members of the class can opt out. It is a factor, however, that needs evaluation in the context of certification.

In Parts V and VI, the parties' additional motions for summary judgment are discussed and resolved. Part VII addresses the motion for class certification. The question of class certification is critical for this court and the Court of Appeals. No individual can afford to prosecute the case alone. Denial of certification here or on

appeal would constitute a "death knell." Part VIII contains an analysis pursuant to Rule 702 of the Federal Rules of Evidence of the proposed testimony of experts for defendants and plaintiffs to determine whether a jury should be permitted to hear them; it is concluded that most experts of both defendants and plaintiffs should be heard. Part IX considers management issues, including the use of aggregate proof and fluid recovery.

Part X considers application of Rule 23(f) or section 1292(b) of title 18 to an interlocutory appeal. Based on experience with the trial and other disposition of a number of aggregate tobacco actions in this court, it is the opinion of the court that this class action can be tried to a final judgment that provides appropriate protection against relitigation of the issues adjudicated with fidelity to the applicable substantive law. Federal courts have the institutional capacity to conduct these proceedings. The representation of defendants and plaintiffs is adequate to conduct the litigation for the benefit of all persons whose interests are being adjudicated.

An immediate stay is rejected in Part XI. The Court of Appeals has the power to grant such a stay, but the case, in the trial court's opinion, should promptly proceed in view of its long history.

Part XII orders that the class sought by plaintiffs be certified. The motions for summary judgment are denied.

Numerous interlocutory orders have been issued in this litigation. *See Schwab v. Philip Morris*, No. 04–CV–1945, 2006 WL 721368 (E.D.N.Y. Mar. 20, 2006) (overruling plaintiffs' objections to magistrate judge's orders); 2005 WL 3032556 (E.D.N.Y. Nov. 14, 2005) (discussing fluid recovery); 2005 WL 2467766 (E.D.N.Y. Oct. 6, 2005) (denying defendants' motion for summary judgment on statute of limitations); 2005 WL 2401647 (E.D.N.Y. Sept. 29, 2005) (*Daubert* issues); 2005 WL 2401645 (E.D.N.Y. Sept. 27, 2005) (denying plaintiffs' motions for partial summary judgment and application of collateral estoppel); 2005 WL 2401635 (E.D.N.Y. Sept. 27, 2005) (denying defendants' motion to dismiss claims based on increased mutagenicity of "light" cigarettes); 2005 WL 2401638 (E.D.N.Y. Sept. 27, 2005) (denying plaintiffs' motion to exclude testimony that "light" cigarettes are safer than regular cigarettes); 2005 WL 2401639 (E.D.N.Y. Sept. 27, 2005) (denying plaintiffs' Rule 16(c) motion for simplification of the issues); 2005 WL 2401642 (E.D.N.Y. Sept. 27, 2005) (denying defendant BATCo's motion for summary judgment on all claims); 2005 WL 2401643 (E.D.N.Y. Sept. 27, 2005) (denying defendants' motion to exclude expert testimony on the impact of "light" cigarette marketing on smoking rates); 2005 WL 2401565 (E.D.N.Y. Sept. 26, 2005) (denying plaintiffs' motion for partial summary judgment on the existence of defendants' conspiracy); 2005 WL 2401353 (E.D.N.Y. Sept. 26, 2005) (granting defendant British American Tobacco p.l.c.'s motion to dismiss); 2005 WL 2401350 (E.D.N.Y. Sept. 26, 2005) (denying plaintiffs' motion for partial summary judgment on defendants' claim that they complied with the directives of the public health community in developing "light" cigarettes); 2005 WL 2401276 (E.D.N.Y. Sept. 26, 2005) (denying plaintiffs' motion for partial summary judgment on defendants' claim that smokers knew about compensation and so were not defrauded); 2005 WL 2401633 (E.D.N.Y. Sept. 26, 2005) (denying plaintiffs' motion for a permanent injunction prohibiting defendants from marketing or selling any cigarette with a "light" or "lights" descriptor); 2005 WL 2401196 (E.D.N.Y. Sept. 26, 2005) (denying plaintiffs' motion for partial summary judgment on the meaning of the

"light" descriptor); 2005 WL 2303821 (E.D.N.Y. Sept. 22, 2005) (granting defendants' motion for partial summary judgment on plaintiffs' claims for equitable relief); 2005 WL 2303822 (E.D.N.Y. Sept. 22, 2005) (denying plaintiffs' motion to strike defendants' employee-expert reports but requiring those reports to meet the standards of Federal Rule of Civil Procedure 26(a)(2)(B)); 2005 WL 2303823 (E.D.N.Y. Sept. 22, 2005) (granting defendants' motion to exclude the expert testimony of plaintiffs' expert on business ethics); 2005 WL 2293381 (E.D.N.Y. Sept. 21, 2005) (denying defendants' motion for an immediate stay of all proceedings); 2005 WL 2155141 (E.D.N.Y. Aug. 31, 2005) (excluding from consideration on interlocutory orders certain plaintiffs' experts' reports); 228 F.R.D. 165 (E.D.N.Y.2005) (preliminary reflections and questions for the parties). This memorandum and order incorporates and modifies the above orders.

## II. Allegations

### A. Burden of Proof

#### 1. Class Certification

On a motion for class certification, plaintiffs bear the burden of proving that the requirements of Rule 23 of the Federal Rules of Civil Procedure have been met. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir.1999). At this stage in the litigation they need not show that they are likely to prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). But a "rigorous analysis" to determine that the Rule 23 requirements are met must be conducted. *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). While it is sometimes mistakenly suggested that "a motion for class certification is not an occasion for examination of the merits of the case,'" *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 93 (S.D.N.Y.2004), the courts should not launch the heavy and expensive machinery of the class action unless there is a chance for a recovery. In any event, since defendants combine their opposition to certification with a motion for summary judgment, the merits must be considered.

#### 2. Summary Judgment

Plaintiffs need not prove that they will prevail at trial in order to survive a motion for summary judgment. Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Mitchell v. Washingtonville Central School District*, 190 F.3d 1, 5 (2d Cir.1999).

The burden rests initially with the moving party to demonstrate the absence of a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed.R.Civ.P. 56(e). This evidence may not consist of "mere conclusory allegations, speculation or conjecture[.]" *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996). *See also Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) ("Conclusory allegations will not suffice to create a genuine issue.").

The mere existence of some peripheral factual disputes will not defeat an otherwise properly supported motion for sum-

mary judgment. *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505. "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505.

In deciding the motion, all inferences from, and ambiguities in, the underlying facts are to be resolved in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Only when reasonable minds could not differ as to the import of the proffered evidence is summary judgment proper. *See Anderson*, 477 U.S. at 250–52, 106 S.Ct. 2505; *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991).

"In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are factual issues to be tried." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986). Critical is recognition of the jury's fact-finding primacy:

> It is well established that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment. If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.

*Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir.2003) (quotation marks omitted).

Defendants in this case have outproduced plaintiffs—in documents, number of experts, etc.—by at least two to one. Yet summary judgment, even in a large, complicated litigation such as this one, does not hinge on volume. If plaintiffs' legal theory is sound, and if they can demonstrate that proof is available to support it, summary judgment for defendants is inappropriate. The materials supplied by both parties demonstrate that plaintiffs have available sufficient evidence, and a legal theory sufficiently sound, to withstand a motion for summary judgment.

## B. Sources of Proof

The record is immense. Plaintiffs and defendants have submitted 200 volumes of documentary evidence, expert reports, and briefs. They have appeared before the court numerous times since suit was filed in May 2004. Argument on the dispositive motions was heard over two days in September 2005 and again in September 2006. Discovery was conducted under Magistrate Judge Steven Gold for over a year and a half. The docket contains some 1000 entries.

Aspects of the cigarette litigation before this and other courts provide additional sources of proof for decision on the summary judgment and certification motions. *See, e.g., United States v. Philip Morris USA, Inc.*, 449 F.Supp.2d 1 (D.D.C.2006) (part 1 of 6) (final order containing findings of fact and law after 9–month bench trial on federal government's civil RICO suit against tobacco manufacturers for mail and wire fraud); *Davies v. Philip Morris USA, Inc.*, No. 04–2–08174–2, 2006 WL 1600067 (Wash.Super. May 26, 2006) (denying certification of class of Washington smokers of Marlboro Lights alleging fraud under state consumer protection act); *Pearson v. Philip Morris, Inc.*, No. 0211–11819, 2006 WL 663004 (Or.Cir. Feb. 23, 2006) (denying certification of class of Oregon smokers of Marlboro Lights alleging fraud under state consumer protection act); *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 813 N.E.2d 476

(2004) (affirming lower court's certification of class of Massachusetts smokers of Marlboro Lights for fraud under state consumer protection act); *Curtis v. Philip Morris Companies, Inc.*, No. PI 01–018042, 2004 WL 2776228 (Minn.Dist.Ct. Nov. 29, 2004) (certifying class of Minnesota smokers of Marlboro Lights for fraud under state consumer protection act); *Craft v. Philip Morris, Inc.*, No. 002–00406A, 2003 WL 23139381 (Mo.Cir. Dec. 31, 2003) (denying summary judgment in class action by Missouri smokers of Marlboro Lights for fraud under state consumer protection act); *Craft v. Philip Morris, Inc.*, No. 002–00406A, 2003 WL 23355745 (Mo.Cir. Dec. 31, 2003) (granting class certification in same suit); *Price v. Philip Morris, Inc.*, No. 00–L–112, 2003 WL 22597608 (Ill.Cir. March 21, 2003) (findings of fact and law after bench trial on Illinois smokers' class action against tobacco manufacturers for "light" cigarette fraud under state consumer protection law), *rev'd on other grounds*, 219 Ill.2d 182, 302 Ill.Dec. 1, 848 N.E.2d 1 (Ill.2005) (holding that the action was barred by the state act); *In re Simon II Litigation*, 211 F.R.D. 86 (E.D.N.Y.2002) (certifying nationwide class for litigation of punitive damages for fraud by tobacco companies), *rev'd*, 407 F.3d 125 (2d Cir. 2005); *Blue Cross & Blue Shield of New Jersey v. Philip Morris, Inc.*, 178 F.Supp.2d 198 (E.D.N.Y.2001) (discussing jury findings after 44 days of trial on health insurer's claim that tobacco companies distorted public body of knowledge about cigarettes in violation of New York's consumer protection statute), *rev'd on other grounds*, 344 F.3d 211 (2d Cir.2003) and 393 F.3d 312 (2d Cir.2004); *Falise v. American Tobacco Co.*, 94 F.Supp.2d 316 (E.D.N.Y.2000) (denying summary judgment in suit by trust established to compensate victims of asbestos against tobacco manufacturers for their alleged role in contributing to the trust claimants' injuries).

Of particular note is the comprehensive recent opinion in the federal government's civil RICO suit against these same defendants, alleging in part the same fraudulent behavior as is now being charged. The opinion runs to 1,742 pages and is minutely documented. *See United States v. Philip Morris USA, Inc., supra.* Defendants object to the use of the district court's findings in that suit—and the evidence upon which they were based—on the motions in this litigation. They argue that, because the district court considered the entire "low tar" market segment, which includes brands not bearing the "lights" descriptor, much of the evidence from the prior suit is irrelevant to this suit. The argument ignores the problem pervading both suits: the health concerns of smokers, which defendants attempted to deflect by their related "lights" and "low tar" advertisements. "Low tar" and "lights" findings in the suit by the United States in the District of Columbia provide substantial support for plaintiffs' claims. Those findings, even if not decisive, supply persuasive muster for the case plaintiffs seek to construct.

> The standard of probability under the rule [of relevance] is "more . . . probable than it would be without the evidence." Any more stringent requirement is unworkable and unrealistic. As McCormick says, "A brick is not a wall" . . . .

Fed.R.Evid. 401 advisory committee notes (1972) (citations omitted).

Plaintiffs have chosen a sensible class definition based, perhaps, on prior experience with other "lights" cases, *see* Part III.E.3.b.i (noting proposed class counsel's previous involvement in such suits), or in anticipation of what a jury may find persuasive. That they could have sought a broader class is no bar to evidence relevant both to the present class and the unchosen more general class. Contrary to

defendants' characterization, plaintiffs' allegations do not depend solely on the use of the "lights" descriptor. *See, e.g.*, proposed expert testimony of Marvin E. Goldberg, Part VIII.F.1.g, *infra*, on variety of marketing techniques employed by defendants, including color and imagery. Evidence of defendants' conduct and its effects on the entire "low tar" market is relevant to their conduct and effect on the "lights" segment of that market. Subject to hearsay, prejudice, and other exclusions, if particular testimony, scientific studies, or internal industry documents could contribute to a jury's understanding of defendants' conduct and plaintiffs' beliefs and alleged injuries with respect to "light" cigarettes, they are admissible. *See also* Part VIII.D, *infra* (rejecting a similar argument with respect to expert testimony).

### C. Overview of the Conspiracy and Fraud

As noted, the fraud and conspiracy alleged here have been the subject of intense litigation in recent years. The court merely limns the allegations here. Appendices A, B, C, and D, *infra*, contain some of the detailed factual findings from previous litigations.

If plaintiffs' allegations are true, defendants have engaged in a fifty-year still continuing conspiracy to deceive the public about the risks of smoking in order to prevent restrictive governmental regulation and prop up cigarette sales that otherwise would have sagged as smokers began to understand the array of diseases caused by smoking. As part of this conspiracy, defendants reacted to growing consensus in the late 1960s by public health officials that smoking cigarettes causes lung cancer and numerous other diseases by promoting new brands as low in tar. This conspiracy was neatly summarized by the district court in the government's suit against the defendant companies after a nine-month bench trial:

> Defendants ... marketed and promoted their low tar brands as being less harmful than conventional cigarettes [when they knew they were not].... By making these false claims, Defendants [gave] smokers an acceptable alternative to quitting smoking, as well as an excuse for not quitting.
>
> Defendants used a combination of techniques to market and promote their low tar brands. Defendants' marketing has emphasized claims of low tar and nicotine delivery accompanied by statements that smoking these brands would reduce exposure to the "controversial" elements of cigarette smoke (i.e., tar). Since the 1970s, Defendants also have used so-called brand descriptors such as "light" and "ultra light" to communicate reassuring messages that these are healthier cigarettes and to suggest that smoking low tar cigarettes is an acceptable alternative to quitting. In addition to appealing advertising and easily-remembered brand descriptors, Defendants have used sophisticated marketing imagery such as lighter color cigarette packaging and white tipping paper to reinforce the same message that these brands were low in tar and therefore less harmful....
>
> Even as they engaged in a campaign to market and promote filtered and low tar cigarettes as less harmful than conventional ones, Defendants either lacked evidence to substantiate their claims or knew them to be false. Indeed, internal industry documents reveal Defendants' awareness by the late 1960s/early 1970s that, because low tar cigarettes do not actually deliver the low levels of tar and nicotine which are advertised, they are unlikely to provide any clear health benefit to human smokers ... when compared to regular, full flavor cigarettes.

As Defendants have long been aware, nicotine delivered by cigarettes is addictive .... Defendants' internal documents demonstrate their understanding that, in order to obtain an amount of nicotine sufficient to satisfy their addiction, smokers of low tar cigarettes modify their smoking behavior, or "compensate," for the reduced nicotine yields by taking more frequent puffs, inhaling smoke more deeply, holding smoke in their lungs longer, covering cigarette ventilation holes with fingers or lips, and/or smoking more cigarettes.... As a result of this nicotine-driven smoker behavior, smokers of light cigarettes boost their intake of tar, thus negating what Defendants have long promoted as the primary health-related benefit of light cigarettes: lower tar intake.

Defendants did not disclose the full extent and depth of their knowledge and understanding of smoker compensation to the public health community or to government regulators.

Defendants' conduct relating to low tar cigarettes was intended to further their overarching economic goal: to keep smokers smoking; to stop smokers from quitting; to encourage people ... to start smoking; and to maintain or increase corporate profits.

*United States v. Philip Morris,* at 449 F.Supp.2d at 430–43.

## D. Other "Light" Cigarette Fraud Actions

Class actions alleging fraud in the sales and marketing of "light" cigarettes have been brought in a number of state—and occasionally federal—courts in the past several years. *See, e.g., FLANAGAN V. ALTRIA GROUP, INC.,* No. 05–71697, 2005 WL 3719112 (E.D.Mich. April 29, 2005); *Watson v. Philip Morris Companies, Inc.,* No. 03–CV–4661 (Ark.Cir.) (filed April 18, 2003); *Virden v. Altria Group, Inc.,* No. 03–C–64 M (W.Va.Cir. March 28, 2003); *Pearson v. Philip Morris, Inc.,* No. 0211–11819 (Or.Cir.) (filed Nov. 20, 2002); *Curtis v. Philip Morris Companies, Inc.,* No. PI 01–018042 (Minn.Dist.Ct.) (filed Nov. 28, 2001); *Craft v. Philip Morris Companies, Inc.,* No. 002–00406A (Mo. Cir.) (filed Feb. 14, 2000); *Marrone v. Philip Morris Cos.,* No. 99 CIV 0954 (Ohio Ct.Com.Pl.) (filed Nov. 8, 1999); *McClure v. Altria Group, Inc.,* No. 99C148 (Tenn. Cir.Ct.) (filed Jan. 19, 1999); *Trombino v. R.J. Reynolds Tobacco Co.,* No. L–11263–98 (N.J.Super.Ct.) (filed Jan. 19, 1999); *Aspinall v. Philip Morris Cos.,* No. 98–6002, 1998 WL 34190483 (Mass.Sup.Ct. Nov. 25, 1998); *Cummis v. Philip Morris Cos.,* No. L–2114–98 (N.J.Super.Ct.) (filed July 9, 1998); *OLIVER V. R.J. REYNOLDS TOBACCO CO.,* No. 268 (Pa.Ct. Com.Pl. Mar. 6, 1998). Results have been mixed.

In several, certification was granted over challenges on the basis of individual causation and reliance. *See, e.g., Aspinall v. Philip Morris Companies, Inc.,* 442 Mass. 381, 392–93, 813 N.E.2d 476 (Mass. 2004) (approving class certification; defendants' common course of conduct predominated over variations in damages; "pragmatically, [a class action] is the only method whereby purchasers of ["light" cigarettes] can seek redress for the alleged deception"); *Curtis v. Philip Morris Companies, Inc.,* No. PI 01–018042, 2004 WL 2776228, at *4 (Minn.Dist.Ct. Nov. 29, 2004) (on reconsideration, granting certification; defendants' deliberately deceptive conduct justified presumption of reliance; as to proof of injury, because " 'it may be unlikely that any individual would smoke a cigarette the exact same way twice[,] ... it is probable that no smoker received the promised benefit of lowered tar and nicotine every time he or

she smoked a ["light"] cigarette'") (quoting *Aspinall*); *Craft v. Philip Morris Companies, Inc.,* No. 002–00406A, 2003 WL 23355745, at *4, 10 (Mo.Cir. Dec. 31, 2003) (compensation by smokers common enough to support certification; variations in damages insufficient to deny certification). In others, questions of individual causation and reliance were found to predominate and render certification inappropriate. *See, e.g., Davies v. Philip Morris USA Inc.,* No. 04-2-08174-2, 2006 WL 1600067, at *3 (Wash.Super. May 26, 2006) (finding that individual causation questions predominated over common questions of defendants' conduct); *Pearson v. Philip Morris, Inc.,* No. 0211–11819, 2006 WL 663004, at *7, 10 (Or.Cir. Feb. 23, 2006) (placing burden on each plaintiff to demonstrate that he or she was not receiving less tar; individual questions predominated because plaintiffs did not present any evidence purporting to prove reliance and causation on classwide basis).

Some of these cases have failed on state law issues irrelevant to the instant suit. *See, e.g., Marrone v. Philip Morris USA, Inc.,* 110 Ohio St.3d 5, 13, 850 N.E.2d 31 (Ohio 2006) (class certification denied; class action only maintainable under state Consumer Sales Practices Act if defendant's alleged violation is "substantially similar to an act that was previously declared to be deceptive"); *Price v. Philip Morris, Inc.,* 219 Ill.2d 182, 196, 265–66, 302 Ill.Dec. 1, 848 N.E.2d 1 (Ill.2005) (consent orders between FTC and two defendants restricting "use of the words 'low,' 'lower,' or 'reduced' or like qualifying terms" with respect to the amount of tar in its cigarettes "specifically authorize[d] all United States tobacco companies to utilize" such terms, including "light," "so long as the descriptive terms are accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content," barring suit under Illinois state statute protecting defendants against consumer fraud actions based on actions "specifically authorized by law administered by any regulatory body or officer acting under statutory authority of this State or the United States"); *Flanagan v. Altria Group, Inc.,* No. 05–71697, 2005 WL 2769010 (E.D.Mich. Oct. 25, 2005) (same under Michigan Consumer Protection Act).

In every case, the class sought was restricted to smokers of particular brands residing within a particular state. *See, e.g., Flanagan* (smokers of Cambridge Lights and Marlboro Lights in Michigan); *Price* (smokers of Cambridge Lights and Marlboro Lights in Illinois); *Aspinall* (smokers of Marlboro Lights in Massachusetts). Yet as shown in Appendix E, *infra,* the National Cancer Institute's 2001 monograph on "light" cigarettes ("Monograph 13"), and Appendix F, *infra,* the Massachusetts Department of Health analysis of increasing nicotine in cigarettes, the alleged frauds and harms were widespread across the industry and the country.

The federal government conducted, at great expense, a civil prosecution under RICO against the defendants named in this suit, who are the dominant members of the tobacco industry. *United States v. Philip Morris,* No. 99–2496 (filed Sept. 22, 1999). Alleging fraud with regards to all cigarettes sold by the defendants, including the "light" cigarettes at issue in this case, it sought disgorgement of the tobacco companies' profits traceable to cigarette sales to addicted youths between 1971 and 2001—an estimated 289 billion dollars—to repay health expenditures the federal government had paid or would pay to treat tobacco-related illnesses. *See United States v. Philip Morris USA, Inc.,* 396 F.3d 1190, 1193 (D.C.Cir.2005). An interlocutory ruling by the Court of Appeals for the District of Columbia rendered dis-

gorgement unavailable under the civil remedy provision relied upon by the government. *Id.* at 1202 (holding that 18 U.S.C. § 1964(a) is limited to prospective remedies, of which disgorgement is not one). The district court then completed the bench trial and held in favor of the government on most claims. It entered an order prohibiting the use of descriptors such as "light," "mild," and "low tar," and enjoining defendants from making misleading statements about their products in the future, *United States v. Philip Morris,* 449 F.Supp.2d at 937 (final judgment and remedial order); directing defendants to issue corrective statements to clear up their prior misrepresentations, *id.* at 938–40; requiring defendants to be more transparent by maintaining document depositories and websites, *id.* at 944; and awarding costs to the government. *Id.* 449 F.Supp.2d at 944–45.

No case has sought, as this one does, a nationwide class to recover economic damages stemming from the alleged "light" cigarette fraud perpetrated by the industry.

## III. Racketeer Influenced and Corrupt Organizations Act

The Racketeer Influenced and Corrupt Organizations Act ("RICO") has strong civil as well as criminal implications. It makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt" or "to conspire to violate" the Act. 18 U.S.C.

§§ 1962(c), 1962(d). RICO defines "racketeering activity" as any act indictable under a list of provisions in title 18 of the United States Code, including sections 1341 and 1343, relating to mail and wire fraud. 18 U.S.C. § 1961(1)(B).

Persons "injured in [their] business or property by reason of a violation of" RICO's criminal provisions may bring a private suit. 18 U.S.C. § 1964(c). If successful, they "shall recover threefold the damages [they] sustain[ ] and the cost of the suit, including a reasonable attorney's fee." *Id.* This civil suit provision, no less than the rest of the RICO statute, is to be "liberally construed to effectuate its remedial purposes." Pub.L. 91–452, § 904(a), 84 Stat. 947 (1970). *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 498, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("The statute's 'remedial purposes' are nowhere more evident than in the provision of a private action for those injured by racketeering activity.").

Dispute over the exact contours of civil RICO is ongoing. *Compare United States v. Philip Morris USA, Inc.,* 396 F.3d 1190, 1197 (D.C.Cir.2005) (disgorgement not a permissible remedy under civil RICO), *with United States v. Carson,* 52 F.3d 1173, 1182 (2d Cir.1995) (disgorgement permissible but only if calibrated to restrain and prevent future conduct), *and Richard v. Hoechst Celanese Chem. Group, Inc.,* 355 F.3d 345, 354–55 (5th Cir.2003) (following *Carson*). *Compare Ideal Steel Supply Corp. v. Anza,* 373 F.3d 251, 262–63 (2d Cir.2004) (reliance by plaintiff or third party on alleged mail or wire fraud is required), *rev'd on other grounds,* —— U.S. ——, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006), *with Systems Management, Inc. v. Loiselle,* 303 F.3d 100, 104 (1st Cir.2002) (reliance not required). No one doubts, however, that the statute relied upon by present plaintiffs provides a

remedy for fraud perpetrated by legitimate businesses on their customers if the customers can establish that the fraud caused them a financial loss. *See, e.g., Kemp v. American Tel. & Tel. Co.,* 393 F.3d 1354, 1360 (11th Cir.2004) (upholding class action jury verdict against phone company for fraudulent billing practices); *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 658–59 (7th Cir.2004) (class of customers could sue tax preparers who were secretly self-dealing); *Moore v. Paine-Webber, Inc.,* 189 F.3d 165, 167 (2d Cir. 1999) (financial services company could be held liable to class for allegedly misrepresenting that its life insurance policies were akin to individual retirement accounts, "thereby tricking [class members] into buying life insurance with funds that they would otherwise have used for IRAs or similar investments").

Civil RICO is akin to a Russian matryoshka doll, with statutes nested inside of statutes. It demands that a plaintiff prove injury stemming from a violation of criminal RICO, which in turn requires proof of a pattern of violations of one or more specific state or federal criminal statutes. As the appellate courts have built specific requirements into the substance of the somewhat vague criminal and civil provisions, each layer has become more complex.

All defendants move for summary judgment on issues of causation, injury, damages, and the statute of limitations. If a motion was granted on any one of these grounds, it would be fatal to the suit. For reasons indicated below, summary judgment is denied.

These motions take aim at the aggregate nature of this litigation. The discussion here sounds themes that will be heard again in the discussion of class certification. *See* Part VII, *infra.*

## A. Violation of Criminal RICO

To sustain a claim under civil RICO, plaintiffs must first prove that defendants violated RICO's criminal provisions. 18 U.S.C. § 1964, *supra.* Plaintiffs here allege injury stemming from a pattern of racketeering activity by defendants (in violation of section 1962(c)) and a conspiracy to commit such activity (in violation of section 1962(d)).

### 1. Conduct of a Racketeering Enterprise (§ 1962(c))

To prove a violation of 1962(c), plaintiffs must demonstrate that defendants conducted or participated in the affairs of an enterprise through a pattern of racketeering activity. *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275.

#### a. Enterprise

An enterprise, as defined in the statute, "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]" 18 U.S.C. § 1961(4). *See also First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159 (2d Cir.2004) (quoting the statute).

A RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The enterprise must be engaged in, or the activities of the enterprise must affect, interstate or foreign commerce. 18 U.S.C. § 1962. *See also First Capital,* 385 F.3d at 173 n. 12. Corporations qualify as persons under the act. *See* 18 U.S.C.

§ 1961(3) (" '[P]erson' includes any individual or entity capable of holding a legal or beneficial interest in property[.]'").

Plaintiffs here allege an association in fact comprised of the named defendant corporations and industry organizations "whereby they coordinated their efforts and conducted their affairs for the past 50 years, with the likelihood of future continuance, in order to achieve the shared goals of preserving and expanding the market for cigarettes and maximizing their profits." Second Amended Complaint ("SAC") ¶ 187.

While denying the accuracy of the factual contentions underlying the claims, defendants do not deny that, if proved, plaintiffs' allegations would demonstrate the existence of an enterprise under the statute.

### b. Conduct

■ A defendant "conduct[s] or participate[s], directly or indirectly, in the conduct of [an] enterprise's affairs," 18 U.S.C. § 1962(c), when it has "some part in directing those affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 179, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). "Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise; but some part in directing the enterprise's affairs is required." *First Capital,* 385 F.3d at 176 (quoting *Reves* ) (alterations omitted).

■ "[O]ne is liable under RICO only if he participated in the operation or management of the enterprise itself." *Id.* (quoting *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 521 (2d Cir.1994)). *See also Reves,* 507 U.S. at 179, 113 S.Ct. 1163 (approving this test). "In this Circuit, the

'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." *First Capital,* 385 F.3d at 176. Whether a defendant operated or managed the affairs of an enterprise is "essentially [a question] of fact." *Id.*

With the exception of BATCo, defendants do not contest that, if true, plaintiffs' allegations would adequately demonstrate that, in a legal sense, defendants had operated or managed the alleged enterprise. *See* Part V.B, *infra.*

### c. Racketeering activity

Racketeering activity is any of a number of violations of state and federal law listed in section 1961(1), including—as alleged in this and many other civil RICO cases— mail and wire fraud in violation of sections 1341 and 1343 of title 18. *See* 18 U.S.C. § 1961(1) (listing offenses); 18 U.S.C. § 1341 (criminalizing use of the mails to "obtain[ ] money or property by means of false or fraudulent pretenses, representations, or promises"); 18 U.S.C. § 1343 (same by way of "wire, radio, or television communication in interstate ... commerce"). Instances of racketeering activity are described as "predicate acts." *See Sedima,* 473 U.S. at 497, 105 S.Ct. 3275.

In relevant part the mail fraud statute reads:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, [or] representations ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be

sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be [guilty of a crime.]

18 U.S.C. § 1341.

In parallel language, the wire fraud provision reads in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be [guilty of a crime.]

18 U.S.C. § 1343.

The Court of Appeals for the Second Circuit has recently approved a simple charge defining a fraudulent "plan, device, or course of action" as follows:

The district court instructed the jury that the phrase "any scheme or artifice to defraud" is defined as:

[A]ny plan, device or course of action that deprives another of money or property by means of false or fraudulent pretenses, representations or promises. It is, in other words, a plan to deprive another of money or property by trick, deceit, deception, swindle or overreaching.

That instruction comports with the Supreme Court's command that the statute be read conjunctively to require that the defendant not only devise a scheme or artifice, but also use that scheme or artifice to obtain money or property. *United States v. Males,* 459 F.3d 154, 157–58 (2d Cir.2006).

Plaintiffs allege that defendants used the mails and interstate communication wires to advertise deceptively, and make misleading public statements about the health risks of, "light" cigarettes, thereby obtaining plaintiffs' money by fraud. There are myriad examples relied upon by plaintiffs of acts violating these statutes. *See* SAC, App. B (non-exclusive list of predicate acts of mail and wire fraud).

### d. Pattern

A civil RICO plaintiff must not only prove that the defendant engaged in acts defined as racketeering in section 1961(1) of title 18, but must also prove that these acts constituted a pattern. To establish such a pattern, a plaintiff must plead and prove at least two section 1961(1) predicate acts, show that the acts are related, and demonstrate that they amount to, or pose a threat of, continuing criminal activity. *See* 18 U.S.C.A. §§ 1961(1), 1962(c); *H.J. Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Economic Opportunity Com'n of Nassau County v. County of Nassau, Inc.,* 47 F.Supp.2d 353 (E.D.N.Y.1999).

Plaintiffs have pleaded nineteen predicate acts of mail and wire fraud. *See* SAC, App. B. Defendants do not contest that, for the purposes of summary judgment and certification, the acts are sufficiently related to each other and the alleged common purpose of defendants to constitute a pattern—or that, if proved, they would demonstrate a threat of continuing racketeering activity. They do not raise the judgment and injunction in *United States v. Philip Morris,* Appendix A, *supra,* as a bar to a finding that there

remains a threat of criminal conduct prohibited by RICO.

### 2. Conspiracy (§ 1962(d))

The conspiracy required is vanilla flavored. Two or more defendant corporations must have agreed explicitly or by implication to act together and commit two related criminal acts. Defendants argue that this provision requires that plaintiffs prove that each conspirator itself agreed to commit two predicate acts. In the seminal case *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), the Supreme Court held that the RICO conspiracy statute does not impose such a requirement. *Id.* at 63, 118 S.Ct. 469. Defendants contend, however, that the *Salinas* standard is limited to criminal cases. Relying on *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244–45 (2d Cir.1999), they submit that, in civil cases, the Court of Appeals for the Second Circuit requires that each defendant agree that he would commit two predicate acts himself.

### a. *Cofacredit*

■ While some language in *Cofacredit* may lend itself to this interpretation, defendants' contention is rejected for several reasons. First, imposing a stricter standard in civil cases is inconsistent with the broad holding of *Salinas* that the RICO conspiracy statute did not change well-established principles of conspiracy law. *See Salinas*, 522 U.S. at 63, 118 S.Ct. 469. Second, neither the Supreme Court nor the Second Circuit have distinguished between RICO conspiracy standards for criminal and civil cases. *See Cofacredit*, 187 F.3d at 244–45. Third, a construction of the standard for civil RICO conspiracy in line with the standard set forth in *Salinas* is supported by subsequent decisions in the Second Circuit and persuasive authority from other circuits. Finally, plaintiffs allege, and there is ample evidence to support, an agreement to take requisite action by each of the defendants. For purposes of a preliminary ruling on certification or summary judgment, plaintiffs satisfy both the narrow and broad readings of RICO's requirement for an agreement to commit two or more predicate acts.

In *Cofacredit*, the defendants were sued on multiple theories, including substantive and conspiracy RICO violations, for their involvement in a scheme to obtain financing from the plaintiffs by presenting sham invoices for factoring. *Cofacredit*, 187 F.3d at 234. The Court of Appeals for the Second Circuit found that there was insufficient evidence that the alleged predicate acts displayed the continuity necessary for a substantive RICO offense, or that the defendants agreed to commit additional predicate acts that, if committed, would have displayed the requisite continuity. *Id.* at 245.

The court applied a two-prong test in reaching this finding. First, a plaintiff must establish that the defendants "agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise." *Id.* at 244 (citing *United States v. Sessa*, 125 F.3d 68, 71 (2d Cir.1997)). Second, a plaintiff must show that if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity. *Id.* at 245 (citing *Salinas*, 522 U.S. at 65, 118 S.Ct. 469).

The case at bar concerns the interpretation of the second clause of the first prong: "they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity." Syntactically, the clause may be understood either as requiring that each

defendant agree that he would commit two predicate acts personally, or that the defendants agreed among themselves that one or some of them would commit two predicate acts. Only the latter interpretation is consistent with Supreme Court precedent, subsequent Court of Appeals for the Second Circuit cases, Second Circuit district courts' applications of the RICO conspiracy provision, and, finally, persuasive authority from other circuits. The fatal defect in plaintiff's claim in *Cofacredit* was that the predicate acts did not extend for a sufficient period to form a pattern of racketeering activity, no matter which defendant had agreed to commit them. *Id.* at 245.

### b. Supreme Court precedent

This reading of *Cofacredit* to ease plaintiffs' burdens accords with the Supreme Court's holding in *Salinas v. United States,* 522 U.S. at 63, 118 S.Ct. 469, that the RICO conspiracy provision does not require that each defendant agree to commit two predicate acts personally. In *Salinas,* the defendant challenged his conviction for RICO conspiracy because the jury had not been instructed that he had to have agreed to commit two predicate acts personally. *Id.* at 61, 118 S.Ct. 469. The Supreme Court rejected that contention on two grounds. First, unlike the general federal conspiracy statute, 18 U.S.C. § 371, which requires that at least one of the conspirators commit an overt act to "effect the object of the conspiracy," section 1962(d) "broadened conspiracy coverage by omitting the requirement of an overt act." *Id.* at 61, 64, 118 S.Ct. 469. Second, the phrase "to conspire" should be interpreted according to well-established principles of conspiracy law, because section 1962(d) "did not ... work the radical change of requiring the Government to prove each conspirator agreed that he

would be the one to commit two predicate acts." *Id.* at 64, 118 S.Ct. 469.

Traditionally, conspiracy requires an agreement between two or more persons to commit an offense and an overt act in furtherance of the object of the conspiracy. *United States v. Falcone,* 311 U.S. 205, 207, 61 S.Ct. 204, 85 L.Ed. 128 (1940). After he has agreed to join the conspiracy, each co-conspirator is liable for the acts of his co-conspirators. *See, e.g., Pinkerton v. U.S.,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) ("[S]o long as the partnership in crime continues, the partners act for each other in carrying it forward. It is settled that an overt act of one partner may be the act of all without any new agreement specifically directed to that act."); *Bannon v. U.S.,* 156 U.S. 464, 469, 15 S.Ct. 467, 39 L.Ed. 494 (1895) ("It has always been ... that, after prima facie evidence of an unlawful combination has been introduced, the act of any one of the co-conspirators in furtherance of such combination may be properly given in evidence against all.").

In accordance with these traditional principles, the Court in *Salinas* held that the RICO conspiracy provision reaches a conspirator who "intend[s] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense[. I]t suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas,* 522 U.S. at 65, 118 S.Ct. 469. The requirement of two predicate acts for a substantive offense under section 1962(c) "makes no difference" in respect to the coverage of the conspiracy provision. *Id.* The Court recognized that some circuits may have required that each defendant agree that he would commit two predicate acts because "in some cases the connection the defendant had to the alleged enterprise or to the conspiracy to further it may be tenu-

ous enough so that his own commission of two predicate acts may become an important part of the Government's case." *Id.* at 65–66, 118 S.Ct. 469. Nonetheless, the Court refused to import such limited considerations into the general definition of RICO conspiracy. *Id.* at 66, 118 S.Ct. 469.

In light of *Salinas, Cofacredit* should not be construed to require that each defendant agree that he would commit two predicate acts. Imposing that requirement would substantially depart from the traditional principle of conspiracy that supporters are liable for the acts of the perpetrators so long as they agree to pursue together the same criminal objective. *See Salinas,* 522 U.S. at 64, 118 S.Ct. 469. Such a departure would be inconsistent with the Supreme Court's understanding that Congress intended to preserve the conventional scope of conspiracy when it enacted the RICO conspiracy provision. *Id.* at 63, 118 S.Ct. 469.

Defendants contend that the standard set forth in *Salinas* is limited to criminal cases. This contention is rejected. If defendants' position were correct, *Cofacredit* would have distinguished its holding from *Salinas* and other criminal cases. The Court of Appeals for the Second Circuit, however, did not distinguish—but rather explicitly relied on—criminal RICO conspiracy cases to establish the standard for RICO conspiracy. *See Cofacredit,* 187 F.3d at 244–45 (citing *Salinas,* 118 S.Ct. at 477, and *United States v. Sessa,* 125 F.3d 68, 71 (2d Cir.1997)). In turn, the passage from *Sessa* relied on in *Cofacredit* quotes from another criminal case, *United States v. Benevento,* 836 F.2d 60, 73 (2d Cir.1987).

The Supreme Court has not indicated that its holding in *Salinas* is limited to criminal cases. In *Beck v. Prupis,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000), a case subsequent to *Salinas,* the Supreme Court rejected petitioner's sug-

gestion that the court should look to civil, rather than criminal, conspiracy to interpret section 1962(d). *Id.* at 501 n. 6, 120 S.Ct. 1608. Citing to *Salinas,* the Court stated that "the common law of criminal conspiracy . . . define[s] what constitutes a violation of § 1962(d)." *Id.See also Smith v. Berg,* 247 F.3d 532, 539 (3d Cir.2001) ("[*Beck's* ] reference to *Salinas* does not in any way repudiate its holding about what constitutes a conspiracy violation or indicate that the violation is different in a civil context . . . .").

The Supreme Court did look to civil conspiracy law, however, for the "combined meaning" of section 1962(d) and section 1964(c), which provides for a private cause of action. *Beck,* 529 U.S. at 501 n. 6, 120 S.Ct. 1608. The Court held that an "injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO . . . is not sufficient to give rise to a cause of action under § 1964(c) for a violation of § 1962(d)." *Id.* at 505, 120 S.Ct. 1608. As the Third Circuit has remarked, the decision in *Beck* "actually limits the class of plaintiffs whose injuries are cognizable; it does not in any way limit the class of defendants who are liable." *Smith,* 247 F.3d at 539 n. 13. Yet, even assuming the civil conspiracy requirement of an injury caused by an overt act indirectly bears on the standard for conspiracy under section 1962(d), it would still not mandate that each particular conspirator agree that he would commit the wrongful act. *See Beck,* 529 U.S. at 506–07, 120 S.Ct. 1608 ("[A] plaintiff could, through a § 1964(c) suit for a violation of § 1962(d) sue co-conspirators who might not themselves have violated one of the substantive provisions of § 1962."). As the Court explained, under the common law, once a conspirator commits a tortious act, then the other co-conspirators are jointly liable. *Id.* at 503, 120 S.Ct. 1608 (conspiracy is a

mechanism for "subjecting co-conspirators to liability when one of their member committed a tortious act"; "some wrongful act to the plaintiff's damage must have been done by one or more of the defendants, and the fact of a conspiracy merely bears on the liability of the various defendants as joint tort-feasors"; conspiracy is "a means for establishing vicarious liability for the underlying tort") (citations omitted).

### c. Subsequent decisions of the Second Circuit and district courts

The jurisprudence of the Second Circuit subsequent to *Cofacredit* also lends no support to defendants' argument. In *Baisch v. Gallina*, 346 F.3d 366, 376–77 (2d Cir.2003), the defendant contended that he was not a proper defendant in substantive and conspiracy RICO claims because he committed no predicate acts, did not operate or manage the enterprise, and his knowledge of fraud was insufficient to support a RICO conspiracy finding. The court rejected his arguments, and, relying on *Salinas*, held that "in the civil context, a plaintiff must allege that the defendant knew about and agreed to facilitate the scheme." *Id.* at 377. Since plaintiff had presented a genuine question as to defendant's knowledge of the racketeering enterprise and his willingness to promote it, summary judgment for defendant was not appropriate. *Id.*

Recent decisions by district courts in the Second Circuit have not required that a defendant agree to the personal commission of two predicate acts in the civil context. *See, e.g., Zito v. Leasecomm Corp.*, No. 02–CIV–8074, 2004 WL 2211650, at *18 (S.D.N.Y. Sept. 30, 2004) ("[I]t is possible to violate § 1962(d) by conspiring with others, even without committing or agreeing to commit any predicate acts oneself."); *Davis Lee Pharmacy, Inc. v. Manhattan Cent. Capital Corp.*, 327 F.Supp.2d

159, 163–64 (E.D.N.Y.2004) ("A plaintiff ... must prove an agreement by each defendant to commit at least two predicate acts," but "[t]he conspirator need not have agreed to commit the two or more predicate acts himself."). *See also State Farm Mutual Auto. Ins. Co. v. CPT Med. Serv., P.C.*, 375 F.Supp.2d 141, 150–51 (E.D.N.Y. 2005) (holding that plaintiff's allegation that defendants provided "support" in furtherance of a pattern of racketeering activity was sufficient under 1962(d), even if plaintiff did not allege that defendants committed two predicate acts themselves).

### d. Other circuits

Persuasive authority from other circuits supports construing the civil standard for a 1962(d) violation analogously to the standard set forth in *Salinas*. The Seventh Circuit has held that "an individual can be charged under § 1962(d) even if he personally does not agree to commit two predicate acts of racketeering." *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir.2001) (citing *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 731 (7th Cir. 1998)). Explaining that the touchstone of 1962(d) liability is an agreement to violate the substantive RICO provisions, rather than an actual violation, the court confirmed that it is enough that "defendant ... agreed that *someone* would commit at least two predicate acts to accomplish [the] goals [of the conspiracy]." *Id.* (emphasis supplied).

The holdings of several circuits on a related issue—whether the reach of the RICO conspiracy statute is limited to those who would have participated in the operation or management of an enterprise—reaffirm the application of *Salinas* to civil cases. In light of *Salinas*, the Court of Appeals for the Third Circuit held that a civil defendant may be held liable for conspiracy to violate section 1962(d) if

he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise. *Smith,* 247 F.3d at 538. The court overruled its prior holding in *United States v. Antar,* 53 F.3d 568 (3d Cir.1995), which limited conspiracy liability to those who had conspired personally to operate or manage the corrupt enterprise. *Smith* at 534. *See also United States v. Fernandez,* 388 F.3d 1199 (9th Cir.2004) (overruling *Neibel v. Trans World Assurance Co.,* 108 F.3d 1123 (9th Cir.1997), on the same grounds). *Smith* held that its prior holding in *Antar* was inconsistent with "the plain indication of the standard set forth in *Salinas* ... that one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate section 1962(c) even if the defendant did not personally agree to do, or conspire with respect to, *any* particular element." *Smith,* 247 F.3d at 537 (emphasis in original). The court explicitly rejected defendants' contention that *Beck* limited *Salinas* to criminal cases. *Id.* at 538–39.

e. Conclusion on conspiracy requirements

Civil liability under RICO does not require that each conspirator agree to the personal commission of any element of the substantive offense—including the personal commission of two predicate acts.

**B. Injury to Property**

*1. Law*

██ A RICO plaintiff "can only recover to the extent that [ ] he has been injured in his business or property by the conduct constituting the violation." *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275. But the statute requires no more than this. Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Those acts are, when committed in the circumstances delineated in § 1962(c), 'an activity which RICO was designed to deter.' Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts. *Id.* at 497, 105 S.Ct. 3275.

██ Money is property under RICO. *See Bankers Trust Co. v. Rhoades,* 741 F.2d 511 (2d Cir.1984), *vacated and remanded on other grounds,* 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985) ("Bankers has alleged that it has been deprived of various sums of money by the defendants' activities. There is no question that this constituted 'injur[y] in [its] business or property...' "). As the Supreme Court has held in the antitrust context, "[I]t taxes the ordinary meaning of common terms to argue ... that a consumer's monetary injury arising directly out of a retail purchase is not comprehended by the natural and usual meaning of the phrase 'business or property.' " *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). The gloss courts have put on the phrase "business or property" in the antitrust context is more restrictive than that put on the phrase in the RICO context. *Compare Sedima* (in RICO suit, no requirement of a distinct "RICO injury") *with Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (in antitrust suit, plaintiffs must plead and prove a distinct "antitrust injury"). A fortiori, if money is property under the antitrust laws, it is property under RICO.

*2. Defendants' Motion for Summary Judgment on Injury*

The challenge to plaintiffs' claim of injury overlaps with defendants' motion to dis-

miss on damages grounds, and is largely discussed at Part III.D, *infra.* Addressed here are two peripheral arguments of defendants that are rejected.

#### a. Proprietary injury

 Defendants contend that plaintiffs have not suffered an injury to their business or property because "light" cigarettes have always cost the same as regular cigarettes, and many, if not all, of the class members would have continued to smoke in the absence of the alleged fraud. These contentions may persuade a jury, but cannot decide the motion for summary judgment.

Defendants rest their challenge on one in-circuit and three out-of-circuit cases. Each, they avow, stands for the proposition that a defrauded plaintiff cannot show injury under RICO if the object he or she received was worth what he or she paid for it. None bars plaintiffs' claims.

In *Commercial Union Assurance Co. v. Milken,* 17 F.3d 608 (2d Cir.1994), the Court of Appeals for the Second Circuit held that plaintiff investors who initially suffered losses stemming from the criminal conduct of Michael Milken and others could not maintain an action under RICO after the full amount of their original investment had been returned to them. 17 F.3d at 611 (noting that appellants had received "114.6 percent of their initial capital investment and they still own their partnership interests"). Because plaintiffs had "received the return actually bargained for, they had suffered no compensable RICO injury." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994) (describing the holding in *Milken* ). Smoker plaintiffs' claim here, to the contrary, is that they did not receive what they bargained for—i.e., a safer cigarette. *Milken* is inapplicable.

In *Heinold v. Perlstein,* 651 F.Supp. 1410 (E.D.Pa.1987), the court dismissed for lack of injury a suit seeking recovery for a lost "bargain opportunity" due to a retailer's representation that a ring was more valuable than it was. *See* 651 F.Supp. at 1411. Critically, the plaintiff conceded that the ring was, in fact, worth more than he had paid. *Id.* The plaintiff sought to recover his expectancy damages, which he defined as the difference between the value that the defendant represented the ring to have and the actual value of the ring. *Id.* The court rejected the plaintiff's position since the only property to which the plaintiff alleged an injury was his expectation interest. "Since plaintiff admits that he either broke even or came out ahead on the deal, albeit not as far ahead as he had hoped, I fail to see what property injury he sustained." *Id. Heinold* is easily distinguishable from the case at hand. Here, plaintiffs allege that they paid *more* than the fair market value of the cigarettes they purchased. It is not only the expectation of a benefit that is the source of plaintiffs' claim, but an actual loss of money: had the truth about "light" cigarettes been revealed earlier, they contend, the market value of these cigarettes would have been lower than the amount they paid. *See* Expert Reports of Dr. Jeffery Harris, Part VIII.F.1.h (under one of plaintiffs' damage models, "an economist assesses, on a per-cigarette basis, the difference between the price paid for the good as represented and the value of the good actually sold"); Dr. John Beyer, Part VIII.F.1.a (another model, using multiple regression, "identifies the extent to which prices of cigarettes were higher as a result of the alleged fraudulent behavior.").

Similarly inapt is *Line v. Astro Manufacturing,* 993 F.Supp. 1033 (E.D.Ky.1998). In *Line,* a putative class of owners of manufactured homes sued the builders to recover for diminution of property value

associated with homes that were subject to an increased risk of injury and death from fires. The court held that the plaintiffs had not alleged a RICO injury because the houses they had purchased were not worth less than what the plaintiffs had paid for them. *See* 993 F.Supp. at 1037 (a plaintiff "did not suffer any injury to business or property because he paid no more than fair market value for a manufactured home without a sprinkler system"). On the record in this suit, the jury may well decide that the cigarettes purchased by plaintiffs were worth less than, and had a fair market value below, what plaintiffs had actually paid.

A third case relied on by defendants, *Frankford Trust Co. v. Advest, Inc.*, 943 F.Supp. 531 (E.D.Pa.1996), is also wide of the mark. *Frankford Trust* found *Heinhold's* limitations—no recovery for harm to an expectation interest—inapplicable in a suit alleging mismanagement of funds and seeking profits that would have been earned had defendants invested wisely. *See* 943 F.Supp. at 535 ("*Heinold* is easily distinguishable from the case at hand."). The district court's holding in *Frankford Trust* that lost profits could be an injury under RICO does not preclude present plaintiffs' claim that they paid more than the fair market value for "light" cigarettes.

That "light" cigarettes did and do cost the same as regular cigarettes may not prevent a finding that plaintiffs paid more than fair market value. Plaintiffs contend that implicit in defendants' marketing was a trade-off between taste and safety. Smokers who chose "light" cigarettes, they claim, understood that flavor would be sacrificed for decreased health risks. *See, e.g.*, Brown & Williamson, "Low 'Tar' Satisfaction, Step 1, Identification of Perceived and Underperceived Consumer Needs," July 25, 1977, Bates No. 775036043–44 ("It must be assumed that

Full Taste smokers come down to 'low tar' expecting less taste ... they are willing to compromise taste expectations for health reassurance."); "Low Tar Brand Market Overview and Lights Review," Nov. 1994, Bates No. 403695152 ("Lights as a descriptor has distinct perception of relating to an expectation of low tar/nicotine delivery with an additional secondary expectation of reduced taste."). Under this view, a "light" cigarette that did not provide any decreased health risk would be worth less than a regular cigarette, even if both were priced the same, because of deficiencies in the latter's taste. Defendants counter that most "light" smokers claim to prefer the taste of "light" cigarettes—suggesting that health risks do not play a major role in the choice to start or continue smoking "lights." Under this view, a smoker who preferred the taste of "light" cigarettes would have no injury even if he or she received no less tar or nicotine than he or she would have from a regular cigarette. *But see* Expert Report of Marvin Goldberg, pp.9–14, excerpted in Part VIII. F.1.g (arguing that defendants' marketing of "light" cigarettes shaped consumer perceptions of taste); *Price*, Appendix C at ¶ 41, *infra* (finding that some smokers' stated preference for the taste of "light" cigarettes "was actually an additional health reassurance reinforcement"). These intricate questions of implicit promises and subjective value are in the jury's bailiwick.

Damage models submitted to the jury will be vetted to conform to the evidence and any jury finding on injury. For example, if the jury were to find that "light" cigarettes were worth what plaintiffs paid, then only damages stemming from sales to those who would have quit, or would have smoked fewer cigarettes but for the fraud, will be permitted. *See* Part III.D.3.a (discussing basis for computation of out of

pocket losses if benefit of the bargain recovery is disallowed).

#### b. Personal injury

Defendants urge that plaintiffs are improperly seeking compensation for increased risk of future personal injury under the cover of economic harm. Plaintiffs respond that the damages they seek are the most direct form of damage envisioned under RICO—money that was taken from them by fraud.

It is not clear that personal injury damages are not recoverable under RICO. *See Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.,* 74 F.Supp.2d 221, 229 (E.D.N.Y.1999) ("The most natural reading of the language in RICO supports the conclusion that pecuniary losses resulting from racketeering and causing personal injuries should be compensable under the statute."); *Guerrero v. Gates,* 110 F.Supp.2d 1287, 1293 (C.D.Cal.2000) (permitting recovery for personal injuries caused by police misconduct; collecting cases). *See also Hargraves v. Capital City Mortg. Corp.,* 140 F.Supp.2d 7, 26 (D.D.C. 2000) (citing *National Asbestos Workers Medical Fund)* (denying motion to dismiss claims seeking damages for emotional or physical injuries). *But see Berg v. First State Ins. Co.,* 915 F.2d 460, 464 (9th Cir. 1990) (personal injuries not compensable under RICO); *Rylewicz v. Beaton Services, Ltd.,* 888 F.2d 1175 (7th Cir.1989) (same).

The Court of Appeals for the Second Circuit has yet to rule on the matter. A prohibition on recovery for personal injuries would not be consonant with the statutory language ("The provisions of this title shall be liberally construed to effectuate its remedial purposes." Pub.L. 91–452, § 904(a), 84 Stat. 947.), or the Supreme Court's admonition that "RICO is to be read broadly." *Sedima,* 473 U.S. at 497,

105 S.Ct. 3275. In any event, plaintiffs here do not seek damages for personal injuries, either directly or indirectly.

Plaintiffs' proposed jury instructions would make this distinction clear. "Damages that are recoverable include, for example, the payment of money, unjust profits, and overcharges. They do not include, for example, claims for personal injury or mental anguish." Pls.' Prop. Jury Inst. 6.

Relying on a footnote from *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation,* defendants also argue that permitting the instant suit to go forward without barring all future suits for personal injury would result in double recovery and double liability. *See* 288 F.3d 1012, 1017 n. 1 (7th Cir.2002) (rejecting certification of nationwide class of consumers seeking damages for reduced value of defective tires). The learned footnote dealing with defects in widgets is of no help in the present case. *Bridgestone* turned on choice-of-law analysis, not double recovery. *See id.* at 1018 (concluding that the applicable state rule of *lex loci delicti* would require utilization of many different state substantive laws, rendering the case unmanageable on a national class action basis). Jurors may take a different view of choices by consumers of cigarettes looking for protection from cancer than they do of choices by purchasers of nonlethal widgets. *Cf.* Joe Nocera, "If It's Good for Philip Morris, Can It Also Be Good for Public Health?", N.Y. Times Magazine, June 18, 2006 (quoting Steve Parrish, Altria's senior vice president for corporate affairs: "We don't make widgets."). No language in RICO evidences concern with the possibility that its rule of recovery might lead to "excess precautions"—a phrase itself somewhat out of place in a suit alleging deliberate, long-term deception about serious public and private health concerns.

For the reasons described in Parts IV.B and IV.C, *infra* (rejecting claim splitting challenge), no double recovery would arise were a plaintiff successful in this suit also to sue for personal injuries stemming from consumption of "light" cigarettes—the claims are distinct and would remedy harms to different proprietary interests.

### 3. Conclusion on Injury

Plaintiffs' theory of injury is legally unobjectionable. It is supported by evidence sufficient to withstand summary judgment.

## C. Causation and Reliance

### 1. Law

To recover under civil RICO, a plaintiff must establish an injury to his business or property "by reason of" the alleged racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) ("[A] plaintiff ... can only recover to the extent that[ ] he has been injured in his business or property by the conduct constituting the violation."); *Bankers Trust Co. v. Rhoades*, 741 F.2d 511, 516 (2d Cir.1984), *vacated and remanded on other grounds*, 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985), *on remand*, 859 F.2d 1096 (2d Cir.1988) ("the requirement that the injury be 'by reason of' a violation of § 1962 means that there must be a causal connection between the prohibited conduct and the plaintiff's proprietary injury. Thus, it is insufficient for a plaintiff to prove simply a violation by the defendants and a proprietary injury; it must prove that the defendant's violation caused the injury."); Douglas E. Abrams, *The Law of Civil RICO* § 3.3.1 (1991) ("[S]ection 1964(c)'s 'by reason of' language requires proof that the violation caused the plaintiff's proprietary injury.").

The "by reason of" language requires both factual, "but for," causation and "proximate" causation. *See Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir.2001) ("RICO's use of the clause 'by reason of' has been held to limit standing to those plaintiffs who allege that the asserted RICO violation was the legal, or proximate, cause of their injury, as well as a logical, or 'but for,' cause.").

#### a. Factual causation

Factual causation is a requirement of every tort. *See generally* Dan B. Dobbs, *The Law of Torts* § 166 (cause in fact requirement). It is commonsensical: if a defendant's action cannot be linked to a harm suffered by plaintiff, he cannot be held liable for it.

#### b. Proximate causation

The term "proximate causation" is used "to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). As it has with identical language in the Clayton Act, *see Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535–6, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court has read a proximate cause requirement into civil RICO. *See Holmes*, 503 U.S. at 268, 112 S.Ct. 1311 ("We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4. It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them. Proximate cause is thus re-

quired.") (citations omitted). *See also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994) (RICO's "by reason of" clause "requires a showing not only that the defendant's alleged RICO violation was the 'but-for' or cause-in-fact of his injury, but also that the violation was the legal or proximate cause.").

Though proximate cause had taken many forms at common law, the issue in *Holmes* was "a demand for some direct relation between the injury asserted and the injurious conduct alleged." *Id.* Little weight was to be put on the Court's terminology. "[O]ur use of the term 'direct' should merely be understood as a reference to the proximate-cause enquiry that is informed by the concerns set out in the text. We do not necessarily use it in the same sense as courts before us have and intimate no opinion on results they reached." *Id.* at 274 n. 20, 112 S.Ct. 1311.

The Court in *Holmes* did not attempt to set out a definitive test for proximate cause. "[T]he infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." *Id.* at 274 n. 20, 112 S.Ct. 1311 (quoting *Associated General Contractors*, 459 U.S. at 536, 103 S.Ct. 897). *See also Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 74 F.Supp.2d 221, 223 (E.D.N.Y.1999) ("[P]roximate causation is a normative, flexible, and highly fact specific doctrine which requires individualized inquiry in each case."); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 42 (5th ed.1984) (proximate cause is "always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent[ ]"). *See also Anza v. Ideal Steel Supply Corp.*, — U.S. —, 126 S.Ct.

1991, 164 L.Ed.2d 720 (2006) (applying *Holmes* as current law).

The Court of Appeals for the Second Circuit has read *Holmes* to imply that the common law torts principles of direct injury, substantial causation, reasonable foreseeability, and the "zone of interests" are "distinct concepts, [each] of which must generally be established by a plaintiff." *Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235–36 (2d Cir.1999). *See also id.* at 238–39 (holding plaintiff health fund's suit barred because its financial losses were wholly derivative of injuries to individual smokers; "the critical question posed ... is whether the damages a plaintiff sustains are derivative of an injury to a third party.").

c. Reliance

i. Reliance is required

■■■ When, as here, mail fraud and wire fraud are the alleged predicate acts forming the racketeering activity, justified reliance on the fraud is necessary to satisfy RICO's causation requirements. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992) ("[T]o establish the required causal connection, the plaintiff [must] ... demonstrate that the defendant's misrepresentations were relied on."). *See also, e.g., Appletree Square I Ltd. v. W.R. Grace & Co.*, 29 F.3d 1283, 1286 (8th Cir.1994) ("In order to establish injury to business or property 'by reason of' a predicate act of mail or wire fraud, a plaintiff must establish detrimental reliance on the alleged fraudulent acts."); *Grantham and Mann, Inc. v. Am. Safety Prods.*, 831 F.2d 596, 606 (6th Cir.1987) (failure to establish detrimental reliance); *In re Sumitomo Copper Litig.*, 995 F.Supp. 451, 458 (S.D.N.Y.1998) ("When the predicate acts [of mail or wire] fraud are alleged, 'to establish the required caus-

al connection, the plaintiff [is] required to demonstrate that the defendant's misrepresentations were relied on.'"). *But see Anza v. Ideal Steel Supply Corp.*, —— U.S. ——, ——, 126 S.Ct. 1991, 2008, 164 L.Ed.2d 720 (2006) (Thomas, J., concurring in part and dissenting in part) (reaching a question not reached by the majority, i.e., whether reliance is required in a civil RICO suit predicated on mail and wire fraud, and concluding that "[b]ecause reliance cannot be read into [the mail or wire fraud statutes], nor into RICO itself, it is not an element of a civil RICO claim").

### ii. Role of reliance

The Court of Appeals for the Second Circuit has not always stated explicitly, when discussing reliance, what purpose it serves. A fair reading of the cases demonstrates that whether reliance, in itself, satisfies both factual and proximate causation depends on whether the reliance is direct or third-party.

### (a) Direct reliance

In cases deriving from predicate acts of mail or wire fraud, plaintiffs may establish reliance sufficient to satisfy RICO's "by reason of" language in one of two ways. First, a plaintiff may "claim that he was the direct target of the fraudulent scheme. In that case, to plead causation, [the] plaintiff would have to allege that he himself relied on the underlying misrepresentations to his detriment." *Sterling Interiors Group, Inc. v. Haworth, Inc.*, No. 94–9216, 1996 WL 537482, at *4 (S.D.N.Y. Sept. 23, 1996). Proof of injury by the intended victim of a scheme is a prototypical example of proximate cause. *See, e.g.*, Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action

in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."). Direct reliance satisfies proximate causation.

### (b) Third-party reliance

As a second possibility, a plaintiff may allege that his injuries were caused by a third party's reliance on fraudulent scheme. *See, e.g., County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1300, 1311 (2d Cir.1990) (permitting plaintiff county and utility ratepayers to sue on theory that defendant utility had testified falsely before the state Public Service Commission, which granted the utility the right to increase rates in reliance on the false testimony). Proof of third-party reliance will not always satisfy RICO's requirement of proximate causation. *See 2 Civil RICO Litigation* § 8.04[B][1][a] ("[I]f the defendant's misrepresentations cause a third party to take actions causing plaintiff's injury, the factual causation link is satisfied. Whether such injury should nevertheless be deemed too remote to permit recovery under [civil RICO] is a matter of proximate causation analysis, not causation-in-fact."). *Cf. Anza v. Ideal Steel Supply Corp.*, —— U.S. ——, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) (proximate cause not met where government agency, not plaintiff, relied on defendant's alleged mail and wire fraud).

### d. Transaction causation and loss causation

The Court of Appeals for the Second Circuit has, in the context of RICO suits alleging fraud in commercial finance transactions, said that plaintiffs must show "transaction causation" and "loss causation." *See, e.g., Moore v. PaineWebber*, 189 F.3d 165 (2d Cir.1999) (plaintiffs alleged that financial service company mis-

represented life insurance policies as Individual Retirement Accounts, causing them to purchase the policies instead of investing their money in more profitable ways); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir.1994) (defendant mortgage broker misrepresented to plaintiff commercial lender the operating income of properties in order to secure loans on those properties, and then defaulted, causing substantial losses); *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489 (2d Cir.1992) (defendants made false representations to lender in order to secure an extension of credit). Defendants contend that the same "transaction causation" and "loss causation" principles apply to the present consumer fraud case, and that plaintiffs cannot meet these requirements.

▪▪▪ The doctrines are inapplicable. Transaction causation would require plaintiffs to demonstrate that, "but for the defendant[s'] wrongful acts, the plaintiffs would not have entered into the transactions that resulted in their losses." *Moore*, 189 F.3d at 172. Loss causation would require that plaintiffs show "that the defendants' misstatements or omissions were the reason the transactions turned out to be losing ones." *Id.* Transaction causation is similar to the factual causation inquiry under reliance, discussed above. Loss causation, in the consumer fraud context, would be nonsensical. If, as defendants aver, plaintiffs here were required to show that the misstatements or omissions "actually caused their economic loss," *see* Tr. of Sept. 13, 2006 Hr'g, at 123:20, they would have to demonstrate that defendants' alleged misrepresentations about "light" cigarettes made those cigarettes worth *less* than plaintiffs paid— i.e., made those purchases "losing ones." But the allegation is not that defendants' fraud itself decreased the value of "light" cigarettes. It is that defendants manufac-

tured an inferior product (because it tasted worse than regular cigarettes and was no safer) and disguised its worth with misleading statements about its reduction of health risks. As with every consumer fraud, it is not the misrepresentation that makes the product worth less than defendant claims. It is the facts behind the lies.

Application of the "transaction causation"-"loss causation" duo would bar all consumer fraud claims under RICO. The law does not so radically reduce consumer protections because of its rules for an entirely different kind of case, one dealing with commercial finance.

### 2. Defendants' Motion for Summary Judgment on Causation

Defendants move for summary judgment on causation grounds. They claim that 1) plaintiffs have made an insufficient showing of reliance and 2) the indirect purchaser rule bars their claims.

#### a. Reliance

The challenge on grounds of insufficient showing of reliance is twofold. It is a challenge, first, to plaintiffs' experts' reports and, second, to the use of aggregate proof on what defendants claim is a set of "individualized" questions. Because the court finds the reports and testimony of plaintiffs' pertinent experts admissible, *see* Part VIII, *infra*, and the use of statistical proof appropriate, *see* Parts VII.D.1.a.ii, VII.D.2.b.i, and IX.A, *infra*, defendants' remonstration is unfounded.

#### i. Plaintiffs' claims of reliance

Plaintiffs allege reliance on the "lights" descriptor appearing on each pack of "light" cigarettes, as well as the sophisticated marketing campaigns of defendants. *See* SAC ¶ 72 ("In furtherance of their fraud and deception, Defendants added the labels "Light" and/or "Lights" to their reg-

ular cigarette brands ... to induce consumer[s] into believing that they would receive lower amounts of tar and nicotine from these cigarettes than from their regular cigarettes ...."); ¶ 115 ("Each advertisement, marketing activity, and public statement regarding light cigarettes was intended to convey a 'health reassurance' to existing and potential smokers."); ¶ 189 ("As a direct and proximate result of Defendants' [conspiracy to misrepresent the health risks of "light" cigarettes], ... Plaintiffs and the Class were induced and/or deceived into purchasing light cigarettes, and were thereby injured in their property."). They also allege reliance on the statements of public health community and government officials, who themselves were misled by defendants and, as a result, did not warn smokers of the risks of "light" cigarettes as soon as they would have had they not been deceived. *See* SAC ¶¶ 149–184 (describing defendants' efforts to suppress research and other documentation that might reveal to the public health authorities and others the risks of "light" cigarettes).

ii. Reliance showing required in this case

██ Though reliance is a requirement for establishing causation where predicate acts based in fraud are alleged, the nature of the reliance is not a constant. Where the fraudulent scheme is limited in scope and specifically targeted at only one or a few individuals, organizations, or entities, the establishment of causation may require reliance on identifiable misrepresentations. *See, e.g., County of Suffolk*, 907 F.2d at 1311 ("*In the context of this case*, which involves RICO mail fraud claims ... it is necessary for Suffolk to demonstrate at trial that LILCO's misrepresentations to the PSC were relied upon by the PSC.") (emphasis supplied). *See also Metromedia*, 983 F.2d at 357 (misrepresentations sent by mail directly to targeted victim). Where, however, the fraudulent scheme is targeted broadly at a large proportion of the American public the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to be designed to distort the entire body of public knowledge rather than to individually mislead millions of people. From the perspective of the fraudulent actors, clear efficiencies are gained by co-opting the media and other outlets of information as unwitting tools for such a pervasive scheme.

If plaintiffs' allegations are borne out, it was crucial to the success of defendants' scheme—particularly the public's willingness to accept the misrepresentations as truths—that the health claims about "light" cigarettes appear to come not only from the defendants themselves, but also to appear as facts, or at least open questions, permeating the entire body of public knowledge. *Cf., e.g., Simon II*, Appendix D, at Part III.B.4, *infra* (it was tobacco industry policy that "reports were to be withheld from the United States Surgeon General" if they implicated cigarettes in causing disease). To require reliance on specific misrepresentations where the concealed and obscured use of indirect channels of communication was integral to the success of the scheme would produce the perverse result of having the most massive and sinister fraudulent schemes be the ones that escape civil RICO liability.

██ Where such a broad-based fraudulent scheme is alleged, a plaintiff in order to establish reliance for injury causation need only establish (1) that the RICO defendants intentionally engaged in a scheme to distort the body of public knowledge, (2) that the defendants were successful in doing so (i.e., were, a sub-

stantial factor causing the distortion), (3) that there was detrimental reliance on this distorted knowledge by an intended and foreseeable class of victims, (4) that such reliance was reasonable in the totality of the circumstances, and (5) that the plaintiffs were proximately injured by this reliance. *Falise v. American Tobacco Co.*, 94 F.Supp.2d 316, 334 (E.D.N.Y.2000).

### iii. Plaintiffs have demonstrated reliance

■ Plaintiffs have met the five *Falise* requirements:

(1) Documents submitted by plaintiffs in this case, experience with like tobacco litigation, the recent opinion after bench trial in *United States v. Philip Morris* (Appendix A, *supra*), the findings of the jury in *Blue Cross* (Appendix B, *supra*), the trial in Illinois state court (Appendix C, *infra*), and the expert reports of Joseph Stiglitz, Robert Pollay, Richard Proctor, and others provide ample evidence of a scheme by defendants to mislead each potential smoker of "light" cigarettes, and the public generally, about the health risks of "light" cigarettes.

(2) While defendants raise FTC and public health community "approval" as defenses, *see* Parts VI.A, VI.C, *infra*, their advertisements and marketing efforts were and are the primary source of information for smokers about defendants' products. *See United States v. Philip Morris*, Appendix A at 449 F.Supp.2d at 513–61, *supra* (detailing marketing efforts). The expert reports of Katherine Kinsella, Marvin Goldberg, Robert Pollay, and others provide evidence on which a rational jury could conclude that defendants' representations were a substantial factor causing plaintiffs' misapprehensions.

(3) Plaintiffs' experts Robert Proctor, K. Michael Cummings, Joel Cohen, and Mi-chael Dennis, among others, provide evidence that "lights" smokers, the class of alleged victims, relied on defendants' misrepresentations, and that they did not receive what was represented—less tar and nicotine or, more generally, a less dangerous cigarette.

Defendants' attack on plaintiffs' failure to produce a single, determinate "reliance number"—the percentage of plaintiffs who relied on defendants', as opposed to any other party's, representations—misconceives the allegations in the case. The survey of plaintiffs' expert John Hauser attempts to fix—within acceptable limits—the percentage of "light" smokers for whom health was a significant contributing factor to the decision to smoke "light" cigarettes. *See* Part VIII.F.1.i, *infra* (finding the survey and Dr. Hauser's opinions based upon it admissible). He concludes, based on his survey, that 90.1 percent of "light" smokers chose their cigarettes based on the desire to reduce health risks.

"Light" cigarettes are an invention of defendants. The true "reliance number" might be expected to closely approximate Dr. Hauser's number, unless there were other sources of information about "light" cigarettes. There is substantial evidence that, beginning in 1971, defendants marketed their "light" brands aggressively—with advertising expenditures out of proportion to their market share—in order to capitalize on anticipated smoker concerns about health. *See* Expert Report of Marvin Goldberg, Part VIII.F.1.g, *infra*. Defendants' representations were thus the primary, (and for many years, the only) source of information about "light" cigarettes. *Accord United States v. Philip Morris*, Appendix A at 449 F.Supp.2d at 898–99, *supra*.

Plaintiffs further claim, with evidence sufficient to withstand summary judgment, that defendants deceived and misled the FTC and public health authorities—the only other possible sources of information about "light" cigarettes. Reliance on those entities' statements, under plaintiffs' view, would in effect be reliance on defendants' statements. This distortion of the collective body of knowledge would have been a critical component of the alleged fraud's success. If this aspect of plaintiffs' claims is proven, Dr. Hauser's number should be very close to the true "reliance number." A jury would be justified in basing a determination of causation on it.

(4) Reliance by many, if not all, of the plaintiffs was reasonable in the totality of the circumstances, particularly given the lack of sophistication on such health matters of many, if not most, smokers, combined with the allegedly voluminous distortions and omissions by defendants concerning the dangers of "light" cigarettes.

Plaintiffs' experts Jeffery Harris, John Beyer, and John Hauser, among others, present admissible reports that provide a basis for a jury determination that plaintiffs suffered compensable economic harms as a result of defendants' alleged fraud. *See* Part VIII.F.1, *infra.*

(5) Compared to previous RICO cases supervised by this and other courts, the proximate cause inquiry here is not complex. It does not involve a medical provider suing in subrogation to recover costs incurred as a consequence of medical injuries suffered by smokers because of defendants' fraudulent conduct, *cf. Blue Cross/ Blue Shield of New Jersey,* 344 F.3d at 218 (overturning jury verdict because plaintiff insurer failed to identify individualized subrogor claims); a trust fund suing to recover monies expended on medical services for smokers misled by tobacco companies about the addictiveness and health risks of cigarettes, *cf. Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 239 (2d Cir.1999) (dismissing complaint because plaintiff trust fund's injuries were "entirely derivative" of union smokers'); or workers or entrepreneurs harmed by a business that hired a large number of undocumented immigrants and paid them poorly—depressing local wages or permitting the business to underbid competitors on public contracts. *See, e.g., Williams v. Mohawk Indus., Inc.,* 411 F.3d 1252, 1261 (11th Cir.2005) (wages); *Trollinger v. Tyson Foods, Inc.,* 370 F.3d 602, 618–9 (6th Cir. 2004) (same); *Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1170–1 (9th Cir.2002) (same); *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,* 271 F.3d 374, 381–5 (2d Cir.2001) (bidding).

Plaintiffs here allege a simple and short chain of causation: defendants represented that "light" cigarettes provided health benefits that they knew these cigarettes did not provide; plaintiffs believed the misrepresentation and so continued to buy "light" cigarettes in larger numbers than they would have absent the fraud; this kept demand for "light" cigarettes at a much higher level than it otherwise would have been; elevated demand allowed defendants to keep prices higher than they otherwise would have; and plaintiffs paid more for "light" cigarettes than they otherwise would have.

Defendants' reliance upon *Ideal Steel Supply Corp. v. Anza* is ill-placed. The plaintiff in *Anza* alleged harm to his business by reason of a competitor's fraudulent submission of false tax claims to state authorities. 126 S.Ct. at 1995. By failing to pay the sums due the state, he alleged, his competitor was able to lower his prices and so attract more customers. *Id.* at 1997. Two discontinuities plagued the suit.

First was the disjuncture between the party allegedly defrauded and the party allegedly harmed. "The cause of [plaintiff's] harms ... is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* "The direct victim of this conduct was the State of New York, not Ideal." *Id.* Second was the "attenuated connection" between the injury and the fraud. Plaintiff's "lost sales could have resulted from factors other than [the competitor's] alleged acts of fraud. Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [plaintiff's] lost sales were the product of National's decreased prices." *Id.*

Plaintiffs here, by contrast, were both the direct target of the fraud and the party injured. Documentary evidence discussed in some detail at Part VIII, *infra*, strongly suggests that the fraudulent "health reassurance" campaign was the central and predominating reason for plaintiffs' choice. Relatively straightforward surveys of consumers are possible—and conducted often by these very defendants—to determine what motivated the choice of "light" cigarettes that would be infeasible in the complex, multifactor business and investment environment. *Cf. Holmes* at 272–273, 112 S.Ct. 1311 ("If the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets.").

As explained by Justice Breyer in his concurrence in part and dissent in part, it was the competitive and antitrust implications of Anza's complaint that mandated a finding of no proximate cause:

In my view, the "antitrust" nature of the treble-damage provision's source, taken together with both RICO's basic objectives and important administrative concerns, implies that a cause is "indirect," i.e., it is not a "proximate cause," if the causal chain from forbidden act to the injury caused a competitor proceeds through a legitimate business's ordinary competitive activity. To use a physical metaphor, ordinary competitive actions undertaken by the defendant competitor cut the direct causal link between the plaintiff competitor's injuries and the forbidden acts.

The basic objective of antitrust law is to encourage the competitive process.

*Anza*, 126 S.Ct. at 2010. Proximate cause boundaries on but-for cause are based on policy decisions designed to prevent undue inhibition of activities society encourages—in *Anza*, competition. No public policy supports drawing the proximate cause limitation to preclude these plaintiffs' suit. They were the persons targeted; they expended their own funds; and they were allegedly damaged by getting less than they paid for, satisfying direct, proximate cause requirements.

*Anza* does not appear to shrink the class of plaintiffs who may sue under the principles set forth in *Holmes*, described *supra*. *See* 126 S.Ct. at 1995 ("Our analysis begins—and, as will become evident, largely ends—with *Holmes*.").

b. Indirect purchaser rule

Defendants do not appear to seriously contend that they had no direct duty to plaintiff smokers, or that they did not have a duty to smokers not to make fraudulent representations regarding the safety of their cigarettes. Nevertheless, they continue to rely upon the non-applicable indirect purchaser rule.

The indirect purchaser rule, or *Illinois Brick* doctrine, precludes an indirect purchaser from suing an antitrust violator for overcharges passed on to the indirect purchaser through intermediaries. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 729, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The doctrine equally applies to RICO actions for treble damages. *See, e.g., Sperber v. Boesky,* 849 F.2d 60, 65 (2d Cir. 1988); *Carter v. Berger,* 777 F.2d 1173 (7th Cir.1985).

Defendants contend that the *Illinois Brick* doctrine bars plaintiffs' claims because plaintiffs seek to recover a portion of the price they allegedly overpaid, and yet they have not bought "light" cigarettes directly from the defendants. Rather, plaintiffs bought from retailers, who bought from wholesalers, who bought from defendants. The gist of defendants' argument is that any injury plaintiffs have suffered is derivative of injury inflicted, in the first instance, upon the wholesalers. In the context of this litigation, the suggestion that the cause of action belongs to the intermediate chain of purchasers in bulk—the wholesaler, the large supermarket corporations, or even the corner grocer—rather than the to the smoker-purchaser to whom defendants' advertising is pitched verges on the bizarre. " 'If the law supposes that,' said Mr. Bumble, 'the law is a ass, a idiot.' " Charles Dickens, *Oliver Twist, in Familiar Quotations* 669b (John Bartlett, ed., 14th ed.1968). But it is not such a bumbler.

Plaintiffs do not contest that they are indirect purchasers within this crabbed definition preferred by defendants. Their submission is that the *Illinois Brick* doctrine does not bar their claims because they are the direct victims and targets of defendants' fraud. First, they point out that the case law does not mandate application of the *Illinois Brick* doctrine in the context of a mail and wire fraud case where the purchasers are the direct victims or intended targets of fraud. Second, they contend that the policy rationale underlying the *Illinois Brick* doctrine—to streamline enforcement by granting full recovery only to the direct victim—does not support divesting direct victims and targets of fraud from a cause of action. Plaintiffs argue that because defendants' fraud was designed to inflate the ultimate purchasers' demand for "light" cigarettes, they are the ones with the "requisite proximity to injury."

The notion of separating the concept of direct victim with that of intended target is not without some basis. *Cf. Associated Gen. Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 537, 540, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (treating the specific intent of antitrust conspirators to target plaintiffs separately from the directness or indirectness of plaintiffs' injury, which relates to the chain of causation between the injury and the unlawful conduct). Although courts have used the term "direct" with some latitude, under Second Circuit precedent, an injury is direct where plaintiff's harm arises from defendant's misrepresentations to the plaintiff and not from an injury to a third party. *See Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 237–39 (2d Cir.1999) (collecting cases).

Analysis requires considering plaintiffs' contention that they are both the direct victims and the intended targets of defendants' fraud. *Illinois Brick* doctrine does not bar plaintiffs' claims under either theory. The cases relied on by defendants do not involve indirect purchasers who are direct victims or intended targets of fraud. Barring plaintiffs' claims would negate the long-standing principle underlying the *Illinois Brick* doctrine that the victim who is

in the best position to uncover violations gets the full recovery. *See Carter,* 777 F.2d at 1176.

#### i. *Illinois Brick*

The *Illinois Brick* doctrine originated in the context of antitrust law. In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Supreme Court rejected an antitrust defendant's claim that the plaintiff buyer did not suffer a cognizable injury because it passed on the illegal overcharges to his customers. In that case, a shoe manufacturer sued a manufacturer and distributor of shoe machinery on the theory that the defendant monopolized the shoe industry through its practice of leasing shoe equipment, instead of selling it. *Id.* at 483–84, 88 S.Ct. 2224. Plaintiff sought to recover the difference between the price of rentals and the amount he would have paid, had defendant been willing to sell the shoe machinery. *Id.* The Supreme Court held that so long as the seller continued to charge the illegal price, the buyer was not barred from recovery even if he had recouped the overcharge by charging higher prices to his customers. *Id.* at 489, 88 S.Ct. 2224.

The Court's first concern was that allowing defendant to assert that plaintiff passed on the overcharges would make it virtually impossible to ascertain how much of the overcharge was passed every time the goods changed hands. *Id.* at 492–93, 88 S.Ct. 2224. Second, allowing the pass-on defense would reduce the effectiveness of treble-damages actions because the buyers of single pairs of shoes would have too tiny a stake to sue, and antitrust violators would retain the fruits of their illegality. *Id.* at 494, 88 S.Ct. 2224.

*Illinois Brick* involved a situation obverse to *Hanover Shoe.* The state of Illinois and local government agencies sued producers of concrete blocks for conspiring to fix prices and alleged that intermediary contractors passed on the overcharge to the government. *Illinois Brick Co.,* 431 U.S. at 735, 97 S.Ct. 2061. The government agencies did not buy the bricks directly from the producers; rather, the producers sold to masonry contractors, who submitted bids to general contractors, who, in turn, submitted bids to the government agencies. *Id.* at 726, 97 S.Ct. 2061. The Supreme Court held that the counties were barred from suing, because giving indirect purchasers standing to sue was inconsistent with the rule of *Hanover Shoe. Id.* at 728–29, 97 S.Ct. 2061. Precluding defendant from asserting that a direct purchaser passed on an alleged overcharge to indirect purchasers, while allowing an indirect purchaser to recover from the defendant would result in multiple liability for the defendant. *Id.* at 730, 97 S.Ct. 2061. Rather than allowing every potentially affected party to sue only for the portion it absorbed, concentrating full recovery in the hands of the direct purchaser would better ensure that violators would not retain the fruits of their illegality. *Id.* at 735, 97 S.Ct. 2061.

The Second Circuit has applied the *Illinois Brick* doctrine in the context of proximate causation in a RICO case. *See Sperber,* 849 F.2d at 65 (holding that investors' injuries were not proximately caused by defendant's acts of insider trading and analogizing the investors to consumers who merely pay higher prices to an intimidated storekeeper). Other circuits have applied the twin holdings of *Hanover Shoe* and *Illinois Brick* to bar both plaintiffs and defendants from asserting the "pass-on" argument in the context of RICO actions for treble damages. *Compare McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842 (3d Cir.1996) (barring suit by indirect purchasers of copies of medical records),

*and Carter,* 777 F.2d at 1173 (barring suit by taxpayers for injuries resulting from defendant's illegal underpayment of taxes), *with County of Oakland v. City of Detroit,* 866 F.2d 839 (6th Cir.1989) (plaintiff counties were not barred from suit notwithstanding that they may have passed overcharges to customers), *and Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.,* 772 F.2d 467 (8th Cir.1985) (property owners association was not barred from suit notwithstanding that it passed costs to its members).

### ii. Inapplicability of *Illinois Brick* Rule

The underlying rationales of *Illinois Brick* doctrine do not support barring plaintiffs' claims. The Supreme Court's concern in *Illinois Brick* that defendants would be exposed to multiple liability if indirect purchasers are allowed to sue is remote or non-existent in the case before the court. Under defendants' interpretation of the *Illinois Brick* doctrine, only the wholesalers would have standing to sue, since they are the ones who bought directly from the defendants. It is questionable, however, whether the wholesalers would have standing to recover, if, as plaintiffs allege, defendants' fraudulent scheme was designed to induce smokers, and not the wholesalers, into buying more "light" cigarettes. *Cf. Abrahams v. Young & Rubicam Inc.,* 79 F.3d 234, 238 (2d Cir.1996) (foreign tourist official who alleged injury to his reputation and business from defendants' scheme to bribe him, which was unbeknownst to him, failed to establish a RICO claim because he was not the target of the enterprise and his injuries did not flow from the harms the predicate acts were intended to cause); *Byrne v. Nezhat, M.D.,* 261 F.3d 1075, 1111–12 (11th Cir. 2001) ("when the alleged predicate act is mail fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepre-

sentations made in furtherance of that scheme") (citations and alteration omitted). *But cf. Terre Du Lac Ass'n,* 772 F.2d at 472 (RICO standing exists even where plaintiff does not allege that it was a target of the racketeering activity). To the extent that the wholesalers do not have standing to sue, defendants do not face a risk of multiple liability if plaintiffs are allowed to sue.

Second, barring plaintiffs' claims would vitiate, rather than enhance, the policy of deterrence underlying the *Illinois Brick* doctrine. As explained by the Seventh Circuit in *Carter,* granting full recovery to a single party rather than spreading recovery amongst all potentially injured parties gives incentive to sue to the person best positioned to uncover violations. *See Carter,* 777 F.2d at 1176. Insofar as defendants' fraud was designed to increase the purchasers' demand for "light" cigarettes, it would be pointless to concentrate full recovery in the hands of the wholesalers. There is no reason to surmise that the wholesalers would be in a better position to uncover fraud committed upon the consumers. If plaintiffs' contentions are correct, the wholesalers stood to gain from defendants' fraud, since it increased total cigarette sales for both producers and wholesalers.

Where the wholesalers have not suffered any injury that might induce them to sue, allowing plaintiffs' claims is the only way to ensure that the defendants will not retain the fruits of illegal practices. Although individual plaintiffs' stakes may be small, *Hanover Shoe,* 392 U.S. at 494, 88 S.Ct. 2224, aggregating their damages in a class action provides adequate incentive to sue.

Defendants rely on the Second Circuit decision in *Sperber,* 849 F.2d at 60, a civil RICO action by investors in six publicly

traded companies against a securities trader who had pled guilty to insider trading. In that case, the plaintiffs alleged that defendant's acts of insider trading violated the wire and mail fraud statutes, and that plaintiffs were injured when the price of the six stocks fell following defendant's plea. *Id.* at 61–62. The court interpreted the allegation to mean that the price of the six stocks was artificially inflated because defendant's success in other stock drove all stocks up by encouraging more people to enter into the market, or that defendant's success attracted a "cult of watchers who bought the stocks he bought," thereby raising the prices only of those stocks. *Id.* at 62, 64. Significantly, plaintiffs did not contend that they were injured from defendant's illegal trading in the six relevant stocks. *Id.* at 64. In addition, plaintiffs did not know that defendant was involved in the stocks that they purchased. *Id.* Citing *Illinois Brick*, the court analogized the investors' situation to consumers, who unaware of any racketeering, pay higher prices to an intimidated storekeeper: "those consumers are further removed from the racketeer than the storekeeper is and probably cannot recover under RICO, just as they cannot recover under the antitrust laws." *Id.* at 65. The court held that the investors' injuries were too remote from defendant's unlawful acts to satisfy proximate cause where the investors "were neither the target of the racketeering enterprise nor the competitors nor the customers of the racketeer," and where the defendant "did not cheat or deceive plaintiffs in any way with regard to the particular stocks in question since they did not know he had purchased them and he did not trade in them illegally." *Id.*

Defendants here contend that the facts of *Sperber* closely parallel the plaintiff smokers' allegations, since the plaintiffs in *Sperber* had similarly alleged that defendants' fraud created the demand for stocks. Defendants' analogy is misplaced. The Second Circuit specifically based its holding in *Sperber* on the fact that plaintiffs were not targets of the racketeering enterprise, and that defendant did not deceive plaintiffs with regard to the relevant stocks. In the case before the court, plaintiffs allege that they were the intended targets of defendants' fraud, and that the defendant manufacturers deceived them into buying "light" cigarettes.

Also distinguishable are the Third Circuit decision in *McCarthy*, 80 F.3d at 842, which barred suit by hospital patients for inflated photocopying charges, and the Seventh Circuit decision in *Carter*, 777 F.2d 1173, which barred suit by taxpayers for injuries derived from defendant's tax fraud upon the county. Plaintiffs in *McCarthy* were patients who asserted both antitrust and RICO violations, alleging that the defendant hospitals and copying services conspired to charge excessive prices for photocopies of their medical records. *McCarthy*, 80 F.3d at 845. In practice, the plaintiffs' attorneys requested the photocopies of their clients' medical records in the course of their representation, after obtaining consent from their clients. *Id.* Defendants billed the attorneys for the requested photocopies. *Id.* The plaintiffs had contingent fee arrangements with the attorneys, and all but one of the plaintiffs had no obligation under their retainer agreements to reimburse the attorneys for photocopying services, unless the attorney obtained monetary recovery in favor of the respective client. *Id.* at 845–46. In these circumstances, the Third Circuit held that the indirect purchaser rule barred plaintiffs' claim, since the attorneys, and not the clients, were direct purchasers of the photocopies. *Id.* at 852. The contingent basis on which attorneys passed on costs to the clients, if any, would have made it too

difficult to ascertain what portions of the costs were borne by the clients. *Id.* at 851.

*McCarthy* is not on point because the plaintiffs were not the direct victims or targets of defendant's unlawful conduct. The patients would have suffered no injury unless their attorneys first obtained monetary recovery in their favor. No allegation was made that the defendant hospitals and copy services induced patients through fraud to request more photocopies of medical records, or that they otherwise targeted the patients. Here, by contrast, plaintiffs have alleged that defendants induced them to buy more "light" cigarettes by falsely representing to them that they would experience reduced health risks from the lower amounts of tar and nicotine in "light" cigarettes.

The *Carter* decision is distinguishable for the same reason. In that case, taxpayers brought a RICO action against a defendant who had previously pled guilty to paying money to county officials to obtain lower tax assessments for his clients. *Carter,* 777 F.2d at 1174. The taxpayers alleged that they had been injured because they had to pay more taxes to make up for the illegal lower assessments. *Id.* The Court of Appeals for the Third Circuit held that the taxpayers did not have standing to sue because their injury was derivative of injury to the county. *Id.* While recognizing that a "fraud committed against one person often injures others," the court stated that "concentrating the entire right to recover in the hands of the directly injured party promotes deterrence," because that person has the best opportunity to uncover a violation. *Id.* at 1174, 1176. While in *Carter* the taxpayers sought to recover for fraud committed against county, plaintiffs in the present case seek to recover for fraud against themselves. They had the best opportunity and motive to uncover the alleged RICO violations and the right to recover properly belongs to them.

Defendants have also relied on three cases which barred RICO defendants from asserting that plaintiffs had no standing to sue because they recouped their losses by passing on the costs to their customers. In the Court of Appeals for the Sixth Circuit case *County of Oakland,* 866 F.2d at 839, plaintiff counties sued the city and the mayor of Detroit under antitrust and RICO theories. *Id.* at 841. The counties' allegation was that the city's charges for sewerage services were inflated because of a price-fixing conspiracy concerning the city's contracts for sludge disposal. *Id.* The district court had held that the counties had suffered no injury in fact because they passed on the costs to municipalities, which in turn passed on the costs to the ultimate consumers. *Id.* The Court of Appeals for the Sixth Circuit reversed, holding that the counties had standing to bring suit, even if they had passed the overcharge down the chain of distribution to the ultimate consumers. *Id.* at 851.

Defendants place great emphasis on the Court of Appeals for the Sixth Circuit's dicta that allowing the defendants to assert the pass-on argument would have transformed the case into a massive class action by the end users and would have presented "enormous evidentiary complexities and uncertainties" in determining each class member's damages. *Id.* at 850 (citations omitted). Notwithstanding these rationales, *County of Oakland* did not involve a situation where defendant specifically targeted the end users or manipulated demand for sewerage services. The court's holding cannot be extended to a situation where defendants' fraud directly manipulated the end users' demand for "light" cigarettes. The public interest in deterring RICO violators by granting rem-

edies to those in the best position to uncover violations outweighs the evidentiary problems of apportioning damages among the class members.

Defendants cite the decision in *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 138 F.Supp.2d 357 (E.D.N.Y.2001). In *Blue Cross*, plaintiff insurer asserted a subrogation claim against cigarette manufacturers on the theory that defendants' deceptions about the adverse health effects of tobacco caused plaintiff's subscribers to incur medical costs, which plaintiff paid. *Id.* at 360, 363. The court rejected defendants' claim that the plaintiff insurance company did not suffer any injury because it passed on the increased health care costs to its subscribers. *Id.* at 360, 363–64. In rejecting the pass-on defense, the court emphasized that plaintiff's "subrogated action [was] not predicated on the idea that costs may have been passed on to its insured in higher premiums," but was an "independent action in which equitable principles are applied to shift [the] loss to the one who caused [it]." *Id.* at 363.

Defendants in the present case erroneously claim that *Blue Cross* held that only the direct purchaser can be properly regarded as the damaged party. The plaintiff insurance company in *Blue Cross* was not a purchaser of tobacco, let alone a direct purchaser. Furthermore, plaintiff in *Blue Cross* did not assert a direct RICO claim against defendants in its own right, but rather asserted the rights of its subrogors. *Blue Cross*, therefore, merely stands for the proposition that insurance subscribers who were injured by paying higher premiums because of tobacco manufacturers' deceptions had the right to recover.

Defendants here directed their marketing and advertising directly at plaintiff smokers. The smokers' injury is not de-

rivative of injury to the wholesalers. *Illinois Brick* does not bar the suit.

### *3. Conclusion on Causation*

Plaintiffs' theory of causation is sound. Their supporting evidence is sufficient to withstand a motion for summary judgment.

### D. Computation of Total Damages

This section covers computation of total damages. Distribution of damages through the "fluid recovery" system is covered in Part IX.B, *infra.* Allocation among defendants is dealt with in Part IX.C, *infra.*

Damages recoverable under RICO are equivalent to the injury suffered, trebled. *See* 18 U.S.C. § 1964(c). Defendants contend that, even if plaintiffs could prove that defendants intentionally misrepresented the health risks of "light" cigarettes, plaintiffs cannot demonstrate that class members suffered compensable damages. Because plaintiffs have offered two methods of calculating class damages that comport with defendants' rights and *Daubert* requirements, the contention is rejected.

Plaintiffs' models for determining loss to the misled purchasers of "lights" come well within the legal boundaries of damages for deceit. As McCormick stated it in his old, but still classic treatise:

As to the measure of damages in deceit, two rules have been adopted in different jurisdictions: (1) The federal rule, followed in a few states, allows the person defrauded to recover the difference between the value of what the plaintiff has parted with and the value of what he has received in the transaction; (2) the majority rule, following the analogy of the measure in actions in contract for breach of warranty, allows recovery of the difference between the actual value

of what the plaintiff received and the value which it would have had if it had been as represented. The first may be termed the "out-of-pocket loss" rule, and the second, the "loss of bargain" rule. Charles T. McCormick, *Handbook on the Law of Damages* 448 (1935). *See* Part III.D.2.a, *infra.*

A certain degree of flexibility in computing damages is allowed, whatever the purist's view of the applicable of damage law. Even, for example, in condemnations cases, where there is a fairly clear rule that market value is determined by what willing sellers and buyers would pay for comparable properties, the special value to the owner—here, the cigarette purchaser—will be considered. *See, e.g.,* Lewis Orgel, *Valuation Under the Law of Eminent Domain* § 43 (2d ed.1953) (value to owner may influence estimate of "fair market value").

### 1. Plaintiffs' Models

Plaintiffs have offered, as possible measures of the injury they have suffered, models based on profit disgorgement, price impact, loss of value, and loss of market. Defendants challenge the admissibility of the profits disgorgement and price impact models on *Daubert* grounds. In an earlier memorandum and order, this court granted defendants' motion to exclude the profits disgorgement model entirely and the price impact model in its initial form. *See Schwab v. Philip Morris USA, Inc.,* 2005 WL 2401647 (E.D.N.Y. Sept. 29, 2005). Defendants make no motion to exclude the loss of value and loss of market models, but contend that neither demonstrates harms compensable under RICO.

### a. "Loss of market" model

The "loss of market" model is based primarily on the expert report of Dr. Jeffery Harris. *See* Part VIII.F.1.h, *infra.*

It asks whether, were it not for defendants' alleged fraudulent conduct, the market for "light" cigarettes would have existed. Based on responses by consumers in sample surveys and the significant costs that defendants incurred setting up, marketing, and manufacturing "light" cigarettes, Dr. Harris concludes that smokers who were aware of the true nature of "light" cigarettes would not have been willing to purchase them at a price high enough to earn defendants a profit—and so the market would not have existed at all. Damages under the loss of market model would be equal to the full purchase price of all "light" cigarettes sold during the class period in the covered areas. This is a restitutionary measure of damages. It is inconsistent with the facts that show some smokers would have continued to smoke "light" cigarettes because of their addiction or for other reasons. Nevertheless, the effect of the fraud on the "lights" market price can be considered in determining loss of value ("b," *infra*) and price impact ("c," *infra*).

Recovery under civil RICO is limited "to the extent that [a plaintiff] has been injured in his business or property." *Sedima, S.P.R.L., v. Imrex Co., Inc.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). This court has previously ruled that disgorgement of profits would represent an inappropriate measure of damages in this RICO suit. *See Schwab v. Philip Morris USA, Inc.,* 2005 WL 2303821 (E.D.N.Y. Sept. 22, 2005).

### b. "Loss of value" model

The "loss of value" model relies on sample surveys that asked smokers to compare their willingness to pay for "light" cigarettes that reduced health risks and "light" cigarettes that were no less harmful than regular cigarettes. Based on these responses, plaintiffs' expert Dr. Har-

ris estimated a loss in value of 77.7 percent if the "light" cigarettes sold by defendants were as harmful as regular cigarettes, and 92.3 percent if they were potentially more harmful. The *Price* court used this model to award damages. *See* Appendix C at ¶ 90, *infra.* As defendants aver and plaintiffs concede, this is a "benefit of the bargain" measure of damages.

### c. "Price impact" model

The "price impact" model uses a multiple regression analysis to determine the impact of the defendants' alleged fraud on the price of "light" cigarettes. It measures the impact of defendants' alleged fraud on the market price for "light" cigarettes. This model identifies a number of variables that might reasonably affect demand for defendants' products, including rates of cigarette consumption, income levels of smokers, population, taxes, advertising expenditures, production costs, and plaintiffs' knowledge of health risks. The model yields overcharge estimates for 5-year periods between 1972 and 1998.

Though this court excluded the "price impact" model in its initial form, it granted leave to adjust the model to meet the reliability requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The revised model is admissible. *See* Part VIII.F.1.a, *infra.*

### 2. Law

The laws governing RICO, securities fraud, and antitrust are all potentially relevant to the determination of the appropriate measure of damages in this suit.

### a. Practice under common law

The common law of fraud and deceit may provide guidance in determining damages. Theories of fraud damages, like other tort theories, seek to restore the plaintiff to the position he or she occupied before the tort was committed. There are two common measures of damages for fraud: "benefit of the bargain" and "out of pocket loss." Both measures purport to make the plaintiff whole, but differ in their approach to remedying the fraud. The benefit of the bargain model attempts to place the plaintiff in the position he or she would have been in had the representations been true. The out of pocket measure attempts to indemnify him or her; it restores the plaintiff to the position he or she would have been in had there been no representation and transaction at all. It is a remedy "by the balance sheet." *See* James M. Fischer, *Understanding Remedies* 503 (1999).

A majority of state courts applies the "benefit of the bargain" measure in fraud actions. Under this measure, a plaintiff is entitled to the difference between the value of the object or service received and the value of the object or service as represented. *See* Victor F. Schwartz et al., *Prosser, Wade and Scwhartz's Torts* 1063 (10th ed. 2000) ("The 'benefit-of-the-bargain' rule has been adopted by about two-thirds of the American courts that have considered the question."); 2 Dan B. Dobbs, *Law of Remedies* 551 (2d ed. 1993) ("The loss of bargain measure in some form has been used in most states, at least when the fraud is intentional ...."); Robert L. Dunn, *Recovery of Damages for Fraud* 28 (3d ed. 2004) ("[B]enefit-of-the-bargain is the 'majority rule.'"); McCormick, *Law of Damages* 448, *supra.* A minority of state courts applies the "out of pocket" measure. Under this measure, plaintiffs are entitled to the difference between the value of the object or service received and the amount paid. *See, e.g.,* McCormick, *supra.*

"Of the two measures the 'out-of-pocket' rule has been termed more consistent with

the logic and purpose of the tort form of action (i.e., compensation for loss sustained rather than satisfaction of contractual expectations) while the 'benefit-of-the-bargain' rule has been observed to be a more effective deterrent (in that it contemplates an award even when the property received has a value equal to what was given for it)." *Stout v. Turney,* 22 Cal.3d 718, 725, 150 Cal.Rptr. 637, 586 P.2d 1228 (1978). The basic argument against the benefit of the bargain rule is theoretical inconsistency: tort law remedies should be retrospective, because they seek to undo harm, not make good on a promise.

The out-of-pocket rule has been criticized by a majority of jurisdictions for providing insufficient deterrence of fraudulent activities. Courts following the benefit of the bargain rule have urged its social utility, arguing that under the out of pocket rule, the wrongdoer is insured against loss from his wrongful act, since at most he will be required to sell the property in question at its actual value. *See, e.g., United States v. Ben Grunstein & Sons Co.,* 137 F.Supp. 197 (1955); *Fleet Nat'l Bank v. Anchor Media Television, Inc.,* 45 F.3d 546 (1st Cir.1995). Under the benefit of the bargain rule, by contrast, a merchant who commits fraud may be held to the value of what a good or service would have been worth if it had been as represented. *See, e.g., Wilhoite v. Franklin,* 570 So.2d 1236 (Ala.App.1990) (determining fraud damages based on what a misrepresented automobile would have been worth as represented, not as it actually was). Courts have not shied away from the inherent windfall that the benefit of the bargain rule gives successful plaintiffs. *See, e.g., Carrel v. Lux,* 101 Ariz. 430, 441, 420 P.2d 564 (1966) ("[I]f plaintiffs can satisfy a jury that they were defrauded by defendants, and that as a result of such fraud there was a difference of $25,000 between the value of the property they purchased had it been as represented and as it actually was, plaintiffs would be entitled to recover that sum as damages. The fact that plaintiffs may have negotiated a very advantageous purchase price ... should have no bearing on their right to recover damages for fraud.").

The out of pocket and benefit of the bargain rules often produce the same result. *Dunn, supra,* 63. The rules diverge only when the value of the property as represented is greater than the price paid. "The courts then face a policy determination: Is the defrauded purchaser to be given the benefit of the 'bargain' the purchaser thought he or she had?" *Id.* Some states have adopted a more flexible rule, which permits the court to use either the out of pocket or the benefit of the bargain rule, based upon which will more appropriately compensate the defrauded party. *See, e.g., Aerotech Res., Inc. v. Dodson Aviation, Inc.,* 191 F.Supp.2d 1209 (D.Kan. 2002) (applying Florida law); *Gardner v. Rosecliff Realty Co.,* 41 N.J.Super. 1, 124 A.2d 30 (1956).

■ In the instant suit, only benefit of the bargain damages would provide sufficient deterrence for the type of widespread, long-term fraud alleged—the aim of RICO's civil damages provision. *See Rotella v. Wood,* 528 U.S. 549, 557, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) ("The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity."). Plaintiffs are not limited to their out of pocket losses.

b. Practice under securities law

The law of recovery in securities fraud actions is the largest body of federal fraud damages law. It often involves mail and wire fraud similar to that alleged in the

present case. Recourse to it is appropriate to discover guiding principles of federal remedies for fraud.

The Securities Act of 1933 and the Securities Exchange Act of 1934 contain several explicit rights of action for parties injured by fraudulent statements made in connection with the sale or purchase of securities. *See* Securities Act of 1933 §§ 11(e), 12(a), 15 U.S.C. §§ 77k(e), 77l(a); Securities Exchange Act of 1934 §§ 9(e), 18(a), 15 U.S.C. §§ 78i(e), 78r(a).

### i. 1933 Act

Damages under the 1933 Act are limited by statutory language to the difference between the purchase price of the security and the value of the security at one of several later dates (time of sale before suit, time of suit, or time of sale after suit but before judgment), or the cost of purchase, plus interest and less any income earned. *See* 1933 Act, *supra.* These measures are "out-of-pocket" measures; they award the plaintiff the difference between the sum he expended and the value he received. RICO does not contain a similar limitation.

### ii. 1934 Act

The 1934 Act's explicit statement of the relevant rights of action are, like RICO, phrased generically. *See* 1934 Act §§ 9(e) (permitting plaintiff "to recover the damages sustained as a result of any ... act or transaction" manipulating the price of securities), 18(a) (permitting plaintiff to recover "damages caused by ... reliance" on misleading statements). They are of greater use in considering the appropriate measure of damages in a RICO case. The Supreme Court has recognized *implied* private rights of action for fraud under sections 10 and 14 of the 1934 Act and SEC Rule 10b–5. *See* 1934 Act §§ 14(a), 14(e); 17 C.F.R. §§ 240.10b–5, 240.14a–9.

### (a) Explicit rights of action

Case law on the topic is scant but suggests that either measure of damages may be appropriate pursuant to the explicit right of action under section 9 of the 1934 Act. *See Sarlie v. E.L. Bruce Co.,* 265 F.Supp. 371, 375–76 (S.D.N.Y.1967) (describing "the difference between the prices at which [plaintiff] purchased the stock and the prices at which [plaintiff] would have purchased the stock in an unmanipulated market" as the "customary measure" under section 9 but applying out-of-pocket loss as an "alternative measure" on the facts).

This court has been unable to find a reported decision that throws light on the appropriate measure of damages for the explicit right of action under section 18(a) of the 1934 Act.

### (b) Implied rights of action

Section 28(a) of the 1934 Act governs damages under rights of action implied from the 1934 Act. It prohibits recovery under its provisions "in excess of ... actual damages on account of the act complained of." 1934 Act § 28(a). The Court of Appeals for the Second Circuit has ruled that the "actual damages" limit of section 28(a) applies to the implied rights of action under the 1934 Act. *See Green v. Wolf Corp.,* 406 F.2d 291, 302 (2d Cir. 1968). This has not prevented it from applying a benefit-of-the-bargain measure of damages in appropriate situations. *See Wilson v. Great Am. Indus., Inc.,* 979 F.2d 924, 932–33 (2d Cir.1992) ("The benefit of the bargain rule ... is the appropriate measure of damages in this matter."); *Osofsky v. Zipf,* 645 F.2d 107, 114 ("We believe that the benefit-of-the-bargain rule should be applied under the 1934 Act to the limited situation involved in this case ...."). *See also Wilson,* 979 F.2d at 933

(describing this measure as necessary "to place plaintiffs in substantially the same position they would have occupied absent the fraud").

The Supreme Court has noted that either measure of damages may be appropriate depending on the facts of a particular case. *See Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 388–89, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) (discussing situations in proxy fraud cases that might justify one measure or the other). The Court has also contemplated recoveries under the 1934 Act greater than either the benefit-of-the-bargain or out-of-pocket measures would afford. *See Randall v. Loftsgaarden,* 478 U.S. 647, 661–2, 106 S.Ct. 3143, 3152, 92 L.Ed.2d 525 (1986) ("the mere fact that the receipt of tax benefits, plus a full recovery under a rescissory measure of damages, may place a § 10(b) plaintiff in a better position than he would have been in absent the fraud, does not establish that the flexible limits of § 28(a) have been exceeded."); *Affiliated Ute Citizens of Utah v. U.S.,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972) ("the correct measure of damages under [§ ] 28 of the Act is the difference between the fair value of all that the ... seller received and the fair value of what he would have received had there been no fraudulent conduct, except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit.") (citations omitted). In short, though recovery under the implied rights of action under the 1934 Act is limited to "actual damages," any one of several measures may be appropriate under the specific circumstances of the suit at issue. "These questions, of course, are for decision in the first instance by the District Court ... [. O]ur singling out of some of the possibilities is not intended to exclude others." *Mills,* 396 U.S. at 389, 90 S.Ct. 616.

### c. Practice under antitrust law

Antitrust law may be relevant to a consideration of the appropriate measure of damages in a RICO suit because the private suit provision of RICO was based on the Clayton Act. *Compare* 15 U.S.C. § 15(a) ("any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.") *with* 18 U.S.C. § 1964(c) ("[a]ny person injured in his business or property by reason of a violation of section 1962 of [chapter 18] may sue therefor ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee ....."). *See Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 151, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ("The clearest current in the legislative history of RICO is the reliance on the Clayton Act model." (citation omitted)). Though the antitrust laws address different underlying causes of action than RICO, they share common problems of estimation.

Antitrust remedies require that courts estimate the amount of damages attributable to a defendant's unlawful actions. This can never be done with absolute precision.

> Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.

*J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981).

The impossibility of determining precisely how much damage is attributable to an antitrust defendant's actions has led the Supreme Court to sanction the use of estimates. "[W]hile the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). *See generally* C. Douglas Floyd & E. Thomas Sullivan, *Private Antitrust Actions* 995 ff. (1996).

These estimates are often based on hypothetical, or counterfactual, situations—e.g., what would the market have been like but for the antitrust violation? Courts have permitted recovery for increased costs, lost profits, and a reduction in the value of a business as a consequence of antitrust violations using a variety of measures. The increased cost suits stemming from price fixing are somewhat similar to the allegations in the instant suit. The measures of damages used there are pertinent to the determination here.

In a price fixing case, the plaintiffs allege that they have incurred excess costs because of collusion by defendants. If injury is proven, damages will be awarded in the amount the plaintiffs paid over a hypothetical "reasonable rate." *Thomsen v. Cayser,* 243 U.S. 66, 88, 37 S.Ct. 353, 360, 61 L.Ed. 597 (1917). Courts have approved "pre-post," "yardstick," economic model, and cost measurement approaches, based on the facts of the particular case. *See generally* Floyd & Sullivan at 999–1000.

The "pre-post" (or "before and after") method of calculating damages has been utilized in cases of horizontal price fixing. This test compares pricing levels prior to the impact of the violation with pricing levels subsequent to it. *See, e.g., Gaines v. Carrollton Tobacco Board of Trade, Inc.,* 496 F.2d 284, 286 (6th Cir.1974) ("detailed comparisons of the sales of the [plaintiff] in the two years operated [during period of alleged antitrust violation] to subsequent years operated without them ... serve to demonstrate damages and may be used to compute same"). The pricing data is used to determine the respective pricing variance between the prices that prevailed in the affected market and the prices that would have prevailed in a market unrestrained by the defendant. *See, e.g., American Crystal Sugar Co. v. Mandeville Island Farms,* 195 F.2d 622 (9th Cir.), *cert. denied,* 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952) (in case alleging price fixing conspiracy among agricultural product buyers, appropriate measure of damages was difference between the price at which plaintiffs sold their products and the higher price they would have received had the conspiracy not existed).

The yardstick test has been utilized in horizontal, as well as vertical, price fixing cases. This test compares pricing information from the affected market with pricing data from markets that have not been affected by defendant's antitrust violations. These figures are then used to calculate a price differential from which a reasonable market rate can be determined. *See, e.g., Phillips v. Crown Central Petroleum Corp.,* 426 F.Supp. 1156 (D.Md.1977) (four independent gasoline service station dealers sued their supplier alleging both horizontal and vertical price fixing; in proving their damages, plaintiffs compared the wholesale prices charged by the defendant with the wholesale prices prevailing in areas unaffected by the defendant's antitrust violations). This test is generally used by

a plaintiff who is driven out of business by an antitrust violation before the plaintiff is able to compile a sufficient earnings record allowing the estimation of lost profits.

The economic model approach has also been utilized in price fixing cases. Under this approach expert witnesses introduce economic models that correlate numerous factors and their corresponding effect on pricing levels. Courts have allowed plaintiffs to use this method in cases where the expert testimony has a rational basis in the record. *See, e.g., Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 668 (5th. Cir.1974) (holding that experts' damage estimates may be indirect and may include estimates based on assumptions, so long as the assumptions rest on adequate data).

A fourth method of calculating damages in antitrust price fixing cases has also been utilized, the cost measurement approach. While the "pre-post," yardstick, and economic model approaches emphasis price comparisons, the cost measurement approach uses the defendant's profit and cost data as evidence of the plaintiff's damages. Under the cost measurement approach the plaintiff must prove damages by establishing a competitive profit level and the amount by which the defendant's profits exceeded this level during the period of alleged price fixing. The plaintiff can prove this by using one of two profit theories: (1) a historical analysis of the defendant's profits over time or (2) a comparison of the defendants' profit rates with those of "competitive industries." *See* Floyd & Sullivan at 1002.

This diversity of approaches demonstrates courts' willingness to confront difficulties of proof with practicable solutions. Without deciding the precise measure of damages computation that will be presented to the jury, it is apparent that there is sufficient basis in the evidence to support a variety of appropriate definitions.

*3. Application of Law to Facts*

Recovery in civil RICO fraud cases is highly fact-specific. "Because of the wide range of predicate acts and possible enterprises and plaintiffs, it is not feasible to set forth a general list of items normally recoverable under civil RICO." 4 L. Sand et al., Modern Federal Jury Instructions 84–70 (2003).

a. Appropriate measure

Facing the question of appropriate damages in state "lights" fraud litigation, courts have applied the benefit of the bargain rule. *See Craft,* 2003 WL 23139381, at *9 (denying defendants' motion for summary judgment on damages; the "[p]laintiff has a very plausible chance of proving [ ] ascertainable losses and damage"); *Aspinall,* 442 Mass. at 399, 813 N.E.2d 476 (" '[B]enefit of the bargain' damages, if proved with reasonable certainty, would be appropriate in this case."). As the court pointed out in *Craft,* defendants' theoretical objections to plaintiffs' "loss of value" model of damages are contravened by common sense.

> [L]ogic and reason suggest that a true low-tar, low-nicotine cigarette very probably would have had an economic worth and value greater (perhaps even considerably greater) than a comparable non-low tar, low nicotine cigarette, due to the health reassurance factor—due to the added value that would be inherent in a less toxic, less harmful, "safer" cigarette. Although the added monetary value of this health factor may be somewhat difficult to measure, and the methods or models for making such calculations might be somewhat complicated or require expert testimony, the Court nonetheless believes that the likelihood of such added value if the cigarettes had truly been as represented is still there.

If so, this is precisely the type of lost "gain" or benefit that the benefit-of-the-bargain rule was designed to allow recovery for.

2003 WL 23139381 at *9 (footnote omitted).

The benefit of the bargain model prevents a windfall to the wrongdoer who has mulcted a consumer, but not in an amount greater than the actual value of the product. "To allow for the plaintiff ... only the difference between the real value of the property and the price which he was induced to pay for it would be to make any advantage lawfully secured to the innocent purchaser inure to the benefit of the wrongdoer." *Craft*, 2003 WL 23139381, at *7 (quoting *Kendrick v. Ryus*, 225 Mo. 150, 123 S.W. 937, 940 (1909)). Under the out of pocket measure, a merchant who deliberately deceived a customer by representing that a widget that in fact was worth only $2 had special characteristics, making it appear to be worth $3, and selling him that widget for $2, would be immune from liability. Defendants' out of pocket theory overlooks the importance of the deceit to the smokers' decision to enter into the transaction at all.

> But for the fact that the purchaser thought he was getting a bargain, he might not have made the contract at all. If by fraud and deceit he is induced to believe that he is contracting for a benefit or a bargain, and not merely swapping dollars, why should not the benefits of the bargain be an element in the measure of damages in an action for fraud and deceit? Such benefit would be a matter fully contemplated by both parties. By the purchaser, because, as a rule, trades are not made for the purpose of merely exchanging dollars. By the seller, because he would not falsely represent the character of the property save and except to induce the purchaser

> to believe that he was procuring a benefit of bargain.

*Kendrick v. Ryus*, 123 S.W. at 940 (quoted in *Craft* at *7).

Inducement to contract is particularly important in this case, where plaintiffs have argued with force that defendants deceived smokers about the health risks of "light" cigarettes in order to prevent those active smokers who were worried about their health from quitting and to encourage health-conscious prospective smokers to start. "Light" cigarettes now make up almost fifty percent of the overall market for cigarettes. On the record before the court, a jury could reasonably find that plaintiffs were fraudulently induced to purchase "light" cigarettes (i.e., enter the contract) by defendants' misrepresentations about the health risks of those cigarettes. In the instant case, the benefit of the bargain models proposed by plaintiffs are valid measures of damages suffered.

Contrary to defendants' contentions, the holding in *Milken*, 17 F.3d 608 (discussed in Part III.B.2.a, *supra*) does not require a different result. The Court of Appeals for the Second Circuit's statement that "damages as compensation under RICO ... must, under the familiar rule of law, place [plaintiffs] in the same position they would have been in but for the illegal conduct[,]" *Id.* at 612, is a restatement of the goal of all tort damages. As explained in Part III.D.2.a, *supra*, both the benefit of the bargain and out of pocket models "seek to restore the plaintiff to the position he or she occupied before the tort was committed.... Both measures purport to make the plaintiff whole, but differ in their approach to remedying the fraud. The benefit of the bargain model attempts to place the plaintiff in the position he or she would have been in had the representations been true. The out of pocket measure attempts to indemnify him or her; it

restores the plaintiff to the position he or she would have been in had there been no representation and transaction at all." In either case, the plaintiff is restored to the position he would have been in "but for" the illegal conduct.

Because application of the "transaction causation"-"loss causation" rule is rejected in this case, *see* Part III.C.1.d, supra, the suggestion in the cases using that rule that plaintiffs would be limited to out of pocket damages is of limited utility.

If the benefit of the bargain measures were held to be improper, the jury could be charged to consider only out of pocket losses, which would be based upon the number of packs of cigarettes purchased by smokers who would otherwise have quit and the number of excess cigarettes smoked by those who compensated on a per-day, rather than exclusively per-cigarette, basis. There is evidence to support a calculation of damages due to these factors. *See, e.g.,* Part VIII.H, *infra* (discussing evidence of effect of "lights" marketing on smoking quit and initiation rates); Neal Benowitz, "Compensatory Smoking of Low–Yield Cigarettes," in Monograph 13 (in portion of chapter not appearing in Appendix E, surveying studies showing cigarette consumption increases with switch to lower yield cigarettes). If necessary, additional time would be permitted to develop out of pocket losses for trial.

b. Degree of precision required

Defendants attack plaintiffs' theory of damages as speculative. Benefit of the bargain damages are always somewhat imprecise. As noted in the antitrust context, they require a court or jury to determine what would have happened were it not for the defendant's misconduct. *See Kendrick* at 940, quoted in *Craft* at *8 ("[D]amages under th[e benefit of the bargain] rule, in terms of determining the 'as represented'

value, are deemed somewhat speculative. Although that has historically been the chief criticism of those who dislike the rule, the difficulty of proof is no greater than in warranty cases where the same rule applies . . . .").

That defendants have allegedly fraudulently marketed a good without readily determinable value "as represented" does not justify dismissal. "The fact that the property sold was of such a character as to make it difficult to ascertain with exactness what its value would have been if it had [been as represented] affords no reason for exempting the defendant from any part of the direct consequences of his fraud." *Kendrick* at 940.

 Where injury is established, damages need not be demonstrated with precision. Under the long-standing—and typical—New York rule, when the existence of damage has been established, and the only uncertainty is as to its amount, the plaintiff will not be denied a recovery of substantial damages. *See Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 456 (2d Cir.1977); *W.L. Hailey & Co. v. County of Niagara,* 388 F.2d 746, 753 (2d Cir.1967) (collecting New York cases). *See also Blue Cross,* Appendix B at Part XII, *supra* (rejecting a similar challenge to sufficiency of plaintiffs' proof of damages). The risk of uncertainty as to the amount of damage is upon the wrongdoer, *Perma Research & Development v. Singer,* 542 F.2d 111, 116 (2d Cir.1976), and the test for admissibility of evidence concerning prospective damages is whether the evidence has any tendency to show their probable amount. *Duane Jones Co. v. Burke,* 306 N.Y. 172, 192, 117 N.E.2d 237 (1954).

An estimate of damages, even when well-founded, "necessarily requires some improvisation, and the party who has

caused the loss may not insist on theoretical perfection." *Entis v. Atlantic Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964). "The law will make the best appraisal that it can, summoning to its service whatever aids it can command." *Sinclair Ref. Co. v. Jenkins Co.*, 289 U.S. 689, 697, 53 S.Ct. 736, 77 L.Ed. 1449 (1933). *See* Part IX.A (discussing pragmatic need for use of aggregate proof).

■ In a class action demanding statistical analysis of damages, as in any individual suit, the models presented by plaintiffs can be adopted in part, or not at all, by the jury without giving rise to a valid objection on grounds of undue speculation. *See, e.g., Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176 (2d Cir.1992) (rejecting defendant's claim that damages award in employment discrimination case was "unduly speculative"; jury's award of $667,000 in future lost earnings fell well within plaintiff's expert's estimate of $915,105); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1078 (2d Cir.1988) ("[W]e cannot accept appellants' contention that the jury's decision to award the State various fractions of the amounts demanded was not an equitable and reasonable one, for to do so in the circumstances here would permit defendants to profit by their wrongdoing at the expense of the person injured."). *See also Hendrickson Bros.*, 840 F.2d at 1077 ("Although the jury is not allowed to base its damages assessment on speculation or guesswork, it is entitled to make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.").

In the antitrust context, the Supreme Court has approved imprecision as practicable and consonant with due process:

> [Damage] issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

*J. Truett Payne*, 451 U.S. at 565–66, 101 S.Ct. 1923 (quoting *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946)). "[Any] other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Bigelow* at 264–265, 66 S.Ct. 574.

The Court's justification for preventing uncertainty from redounding to the benefit of an antitrust tortfeasor—"the vagaries of the marketplace" that prevent "sure knowledge of what plaintiff's situation would have been in the absence of the" wrong, *see J. Truett Payne*, 451 U.S. at 565–566, 101 S.Ct. 1923—applies equally to RICO.

This latitude is only afforded if a plaintiff can trace his or her injury to the defendant's unlawful acts. It "is thus circumscribed by the need for proof of causation." *United States Football League v. National Football League*, 842 F.2d 1335, 1378 (2d Cir.1988). It does not threaten to punish an innocent defendant.

Both the loss of value and price impact theories of damages are sound and sufficiently supported by the evidence to go to a jury. They may form the basis for a determination of damages, if plaintiffs demonstrate causation.

#### 4. Equitable Relief

Plaintiffs primarily seek money damages. They also seek equitable relief in the form of (1) disgorgement of profits and (2) an order eliminating the use of "lights" as a descriptor on packaging and in advertisements by defendants for some of their cigarette brands. Defendants move for partial summary judgment on these equitable claims.

 Disgorgement of profits would duplicate damages—particularly as trebled—based upon claimed overpayments by plaintiffs. They would be inequitable.

 Any order limiting the future use of the descriptor "lights" is best left to state cases, a case brought by the federal government (see United States v. Philip Morris, Appendix A, supra), government regulation by the Federal Trade Commission, or legislation. The government now substantially controls warnings on cigarette packaging and advertising. See Federal Cigarette Labeling and Advertising Act, Pub.L. No. 89–92, 79 Stat. 282 (1965), as amended by Pub.L. No. 98–474, 98 Stat. 2204 (1984) and by Pub.L. No. 99–92, § 11, 99 Stat. 393, 402–04 (1985), current version at 15 U.S.C. § 1331 (1982 & Supp. IV 1986). Cf., e.g., World Health Organization Framework Convention on Tobacco Control, art. 11(1)(a) (states party to the Convention agree to take measures to ensure that "tobacco product packaging and labeling do not promote a tobacco product by any means that are false, misleading, deceptive or likely to create an erroneous impression about its characteristics, health effects, hazards or emissions, including any term, descriptor, trademark, figurative or any other sign that directly or indirectly creates the false impression that a particular tobacco product is less harmful than other tobacco products. These may include terms such as 'low tar', 'light', 'ultra-light', or 'mild.'"). The United States,

along with 167 other nations, has signed the Convention, though it has yet to ratify it.

The motion for partial summary judgment dismissing plaintiffs' claims for equitable relief is granted.

#### 5. Conclusion on Computation of Total Damages

Plaintiffs' theories of damages are sound. A rational jury could make a reasonably precise determination on the basis of either the price impact or loss of value model. Both may be submitted to the jury. Additional models may be created, and additional data generated, between now and trial.

### E. Statute of Limitations

Defendants move to dismiss on the ground that, as a matter of law, plaintiffs' claims are barred by RICO's four-year statute of limitations. Plaintiffs oppose.

#### 1. Law

The statute of limitations for a civil RICO claim is four years. Agency Holding Corp. v. Malley–Duff & Assoc., Inc., 483 U.S. 143, 153, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Congress initially failed to include an express statute of limitations period for civil RICO actions when it passed the legislation. See id. at 146, 107 S.Ct. 2759. The Supreme Court remedied this omission in Malley–Duff when it "borrowed" the statute of limitations from what it considered the most analogous federal legislation, the Clayton Antitrust Act, 15 U.S.C. § 15(a), after which RICO was modeled. Id. at 153, 107 S.Ct. 2759.

 The statute of limitations is an affirmative defense; defendants must plead and prove it. Fed.R.Civ.P. 8(c).

They must demonstrate, as a matter of law, when the class members either 1) knew or 2) should have known of their injuries. *In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 59 (2d Cir.1998).

### a. Accrual

Three distinct approaches to the accrual of the statute of limitations emerged in federal Courts of Appeals after the decision in *Malley–Duff*: the common law discovery-of-injury rule, the last-predicate-act rule, and the discovery-of-injury-and-pattern rule. *See Rotella v. Wood*, 528 U.S. 549, 553, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000).

In *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), the Supreme Court rejected the last-predicate-act rule, which postponed the running of the statute of limitations until the commission of the last predicate act that formed the pattern of racketeering upon which the plaintiff's claim was based, regardless of when the plaintiff had knowledge of its injury resulting from the defendant's racketeering. *See also Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1130 (3d Cir.1988), *overruled by Klehr* (stating the "last predicate act" rule). The Court gave two reasons why this rule was not appropriate: it was not consistent with the accrual rule from the Clayton Act, and it excessively lengthened the statute of limitations period. *Klehr*, 521 U.S. at 187–188, 117 S.Ct. 1984. The Court stated that such a rule "would permit plaintiffs who know of the defendant's pattern of activity simply to wait, 'sleeping on their rights,' . . . as the pattern continues and treble damages accumulate, perhaps bringing suit only long after the 'memories of witnesses have faded or evidence is lost.'" *Id.* In *Rotella*, 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047, the Supreme

Court rejected the discovery-of-injury-and-pattern rule, which postponed the running of the statute of limitations until the plaintiff discovered, or reasonably should have discovered, both (a) the existence and source of his or her injury, and (b) the fact that the injury was part of a pattern. *See also Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.*, 906 F.2d 1546, 1554–55 (11th Cir.1990).

■ The accrual rule now sanctioned by the Supreme Court for civil RICO claims is the discovery-of-injury rule, which starts the four year statute of limitations at the point when a victim discovers or reasonably should have discovered his or her injury. *See Rotella*, 528 U.S. at 558, 120 S.Ct. 1075.

### b. Equitable tolling

■ The Court in *Rotella* noted that, "[i]n rejecting [the discovery-of-injury-and-pattern] rule, we do not unsettle the understanding that federal statutes of limitations are generally subject to equitable principles of tolling, and where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to the plaintiff's difficulty." *Id.* at 560–561, 120 S.Ct. 1075 (internal citation omitted). Fraudulent concealment, or "affirmative continuing acts of fraud . . . coupled with active cover-up of the fraud," may also justify relief from a statute of limitations that appears to have run. *Klehr*, 521 U.S. at 194, 117 S.Ct. 1984. The Court of Appeals for the Second Circuit has explicitly approved the use of equitable tolling principles in civil RICO suits. *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir.1988) ("[T]he standard tolling exceptions apply.").

### 2. Procedural History

When the court denied defendants' initial motion to dismiss on statute of limita-

tions grounds, it noted the difficulties of proof facing plaintiffs at trial. It stated that a troubling critical problem for plaintiffs is that some members of the class almost certainly were aware long before 2000 that "light" cigarettes were not appreciably safer for them than regular cigarettes. The statute would bar their claims. Yet the plaintiffs may be able to show that a substantial number of smokers were not aware before May 2000. The individual class members and their times of awareness may well have differed over the years. Suppose, for example, that one million became aware in 1998, one million in 1999, one million in 2000 and one million in 2001. The first two million (1998–1999) would be barred, the third (2000) could be deemed damaged for a year or less, and the fourth (2001) for somewhat more than a year. According to plaintiffs' theory of the case, the particular persons in each group cannot be known. Assuming a jury could find defendants liable, recovery would have to depend upon a statistical analysis to estimate how many smokers knew what and when. *See* Mem. & Order of Sep. 29, 2005 (Docket No. 763) (discussing *Daubert* issues). One of the ways that plaintiffs might proceed would be, the court pointed out:

1) Based on surveys, other evidence and extrapolation, plaintiffs' experts might develop a model showing how many smokers of "light" cigarettes were ignorant of the alleged fraud in each relevant year.

2) Based on evidence, plaintiffs' experts might estimate the "pack premium" paid by smokers because of the fraud, and the total class damages for each year.

3) To provide a total loss for the period of liability fixed by the jury, the damages for each year might be summed up.

4) Members of the class might prove by affidavits the number of packs of "light" cigarettes they bought during the period to receive a pro rata share of damages.

Calculations might have to exclude geographic areas such as Illinois where, in the *Price* case, sales overcharges were recovered in a separate state substantive law fraud recovery and the recovery was then overturned on appeal on state-law grounds.

The population of smokers is not static. There was during the applicable time of alleged fraud a continuing introduction into the class of naive new smokers, including children who may have had no inkling of the extensive literature in the field concerning health risks of "light" and regular cigarettes, newly addicted sophisticated adults and other new smokers. Over the years there was also a continuing seepage out of the class of those who quit smoking, either voluntarily because of what they had learned about health risks; concern about their children's health; or disapproval of their spouses, peers and employers; or involuntarily because of death. Between the completely naive and the completely sophisticated lies a broad changing spectrum of smokers with partial knowledge that may or may not have been fully assimilated. There are, as defendants rightly suggest, probably as many variations in knowledge as there are individual smokers.

In short, to avoid the statute of limitations and determine total damages, plaintiffs' theory may depend upon an estimate predicated largely on expert testimony that may require disaggregation of smokers by knowledge, year by year, with reintegration to obtain total damages. Such estimates, if properly modeled and supported by evidence, may be appropriately used to resolve factual issues not

susceptible of direct proof. *See, e.g.*, Federal Judicial Center, Reference Manual on Scientific Evidence 2 (2d ed. 2000) (Breyer, J., describing the "great weight" the Supreme Court had placed on statistical analysis in recent cases); *id.* at 83–178 (offering guidelines for the judicial supervision of statistical evidence); *id.* at 229–276 (guidelines for survey data); *id.* at 277–334 (damages); American Bar Association, Econometrics 179–224 (2005) (use of statistical techniques in class certification to demonstrate existence of common issues); *id.* at 1 n. 2 (noting widespread use of statistical analyses outside antitrust context).

Prior discussion by the court in this case may have caused confusion in two respects. First, its attention to the proofs required of plaintiffs at trial may have distracted the parties from a central point: that the statute of limitations is an affirmative defense. Second, its exposition of a possible form of proof may have been regarded by the parties as a required form of proof. Money and time are finite; courts (and parties) rarely get the crystal clear evidence they would prefer. The "time study" of plaintiffs' expert Dr. Hauser—an effort to measure, using surveys and extrapolation, when members of the class actually learned of the alleged fraud—seemed that it might be a useful possible source of proof on this issue; it has been withdrawn by plaintiffs.

### 3. Application of Law to Facts

#### a. Actual knowledge

As to actual knowledge, defendants point to several surveys and statements by experts that less than a majority of smokers believe "light" cigarettes are healthier than regular cigarettes. Defs.' Br. in Opp. to Class Cert. 38–40. These surveys are controverted by plaintiffs, who rely upon surveys referred to in Monograph 13 and the expert reports of Katherine Kinsella (detailing news releases), Michael Dennis (interviews with named plaintiffs), and Robert Proctor (analyzing when smokers might reasonably have learned of the fraud). As to imputed knowledge that a smoker reasonably should have been expected to have, defendants have marshaled a number of media reports, public service announcements and case filings. These, too, are met with evidence supplied by plaintiffs.

Defendants also argue that smokers' knowledge for statute of limitations purposes must be decided for each individual smoker, making the statute of limitations defense presumptively valid and the class action unmanageable. *See* discussion of aggregate proof in Part IX.A, *infra* (rejecting this contention).

Untenable is plaintiffs' extreme position that *no member of the class discovered the injury*, and so set the statute of limitations running, before May 11, 2000 (four years before the complaint was filed). Some undoubtedly discovered the alleged fraud earlier, and of those some may have then quit smoking. The gradual attrition of those smokers who did not know or could not reasonably have known presents a problem of proof for plaintiffs' experts. It does not require the dismissal of the entire proposed class. Based upon the experts' reports and extrapolation from available facts, it is possible to make reasonable estimates by appropriate time periods of those whose claims would be barred by the statute of limitations. In addition, if the jury finds some claims barred, the equitable tolling rule may ameliorate the statute of limitations problem. *See* Part III.E.3.d, *infra*.

#### b. Imputed knowledge

Plaintiffs filed this case on May 11, 2004, claiming economic injuries arising from

their fraud-induced purchases of light cigarettes marketed by defendants since 1971. The bar of limitations is measured from a date four years earlier—May 11, 2000. Should plaintiffs have known of the fraud prior to that date?

### i. Class counsel's knowledge

Many attorneys knew of the dangers of "light" cigarettes long before 2000. A substantial number of actions based on grounds of fraud much like those now alleged were brought earlier than May 11 of that year. Putative class counsel in the present case—Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Finkelstein, Thompson & Loughran ("plaintiffs' counsel")—filed four similar "light" cigarettes class actions in various state courts in 1998 and 1999: *ASPINALL v. PHILIP MORRIS COS.*, No. 98–6002, 1998 WL 34190483 (Mass. Sup.Ct. Nov. 25, 1998); *Cummis v. Philip Morris Cos.*, No. L–2114–98 (N.J.Super.Ct.) (filed July 9, 1998); *Marrone v. Philip Morris Cos.*, No. 99 CIV 0954 (Ohio Ct.Com.Pl.) (filed Nov. 8, 1999); *McClure v. Altria Group, Inc.*, No. 99C148 (Tenn. Cir.Ct.) (filed Jan. 19, 1999). Other "of counsel" attorneys to the class filed two "light" cigarettes class actions in state courts during the same period: *Oliver v. R.J. Reynolds Tobacco Co.*, No. 268 (Pa.Ct. Com.Pl.) (filed Mar. 6, 1998); *Trombino v. R.J. Reynolds Tobacco Co.*, No. L–11263–98 (N.J.Super.Ct.) (filed Jan. 19, 1999). In those state class actions, plaintiffs sought economic damages on state fraud and consumer protection law grounds alleging facts similar to those now relied upon. In 1999, the United States government filed a widely remarked upon complaint in federal district court for damages and injunctive relief under RICO and other statutes alleging that the tobacco companies misled consumers about the dangers of "light" cigarettes. That case, *United States v. Philip Morris*, was recently tried to a judgment. *See* 449 F.Supp.2d 1 (D.D.C. 2006) (part 1 of 6). Other private and state government plaintiffs filed RICO and consumer fraud suits in the 1990s alleging deceptive marketing of "light" cigarettes. *See, e.g., ALLMAN v. PHILIP MORRIS, INC.*, No. 94–0504–IEG, 1994 WL 16138145 (S.D.Cal.1994); *Mass. v. Philip Morris Inc.*, No. 95–7378 (Mass.Dist.Ct.); *Maryland v. Philip Morris Inc.*, No. 96122017/CL211487 (Md.Cir.Ct.); *OREGON v. PHILIP MORRIS, INC.*, No. 9706–04457, 1999 WL 33748770 (Or.Cir.Ct. 1999); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 178 F.Supp.2d 198 (E.D.N.Y.2001).

It is not denied that plaintiffs' counsel has had knowledge of the RICO injury alleged in this matter since at least July 1998, when they filed a class action alleging a similar fraud in New Jersey state court. Defendants contend that this knowledge should be imputed to the entire class under principles of agency. To do so would bar the suit entirely.

"The relationship between an attorney and the client he or she represents in a lawsuit is one of agent and principal." *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir.1994); *see* Restatement (Third) of the Law Governing Lawyers Ch. 2 Introductory Note (2000) (the attorney-client relationship is, "from one point of view, derived from the law of agency."). In a conventional attorney-client relationship, the attorney's knowledge is imputed to the client. *Geraci*, 23 F.3d at 725; Restatement (Third) of the Law Governing Lawyers ("Information imparted to a lawyer during and relating to the representation of a client is attributed to the client for the purpose of determining the client's rights and liabilities in matters in which the lawyer represents the client...."); *see generally* Restatement (Second) of Agency

§ 272 (agent's knowledge imputed to principal). An attorney's knowledge of an injury may work to bar his client's claim under a statute of limitations. *See Geracia* at 725 (plaintiff's § 1983 claim time-barred because his attorney knew of injury outside three-year statute of limitations period).

In some cases it is appropriate for an attorney's knowledge to be imputed to the client, particularly where there is a single attorney and a single known client in an ongoing relationship. That is not the situation now presented. In the instant case defendants seek to impute the knowledge of counsel to a class of unidentified plaintiffs numbering in the tens of millions who claim they were defrauded for decades. Principles of agency applicable in the single-attorney-single-client relationship cannot be transposed into the class action context under present circumstances. *Cf.* Restatement (Third) of the Law Governing Lawyers § 14 cmt. f ("Class actions may pose difficult questions of client identification."). How can a smoker who was not even aware when he purchased a pack of cigarettes years ago that any of the class attorneys existed be assumed to have known what the attorneys knew?

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). Without consent by both parties, there can be no principal-agent relationship. *See* Restatement (Second) of Agency § 15. Unnamed class members have not yet "consented" to be represented by putative class counsel; these attorneys cannot be their agent for purposes of imputing knowledge of danger. The role of class counsel is akin to that of a judi-cially appointed fiduciary, not that of a privately retained attorney. *See* Restatement (Second) of Agency § 14F ("A person appointed by a court to manage the affairs of others is not an agent of the others."); *cf.* Rule 23(g), Fed.R.Civ.P. (setting forth standards governing mandatory court appointment of class counsel).

The mass nature of the class action requires that both the court and counsel carefully protect unnamed plaintiffs' rights. *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999); *see generally* John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action,* 95 Colum. L.Rev. 1343 (1995); Monograph, *Individual Justice in Mass Tort Litigation* 53 ff. (1995) (noting the ethical challenges facing class counsel). It does not permit the imposition of the principles of agency in a way that would bar the suit and deprive class members of experienced counsel. The knowledge of class counsel cannot be imputed to the members of the class for the purposes of determining whether this suit is barred by the statute of limitations.

The attorneys' knowledge is not decisive. What is critical is what and when the plaintiffs knew or should have known.

### ii. Class members' knowledge

One line of cases, relied upon by defendants, has described the statute of limitations inquiry in terms of "storm warnings"—any information "that would alert a reasonable person to the probability that misleading statements or significant omissions had been made." *Cetel v. Kirwan Financial Group, Inc.,* 460 F.3d 494, 507 2006 WL 2466855 at *7 (3rd Cir.2006); *see also Nivram Corp. v. Harcourt Brace Jovanovich, Inc.,* 840 F.Supp. 243, 249

(S.D.N.Y.1993); *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3rd Cir. 2001). Under these cases, the initial burden to show the existence of "storm warnings" rests with defendants, and, if determined, "the second step then shifts the burden to plaintiffs to show that, heeding the storm warnings, they exercised reasonable diligence but were unable to find and avoid the storm." *Cetel*, 460 F.3d 494, 507, 2006 WL 2466855 at *7.

The enormous amount of conflicting evidence filed by the parties on the subject of consumer knowledge demonstrates that genuine issues of fact exist. Defendants cite several cases dismissed on "storm warnings" grounds. *See, e.g., Isaak v. Trumbull Savs. & Loan Co.*, 169 F.3d 390 (6th Cir.1999) (dismissing RICO claim against banks that provided loans to owners and developers of undeveloped timeshare); *In re Burbank Envt'l Litig.*, 42 F.Supp.2d 976 (C.D.Cal.1998) (dismissing CERCLA claim against defendants for groundwater contamination). They are marked by the clear, pervasive and unequivocal nature of the warnings. *See Isaak*, 169 F.3d at 401 (plaintiffs had retained counsel, filed formal complaints, or abandoned ownership interests outside statute of limitations period; widespread newspaper accounts of state investigation into the resorts reported that the owners diverted plaintiffs' payments for their personal use); *Burbank Envt'l*, 42 F.Supp.2d at 981 (plaintiffs were inundated by media reports, public meetings, and lawsuits; plaintiffs conceded that they had known of the contamination outside of the statute of limitations period). They are distinguishable from the notice provided in the instant case.

Defendants make a strong case that plaintiffs knew or should have known of their claimed economic injuries years before 2000. A number of reports appeared in newspapers, popular magazines, textbooks, government pamphlets, television news programs and public service announcements from the late 1950s to the present indicating that "light" cigarettes were not as safe as portrayed by defendants. Tens of millions of pages of internal documents could easily be obtained for research as a result of the Master Settlement Agreement of November 23, 1998 between the tobacco industry and various states' attorneys general. The Agreement provided that the tobacco companies would make available through their web sites and at a central depository in Minnesota many of the documents produced during discovery of the states' attorneys general actions. *See* Master Settlement Agreement ("MSA") 29–32. Not all of these documents were available at once; the earliest posting on the Philip Morris USA Document Site, for example, appears to be February 1998. Many of the documents relied upon by plaintiffs' counsel were available long before 2000 through the defendants' web sites and other channels.

In response, plaintiffs argue that plaintiffs' constant exposure to defendants' marketing overwhelmed any doubts they may have had about "light" cigarettes. Plaintiffs also point to the testimony of tobacco industry executives who testified that, into the late 1990s, they were ignorant of the phenomenon of compensation—a technique used by many smokers to increase their intake of nicotine and tar from "low-tar" cigarettes. The *Price* court found that Monograph 13 represented the first scientific consensus on the true nature of "light" cigarettes; it appears to have concluded that the class could not be deemed to have known of the fraud prior to the publication of the monograph. *Id.* at ¶ 80. Defendants contest this point, arguing that Monograph 13 was only a reinterpretation of existing studies. Tr. of Sept. 12–13, 2005 Hr'g 229.

■ Despite the questionable existence of adequate "storm warnings," given the number of plaintiffs, some of them were undoubtedly alerted to a possible fraud. Under this line of cases, the burden would shift to these plaintiffs to show that reasonable diligence would not have uncovered their injury. Assuming, without deciding, that the "storm warnings" precedents apply in this case, it is impossible to resolve this issue on summary judgment. The equivocal and sometimes conflicting information provided by defendants and the media before 2000 make it premature to determine, as a matter of law, that plaintiffs' claims are barred. If this case goes to trial, it will be for a jury to determine when plaintiffs had actual knowledge or should have had knowledge of the alleged fraud. *Cf. Bingham v. Zolt,* 66 F.3d 553, 558 (2d Cir.1995) (jury asked to determine "when the estate actually knew of defendants' alleged wrongful acts").

The instant matter is unlike other RICO statute of limitations cases before the Court of Appeals for the Second Circuit. Other litigations have dealt with either individuals in close contact with the persons who defrauded them, *see, e.g., Tho Dinh Tran v. Alphonse Hotel Corp.,* 281 F.3d 23 (2d Cir.2002) (hotel employee suing hotel); *Bingham,* 66 F.3d 553 (administrator of estate suing decedent's legal advisors); *Turkish v. Kasenetz,* 27 F.3d 23 (2d Cir.1994) (trust beneficiaries suing administrators), or sophisticated plaintiffs who invested significant amounts of money in a venture controlled by defendants. *See, e.g., In re Merrill Lynch Ltd. P'ships Litig.,* 154 F.3d 56 (2d Cir.1998) (investors in real estate limited partnerships); *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763 (2d Cir.1994) (federal stock association lending money to mortgage broker). Such plaintiffs in ongoing business relationships with defendants can be expected to be alert to the possibility of fraud in a way that the average smoker, spending a few dollars for a pack of cigarettes as a matter of habit, may not be. The plaintiffs in the instant matter are members of a nationwide mass market; their interaction with defendants was largely limited to advertisements and other general knowledge.

Under either the "storm warnings" analysis or more general Second Circuit approach, a jury question is presented.

### c. Separate accrual

The Court of Appeals for the Second Circuit has adopted a "separate accrual" rule in civil RICO cases under which "a new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." *In re Merrill Lynch,* 154 F.3d at 59 (separate accrual rule not applicable on the facts). If this rule were to apply here, it might permit recovery for economic damages suffered by plaintiffs on all packs of cigarettes purchased after May 11, 2000, four years before class counsel filed the complaint in this matter. Defendants argue that the rule is inapplicable because plaintiffs have alleged a single injury—the loss of value in packages of "light" cigarettes purchased in reliance on defendants' alleged fraud. Plaintiffs have not relied on the separate accrual rule in their papers in opposition to summary judgment, possibly for the sensible reason that if knowledge barred all claims for purchases before May 11, 2000, *a fortiori* it applied to purchases after that date.

### d. Equitable tolling

Plaintiffs raise defendants' alleged ongoing deception as a bar to the statute of limitations defense. *See, e.g.,* Part V.C.3.d,

*infra* (ongoing increase in nicotine levels of "light" and other cigarettes). Their argument is essentially one of estoppel: the tobacco companies made tremendous efforts to keep the truth about "light" cigarettes from smokers and so should be estopped from arguing that the smokers learned the truth anyhow.

Plaintiffs chronicle the past and ongoing efforts of the tobacco industry to induce public misperception of the health risks posed by smoking by indicating their doubt about the truth of warnings by the health services community, and by limiting the release of their own scientific studies; lobbying the Federal Trade Commission; cloaking documents with the attorney-client privilege; conducting animal studies outside the United States so that the results would remain secret; and working with scientists sympathetic to the industry to produce reports favorable to the industry's health claims. *See Simon II*, Appendix D, at Part III.B.4, *infra*.

One court apparently adopted the estoppel theory. *See Price*, Appendix C, *infra*. The Illinois court ruled that since evidence at that trial established that Philip Morris had concealed the truth about "light" cigarettes until November 2002 (when it added inserts to packages of "light" cigarettes that warned of their dangers), it could not assert that the plaintiffs should have been aware of the information any earlier. *Price* at ¶ 81. As to actual knowledge, the court found that the company's decision to publish the inserts so widely (and duplicate their contents in newspaper advertisements and on its website) provided strong evidence that its customers were unaware earlier of the risks the inserts described. *Id.*

Whether the largely unknown still continuing increase in nicotine content provides a new basis for tolling, *see* Appendix F, *infra*, is a matter that need not now be addressed. *See* Part V.C.3.d (discussing the increase reported by the Massachusetts Department of Public Health). *See also Simon II*, Appendix D, at Part III. B.5, *infra*.

There is ample direct and indirect evidence of continuing coverups of the fraud by defendants. Based on the evidence, and experts' reports, a jury could find that many members of the proposed class did not discover the fraud because of defendants' inequitable conduct. Those smokers would not be barred by the statute of limitations. The number of smokers for whom the statute should be tolled during various periods may be determined from plaintiffs' experts and the available evidence. Equitable estoppel may provide another independent basis for not dismissing the suit on the ground of the statute of limitations.

Only if the jury finds plaintiffs' claims barred by the statute of limitations will equitable tolling be considered. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 508, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (where suit raises both legal and equitable issues, legal issues must be tried to a jury before resolution of any equitable issues by the court).

### 4. Conclusion on Statute of Limitations

Because the statute of limitations is an affirmative defense and it cannot be said with any assurance that defendants would necessarily succeed in proving the defense at trial, the motion is denied. Defendants have not shown that the class members' claims are barred as a matter of law. Whether the issue is susceptible to classwide treatment is discussed in Part VII. D.2.b.iii, *infra*.

## IV. Collateral Estoppel

The interactions between this case and others like it in which plaintiffs have sought recompense against these same defendants for harm caused by the sale or consumption of "light" cigarettes must be considered. Affected may be the motion to dismiss, issues to be decided by the trier, or the decision on certification. As indicated below, a substantial argument can be made that collateral estoppel makes it unnecessary to retry certain issues of fact, such as fraud and continuing concealment. Nevertheless, in the exercise of its discretion and in the interest of fairness to defendants, the doctrine will not be applied.

### A. Law

■ Under claim preclusion, "[a] final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). "Whether there is claim preclusion depends upon whether the same or connected transactions are at issue and the same proof is needed to support the claims in both suits or, in other words, whether facts essential to the second suit were present in the first suit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir.2000). "[T]hat several operative facts may be common to successive actions between the same parties does not mean that the claim asserted in the second is the same that was litigated in the first, and that litigation of the second is therefore precluded by the judgment in the first." *NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1259 (2d Cir. 1983).

■ "One of the most general reasons for separating claims is that a broad course of completed unlawful conduct has included a clearly separable event that gave rise to distinctive injury." 18 Charles A. Wright, et al., § 4408 (2002). In this situation, claim preclusion would not apply, though, issue preclusion may still arise. Issue preclusion "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994). Therefore if a suit shares some of the operative facts as a previous suit, issue preclusion will arise if those operative facts were determined by a valid and final judgment in the previous suit—but claim preclusion may not.

### B. Preclusive Effect in Possible Future Bodily Injury Cases

This is a civil class action under RICO for monetary loss based on the price paid for a product sold in violation of federal mail and wire fraud substantive law. The proposed class consists of all persons who purchased "light" cigarettes including those who: (1) did not use the product; (2) used the product and suffered no physical or other harm; (3) used the product and will suffer future physical or other harm; (4) used the product and have already suffered physical or other harm. It is conceivable that claim preclusion might apply to prevent those who have suffered physical or other harm, or will suffer future harms caused by the use of the product based on fraud under state substantive law from bringing a cause of action based on these physical harms. If those persons would be precluded from bringing a future cause of action then it might be useful for those claims to be severed, with a subclass created so that they may bring those claims now. If those personal injury claims would not be precluded, then bring-

ing a class action on behalf of all those who purchased the product would not pose a problem.

 This civil RICO suit shares operative facts with a cause of action for the physical or other harm caused by use of the product based on fraud under state substantive law. The instant suit, however, does not present the essential facts necessary for a personal injury suit, and therefore claim preclusion would not bar plaintiffs from bringing such a suit after this one.

A suit for physical or other injury based on use of the product would require proof of several essential facts not present in a RICO suit, namely that the plaintiffs *used* the product, and that the product's use *caused* harm to plaintiffs. The source of injury in the suit for monetary loss is the purchase of the product, rather than its use. *See* Restatement (Second) of Judgments § 24(2) ("What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series', are to be determined *pragmatically*, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.") (emphasis supplied).

An additional factor suggesting that the claims for monetary loss caused by purchasing the product is different from the claim for harm caused by use of the product is that the claims matured at different times. The RICO claims matured immediately upon the purchase of the product, while the claims for injuries resulting from use of the product matured only after the sustained use of the product caused such injuries.

Since the evidence, facts, and issues necessary to maintain a cause of action for physical injury are separate and distinct from those required in this civil RICO case and a different judgment in any personal injury suit brought by a class member would not impair rights established by any judgment in the civil RICO case, any future physical injury claims would not constitute the same cause of action for purposes of claim preclusion.

## C. Claim Splitting

 For the same reason described immediately *supra*, defendants' challenge to certification on the basis of claim splitting is rejected. *See Pearson*, 2006 WL 663004 at *8 (rejecting claim-splitting challenge); *Aspinall*, 442 Mass. at 397 n. 19, 813 N.E.2d 476 (same); *Craft*, 2003 WL 23355745 at *13 (same; "any and all [ ] claims for personal injury ... could not realistically be included in this [consumer fraud] action ....").

To avoid any future contention about bars for claim preclusion, any personal injury claims of class members are deemed specifically preserved. *See* Restatement (Second) of Judgments § 26(1)(b) (claims possibly subject to preclusion may be specifically preserved by the court adjudicating the first action).

## D. Preclusive Effect of *United States v. Philip Morris*

The final opinion issued in *United States v. Philip Morris* reaches conclusions on a number of factual issues germane to this case. *See* Appendix A, *supra*. Plaintiffs argue that these should collaterally estop defendants from relitigation of those issues in the present suit.

 Collateral estoppel prevents a party from relitigating, in a subsequent proceeding, an issue of fact or law that was fully and fairly litigated in a prior proceeding. In the federal system collateral es-

toppel may be applied offensively to foreclose a defendant from relitigating an issue that it has previously litigated unsuccessfully against another plaintiff. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

■■■■ For a plaintiff to bar a defendant from litigating an issue based on collateral estoppel:

(1) the issues in the proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Faulkner v. Nat'l Geographic Enters., Inc.*, 409 F.3d 26, 37 (2d Cir.2005). Application of offensive collateral estoppel is at the trial court's discretion. *Parklane Hosiery*, 439 U.S. at 331, 99 S.Ct. 645.

There is a strong argument for offensive collateral estoppel in this case. Present plaintiffs make identical allegations to those made in *United States v. Philip Morris* and bring their suit under the identical statute. *Compare* SAC ¶¶ 7–8 (alleging conspiracy to mislead the American public about the health risks of "light" cigarettes) with *United States v. Philip Morris*, 449 F.Supp.2d at 106–07 (concluding, by "clear and convincing evidence," that defendants knew there was no clear health benefit from low-tar and "light" cigarettes; knew smokers "were willing to trade flavor for reassurance that their brands carried lower health risks"; extensively marketed their "light" and low-tar brands to take advantage of smokers' concerns; and "[b]y engaging in this deception ... dramatically increased their sales

of low tar/light cigarettes, assuaged the fears of smokers about the health risks of smoking, and sustained corporate revenues in the face of mounting evidence about the health dangers of smoking."). Matters in direct issue in both the federal government's suit and the present one include:

1. Defendants devised and executed a scheme to defraud consumers by falsely denying, distorting, and minimizing the significant adverse health consequences of smoking. Appendix A at 449 F.Supp.2d at 145–264, 449 F.Supp.2d at 482–525, *supra*.

2. Despite their knowledge that "light" cigarettes provide no clear health benefit, defendants falsely marketed and promoted "light" cigarettes as less harmful than regular cigarettes in order to keep their customers smoking and sustain corporate revenues. This plan was successful. Appendix A at 449 F.Supp.2d at 430–81, 449 F.Supp.2d at 482, *supra*.

3. Defendants attempted to and did suppress and conceal scientific research and destroy documents relevant to their public and litigation positions. Appendix A at 449 F.Supp.2d at 768–99, *supra*.

There was a full and fair opportunity to litigate these issues in the prior action: more than eighty four witnesses testified in a nine month bench trial. Defendants had every incentive to fully and vigorously litigate the claim against them; before an interlocutory order restricting disgorgement was issued by the Court of Appeals for the District of Columbia, $289 billion of allegedly ill-gotten gains were at risk. Even after the appellate court's limitation on available remedies, defendants' valuable brand identities were at risk: the government requested, and the court entered, an order enjoining defendants from using the term "lights" and other such descriptors.

The posture of the previous action was identical to the present case. The extent of the litigation, the competence and experience of defense counsel, and the availability of evidence were the same. At least some of the issues in the previous case—e.g., the existence of defendants' enterprise, the deception of the public—were necessary to support the verdict.

 Despite the good reasons to employ collateral estoppel, the court exercises its discretion not to do so. The fairness of its application in the present instance is questionable. *See Parklane Hosiery,* 439 U.S. at 330–331, 99 S.Ct. 645 (identifying situations where the use of offensive collateral estoppel might be unfair). First, in the government suit, defendant Liggett was, in effect, a prevailing party. Collateral estoppel could not be applied against it. *See, e.g., Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) ("[T]he resolution of the issue [must be] necessary to support a valid and final judgment [against the party] on the merits" in the prior action). Application of estoppel to all but one of many defendants would confuse the jury, making administration of the case more difficult. Second, defendants have won so many of the tobacco cases that applying the rule of the Restatement according conclusive effect to the last of the series of litigations is inappropriate. *Cf., e.g.,* Restatement (Second) of Judgments § 15 cmt. c (applying rule in one defendant-one plaintiff cases); *Parklane Hosiery,* 439 U.S. at 331 n. 14, 99 S.Ct. 645 (cautioning against applying collateral estoppel when the last judgment is inconsistent with prior judgments favoring the defendant). Third, little efficiency would be gained: plaintiffs' proof of reliance and damages would almost certainly—as a matter of legal burden and persuasive strategy—require presentation of all evidence available to them of defendants' alleged scheme.

### E. Preclusive Effect of Overlapping Class Actions

A number of state class actions alleging fraud in the sale of "light" cigarettes have been filed. *See* Part II.D, *supra* (listing and discussing these). Any plaintiff claims bound by a decision on the merits in one of those actions will be excluded from any recovery secured in this suit. *See, e.g., Beck v. Levering,* 947 F.2d 639 (2d Cir. 1991) (collateral estoppel and double recovery); *LaFleur v. Whitman,* 300 F.3d 256, 271 (2d Cir.2002) (choice of law in collateral estoppel); *Bajwa v. Metropolitan Life Ins. Co.,* 208 Ill.2d 414, 281 Ill.Dec. 554, 804 N.E.2d 519 (2004) (Illinois collateral estoppel rule). The definition of the class accomplishes this result.

The preclusive effect of particular state actions on this suit has not been fully briefed; decision now would be premature. The preclusive effect of a suit decided against plaintiffs on grounds peculiar to state law, rather than on the facts, *see, e.g., Price* (described in Part II.D, *supra*) is dubious. For the reasons stated in D, *supra,* preclusive effect should not be given to any state judgment against defendants.

### V. Defendants' Other Summary Judgment Motions

### A. Mutagenicity of "Light" Cigarettes

 Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants move for partial summary judgment dismissing plaintiffs' claims concerning the health risks of "light" cigarettes based on mutagenicity or toxic constituents. The motion is denied.

In support of their claim that defendants misled smokers about the health risks of "light" cigarettes, plaintiffs allege that defendants had substantial evidence that "light" cigarettes "could be even more harmful than regular cigarettes" and did not communicate this knowledge to consumers. *See* SAC ¶¶ 7 (allegation), 105–107 (quoting internal company documents revealing knowledge), 108 (failure to warn consumers). Defendants, contending that no competent evidence demonstrates increased toxicity to the degree required by precedent, seek partial summary judgment on all claims based on those allegations.

Defendants misconstrue the purpose of plaintiffs' evidence. Plaintiffs allege generally that defendants misled the American public by representing "light" cigarettes to be less dangerous than regular cigarettes when they knew they were not. The result, plaintiffs claim, was a stronger market for defendants' products than would otherwise have been the case and so a greater price per pack than would otherwise have been the case. As part of this scheme, plaintiffs contend, defendants refrained from conducting research that might reveal the dangers of their cigarettes and suppressed the results of the research they did conduct. Evidence that some internal tests of defendants revealed a risk of increased mutagenicity or toxicity from the ventilation holes of "light" cigarettes—and that defendants did not reveal this information to their consumers but instead continued to make explicit and implicit health claims about "light" cigarettes—would tend to prove the alleged fraud.

It is not actual increased toxicity, but defendants' knowledge of a possible risk, that plaintiffs need to demonstrate. This is a case of alleged fraud resulting in economic harm, not medical injury. Case law cited by defendants establishing the standard of proof required for increased risk claims in personal injury torts—a "reasonable medical certainty," *see, e.g., In re Agent Orange Prod. Liab. Litig.*, 611 F.Supp. 1223, 1262–63 (E.D.N.Y.1985)—are thus inapposite. Defendants' arguments that the test results referred to by plaintiffs are unreliable and do not demonstrate to a scientific certainty an increased risk of harm in humans are irrelevant for the same reason.

The motion for partial summary judgment on mutagenicity is denied. Defendants will be free to argue at trial that the test results referred to by plaintiffs were so insignificant as to not confer upon them a duty to disclose, and that the price of "light" cigarettes would not have suffered had those results been known.

## B. Defendant BATCo's Separate Motion for Summary Judgment on All Claims

Defendant BATCo moves to dismiss pursuant to Rule 56 of the Federal Rules of Civil Procedure on the ground that plaintiffs cannot establish BATCo's liability for conduct of the enterprise; cannot prove BATCo's participation in the conspiracy charged; and cannot demonstrate that they have suffered compensable damages as a result of BATCo's conduct. Similar motions filed by BATCo in other litigations have been rejected. *See United States v. Philip Morris USA, Inc.*, 321 F.Supp.2d 82, 85–86 (D.D.C.2004) (denying BATCo's motion for summary judgment in government's civil RICO suit for cigarette fraud, including misrepresentations about the health risks of "light" cigarettes); *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 113 F.Supp.2d 345, 367–368 (E.D.N.Y.2000) (denying BATCo's motion for summary judgment in civil RICO suit alleging deception regarding the health risks of all cigarettes).

BATCo repeats a number of the challenges made by all defendants in their group motion for summary judgment on causation, injury, and damages. For the reasons set forth in Part III, *supra*, these are rejected. Several challenges stemming from BATCo's position as a foreign corporation merit separate consideration.

### 1. Extraterritoriality of RICO

BATCo challenges the court's subject matter jurisdiction over those parts of plaintiffs' claims based on BATCo's membership in foreign trade associations.

### a. Law

The Supreme Court has not ruled on the extraterritorial reach of RICO; the Court of Appeals for the Second Circuit has discussed, but not resolved the issue. *See North South Fin. Corp. v. Al–Turki*, 100 F.3d 1046, 1051 (2d Cir.1996) ("[S]pecifying the test for the extraterritorial application of RICO is delicate work. That work has not been done, but we need not do it now.").

*Al–Turki* considered two possible tests—the "conduct test" and the "effects test"—drawn from securities and antitrust law. The securities "conduct test" confers subject matter jurisdiction on a court if "conduct material to the completion of the fraud occurred in the United States. Mere preparatory activities, and conduct far removed from the consummation of the fraud, will not suffice to establish jurisdiction." 100 F.3d at 1051. The "effects test" differs slightly under the antitrust and securities laws, but in either case confers jurisdiction on a court if the alleged wrongful conduct causes "substantial effects within the United States." *Id.*

Courts in this and other circuits have applied both, either, and neither of the two tests. *See, e.g., Madanes v. Madanes*, 981 F.Supp. 241 (S.D.N.Y.1997) (concluding that both tests may confer jurisdiction);

*Concern Sojuzvneshtrans v. Buyanovski*, 80 F.Supp.2d 273, 278 (D.N.J.1999) (applying "conduct test" to foreign plaintiff alleging fraud committed abroad and finding it met); *United States v. Noriega*, 746 F.Supp. 1506, 1517 (S.D.Fla.1990) (ruling that RICO applies extraterritorially if "the racketeering activities produce effects or are intended to produce effects in this country"); *Thai Airways Intern. Ltd. v. United Aviation Leasing B.V.*, 842 F.Supp. 1567, 1571 (S.D.N.Y.1994) (declining to "measure the extraterritorial reach of RICO" because allegations of racketeering activity occurring within the United States were sufficient to confer subject matter jurisdiction). In *Al–Turki*, the Court of Appeals suggested that the antitrust "effects test" might be the most appropriate under RICO, since RICO's civil provisions are based on the antitrust Clayton Act. *See* 100 F.3d at 1052.

The results of these two tests are not determinative. Securities and antitrust law are analogous, not controlling sources of law. The "ultimate inquiry," according to the Court of Appeals, is whether "Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to [the alleged fraud] rather than leave the problem to foreign countries." *Id.* (quoting *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975) (alteration removed)).

### b. Application of law to facts

It is necessary to correct a misapprehension. Defendant BATCo cites *Al–Turki* for the proposition that RICO plaintiffs must demonstrate that a defendant's foreign conduct had direct and substantial adverse effects within the United States for jurisdiction to obtain; that case does not so hold. First, the "direct and sub-

stantial effects" test that BATCo advances is a combination of the alternative "conduct" and "effects" tests. Second, the Court of Appeals for the Second Circuit made no ruling on the applicability of either of those tests under RICO. *See id.* at 1052, quoted *supra.*

■ Under either alternative test, BATCo's alleged conduct is sufficient to confer subject matter jurisdiction. Plaintiffs have alleged that BATCo participated in a conspiracy to deceive the *American* public through actions *in the United States* by deceitful marketing and manipulation of the public health community and governmental institutions *in the United States,* in order to prevent American smokers from learning the truth about "light" cigarettes—resulting in death, disease, and economic harm to millions. All members of the proposed class are United States residents; all damages stem from sales of "light" cigarettes within this country. Consideration of these claims is a proper and valuable use of "the precious resources of United States courts." *Id.* The court has jurisdiction over these claims. That some activities may have been engaged in abroad does not divest a federal court of jurisdiction.

### 2. BATCo's Liability

BATCo is a British corporation that sells one brand of light cigarettes in the United States. Until 1979, defendant Brown & Williamson was a subsidiary of BATCo. In a corporate reorganization in 1979, BATCo relinquished ownership of Brown & Williamson and became its affiliate.

#### a. BATCo's conduct of the enterprise

BATCo argues that plaintiffs' claims against it must fail because they cannot establish that it participated in the operation or management of the alleged RICO enterprise. In support of this argument, BATCo notes that it did not attend the December 1953 meeting of cigarette company executives where, according to the plaintiffs, the alleged enterprise was conceived; and that it was never a member of either of the two United States trade organizations through which the plaintiffs allege the enterprise was managed and directed. *See, e.g.,* BATCo Mem. at 6–7; Reply Br. in Supp. of Def. BATCo's Mot for Summ. J. ("BATCo Reply") at 7–21.

■ Plaintiffs, in their opposition, demonstrate that there are numerous material issues in dispute about whether BATCo participated in the operation or management of the alleged enterprise. For example, while BATCo relies on the fact that it was not an official member of the United States trade organizations, plaintiffs allege that it nevertheless communicated and coordinated with both of them to further the enterprise's unlawful objectives. They also present evidence that BATCo created and joined related foreign trade organizations, such as the International Tobacco Information Center ("INFOTAB") and the Tobacco Research Council ("TRC"), in order to conceal, suppress, and destroy information that might adversely affect the enterprise's interests. *See, e.g.,* Pls.' Mem. in Opp. to Def. BATCo's Mot. for Summ. J. ("Pls.' BATCo Opp.") at 4–8. *See also Philip Morris USA, Inc.,* 321 F.Supp.2d at 85–86 (describing the government's evidence in support of its opposition to BATCo's motion for summary judgment); United States' Mem. of Points and Authorities in Opp. to Mot. for Summ. J. by Def. BATCo at 6–49, *United States v. Philip Morris USA, Inc.,* 321 F.Supp.2d 82 (D.D.C.2004) (government's evidence regarding the motivation for global coordination and BATCo's involvement).

### b. BATCo's participation in the conspiracy

BATCo argues that there is no evidence that it agreed to conspire with any of the other defendants to violate section 1962(c). *See, e.g.,* BATCo Mem. at 20–22; BATCo Reply at 21–26. Plaintiffs, however, point to substantial circumstantial evidence that BATCo embraced, and assisted in achieving, the objectives of the conspiracy by (1) fraudulently denying the adverse health effects of smoking; (2) refraining from developing, marketing, and promoting products and feasible technologies it believed may have been likely to cause less harm than cigarettes sold at the time; (3) working with the enterprise to perpetuate the myth of independent research on smoking and health; and (4) making fraudulent representations regarding low tar cigarettes. *See, e.g.,* Pls.' BATCo Opp. at 4–25. *See also* United States' Mem. of Points and Authorities in Opp. to Mot. for Summ. J. by Def. BATCo at 50–121, *United States v. Philip Morris USA, Inc.,* 321 F.Supp.2d 82 (D.D.C.2004) (government's evidence regarding BATCo's involvement in the conspiracy). Additionally, the plaintiffs allege various statements by BATCo that support the conclusion that it knew of, and supported, the central objectives of the conspiracy. *See, e.g.,* Pls.' BATCo Opp. at 7, 9. The jury could conclude that BATCo deliberately contributed to the general deceit and mendacity permeating public debate on "light" cigarettes' dangers in the United States. It, like other defendants, took positions gravid with seeds of deception about "lights."

BATCo also maintains that plaintiffs' section 1962(d) conspiracy claim against it cannot succeed because plaintiffs cannot prove that BATCo agreed that BATCo itself would commit at least two predicate acts in furtherance of the alleged conspiracy. *See, e.g.,* BATCo Mem. at 20–22.

Even assuming that plaintiffs are unable to prove that BATCo agreed to commit two predicate acts, this argument fails for the reasons explained in Part III.A.2, *supra.* Civil liability under RICO does not require that each conspirator agree to the personal commission of any element of the substantive offense—including the personal commission of two predicate acts.

### c. Damages

■ BATCo maintains that plaintiffs' claims against it must fail because they cannot demonstrate that they are entitled to compensable damages as a result of BATCo's conduct. Even assuming that the plaintiffs cannot prove that they suffered damages as a result of their reliance on the predicate acts specifically alleged against BATCo, this argument does not persuade. As is described in Part V.B.1.2.b, *supra,* members of a RICO enterprise are liable for the foreseeable acts of their coconspirators taken in furtherance of the objectives of the conspiracy. As a result, if BATCo is found to have participated in the enterprise or the conspiracy with one or more of the other defendants and plaintiffs are able to show that they suffered damages as a result of their reliance upon the acts of the other defendants, BATCo may be held liable for the overall scheme to defraud and the resulting overall damages. What portion of total computed damages, if any, that it may be forced to pay is discussed in Part IX.C, *infra.*

### d. BATCo's association with Brown & Williamson

BATCo complains that plaintiffs have attempted to "remedy the fatal flaws in their case" by pointing to actions of BATCo's affiliate, Brown & Williamson, which cannot be attributed to BATCo under any

alter ego or agency theory. *See, e.g.,* BATCo Mem. at 26–30.

Because there are significant disputes about the material facts concerning BAT-Co's *own* actions, there are, at this stage, no "fatal flaws" to be remedied by allegations regarding Brown & Williamson. Nevertheless, any attempt by the plaintiffs to rely on an "alter ego" theory to impute actions of Brown & Williamson to BATCo fails. Any actions of Brown & Williamson attributable to BATCo will be attributable to it, if at all, not because Brown & Williamson was BATCo's agent or alter ego, but rather because the two were both members of the same RICO enterprise and conspiracy.

### 3. Conclusion on BATCo's Separate Motion

Defendant BATCo's separate motion to dismiss the claims against it is denied. As the above recitation of the parties' positions demonstrates, there are numerous disputes about material facts and about the inferences and interpretations to be drawn from those facts which can only be resolved at trial. Acts of Brown & Williamson are not directly attributable to BATCo as its agent or alter ego. They may be attributed to it as a member of the enterprise and conspiracy. If BATCo is found to have participated in the charged enterprise or conspiracy, damages may be assessed against it on the theory of joint and several liability.

While the court has subject matter jurisdiction over those parts of plaintiffs' claims that are based on BATCo's membership in foreign trade associations, use of BATCo's alleged lobbying activities abroad may implicate the First Amendment right to petition a government. *See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) (First Amendment protects right of persons to associate together "in an attempt to persuade the legislature or the executive to take particular action with respect to a law"); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (accord). *But see United States v. Philip Morris,* 449 F.Supp. at 886 (only public statements that "constitute direct attempts to persuade government officials" qualify for protection under *Noerr–Pennington*; press releases, advertisements, and the like that are "aimed at influencing smokers, potential smokers, and the public" do not). The court will hear motions in limine with respect to specific items of evidence offered by plaintiffs on these matters.

### C. Defendant Philip Morris' Separate Motion for Summary Judgment on All Claims After November 2002

Defendant Philip Morris USA Inc. ("PM USA") moves separately for summary judgment on all plaintiffs' claims arising on or after November 2002. PM USA claims that, in November 2002 and at various times thereafter, it provided disclosure sufficient as a matter of law to prevent any plaintiff from believing that it claimed its "light" cigarettes were any less dangerous than its regular cigarettes. The sufficiency and clarity of these disclosures, as well as their effect on consumer knowledge, given the history of public statements by PM USA and other defendants, cannot be decided on summary judgment.

### 1. Facts

#### a. PM USA's disclosures

In November 2002, PM USA began to make disclosures regarding "light" cigarettes in package "onserts," pamphlets attached to the outside of cartons or packs of

cigarettes of PM USA's "light" and other "reduced tar" cigarettes. The onserts explained that the "lights" descriptor refers to taste and flavor, that it was possible to compensate while smoking "light" cigarettes so as to eliminate any reduction in tar or nicotine, and that consumers should not assume that "light" cigarette brands are less harmful than "full flavor" brands:

> There is no such thing as a safe cigarette. The terms "Ultra Light", "Light", "Medium" and "Mild" are used as descriptors of the strength of taste and flavor. These terms, as well as "low tar" or "lowered tar and nicotine" also serve as a relative indication of the average tar and nicotine yield per cigarette, as measured by a standard government test method.
>
> The tar and nicotine yield numbers are not meant to communicate the amount of tar or nicotine actually inhaled by any smoker, as individuals do not smoke like the machine used in the government test method. The amount of tar and nicotine you inhale will be higher than the stated tar and nicotine yield numbers if, for example, you block ventilation holes, inhale more deeply, take more puffs or smoke more cigarettes. Similarly, if you smoke brands with descriptors such as "Ultra Light", "Light", "Medium" or "Mild," you may not inhale less tar and nicotine than you would from other brands. It depends on how you smoke. You should not assume that cigarette brands using descriptors like "Ultra Light", "Light", "Medium" or "Mild" are less harmful than "full flavor" cigarette brands or that smoking such cigarette brands will help you quit smoking. If you are concerned about the health effects of smoking, you should quit.

PM USA Onsert (Def. PM USA's Mot. for Summ. Jmnt. on Claims After Nov. 2002, Ex. A). In November 2002, PM USA enclosed about 15.6 million booklets providing similar information about "light" cigarettes and compensation in more than 25 United States newspapers.

PM USA again utilized an onsert in packages of non-full flavor cigarettes in the fourth quarter of 2003 and 2004, and the second and fourth quarters of 2005. PM USA has disclosed information on its website about "light" cigarettes and compensation since October 1999. A current web page contains information identical to that found in the newspaper booklets. *See* www.pmusa.com (click on link for "Low Tar Cigarettes").

### b. Plaintiffs' "concession"

At the class certification hearing in September 2005, plaintiffs' counsel made a statement that defendant PM USA contends is a concession of the non-viability of all post-November 2002 claims. The court asked plaintiffs' counsel whether, if PM USA had made the statements now available on its website at the time it introduced "light" cigarettes in 1971, there would have been a fraud:

> THE COURT: Now, is it your contention that if they had said this in '71 there would be no fraud, if they disseminated that generally?
>
> MR. HAUSFELD: Absolutely. That is a disclosure that would have communicated to the public that there really was no health difference between a light and a regular cigarette.

Sept. 13, 2005 Hr'g Tr. at 180:16–22.

Plaintiffs contest defendant's characterization of counsel's remark. They argue that his position was (and is) that, while PM USA's disclosure would have been sufficient if made in 1971, when "light" cigarettes were first introduced, it is not sufficient now, after 30 years of deceptive marketing. *See* Pls.' Opp. to PM USA's Mot., at 1 ("PM[ ]USA's purported disclo-

sures are too little, too late. They are 'too little' because they did not serve to put customers on notice of its fraud, and they are 'too late' because they came long after PM[ ]USA and its co-defendants had created a market for 'light' cigarettes founded on this fraud.").

### 2. Law

The standard for summary judgment has been set forth in Part II.A.2, *supra*. It is sufficient to reemphasize that summary judgment is appropriate only if there is no genuine issue as to any material fact. The moving party bears the burden of proving that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505.

### 3. Application of Law to Facts

To prevail on their civil RICO claim, plaintiffs must establish that defendants conducted a scheme to defraud them of money or property and that smokers reasonably relied to their detriment on defendants' misrepresentations. *See generally* Part III, *supra*. The crux of plaintiffs' claim is that defendants defrauded consumers by describing certain cigarettes as "light"—implying less damage to health— without disclosing that, when smoked, they delivered no less tar or nicotine than "regular" cigarettes. *See, e.g.*, Sept. 13, 2005 Hr'g Tr. at 192:18–22 ("Had they put nothing on the cigarette, had they not called it lights, then it might be a different story, but they chose a word which by publicly embedded expectation was synonymous with less harmful."). To prevail before trial on all claims after November 2002, PM USA must demonstrate, first, that its disclosures were so widely distributed and so clear that, as a matter of law, no scheme to defraud existed after that date or, second, that no plaintiff could have

reasonably relied upon the "lights" descriptor after that date.

Critical in this analysis is context: defendant's recent representations must be viewed in light of the marketing campaigns and public statements of the previous thirty years.

#### a. Absence of a scheme to defraud

The cases cited by defendant in support of its contention that its recent disclosures demonstrate the absence of a scheme to defraud as a matter of law are inapt. In each of them, a court or a jury found that no misrepresentation had ever been made. *See, e.g., Perlman v. Zell*, 185 F.3d 850, 854 (7th Cir.1999) (no RICO claim possible where jury found defendant had not committed fraud); *Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1251 (7th Cir.1989) (affirming grant of summary judgment; no mail or wire fraud possible where plaintiffs had "not alleged or shown that the defendants lied to them—or anybody else"; "mere failure to disclose, absent something more" was insufficient as a matter of law); *A. Terzi Prods., Inc. v. Theatrical Protective Union*, 2 F.Supp.2d 485, 500 (S.D.N.Y. 1998) (wire fraud claim could not be sustained where plaintiffs alleged "that defendants coerced plaintiffs into entering a labor agreement through threatening and abusive conduct" that "contain[ed] no element of deception whatsoever"); *Smith v. Grundy County Nat. Bank*, 635 F.Supp. 1071, 1076 (N.D.Ill.1986) (RICO mail fraud complaint properly dismissed where all terms of a financial transaction were disclosed to, and approved by, plaintiffs "in advance").

Here, by contrast, plaintiffs have provided ample support for their allegations of three decades of affirmative misrepresentations and concealment. *See* Pls.' Cert. Brief. *See also* Appendix A, *supra* (detailed factual findings of fraud after nine

month trial in federal government's suit against the tobacco industry). Whether the disclosures made after defendant's lengthy marketing campaign are sufficient to make clear the "truth" about "light" cigarettes presents several matters for jury resolution.

For example, reasonable jurors might differ as to whether the number of copies of the pamphlets and onserts were sufficient to reach a critical mass of smokers, thus "clearing the air" of any lingering misrepresentations. No evidence has been presented of the geographic breadth of distribution or the reaction of any smoker to the onsert. Similarly, PM USA has provided no evidence of the readership of the newspapers in which its pamphlets were included—were they likely to be seen, or read, by smokers of "light" cigarettes? A rational juror could also believe, as James Morgan, Brand Manager of Marlboro (including Marlboro Lights) from 1969 to 1972, has testified, that:

> if you took the advertising, the point of sale, whatever may have been said on the racks or the cartons, the whole panoply of what the consumer saw about a cigarette brand would be more influential in that consumer's perception of the tar of that brand ... than the fact that they may or may not have sat down and looked at a newspaper that had the latest Federal Trade Commission report.

*United States v. Philip Morris*, at 2006 WL 2381449, *35.

The same doubts of comprehension exist about the internet disclosures: PM USA claims that its website informed consumers about "light" cigarettes as far back as October 1999, but evidence of the content and style of the information conveyed in the old site pages has not been put before the court. *See* Def. PM's Mot., Ex. C (website content dated May 23, 2006). The current website contains the same information provided in the newspaper booklets and package onserts, but PM USA has offered no evidence of the number of consumers that visit its website in general or its "low tar" information pages in particular.

Plaintiff counsel's remark in arguments was not a concession that PM USA's disclosures were sufficient to absolve it of liability in 2002, but that they would have been in 1971, before defendants began their fraudulent "health assurance" marketing campaign.

### b. Reasonable reliance

Since the sufficiency of PM USA's message is in dispute, it follows that PM USA's contention that plaintiffs could not establish detrimental reliance on a material misrepresentation by PM USA on or after November 2002 is premature. PM USA argues that in light of its repeated disclosures about "light" cigarettes and compensation, it would have been unreasonable as a matter of law for any consumer to have interpreted the "lights" descriptor on PM USA's cigarette packs to carry a safety message after November 2002.

PM USA cites *In re ORFA Sec. Litig.*, 654 F.Supp. 1449, 1465 (D.N.J.1987), to support its position that disclosure of information that allegedly was fraudulently withheld cuts off the time period during which a plaintiff could reasonably rely on the previous misrepresentation. Several barriers prevent the application of *In re ORFA* to this case.

First, *In re ORFA* was brought under the securities laws, not RICO. It is not clear that the securities fraud doctrine of "curative disclosure" applies to a case of RICO mail and wire fraud. Second, even assuming that this doctrine does apply, the disclosure in *In re ORFA* painted an "extremely negative portrait of the defen-

dant's financial and development position," and the information was highly contradictory to defendant's past press releases and reports. *Id.* at 1464. By contrast, the disclosures PM USA provided through newspapers and on its website state:

> A *smoker should not assume* that brand descriptors such as "light" or "ultra light" *indicate with precision* either the actual amount of tar and nicotine inhaled from any particular cigarette, or the relative amount as compared to competing cigarette brands. *Some researchers report* that smokers of "light" cigarettes inhale as much tar and nicotine as from full-flavor brands.

PM USA Mot., Ex. B at 8 (emphasis supplied). These warnings are somewhat equivocal. Reasonable jurors could disagree about their import. *Cf. In re AM International Sec. Litig.,* 108 F.R.D. 190 (S.D.N.Y.1985) (holding that the class period could not be narrowed because substantial and triable issues of fact remained with respect to defendants' contention that the market was cured). Securities investors, a jury might find, are more likely to follow details of disclosure than lay smokers since the former are trying to protect their investments, while the latter are, in the main, following a habit embedded by addiction.

On the present record, it would be improper to remove these substantial questions of fact about the scope or time limits of the class from jury consideration. *See Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 572 (2d Cir.1982) (upholding judge's decision to extend securities fraud class period beyond issuance of press release that defendants claimed had cured the market). Whether a plaintiff could have reasonably relied on the implicit health claims in PM USA's marketing in the period after November 2002 is a contested issue of fact to be resolved by the jury.

c. Judicial estoppel

■ Judicial estoppel prevents a party from asserting a position when (1) the party argued an inconsistent position in a prior proceeding and (2) the prior inconsistent position was adopted by the court in some manner. *Bates v. Long Island R.R. Co.,* 997 F.2d 1028, 1038 (2d Cir.1993). "Judicial estoppel protects the sanctity of the oath and the integrity of the judicial process." *Id.* at 1037.

As the Supreme Court cautioned in *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), a court must carefully consider the contexts in which apparently contradictory statements are made to determine if there is, in fact, direct and irreconcilable contradiction. *See id.* at 807, 119 S.Ct. 1597 (representation of complete disability in a Social Security proceeding was not directly contradicted by party's ADA claim that he could perform essential job functions with reasonable accommodation because the former proceeding did not consider the effect that reasonable workplace accommodations would have on the claimant's ability to work).

■ Judicial estoppel applies equally to inconsistent positions asserted earlier in the same litigation. *See Ergo Science, Inc., v. Martin,* 73 F.3d 595, 598 (5th Cir.1996); *Cont'l Ill. Corp. v. Comm'r of Internal Revenue,* 998 F.2d 513, 518 (7th Cir.1993). Plaintiffs argue that PM USA's November 2002 disclosures are inconsistent with the position adopted by PM USA in response to plaintiffs' motion to preclude PM USA from arguing that "light" cigarettes are safer than regular cigarettes. *See* Mem. in Supp. of Pls.' Rule 16(c) Mot. (Dkt. No. 128).

■ Inapplicable is judicial estoppel. PM USA's statements in opposition to

plaintiffs' Rule 16(c) motion do not contradict their position in support of their current motion to dismiss post-November 2002 claims. Defendant's position in its current motion is that its public disclosures were sufficient to put smokers on notice of possible risks, thus demonstrating the absence of a scheme to defraud, *see supra*; its position in the previous motion was that it had never conceded that "light" cigarettes were, in fact, as dangerous as regular cigarettes. *See* Defs.' Mem. in Opp'n to Pls.' Rule 16(c) Mot. (Docket No. 736), at 4–5 ("[T]he weight of the scientific evidence suggests that lower FTC machine-measured tar yield cigarettes may reduce the risk of certain smoking related diseases, such as lung cancer.") (quoting Def. PM USA's Resp. to Pls.' 4th Reqs. For Admissions, at No. 17). In light of this ruling it is not necessary to consider whether it would be against public policy to use as admissions attempts to warn consumers of dangers. *Cf.* Fed.R.Evid. 407 (prohibiting introduction of evidence of subsequent remedial measures).

 d. Findings on continued increases in nicotine inhaled from "light" cigarettes

It has been recently reported that, in the period during and after the public statements that PM USA relies upon as evidence of the absence of a scheme to deceive the public, nicotine in smoke inhaled by smokers, including those using "light" cigarettes, increased significantly. *See* Appendix F, *infra* (Massachusetts Department of Health report). This increase, which might hasten or deepen addiction and make quitting more difficult, is arguably a critical fact never disclosed by any defendant. It appears to be industry-wide. A jury might find that this new information supports a conclusion of an ongoing duplicitous scheme. *See* Part III.

E.1.b, *supra* (fraudulent concealment may toll statute of limitations).

 *4. Conclusion on Philip Morris' Separate Motion*

Plaintiffs' motion for judicial estoppel is denied. Defendant PM USA's motion for summary judgment is denied. PM USA (and any other defendant) will be free to put before the jury evidence of its disclosures in support of its argument that no scheme to defraud existed after November 2002 and that plaintiffs could not have reasonably relied on any implicit health claim in the "lights" descriptor after that date.

## VI. Plaintiffs' Motions for Summary Judgment

Plaintiffs move for summary judgment or, in the alternative, in limine rulings on a variety of defenses used by defendants in other similar litigation in other courts. Because granting any of these motions would prevent the jury from fairly evaluating the complex factual issues in this case, all the motions are denied.

### A. FTC Defense

Claiming discovery of new evidence, plaintiffs move pursuant to Rule 60(b) of the Federal Rules of Civil Procedure for relief from a previous order denying their motion for summary judgment on what they describe as defendants' "FTC defense." The motion is denied.

#### *1. Facts*

##### a. FTC action

Pursuant to section 45(a) of title 15 of the Unite States Code, the Federal Trade Commission ("FTC") has jurisdiction over the advertising and testing of cigarettes. *See* 15 U.S.C. § 45(a)(2) (empowering the FTC to prevent "unfair methods of compe-

tition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce").

As described in great detail in *Price v. Philip Morris,* 219 Ill.2d 182, 186–208, 302 Ill.Dec. 1, 848 N.E.2d 1 (Ill.2005), the FTC regulated the tobacco companies' ability to make health claims about their products in almost every decade since the 1930s through formal administrative complaints, *see, e.g., Julep Tobacco Co.,* 27 F.T.C. 1637 (1938) (company made unsubstantiated health claims for its cigarettes); *AMERICAN BRANDS, INC.,* 1971 WL 128779, 79 F.T.C. 255 (1971) (company claimed its cigarettes were "lower in tar" without "clearly disclosing material tar and nicotine data"); *IN RE AMERICAN TOBACCO CO.,* 1995 WL 17012576, 119 F.T.C. 3, 5 (1995) (company claimed consumers would "get less tar by smoking ten packs of Carlton brand cigarettes than by smoking a single pack of the other brands of cigarettes depicted in the ads"); advertising guidelines, *see, e.g.,* 6 Trade Reg. Rep. (CCH) ¶ 39,012 (1988) (FTC Release, 1955) (requiring cigarette manufacturers making claims regarding tar and nicotine yields to substantiate their claims by "competent scientific proof"); 6 Trade Reg. Repo. (CCH) ¶ 39,012.70 (1988) (FTC Release, 1966) (permitting factual statement of milligrams of nicotine or tar, but "no collateral representation . . . as to reduction or elimination of health hazards"); 32 F.R. 11,178 (August 1, 1967) (prescribing conditions for "FTC Method" of testing, adopted as the sole acceptable method of measuring tar and nicotine); investigations, *see, e.g., In re Lorillard,* 1978 WL 206080, 92 F.T.C. 1035 (1978) (after tobacco company suggested variation in test method to prevent blocking of ventilation holes, FTC reconsidered and then adhered to its existing methods); enforcement proceedings, *see, e.g., Federal Trade Comm'n v. Brown & Williamson Tobacco Corp.,* 778 F.2d 35 (D.C.Cir.1985) (agency sought injunction prohibiting manufacturer from advertising its Barclay cigarettes as "1 mg tar" and "99% tar free"); consent orders, *see, e.g., IN RE AMERICAN TOBACCO CO.,* 1995 WL 17012576, 119 F.T.C. 3 (company agreed to abandon Carlton advertising campaign that was the source of complaint described *supra* ); *IN RE LORILLARD,* 1972 WL 128702, 80 F.T.C. 455 (1972) (companies agreed to FTC demand that they display in advertising the health warning already required by Congress on cigarette packages); and voluntary agreements, *see, e.g.,* FTC, Report to Congress, Dec. 31, 1970, attached to Defs.' Opp. to Pls.' Mot. on FTC Defense, Ex. 78, at 18–19 (describing approval of tobacco industry plan "to disclose tar and nicotine content in cigarette advertising on a voluntary basis"). *See generally Price,* 219 Ill.2d at 186–208, 302 Ill.Dec. 1, 848 N.E.2d 1.

In *Price,* a suit under state fraud law making allegations similar to that in the present case, the Illinois Supreme Court found that consent orders issued in 1971 and 1995 restricting "use of the words 'low,' 'lower,' or 'reduced' or like qualifying terms" "specifically authorize[d] all United States tobacco companies to utilize" such terms, including "light," "so long as the descriptive terms are accompanied by a clear and conspicuous disclosure of the 'tar' and nicotine content[.]" It held that plaintiffs' suit was thus barred under a state statute immunizing defendants against consumer fraud claims based on actions "specifically authorized by law administered by any regulatory body or officer acting under statutory authority of this State or the United States." *Price,* 219 Ill.2d at 196, 265–66, 302 Ill.Dec. 1, 848 N.E.2d 1.

There is no analogous provision in RICO. Yet evidence that the FTC approved defendants' representations might

tend to disprove plaintiffs' allegations of a scheme to defraud the public. Defendants contend in this suit that the FTC, directly and indirectly, authorized descriptors such as "low tar" and "lights"; that "lights" is a synonym for "low tar"; and that the FTC, in effect, defined "low tar" by publishing the amount of tar "imbibed" by the FTC's approved smoking machine for defendants' cigarette brands.

### b. Procedural history

During the first round of briefing in this litigation, plaintiffs moved pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 104(a) of the Federal Rules of Evidence for an order that there was no genuine issue of material fact as to their following contentions: (1) that the Federal Trade Commission ("FTC") did not require defendants to disclose tar and nicotine levels in advertising and packaging; (2) that the FTC did not approve the "lights" descriptor; and (3) that the FTC did not define the "lights" descriptor. Alternatively, plaintiffs requested that the court preclude defendants from raising as an affirmative defense that they were acting pursuant to FTC regulation in using the "lights" descriptor or disclosing tar and nicotine information in advertising or packaging, or introducing evidence to that effect. They contended that the FTC has never taken an official position regarding the "lights" descriptor and that it has not recognized, approved of, or defined this descriptor.

Plaintiffs' motion was denied, because:

[t]he relationship of "tar" to "lights" and the history of FTC action on the subject pervades the lawsuit. The jury could not understand and decide critical issues were plaintiffs' summary judgment motion or alternative motion granted in whole or in part. Evidence bearing on the issue is capable of inferences supporting either side's views.

Mem. & Order on Pls.' Mot. Re "FTC Defense" of Sept. 26, 2005 ("FTC Defense Order"), at 2.

Plaintiffs offer deposition testimony of David Beran, Marketing Director of Philip Morris, and a designated 30(b)(6) witness, in support of their motion for relief from this previous order. *See* Fed. R. Civ. P. 30(b)(6) (when a party subpoenas a corporation, the corporation "shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf ..."). Mr. Beran was deposed after the court's ruling that further discovery was necessary to develop a record sufficient to support decision on the dispositive motions.

Emphasized by plaintiffs is the following passage of the deposition:

Q: Mr. Beran, can you identify the FTC rule which you contend regulates the product descriptors such as Lights for the sale of cigarettes?

A: No.

Q: Why not?

A: It is done, I believe, by practice, not by rule.

Q: How did it come about by practice?

A: When we came out with Marlboro Lights, Lights did not exist prior to that time. We came out with Marlboro Lights in the marketplace and over the years, the FTC could have said, no, take it off. They have not, to my knowledge.

Deposition of David Beran, *Schwab v. Philip Morris*, May 25, 2006 ("Beran Dep."), at 348:6–348:19.

In opposition, defendants maintain that 1) the testimony is not "new" and 2) the testimony is consistent with their position

that the FTC authorized use of the "lights" descriptor.

### 2. Law

Plaintiffs look to the wrong source for the district court's authority to modify interlocutory orders such as this one.

 Rule 60(b) provides:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b) ....

Fed.R.Civ.P. 60(b). By its terms, the rule applies only to a "final judgment, order, or proceeding." A denial of summary judgment is not a final order. *See United States v. 228 Acres*, 916 F.2d 808, 811 (2d Cir.1990) ("An order that denies summary judgment or grants partial summary judgment ... is nonfinal."). Rule 60(b) is inapplicable by its terms.

 Nevertheless, relief is possible. Rule 60(b) does not affect the district court's inherent power to modify its own interlocutory orders.

The addition of the qualifying word "final" emphasizes the character of the judgments, orders or proceedings from which Rule 60(b) affords relief; and hence interlocutory judgments are not brought within the restrictions of the rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires.

Fed.R.Civ.P. 60(b) advisory committee notes (1946). *See also John Simmons Co. v. Grier Bros. Co.*, 258 U.S. 82, 88, 42 S.Ct. 196, 66 L.Ed. 475 (1922) ("If [an order] be only interlocutory, the court at any time before final decree may modify or rescind it."); *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623 (2d Cir.1962) ("Of course, absent an appeal, a district court has complete power over its interlocutory orders."); *Project Strategies Corp. v. Nat'l Commc'ns Corp.*, No. CV–94–4925, 1995 WL 669655, at *2 (E.D.N.Y. Oct. 27, 1995) (reconsidering issuance of temporary restraining order as a matter of discretion).

### 3. Application of Law to Facts

Though possible, relief from the previous order denying plaintiffs' motion for summary judgment on defendants' "FTC defense" is unwarranted. The issue should be adjudicated before the jury as part of the central, common questions relating to defendants' intentions to deceive.

#### a. "New" evidence

Defendants' first objection—that the testimony is not "new evidence" under Rule 60(b)—is not well taken. Because Rule 60(b) does not limit the court's power to revise its interlocutory orders, the testimony's novelty is immaterial. These proceedings were referred to the magistrate judge for the purpose of completing discovery. *See* Order of Nov. 7, 2005, at 1 ("Full discovery is to proceed under the control of the magistrate judge, who is respectfully requested to ensure that, as speedily as practicable, all parties have a fair opportunity to gather the evidence necessary for the disposition of the pending motions on class certification and dismissal."). Additional depositions of experts and 30(b)(6) witnesses were permitted with the expectation that they would inform the decision on the dispositive motions, including those that were denied. *See, e.g.,* Mem. & Order on Stat. of Limitations, 2005 WL 2467766, at *7 (E.D.N.Y. Oct. 6, 2005) (denying defendants' motion for summary judgment;

"[l]eave to renew is granted upon completion of discovery, with additional expert and other evidence on how dated knowledge is to be imputed to the class"); Mem. & Order on Mutagenicity, 2005 WL 2401635, at *1 (E.D.N.Y. Sept. 27, 2005) (denying defendants' motion for summary judgment on plaintiffs' claims of mutagenicity of "light" cigarettes; "defendants' contentions on this issue will be considered with the certification motion and general motion to dismiss upon completion of discovery").

The court gives Mr. Beran's deposition testimony full consideration. It does not warrant a change in the court's ruling.

b. Defendants' stated position

■ Defendants' second objection is fatal to the motion. Defendants' position in this litigation has been from the start that the FTC authorized, directly or indirectly, defendants' conduct by withdrawing proposed Trade Regulation Rules ("TRRs") that would have required the disclosure of tar and nicotine yields; entering into consent decrees with the tobacco industry that permitted the use of "qualifying terms" such as "low" tar, provided those claims were substantiated by FTC measurements; investigating the use of the "lights" descriptor and deciding not to take any action; and formally defining which cigarettes could be considered "low tar." Some evidence supports this position, *see supra*, though a rational juror could also conclude that the FTC did not, by action or inaction, "approve" the use of the "lights" descriptor, but merely refrained from banning it when defendants acceded to some of the FTC's demands. *Cf. Price*, 219 Ill.2d at 192, 302 Ill.Dec. 1, 848 N.E.2d 1 (quoting the chairman of the FTC's explanation for the agency's preference for self-regulation over direct intervention: "Trade regulation rules, if contested in the

courts, might take a long time to become effective. A workable voluntary plan by the industry could be put into effect immediately.").

Mr. Beran's remark that the "lights" descriptor was introduced by Philip Morris and continues to be used "by practice, not by rule," is consistent with both plaintiffs' and defendants' positions. As the court indicated in its previous ruling on the topic:

The relationship of "tar" to "lights" and the history of FTC action on the subject pervades the lawsuit. The jury could not understand and decide critical issues were plaintiffs' summary judgment motion or alternative motion granted in whole or in part. Evidence bearing on the issue is capable of inferences supporting either side's views.

FTC Defense Order at 2. The deposition testimony adds to the welter of evidence on tobacco industry-FTC relations; it does not resolve it as a matter of law. *Cf.* Fed.R.Civ.P. 56 (summary judgment is appropriate only when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").

To the extent that plaintiffs expand their motion to include a request for a ruling that defendants were never "required" to use the "lights" descriptor, that request is also denied. Defendants have not contended in this litigation that the FTC mandated use of the descriptor. *See, e.g.,* Def. Philip Morris USA Inc.'s Resp. to Pls.' Third Request for Admissions, at Request No. 13–14 (admitting that "the FTC does not mandate the use of the descriptor 'lights' for any cigarette advertising" and that "the FTC does not mandate the use of the descriptor 'lights' for any cigarette packaging"). In limine rulings are inappropriate on subjects not in controversy.

### 4. Conclusion on FTC Defense

Plaintiffs' motion for reconsideration of the previous order denying summary judgment is granted. The previous decision is adhered to. The interaction between the FTC and defendants is a relevant issue in the case; the jury should hear all evidence pertinent to it.

### B. Compensation Defense

Plaintiffs move for summary judgment on, or in the alternative for *in limine* orders restricting, defendants' compensation defense. The motion and alternative motion are denied. The issues respecting compensation are central to the case and should be aired before a jury.

Compensation refers to the techniques used by smokers to increase their intake and retention of tar and nicotine in cigarettes. They can do this, among other ways, by inhaling smoke more deeply into their lungs and holding it there longer; covering up the holes in cigarette papers designed to reduce ingestion of tar; smoking more cigarettes; and smoking more of each cigarette to reduce the filtering action of the unsmoked tobacco. Whether and when smokers were aware of the effect of these techniques is strongly contested.

Plaintiffs seek immediate relief in the form of an order that there is no genuine issue of material fact as to the following: (1) that smokers did not understand the phenomenon of compensation; (2) that, inconsistent with an understanding of compensation, smokers believed that "light" cigarettes were healthier than regular cigarettes; (3) that defendants intentionally concealed information concerning compensation from smokers; (4) that defendants designed cigarettes that exploited smokers' tendency to compensate; and (5) that whether compensation is "complete" is immaterial to the viability of a fraud claim. Alternatively, plaintiffs request an order precluding defendants from introducing evidence (1) that the public was aware of the phenomenon of compensation and (2) relying on the theory that no fraud claim can exist unless compensation was "complete."

Defendants strongly urge that the compensation issue is relevant: the phenomenon was well known to smokers of "light" cigarettes, they contend, and thus there was no fraud.

 Judgment as a matter of law cannot be granted on any of these issues.

(1) Plaintiffs' assertion that smokers must be deemed, as a matter of law, not to have known about compensation is based largely on defendants' internal documents. They cite, for example, a May 6, 1992 BATCo report titled, "Topics in Smoking and Health 'Bible,' " which states:

> There can be no guarantee that a smoker who switches from one product to another delivering a lower 'tar' value will thereby reduce his intake of 'tar'. He may well alter the way he smokes the second product in some subtle fashion and so adjust his intake of smoke to fit his needs. In this way, he may inadvertently increase his intake of other substances in the smoke.
>
> League tables and delivery data on products may, therefore, be misleading to the consumer, who will be unaware of the sub-conscious ways in which he manipulates his own behavior.

Bates No. 500887606–7607, Ex. 19 to Pls.' Mot. on Compensation Defense. *See also* R.J. Reynolds, "A Gap in Present Cigarette Product Lines and an Opportunity to Market a New Type of Product," Bates No. 500790782 ("Given a cigarette that delivers less nicotine than he desires, the smoker will subconsciously adjust his puff volume and frequency, and smoking frequency . . . ."). While such documents are

highly relevant to *defendants'* knowledge, actions, and intent, they are not probative of actual consumer knowledge.

Defendants offer a number of sources suggesting that at least some smokers knew of compensation. *See* Defs.' Opp. to Pls.' Mot. on Compensation Defense, Exs. 27–47 (including Surgeon General's Reports, magazine and newspaper articles, and scientific studies published from the 1930s to the 1990s addressing compensation). Whether defendants' persistent marketing efforts overwhelmed these occasional reports is a matter for the jury.

(2) Similarly, defendants' internal marketing plans are not sufficient to remove from jury consideration the issue of consumer beliefs about the meaning of the "lights" descriptor. Documents such as the following 1977 Brown & Williamson Internal Marketing Study strongly suggest that defendants intended to assuage smokers' fears of health risks:

[A]s the dynamic proportion of quitters continues to be larger than the proportion of starters, actual smoking incidence has declined about ten percentage points over the last ten years .... [I]ncreases in per capita consumption are assumed to correlate with lowered 'tar' delivery as well as other factors [including] HEALTH REASSURANCE: Almost all smokers agree that the primary reason for the increasing acceptance of low 'tar' brands is based on the health reassurance they seem to offer .... It must be assumed that Full Taste smokers come down to 'low tar' expecting less taste ... they are willing to compromise taste expectations for health reassurance.

Bates No. 775036043–44, Pls.' Mot. on Compensation Defense, Ex. 28 (capitals in original). *See also* BATCo Memorandum, April 14, 1977, Bates No. 100427794, Pls. Mot. on Compensation Defense, Ex. 30

("All work in this areas should be directed towards providing consumer reassurance about cigarettes and the smoking habit .... [A]dvertising for low delivery or traditional brands should be constructed ... so as not to provoke anxiety about health, but to alleviate it ...."). Whether smokers in fact perceived "light" cigarettes as healthier than regular cigarettes, however, remains subject to proof and argument before the jury.

(3) There is strong evidence that defendants intentionally concealed information about compensation from smokers. *See United States v. Philip Morris*, Appendix A at 449 F.Supp.2d at 801–39, *supra*. Yet at least one of the defendants has shared its research information with public health officials and governmental agencies. *See* 449 F.Supp.2d 236–38. Critical at trial will be the timing and extent of such disclosures, since they may impact on the duration and scope of any scheme to defraud and the possibility of proper conduct by some defendants. Jury questions are presented.

(4) Plaintiffs support their motion for partial summary judgment on defendants' alleged design of cigarettes that exploited compensation subtly with internal documents describing *possible* products and debating company policy towards these hypothetical products. *See, e.g.,* R.J. Reynolds interoffice memorandum of March 4, 1982, Bates No. 503670658–59 (discussing the "next generation" of cigarettes that would yield no tar under the FTC method but 20–40 mg of tar when smoked by a human; proposing "to provide design sketches or prototypes"). While discomfiting to defendants, these, too, are insufficient facts justifying judgment as a matter of law that such products were actually produced and marketed.

(5) Plaintiffs' assertion that the completeness of compensation is irrelevant to the fraud claims assumes key facts at issue. A necessary antecedent to plaintiffs' proof of misrepresentation is proof of what was represented: were smokers promised a healthier cigarette, a cigarette that delivered less tar and nicotine when smoked, or merely a cigarette that, by an FTC-defined methodology, contained a stated number of milligrams of these substances? Only after the jury decides upon the content of the implicit and explicit promises conveyed by defendants' marketing can it decide whether the promises were kept. Evidence of the completeness of compensation is pertinent to this latter determination.

(6) Plaintiffs opposed defendants' view, expressed at the September 13, 2006 hearing, that only compensation that exists with respect to an individual cigarette can form the basis of an injury—that is to say, if smoking a single "light" did not satisfy a smoker's need for nicotine, and he picked up a second or third cigarette to make up the deficiency, ingesting more tar than he would have from a single regular cigarette, the smoker would have been on notice of the change and there could be no fraud. Tr. of Sept. 13, 2006 at 124:24–125:17. Defendants appear to have known that nicotine's addictive properties might lead to compensation by smokers covering up ventilation holes to inhale more smoke, holding the smoke in the lungs longer and deeper, smoking more of any one cigarette, and smoking a greater number of cigarettes. All these techniques were used to compensate for the lower nicotine content of "light" cigarettes—and in the process, exposed smokers to levels of tar greater than or equal to that released by regular cigarettes. Defendants' per-cigarette argument is one the jury may, but is not required to, consider in connection with compensation.

The motions are denied.

## C. Compliance with Public Health Community Defense

Plaintiffs seek an order that there is no genuine issue of material fact as to the following: that the defendants did not act in compliance with the directives of the public health community in designing, manufacturing and marketing defendants' "low tar" products. Alternatively, plaintiffs request that the court preclude defendants from introducing evidence to contradict that allegation. It is their contention that defendants' claim of compliance with the public health community's views is contradicted by their failure to adhere to the public health community's desires with respect to "low tar" or "light" cigarettes.

Defendants contend that they acted in compliance with the public health community's recommendations in developing a Federal Trade Commission-measured low tar and low nicotine cigarette and that they did not withhold relevant information regarding health issues from the FTC or the public health community. Defendant Liggett Group, Inc. opposes on the ground that plaintiffs' motions are particularly misplaced with respect to Liggett, which has been more forthcoming about smoking health issues than other defendants.

The evidence of the relationship among defendants, plaintiffs, various components of the health community, and governmental agencies on smoking health issues is extraordinarily extensive and covers many years. *Compare United States v. Philip Morris*, Appendix A at 449 F.Supp.2d at 499–507, *supra* (finding defendants misled governmental agencies and public health officials) *with* Defs.' Mem. in Opp. to Pls.' Mot. on Public Health Defense, Exs. 3–8 (various plaintiff and defense experts testifying that a num-

ber of public health organizations recommended that smokers who could not quit smoke lower tar cigarettes between 1950s and 1990s). It is pertinent to defendants' intent and plaintiffs' reliance to determine whose statements smokers were relying on when they chose "light" cigarettes. If they relied in part on messages from the public health community and governmental agencies, to what extent those messages were tainted by defendants' alleged fraud is a jury question.

The motion is denied.

## D. Meaning of "Lights" Descriptor

Plaintiffs seek an order that there is no genuine issue of material fact as to the following: that the defendants never intended the "light" or "lights" descriptor to refer to taste. Alternatively, plaintiffs request that the court preclude defendants from introducing evidence that the meaning of the "light" or "lights" descriptor was primarily a reference to the taste of defendants' products. Their contention is that the word "lights" was intended to convey to the smoker that "light" cigarettes were not as harmful to health as "regular" cigarettes.

Defendants' view is that the evidence demonstrates that they intended "lights" to refer to a lighter-tasting cigarette and that many consumers understood this.

■ For the reasons set out in Part VI.B, *supra*, the issue of smokers' beliefs cannot be resolved on summary judgment. Evidence of consumers' perceptions of the meaning of the "lights" descriptor is necessary to prove or controvert their reliance on defendants' representations and will be received. *See also* the discussion of collateral estoppel in Part IV, *supra*.

The motion is denied.

## VII. Plaintiffs' Motion for Class Certification

Critical to plaintiffs' case is certification as a class action. No other method of aggregation of tens of millions of smokers' claims is practicable. The small amount of possible recovery for each smoker could not justify the expensive and time-consuming pretrial and trial procedures required. As indicated below, an analysis of the facts and law supports certification over defendants' objections.

### A. Class Certification Under Rule 23

In order to certify a class action, Rule 23 of the Federal Rules of Civil Procedure requires plaintiffs to meet two major requirements. First, they must satisfy all four of the conditions of Rule 23(a) and, second, they must demonstrate that their action fits within one of the three categories of Rule 23(b). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689, (1997); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132–133 (2d Cir.2001).

#### 1. Burden of Proof

■ Plaintiffs bear the burden of proof in showing that these requirements have been met. *Amchem Prods.*, 521 U.S. at 614, 117 S.Ct. 2231; *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir.1999). The Court of Appeals for the Second Circuit still apparently holds that they need not show that they are likely to prevail on the merits of their claim at this stage in the litigation. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (internal citation and quotation marks omitted) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule

23 have been met."). *See also Visa Check*, 280 F.3d at 135 (a motion for class certification is not an occasion for examination of the merits of the case); *Caridad*, 191 F.3d at 293 (courts should not "consider or resolve the merits of the claims of the purported class."). Yet conservation of court resources requires that plaintiffs demonstrate that they have a reasonable chance of success before the costs attendant on certification are shouldered by the litigants.

A "rigorous analysis" is required to determine that the Rule 23 requirements have been met. *See Gen. Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 93 (S.D.N.Y.2004) ("In sum, under the binding caselaw in this Circuit, a district court may not simply accept the allegations of plaintiffs' complaint as true. Rather, it must determine, after a 'rigorous analysis,' whether the proposed class comports with all of the elements of Rule 23. In order to pass muster, plaintiffs— who have the burden of proof at class certification—must make 'some showing.' That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint.").

"Evaluation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims," *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. at 91, and sometimes requires the court to "look past the pleadings" and consider evidence relevant to class certification even if that evidence is also related to the merits of the case. *Castano v. American Tobacco Company*, 84 F.3d 734, 744 (5th Cir.1996). "Both the Supreme Court and the Second Circuit, however, have suggested that re-

quiring a plaintiff to establish the elements of Rule 23—especially when those elements are 'enmeshed' in the merits—by a preponderance of the evidence would work an injustice." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. at 92. For example, when considering expert evidence in a class certification motion, the court "must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law," but should not consider decisive "whether the evidence will ultimately be persuasive." *Visa Check*, 280 F.3d at 135. Expert evidence thus far presented meets this test. *See* Part VIII.F.1, *infra*.

■ The Supreme Court has recognized that many of the Rule 23(a) and (b) requirements are not distinct from one another, but rather "merge" when considered in light of the overall purposes of Rule 23. *Falcon*, 457 U.S. at 158 n. 13, 102 S.Ct. 2364 (1982). *See also Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). Ultimately, courts have broad discretion in determining whether to certify a class and are encouraged to construe the requirements of Rule 23 liberally in order to effectuate its overall purpose. *See, e.g., Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52 (2d Cir.2000); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir.1990); *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 563 (2d Cir.1968).

### 2. Purpose of Rule 23

In interpreting Rule 23, the Second Circuit Court of Appeals has explained that central to its ameliorative purpose is protection of small claims through aggregation.

Class actions serve an important function in our judicial system. By establishing a technique whereby the claims of

many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation.

. . . . .

[T]he Advisory Committee on the Rules of Civil Procedure [ ] completely redrafted Rule 23 in order to provide a thoroughly flexible remedy. Throughout the course of a proceeding courts are given complete control to give assurance that the procedures adopted are fair, reasonable and effective. All actions will result in judgments binding on the entire group of individuals found by the court to be members of the class.

*Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 560 (2d Cir.1968).

■■ Use of class actions to vindicate the rights of, and provide remedies for, small claimants who might otherwise not be able to utilize the judicial system is favored. *See Amchem Prods.,* 521 U.S. at 617, 117 S.Ct. 2231 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (internal quotation marks omitted).

The Supreme Court recognized that protecting small claims was especially important in class actions certified under Rule 23(b)(3), for which "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods.,* 521 U.S. at 617, 117 S.Ct. 2231 (internal quotation marks omitted).

*See also Eisen v. Carlisle and Jacquelin,* 417 U.S. at 186, 186 n. 8, 94 S.Ct. 2140 (Douglas, J., joined by Brennan, J. and Marshall, J., concurring) ("The class action is one of the few legal remedies the small claimant has against those who command the status quo.... The matter touches on the issue of the credibility of our judicial system. Either we are committed to make reasonable efforts to provide a forum for adjudication of disputes involving all our citizens—including those deprived of human rights, consumers who overpay for products because of antitrust violations and investors who are victimized by insider trading or misleading information—or we are not. There are those who will not ignore the irony of courts ready to imprison a man who steals some goods in interstate commerce while unwilling to grant a civil remedy against the corporation which has benefited, to the extent of many millions of dollars, from collusive, illegal pricing of its goods to the public.... When the organization of a modern society, such as ours, affords the possibility of illegal behavior accompanied by widespread, diffuse consequences, some procedural means must exist to remedy—or at least to deter—that conduct.") (internal citation and quotation marks omitted).

Congress in effect approved the class action format as a means of promoting litigation efficiency by consolidating a large number of small claims into a single convenient forum, preventing both the courts and the parties from being forced to litigate the same issues multiple times. *See Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. at 155, 102 S.Ct. 2364 (explaining that "the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23"); *American Pipe & Constr. Co. v. Utah,* 414

U.S. 538, 552–53, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974) (efficiency and economy are primary purposes of the class action procedure). Recently, Congress has reaffirmed its confidence in federal class actions by providing for the federalization of much national class action litigation formerly conducted in state court. *See* Class Action Fairness Act ("CAFA"), Pub.L. 109–2, 119 Stat. 4 (2005); *Exxon Mobil Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 125 S.Ct. 2611, 2627, 162 L.Ed.2d 502 (2005) ("Subject to certain limitations, the CAFA confers federal diversity jurisdiction over class actions where the aggregate amount in controversy exceeds $5 million.").

Although Rule 23 was designed to promote judicial efficiency and help vindicate the rights of small claimants, it does not sacrifice the due process rights of absent class members who would be bound by the adjudication despite their lack of active participation. Many of the requirements of Rule 23, as well as the discretion granted district courts in administering the proceedings, are designed to ensure that absent class members are aware of, and adequately represented in, the litigation. These over-arching purposes cause many of Rule 23's requirements to run together. *Falcon,* 457 U.S. at 158 n. 13, 102 S.Ct. 2364. Judge Schiendlin of the Southern District of New York observed:

> All of these requirements are aimed at answering two questions: *Can* the claims be managed as class actions, and *should* they be managed as class actions? In this regard, the term "claims" encompasses not only plaintiffs' claims, but also any affirmative defenses that defendants may assert. Courts must therefore exercise their judgment to further Rule 23's goals of promoting judicial economy and providing aggrieved persons a remedy when it is not economically feasible to obtain relief through multiple individual actions. The Second

Circuit requires a "liberal" construction of Rule 23. Thus, to deny a class action simply because all of the allegations of the class do not fit together like pieces in a jigsaw puzzle would destroy much of the utility of Rule 23.

*In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65, 89–90 (S.D.N.Y.2004) (emphasis in original) (internal citations and quotation marks omitted).

As already noted, Rule 23 does not mandate that each requirement have a separate and distinct sphere of operation, since rigid compartmentalization may divert the court from a proper application of the rule as a whole. *See, e.g., Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 61 (2d Cir.2000) (applying the adequacy-of-representation requirement with an eye for typicality concerns and disavowing an overly-technical or "myopic" view of Rule 23(a)(4)'s requirements); *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 163–167 (2d Cir.2001) (adopting an *ad hoc* discretionary approach to Rule 23(b)(2), rather than a strict bright-line standard, in order to effectuate the purposes and fairness of the rule). It is for this reason that the Court of Appeals for the Second Circuit has repeatedly advised district courts to interpret Rule 23 liberally to effectuate its purpose. *See Korn v. Franchard Corp.,* 456 F.2d 1206, 1209 (2d Cir.1972); *Green v. Wolf Corp.,* 406 F.2d 291, 298 (2d Cir.1968); *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. at 89–90; *In re Lloyd's Am. Trust Fund Litig.,* No. 96–Civ–1262, 1998 WL 50211, at *5 (S.D.N.Y. Feb. 6, 1998) ("The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation."); *McNeill v. New York City Hous. Auth.,* 719 F.Supp. 233, 252 (S.D.N.Y.1989) ("Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a 'standard of

flexibility in application' so that it may best serve the ends of justice and promote judicial economy in a given case.").

### B. Rule 23(a) Prerequisites

Rule 23(a) provides four threshold criteria which must be met in order for a class to be certified:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These requirements are generally referred to as numerosity, commonality, typicality, and adequacy of representation. *See Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980).

#### 1. Numerosity

##### a. Law

■■■■ The numerosity clause of Rule 23(a)(1) requires the prospective class be so numerous that joinder is "impracticable." Fed.R.Civ.P. 23(a)(1). "Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. at 86. *See also Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir.1993). The Court of Appeals for the Second Circuit has held that a prospective class of forty or more raises a presumption of numerosity. *See Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113 (S.D.N.Y. 2001). Plaintiffs need not establish the precise number of class members in or-

der to satisfy the numerosity requirement, as long as they reasonably estimate the number as substantial. *See Robidoux*, 987 F.2d at 935; *McNeill v. New York City Hous. Auth.*, 719 F.Supp. 233, 252 (S.D.N.Y.1989). They may "rely on reasonable inferences drawn from the available facts" in order to make that approximation. *McNeill*, 719 F.Supp. at 252. *See also Port Auth. Police Benevolent Ass'n v. Port Auth.*, 698 F.2d 150 (2d Cir.1983); *Kirkland v. New York State Dep't of Corr. Servs.*, 520 F.2d 420, 427 (2d Cir.1975); *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y.1981). Important are "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Robidoux*, 987 F.2d at 936.

##### b. Application of law to facts

■■■■ Plaintiffs have shown that the instant class is so numerous that joinder is impracticable, thus satisfying Rule 23(a)(1). Though plaintiffs do not know the exact size of the class, it is reasonably believed to number in the tens of millions. The class members are widely-dispersed, being resident in all fifty states.

#### 2. Commonality

##### a. Law

■■■■ The commonality requirement of Rule 23 necessitates a showing that the prospective class members share common questions of law or fact. Fed.R.Civ.P. 23(a)(2). This requirement is satisfied where the "claims of all proposed class members derive from the same [ ] policies and procedures, and are based on the same legal theories." *McNeill*, 719

F.Supp. 233, 252 (S.D.N.Y.1989). It is not necessary that *"all* questions of law or fact raised be common." *D'Alauro v. GC Servs. Ltd.,* 168 F.R.D. 451, 455–456 (E.D.N.Y.1996) (emphasis in original). *See also Forbush v. J.C. Penney Co.,* 994 F.2d 1101 (5th Cir.1993); *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1557 (11th Cir.1986); *Berwecky v. Bear, Stearns & Co.,* 197 F.R.D. 65, 68 (S.D.N.Y.2000); *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. at 93; 1 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 3:10 (4th ed.2002). "The critical inquiry is whether the common questions are at the 'core' of the cause of action alleged." *D'Alauro,* 168 F.R.D. at 456.

■ One method of showing factual commonality is to allege a "common course of conduct" which will necessarily involve questions of law or fact common to the class. *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 914 (9th Cir. 1964). *See also Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir.1997); *Korn v. Franchard Corp.,* 456 F.2d 1206, 1213 (2d Cir.1972); *In re WorldCom, Inc. Secs. Litig.,* 219 F.R.D. 267, 280 (S.D.N.Y.2003).

> The overwhelming weight of authority holds that repeated misrepresentations ... satisfy the 'common question' requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit.

*Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975) (citing *Green,* 406 F.2d at 298). *See also In re Baldwin–United Corp. Litig.,* 122 F.R.D. 424, 426 (S.D.N.Y.1986) ("The nub of plaintiffs' claims is that material information was withheld from the entire putative class in each action, either by written or oral communication. Essentially, this is a course of conduct case, which as pled satisfies the commonality requirement of Rule 23."); *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied."). These decisions are consistent with the view of the Advisory Committee on the 1966 Amendments to Rule 23 that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class." Fed.R.Civ.P. 23(b)(3) advisory committee notes (1966).

Allegations of a conspiracy implicating purposeful conduct by a defendant may establish liability through common legal and factual questions about the existence, scope, and effect of the alleged conspiracy. *See Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir.1968); *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231 (E.D.N.Y.1998).

The commonality requirement should not be confused with the predominance requirement of Rule 23(b)(3), described *infra,* sometimes a "more demanding" standard. *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002). While subsection (b)(3) requires the court to weigh common issues against individual issues in deciding which predominate, commonality only requires that common issues of law or fact exist:

> [I]t is for the predominance and other requirements of Rule 23(b)(3), rather than the common question requirement,

to function to keep the balance between the economies attained and lost by allowing a class action. The common question requirement should not be restrictively interpreted to attain that objective, particularly as to do so would eliminate the class action deterrent for those who engage in complicated and imaginative rather than straightforward schemes . . . .

*Blackie,* 524 F.2d at 904 n. 19. *See also Moore,* 306 F.3d at 1252; *Korn,* 456 F.2d at 1210 (holding that commonality was satisfied, regardless of whether reliance on alleged misrepresentations constituted a common question, and if not, whether it predominated); *Schaefer v. Overland Express Family of Funds,* 169 F.R.D. 124, 128 (S.D.Cal.1996) (finding that issues of "individual reliance could vary without destroying the commonality").

b. Application of law to facts

■ The common issues concerning the liability of the defendants that are presented in this action are substantial and satisfy the requirement of Rule 23(a)(2). Plaintiffs allege both a common course of conduct: the deliberate misleading of the public concerning the relative health risks of "light" cigarettes through significant and widespread advertising campaigns; and a conspiracy: the collusion between the various defendant companies in perpetrating this alleged fraud through many predicate acts committed by all of them. These allegations would comprise the source of defendants' liability under RICO and would be established by the same facts and evidence for each plaintiff, i.e., by generalized proof of marketing and knowledge of defendants. More specifically, plaintiffs have alleged a list of common questions of law and fact, including:

(a) Whether defendants were members of an enterprise;

(b) Whether defendants participated and conducted the affairs of the enterprise through a pattern of mail and wire fraud;

(c) Whether defendants conspired to mislead the public about the relative risk of "light" cigarettes as compared to regular cigarettes;

(d) Whether defendants knew that "light" cigarettes were not appreciably less harmful than their regular cigarette counterparts;

(e) Whether defendants intentionally designed "light" cigarettes to enable smokers to compensate;

(f) Whether defendants misleadingly portrayed "light" cigarettes as less harmful than their regular cigarette counterparts;

(g) Whether defendants' implication that "light" cigarettes were less harmful than regular cigarettes was intended to induce consumers to purchase "light" cigarettes; and

(h) Whether the class has been damaged by paying more for a cigarette they were led to believe was relatively safe than the cigarette would have been worth if there had been no fraud and if so the extent of the damages to which the class is entitled.

Were plaintiffs' claims to be pursued individually, these questions could be relitigated possibly millions of times, requiring an incredibly wasteful expenditure of time, effort, and resources by both the court and the various parties, probably resulting in inconsistent outcomes. In light of the relatively small value of individual claims, none of the members of the class individually has the wherewithal or interest to conduct individual litigation against these defendants. For example, an individual one-pack-a-day smoker over

a ten year period would have smoked some 3500 packs of cigarettes. Assuming a difference in value of ten cents between what he or she was induced to think was bought—a relatively safe cigarette—and the dangerous cigarette actually bought, the total economic loss of such a member of the class would be only $350.00. Yet, since there were tens of millions of smokers of light cigarettes, total class damages could be in the tens of billions, with trebled damages of more than a hundred billion possible. Class actions are specifically designed to deal with this kind of problem.

### 3. Typicality

#### a. Law

■■■■ Claims or defenses of the representative party or parties are required to be typical of those of the prospective class. Fed.R.Civ.P. 23(a)(3). This requirement tends to "merge" with the commonality requirement, since both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n. 13, 102 S.Ct. 2364. *See also Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997). Typicality "does not require that the factual background of each named plaintiff's claim be identical to that of all class members" but rather that "the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Caridad*, 191 F.3d at 291 (internal citation and quotation marks omitted). *See also McNeill*, 719 F.Supp. at 252; *Dura–Bilt*, 89 F.R.D. at 99 n. 12. Like commonality, the typicality requirement is

satisfied "if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members ...." *Marisol A.*, 929 F.Supp. at 691. *See also Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir.2001).

#### i. Unique defenses

■■■■ Typicality may be satisfied despite some disparity in the facts, defenses, or damage calculations of the representative plaintiffs and the rest of the class. *See Robidoux*, 987 F.2d at 937. Disparities that create unique defenses to some members of the putative class may make class certification inappropriate if they are likely to significantly divert the focus of the class litigation. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990). Because the concern is with the "danger that absent class members will suffer if their representative is preoccupied with defenses unique to it[,]" this inquiry may be framed as an impediment to either typicality or adequacy-of-representation. *Id.* Under either framework, the test is "whether the defenses will become the focus of the litigation, overshadowing the primary claims and prejudicing other class members." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 87 (S.D.N.Y.2004). The unique defense must be serious and likely to sidetrack the litigation to the detriment of the entire class in order to defeat typicality. *See, e.g., Langner v. Brown*, No. 95–Civ–1981, 1996 WL 709757 (S.D.N.Y. Dec. 10, 1996) (certifying a major shareholder and former insider as the class representative even though he might be subject to some unique defenses); *Kronfeld v. Trans World Airlines, Inc.*, 104 F.R.D. 50, 53 (S.D.N.Y. 1984) (finding that a representative's reliance on a third party to purchase stock at

issue did not create a unique defense making him an inadequate representative for those class members who purchased the stock directly); *In re Control Data Corp. Secs. Litig.*, 116 F.R.D. 216 (D.C.Minn. 1986) (finding that variations in reliance did not raise unique defenses that would preclude typicality).

### ii. Subclasses

█ Where the disparity among claims and defenses is substantial, subclassing may permit the class action to go forward. *See Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir.1997) (affirming order of class certification but remanding for the district court to consider creating additional subclasses to reflect groups of plaintiff children with "separate and discrete legal claims pursuant to particular federal and state constitutional, statutory, and regulatory obligations of the defendants"). Subclassing should not be resorted to unless it serves a necessary purpose since it adds to the cost and complexity of a class action.

### b. Application of law to facts

█ The claims of the proposed plaintiffs are typical of those of the class when evaluated under the Rule 23(a)(3) standard. Typicality requires that a class representative "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *In re NASDAQ Market–Makers Antitrust Litig.*, 172 F.R.D. 119, 126 (S.D.N.Y.1997). Though the specific factual circumstances for the proposed plaintiffs may not be identical to those of everyone in the million-plus member putative class, a virtually impossible condition, they share the common traits that define the class: arguably, they purchased "light" cigarettes under the reasonable belief in defendants' knowingly false representations that they were a safer alternative to regular cigarettes which would deliver less tar and nicotine.

Unfounded is defendants' objection to the aggregation of the many brands of "light" cigarettes into one suit. Plaintiffs' expert reports appear to show sufficiently that the marketing of all "light" cigarettes was characterized by certain common advertising techniques including, but not limited to, the use of the "lights" descriptor. *See, e.g.,* Expert Report of Richard Pollay, Part VIII.F.1.m; Monograph 13, Chapter 7, in Appendix E, *infra*. Defendants' argument that class treatment is inappropriate because the marketing campaigns varied too widely to demonstrate a common scheme assumes what it seeks to prove.

Members of the class make identical legal and factual assertions regarding defendants' conduct concerning the alleged collusion and conspiracy, the basis of their liability for mail and wire fraud. To recover for themselves, proposed plaintiffs would need to prove the same "common questions" that would entitle the entire class to relief. Proposed plaintiffs allege the same type of injury from defendants' alleged conduct: that they were fraudulently induced to purchase defendants' "light" cigarettes. Whether that injury suffices for recovery under RICO should be decided by the jury on its merits, with the same consequences for both the proposed representative plaintiffs and the absent class members. There is sufficient typicality to induce the proposed plaintiffs to adequately represent the interests of absent class members in this litigation. No basis for subclassing has been shown as to plaintiffs or as to defendants. The conduct on both sides cannot, at this stage of the litigation, be said to differ among the parties on any appropriate method of classification.

#### 4. Adequacy of Representation

##### a. Law

Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the interests of the prospective class. Fed.R.Civ.P. 23(a)(4). The Advisory Committee for the 1966 Amendments and the courts have expressed particular concern regarding adequacy of representation because any judgment conclusively determines the rights of absent class members. *See, e.g., Eisen v. Carlisle and Jacquelin,* 391 F.2d 555, 562 (2d Cir.1968) (citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), for the premise that fundamental due process prevents a decision from binding class members if their interests were not adequately represented). The adequacy-of-representation requirement tends to "merge" with the commonality and typicality requirements; commonality and typicality of the claims ensure that as class representatives advance their own interests, they will also advance the interests of the absent class members, serving as adequate representation. *Falcon,* 457 U.S. at 158 n. 13, 102 S.Ct. 2364. *See also McNeill,* 719 F.Supp. at 252 (citing *Dura–Bilt Corp.,* 89 F.R.D. at 93).

█ "The question of whether the named plaintiffs can fairly and adequately represent the class is one 'committed to the sound discretion of the district court.'" *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1407, 1413 (E.D.N.Y. 1989), *aff'd,* 907 F.2d 1295 (1990) (quoting *Malchman v. Davis,* 761 F.2d 893, 899 (2d Cir.1985)). To determine that representation is adequate, a plaintiff must meet two basic standards: class representatives and members must not have interests antagonistic to one another; and counsel for the prospective class must be qualified, experienced, and generally able to conduct the litigation. *See In re Joint Eastern &* *Southern Dist. Asbestos Litig.,* 78 F.3d 764, 778 (2d Cir.1996) (citing *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992)); *Eisen v. Carlisle and Jacquelin,* 391 F.2d 555, 562 (2d Cir. 1968). Other factors that have been considered in determining the adequacy of a proposed representative include the putative plaintiffs' "knowledge of the case" and "credibility." *In re Joint E. and S. Dist. Asbestos Litig.,* 78 F.3d 764, 778 (2d Cir. 1996).

###### i. Class counsel

█ Class counsel must be "qualified, experienced, and generally able to conduct the litigation." *See id.* (citing *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d at 291; *Eisen,* 391 F.2d at 562).

██ When courts review the adequacy of counsel under Rule 23(a)(4), they generally inquire whether the counsel is willing and able to vigorously prosecute the action. Rule 23(a)(4) is satisfied where the class attorneys are experienced in the field or have demonstrated professional competence in other ways, such as by the quality of the briefs and the arguments during the early stages of the case. *See, e.g., Klein v. A.G. Becker Paribas Inc.,* 109 F.R.D. 646 (S.D.N.Y.1986); *Bacon v. Toia,* 437 F.Supp. 1371 (S.D.N.Y.1977). *See generally* 7A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1769.1 (3d ed.2005). Counsel may be deemed inadequate if they have little experience, have done inadequate work up until the decision on certification, or demonstrate a conflict of interest with some members of the class. *See, e.g., Carson v. Giant Food, Inc.,* 187 F.Supp.2d 462 (D.C.Md.2002); *Dietrich v. Bauer,* 192 F.R.D. 119 (S.D.N.Y.2000); *In re Joint E. & So. Dist. Asbestos Litig.,* 133 F.R.D. 425 (E.D.N.Y.1990). *See also* Wright & Miller

§ 1769.1 ("It is important to note that mere allegations that the class attorney is inexperienced or incompetent will not suffice to demonstrate inadequacy if other evidence suggests that the attorney is competent" and "the fact that the counsel is engaged in multiple parallel or overlapping class suits does not, standing alone, establish a conflict.").

Congress expressly acknowledged the importance of adequate class counsel in the 2003 amendments to the Federal Rules of Civil Procedure by adding a new section devoted to the appointment of class counsel. *See* Fed.R.Civ.P. 23(g); *Noble v. 93 University Place Corp.*, 224 F.R.D. 330, 339 n. 74 (S.D.N.Y.2004) ("As noted in the Advisory Committee's Notes to the 2003 Amendments, 'Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while [Rule 23(g)] will guide the court in assessing proposed class counsel as part of the certification decision.' Thus, adequacy of class counsel is now properly considered under Rule 23(g), rather than Rule 23(a)(4)."). Rule 23(g) requires a court to assess the adequacy of proposed class counsel. The court should consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class, as well as any other matter relevant to counsel's ability to represent the interests of the class. *See* Fed. R.Civ.P. 23(g)(1)(C)(I); Fed.R.Civ.P. 23(g)(1)(C)(ii). *See also Noble*, 224 F.R.D. at 339–40 (citing Rule 23(g)(1)(C)(I)). The court has "broad authority in making these appointments." Wright & Miller § 1802.3.

ii. Class representatives lacking interests antagonistic to class

 In order to adequately represent absent class members, representative plaintiffs must not have interests that are antagonistic to or in conflict with those of the class as a whole. Just as claims need not be identical for plaintiffs to meet the typicality requirement, some variation in factual claims will not necessarily create an antagonism between the interests of the representative plaintiffs and the class: the conflict with the class must be significant and fundamental in order to defeat the adequacy-of-representation requirement. *See Visa Check*, 280 F.3d at 145 ("The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental" and "speculative conflict should be disregarded at the class certification stage.") (internal quotation marks omitted); *In re Joint E. and S. Dist. Asbestos Litig.*, 78 F.3d 764 (2d Cir. 1996) (finding that differences in treatment of *pro rata* and apportionment health claimants did not create sufficient antagonism between those categories of plaintiffs to defeat adequacy-of-representation requirement); *Morris v. Wachovia Secs., Inc.*, 223 F.R.D. 284, 299 (E.D.Va.2004) ("Because the conflict of interests over appropriate relief in this case is fundamental, it defeats the adequacy of representation requirement").

Variations in distribution of damages to different members of the class generally does not create a fundamental antagonism between plaintiffs. *See Visa Check*, 280 F.3d at 145 ("In the event that the district court does find conflicts[,] ... there are a variety of devices available to resolve the problem.... [including] the possibilities of bifurcating liability and damage trials, decertifying the class after the liability trial, and creating subclasses."); 1 Herbert Newberg & Alba Conte, *Newberg on Class*

*Actions* § 3:32 (4th ed. 2002) ("In some cases, all class members will have a common interest in prevailing on the liability issue but may have competing interests in distributing the monetary relief. Such a conflict should not preclude class litigation, particularly because the court may subsequently create subclasses along the lines of conflicting interests.... The Notes of the Rules Advisory Committee state: 'Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class.' ") (quoting Fed.R.Civ.P. 23(c)(4) advisory committee notes (1966)).

### iii. Other factors

### (a) Knowledge of the case and ability to supervise counsel

Courts have sometimes considered representative plaintiffs' knowledge of the case and ability to supervise counsel when evaluating whether they adequately represent the class, thus expecting them "to demonstrate a thorough familiarity with the underlying basis for his cause of action." *Kamerman v. Steinberg,* 113 F.R.D. 511, 517 (S.D.N.Y.1986). *See also Berger v. Compaq Computer Corp.,* 257 F.3d 475, 481–83 (5th Cir.2001) (requiring plaintiffs to be highly knowledgeable about claims because of "Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases."). The Second Circuit Court of Appeals has held that this "knowledge" requirement should be applied with a view toward typicality concerns:

> [T]he motivation behind requiring representative plaintiffs to demonstrate great familiarity with the case is a fear that the representatives, during pretrial discovery and at trial, will give misleading and contradictory testimony with regard to basic issues in the case that might make their claims subject to unique de-

fenses.... [I]n that situation, the challenge to class certification can alternatively be viewed as a challenge to the representative plaintiffs' compliance with the typicality requirement of Rule 23(a)(3).

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 61 (2d Cir.2000) (citing *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.,* 941 F.Supp. 326, 340 (S.D.N.Y.1996)). The *Baffa* Court vacated the finding that the plaintiff was not an adequate class representative because "the district court unfortunately seized on a myopic view of the knowledge requirement and concluded that [plaintiff] did not have a basic understanding of the litigation and therefore could not be an adequate class representative." *Baffa,* 222 F.3d at 61 (citing *Surowitz v. Hilton Hotels Corp.,* 383 U.S. 363, 370–74, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966), to support the conclusion that "[t]he Supreme Court has expressly disapproved of attacks on the adequacy of a class representative based on the representative's ignorance.").

Representative plaintiffs are not required to know all the intricacies of class litigation, but only enough to serve the interests of the class and ensure that they are not simply lending their names to a suit controlled entirely by the attorneys for the benefit of counsel. *See, e.g., In re Frontier Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31 (E.D.N.Y.1997) (finding that plaintiffs had sufficient familiarity with their claims, despite some isolated quotes from plaintiffs' deposition transcripts suggesting that several of them did not understand legal strategies in the case, had only recently fully read their complaints, did not consider problems attending participation of eleven law firms in the action, had imperfect recollections of their investments, and did not fully comprehend their duty to supervise class counsel); *Michaels*

*v. Ambassador Group Inc.,* 110 F.R.D. 84 (E.D.N.Y.1986) (finding that representative plaintiff in a class action for alleged securities violations need not have extensive knowledge of federal securities laws or complete familiarity with all particulars of the lawsuit; class representative's awareness of the basic facts underlying the lawsuit as alleged in the complaint and of his obligations to fellow class members suffices); *County of Suffolk,* 710 F.Supp. at 1416 (stating that in complex actions "named plaintiffs are not required to 'have expert knowledge of all the details of the case … and a great deal of reliance on expert counsel is to be expected' "); *Trautz v. Weisman,* 846 F.Supp. 1160, 1168 (S.D.N.Y.1994) (finding adequate representation in RICO case where plaintiff's deposition revealed an extremely limited understanding of (1) the RICO statute, (2) facts asserted in complaint, and (3) his role as a class representative); *In re THQ Inc. Sec. Litig.,* No. CV 00–1783AHM, 2002 WL 1832145, at *7 (C.D.Cal. Mar. 22, 2002) (holding that although some representatives were unfamiliar with some details of the case and were unaware that they might be liable for costs and fees if the claim was unsuccessful, that level of unfamiliarity with the class action was not sufficient to defeat class certification). Particularly where members of the class are laypersons without any necessary business or legal experience and the claims are small, detailed knowledge of the claim is inappropriate, approaching irrelevance.

### (b) Credibility of representatives

 It is appropriate to consider the "honesty and trustworthiness" of class representatives. *Savino v. Computer Credit, Inc.,* 164 F.3d 81, 87 (2d Cir.1998). Potential class representatives may not be adequate representation for the class if they "are so lacking in credibility that they are likely to harm their case." *In re Frontier*

*Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31, 47 (E.D.N.Y.1997) (citing *Panzirer v. Wolf,* 663 F.2d 365 (2d Cir.1981)). Plaintiffs have been found to be inadequate class representatives where their testimony on an "issue critical to" the cause of action was "subject to sharp attack." *Kline v. Wolf,* 702 F.2d 400, 403 (2d Cir.1983). *See, e.g., Panzirer,* 663 F.2d at 368 (finding that lack of credibility made the plaintiff an inadequate class representative where the plaintiff had given "no less than four versions of her conversation with her broker"); *Savino,* 164 F.3d at 87 (finding that lack of credibility made the plaintiff an inadequate class representative where the plaintiff "repeatedly changed his position … about letters that form[ed] the very basis of his lawsuit"); *Zemel Family Trust v. Philips Int'l Realty Corp.,* 205 F.R.D. 434 (S.D.N.Y.2002) (finding that lack of credibility made the plaintiff an inadequate class representative where the plaintiff falsely represented himself as a CFO); *Darvin v. Int'l Harvester Co.,* 610 F.Supp. 255, 257 (S.D.N.Y.1985) (finding that lack of credibility made the plaintiff an inadequate class representative where the plaintiff changed his testimony regarding an issue central to the action numerous times). Where the individual claims are not based on credibility of individual smokers, but on the characteristics of a universe to be determined with the aid of experts, the candor of one representative plaintiff among many is not decisive.

### b. Application of law to facts

#### i. Named plaintiffs

 Proposed plaintiffs will serve as adequate representatives of the putative class. Defendants have not identified any interests that are sufficiently antagonistic or conflicting as to preclude the proposed class representatives from adequately rep-

resenting the class as a whole. The proposed representative plaintiffs appear to be typical smokers as interested in establishing defendants' liability as are the rest of the class.

Any intra-class conflicts that may arise concerning the amount and allocation of the potential damages will not preclude the proposed plaintiffs from serving as class representatives. If conflicts arise, the court has sufficient power to handle them. All named plaintiffs have relatively small potential recoveries so their interests will not conflict with the unnamed plaintiffs.

Plaintiffs' lack of specific or technical knowledge about their claims does not disqualify them as class representatives. "To require the class representative to be sophisticated and knowledgeable enough to help counsel ... would reduce the class action device ... to an impotent tool." *Dura–Bilt*, 89 F.R.D. at 103. It is unrealistic in a complex RICO action involving decades of alleged fraud and collusion to expect lay plaintiffs to be experts on the intricate legal details of their case. It is sufficient that the proposed representatives appear to have a common sense understanding of how they were allegedly wronged and what the consequences of this litigation may be.

The competence of present highly skilled and unconflicted class counsel will suffice to ensure that they are adequately represented. This litigation scheme was encouraged by Congress' inclusion of "the carrot of treble damages" in RICO, *Klehr*, 521 U.S. at 199 n. 2, 117 S.Ct. 1984, and by the design of Rule 23, to aggregate relatively small recoveries into "something worth someone's (*usually an attorney's* ) labor." *Amchem Prods.*, 521 U.S. at 617, 117 S.Ct. 2231 (emphasis added).

Defendants' contention that named plaintiffs who continue to smoke after the filing of the complaint cannot be deemed to have relied on defendants' alleged misrepresentations at any time is premature: the place of addiction in this suit remains unclear.

Finally, the proposed plaintiffs, individually or as a group, do not demonstrate a lack of credibility warranting their exclusion as class representatives. They are:

**Susan Bailey**

Home: Peoria, Arizona

Age: 56

Marital status: Widowed

Children: 3

Grandchildren: 1 (she has permanent legal guardianship)

Education: K–12, plus 1½ years of college

Occupation: Office Supervisor at Helping Hands of Hope (part-time)

Started Smoking: 14 years old

First brand: Marlboro Reds (1962–1971)

Lights brand: Marlboro Lights (1971–1998)

Current brand: Marlboro Ultra Lights (1998–present)

**Barbara Bishop**

Home: McGee, Mississippi

Age: 49

Marital status: Divorced

Children: 2

Grandchildren: 1

Education: K–12, plus 2 years of college in 1981 and 1987

Occupation: None, SSI

Started Smoking: 19 years old

First brand: Salem Menthol (1975–1977)

Lights brand: Salem Lights (1977–2001)

Current brand: Misty Menthol Lights (2001–present)

Defendants' objection to this proposed plaintiff on credibility grounds is not sufficient to disqualify her.

**Trevor Campbell**

Home: Lexington, Kentucky

Age: 31

Marital status: Partnership

Children: 0

Education: G.E.D.

Occupation: SSI

Started Smoking: 17 years old

First brand: Marlboro Lights (1990)

Lights brand: Marlboro Lights (1990); Camel Lights (2003)

Current brand: Marlboro Lights and Camel Lights

**Fergal Furlong**

Home: Hammond, Indiana

Age: 31

Marital status: Married

Children: 2

Education: College degree

Occupation: Web design; Information technology

Started Smoking: 14 years old

First brand: Carols (Irish brand) (1987–1994)

Lights brand: Marlboro Lights (1998–present)

Current brand: Marlboro Lights

**David Rogers**

Home: Abbotsford, Wisconsin

Age: 39

Marital status: Single (engaged)

Children: 0

Education: High school diploma; Trade school certification

Occupation: School bus driver

Started Smoking: 11 years old

First brand: Kool Super Longs (1976–1981)

Lights brand: Kool Lights (1981–1983); Marlboro Lights (1983–1944); Doral Lights (1994–2001)

Current brand: Doral (2001–present)

Defendants' objection to this proposed plaintiff are similar to those made to Ms. Bishop. They are not disqualifying.

**Barbara Schwab**

Home: Falconer, New York

Age: 38

Marital status: Married

Children: 4

Grandchildren: 0

Education: K–12 plus 4 computer classes

Occupation: Unemployed

Started Smoking: 18 years old

First brand: Marlboro Reds (1984–86)

Lights brand: Newport Menthol Lights (1987–1990)

Current brand: Misty Ultra Light Menthol (1995–present)

**Patricia Scocozza**

Home: Pelham, New York

Age: 73

Marital status: Widowed

Children: 1

Grandchildren: 1

Education: K–12

Occupation: Retired

Started Smoking: 15 years old

First brand: Camels (1946–48)

Lights brand: Marlboro Lights (1971–2001)

Current brand: Quit in 2001

**James "Jim" Sherman**

Home: La Quinta, California

Age: 53

Marital status: Divorced

Children: 1

Grandchildren: 0

Education: Associate's degree in marketing

Occupation: Office Administration

Started Smoking: 15 years old

First brand: Marlboro Reds (1967–1971)

Lights brand: Marlboro Lights (1971–present)

Current brand: Marlboro Lights

Defendants' objections to this proposed plaintiff are similar to those made to Ms. Bishop. They are not disqualifying.

#### ii. Proposed class counsel

 Plaintiffs move to appoint Cohen, Milstein, Hausfeld & Toll, P.L.L.C. and Finkelstein, Thompson, & Loughran as co-lead class counsel in accordance with Federal Rule of Civil Procedure 23(g). Proposed counsel have performed significant work in investigating the claims of the class and have committed substantial resources to represent the putative class in the litigation to date. They have demonstrated extensive knowledge of the applicable law and experience in handling similar class actions. Their briefs, exhibits, and oral representations are excellent. Since defendants' attacks on the choice of class representatives have been rejected, there is no other factor to suggest proposed counsel are not "qualified, experienced, and generally able to conduct the litigation." *In re Joint E. & S. Dist. Asbestos Litig.*, 78 F.3d 764, 778 (2d Cir.1996). The court finds that proposed counsel will adequately represent the interests of the class.

### C. Rule 23(b)(2): Injunctive or Declaratory Relief

#### 1. Law

 Rule 23(b)(2) permits class certification if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). A class will be certified if "broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 162 (2d Cir.2001).

Subsection (b)(2) has primarily been used in civil rights, institutional, environmental, and law reform cases. *See* 2 *Newberg on Class Actions* § 4:11. Since it focuses primarily on injunctive relief, some difficulty may arise in cases where plaintiffs seek *both* injunctive relief and money damages. Money-damage class actions generally fall under Rule 23(b)(3), which imposes additional notice requirements and opt-out rights, as well as stricter predominance and superiority requirements for the protection of absent class members. "[T]he main focus in determining the applicability of subdivision (b)(2) is whether the injunctive relief that is being sought is deemed to be the primary relief, with money damages being only incidental. A suit predominantly seeking money damages does not qualify under [subdivision (b)(2) ]." Wright & Miller § 1775. *See also Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (2d Cir.1968) ("Subsection (b)(2) was never intended to cover cases like the instant one where the primary claim is for damages, but is only applicable where the relief sought is exclusively or predominantly injunctive or declaratory."). *But see Visa Check*, 192 F.R.D. at 88

(finding antitrust action to be maintainable as a class action under Rule 23(b)(2) notwithstanding a prayer for damages because the request for an injunction ending the collusive practice was central to the suit).

In *Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d at 167, the Court of Appeals for the Second Circuit adopted a "discretionary" *ad hoc* standard for determining whether a claim should be certified for class treatment under Rule 23(b)(2). In doing so, the court rejected the Fifth Circuit's "no more than incidental damages" standard, a bright-line approach that "forecloses (b)(2) class certification of all claims that include compensatory damages (or punitive damages) even if the classwide injunctive relief is the form of relief in which the plaintiffs are primarily interested." *Id.* at 163 (internal quotation marks omitted).

> Rather, [it held] that when presented with a motion for (b)(2) class certification of a claim seeking both injunctive relief and non-incidental monetary damages, a district court must consider[ ] the evidence presented at a class certification hearing and the arguments of counsel, and then assess whether (b)(2) certification is appropriate in light of the relative importance of the remedies sought, given all of the facts and circumstances of the case. The district court may allow (b)(2) certification if it finds in its informed, sound judicial discretion that (1) the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy.

*Id.* at 164 (internal citations and quotation marks omitted). *See also Parker v. Time*

*Warner Entm't Co.*, 331 F.3d 13 (2d Cir. 2003).

■ Before allowing certification under subsection (b)(2), a district court should, "at a minimum," determine that: "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Robinson*, 267 F.3d at 165. "Insignificant or sham requests for injunctive relief" should not be certified under subsection (b)(2) when the claims are essentially brought for monetary recovery. *Id.*

### 2. Application of Law to Facts

The injunctive relief sought by plaintiffs—elimination of "light," "lights," and other such descriptors from all cigarette packaging and advertising—is arguably maintainable under 23(b)(2). The confusion engendered by these descriptors is central to plaintiffs' complaint; cessation of use would prevent, in plaintiffs' view, future deception. The growing awareness of the public health community and smokers that "light" cigarettes do not necessarily confer a health benefit, *see, e.g.,* Monograph 13, Appendix E, *infra*, and admissions by defendants to this effect, *see, e.g.,* Philip Morris USA website, "Smoking & Health Issues: Low Tar Cigarettes," at www.pmusa.com/en/health_issues/low_tar_cigarettes.asp, lessens the importance of any such judicial regulation of the industry without lessening the difficulties it would entail. In the recently issued final opinion in the government suit against the industry, the district court entered such an injunctive order. *See United States v. Philip Morris*, 449 F.Supp.2d at 937. Coordination between the Department of Justice and the FTC may permit that injunction to be enforced.

■ Much more important to the private individuals making up the class is financial compensation for the past fraud allegedly perpetrated on them. For the reasons stated in Part III.D.4, *supra*, injunctive relief is not available in this case. A Rule 23(b)(2) class will not be certified.

### D. Rule 23(b)(3): Money Damages

Rule 23(b)(3) permits the certification of a class action if the prerequisites of subdivision (a) are satisfied and if the court finds that (1) "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b). *See also Amchem Prods.*, 521 U.S. at 615, 117 S.Ct. 2231; *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.2002). "Framed for situations in which 'class action treatment is not as clearly called for' as it is in Rule 23(b)(1) and (b)(2) situations, Rule 23(b)(3) permits certification where class suit may 'nevertheless be convenient and desirable.'" *Amchem Prods.*, 521 U.S. at 615, 117 S.Ct. 2231 (quoting Fed.R.Civ.P. 23(b)(3) advisory committee notes (1966)). The Supreme Court has stated that "[w]hile the text of Rule 23(b)(3) does not exclude from certification cases in which individual damages run high, the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Id.* at 617, 117 S.Ct. 2231.

#### 1. Law

##### a. Predominance of common questions of law or fact

Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). This predominance inquiry focuses on the same commonality issues as Rule 23(a)(2), but employs a significantly more demanding standard, testing "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623, 117 S.Ct. 2231. It "calls only for predominance, not exclusivity, of common questions." *Visa Check*, 280 F.3d at 140.

■ Issues applicable to the class will be said to predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore*, 306 F.3d at 1252. *See also Visa Check*, 280 F.3d at 136 ("In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof.") (internal quotation marks omitted). A court deciding a motion for certification under 23(b)(3) therefore examines which, if any, of the required elements of the plaintiffs' claims and any defenses can be established by common evidence. *See Visa Check*, 280 F.3d at 136.

■ As the Court of Appeals for the Second Circuit recently clarified the matter, certification on particular issues may be appropriate even if certification of the class on all issues is not. *In re Nassau County Strip Search Cases*, 461 F.3d 219,

227 (2d Cir.2006) (directing the district court to certify a proposed class on the issue of liability; "a court may employ subsection [23](c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement").

i. Violation of RICO mail or wire fraud

In determining Rule 23(b)(3) predominance, the court's inquiry is primarily focused on issues of liability. *See Cumberland Farms v. Browning–Ferris Indus.*, 120 F.R.D. 642, 647 (E.D.Pa.1988). It is the alleged racketeering conduct, such as a wide-spread scheme of mail and wire fraud designed to mislead a class of buyers about a particular commodity, that creates liability in a RICO action. The charged racketeering conduct will therefore be the most important issue in the predominance inquiry:

> [T]he gravamen of the alleged fraud is not limited to the specific misrepresentations made to [plaintiffs]. The allegation is of a whole roster of deception designed to contrive a false image of [the defendant company].... *It is the underlying scheme which demands attention.* Each plaintiff is similarly situated with respect to it, and it would be folly to force each [plaintiff] to prove the nucleus of the alleged fraud again and again.

*In re ACC Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 431 (D.Ariz.1992) (citing *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981)) (emphasis supplied).

The Supreme Court has recognized that Rule 23(b)(3) predominance "is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods.*, 521 U.S. at 625, 117 S.Ct. 2231. Such situations involve an "underlying scheme" to defraud a large group of purchasers which focuses the court's inquiry on the conduct of the defendant rather than that of individual plaintiffs, making it particularly susceptible to common, generalized proof. *See Falise v. American Tobacco Co.*, 94 F.Supp.2d 316, 335 (E.D.N.Y.2000); *Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 252 (D.N.J.1992) ("[P]redominance may be found if the defendant's challenged activities stem from a single, class-wide course of conduct, so that the issue of statutory liability is common to the class.") (internal quotation marks omitted).

ii. Causation and reliance

A RICO plaintiff "faces an additional hurdle": showing that the injury was caused "by reason of" the RICO violation. *Summit Properties Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 559 (5th Cir.2000). Although reliance is required to show causation for RICO claims based on mail or wire fraud, "the nature of the reliance is not a constant." *Falise*, 94 F.Supp.2d at 335.

(a) General proof of reliance

The Court of Appeals for the Second Circuit has not specifically decided the standard of reliance for RICO claims such as those in the instant case. Its approach to reliance in fraud cases varies with context. For example, in a life insurance fraud claim brought under RICO, it held:

> Fraud actions must therefore be separated into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations. The former are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof. Where there are material variations in the nature of the misrepresentations made to each member of the proposed class, however, class certification

is improper because plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations in order to sustain their claims.

*Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir.2002) (de-certifying a class because it fell into the latter category).

In *Falise v. American Tobacco Co.*, reliance for RICO fraud claims was found to be amenable to generalized proof in situations where the scheme of fraud was targeted at a large portion of the public:

> Where [a] fraudulent scheme is limited in scope and specifically targeted at only one or a few individuals, organizations, or entities, the establishment of causation should require reliance on identifiable misrepresentations. Where, however, the fraudulent scheme is targeted broadly at a large proportion of the American public the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to be designed to distort the entire body of public knowledge rather than to individually mislead millions of people. From the perspective of the fraudulent actors, clear efficiencies are gained by co-opting the media and other outlets of information as unwitting tools for the pervasive scheme.... To require reliance on specific misrepresentations where indirect channels of communication were integral to the success of the scheme would produce the perverse result of having the most massive and sinister fraudulent schemes be the ones that must escape civil[ ]RICO liability.

94 F.Supp.2d at 335.

Similar adjustments have been made in other areas of the law. While neither binding in this case, nor identical in reasoning, securities fraud and antitrust actions provide illuminating examples of how federal courts have interpreted the standard of proof for reliance involved in broad-based schemes of fraud. For example, in *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court recognized that if every investor were required to prove individual reliance in securities cases, it would preclude plaintiffs from ever being certified as a class and, effectively, from ever bringing suit at all. 485 U.S. at 245, 108 S.Ct. 978 (requiring proof of individual reliance would impose an "unnecessarily unrealistic evidentiary burden"). Not satisfied with such a result, the Supreme Court reasoned that securities fraud class actions may be premised on a fraud-on-the-market presumption of reliance. *Id.*

First recognized by federal courts in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975), the fraud-on-the-market theory is based on the idea that, in an efficient securities market, stock prices will reflect all publicly available information, including fraudulent misinformation. Because this misinformation inflates the stock price on which buyers rely in determining the worth of the entity in which they are investing, buyers implicitly rely on the fraudulent misinformation without necessarily realizing it; therefore, when alleging that the corporation fraudulently provided information that altered its stock price, individual plaintiffs do not have to prove that they personally saw or read the inaccurate information. *See Basic*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194; *Blackie*, 524 F.2d 891.

The fraud-on-the-market presumption of reliance amounts to an acceptably objective standard of what constitutes reliance, where reliance may be inferred from the materiality of the misstatements or omis-

sions that constitute the fraud. Professor Samuel Issacharoff cogently argues that this is essentially the same standard of proof as is found in defective product claims based on strict liability, implied warranty of merchantability, or breach of express warranty, where subjective reliance need not be established because "consumer expectations can be fairly presumed." Samuel Issacharoff, *The Vexing Problem of Reliance in Consumer Class Actions,* 74 Tul. L.Rev. 1633, 1635 (2000). "What seems to emerge in both contexts is the sense that repeat actors in the relevant markets should be held accountable for the material representations that situate their products in the respective competitive markets." *Id.* at 1651. The law is willing to adjust the standard of proof in such fraud cases, using notions of common sense and fairness to effectuate the overall purpose of the statutory scheme. *See, e.g., Basic,* 485 U.S. at 246, 108 S.Ct. 978 (the fraud-on-the market presumption is "supported by common sense and probability"); *Blackie,* 524 F.2d at 908 ("[T]he same causal nexus can be adequately established indirectly, by proof of materiality coupled with the common sense that a stock purchaser does not ordinarily seek to purchase a loss in the form of artificially inflated stock . . . .").

Such a presumption may be appropriate in the present case, where defendants have conceded that all rational smokers would avoid health risks by choosing a less dangerous cigarette if they could. *See* Tr. of Sept. 13, 2006 Hr'g 84:23–85:2 ("[T]he central question of whether a purchaser, given two identical cigarettes, taste identical, cost the same, everything, would prefer one that had less risk or more risk [is] a question that only a suicidal person could answer in the negative, or someone who didn't understand the question.").

These doctrines are flexible; they permit deviations in favor of class certification. In *Visa Check,* the Court of Appeals cited *Blackie v. Barrack* (a securities suit) to support its conclusion in an antitrust case that common issues may predominate over individual ones notwithstanding individual questions of causation where liability can be determined on a class-wide basis. *See also Eisen v. Carlisle & Jacquelin,* 391 F.2d at 565, 567 (noting "the desirability of providing small claimants with a forum in which to seek redress for alleged large scale anti-trust violations" and finding that common questions of law or fact predominate over individual questions even though "members of the proposed class might have had different motives when they entered into the odd-lot market.").

Generalized proof may include surveys, expert evidence on marketplace principles, and extrapolated and statistic analysis of individuals and groups in the class, such as that conducted by plaintiffs' experts. *See* Parts VIII.F, IX.A, *infra.*

### (b) Individual proof of reliance

When individual proof of subjective reliance is required, Courts of Appeals are split over whether such a situation precludes class certification in RICO cases. In *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem.,* 319 F.3d 205 (5th Cir. 2003) the Fifth Circuit Court of Appeals posited that "[f]raud actions that require proof of individual reliance cannot be certified as Fed.R.Civ.P. 23(b)(3) class actions because individual, rather than common, issues will predominate." 319 F.3d at 211. The court explained its position rejecting certification:

Causation is one issue to be tried in the present case. RICO creates a civil cause of action for [a]ny person injured in his business or property by reason of a violation of section 1962 . . . . *Holmes*

explicitly confirmed that the "by reason of" language in RICO requires a causal connection between the predicate mail or wire fraud and a plaintiff's injury that includes "but for" and "proximate" causation. In common law fraud cases, proof of reliance satisfies the "but for" cause, or cause-in-fact, requirement.

 · · · · ·

Proximate cause generally demands that a misrepresentation be relied upon by the plaintiff, individually.

 · · · · ·

To determine reliance for each individual class member would defeat the economies ordinarily associated with the class action device.

*Id.* at 218–219 (internal citations and quotation marks omitted).

This unyielding rigid approach has been rejected by other federal appellate courts, including the Court of Appeals for the Seventh Circuit, which reversed a district court's denial of class certification in a RICO action and rejected *Sandwich Chef's* result:

> In deciding that … the case was inappropriate for class treatment, the [district] judge was applying the presumption against class action certification in RICO cases that has been articulated by the Fifth Circuit in *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indemnity Ins. Co.,* 319 F.3d 205, 219 (5th Cir. 2003). We are dubious about such a presumption. The question whether RICO was violated can be separated from the question whether particular intended victims were injured, and thus can—or so a district court could determine without being thought to have abused its discretion—be resolved in a single proceeding with the issue of injury parceled out to satellite proceedings, as is frequently done in class action tort litigation, *see, e.g., Exxon Co. v. Sofec, Inc.,* 54 F.3d 570, 575–76 (9th Cir.1995); *In re Bendectin Litigation,* 857 F.2d 290, 308–13 (6th Cir.1988), of which th[is consumer fraud] class litigation is a species.

*Carnegie v. Household Intern., Inc.,* 376 F.3d 656, 663 (7th Cir.2004). *See also Schaefer v. Overland Exp. Family of Funds,* 169 F.R.D. 124, 131 (S.D.Cal.1996) (variation in plaintiffs' reliance did "not result in a conclusion that individual issues predominate over the common questions").

The Court of Appeals for the Second Circuit has used a similar liberal approach to that of the Seventh Circuit in the securities fraud context:

> [Defendant] earnestly argues that each person injured must show that he personally relied on the misrepresentations in order to recover and thus any common issues of misrepresentations do not predominate over the individual questions of reliance. Even if [defendant] is correct in its assertion of the need for proof of reliance, and we express no views on that issue, we must still reject the argument. Carried to its logical end, it would negate any attempted class action under Rule 10b–5, since as the District Courts have recognized, reliance is an issue lurking in every 10b–5 action. We see no sound reason why the trial court, if it determines individual reliance is an essential element of the proof, cannot order separate trials on that particular issue ….

*Green v. Wolf Corp.,* 406 F.2d 291, 301 (2d Cir.1968) (internal citation omitted). In this circuit, variations in individual reliance may be adjusted in a variety of ways including averaging through statistical analysis and variations in damage awards. *See* Parts X.A, X.B, *infra.*

### iii. Injury to property and damages

■ Individualized damage issues do not preclude a Rule 23(b)(3) class action when liability can be determined on a class-wide basis. *Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir.2001). *See generally* Fed.R.Civ.P. 23(b)(3) advisory committee notes (1966) (explaining that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a [Rule 23(b)(3) ] class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class"); 4 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 18.27 (3d ed.1992) (stating that for antitrust class actions, "[a] particularly significant aspect of the Rule 23(b)(3) approach is the recognition that individual damages questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class"); *Bertulli v. Independent Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir.2001); *Blackie*, 524 F.2d at 905 (9th Cir.1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment.").

If the determination of damages poses some difficulty, the court may employ various devices to manage the issue, instead of denying certification under the predominance inquiry. The Court of Appeals for the Second Circuit has adopted this approach with regard to both securities fraud and antitrust class actions. In *Visa Check,* the court stated that "if defendants' argument (that the requirement of individualized proof on the question of damages is in itself sufficient to preclude class treatment) were uncritically accepted, there would be little if any place for the class action device in the adjudication of antitrust claims" and "[s]uch a result should

not be and has not been readily embraced by the various courts confronted with the same argument." 280 F.3d at 140 (internal citation omitted). The court went on to suggest a number of management tools available to a district court for addressing any individualized damages issues that might occur in a class action, including: "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *Id.* at 140 (citing Fed.R.Civ.P. 23(c)(4) provision stating that "[w]hen appropriate, (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class."). In *Green v. Wolf,* a securities fraud case, the Court of Appeals held that "[t]he district court may use the procedures suggested by Rule 23 to cope with [individual issues]" and can "order separate trials ... on the question of damages, if necessary. The effective administration of 23(b)(3) will often require the use of the 'sensible device' of split trials." 406 F.2d at 300–301. None of the suggestions in (1) to (5) in *Visa Check* or in *Green* is required in the instant case because the matter can be handled by statistical averaging over the entire class. *See* Part IX.A, *infra.*

Finding the Court of Appeals for the Second Circuit's rationale applicable to the RICO context, the Seventh Circuit, in *Carnegie v. Household Intern., Inc.,* explained:

> Often, and possibly in this case as well, there is a big difference from the standpoint of manageability between the lia-

bility and remedy phases of a class action. The number of class members need have no bearing on the burdensomeness of litigating a violation of RICO. Whether particular members of the class were defrauded and if so what their damages were are another matter, and it may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief. Fed.R.Civ.P. 23(c)(4)(A); *Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 141 (2d Cir.2001); *Robinson v. Metro–North Commuter R.R.*, 267 F.3d 147, 168–69 (2d Cir.2001). That prospect need not defeat class treatment of the question whether the defendants violated RICO. Once that question is answered, if it is answered in favor of the class, a global settlement ... will be a natural and appropriate sequel. And if there is no settlement, that won't be the end of the world. Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. 376 F.3d at 661 (some citations omitted). The court went on to quote the five management tools suggested by the Court of Appeals for the Second Circuit in *Visa Check, supra.*

b. Superiority

Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication. Matters pertinent to this inquiry include: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrat-ing the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3). *See also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). This is a "nonexhaustive" list. *Amchem Prods.*, 521 U.S. at 615, 117 S.Ct. 2231.

"In setting out these factors, the Advisory Committee for the 1966 reform anticipated that in each case, courts would 'consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit.'" *Id.* at 616, 117 S.Ct. 2231 (quoting Fed.R.Civ.P. 23(b)(3) advisory committee notes (1966)).

[The Advisory Committee] elaborated: "The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable."

*Id.*

The difficulties likely to be encountered in the management of a RICO class action with respect to individual reliance and damages issues have for the most part been discussed in Parts III.C and III.D, *supra.* While these problems are significant, they are superable. Extrapolation that comports with due process can be carried out using very small samples; the burden on the parties and the court of generating and evaluating the evidence would not be over-great. *See, e.g., Michigan Dept. of Educ. v. U.S. Dept. of Educ.*, 875 F.2d 1196, 1199 (6th Cir.1989) (in suit by state challenging administrative finding

that state department of education had misused federal funds, upholding estimate of disallowance based on 259 samples from a class of 66,368 authorizations, or four-tenths of a percent; "[t]here is no case law that states how large a percentage of the entire universe must be sampled"). *See also Ratanasen v. California Dept. of Health Servs.*, 11 F.3d 1467, 1472 (9th Cir.1993) (in Medicaid/Medicare audit context, "the cases addressing sampling ... make no mention of a statistical 'floor' which auditors must exceed in order to guarantee providers due process."). The sample need not comport with any particular sampling methodology. *See, e.g., Ratanasen* at 1471 n. 1 (case law "do[es] not specify that a certain method of sampling must be used to satisfy due process"; collecting cases). *See generally* Part IX.A, *infra*.

 It should be noted that "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir.2001). *See also Yaffe v. Powers*, 454 F.2d 1362, 1365 (1st Cir. 1972) ("[F]or a court to refuse to certify a class ... because of vaguely-perceived management problems ... discount[s] too much the power of the court to deal with a class suit flexibly, in response to difficulties as they arise."); *In re Workers' Compensation*, 130 F.R.D. 99, 110 (D.Minn. 1990) ("[D]ismissal for management reasons is never favored."); *In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 78 F.R.D. 622, 628 (W.D.Wash.1978) (stating that "dismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule") (internal quotation marks omitted).

If a class action is "markedly superior to all the alternatives," a court should, "at least at the early stages of the litigation ... construe broadly the other elements of Rule 23." *Green*, 406 F.2d at 301.

### 2. Application of Law to Facts

Subsection (b)(3) of Rule 23 is more comprehensive than subsection (b)(2) and imposes stricter superiority and predominance requirements. *See* 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 4:1 (4th ed.2002). The court therefore evaluates plaintiffs' claims under the subsection (b)(3) rubric.

### a. Class action is superior method of adjudication

 A class action is the superior method for the fair and efficient adjudication of this controversy. Considering the complexity of this lawsuit, involving an alleged conspiracy perpetrated by multiple corporate defendants over a period of several decades, extensive discovery and litigation will be required to prosecute it; most plaintiffs will not be in a position to do so alone or even in smaller joinder actions. The costs to individual plaintiffs would dwarf any potential recovery. One of the fundamental purposes of Rule 23 is to enable such small claimants to seek judicial redress through the aggregation of claims into a single class action.

Plaintiffs, a class of "light" cigarette purchasers, are the only direct victims of an alleged massive scheme by cigarette companies to defraud consumers, and thus may be the only plaintiffs with standing to bring claims against the defendants. In *Service Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc.*, 249 F.3d 1068 (D.C.Cir.2001), the Court of Appeals for the District of Columbia dismissed a plaintiff labor union trust fund's RICO claims against cigarette companies,

holding that the trust funds' injuries were too remote. The Court held: "Like other circuits, we conclude that individual smokers constitute a group of potential plaintiffs possessed of more direct claims who can be counted on to deter the alleged wrongdoing by asserting ... RICO [or other] claims ...." *Id.* at 1076. *See also Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200, 207, 785 N.Y.S.2d 399, 818 N.E.2d 1140 (N.Y.2004) (health insurer could not sue tobacco companies for injuries to its insureds under state deceptive business practice statute); *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 217–18 (2d Cir.2003) (where plaintiff health plan did not identify identities of its subrogors, its claims were not true subrogation claims and so were too remote to satisfy proximate cause requirement of RICO); *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir.1999) (union trust funds could not maintain suit under RICO against tobacco companies for increased benefit payments made to injured smokers); *Oregon Laborers–Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 964 (9th Cir.1999) (same; "[t]he existence of the smokers, who are the more direct victims of the alleged wrongful conduct and who can be counted on to vindicate the injury caused by defendants' alleged wrongful conduct, weighs heavily in favor of barring [the labor union trust fund] plaintiffs' actions.").

Given that the United States government was precluded from seeking a disgorgement remedy in their RICO case against the cigarette industry, the instant action, or one like it, is likely to be the only way defendants, if they are responsible for the alleged massive fraudulent scheme, can be forced to account monetarily to "light" cigarette smokers in federal court and be deterred from continuing such fraudulent conduct in the future. *See United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1200 (D.C.Cir.2005) (concluding that the federal government could not seek a disgorgement remedy; "[i]ndividual plaintiffs are made whole and defendants punished through treble damages under 18 U.S.C. § 1964(c) ..."). It would be unfair for the court system to deny recovery to institutional plaintiffs because direct victims can recover, only to then deny those direct victims recovery.

A class action in the instant case is a superior method of adjudication because it is likely to be the *only* method of adjudication open to plaintiffs. *See Aspinall*, 442 Mass. at 398 n. 21, 813 N.E.2d 476 (approving certification of a "light" cigarettes fraud class action; "[t]he device of a class action is ... driven by pragmatic considerations. Requiring individual actions to be brought by thousands of individual smokers, merely to provide absolute certainty that (for example) each plaintiff sometimes covered up the vent holes, would by wholly impractical."); *Curtis*, 2004 WL 2776228, at *5 (same; "a class action is not only an appropriate method to resolve the plaintiffs' allegations, but pragmatically, the only method ..."). On this reasoning, the Supreme Judicial Court of Massachusetts certified a statewide class action alleging a similar cigarette fraud over the defendant's similar objections.

> The [trial] judge's conclusion that the plaintiffs' claim warrants certification as a consumer class action is amply supported by the record. The claims of the plaintiffs and members of the purported class (estimated to number in the hundreds of thousands) derive from a common course of conduct on the part of the defendants and present the identical issue-whether the defendants misrepresented material information concerning

the design, function, marketing, toxicity, and tar and nicotine yields of Marlboro Lights and, in doing so, violated [state consumer protection law]. The plaintiffs are similarly situated to other consumers of Marlboro Lights, and, because the injury claimed is an economic, and not a personal, injury, all have been similarly injured. Were there to be individual trials (a highly unlikely scenario due to the lack of economic incentive), the common aspects of the defendants' conduct would become a predominant aspect of each trial. Considerations of delay, high costs, and arbitrary results provide further support for the appropriateness of class certification. We conclude that a class action is not only an appropriate method to resolve the plaintiffs' allegations, but, pragmatically, the only method whereby purchasers of Marlboro Lights in Massachusetts can seek redress for the alleged deception.

*Aspinall,* 442 Mass. at 392–93, 813 N.E.2d 476.

In such "death knell" situations, as in the instant one, where the only possible litigation is a class action, the other requirements of Rule 23 are read broadly, since the court's obligation to protect the interests of absent class members is best served by allowing some form of adjudication, as opposed to none at all, to go forward. *See Green v. Wolf Corp.,* 406 F.2d 291, 302 (2d Cir.1968) ("If a class action is markedly superior to all the alternatives, then, at least at the early stages of the litigation, we should construe broadly the other elements of Rule 23 . . .").

b. Common questions of law or fact predominate

Questions relating to the defendants' commission of mail and wire fraud through an alleged conspiracy and scheme to fraudulently market "light" cigarettes generates a significant number of common questions of law and of fact, discussed *supra.* Fraud-based claims premised on a common course of conduct or scheme satisfy the predominance inquiry. The defendants' conduct and the impact of that conduct will be substantially the same for most class members. It would be both inefficient and unjust to force plaintiffs to relitigate the same issues concerning the existence, scope, and effect of what appears to be a uniform fraudulent scheme—whatever minor variations might have existed in its execution. *See Davies v. Philip Morris,* No. 04–2–08174–2, 2006 WL 1600067, at *2 (Wash.Super. May 26, 2006) (finding commonality under state class action rule; rejecting "the argument . . . that the various packages used over the years or the various commercial advertisements somehow strips [the question of defendants' alleged deception] of its commonality.").

Plaintiffs' experts have demonstrated that they can probably extrapolate to the class as a whole from individual class members' experience as determined in individual discovery, surveys, and statistical proof. *Daubert* analysis has found their scientific approach meets appropriate standards of proof under the Federal Rules of Evidence despite strong scientific proof to the contrary, proffered by defendants. *See* Part VIII, *infra.* The issues are for the jury. Denying certification would bring a premature end to a series of related claims that appear to have considerable merit.

Nevertheless, defendants argue that the existence of four major individualized issues precludes a finding of predominance of the common questions of law or fact. These issues are: (1) reasonable reliance; (2) injury to business or property; (3) calculation of damages; and (4) the affirmative defense that some members of the

putative class will be time-barred from recovery by RICO's statute of limitations.

All of these objections are based on defendants' position that each smoker differs from every other smoker—and any one smoker's behavior differs from one day, or one cigarette, to the next. While superficially true, the argument is overstated. The putative class contains only smokers of "light" cigarettes, one segment of the cigarette market. Common sense and defendants' own documents strongly suggest that the members of the class are persons who were drawn to the brand images consciously projected by defendants after careful consumer research. *See, e.g.,* Expert Report of Richard Pollay, ¶¶ 31–37, excerpted in Part VIII.F.1.m (quoting internal industry documents demonstrating defendants' understanding of the "lights" market, including the following from a 1978 study: "The very fact, then, that a smoker has decided to switch from a full-flavor cigarette to a low delivery cigarette tells us something very important about him: he is concerned about his health, and he is willing to do something about it."). It is probable that the variation among plaintiffs' reactions to defendants' representations is not great in ways that matter to the outcome of this case. *Cf. Price,* Appendix C at ¶ 40, *infra* ("that Class members may have relied to *different degrees or different ways* upon [defendants'] health representations" did not preclude class treatment) (emphasis supplied).

### i. Reliance

In creating RICO, Congress was particularly concerned that "those who have been wronged ... should at least be given access to a legal remedy." *Sedima,* 473 U.S. at 487, 105 S.Ct. 3275. Should plaintiffs prove their claims of conspiracy, collusion, and a broad-based scheme to deceive a large part of the American public, they will have established the existence of "organized" RICO crime, in the sense that the conduct was criminal and purposefully orchestrated, with significant effects on the American economy. As Nobel Prize winning economist Joseph E. Stiglitz notes, defendants'

> collusion [if proved,] was clearly responsible for creating and sustaining a radically different business environment. Collusion involved choosing which areas to compete in (like brand images) and which areas not to compete in (like health and safety). Collusion involved restricting the scope of research in a manner that is utterly inexplicable without some joint understanding. And collusion reinforced and strengthened the joint and misleading statements about the harmfulness of tobacco, ensuring that no firm defected from the strategy. This had profound effects on the cigarette industry. Had the cigarette companies acted in a competitive manner, smoking would have been significantly reduced as a result of consumers coming to a better understanding of health consequences of smoking. In addition, the cigarette companies might have developed and marketed a genuinely less harmful cigarette.

Decl. of Joseph E. Stiglitz at 44; Part VIII.F.1.p.

The burden of proof for RICO reliance in a suit alleging mass market fraud is set out in *Falise v. American Tobacco Co.:*

> Where ... the fraudulent scheme is targeted broadly at a large proportion of the American public the requisite showing of reliance is less demanding. Such sophisticated, broad-based fraudulent schemes by their very nature are likely to be designed to distort the entire body of public knowledge rather than to individually mislead millions of people.

From the perspective of the fraudulent actors, clear efficiencies are gained by co-opting the media and other outlets of information as unwitting tools for the pervasive scheme.

. . . . .

Where such a broad-based fraudulent scheme is alleged, a plaintiff in order to establish reliance for injury causation need only establish (1) that the RICO defendants intentionally engaged in a scheme to distort the body of public knowledge, (2) that the defendants were successful in doing so (e.g., a substantial factor causing the distortion), (3) that there was detrimental reliance on this distorted knowledge by an intended and foreseeable class of victims, (4) that such reliance was reasonable in the totality of the circumstances, and (5) that the plaintiff was proximately injured by this reliance.

94 F.Supp.2d 316, 335 (E.D.N.Y.2000). In such a case, attention is properly trained on defendants' alleged misconduct, not minor differences in plaintiffs' reaction to it. *But see Pearson v. Philip Morris, Inc.,* No. 0211–11819, 2006 WL 663004, at *7, *10 (Or.Cir. Feb. 23, 2006) (placing burden on each plaintiff to demonstrate that he or she was not receiving less tar; individual questions predominated because plaintiffs did not present any evidence purporting to prove reliance and causation on class-wide basis).

In proving that defendants' · alleged scheme existed, and class members then purchased "light" rather than "regular"— or no—cigarettes, plaintiffs may be able to show through their experts and other proof that reliance was reasonable · and pervasive. Proving such a successful and pervasive marketing scheme presents a substantial hurdle. Yet the evidence thus far presented by the plaintiffs includes evidence sufficient to go to the jury.

Plaintiffs ˙ have presented evidence through defendants' own internal documents, memoranda, and first-hand testimony that they recognized at the time that their conduct was likely to create liability to "light" cigarette purchasers. The certainty that not all "light" smokers chose their brands for the same reasons does not preclude a finding that an implied reduction in danger was a substantial factor in nearly all class members' decisions. *See* Expert Report of John Hauser, Part VIII. F.1.i (concluding based on reliable surveys that 90.1 percent of the class members based their decision to smoker "light" cigarettes on health concerns). *Cf. Price,* Appendix C at ¶ 47, *infra* ("[T]he mere existence of potential other reasons for a consumer to prefer the products at issue in this case does not vitiate or eliminate the fraud associated with the health representation as a causative influence on all Class members' purchase decisions.").

Reasonable inferences may be made based on the nature of sophisticated marketing and advertising of a product available throughout the nation. As one commentator has recognized,

[t]he common law typically has preferred individualized proof of liability, but has authorized departures from individuated proof when practicality demands. For example, contracts are interpreted according to the intent of the parties, but in some cases the intent is impossible to discern. In these cases, intent may be construed by reference to what most people would prefer (so-called majoritarian default rules). Here, interpretation aims to establish individual intent; but proof turns on what most people would have intended and so is not a specific, individualized analysis of the unique transaction. The common law mediates the choice between individual rights and group rights in this way, by

prescribing the conditions for, and the degree of departure from, individualized proof.

Mark Moller, *The Rule of Law Problem: Unconstitutional Class Actions and Options for Reform*, 28 Harv. J.L. & Pub. Pol'y 855, 860 (2005). As discussed above, general proof or use of presumptions are practical responses to the limitations of an "individual rights" model in a mass market economy.

A focus on defendant misconduct is not unusual in consumer cases. Theories of consumer products liability and implied warranty of merchantability also emphasize the conduct of defendants and their position relative to plaintiff-purchasers:

> [these theories of liability] appear to rest tacitly on several key features of a mature market for mass-produced products. In such markets, sellers produce without contact with any particular buyers. The sellers maintain exclusive control over product development and production until the finished product is released into the stream of commerce. The sellers have superior, if not exclusive, access to information that would generally be critical for establishing more traditional bases for liability, such as negligence. Finally, the product is sold among similar goods, such that consumer expectations can be fairly presumed . . . .

Samuel Issacharoff, *The Vexing Problem of Reliance in Consumer Class Actions*, 74 Tul. L.Rev. 1633, 1648 (2000).

Individual subjective reliance has also been de-emphasized in the law of express warranties, having been largely replaced by "an obligation on the part of the seller to honor the 'basis of the bargain.'" *Id.* at 1652. Professor Issacharoff argues that these alterations in the standard of proof of reliance are often presented in class certification debates because:

First, the assertion of this claim on behalf of a class has a compelling logic to it, as reflected in the common issue and predominance requirements of Federal Rule of Civil Procedure 23. Second, absent collective prosecution, there would be no redress since no consumer would ever pursue such a claim alone, a step that also has a rules component under the superiority requirement of Rule 23(b)(3)[; this is] not truly a procedural issue at all, but a legacy of the incomplete resolution of the role of individual reliance in the substantive law[.] *Id.* at 1635.

Such a concentration of attention by the court is particularly appropriate in the present suit. Defendants not only had significantly more economic power than smokers, they also had significant control of the scientific information available to consumers regarding the healthiness or dangers of "light" cigarettes. There is substantial evidence that they used their knowledge and power to the detriment of the public: they allegedly agreed to halt much of the scientific testing and development of a truly healthy cigarette, hid much of the adverse scientific information they did discover (including knowledge about the failings of the FTC method of measuring tar and nicotine), and exploited other knowledge (including information concerning compensation). *See, e.g., Simon II*, Appendix D at Part III.B.5, *infra*. As a result, consumers were unlikely to have had any way to challenge or any basis to critique the health information disseminated by the defendants concerning "light" cigarettes.

Substantial evidence supports plaintiffs' position that defendants used general "proof," in the form of marketing research and customer surveys, to determine how to advertise and promote their products to actual and potential smokers. *See, e.g.,*

Expert Report of Paul Slovic, dated Aug. 15, 2005 ¶¶ 27–32, excerpted in Part VIII. F.1.o, *infra* (describing defendants' use of "sophisticated methods to uncover consumer needs and motivations that could be addressed in targeted advertising and promotion campaigns. These methods included focus groups and large surveys designed to measure smoking behavior, people's attention to advertising materials, and their attitudes and emotional responses.") (citations to defendant documents omitted). Advertisement imagery and verbiage was chosen to appeal to the entire prospective market of "light" smokers. Information about the health risks was allegedly withheld from all, not just some. Why, plaintiffs properly ask, should they be precluded from seeking a remedy as a class when defendants treated them as a class in allegedly defrauding them? Fairness requires that a jury be given some concrete basis on which to determine the effects of defendants' conduct on plaintiffs. *See* Parts III.D.3.b, *supra;* IX.A.3, *infra.* It does not require utter certainty as to the quantum of those effects before a class may be certified.

Where a defendant specifically targets a large group and knowingly relies on the group's dynamics and communications to succeed in a fraud, that group may assert its "group rights" in holding the defendant accountable for its conduct. The RICO mail and wire fraud federal substantive law and the Rule 23 federal procedural law together provide a powerful tool for satisfying the community's basic sense of fairness while protecting defendants' due process rights. Utilization of the class action does not change the lawful conduct to be expected of the defendants when the alleged conspiracy was operative.

As discussed above, the Court of Appeals for the Second Circuit has held in antitrust and securities fraud contexts that reliance issues do not warrant class decertification, especially where the defendant's liability can be established through common proof. *See In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 140 (2d Cir.2001); *Green v. Wolf Corp.,* 406 F.2d at 300–301. The Seventh Circuit extended this approach to RICO claims in *Carnegie,* 376 F.3d at 661. This approach is applicable to the present case. The facts in the instant case are at least as compelling as those in *Visa Check, Green,* and *Carnegie.*

ii. Injury to property and damages

Defendants argue that plaintiffs cannot show injury to property on a class-wide basis. Under their theory, the requisite showing of injury would require an individualized determination of each class member's personal loss because, defendants maintain, at least some of them got what they were promised from "light" cigarettes. For example, if an individual plaintiff cannot show that he or she "compensated" for the lower tar and nicotine levels in "light" cigarettes by inhaling more deeply, covering ventilation holes, or smoking greater quantities of cigarettes, then that plaintiff may not be able to prove that he or she did not receive less tar and nicotine, and thus, it is contended, cannot prove any injury.

Defendants' claims are not convincing on the issue of certification. First, the question of what was promised has not yet been decided. Whether the promise, explicit or implicit, in defendants' advertising campaign was the delivery of less tar and nicotine or a healthier cigarette is a question subject to proof and best decided by a jury in a centralized class adjudication.

Second, plaintiffs have proffered several theories of injury and damages that are based on "light" cigarettes being overpriced. For example, plaintiffs' expert

John C. Beyer, Ph.D. has identified one such method:

> The first methodology, which I refer to as the 'demand methodology,' relies upon the estimation of the demand and supply of cigarettes during a period that includes the period preceding the introduction of light cigarettes and which includes the entire class period. I then measure the effect that the introduction of light cigarettes had on total demand for cigarettes and the prices paid by class members for cigarettes .... [The] effect of light cigarettes was almost certainly to increase total cigarette demand, resulting in more consumption of cigarettes than otherwise would have been the case. Because of the higher level of consumption arising from the conspiracy, purchasers of light cigarettes paid higher prices than they would have in the but-for world.

Expert Report of John C. Beyer at ¶ 32; Part VIII.F.1.a, *infra.*

Plaintiffs' expert Jeffrey E. Harris, M.D. Ph.D. has identified another economic methodology for computing class-wide damages:

> In the ... "loss of value" approach, an economist assesses, on a per-cigarette basis, the difference between the price paid for the goods as represented and the value of the goods actually sold.

*See* Expert Report of Jeffrey E. Harris at ¶¶ 11, 20; Part VIII.F.1.h, *infra.*

Both Dr. Beyer's and Dr. Harris's proposed testimony meet *Daubert* requirements. *See* Parts VIII.F.1.a, VIII.F.1.h, *infra.* They sufficiently support certification.

Defendants' contention that certification is inappropriate because some smokers likely received less nicotine and tar, or a cigarette that was in fact less dangerous, places an impossible and unnecessary burden on plaintiffs. "So far as we are aware, the actual level of tar and nicotine received by an individual smoker is a factor that cannot be measured by any test." *Aspinall,* 442 Mass. at 398, 813 N.E.2d 476. And the obverse of defendants' position is also true: if some smokers received what was promised, then others did not. *See Aspinall,* 442 Mass. at 398 n. 20, 813 N.E.2d 476 ("Indeed, it may be unlikely that any individual would smoke a cigarette the exact same way twice. Thus, by implication, it is probable that no smoker received the promised benefit of lowered tar and nicotine every time he or she smoked a Marlboro Lights cigarette."). Reliable statistical evidence is available to help the jury decide, within a reasonably precise range, how many fall into the defrauded category. *See* Part IX.A, *infra.*

As discussed in Part III, plaintiffs' evidence to date is less than decisive. It is sufficient, however, to support certification. *Cf. Caridad,* 191 F.3d at 293 (reversing district court's denial of certification where the trial court had credited defendant's expert evidence over plaintiffs'; "More detailed statistics might be required to sustain the Plaintiffs' burden of persuasion, but [their proffered expert] report, in conjunction with the anecdotal evidence, satisfies the Class Plaintiffs' burden of demonstrating commonality for purposes of class certification.") (internal citation omitted).

Individual smoker variation is no reason to deny recovery to the entire class:

> [T]he Court is not convinced from the record that alleged differences in individual smoking behavior constitute a sound and sufficient reason to deny class action status in this case. While it undoubtedly is true in a broad and generic sense that there are differences in smoking behavior from smoker to smoker, the Court believes there are indications in

the record that "compensation" may be a virtually universal behavioral characteristic of all smokers of so-called "low tar" cigarettes, including Marlboro Lights. If so, then the individual differences in smoking behavior would have no effect in terms of requiring individual mini-trials for each class member, because despite any such differences, each class member would still have received a product that in fact did not deliver, to him or her, lower yields of tar and nicotine.

*Craft,* 2003 WL 23355745, at *4. Such a smoker has been defrauded—he or she paid for something that he or she did not get—and so has suffered an economic injury.

This economic loss can arguably be calculated based on general data from the market, such as cigarette sales records, rather than on receipts that "light" cigarette purchasers may or may not have kept. It is not necessarily contingent on whether some "light" cigarette purchasers would have continued to smoke regular cigarettes but for the "lights" fraud. *See* Part III.B.2.a, *supra* (rejecting argument that, as a matter of law, plaintiffs who would have smoked regular cigarettes absent the fraud suffered no injury).

 A class certification motion is not the proper forum in which to evaluate the merits of experts' theory of damages, but only to ascertain whether they are colorable. *See Visa Check,* 280 F.3d at 139 (holding that the court "must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law," but should not consider "whether the evidence will ultimately be persuasive."); *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 292–93 (2d Cir.1999) (holding that a court may not weigh conflicting expert evidence or engage in "statistical dueling" of experts.").

*See also Aspinall,* 442 Mass. at 400, 813 N.E.2d 476 ("Whether plaintiffs ultimately will be successful in proving actual damages is a matter that need not be resolved at the certification stage.").

There is no persuasive reason why individualized damages should preclude certification under Rule 23(b)(3), even were they to become an issue, "when the issue of liability can be determined on a class-wide basis." 280 F.3d at 139.

> [I]f the Court were to say that class action status is inappropriate in this type of case merely because there may be some individual questions that need to be resolved with regard to class damages, then it would severely limit the type of consumer fraud actions that could ever be brought ... since many if not most such actions would necessarily involve at least some differences among class members regarding prices or amounts of purchases. This ... would be contrary to the underlying spirit and intent of [the cause of action] ....

*Craft,* 2003 WL 23355745, at *10.

Defendants also contend that plaintiffs' claims are personal injury claims in disguise, and so raise predominating individual questions rendering certification inappropriate. Plaintiffs' theories of injury and damages are based on the actual worth of the "light" cigarette as compared to how much a purchaser paid for them when deluded into thinking they were relatively healthful. This is an economic loss, not a personal injury. It raises questions of claim splitting, already rejected in Part IV.C, *supra,* but not questions of individual proof.

The Court of Appeals for the Second Circuit has stated, in the criminal context, that "a party who contracts to have goods produced or services performed according to certain specifications, and who pays for

those goods or services in reliance on a fraudulent representation that they conform to the specifications, has sustained a measure of *pecuniary loss* ...." *United States v. Canova,* 412 F.3d 331, 354 (2d Cir.2005) (emphasis supplied). This principle holds true even where the goods purchased have medical implications. *See id.* at 352 ("Whether the *testing time on a pacemaker,* the number of rivets on an airplane wing, or the coats of paint on a refurbished building ... the victim [who] has been induced to pay for something that it wanted and was promised but did not get [has] incurr[ed] some measure of pecuniary 'loss.' ") (emphasis supplied).

Plaintiffs have suggested a sensible and usable plan for managing the litigation. Pls.' Resp. to Mem. of June 6, 2005, Ex. 8. They have included understandable proposed jury charges, verdict forms, and notice procedures. Pls.' Resp. to Mem. of June 6, 2005 (Docket No. 676), Exs. 3–7. While they propose a bifurcated trial as suggested in *Green,* the court finds that a single trial of liability and damages is practicable and desirable; a single trial will save time and money.

iii. Statute of limitations

Individual issues concerning the statute of limitations do not predominate over common questions of liability, and thus do not preclude class certification under Rule 23(b)(3). Defendants contend that the class must include at least *some* untimely claims under RICO's four-year limitations period, which would bar plaintiffs who were or reasonably should have been on notice of their injury before May 11, 2000 when the action was commenced.

The issue of timeliness goes to the merits of the case, and cannot be decided now to deny certification. *Chiang v. Veneman,* 385 F.3d 256 (3d Cir.2004) (holding that a statute of limitations defense goes to the merits and hence is not an appropriate objection in the context of class certification); *In re Monumental Life Ins. Co.,* 365 F.3d 408 (5th Cir.2004) (finding that the issue of whether individual claims were barred by statute of limitations did not predominate over request for injunctive relief so as to preclude certification of class because a theory of constructive notice, which could be decided on class-wide basis). It was properly addressed when defendants' motion for summary judgment was denied. *See* Part III.E, *supra.*

There is substantial evidence concerning defendants' alleged conspiracy to hide the truth about "light" cigarettes, that there was a class-wide lack of notice before May 11, 2000, and that there was fraudulent concealment, a just cause for equitable tolling of the limitations period on a class-wide basis. *See* Part III.E.3, *supra.* Even if some members of the class would be barred at different times, the jury will be able to extrapolate the total damages with the aid of experts and statistical analysis.

This issue will present questions that can be decided based on generalized proof, including questions concerning what constitutes notice of injury and wide dissemination of the truth about the healthiness of "light" cigarettes in a case where defendant's alleged misrepresentations about "light" cigarettes were so broadly publicized for so many years in their extensive advertising campaign; where defendants claim that as recently as 1996 the National Cancer Institute (NCI) published a report that concluded that lower tar cigarettes reduce the risk of lung cancer (Def.'s Opp'n to Pls.' Mot. For Class Cert. at 18); and where Monograph 13, concluding that "light" cigarettes were *not* healthier, was published within the statute of limitations period. *See* Part III.E.3.b.ii, *supra.* It is a question for the jury to resolve upon a

full review of the evidence. *See Bingham v. Zolt*, 66 F.3d 553, 558 (2d Cir.1995) (jury asked to determine "when the estate actually knew of defendants' alleged wrongful acts"). If the jury finds that the statute of limitations bars part or all of some plaintiffs' claims, the court will then consider the application of the equitable principles described in Part III.E.3.d, *supra*.

The statute of limitations defense does not cause individual questions to predominate. *See Craft*, 2003 WL 23355745, at *12 ("[T]he statute of limitations does not present an individualized question of law or fact of sufficient magnitude, whether considered separately or in combination with other questions, to result in such predominance of individual questions over common questions as would warrant denial of class certification. A class definition is always subject to possible later change or even decertification as a case develops ....").

Should the statute of limitations question not prove to be amenable to generalized proof, the court retains the same mechanisms to manage individualized statute of limitations issues as it does for individualized reliance and damages issues.

### E. Rule 23(g) Adequacy of Class Counsel

This inquiry is discussed under Part VII.B.4, *supra*.

### F. RICO and Class Certification

One of the major functions of Rule 23 is to promote judicial economy. Another is to provide a means for individual private persons to sue in the interest of members of a larger group who would not be able to pursue those claims individually, a goal in line with those of RICO, a private attorney general statute. These primary goals, judicial efficiency and justice for small claimants, must be balanced against the interest in protecting the due process rights of absent class members and of defendants. Understanding the relationship and balance of these at times conflicting interests is essential to a proper appreciation of Rule 23's power and pitfalls. Any evaluation of the Rule 23 criteria must be conducted with its underlying merits-oriented goals in mind. Given the importance of the class action to society as a whole, the goals of Rule 23 should not be frustrated by a hypertechnical reading of its requirements.

In light of RICO and Rule 23's purposes, the instant case is well-suited for class certification. If their allegations are proven, plaintiffs and class members are private individuals who have been deliberately wronged by powerful corporations. Their claims are largely the same; all were allegedly defrauded as a result of a common fraudulent scheme developed and executed by the defendants over several decades in order to protect the viability of the cigarette industry and to maintain and increase profits. Any economic losses of individual plaintiffs, although significant to each, would be minimal in comparison with the costs of individual litigation against the multi-billion dollar enterprise alleged to have committed the claimed fraud.

### G. Conclusion on Certification of Class

Plaintiffs meet the requirements of Rule 23(b)(3). They have demonstrated that there is more than enough merit to their case to justify the time and expense of a consolidated trial. The Court of Appeals for the Second Circuit would not require even that showing to approve certification. *See Visa Check*, 280 F.3d at 135 (on motion for certification, plaintiffs bear no burden to demonstrate merits of case); *Caridad*, 191 F.3d at 293 (same).

Aggregate litigation is the most appropriate way to resolve plaintiffs' claims.

The class as defined by plaintiffs is certified. Plaintiffs may amend the class definition to include all claims arising up until the beginning of trial.

## VIII. Admissibility of Expert Evidence

### A. Motions Regarding Admissibility of Expert Reports

Plaintiffs and defendants each bring multiple motions for exclusion *in limine* of opposing expert witnesses, pursuant to Federal Rules of Evidence 104(a), 403, 701, and 702. On September 22, 2005, this court granted defendants' motion to exclude the expert testimony of Dr. Robbin Derry on the ground that testimony related to business ethics is not sufficiently related to the facts at issues in this case. *See* 2005 WL 2303823 (E.D.N.Y. Sept.22, 2005). On September 27, 2005, this court granted defendants' motion to limit testimony by plaintiffs' expert John C. Beyer regarding his "disgorgement model" and his "price impact model"; admitted the testimony of plaintiff's expert Dr. Richard W. Pollay; and admitted in part the testimony of plaintiff's expert Dr. K. Michael Cummings. *See* 2005 WL 2401647 (E.D.N.Y. Sept. 29, 2005). The memorandum and order on *Daubert* issues dated September 29, 2005 is deemed embodied in this opinion. Set out in Part VIII.F, *infra*, are the names and backgrounds of the experts thus far relied on by the parties, with particular emphasis on those they challenge under Rule 702 of the Federal Rules of Evidence. Because of the presentation of new data and analysis, as well as additional briefings, the court has readdressed and carefully reconsidered the reports of experts already ruled upon.

### B. Rules 702 and 703 of the Federal Rules of Evidence

The key provisions are rules 702 and 703 of the Federal Rules of Evidence, embodying the basic principles of *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). They are:

Rule 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

In some instances the experts are also fact witnesses, requiring satisfaction of Rule 701 of the Federal Rules of Evidence covering opinions of non-experts.

 While a detailed analysis for such *in limine* matters is not required, a gatekeeping function is conferred upon the

district court by the Rules of Evidence. *Daubert,* and the guidelines set forth in Rule 104(a) governing decisions on witness qualifications and admissibility of evidence, suggest a preliminary determination that the testimony of experts expected to testify is or is not helpful to the trier of fact, reliable from an evidentiary standpoint, and relevant to the issues in the case. The method for determining the reliability of such testimony is within the discretion of the district court. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). It should make a suitable inquiry before reaching its determinations. *Id.* The inquiry may be a "flexible one," with the ultimate goal of assuring that proffered expert testimony is scientifically acceptable and relevant, as well as otherwise reliable from an evidentiary standpoint. *See Daubert,* 509 U.S. at 594–95, 113 S.Ct. 2786. Since "Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely v. City of New York,* 414 F.3d 381, 395 –396 (2d Cir.2005), the assumption the court starts with is that a well qualified expert's testimony is admissible. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," and "are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. The party who presents an expert bears the burden of proving each element necessary to the admissibility of that expert's testimony and report. *See Daubert,* 509 U.S. at 592, 113 S.Ct. 2786; Fed.R.Evid. 702 advisory committee note (2000).

The parties have agreed that the court should make its findings based solely on the submitted papers without an evidentiary hearing. *See* Tr. of Status Conference of July 31, 2006. Since much of the expert evidence, and the experts who are expected to give it, are the same or similar to that received at prior trials and proceedings in this court, reliance on their backgrounds, reports and depositions rather than full in-court testimonial hearings is appropriate.

### C. Qualifications of Expert Witnesses

 Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, or education. *See* Fed.R.Evid. 702. In keeping with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony," *Daubert,* 509 U.S. at 588–89, 113 S.Ct. 2786, the standard for qualifying expert witnesses is liberal. Assertions that the witness lacks particular educational or other experiential background, "go to the weight, not the admissibility, of [the] testimony." *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995). If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent. *See, e.g., Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir.1997) (expert witness qualified when experience, knowledge, or training related to general area, not to specific question before trier of fact).

### D. Helpfulness and Relevance

 In deciding whether to allow the witness to give expert testimony the primary issue is whether the expertise provides the witness with the ability to assist the finder of fact in deciding the issues before it. This inquiry is subsumed within

the broader "relevance" analysis governed by Rule 401. The *Daubert* court described this consideration as one of "fit," requiring a "valid scientific connection" between the subject matter of the expert's testimony and the factual issues to be determined by the jury. *Daubert,* 509 U.S. at 591–92, 113 S.Ct. 2786. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. "[T]he Rules' basic standard of relevance ... is a liberal one," *Daubert,* 509 U.S. at 587, 113 S.Ct. 2786. The decision to admit or exclude on these grounds is within the trial court's discretion. *See United States v. Aminy,* 15 F.3d 258, 261 (2d Cir.1994).

In inquiring into the potential helpfulness of the proffered expert testimony, the court decides whether it concerns matters requiring assistance to the kind of people expected to sit on the jury. *See United States v. Mulder,* 273 F.3d 91, 101–02 (2d Cir.2001). The evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. *See also Daubert,* 509 U.S. at 591, 113 S.Ct. 2786.

Expert testimony should not merely reiterate arguments based on inferences that can be drawn by laypersons; those can properly be advanced by the parties in their summations. Neither should it include conclusory testimony that "undertakes to tell the jury what result to reach ... [or] attempts to substitute the expert's judgment for the jury's." *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994). Freely admitted is expert testimony that is likely to substantially assist the average person in understanding the case—even if it simply explains facts and evidence already in the record. *See Mulder,* 273 F.3d at 101–02.

After determining that the requirements of general helpfulness and specific "fit" are met, the court engages "in a balancing ... to determine whether the probative value of the proffered evidence substantially outweighs its danger of unfair prejudice." *United States v. Jakobetz,* 955 F.2d 786, 794 (2d Cir.1992); Fed.R.Evid. 403. Because "expert evidence can be both powerful and quite misleading," the court, in weighing possible prejudice against probative force under Rule 403, "exercises more control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. *See also Nimely,* 414 F.3d at 397 ("[T]he Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations."). In deciding possible probative value of the expert's proposed testimony against the potential for confusion or overreliance by the jury, it cannot be assumed that a jury of this district "will be so dazzled or swayed as to ignore evidence suggesting that an experiment was improperly conducted or that testing procedures have not been established." *Jakobetz,* 955 F.2d at 797.

Defendants object to plaintiffs' experts' reliance on many of the scientific studies in Monograph 13 and elsewhere because these materials consider the effect of defendants' alleged fraud on all smokers of low tar products, not just those bearing the "lights" descriptor. Imperfect correlation is no bar to scientific evidence. With respect to surveys, for example:

A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant. Courts are likely to exclude the survey or accord it little weight.... More commonly, however, the sampling frame is either

underinclusive or overinclusive relative to the target population.

Shari Seidman Diamond, "Reference Guide on Survey Research," in Reference Manual on Scientific Evidence (FJC, 2d ed.2000), at 241. While evidence that pertains to a broader class than that represented by plaintiffs is not preferred, it may still be useful. *See, e.g., Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F.Supp. 232, 246 (S.D.N.Y.1994) (using survey as evidence of trademark infringement, notwithstanding its overbreadth, because it was "more likely than not to shed some light" on the issue of confusion) (cited in Diamond, *supra*, at 242). Studies evaluating broadly the beliefs of low tar smokers generally are relevant to the beliefs of "light" smokers more specifically. *See* Diamond at 242 ("An overinclusive universe generally presents less of a problem in interpretation than does an underinclusive universe."). *See also* Fed.R.Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

The jury's fact-finding and credibility-determining abilities—the skills that our legal system relies on juries to provide—can evaluate and integrate most expert testimony. A bent towards exclusion to permit the court to take the case away from the jury is frowned upon.

**E. Reliability**

The most challenging and controversial gatekeeping role, as set out in *Daubert* and elaborated in *Kumho*, is that of ascertaining the reliability of proffered testimony, or "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786. This is partly

because "[u]nlike an ordinary witness [governed by Rule 701], an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. The exception made for such experts "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.*

The *Daubert* court supplied the following nonexhaustive guidelines for analysis of the reliability of expert testimony: (1) "whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "general acceptance" within the scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. These guidelines are not to be construed as a "definitive checklist." *Id.* at 593, 113 S.Ct. 2786. The applicability of any one factor will depend "upon the particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 137, 119 S.Ct. 1167.

 While, preferably, the content of the expert's testimony will grow "naturally and directly out of research [the expert or others have] conducted independent of the litigation," *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1317 (9th Cir. 1995), testimony based on research conducted solely for litigation is admissible as long as the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152, 119 S.Ct. 1167.

 Of primary importance in determining reliability of expert testimony is the methodological soundness of the expert's study. *See Liriano v. Hobart Corp.*, 949 F.Supp. 171, 177 (S.D.N.Y.1996).

Each step of the expert's analysis is examined, including "the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir., 2002). Ideally, the scientific methodology or technique will have been tested or the findings published and peer reviewed, *see Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786, but "[i]t might not be surprising in a particular case . . . that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist." *Kumho,* 526 U.S. at 151, 119 S.Ct. 1167.

■■■ To be considered is whether there is "a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions," *Nimely,* 414 F.3d at 397, and whether the scientific principles and methods have been reliably applied by the expert to the facts of the case. Unfounded extrapolations not supported by, or sufficiently related to, scientific data or expertise should be rejected; opinion that "is connected to existing data only by the *ipse dixit* of the expert" need not be admitted. *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Expert opinions based on insufficient facts or data, or on unsupported suppositions is not acceptable. *See* Fed.R.Evid. 702(1). Anecdotal evidence and "generalized assumptions" are inadequate bases for an expert report. *United States v. Tin Yat Chin,* 371 F.3d 31, 40–41 (2d Cir.2004).

■■ Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, have been relied upon by appellate courts as grounds for rejection of expert testimony. *See, e.g.,*

*O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1105–07 (7th Cir.1994); *Guidroz–Brault v. Missouri Pacific R.R. Co.,* 254 F.3d 825, 831 (9th Cir.2001). Finally, it is properly held that sound scientific methodology requires a scholar to make some effort to account for alternative explanations for the effect whose cause is at issue. *See, e.g., Kudabeck v. Kroger Co.,* 338 F.3d 856, 860–61 (8th Cir.2003); *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256–57 (11th Cir.2002).

■■ The mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility. *See* Fed.R.Evid. 702 advisory committee note (2000) ("When a trial court, applying this amendment, rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable."). If two contradictory expert opinions meet the requisite threshold of reliability, it is the function of the factfinder, utilizing the "conventional devices" of "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," to determine which is the more trustworthy and credible. *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. It is worth noting in this respect that defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts. Contradiction is to be expected and is often unresolvable without trial.

■■ When considering reliability factors under Rule 702 and *Daubert,* it is important to recall the Supreme Court's caution that the analytical focus should be on principles and methodology. *See Liriano,* 949 F.Supp. at 177. Expert testimony should not be rejected simply because the conclusions reached by the witness

seem subjectively improbable. *See Daubert,* 509 U.S. at 594, 113 S.Ct. 2786.

 It is critical that "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Jakobetz,* 955 F.2d at 797. Any more rigorous approach would deny the jury's constitutional role.

No individual expert's proffered testimony in the instant case by itself presents a decisive analysis on the critical reliance and damage questions. Defendants, through their experts and in their briefs, charge that this failure to come up with "a number" requires dismissal of plaintiffs' claims. Yet legal standards of proof are not so demanding.

> *Daubert* was designed to exclude "junk science." ... The legal standard, after all, is preponderance of the evidence, i.e., more-probable-than-not, and that applies to causality as to any other element of a tort cause of action. Rule 702, a rule of threshold admissibility, should not be transformed into a rule for imposing a more exacting standard of causality than more-probable-than-not simply because scientific issues are involved.

*In re Ephedra Prods. Liab. Litig.,* 393 F.Supp.2d 181, 190, 193 (S.D.N.Y.2005). *See also id.* at 193 ("Although th[e preponderance] standard may lead to what some scientists might consider an unacceptably high error rate in jury verdicts, the law has tolerated the jury error rate for centuries because it has not yet found a better way of adjudicating disputes"; a court should "not treat *Daubert's* dictum about scientific validity as authority for increasing the burden of proof imposed by substantive law").

> In cases alleging economic harm, no less than those alleging physical injury, the test for allowing a plaintiff to recover ... is not scientific certainty but legal sufficiency; if reasonable jurors could conclude from the expert testimony that [defendants] more likely than not caused [plaintiffs'] injur[ies], the fact that another jury might reach the opposite conclusion or that science would require more evidence before conclusively considering the causation question resolved is irrelevant.

*Ferebee v. Chevron Chem. Co.,* 736 F.2d 1529, 1536 (D.C.Cir.1984). *See also Hodges v. Sec'y of Health & Human Servs.,* 9 F.3d 958, 967 (Fed.Cir.1993) ("Scientists as well as judges must understand the reality that the law requires a burden of proof, or confidence level, other than the 95 percent confidence level that is often used by scientists to reject the possibility that chance alone accounted for the observed differences.") (internal citations and quotation marks omitted).

Plaintiffs' proof is akin to a pointillist painting by Georges Seurat. When a juror stands back from the canvas and looks at the big picture, he or she may well discern clearly enough an industry allegedly based on fraud and coverup that has taken more than a half century to begin to admit its alleged subtle lies to the public designed to sell its product. Viewed in context, the proof of acts of defendants and the various experts' opinions permits a finding of damages to the class with sufficient precision to allow a jury award. *See also* Part III.D.3, *supra.*

## F. Individual Experts' Reports

Taken up in order are first, the challenged plaintiffs' expert reports; second, the challenged defendants' expert reports, and third, those whose admissibility does not appear to have been seriously challenged. In the case of experts in the third

category, the court has determined probable admissibility even without an opponent's objection. Emphasis is placed on the plaintiffs' experts since they bear the burden of proof.

By the memorandum and order of September 29, 2005, discovery was extended to permit defendants to evaluate the work of the following experts: Dr. John C. Beyer, Dr. John R. Hauser, Dr. Jeffrey E. Harris, Judith Wilkenfeld, Matthew L. Myers, Laurence Tribe, Katherine Kinsella, Robert Proctor, Richard Redfern, Dr. Paul Slovic, Dr. Joel Cohen (new materials), Dr. Marvin Goldberg, Dr. Stanley Presser, and others. Except as their testimony had been excluded on relevancy grounds, *see* 2005 WL 2293381, the court was not then in a position to render a *Daubert* opinion on their work. It was proposed to develop by depositions any objection to their testimony and reports according to a schedule developed by the magistrate judge. *Id.* That discovery has now taken place.

The order of September 29th also dealt with plaintiffs' motion to exclude testimony of a number of defendants' proposed experts who appear to be qualified and whose professional background should allow them, individually and in combination, to opine scientifically on cigarette "safety"—i.e., the amount of carcinogenic and other toxic substances released by cigarettes with less tar, and their effect on smokers. They were Dr. Kenneth A. Mundt, Ph.D., an epidemiologist; Dr. Lawrence S. Mayer, a statistician; Dr. William E. Wecker, a statistician; Dr. Jane Y. Lewis, a chemist; Dr. Kenneth F. Podraza, a chemist; Dr. Jeffery Gentry, a chemist; Dr. Andrew T. Mosberg, a toxicologist; Dr. Edward A. Robinson, a toxicologist; and Dr. Carr J. Smith, a toxicologist. *See* Mem. in Supp. of Pls.' Mot. to Excl. Exp. Test. that "Light" Cigs. are Safer than Reg. Cigs. 1–2 (Docket No. 691–2).

 All of the scientific specialties represented by these experts employed by defendants bore on a critical factor in the case—the amount of tar and other noxious substances inhaled by cigarette smokers when smoking "light" cigarettes and the dangers they pose to the human body. While plaintiffs' experts and others in the public health community may differ with their conclusions, that, alone, is no reason to exclude under *Daubert.* That a person is an employee of a party, rather than an independent expert is no ground, in and of itself, to exclude under Rule 702.

Following an opportunity for further full discovery of all experts, a number of plaintiffs' experts were challenged in final *Daubert* briefs.

Even the lengthy excerpts included here do not do justice to the usefulness of proffered reports. Except where indicated in discussion, the opinions of both plaintiffs' and defendants' experts are supported by internal documents, scientific research, and other appropriate materials.

Citations are generally omitted without comment. All emphasis is in the original. No effort has been made to conform typography in the reports to that of the opinion except where necessary to avoid confusion.

*1. Challenges to Plaintiffs' Experts*

a. John C. Beyer

Dr. John C. Beyer has filed a class certification report, a report on computation of damages, and an affidavit responding to defendants' motion to exclude his prospective testimony. Defendants' experts Kevin M. Murphy, Bruce C. Owen, and William Wecker have attacked his analysis. All three of these defense experts are qualified in their fields. *See*

Parts VIII.3.o, 3.q, and 2.h, *infra*. Dr. Beyer's opinion is important in the case because it bears on the critical question of whether, even if there were a "lights" fraud, there is a reasonable method of computing economic damages.

He is President of Nathan Associates Inc., an economic and financial consulting firm established in 1946. It provides economic research and analysis to public and private clients in the United States and abroad. He has been associated with Nathan Associates as an economist for approximately 34 years. As part of his professional career he has been employed by the Ford Foundation and conducted research at the Brookings Institute. In addition to his consulting and research work, he is an Adjunct Professor at American University in Washington, D.C. He earned a degree of Bachelor of Arts from the University of the Pacific in 1962 and a degree of Doctor of Philosophy from Tufts University's Fletcher School in 1966. He has professional experience with the analysis of economic issues involving antitrust litigation, including matters concerning the structure, conduct, and performance of industries; the determination of economic impact on companies and individuals as a result of alleged market restraints; and the estimation of damages arising from such restraints. In several instances, his analyses have addressed the issue of whether generalized proof is available to show impact upon multiple plaintiffs and plaintiff classes, as well as the development of methodologies to assess damages on a class-wide basis. He submitted an affidavit in this litigation concerning economic issues pertaining to class certification. His extensive publications and affiliations support the conclusion that he is well qualified to testify in the instant case on relevant issues.

His amended report reads in part as follows and responds to the contentions of his critics:

If a conspiracy such as the one alleged here existed, then the market price for all cigarettes, including light cigarettes, would have been higher. As a result of the higher market price, all members of the proposed class would have been harmed in that they would have paid more for light cigarettes than otherwise would have been the case. My opinion on this matter is based, in part, on the fact that defendants priced light cigarettes the same as regular cigarettes, and that there was a national pricing strategy for lights. The effect of a fraud such as the one alleged here would have been to increase market demand for cigarettes and thus to cause the price that prevailed in the market to be higher than it otherwise would have been. As a result of the higher market price for cigarettes, all purchasers of light cigarettes would have paid a higher price. Further, there exist methodologies which allow me to identify the extent to which the market price of cigarettes was higher as a result of the alleged fraud. In light of the specific nature of the RICO statute, I have further refined my damage estimates to include only light cigarette purchasers who relied on the: alleged fraud in smoking light cigarettes [as determined in the report of plaintiffs' expert, John R. Hauser.] .... I now provide damage estimates that vary across time (in five year intervals) during the class period. Moreover, I provide a range of damage estimates based on various lags of the knowledge variable [which accounts for the delay between when information about smoking risks is released to the public and when it is understood by laypersons]. And finally, I have adjusted my measure of damages to include

only those light cigarette smokers who relied on the alleged fraud .... I have calculated using generally accepted economic principles, a range of class-wide damages of $43.8 billion to $56.6 billion using state-level data. [The measure of damages may be adjusted at the appropriate date to exclude from the calculations damages for those light-cigarette consumers who reside in states excluded from the class, if any.] Based on the revisions to my earlier damage estimates, I have calculated damages to members of the class of $22.8 billion using the profit disgorgement methodology. In both cases, these damages are before trebling.

## II. Damage Estimates from the Revised Price Impact Model

I utilize a methodology that determined the effect of the alleged fraudulent behavior by defendants upon the market price for light cigarettes. I refer to this methodology as the "price impact model." The price impact model is a multiple regression model, which explains the role that several other variables play in determining the value of the single variable to be explained, which in this case is cigarette prices. In constructing the price impact model I attempt to control for all the factors that might affect cigarette prices. The theoretical justification for the price impact model lies in the effect that the alleged fraudulent behavior would have had on cigarette prices. To the extent that light cigarettes allayed the health concerns of smokers, the result would have been increased cigarette demand. The increase in total cigarette demand resulted in higher consumption of cigarettes than otherwise would have been the case, which resulted in higher prices paid by consumers of cigarettes, including consumers of light cigarettes. The price impact model identifies the extent to which prices of cigarettes were higher as a result of the alleged fraudulent behavior.

### The price impact model properly controls for factors affecting price

The purpose of the price impact methodology is to determine how the introduction of light cigarettes and their effect on demand would have impacted cigarette prices. As I explained in my earlier damages report, by controlling for—or taking account of—all the relevant factors that affect the price of cigarettes except for the effect of the alleged conspiratorial behavior, the price impact model is able to isolate the effect that the conspiratorial fraudulent behavior had on cigarette prices. In developing the model, therefore, it is necessary to consider all factors that might affect cigarette prices. In revising my damage estimates, I have incorporated the observations of the Court and defendants' experts into the price impact model. I discuss each of these factors below, beginning with the variable to be explained, cigarette price.

### Cigarette price is the dependant variable

In the price impact model, the variable to be explained (sometimes in regression analysis this is referred to as the "dependent" variable) is cigarette price. The cigarette price used in my model is the annual average statewide price of cigarettes at the retail level, including all taxes levied against cigarettes. I based my analysis on cigarette prices at the state level because there is considerable variation in state-level prices. Most academic authors have used state-level data in their analysis of cigarette demand or cigarette price,

since state-level data makes it possible to test for the robustness of statistical results and to do appropriate sensitivity analysis of my model.

*Explanatory variables: Cigarette consumption*

In this model of cigarette prices, a critical variable that affects price is aggregate cigarette consumption, as determined in the cigarette market. Aggregate cigarette consumption, by its definition, subsumes in it all the behavioral changes among individual smokers that affect their own cigarette consumption. Therefore, the price impact model fully accounts for the impact of the light cigarettes fraud on factors such as smoking initiation rates, smoking quit rates, the effect of light cigarette consumption on smoking intensity, or other factors. It is not necessary to include these factors as separate variables in the price impact model because they are fully accounted for within the regression model through the measurement of aggregate cigarette consumption. As with the price of cigarettes, consumption · is measured at the state level, to account for differences across states in consumption patterns that might affect the price level. In addition to state-level consumption patterns, however, aggregate consumption of cigarettes nationally in the United States was also included in the price impact model. Because the market for cigarettes in the United States is a national market, total U.S. consumption affects aggregate demand for cigarettes in the United States and potentially total demand. For both state consumption and national consumption of cigarettes, the lagged value of consumption is used.

*Income*

One factor that may affect cigarette consumption is personal income level in each state. Higher incomes make cigarettes more affordable to consumers. In order to control for this effect, the level of disposable personal income in each state was included in the price impact model. In addition, disposable personal income in the United States was also included, to control for the fact that the cigarette market is a national market.

*Population*

Over time, demand for cigarettes may increase because the population is rising. An increase in demand which raises consumption will result in higher prices, so it is necessary to control for this effect in the price-impact model. Since the model is estimated using data at the state-level, population changes are controlled for using state level population. However, just as total U.S. consumption and income may affect cigarette prices, total U.S. population is important as well. I include both state and national population in estimating the price-impact model.

*Taxes*

Cigarette prices are heavily influenced by taxes imposed by both the Federal Government and state governments. Since cigarette taxes have increased over time, failing to control for their effect on cigarette prices could result in an artificially high estimate of the overcharge arising from the alleged light cigarettes fraud. Both state-level taxes and Federal taxes on cigarettes are included in the price impact model.

*Advertising expenditures*

One factor which may affect both the demand for cigarettes and the cost of producing them is advertising expendi-

tures. To the extent that advertising results in greater cigarette consumption, it will lead to higher cigarette prices. Likewise, if advertising raises the cost of producing cigarettes, it will result in higher prices. I include total advertising expenditures in my price impact model in order to control for these effects.

### Costs of producing cigarettes

Economic theory holds that the price at which a firm is willing to supply a certain quantity of a good increases as the cost of producing that good increases. In the price impact model it is important to control for the cost of producing cigarettes, since this is one factor that affects their price. The revised cost index is based on the prices of flue-cured tobacco, paperboard, manmade fibers, and electricity; wages paid to non-supervisory workers are included to account for labor costs.

### The "knowledge impact" variable is a useful measure of information on health hazards

A report by the U.S. Surgeon General in 1989 explored the factors that go into the decision to begin or quit smoking, and found that knowledge of health hazards of smoking was one critical factor. The Surgeon General's report notes that the acquisition of knowledge about smoking, especially about the risks of smoking for health, may be difficult, and individuals may deny personal risks, especially young smokers, creating a lag between exposure to information and knowledge. A study of adolescent smoking found that study participants thought they would be "significantly less likely to get lung cancer, have a heart attack, die from a smoking-related disease, get a bad cough, [or] have trouble breathing ..." from smoking light cigarettes. The Surgeon General's Report found that light cigarettes may be perceived as less hazardous. A similar study of a California education program found that as late as 1996, a large segment of smokers believed that light cigarettes were safer, and this confusion about safety may have hindered cessation. The Surgeon General's Report also found that there was a dramatic improvement in knowledge generally about health hazards by the mid–1980s and that major events, such as the original Surgeon General's report in 1964 had influenced smoking decisions. Likewise, knowledge may have been delayed or distorted by the use and the perception, for example, of the "light" label: The California Report specifically found that, "... the tobacco industry may be using the 'light' label to ameliorate the smokers' health concerns."

As a result of these and other factors, it may take years for smokers to respond to new information about the health hazards of smoking once it becomes publicly available. For example, studies have documented the considerable time it takes smokers to quit smoking, once they have determined to do so in response to new information about health hazards. The California study cited above noted that researchers have found it may take up to ten years for some smokers to assimilate smoking information and to quit. The California Report states, "... quitting smoking is a process that occurs over time." The American Legacy Foundation notes that it may take as many as seven to eight attempts before a smoker is successful at quitting.

In my original damages report, I constructed a "knowledge" variable to capture the impact of greater information about health hazards of smoking on ciga-

rette consumption. The knowledge impact variable is determined from articles which contain the words "health," "hazard" and "smoking" in three major national newspapers: The New York Times, The Washington Post, and The Wall Street Journal. These newspapers were chosen because each was national in scope and each had electronic archives going back to the 1950s that were used to determine the number of articles in each year. As the graph in Figure 1 shows, knowledge of the health hazards of smoking increased sharply after the Surgeon General's warning in 1964.

In light of the Court's rulings as well as observations made by defendants' experts, I have reviewed my use of. the knowledge impact variable in the price impact model. In the Courts' Daubert ruling, the Court suggested that there was inadequate support for the use of the eight[-year] lag of the knowledge impact variable. In addition, Dr. Murphy, Dr. Owen, and Dr. Wecker criticize my use of the eight[-year] lag of the knowledge impact variable. I have re-examined the relationship between the knowledge impact variable and cigarette consumption in light of the Court's opinion, Defendant's experts, and my own research. The purpose of the knowledge impact variable in the price impact analysis is to capture the impact of increasing knowledge of health risks of smoking on cigarette consumption. As discussed above, the majority of scientific evidence published in academic sources suggests that the response to new information on the health hazards of smoking was not instantaneous, but took place over time. My own research finds that the effect of knowledge of health hazards on cigarette consumption involves a lag of several years. Because cigarettes are an addictive product, there is some period of time between the

acquisition of knowledge and changes in behavior (see above). Thus, it is not surprising that the effect of the knowledge impact variable on cigarette consumption would take place with a considerable lag.

In determining the appropriate range for the lag between the time at which smokers on average learned of the health hazards of smoking and the point at which that knowledge most greatly affected smoker behavior, I took an empirical approach. I developed a separate multiple regression model of cigarette consumption over the period 1955 to 1998. The purpose of this analysis was to determine how long it takes for knowledge of cigarette health hazards to have its greatest impact on cigarette consumption. In this model, total U.S. cigarette consumption was the dependent variable. Its behavior was explained using price, income, population and the value of consumption in the previous period. In addition, a variable to measure the effect of the alleged light cigarette conspiracy on consumption behavior was also included. Finally, the model was estimated using 15 different lags of the knowledge impact variable, to determine which lagged knowledge impact value was most effective at explaining price.

The results of the analysis used to determine the appropriate lag length for the knowledge impact variable ... indicate that when the consumption model is estimated using lag [times of] seven through ten [years] of the knowledge impact variable, there is a valid and inverse relationship between the knowledge impact variable and cigarette consumption. That is, the statistical analysis indicates that as the more consumers change their behavior in response to increasing knowledge of health risks

from smoking, cigarette consumption falls, but the impact of the increased knowledge takes seven or more years to show up in reduced cigarette consumption. The results also indicate that the eight[-year] lag of the knowledge impact variable results in the largest impact from knowledge on cigarette consumption. This model provides independent justification for the well-supported proposition—established independently in peer-reviewed articles—that it takes many years for knowledge of health hazards to have their maximum effect on cigarette consumption.

Dr. Owen's statement, "It would seem most natural to assume that the demand for cigarettes in any given year would best be explained by the knowledge impact available in the same year," indicates an ignorance of the published academic research on cigarette demand. Some academic researchers have found that the time lag may have been as much as ten years, consistent with my eight-year lag on the knowledge impact variable. Likewise, defendants' expert Dr. Murphy's statement that "the contemporaneous knowledge variable helps to explain price," appears at odds *with his own published economic research.* Indeed, Dr. Murphy has stated elsewhere, in an article published in a peer-reviewed economics journal "... adjustment by consumers to new information takes time .... Given substantial lags in consumer adjustment, it is unlikely that all of the long-run percentage effect on consumption will be felt in the first year of the release of new information."

### Range of damage estimates

In the Court's Daubert ruling, the Court suggested that my previous estimate of the damages suffered by class members suffers from, "... an apparent error of unwarranted and excessive pre-cision." In light of the Court's ruling, I have reviewed my damage estimates to consider a range of possible damage estimates based on the possibility that there are a range of values over which the effect of knowledge of the health hazards of smoking may have had its greatest effect on cigarette consumption. In particular, based on the results of the Consumption model .... I consider a range of values for the lag of the knowledge impact variable between 7 years and 10 years. The effect of the alleged light cigarettes fraud was to artificially inflate the price of all cigarettes in the market, including light cigarettes. Importantly, however, my analysis below seeks to estimate only the damages to smokers of light cigarettes who relied upon the fraudulent behavior in choosing to smoke lights.

### Adjustments to damages

In my earlier report, I based the overcharge on a single indicator variable which measured the average impact over the entire class period from 1972 through 1998. To account for the Court's suggestions, I now allow the overcharge arising from the alleged light cigarettes fraud to vary over time. In this analysis, the effect of light cigarettes on price is measured using a set of indicator, or binary, variables which measure the overcharge during different phases of the class period. In particular, there are now (six) indicator variables for the periods 1972 through 1976, 1977 through 1981, 1982 through 1986, 1987 through 1991, 1992 through 1996, and 1997 through 1998.

The decision to estimate a different overcharge measure for each five year period reflects the fact that, because cigarette consumers change their smoking behavior only slowly (see above), it

is likely that the impact of light cigarettes on smoker behavior was gradual, rather than sudden and abrupt. Because it took some time for light cigarettes to capture a significant market share, there was a period of time before light cigarettes could have their greatest impact on cigarette demand, and therefore cigarette price. One reason was that cigarette smokers initially found light cigarettes "flavorless." The choice of particular five-year periods used in determining the overcharge reflects the need to cover the entire period during which light cigarettes impacted the market, beginning in 1972. I chose to use five year intervals rather than longer or shorter intervals because five year intervals balance the need to allow the overcharge to change over time with the necessity in statistical modeling of not introducing too many variables. Choosing slightly different five year periods would not result in significantly different overcharge measures.

The Court found in its Daubert ruling that it is unlikely that all smokers relied upon the health claims of light cigarettes in deciding to smoke lights. In light of the Court's ruling, I have adjusted my damage estimates to reflect only those light cigarette smokers who relied upon the health claims in making their decision to smoke lights, Dr. John Hauser of MIT has performed an analysis to determine the percentage of light cigarette smokers who relied on the health claims of light cigarettes. His analysis determined that 90.1 percent of light cigarette smokers relied upon the health claims in deciding to smoke lights. I have been instructed by counsel to use this measure to adjust my damage estimates.

*The overcharge based on price impact*

The coefficients that summarize the overcharge for each phase of the class period, based on regressions using lags seven through ten of the knowledge impact variable, are reported in Table 2 [omitted]. The coefficients on these indicator variables are used to tell the amount by which all purchasers of cigarettes paid a higher price due to the alleged light cigarettes fraud for the relevant time period during the conspiracy. The measure of overcharge for each time period is then applied to sales of light cigarettes during that time period to find the amount by which light cigarette purchasers paid a higher price during the class period. These are aggregated across all time periods to find total damages. To find damages, I adjust this amount to reflect the percentage of light cigarettes smokers who relied upon the alleged fraud in their decision to smoke lights.

In order to calculate damages to purchasers of light cigarettes the overcharge was applied to the defendants' revenues from sales of light cigarettes during the class period. As before, it was necessary to estimate consumer expenditures on light cigarettes by defendants. This portion of my analysis is shown in Tables 3 through 9 [omitted]. Damages are calculated by applying the percentage overcharge to the consumer expenditures for light cigarettes in Table 3. These numbers have changed slightly based on unit sales data provided by defendants.

Tables 10 through 13 [omitted] show the amount by which purchasers of light cigarettes overpaid, based on regression results using lags seven through ten of the knowledge impact variable for each defendant and across all defendants. Damages to those light cigarette smokers who relied upon the alleged fraud in choosing to smoke light ciga-

rettes are summarized in Table 14 [omitted]. In calculating damages, sales of light cigarettes were adjusted in order to reflect the amount by which sales were higher because of the alleged wrong-doing. Moreover, the coefficients on the indicator variables were adjusted to reflect a technical correction to the overcharge measure. Finally, I adjusted to show only the amount of the overcharge to those light smokers who relied upon the existence of the alleged fraud in deciding to smoke lights. These calculations yield a range of damage estimates for each defendant arising from sales of light cigarettes. The range of total damages for all defendants in all years was $43.8 billion to $56.6 billion.

\*　　\*　　\*　　\*　　\*　　\*

### Updated Damages From The Profit Disgorgement Methodology

In my earlier reports, I developed and implemented a methodology to measure the damages to class members based on the profits earned by defendants from the sale of light cigarettes, which I referred to as the "profit disgorgement" methodology. This methodology relied upon the evidence that demand for light cigarettes owed to the fraudulent health claims of the defendants. If accurate information concerning the health implications of so-called light cigarettes had been presented to consumers there would have been no reason for them to have chosen to smoke light cigarettes rather than regular cigarettes. Therefore, but for the alleged conspiracy cigarette companies would have lost the entire profits earned from sales of light cigarettes. The exact methodology used to calculate profits earned from sales of light cigarettes was discussed in my earlier report on damages. I understand that for legal reasons the Profit Disgorgement methodology was excluded

by the Court. However, in its Fluid Recovery ruling, the Court suggested that depriving "wrongdoers" from their ill-gotten gains was a reasonable use of class-action litigation. Therefore, I have included the Profit Disgorgement Methodology as one way of calculating damages. For the profit disgorgement analysis, I have adjusted the damages to reflect only those light cigarette smokers who relied upon the alleged fraud in smoking light cigarettes.

Defendants' expert Dr. Owen asserts that because some class members would have smoked regular cigarettes or ultra light cigarettes but for the existence of the alleged fraud, my profit disgorgement analysis should have taken account of offsetting profits that defendants might have earned from those sales. It is my understanding that the appropriate legal measure of ill-gotten gains under the RICO statute includes all profits earned from the sale of light cigarettes, regardless of whether defendants might have offset some of those ill-gotten gains with earnings from other cigarette sales.

Dr. Owen further asserts that I should have excluded income taxes paid by defendants to the Federal Government. It is my understanding that profit disgorgement should not exclude those taxes, since cigarette purchasers were harmed to the extent that their payments for light cigarettes implicitly included funds to pay corporate taxes. As a practical matter, it would be impossible at this stage of litigation, without substantially more input from defendants, to calculate their corporate income tax obligations if profits were reduced to reflect the loss of light cigarettes sales.

Dr. Owen further asserts that the estimates of damages under profit disgorgement should be reduced to reflect

the cost of capital. It is possible that the interest expense attributable to capital purchases should be deducted from profits obtained from light cigarettes. We attempted to obtain reliable data on interest expense for domestic cigarette operations, or light cigarette operations for defendants from publicly available sources, but were unable to do so. If defendants supply data on their interest expenses, it can be deducted from the light cigarettes profits calculated below.

I have updated my estimates of profits earned from sales of light cigarettes based on information provided by defendants. Defendant Philip Morris provided information on total operating revenues and operating profits from domestic cigarette operations .... In addition, Philip Morris provided information on unit sales of light cigarettes which could be used to improve my estimates of the share of their operating profits from light cigarettes.

Defendant RJ Reynolds provided updated profit information for RJ Reynolds and Brown and Williamson for the period 1987 through 2001 .... I have included these profit estimates in the profits calculated for the disgorgement methodology in Tables 15 and 16 [omitted].

Remaining defendants Lorillard and Liggett did not provide updated information on operating income or profits, and defendant RJ Reynolds did not provide information for American Tobacco (Tables A8 through A10) [omitted]. However, each defendant except Liggett did provide new information on unit sales of light cigarettes .... Defendants Philip Morris, RJ Reynolds, and Brown and Williamson provided information on their total unit sales of all cigarettes. This new information on sales of cigarettes was used to estimate each defendant's share of light cigarettes in total

cigarette sales. This number, in turn, is used to estimate the share of operating profits from sales of light cigarettes for those defendants who did not provide information on operating profits from light cigarettes.

*Further Adjustments for Reliance Concerns*

I have adjusted the damages arising from profit disgorgement to account for the fact that not all consumers of light cigarettes relied upon the implicit health claim in deciding to smoke light cigarettes. As above, I base my adjustment on the work of Dr. John Hauser of MIT, who found that 90.1 percent of light smokers relied on the health claims in smoking light cigarettes. These adjustments are reflected in the damages presented in Table 16 [omitted].

Based upon the new information provided by defendants, and improved estimates made possible by that data, profits earned from sales of light cigarettes to those light cigarette smokers who relied upon the alleged fraud in choosing to smoke light cigarettes is now estimated to be $22.8 billion. These are the damages owed to plaintiffs under the profit disgorgement methodology.

\*　　\*　　\*　　\*　　\*　　\*

## CONCLUSIONS

I have revised my estimates of damages to class members who relied upon the alleged fraud based on two methodologies developed in my earlier report. I have accounted for numerous comments of the damage estimates made by defendants' experts. In response to the Court's rulings on several motions, I now provide a range of possible damage estimates and I allow for the possibility that the impact of the alleged light cigarettes fraud may vary over time. I also

adjust damage estimates to reflect injury only to those smokers who relied on the allegedly fraudulent health claims. With the price impact methodology I have calculated a range of class-wide damages of $43.8 billion to $56.6 billion. I have determined damages arising from the alleged conspiracy in this matter of $22.8 billion using the profit disgorgement methodology.

Defendants originally moved to exclude the testimony of Dr. Beyer. It was contended that his "price impact model" and his "profits disgorgement model" fail to meet *Daubert* requirements.

The profits disgorgement model was excluded by the order of September 29, 2005. *See* 2005 WL 2401647. As noted in an earlier memorandum and order granting defendants' motion to dismiss claims for equitable relief, disgorgement is not an appropriate remedy in this case. *See* 2005 WL 2303821. Under the disgorgement theory, the profits made on light cigarettes would be used to support a claim for overcharges. This theory was ruled to be such an indirect indicator of excess price that it was not sufficiently probative to permit admission as an element of damages. Moreover, focusing on profits might tend to be unduly prejudicial under Rule 403 of the Federal Rules of Evidence. The motion to exclude the profit disgorgement model was granted.

The price impact model was not ruled irrelevant, but it was temporarily excluded in its then form. The following assumptions upon which the model depended were not supported: 1) that everyone who purchased "light" cigarettes did so in reliance on the alleged fraud that they were safer and 2) that it takes eight years for knowledge concerning the health risks of smoking to affect consumer behavior—a result that, according to defendants, caused the model to produce the highest damages possible. The first is inconsistent with common sense and the evidence generally: all consumers do not react in the same way. The second had no survey or other acceptable data to support it. Plaintiffs' argument to the contrary was not persuasive.

This ruling did not preclude making "assumptions" of a different time lag or of averages, so long as the assumptions had an adequate basis in evidence or theory. The opinion in its then form also suffered from unwarranted and excessive precision. In matters of this kind a range of possible reasonable conclusions is often all that can be obtained. *See, e.g.,* Eric Stallard, Kenneth G. Mouton and Joel E. Cohen, Forecasting Product Liability Claims, Epidemiology and Modeling in the Manville Asbestos Case, 89 ff. (2003) (discussing uncertainty in forecasts based on indirect estimates of asbestos exposure); *id.* xix (the "models and methods" described have "applicability beyond product liability"). The court noted that, "Should the expert revise his opinion to take a more realistic account of variables and supply a reasonable basis for a trier's evaluating where within a spectrum of possibilities the 'lag' lies, the court will reconsider the *Daubert* issue." 2005 WL 2401647, at *4. The court was aware that Dr. Beyer's past work has been criticized by other courts and academics. *See* Mem. in Supp. of Defs.' Mot. to Excl. Test. of Dr. Beyer 1–2.

Possible lack of credibility is not a sufficient basis for a decision to exclude. *See* Pls.' Mem. in Opp'n to Mot. to Excl. Test. of Dr. Beyer (citing many cases in which his testimony was accepted) (Docket No. 703). This witness was not precluded from rebutting defendants' expert reports within the scope of his professional training and accomplishments as an economist. *See* Expert Report of John C. Beyer, Ph.

D., Regarding Class–Wide Damages and Damage Methodologies 1–2 and App. A. His general experience and competence as an expert is not challengeable on the facts of his background.

■ Upon consideration of the materials now relied upon by the witness, his amended report which takes account of defendants' objections, is admissible under Rules 702 and 703 of the Federal Rules of Evidence.

The analysis of defense experts will permit the jury to determine whether Dr. Beyer has sufficiently met their objections so as to allow them to lend credence to his report. The methods of statistical analysis used by Dr. Beyer are acceptable. Whether he utilized them correctly—which defendants deny—is a disputable matter a jury can decide.

The proposed testimony of John C. Beyer and his supporting amended report meet the standards of Rules 702 and 703 of the Federal Rules of Evidence.

b. David M. Burns

Professor David M. Burns is a medical doctor, professor of medicine and professor of family and preventive medicine at the University of California, San Diego School of Medicine. He is currently licensed to practice medicine in the State of California, and is board certified in Internal Medicine and Pulmonary Medicine, with a certificate of special competence in Critical Care Medicine. He received his doctorate in medicine at Harvard Medical School in 1972. He trained in Internal Medicine on the Harvard Medical Service at Boston City Hospital from 1972 through 1974 and in Pulmonary Medicine at the University of California, San Diego School of Medicine from 1976 through 1979. He was medical officer for the United States National Clearinghouse for Smoking and Health at the Centers for Disease Control of the U.S. Public Health Service. His responsibilities at that time included the preparation of the 1975 United States Surgeon General's Report on the Health Consequences of Smoking and editing the 1976 Surgeon General's report. He has been an author, editor, or reviewer for each of the annual reports of the United States Surgeon General on the Health Consequences of Smoking. Specifically, he authored multiple chapters in the 1979 report. He was Consulting Scientific Editor from 1980 through 1983, and from 1984 through 1986 he was the Senior Scientific Editor for these reports. Since that time, he has been a Senior Reviewer for each of the reports including the "Health Consequences of Smoking: Addiction" in 1988, "Health Consequences of Smoking: Twenty–Five Years of Progress" in 1989; "Health Benefits of Smoking Cessation" in 1990, "Preventing Tobacco Use Among Young People" in 1994, "Tobacco Use Among U.S. Racial/Ethnic Minority Groups" in 1998, "Reducing Tobacco Use" in 2000, "Women and Smoking" in 2001, and "The Health Consequences of Smoking" in 2004.

Dr. Burns was Senior Scientific Editor and contributing author for a series of tobacco control monographs for the National Cancer Institute, including Monograph 13, which was published in conjunction with the United States Department of Health and Human Services and the National Institutes of Health. He co-authored Chapters 1 and 4 of that publication. In addition, he has been a consultant to the National Cancer Institute and served on the Policy Advisory Committee for the COMMIT trial conducted by the National Cancer Institute. He has written extensively on the disease consequences of smoking, including authoring a chapter titled "Nicotine Addiction" in Harrison's Principles of Internal Medicine. He con-

sulted with the Canadian government and the World Health Organization on smoking and health-related issues, specifically including consideration of the propriety of using the term "Lights" as a cigarette product descriptor.

The extensive report of Dr. Burns includes an analysis of publications bearing on smoking risks; general and scientific knowledge of the effect of smoking on health, including lung cancer, coronary heart disease, and obstructive pulmonary disease; the history of tobacco use in the United States; the purported health benefits of so-called "low tar yield" products; knowledge of the actual yields to smokers of "light" cigarettes; the alleged deceptions of the cigarette manufacturers; the lack of disease risks in smoking "lights"; and the higher rate of smoking and disease caused by defendants' exploitation of "lights." His report concludes:

> Based on my training, experience and review of changes in cigarette smoking based on the actions of the tobacco companies, it is clear that the misconduct of the tobacco industry in denying the disease risks caused by smoking, conspiring not to do biologic testing or to compete by developing safer cigarettes, blocking appropriate public health efforts to reduce tobacco related disease, and deceptively marketing filtered and "lower yield" cigarettes as "lights," or as safer cigarettes, has led to substantially higher rates of cigarette consumption than would have occurred absent these actions. This excess consumption has resulted in substantial excess rates of disease, a result which would have not occurred absent these actions by the tobacco industry. All cigarettes, including those sold as "lights", are dangerous when used as directed by the manufacturers. The "light" cigarettes that are and have been manufactured and sold in the United States contain toxic and car-

cinogenic compounds sufficient to cause the diseases listed in above and also contain levels of nicotine sufficient to sustain addiction.

 Defendants strongly oppose introduction of Dr. Burns's report or testimony. David M. Burns is, however, fully qualified and meets the requirements of Rules 702 and 703 of the Federal Rules of Evidence. He will not be permitted to testify that defendants lied, but he may contrast what was known and what was suggested to the public by defendants, leaving to the jury the question of fraud.

### c. Joel B. Cohen

Professor Joel B. Cohen currently serves as Distinguished Service Professor of Marketing and Adjunct Professor of Anthropology at the University of Florida, a position held since 1988. He was chairman of the Marketing Department at the University of Florida from 1974 until 1983 and created the Center for Consumer Research in 1975. From 1972–74, he was Vice President and Director of Social Science Research at National Analysts, a major survey behavior organization which was part of consultant firm Booz, Allen & Hamilton. Prior to that he was a tenured member of the marketing faculty at the University of Illinois.

He has been president of the Association for Consumer Research, a member of the American Psychological Association, editor of the *Journal of Public Policy and Marketing,* and a member of the editorial boards of the *Journal of Consumer Research* and the *Journal of Marketing.* He also served as a reviewer for a number of psychology and marketing journals and assessed the quality of manuscripts submitted for national conference presentations in these two fields.

His publications include a number of invited chapters including those in the *Annual Review of Psychology, The Handbook of Consumer Behavior, Affect and Social Behavior,* and *Social Marketing: Theoretical and Practical Perspectives.* His research on psychology processes in attitude formation and judgment, cognitive dissonance, affect, personality, and interpersonal influences appear in a number of journals including the *Journal of Consumer Research, Journal of Marketing Research, Journal of Experimental Social Psychology, Journal of Applied Psychology, Personality and Social Psychology Bulletin,* and a number of edited volumes.

He has served as a consultant on advertising, marketing and research design to the Federal Trade Commission on many occasions since 1972, participating in many regulatory actions. In the course of that work and other professional activities, he reviewed hundreds of marketing and advertising plans and studies. He also served as a consultant to the National Academy of Sciences Panel on the Impact of Drug Use and Misuse and advised the National Institute on Alcohol Abuse an Alcoholism on mass media approaches to alcohol abuse prevention. His articles on these public policy issues have appeared in the *American Journal of Public Health, Journal of Public Policy and Marketing,* and a number of edited volumes.

He has extensive knowledge of the cigarette industry, partially through involvement in a number of FTC activities. Most recently he served as the FTC's expert on marketing, advertising, and consumer behavior in their investigation and case against R.J. Reynolds for their, so called, "Joe Camel" campaign. He was a principal plaintiffs' witness and consultant in a number of important cigarette cases, several dealing specifically with "Light" cigarettes. On behalf of the President's Cancer Panel, he conducted a national probability study of smokers' understanding of advertised tar numbers, culminating in an *American Journal of Public Health* lead article, *Smokers' knowledge and understanding of FTC tar numbers: Health policy implications,* published in 1996. This article is referred to in several chapters of Monograph 13, for which he also served as peer reviewer. His previous work on cigarette marketing and advertising issues is reflected in his report to the Federal Trade Commission on information processing issues involved in communicating cigarette warning information to smokers and subsequent invited testimony to the United States Senate Commerce Committee and the United States House of Representatives ("The Protect Our Children from Cigarettes Act of 1989"). He also served as a peer reviewer for a number of government-sponsored reports on smoking starting with the 1989 Surgeon General's Report. He has written a number of other articles relating to cigarettes. Further details of his curriculum vita support the conclusion that Professor Cohen is skilled in fields relevant to this case.

His opinion is summarized as follows:

It is my opinion, to a reasonable degree of scientific certainty that the implicit health reassurance representation in the term "Lights" (as that term is used as a cigarette brand descriptor) was universally understood by all smokers of so-called "Lights" cigarettes. In addition, the implicit health representation in the term "Lights" contributed to the purchase decision for all cigarette purchasers of "Lights" cigarettes. Given the numerous cigarette company documents that attest to the overriding importance of health reassurance in marketing "Lights" cigarettes, it is reasonable to conclude that the health reassurance

representation implicit in the term "Lights" carried substantial weight. Further, it is my opinion that the tobacco companies in this case intentionally developed, launched and marketed "Lights" cigarettes in an effort to reduce smokers' health concerns as well as to deter smokers from quitting.

His conclusion is:

My analysis leads me to two conclusions: (1) If people smoke a "Light" cigarette—as all members of the class do—one of the material reasons must be a promised health benefit, and (2) In making any decision between a "Light" and a full flavored cigarette, promised health benefits must play a material role.

My rationale for both of the above is based on: (1) a well-recognized field of forces/bundle of benefits analysis that establishes the universal "positivity" of health reassurances and hence the direction of influence for this promised benefit, (2) cognitive dissonance theory that supports an increased magnitude for this directional factor in order to reduce smokers' dissonance which is further intensified for those who believe it is difficult for them to quit and/or who experience guilt and negative affect about smoking, (3) the fact that everyone purchasing a "Light" cigarette sees this term on the package and is, therefore, aware of the promised health benefit, and, (4) the fact that "Light" is universally understood to mean lower or lowered tar and nicotine.

"New" smokers who select a "Light" cigarette as well as smokers who switch to a "Light" cigarette, therefore, would never knowingly choose a "false Light" cigarette over a "true Light" cigarette because the "true Light" cigarette will always have one material benefit that the "false Light" cigarette does not have. Hence, the bundle of benefit is greater—so product utility is higher—for the "true Light" cigarette.

In addition, "taste" (as distinct from it being corroboration of lower impact/less tar and nicotine, and hence "healthier") cannot be a key factor in any decision to exit the full flavor category and to smoke a "Light" cigarette since all studies show that smokers view this choice as a tradeoff between better taste and lower tar and nicotine. Taste is a factor in within-category brand decisions, once the primary decision to smoke a "Light" cigarette has been made. Taste preference can also migrate to the "Lights" cigarette, once the initial choice is made for health reasons, based upon habituation, psychological commitment to that decision and adjustments in smoking behavior that render "full flavor" cigarettes unacceptable.

Defendants' brief and documents supporting their *Daubert* motion to exclude the testimony of Dr. Cohen are based upon three arguments:

1. His opinions were created for litigation, have never been published or peer-reviewed, and are not supported by any expert in the field.

2. His opinions have not been tested and are not testable.

3. His cognitive dissonance assertion does not fit the facts of the case.

The first and second points are not convincing. Dr. Cohen's extensive supporting documents and wide experience in marketing and tobacco matters meet the requirements of Rules 401, 702, and 703. The opinions on these points will be helpful to a jury, even if the jury rejects them in accepting contrary opinions.

The third point is troublesome. In effect, Dr. Cohen is opining that *everyone* who smoked "light" cigarettes believed they were safer than traditional cigarettes,

which contributed to the purchase of *all* light cigarettes in the last 30 years. The court has, at various hearings, indicated its skepticism of such claims of universality. *See, e.g.,* Defs.' Mem. of June 9, 2006, pp 1—2 (collecting these).

The opinion need not be accepted in whole by the jury. *See Girden v. Sandals Int'l.,* 262 F.3d 195, 204 (2d Cir.2001) ("[J]urors have the latitude to analyze the evidence in a case, to accept part of it and to reject part of it, and to draw any inferences from the testimony, exhibits, and circumstances that they deem reasonable."). It supports the position that the advertising programs of defendants and their use of the "lights" descriptor affected purchases by many smokers. How many is a decision that the jury can rationally reach after cross-examination of this witness and consideration of opposing experts.

 Dr. Joel Cohen's testimony and report are admissible under Rules 702 and 703 of the Federal Rules of Evidence. *See also Price,* Appendix C at ¶¶ 28, 30, *infra* (finding Dr. Cohen credible).

### d. K. Michael Cummings

Dr. K. Michael Cummings' opinion was challenged by defendants in a motion to partially exclude. Following further discovery, they renew the motion.

Dr. Cummings is Chairman and a cancer research scientist in the Department of Health Behavior at the Roswell Park Cancer Institute and Director of the Tobacco Cessation Center of the institute. He is an Associate Research Professor of the Department of Experimental Pathology and Epidemiology at State University of New York at Buffalo, and a Professor of the Department of Social and Preventive Medicine at that university. His Ph.D. is in Health Behavior from the University of Michigan. He has had an extensive lead-ing role in professional editorial boards and as a reviewer in leading journals. He has received many awards for his work. He has had 40 research grants and contracts, many in the field of smoking, and authored over 200 publications. He has given testimony and depositions in other tobacco cases.

In the instant case, he interviewed the named plaintiffs. Dr. Cummings is prepared to testify to two opinions:

1. The named class members share common characteristics of their smoking behavior and beliefs about "light" cigarettes among themselves and with smokers of "light" cigarettes in the general population; and

2. The actions of cigarette manufacturers have contributed to smokers' misunderstandings about "light" cigarettes.

He opines as follows:

[D]espite the varied backgrounds and geographical locations of the named class members they shared common characteristics of their smoking behavior and beliefs about cigarettes with smokers of light cigarettes in the general population. These common characteristics include:

*Starting to smoke at a young age*

All of the named class members I interviewed began smoking before age 25, most started smoking before age 18. The surveys I've conducted and my review of the scientific literature and internal industry documents show that nearly all those who do smoke report beginning regular smoking before the age of 25. In fact, for any cross section of adults who smoke daily, approximately 90% report their first use of cigarettes before age 18.

*Not thinking about health consequences when first starting to smoke*

None of the named class members I interviewed said that they were thinking about the possibility of nicotine addiction when they first began smoking. Paul Slovic in his research on adolescent risk assessment of smoking found that a "high percentage of adolescent smokers see no health risk from smoking the next cigarette or from smoking regularly for a few years." My review of the scientific literature and industry documents shows that it is possible to get addicted to nicotine with just a few cigarettes and that young smokers don't often appreciate the lifelong consequences of getting addicted to cigarettes.

*Regret about ever starting to smoke*

The majority of people who smoke light cigarettes regret their decision to start smoking and smoke because they are addicted to nicotine. Regret about the decision to start smoking was expressed by all of the named class members I interviewed and is a finding consistent with published data based on a representative sample of adult smokers in the United States. In a recent paper ... over 90% of smokers in the United States said they regretted their decision to smoke. Industry documents also support that smokers often regret their decision to start smoking and smoke because they are addicted to nicotine ....

*Belief that filtered cigarettes are safer than unfiltered cigarettes*

Today, approximately 95% of the cigarettes sold in the U.S. have a filter. All light cigarettes are filtered. All light cigarette smokers in my surveys reported smoking a filtered cigarette. All of the class members I interviewed thought a filtered cigarette was safer than an unfiltered one a finding that is consistent with my 2001 nationwide survey of adult smokers. Based on my research on brand switching it is rare to identify a smoker who switches from a filtered to an unfiltered cigarette brand. In the few cases identified, it is almost always for economic reasons with smokers switching to roll-your-own cigarettes; however, some of the roll-your-own cigarettes include kits with filters that can be added. None of the class members who were current smokers that I interviewed would consider switching to an unfiltered cigarette.

*Belief that "light" cigarettes expose the user to less bad stuff in the smoke*

All of the named class members I interviewed expressed the belief that the adjective light as used in advertising for "light cigarettes" implied getting less stuff such as less tar, less nicotine, less taste, and less risk of disease ....

*Belief that "light" cigarettes are an excuse to delay quitting smoking*

All of the named class members who reported switching to a light cigarette did so because they thought they would get less tar and less nicotine, and thus lowering their chances from getting sick from smoking. The misguided belief that a light cigarette is less risky is a deterrent to smoking cessation since concern about health consequences is an important factor in motivating smoking cessation. Studies show that switching to so called lower tar products does not increase quit rates. Industry documents talk openly about marketing new cigarette brands to "alleviate smokers' guilt and reduce their desire to quit." A common thread through much of the advertising and marketing of lower tar cigarette brands over the past 50 years has been the promise of preserving taste

satisfaction, while simultaneously reducing perception of cigarette strength. Cigarette manufacturers recognized that product line extensions, such as Marlboro Lights, had the advantage of being perceived as more flavorful due to the taste reputation of its "parent" brand. However, cigarette manufacturers also recognized that the motivation for a smoker choosing a "light" cigarette was because of the belief that the cigarette would be lower in tar and therefore less risky to smoke. Since most smokers quite smoking because of concerns about health, if one erroneously thought that smoking a light cigarette was a little safer this would serve as a deterrent to quitting. Internal industry documents shows that the marketing of light cigarettes was directed to attract smokers who were increasingly concerned about their health precisely because they worried that these individual might quite smoking.

*Recognition of "light" as compared to "full-flavored" cigarette brands*

My review of light cigarette product packaging reveals that light cigarettes tended to be lighter and brighter colored packages and to use white tipping paper for the filter wrap. All of the named class members who I interviewed were able to differentiate light and non-light cigarette brands that they had smoked during their lifetime. All of the named class members acknowledged that light cigarette brands use the word "light" in the brand name, and that light cigarette brands packaged in lighter brighter colored packaging compared to full-flavored cigarettes. All of the class members knew that one way to differentiate a light and non-light cigarette was the color of the tipping paper used, with white tipping paper used more commonly with light compared to full-flavored

cigarettes. In other words, smokers seems to have a pretty strong awareness of ways that cigarette marketers communicate to them about whether a cigarette is light or full-flavored cigarettes. While smokers assume that light cigarettes are lower in tar and nicotine delivery compared to a full-flavored cigarette, they are not able to easily recall the exact tar and nicotine levels advertised on their packs or in advertising for their brand. In other words, the advertised tar and nicotine numbers does not appear to be the primary means by which cigarettes are recognized as light or full-flavored.

*Unsophisticated understanding of how cigarette design influences smoking behavior*

None of the named class members I interviewed knew what the term "smoker compensation" meant; all reported a low level of awareness of cigarette smoke constituents and lacked awareness of tar and nicotine numbers in the cigarette brands they smoked. [My 2004] survey also revealed a low level of understanding among adult smokers about how cigarette design influences smoking behavior. For example, the majority of smokers surveyed express the belief that one had to smoke more light cigarettes to get the same amount of tar as someone smoking a full-flavored cigarette. This same survey revealed that smokers of light cigarette brands are mostly unaware of filter vents in the cigarettes they smoked. Lack of awareness of filter vents is important because smokers may unknowingly take bigger deeper puffs on cigarettes with vented filters and/or block the filter vents during smoking, thus defeating the lower tar benefit presumably gained by ventilation. Based upon

my interviews with the named class members, my direct interactions with thousands of smokers, my review of the published scientific literature, and my own research with smokers, it is my opinion that light smokers as a group have an unsophisticated knowledge of smoke constituents, cigarette tar and nicotine numbers, and how cigarette design features might influence how they smoke.

## THE ACTIONS OF CIGARETTE MANUFACTURERS HAVE CONTRIBUTED TO SMOKERS' MISUNDERSTANDING ABOUT LIGHT CIGARETTES

This opinion is based upon my research of internal industry documents that reveals that the cigarette companies lied to smokers about manipulating nicotine in cigarettes, and misled smokers about the health risks of smoking, nicotine addiction, and their commitment to put the smokers' health above their profits.

### Cigarette companies have lied about manipulating nicotine in cigarettes

The tobacco industry has publicly denied that they intentionally manipulate nicotine in cigarettes. For example, in a 1994 advertisement, Philip Morris stated:

*"Philip Morris does not 'manipulate' nicotine levels."*

Cigarette manufacturers control and manipulate nicotine delivered to the smokers through a variety of means including use of reconstituted tobacco, filtration, filter ventilation, the use of additives, and the ratio of tobacco shred size to tobacco weight per cigarette. Internal industry documents reveal efforts to determine the minimum and optimum levels of nicotine for their products.

Based upon my own research and my analysis of internal industry documents it is my opinion that cigarette manufacturers do manipulate nicotine levels in their products.

### The cigarette companies have misled smokers about health risks

Based upon my interviews with the named class members, my direct interaction with thousands of smokers, my review of the published scientific literature, and my own research with smokers, it is my opinion that light smokers as a group have been misled about the health risks of smoking. None of the named class members I interviewed knew what the term "smoker compensation" meant; the majority of smokers believe that one had to smoke more light cigarettes to get the same amount of tar as someone smoking a full-flavored cigarette, which is not true. A recent study by Hamilton et al. found that smokers perceive advertisements for light cigarettes as conveying positive messages about health and safety.

Cigarette manufacturers have only recently acknowledged the medical and scientific consensus that smoking causes serious diseases such as lung cancer, respiratory disease and heart disease. Since the early 1950's, cigarette manufacturers have told smokers that their products were not injurious to health. Industry documents reveal that the tobacco industry conspired to mislead smokers about health risks associated with smoking in general, both through their own statements and those of the Tobacco Industry Research Committee and its successor, the Council for Tobacco Research and the Tobacco Institute.

The past public statements of the tobacco industry about the health risks of

smoking, nicotine addition, and their commitment to put the smokers' health above their profits are in sharp contrast to the private views expressed by many their own scientists. The tobacco documents reveal that many scientists within the tobacco industry acknowledged as early as the 1950's that cigarette smoking was unsafe. The sincerity of the industry's promise to support research to find out if smoking was harmful to health and to disclose information about the health effects of smoking can also be questioned based upon the industry's own documents which reveal: 1) skepticism about the scientific value of the smoking and health research program established by the industry and 2) evidence that research findings implicating smoking as a heath problem were often not published or disclosed outside the industry.

Cigarette manufacturers marketed so-called light cigarette brands recognizing that smokers would consider them safer than conventional cigarettes, but knowing full well that light cigarettes offered little advantage to the smoker over regular filtered cigarettes. Between 1971 and 2003 Philip Morris advertised that Marlboro Lights were "lowered in tar and nicotine." However, this statement is not true. Research by Philip Morris revealed that the amount of tar delivered to the smoker was essentially the same between Marlboro Lights and Marlboro Reds. Unknown to the public is the observation made by cigarette company scientists that revealed that high filter dilution cigarettes scored higher on the Salmonella/microsome mutation assay, compared to full-flavor low dilution filtered cigarettes.

(Emphasis in original.)

Defendants concede that Dr. Cummings, who was trained in public health, may testify on smokers' behavior and attitudes. They object to his opinion that defendants have "lied" or "misled" and to the introduction of what they characterize as a non-scientific survey of named plaintiffs.

■ Except as indicated below, the opinions of Dr. Cummings are supported by the record he relies upon and meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence. References to "lies" and "misleading" by defendants will be stricken since the jury can decide the truthfulness of defendants' claims without this expert. Dr. Cummings may, however, state how smokers would be expected to react to, or rely upon, statements of defendants. His conclusion that cigarette manufacturers "manipulate" nicotine in cigarettes is not admissible, but he may testify that they control the nicotine the smoker will receive. He may testify about implicit and explicit statements about the health risks of cigarettes by defendants and the actual health risks. He may not testify that defendants themselves did not believe these claims.

He may testify to his interviews with named plaintiffs if he, or other experts, testify that this is an appropriate way to obtain the information sought. If defendants wish they may have an instruction that what the interviewees in this limited "survey" said may not be depended upon as true or as representing universal beliefs, but is being admitted only to show part of the basis of Dr. Cummings' opinions.

Subject to the above limitations, K. Michael Cummings may testify pursuant to Rules 702 and 703 of the Federal Rules of Evidence.

e. Michael J. Dennis

Michael J. Dennis, Ph.D., is the author of a report upon which he based his testi-

mony in the 2003 Illinois state "Miles" case formally known as *Price et al v. Philip Morris. See* Appendix C, *supra.* His role in the *Price* case was to provide survey research and expert witness services to measure the attitudes, perceptions, and valuations of Marlboro Light cigarette smokers. He designed the survey questionnaire that was used for the survey, analyzed the survey data, wrote the expert report detailing the study procedures and results, and designed the exhibits used in the *Price* trial during his testimony. His expert report and survey research was used by Dr. Jeffrey Harris as the basis for his own testimony and reports in the *Price* case. He was deposed twice in the *Price* case and provided testimony in court once.

At the time of the preparation of the report for the *Price* case, he was a Vice President and Managing Director for Government and Academic Research for Knowledge Networks, based in Menlo Park, California. He joined Knowledge Networks in February 2000 as the Vice President for Operations. During ten months in this position he was responsible for survey research for the company and designed and implemented some twenty surveys in the areas of health, social public policy, and consumer research. He reviewed and provided design assistance for approximately a dozen market research surveys that were being conducted by his colleagues. From 2001 to present, he has managed all research conducted by Knowledge Networks on behalf of federally funded principal investigators who conduct health, economic, social, and political research. He has been personally involved in the design and implementation of over a hundred statistical surveys in the last four years, and over fifty such surveys prior to the work he conducted for the *Price* case. Among federal sponsors of his statistical surveys are the United States Centers for Disease Control and Prevention and United States Environmental Protection Agency.

Prior to joining Knowledge Networks, he was a senior Scientist at Abt Associates, Inc., a social science consulting firm based in Cambridge, Massachusetts. While there, he managed several large-scale federal surveys and was Associate Project Director for the National Immunization Survey. At the time, this survey was the largest federally funded telephone survey conducted for the government. In his seven years at Abt Associates, he managed statistical surveys for the Social Security Administration, Office of National Drug Control Policy, and National Cancer Institute. The survey he did for the *Price* case was done using the Knowledge Networks "web-enabled panel." The web-enabled panel is a methodology available for conducting surveys on the internet using nationally representative samples of United States households.

He claims that the methodology used for the *Price* case is widely recognized as producing valid and reliable survey data and has been widely used in research conducted by federal government, university, and other researchers. In his opinion the survey results he obtained for the *Price* case are reliable and valid, and constitute a sound basis upon which Dr. Jeffrey Harris could produce his expert opinion for the *Price* case—and in the current case, in support of his "loss of value" approach. *See* Part VIII.F.1.h, *infra.*

Dr. Dennis lists sixteen publications, none dealing with tobacco. A number cover research techniques.

██ Defendants' detailed analysis of the Dennis methodology suggest reasons why it should not be relied upon by a jury. Nevertheless, his methods and conclusions fall well within appropriate practice in such studies. They, and the proposed tes-

timony of Dr. Dennis, meet minimum standards under Rules 702 and 703 of the Federal Rules of Evidence. They are relevant to issues in the case. The methodology described in detail in the Dennis report satisfies the general requirements for surveys. Dr. Michael J. Dennis's proposed testimony and report meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence. *See also* the analysis, and reliance on, his testimony in *Price*, Appendix C at ¶¶ 89, 92, *supra.*

### f. Robbin Derry

Plaintiffs have proffered Dr. Robbin Derry, a Research Professor at the Kellogg School of Management at Northwestern University, to render her expert opinion on the ethical nature of the defendants' conduct in developing and marketing "light" cigarettes. Dr. Derry is a well-qualified expert on business ethics. Defendants move to exclude her testimony primarily on relevancy grounds.

 The issues in the litigation involve rules of substantive and procedural law that are only indirectly informed by ethical considerations. Dr. Derry's opinions may be useful to those formulating rules of law. They will not be relevant to the triers' consideration of the evidence relevant to findings of fact required by the rules of law.

Irrelevant evidence is inadmissible. *See* Rule 402, Fed.R.Evid. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. Since the ethical rules relied upon by Dr. Derry are not relevant, and therefore not admissible, the motion to exclude is granted on the ground of lack of relevancy.

The testimony of Dr. Derry should also be excluded because it might mislead the jury by confusing it about the differences between rules of law and their own ethical judgments. *See* Rule 403, Fed.R.Evid.

The motion to exclude Dr. Derry's opinion and testimony is granted.

### g. Marvin E. Goldberg

Dr. Marvin E. Goldberg is the Irving & Irene Bard Professor of Marketing at Pennsylvania State University. He has held this position since 1991. In 1998–99, he served as Interim Dean of the Smeal College of Business Administration at Pennsylvania State. From 1999 to the present, he has served as Chairman of the Marketing Department at Pennsylvania State. From 1970 to 1991, he was a professor at McGill University in Montreal, Canada. He received his Ph.D. in Marketing (minors in Economics and Psychology) from the University of Illinois in 1972, an M.A. in Sociology from Columbia University in 1967, and a B.A. from McGill University in 1965.

He is past President of the Society for Consumer Psychology (Division 23 of the American Psychological Association). He is currently a member of the editorial board for the *Journal of Consumer Research, Journal of Public Policy and Marketing, Journal of Social Marketing,* and *International Quarterly Journal of Marketing.*

He is an expert in marketing as it relates to advertising, packaging, promotion, and public relations, with special knowledge of cigarette marketing and the impact of tobacco advertising and promotion on youths and adults.

His published research has focused on the effects of advertising on adults and youth. These include a co-edited book, *Social Marketing: Theoretical and Prac-*

*tical Perspective* (1997), a chapter in *Advertising to Children* (2000), and articles in a wide variety of journals, including the *Journal of Consumer Research, Journal of Consumer of Psychology, Journal of Public Policy and Marketing, Psychology and Marketing, Journal of Advertising Research, Journal of Communication, Journal of Business Research, American Journal of Public Health,* and *Nicotine and Tobacco Research.* His other publications are extensive.

The opinion of this witness is relevant. It is in part as follows:

> **How light cigarettes came to dominate the marketplace—the origins of their popularity.**
>
> **Advertising and Promotion for the Light category drove the process.** 1) [The figure below (omitted) illustrates] the trend with regard to the percentage of the tobacco industry's advertising and promotion dollars that were allocated annually to light cigarettes from 1967 to 1998, the years that the FTC reported this data in their annual report on cigarettes and 2) the annual percentage of total cigarette sales represented by light cigarettes. As may be noted, "Light" cigarettes (defined as less than 15 mg. Tar) came to dominate both categories.
>
> . . . . [U]ntil the 1990's, the percentage of dollars allocated to advertising and promotion for the light cigarette category exceeded their share of market. In effect, the industry was investing in and driving the growth of this category. Ultimately by the 1990's, given a "ceiling effect" (there is only so high that both percentages could realistically go) the two sets of percentages became more closely aligned.
>
> **The industry shaped a "viral marketing" campaign to ensure the success and popularity of Light cigarettes.** The tobacco industry has long

understood how advertising and interpersonal influence combine to influence the individual smoker or potential smoker. Burrows of R.J. Reynolds referred to this as a "bandwagon" effect. The process starts with the intense advertising and promotion on the part of the industry: over $200 billion in the last half century—an average of $9 million a day over the extended period of time and more recently, with climbing outlays, $35 million per day . . . .

**Internal corporate documents make it clear that the tobacco companies have long known that the health issue has been the main motivation for smokers to switch to lower tar brands.**

. . . The industry has operated on the premise that *the* factor leading smokers to lights is because they believe such cigarettes are "better for you." Any other factor—for example, "taste,"—is secondary at most and more accurately, spurious.

[Discussion of studies by Kozlowski, et al., mentioned elsewhere, suggesting that large numbers of smokers gave health-related reasons for smoking light cigarettes (76 percent) and used these cigarettes as a step towards quitting (33 percent) or reducing tar exposure (50 percent).]

\* \* \* \* \* \*

It is worthwhile considering how tobacco industry advertising, related to the health dimensions discussed above, shaped syllogistic thinking on the part of smokers: if mildness means less throat irritation, and less throat irritation means—in some way—a healthier cigarette, then mild, light cigarettes must be better for health. Similarly, if Lights are said to have less tar/nicotine, and if it is understood that tar/nicotine have negative health consequences, the smoker is syllogistically led to the con-

clusion that Lights must be better for health (less of the "bad stuff")....[T]he CEO's of R.J. Reynolds and the Liggett group and the former CEO of American Tobacco engaged in these syllogisms and they believe their customers did as well.

As internal documents reveal, the tobacco industry recognizes that it would be by allowing actual tar yields to increase that the cigarettes would come closer to tasting like regular cigarettes, and so gain in popularity.

\* \* \* \* \* \*

**Internal tobacco company documents further indicate that Barclay may have done a better job in allowing for compensation than its competitors, but the others also developed cigarettes that allowed for compensation.**

\* \* \* \* \* \*

**The use of brand extension and the related advertising helped shaped smokers' perceptions of taste.** At the same time as they developed light cigarettes that allowed for compensation, the tobacco companies learned how to boost the *perceived* strength of the taste, by using their advertising to shape the images associated with Lights. The companies viewed the taste dimension much as a "Rorschach ink blot test." Light cigarette smokers could be induced to see/taste in the cigarettes what the companies wanted them to see.

\* \* \* \* \* \*

The industry further understood that they could "borrow" some of the brand equity established for their primary (regular) brands such as Marlboro Red and Camels for the benefit of the light cigarette. The did so by creating brand extensions—Marlboro Lights, Camel Lights etc. and using the same advertising themes and imagery that had been

so successful to shape the imagery associated with the light extensions. That this strategy could affect smokers' perceptions of the light cigarettes' *taste*, is recognized in their internal documents.

\* \* \* \* \* \*

**The taste of regular cigarettes.** One needs to question whether the "standard" for taste set by regular cigarettes is such that the taste of regular cigarettes is a positive feature? Are regular cigarettes inherently "tasty?" Internal documents indicate that the tobacco companies believed that the initial taste for (typically underage) starter smokers was aversive and sought to take measures to compensate for this. Thus, as early as 1974, R.J. Reynolds considered flavored cigarettes as a way of masking the tobacco taste. A meeting at the R.J. Reynolds offices resulted in a memo titled "New Products." Under the authorship of J. Donati of Taitham–Laird & Rudner, an R.J. Reynolds advertising agency, the memo served to define a "Cigarette Designed for Beginning Smokers."

\* \* \* \* \* \*

That taste is, at least in part, a function of how products are portrayed/labeled and advertised has been carefully researched in the context of "field" experiments with foods. In one such experiment, the same lunch meals were sold in a university faculty cafeteria but were labeled differently on different days. For example, on some days one such meals was identified as "Succulent Italian Seafood filet" but on other days merely as "Seafood Filet." Those who bought and ate the foods when they were described in an embellished way reported that: the foods were more appealing to the eye; *they tasted significantly better*; and after eating the meal

they felt more "comfortably full and satisfied."

\* \* \* \* \* \*

In the same way, [the tobacco companies] having convinced smokers that light cigarettes are healthier, those who smoke them experience and report them as tastier. The taste they experience is, at least in part, a function of the "theory" smokers have been given by the tobacco industry—that light cigarettes are healthier and "healthier" tastes better.

How is it that people develop a theory that healthier things taste better? Consumers often cannot directly judge the merits of a claim and in these circumstances they develop heuristics or "rules of thumb" which involve relying on "proxies" for the real evidence they are seeking. For example, consider how difficult it is to judge how "fresh" fish in a supermarket is. Supermarket executives have come to realize that for some consumers, fish sitting on a styrofoam tray represents a proxy conveying "not fresh," while fish sitting on ice represents a proxy conveying "fresh."

The tobacco companies have been more than willing to mislead and deceive smokers by presenting them with false proxies. Since smokers cannot know from simply examining a cigarette whether it is healthier than others or not, they need to rely on what they believe is indirect evidence—for example, calling a cigarette "light" and putting lighter colors on the package has led smokers to reason that these cigarettes must be better for them (just as ... light beer [has] an objective benefit—fewer calories). In effect, "light" comes to mean "healthier" and "healthier" tastes better. As with the food experiments cited above, if questioned, smokers are almost certainly not going to be aware of how the label "light" (and hence the inference "healthier") influence their perceptions of the cigarette's taste.

An affidavit of Dr. David W. Stewart, Robert E. Brooker Professor of Marketing in the Gordon S. Marshal School of Business at the University of Southern California, and a defense expert, contested Dr. Goldberg's conclusions. *See* Part VIII. F.3.v, *infra*. Dr. Stewart has wide experience in tobacco and related fields and is fully qualified as an expert supporting his opinions. His conclusion was:

It is very clear from the very rich information regarding smokers of "light" cigarettes that putative class members are different. They exhibit significant individual differences. They smoke different brands and have different smoking histories. The advertising messages and packages designs differ across brands and smokers' responses to these messages and packages will differ. There have been temporal changes in the information environment that will change even the same consumer over time. They have different family, friends and social relationships that will influence decisions about smoking. They have different retail experiences, have been exposed to different media, have attended different schools and have different health care experiences. All of these differences will influence the way in which consumers of "light" cigarettes will respond in the market place.

Both experts can be useful to the jury. It will be in a position to discount Dr. Goldberg's broad assessments, if appropriate, with the more measured conclusions of Dr. Stewart. Both experts' opinions meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence.

h. Jeffery Harris

Dr. Jeffrey Harris has submitted reports dated February 28, 2005, March 28, 2005, and September 6, 2005.

He is a tenured professor of economics at the Massachusetts Institute of Technology and a practicing primary care physician at the Massachusetts General Hospital. He appeared before this court as an expert witness in *Falise v. American Tobacco Co.,* 107 F.Supp.2d 200 (E.D.N.Y. 2000), and in *Blue Cross & Blue Shield of New Jersey v. Philip Morris,* 141 F.Supp.2d 320 (E.D.N.Y.2001). He gave expert testimony on behalf of plaintiffs in *Price.* See Appendix C, *infra.* He also testified on behalf of the United States Department of Justice concerning the economics of collusion in *United States v. Philip Morris.* See Appendix A, *supra.* His work supports the conclusion of this and other courts that he is qualified as an expert in the field for which his testimony will be proffered.

His February 2005 report reads in part as follows:

In connection with this lawsuit, counsel for plaintiffs have asked me to describe, in summary form, two specific economic methodologies that could be used to compute class-wide damages in the event that the proposed class is certified and the suit goes to trial. In what follows, I describe these two methodologies as the "loss of value" approach and the "loss of the market" approach.

Under either approach to damages, I conclude that all or virtually all class members have been harmed.

Moreover, I conclude that both methods for computing damages are feasible, reliable, and reproducible.

**Loss of Value Approach**

In the first method, or "loss of value" approach, an economist assesses, on a per-cigarette basis, the difference between the price paid for the good as represented and the value of the good actually sold. In effect, the economist asks: Suppose a consumer of a light cigarette had been properly informed that such a cigarette offered no reduction in risk, or possibly an increased risk. What discount from the price actually paid would be required to induce the consumer to continue to smoke the light cigarette?

I applied the loss-of-value approach in my trial testimony concerning Marlboro Lights, a particular brand of light cigarettes sold by Philip Morris USA, in *Price [ ] v. Philip Morris.* In the case where the Marlboro lights brand was assumed to offer no reduction in risk (the "just as harmful" case), I estimated the relative loss in value to be 77.7 percent of the purchase price. In the alternative case where Marlboro lights cigarettes might in fact increase risk (the "could be more harmful" case), I estimated the relative loss of value to be 92.3 percent. In entering its judgment in *Price,* the trial court found that Marlboro Lights in fact might increase risk, and thus adopted the latter measure of damages.

I also applied the loss-of-value approach in my expert report in another Illinois-based class-action lawsuit concerning the brands Doral Lights, Camel Lights, Winston Lights and Salem Lights cigarettes, all sold by R.J. Reynolds Tobacco Company. In the "just as harmful case," I estimated the relative loss of value to be 73.4 percent of the purchase price, and in the "could be more harmful" case, I estimated the relative loss in value to be 91.9 percent. In formal statistical tests, I could not distinguish between the loss in value for

Marlboro Lights and the loss in value for the other lights brands.

Estimation of relative loss in value entails the use of sample surveys, an approach that is well accepted in economic analysis. In my expert report and trial testimony in Price, I relied upon the results of surveys of Marlboro Lights smokers that were performed by Knowledge Networks, Inc. In my expert report on light cigarette brands sold by R.J. Reynolds, I relied on additional surveys by Knowledge Networks of smokers of those light brands. Since the Knowledge Network surveys were performed on national panels of light cigarette smokers, they would also be applicable to the present litigation. I understand that the present lawsuit encompasses light cigarette brands not covered by the two prior Knowledge Networks surveys. However, in view of my finding that the loss in value for Marlboro Lights was indistinguishable from that of four light cigarette brands sold by R.J. Reynolds, I would not necessarily recommend additional brand surveys. Nonetheless, comparable surveys could be performed to supplement those already completed.

The Knowledge Networks surveys asked respondents to make binary comparisons between a "genuine" light cigarette that reduced risk (as represented by defendants) and a "misrepresented" light cigarette that was no less harmful than conventional cigarettes. In soliciting such binary comparisons, the surveys instructed respondents to assume that the genuine and misrepresented cigarettes "taste exactly the same, cost the same, and are identical in every way" to each other. Alternatively, one could in principle use multiple-attribute survey methods, such as conjoint analysis, to determine the loss in value attributable to defendants misrepresentations.

In my analysis of the Knowledge Networks survey results, I found that virtually all respondents reported a non-zero loss in value. Thus, in an analysis of the combined results of both the Marlboro Lights survey and the survey of light cigarette brands sold by R.J. Reynolds, I found that 93 percent of respondents reported a non-zero discount in the "just as harmful case" and 96 percent reported a non-zero discount in the "could be more harmful case."

Once the discount per cigarette is determined by survey methods, it can be used to compute total class-wide damages. In particular, if the discount is computed on an absolute basis, then total class-wide damages equal the difference between price and actual value per cigarette multiplied by the number of cigarettes sold to class members. If the discount is computed on a relative basis, that is, as a percentage of the price actually paid, then total class-wide damages equal the percentage discount multiplied by the dollar value of cigarette sales to class members. I used the latter approach in my prior testimony in Price and in my expert report concerning light cigarette brands sold by R.J. Reynolds. In both instances, I used publicly available data on cigarette shipments and taxable sales, combined with data submitted by cigarette manufacturers during pretrial discovery, to compute the dollar value of light cigarette sales to class members in the State of Illinois. In the present lawsuit, data on nationwide shipments and average retail price of various brands of light cigarettes are already available from public sources.

In the Knowledge Networks surveys, virtually every respondent reported that he would require a discount to purchase the misrepresented light cigarette.

Therefore, it is reasonable to conclude that all or virtually all class members have been harmed.

The facts in the present lawsuit do not significantly differ from those in the Illinois cases. Accordingly, I conclude that the loss of value approach can likewise be applied to the present lawsuit. Moreover, there is already sufficient survey evidence to conclude that the loss of value approach is feasible, reliable, and reproducible.

[In his September 6, 2005 report, Dr. Harris uses this model to produce estimated damages of $144 billion for a cigarette of equal risk to $205 billion for a cigarette of greater risk.]

**Loss of the Market Approach**

In the second method, which I shall term the "loss of the market" approach, the economist asks: Would the market for light cigarettes have continued to exist, or even have arisen in the first place, had the defendants not engaged in their alleged deceptive enterprise?

As I understand it, plaintiffs allege that defendants had substantive knowledge that light cigarettes did not reduce health risks or may even have increased health risks and that, absent defendants' enterprise, consumers would have learned that light cigarettes did not reduce health risks or, in fact, might actually increase risk. Moreover, I am aware of evidence indicating that, absent defendants' enterprise, genuine risk-reducing brands would have in fact been sold. Accordingly, I conclude that, in all likelihood, light cigarettes—at least in the form they were actually marketed—would either have been discontinued or never sold in the first place.

The economic bases for such a conclusion are the very substantial discounts for light cigarettes reported in the sur-

veys performed thus far, as well as certain cost factors. Cigarettes have been and remain subject to substantial state and federal excise taxes. In addition, there are likely to be significant setup costs to launching, manufacturing and promoting light cigarette brands. In view of these cost factors, if the demand for light cigarette brands were sufficiently low, then in all likelihood, it would have been unprofitable for cigarette manufacturers to market them at all. It is a well established precept in basic economics that suppliers will not market or discontinue marketing a good if demand is inadequate in comparison to costs.

For example, in 2003, excise taxes comprised 23.1 percent of total U.S. expenditures on cigarettes. At the same time, the 2003 Knowledge Networks Survey indicated that, even in the "just as harmful case," consumers would be willing to pay only 22.3 percent of the current retail price of Marlboro Lights cigarettes. In view of these findings, an economist would conclude that no Marlboro Lights brand cigarettes—at least in the form that they were actually marketed—would have been sold in 2003.

Under the loss of market approach, light cigarette brands would have never been sold in the first place, or would have been discontinued soon after consumers would have learned that such brands do not reduce harm. Accordingly, under the loss of market approach, it is reasonable to conclude that all or virtually all class members have been harmed.

Under the loss of market method, the per-cigarette damage would equal the full purchase price, and the total damages would equal the retail value of all lights cigarettes sold from the date of discontinuation of the market up to the

date of trial. I therefore conclude that the loss of market method is feasible, reliable and reproducible. [In his March 2005 report, Dr. Harris estimated damages of $285 billion using the loss of market model.]

The "loss of market" model is excluded on non-*Daubert* grounds. *See* Part III. D.1.a, *supra.*

Defendants properly point out in their objections to Dr. Harris's "loss of value" model that he does not calculate the number of persons who actually relied on defendants' representations, but assumes reliance by every member of the class. Nevertheless, on the assumptions made, the methodology and computations are supportable—even though contested by defense experts. The model can be adjusted according to the jury's finding on the percent of the class that relied on the alleged fraud. *See,* for example, the lower estimates of 28 percent, 31 percent, and 41 percent of smokers who believed "lights" were safer according to surveys cited in defendants' memorandum seeking to exclude Dr. Harris's testimony, dated June 9, 2006 at p. 12. The issues are appropriate for the jury's resolution. Dr. Harris's work will be helpful to them when subject to cross-examination and contrasting views of experts for both sides.

 Jeffrey E. Harris's proposed testimony and the reports on which it is based meet the requirements of Rules 702 and 703 of the Federal Rule of Evidence. *See also Blue Cross,* Appendix B at Part IV.C.2.a.ii, *supra; Price,* Appendix C at ¶¶ 83–85, 95–97, *infra.*

i. John R. Hauser

Dr. John R. Hauser is the Kirin Professor of Marketing at the Sloan School of Management at the Massachusetts Institute of Technology ("MIT"). He serves MIT in a number of capacities, including Head of the Marketing Group, Director of the Center for Innovation in Product Development, and Director of the International Center for Research on the Management of Technology. He is Area Head for Management Science at MIT. The Management Science Area at the MIT Sloan School of Management includes the Marketing Group, the Statistics Group, and other groups. The principal focus of his research and teaching has been in marketing management, product and service development, consumer satisfaction, marketing research, and competitive marketing strategy. He is the author of over sixty articles and papers, as well as the textbooks *Design and Marketing of New Products* and *Essentials of New Product Management.* In addition, he has served as editor-in-chief of *Marketing Science* and held senior editorial positions with *Management Science* and the *Journal of Product Innovation Management.* He has received numerous awards for excellence in research and teaching in marketing and marketing research, and was recognized by the American Marketing Association with the Converse Award for "outstanding contributions to the development of the science of marketing." In September of 2001 he received the Parlin Award, "the oldest and most distinguished award in the marketing research field," according to the American Marketing Association.

He has served as an expert witness in connection with a range of disputes. Most of his expert testimony has involved surveys and other market research to measure consumers' attitudes, beliefs, and intentions. He has been called upon to project what consumers would have done in different market scenarios, to measure the importance of product features, to measure the impact of rumors, to evaluate marketing research with respect to advertising claims, and to investigate the poten-

tial for consumer confusion. He has been consulted by dozens of major corporations, including General Motors, Fidelity Investments, American Airlines, Proctor & Gamble, and International Business Machines.

His report dated December 19, 2005 included the results of a survey that, using conjoint analysis, sought to determine whether health risks are a significant contributing factor in consumer decisions to smoke "light" cigarettes; what proportion of "light" cigarette-smoking consumers relied on health risks as a significant contributing factor to their decision; and how consumers and the market would react to cigarettes with different levels of health risks. It was accompanied by extensive supporting documents and print-outs of calculations. His study methodology conformed to appropriate standards and appeared to have been properly executed.

It reads in part as follows:

The basic methodology I selected is known as web-based conjoint analysis. Conjoint analysis is a tool that is widely used in the field of marketing research .... [It] is generally recognized by marketing science academics and industry practitioners to be the most widely studied and applied form of quantitative consumer preference measurement. It has been shown to provide valid and reliable measures of consumer preferences, and these preferences have been shown to provide valid and reliable forecasts of what consumers will do (or would have done) under scenarios related to those measured. For example, under the auspices of MIT's virtual Consumer Initiative, my colleagues and I have undertaken large-scale tests of the validity of web-based conjoint analysis. Predictions were highly accurate.

One of the scientific papers discussing the validity test recently received two highly prestigious awards as the best paper in the marketing sciences literature for 2003 (awarded in 2004) and for the best paper based on a dissertation (awarded in June 2005) ....

The general idea behind conjoint analysis is that consumers' preferences for a particular product are driven by features or descriptions of features embodied in that product. For example, a cigarette might be described by features such as:

(I) pack type (hard or soft); (ii) degree of perceived health risks; (iii) taste; and (iv) price. A feature, such as perceived health risks, can have many levels such as: less than "ultra-light" cigarettes, the same as "ultra-light" cigarettes, the same as "light" cigarettes, the same as regular cigarettes, and greater than regular cigarettes. (Detailed wording and description of these levels are provided later in this report.) When applying (decompositional) conjoint analysis, respondents are asked to make holistic judgments about products (or product descriptions) or to choose among products (or product descriptions). That is, consumers are shown product profiles made up of the features or descriptions of features and asked to indicate their preferences for these profiles or to choose among these profiles ("choice task"). The conjoint analysis methods use the holistic judgments or choice tasks to decompose respondent preferences for a product into the partial contribution of these feature levels or descriptions ("partworths"). These partworths are then estimated from respondent preferences or choice with the appropriate statistical methods. The partworths for feature levels are identified with the estimation methods so that the partworths best predict

consumer preferences or choices. The difference between the smallest and largest partworths for levels of each feature can be used to calculate the relative importance of each feature in purchase decisions. Importance refers to the relative value of changing that feature from its least preferred level to its most preferred level. The partworths for changes in price levels measure the relative importance of changing price. The price reduction needed to compensate for a lower (less-preferred) level of a feature, or the additional price consumers would pay for the higher (more-preferred) level of feature can then be calculated.

\* \* \* \* \* \*

Based on the methodologies described in this report and based on calculations of the importance of health risks as a factor in consumer decisions, consumer willingness to pay for lower health risk, and market-based simulations, I conclude that health risks are a positive contributing factor in the choice of "light" cigarettes for 90.1 percent of "light" cigarette consumers and, of these consumers, on average, it is ranked above all other measured features, excluding price, (i.e., taste or packaging). It is ranked above at least one other feature by 97.8 percent of the consumers, indicating its significance for the overwhelming majority of respondents.

The methodologies described in this report provide data with which to calculate the market value of the change in perceived health risks for "light" cigarettes. In this report I provide two examples of how one might calculate the market value. These examples suggest that the market value of a decrease in health risks from the same as regular cigarettes to the same as "light" ciga-

rettes is between 39.8 percent and 47.3 percent of the price per pack.

For "light" cigarette consumers, the data and analyses in this report can be used to simulate "but for" scenarios in which "light" cigarettes with varying health risks are available on the market. For example, if each brand of "light" cigarettes offered two versions of "light" cigarettes, one version with the perceived health risks the same as "light" cigarettes at regular price and another version with the perceived health risks the same as regular cigarettes but at a 50% reduction in price, then the "light" cigarettes with the better perceived health risks would obtain a market share between 46 and 48 percent.

The data and analyses in this report can be used to gain insight on the price discount that would be needed to sell a cigarette with perceived health risks *greater* than regular cigarettes. For example, more than 75 percent of the consumers would be willing to pay more than 50 percent of the price per pack to decrease health risks from greater than regular cigarettes to health risks the same as "light" cigarettes. One estimate of the market value of a perceived decrease in health risks from greater than that of regular cigarettes to that the same as "light" cigarettes is substantially more than 50 percent of the price per pack. At most 8/10ths of 1 percent of the respondents use a non-compensatory lexicographic decision rule for taste, health risks, pack type, and price. For all other respondents and for the features of taste, health risks, and price, high levels on some features can compensate for low levels on other features.

The overall summary of his conclusions is:

Based upon an examination of the partworths for perceived health risks, I find, to a reasonable degree of scientific

certainty, that 69.7 percent of "light" cigarette consumer place a statistically significant positive value on perceived health risks, and only 1.1 percent place a statistically significant negative value on perceived health risks. In accordance with these assessments and measurements, 90.1 percent of "light" cigarette consumers place a positive value in perceived health risks.

Based upon an examination of feature importance, I find, to a reasonable degree of scientific certainty, that perceived health risks are a significant contributing factor in the cigarette purchase decision of 98.1 percent of "light" cigarette consumers who place a positive value on perceived health risks.

Based on Willingness–to–Pay method, I estimate that the median value of the change in perceived health risks from the same as regular cigarettes to the same as "light" cigarette is 47.3 percent of the price per pack.

Based on the Market–Based method, I estimate that the market value of the change in perceived health risks from the same as regular cigarettes to the same as "light" cigarette is between 39.8 percent and 47.1 percent of the price per pack. Based on the Willingness–to–Pay method, I estimate that more than 75 percent of the consumers would be willing to pay more than 50 percent of the price per pack to decrease health risks from greater than regular cigarettes to health risks the same as "light" cigarettes.

Based on the Market–Based method, I estimate that the market value of the change in perceived health risks from greater than regular cigarettes to the same as "light" cigarettes is substantially more than 50 percent of the price per pack.

Based on the methodologies described in this report, derived from both consumer Willingness–to–Pay and Market–Based simulations, I conclude, on the basis of the best available information and methodologies, that individual consumers and the market value of the change in perceived health risks from that of a regular cigarette to that of a "light" cigarette is between 39.8 percent and 47.3 percent of the price per pack.

Based on the above analysis of the partworths, at most 8/10ths of 1 percent of the respondents use a non-compensatory lexicographic decision rule for taste, health risks, pack type, and price. For all other respondents and for the features of taste, health risks, and price, high values on some features can compensate for low values on other features.

Since this proposed testimony will probably be critical in estimation of damages, the report of Dr. Hauser has been strongly attacked by defendants through depositions, documents, and the report of defendants' well qualified expert Dr. David W. Stewart, among others. Dr. Stewart's scientific background is exemplary. His conclusions are:

Dr. Hauser's survey and the conclusions he draws from its results are fundamentally and fatally flawed. His survey creates highly artificial product alternatives that are provided to smokers of "light" cigarette brands for evaluation. These alternatives do not include the most important factor that influences the choice of cigarettes by smokers—brand equity. Dr. Hauser also ignores other factors that influence choice including, menthol versus non-menthol, and filter tip versus non-filter tip. Additionally, none of his alternatives are described in terms of FTC levels of tar and nicotine and none include the health warnings that are

mandated for all cigarette advertising and packages.

Dr. Hauser creates highly artificial alternatives that include selections that are not available in the market: a cigarette with greater health risk than "regular" cigarettes and a cigarette that has less health risk than ultra-light cigarettes. His results report that many smokers have a preference for the non-existent "healthier" cigarette relative to the non-existent, very unhealthy cigarette. These results offer no insight into smokers' choices of cigarettes that actually exist in the market. Dr. Hauser's survey explicitly suggests to respondents that there are differences in health risks associated with different types of cigarette, ignoring the very substantial empirical research that demonstrates that many smokers do not believe there are any differences in health risks associated with cigarettes that differ in their FTC measured levels of tar and nicotine.

By creating artificial differences in health risk and by inflating the range of health risk and price among his alternatives relative to the two other attributes included in his product descriptors, taste and type of pack (hard versus soft), Dr. Hauser makes the outcome of his survey a foregone conclusion. The results of his survey were foreordained by its design. Such results provide no insights into the actual choices of real smoker in existing markets now or in the past.

■■■■ These differences between the experts are substantial. Given all the other evidence in the case, the jury will be in a position to evaluate the probative force of their positions. The survey conducted by Dr. Hauser may not perfectly represent the class; that does not make it irrelevant or unhelpful. Sample surveys, by their very nature, are sketches, not exact replicas, of the examined population.

[A] good survey defines an appropriate population, uses an unbiased method for selecting the sample, has a high response rate, and gathers accurate information on the sample units. When these goals are met, the sample tends to be representative of the population: the measurements within the sample describe fairly the characteristics in the population. It remains possible, however, that despite every precaution, the sample, being less than exhaustive, is not representative; proper statistical analysis helps address the magnitude of this risk .... [S]urveys may be useful even if they fail to meet all of the criteria given above; but then, additional arguments are needed to justify the inferences.

David H. Kaye and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence* (FJC, 2d ed.2000), at 102 (emphasis supplied). Direct and cross-examination, testimony by supporting and opposing witnesses, and argument by plaintiff and defense counsel will provide the additional guidance "needed to justify the inferences" the parties seek to draw from Dr. Hauser's survey.

The proposed testimony of John R. Hauser meets the requirements of Rules 702 and 703 of the Federal Rules of Evidence.

j. Katherine Kinsella

Katherine Kinsella is the president of Kinsella/Novak Communications, Ltd., an advertising and legal notification firm. She has over 30 years of experience in advertising, marketing, and public relations. She is a nationally recognized specialist in media-based notification programs in class actions and bankruptcies. She has developed and directed some of the largest and most complex national no-

tification programs in the country. The scope of her work includes notification programs in antitrust, bankruptcy, consumer fraud, mass tort, and product liability litigation. Specific cases have involved asbestos, breast implants, home siding and roofing products, infant formula, pharmaceuticals, polybutylene plumbing, tobacco, and Holocaust claims. She and her firm have developed or consulted on over 200 notification programs, placing over $120 million in media notice.

She is the author of the "Plain Language Tool Kit for Class Action Notice," published in the October 25, 2002 issue of *Class Action Litigation Report*; "Quantifying Notice Results in Class Actions—the *Daubert/Kumho* Mandate," published in the July 27, 2001 issue of *Class Action Litigation Report* and the August 27, 2001 issue of the *United States Law Week*; "The Ten Commandments of Class Action Notice," published in the September 24, 1997 issue of the *Toxics Law Reporter*, and co-author of "How Viable Is the Internet for Class Action Notice" published in the March 25, 2005 issue of *Class Action Litigation Report*.

Prior to establishing her firm, she was the Senior Vice President and Director of Marketing and Advertising for the Kamber Group, then the largest independently owned communications company in Washington, D.C. In that capacity she handled national advertising, direct mail and marketing clients. During her twelve years at the Kamber Group, she also served as Director of the Public Affairs Division, which included the firm's public relations, marketing, corporate communications, and advertising operations. She holds a B.A. in Education and English Literature and an M.A. in English Literature. Her experience qualifies her in the field on which she was asked to report.

Plaintiffs' counsel asked that media stories focusing on the health aspects of low tar or "light" cigarettes over a 43-year period be examined for media source, consistency of message, and reach of audience.

Despite the length of time during which stories appeared and the inability to capture coverage in all media due to the lack of records, the results of the analysis seem persuasive and are supported by research on how Americans get their news.

Ms. Kinsella's report reads in part as follows:

- From 1957 to 1968, media stories focused on the development of better filters.
- From 1968 to 1983, media stories reporting on the health aspects of "light" and low tar cigarettes provided a dominant message concerning the efficacy of smoking these types of cigarettes. This reflected the view of U.S. health authorities, which was based on the known or released scientific research at the time. The message was:

*Smoking is hazardous to your health but "light" cigarettes appear to be safer so if you must smoke, switch to low tar and low nicotine cigarettes.*

Even the Surgeon General in 1981 stated that low tar and low nicotine cigarettes appear to provide some small measure of protection to the smoker.

The first observed national appearance specifically questioning the positive health effects of "light" cigarettes was provided to the public with the publishing of the 1983 San Francisco Hospital Study in the *New England Journal of Medicine*. It reported that people absorb just as much nicotine from the low tar, low nicotine cigarettes as from regular brands and that the tar intake from these smokes is probably the same, as well. Although reports on these cigarettes continued to appear in the media

sporadically until Monograph 13 was published by the U.S. Department of Health and Human Services in February 2001, these reports often contained conflicting and mixed messages. The language used by health authorities and the media was often equivocal. An example is the 1985 statement by the *New York State Journal of Medicine* that "low tar cigarettes 'may' be no less hazardous than other cigarettes." Even as late as 1997, *NBC Evening News* indicated its assessment that the smoking public was unaware of the health and safety hazards of low tar when it stated that a report from the Centers for Disease Control was "about to shatter the myth that low tar, low nicotine cigarettes are less harmful to your health."

• National media coverage of the health effects of low tar and "light" cigarettes over time was tied directly to the release of reports from respected health authorities, such as the American Cancer Society, the National Institutes of Health and the *New England Journal of Medicine.* Coverage occurred in clusters around the release day and there is no evidence of any sustaining reputation of the substance of [these] reports. With rare exception, the news story disappeared from the media within a few days or a week. There was no continuous coverage of the health effects of "light" or low tar cigarettes, only intermittent spikes of short-lived information.

• Research during this period from 1983 to 2000 indicated that there was essentially two types of stories.

Story A was primarily about nicotine or the safety of smoking in general. Low tar or "light" cigarettes were mentioned in these stories. Approximately 148 appearances of this story were observed during this period.

Story B focused specifically on the health and safety attributes of low tar and "light" cigarettes. Approximately 280 appearances of this story were observed during this period.

• Almost without exception, news stories appeared in observed national and local media for a single day in a single market. With rare exception, the stories collectively had a shelf life of no more than a few days. Only six of the 72 clusters during 1983 to 2000 reached more than 10 percent of the national audience of adults 18 years of age and older. In terms of share of voice, even the largest cluster of stories on the health and safety attributes of low and "light" cigarettes had less than one percent of the gross impressions as compared to the impressions to the cigarette advertising schedules during the same time frame.

• Even through the late 1990s there was no consistent message that would have enabled a smoker of low tar and "light" cigarettes to come to a fully informed conclusion about the health and safety of these cigarettes.

■ Defendants question the criteria, methodology, and completeness of Ms. Kinsella's survey. The exhibits attached to their brief attacking her report raise *bona fide* questions as to its reliability, particularly as to articles she excluded as peripheral or those she missed. These arguments raise issues that a jury will consider in determining the probative force of this expert's findings. Her research methodology was adequate. Katherine Kinsella's research, report, and proposed testimony meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence.

k. Matthew L. Myers

Matthew L. Myers graduated from the University of Michigan Law School in 1973

and then served as a law clerk to Chief Judge Raymond Pettine of the United States District Court for Rhode Island. He has been Chief Staff Counsel for the National Prison Project of the American Civil Liberties Union Foundation and is president of the Campaign for Tobacco–Free Kids Organization. From 1980 to 1981 he was Program Advisor in charge of all tobacco-related actions for the Federal Trade Commission. From 1982 through 1991 he was the lead staff person for a coalition created by the American Cancer Society, the American Lung Association, and the American Heart Association to address tobacco-related issues on a national level. He served as counsel to that organization from 1992 to 1996.

The Harvard School of Public Health honored him with the Julius Richmond Award for actions taken to protect the public health. He was also a recipient of the Surgeon General's Medallion from then-Surgeon General C. Everett Koop. In 2000 he was selected to co-chair a commission appointed by President Clinton to propose recommendations for how to best address the problems facing tobacco farmers and their communities while protecting the public health. This commission produced a report and set of recommendations that were endorsed by the major public health organizations and by the major tobacco growers' organizations. In 1998 he was appointed to the first tobacco advisory committee created by the Director General of the World Health Organization to make recommendations for addressing the problem of tobacco worldwide.

In his report he opines in part as follows:

*Summary of Conclusions*

1. The cigarette industry historically has had far greater technical and scientific knowledge on issues of smoking and health, including compensation, cigarette design, and the accuracy of the FTC Method, than the FTC.

2. The cigarette industry did not provide information that it possessed to the FTC that would have been useful to the FTC in its efforts to ensure that the public was being provided with accurate information regarding cigarettes.

3. The information the cigarette companies did not provide to the FTC was relevant to the FTC's understanding of whether the results produced by the FTC Test Method provided meaningful and not misleading information about the relative level of tar consumers of different tobacco products were receiving and about whether the test results, as the FTC believed, produced meaningful and not misleading information for consumers, who believed that they potentially were reducing their risk of disease by reducing their level of intake of tar by switching to and/or smoking cigarettes that scored lower on the FTC machine tests. This information might have changed or modified the positions taken by the FTC on issues such as the FTC Method, compensation, and the publication of tar and nicotine numbers in advertising.

*The Cigarette Industry and the FTC*

*Personal History with the Industry.* In the Fall of 1980 I was hired as a Senior Trial Attorney and Program Advisor in the Division of Advertising Practices of the Bureau of Consumer Protection at the Federal Trade Commission. In that capacity I was responsible for overseeing all of the FTC's enforcement activities concerning tobacco, and had supervisory authority over the FTC's tar and nicotine testing laboratory and report.

I supervised the largest investigation that the FTC had ever conducted into tobacco industry marketing and the impact of that marketing on the government's efforts to use health warnings to inform the American public of the health hazards of using tobacco. This was a broad investigation that was initiated before my arrival and that led the FTC in the Spring of 1981 to issue a report titled "Staff Report on the Cigarette Advertising Investigation." This report was a comprehensive review of what the government knew about the health effects of tobacco, and it examined in detail the public's knowledge of the health effects of tobacco products, including light and low tar tobacco products. It also included the federal government's most comprehensive review as of that date of tobacco industry marketing practices and their impact. Finally, the report set out the Federal Trade Commission's history of involvement with the tobacco issue and made recommendations for revising the then existing health warnings on cigarette packages and ads.

While at the FTC I also initiated the investigation that ultimately resulted in litigation between the FTC and Brown & Williamson ("B & W") because of B & W's advertising of Barclay cigarettes. The FTC alleged that B & W made false and deceptive claims about the tar yield of the product in both its advertising and its labeling. The outcome of this litigation was that B & W was prohibited from advertising their Barclay brand as a 1 mg cigarette. The case was of particular interest because it exposed a serious weakness in the FTC's system of testing the tar and nicotine levels in cigarettes and required my staff and me to look more closely at the tar and nicotine testing system.

.... I believe the tobacco companies have unfairly attempted to shift responsibility from themselves to the government by: (1) wrongly asserting that the government made them come up with a tar and nicotine testing system; (2) wrongly asserting that the government required them to publish the machine-generated tar and nicotine results; and (3) wrongly asserting that the FTC fully understood that its testing system did not predict the amount of tar and nicotine smokers actually received.

From the beginning, the FTC acknowledged that the FTC testing method did not provide ratings that represented either an average or usual dosage of tar and nicotine, but indicated that such ratings would allow consumers to compare brands based upon testing under a controlled system. However, the FTC did not contemplate and was not aware that tobacco companies could or would manipulate or design cigarettes which would produce lower tar and nicotine yields when tested on the machine but permit consumers to extract higher levels of tar and nicotine or deliver higher levels of tar and nicotine to consumers in ways that could not be detected by the testing method.

As reflected in the position that the FTC took in the case against B & W concerning Barclay cigarettes that I worked on, although the FTC knew the machine tests did not accurately predict the exact amount of tar and nicotine a consumer receives because different consumers smoke differently, they did believe that as a general rule the tests gave consumers relevant information that would enable consumers to judge which products would result in them receiving more tar and which ones would result in them receiving less tar. As reflected in the findings in the National Cancer Institute Monograph 13, this

perception is as a general rule inaccurate and the FTC testing system does not provide a reliable predictor of which cigarettes provide consumers more or less tar, let alone predict the relative tar delivery ratio of different tobacco products when actually consumed by a smoker.

It was the tobacco companies—not the FTC—who for decades wanted to use tar and nicotine figures to promote their products. In response to tobacco company claims about the tar and nicotine levels in their products, the FTC was constantly attempting to find ways to prevent them from using tar and nicotine claims to mislead consumers. For example, on several occasions in the 1950's, the FTC challenged tar and nicotine claims made by various tobacco companies. In 1960, Earl Kintner, then Chairman of the FTC, issued a statement which described an agreement by the tobacco companies that there would be no more tar and nicotine level claims made in cigarette advertising because the FTC perceived those claims to be deceptive.

A frequent problem with the tobacco industry's tar and nicotine claims prior to 1966 was the FTC's perception that these claims were based on unreliable testing systems about which there was no scientific consensus. These various systems did not permit meaningful comparisons between products and permitted the tobacco companies to manipulate the results in ways that were misleading to consumers.

It was in response to this problem that the FTC consulted with the tobacco industry in an effort to come up with a testing system that would provide consumers with reliable comparative data to evaluate the relative tar and nicotine delivery of different tobacco products on the market.

After significant input from and reliance on the tobacco industry, the FTC believed that the test that became known as the FTC Method was such a system. As a result, in 1966, the FTC issued a press release stating that a statement by a tobacco manufacturer of tar and nicotine content expressed in milligrams of mainstream smoke of a cigarette consistent with the FTC testing method would not be a violation of any provision of law administered by the Commission. Falsely believing that the testing system that became popularly known as the FTC Test Method gave consumers reliable information about the relative tar delivery of different products, in 1970, the FTC proposed a trade regulation rule that would have required disclosure of tar and nicotine ratings in cigarette advertising. That rulemaking was suspended when eight cigarette manufacturers voluntarily and jointly agreed to include the ratings in advertising without government action. The FTC was not a party to that agreement.

Thus, no administrative rule to require the disclosure of tar and nicotine ratings was ever promulgated by the FTC or any other federal agency, and the system of placing tar and nicotine ratings in advertising was never established pursuant to law or regulation. Rather, until the FTC closed down its small lab, the FTC conducted testing and the industry disclosed these numbers voluntarily. This fact was referred to in an opinion rendered by the Honorable Gerhard Gesell of the United States District Court for the District of Columbia, in which he stated that the voluntary agreement has "no legal effect." *Federal Trade Comm'n v. Brown & Williamson Tobacco Co.*, 580 F.Supp. 981,

986 (D.D.C.1983), *aff'd in part,* 778 F.2d 35 (D.C.Cir.1985).

*The Superiority of the Industry's Knowledge.* From the 1960s through the 1980s, the FTC had only a handful of lawyers who had any involvement with overseeing the advertising and marketing of cigarettes. Moreover, the FTC's scientific capabilities were woefully inadequate. The FTC did not employ scientists with special expertise in tobacco and health, and had only one analytical chemist on staff.

In contrast, the cigarette companies had many scientists on their staffs, and contemporaneous documents that were made public in the late 1990s indicated that their expertise on many smoking and health issues that the FTC was trying to investigate or oversee was far superior to that of the FTC. For example, from my review of recently-publicized cigarette industry documents, it is apparent to me that the industry's knowledge regarding compensation and the impact of product design mechanisms was dramatically greater than the FTC's. Moreover, during my tenure at the FTC, the FTC was not aware of the manner or the extent to which the cigarette companies undermined the goal of the machine tests to produce ratings that provided consumers a meaningful way to differentiate between different tobacco products. The companies did this by exploiting their superior knowledge regarding compensation and product design in order to design cigarettes that would register as low tar when tested by the FTC Method but deliver much higher tar and nicotine when smoked by humans. These cigarettes' tar and nicotine delivery in normal use compared to other products bore little or no relation to their relative rating on the FTC administered machine tests.

During my tenure at the FTC, we sought information from the cigarette companies on issues such as compensation, the accuracy of the FTC Method, and related issues. After seeing documents made public in the late 1990s that reflect the state of the industry's knowledge on these and other topics in the 1960s, 1970s and 1980s, it is clear to me that the industry had information that it did not provide to the FTC. As a result, the FTC was misled by the cigarette companies, who concealed a significant amount of information that was relevant to the FTC's understanding of whether the results produced by the test method relied upon by the FTC provided meaningful and not misleading information about the relative level of tar consumers of different tobacco products were receiving and, therefore, would have been invaluable to the FTC in its regulatory efforts.

\* \* \* \* \* \*

The subsequent publication of internal cigarette company documents in the late 1990s indicates that the companies had far greater information about the FTC Method, compensation and design changes than the cigarette companies provided to the FTC, even after the FTC requested disclosure of such information for the purpose of the Barclay investigation. RJR and PM provided the FTC with only the information that was necessary to enable the FTC to conduct the Barclay investigation. In fact, the subsequently-disclosed documents indicate that the companies withheld crucial information that might have changed the FTC's approach both to the Barclay investigation and the continued use of the FTC Method.

Based on my review of these documents as compared with the information that was disclosed to the FTC at the

time of the Barclay investigation, I believe that the FTC was deceived by the cigarette industry as a result of their failure to disclose material information, as well as by their assertion of positions that they knew at the time not to be supported by the information that was available internally to the companies.

*"Light" and Low–Tar Cigarettes.* As far back as the 1981 FTC Staff Report that I supervised, the survey evidence indicated that a large percentage of smokers believed that it had been proven that "light" and "low tar" cigarettes were less hazardous than other cigarettes.

The tobacco companies marketed these products in ways that contributed to the public's belief that these products had been proven to be safer than other products. The descriptors themselves contributed to these impressions, as did the marketing themes that emphasized that certain brands have lower levels of tar on machine tests than other brands.

 Defendants move to exclude entirely the testimony of Mr. Myers. It was excluded in *United States v. Philip Morris,* as "basically a speech, not admissible in evidence." *See United States v. Philip Morris,* 5/16/05 Tr. at 21041–42. The motion to exclude is granted. What the Federal Trade Commission knew, how its smoking test equipment worked, and what information defendants did or did not conceal from it may be proven by documentary evidence and less personally involved experts and through argument to the jury. This testimony and report, even if parts might meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence, are excluded under Rule 403 as cumulative.

### 1. Blaine F. Nye

Dr. Blaine F. Nye is a financial economist and the President of Stanford Consulting Group, Inc., which provides research and consulting services in financial economics and related areas to clients, including government agencies, corporations, and law firms. He has a B.A. degree in physics from Stanford University, an M.S. degree in physics from the University of Washington, an M.B.A. degree from Stanford, and a Ph.D. in finance from Stanford. He has served as a consultant or expert witness in the areas of insurance economics, securities litigation, intellectual property, and economic damage analysis. During the past five years he has provided expert testimony in tobacco trial or cases by deposition.

He was retained by counsel for plaintiffs to provide expert opinions on the following issues, during the period commencing on the first date that defendants began selling "light" cigarettes until the present:

1) The Defendants' need to introduce low-tar cigarette brands, including "light" cigarette brands, in order to bolster Defendants' sales and financial results amid new and increasing public health concerns about smoking; and

2) The correlation of Defendants' stock prices with public announcements regarding both the dangers of smoking and the relative health benefits of smoking "light" or low-tar cigarettes.

His opinion reads in part as follows:

My preliminary opinions are based upon my professional knowledge and experience, as well as on a preliminary review of documents and information relevant to this matter, and analyses of data .... Documents and other materials upon which I have relied as a basis for my opinions are cited in this report and its exhibits; all documents and materials are the type typically relied upon by experts in preparing this type of

report. Analyses that are bases for my opinions are described in this report and its exhibits, and the results of these analyses are also contained herein.

The materials I have relied upon include, in general categories: Plaintiffs' Complaint and other pleadings, news reports, government reports, SEC filings, industry-related documents and other information, analysts' reports, daily stock price data, and daily market index prices. These are the types of materials and data typically relied upon by economists to examine the effects of public information on changes in stock prices and the relationships between changes in stock prices, newly released information, and changes in market effects.

\* \* \* \* \* \*

### III *Summary of Opinions*

1. The Defendants' need to introduce low-tar cigarette brands, including "light" cigarette brands, in order to bolster Defendants' sales and financial results amid new and increasing public health concerns about smoking.

Share price is the present value, on a per-share basis, of the expected future earnings stream of a company that would accrue to the company's shareholders and embodies market expectations about the company's future earnings growth.

My preliminary opinion is that in the absence of low-tar cigarette brands, including "light" cigarette brands, and the sales they generated, the present values of Defendants' expected future earnings streams during the Class Period would have been less than what was observed during Class Period. Thus, Defendants' financial health, as reflected in their share prices and financial statements, would not have been as strong as was observed during the Class Period.

2. The correlation of Defendants' stock prices with public announcements regarding both the dangers of smoking and the relative health of smoking "light" or low-tar cigarettes.

My preliminary analysis indicates that there is a strong correlation between Defendants' stock prices and public announcements regarding either the dangers of smoking or the relative health aspects of smoking "light" or low-tar cigarettes . . . .

### IV. *Statement of Opinions and Bases of Opinions*

#### A. Background

During the early 1960's, government studies in both the United States and Britain concluded that smoking was unhealthful. In March 1962, the British Royal College of Physicians released a report that concluded smoking is a cause of lung cancer and bronchitis and "probably contributes to the development of coronary heart disease and various other less common diseases." Additionally, Readers Digest published an article in June 1962 describing the British report. The impact of these publications on the value of Defendants' stock prices was swift and negative. An event study of the period beginning two months before the release of the Royal College of Physicians report and ending approximately four months after the Readers Digest article was published shows that the tobacco industry both as a whole (minus British-based Brown & Williamson) and individually exhibited statistically significant negative abnormal stock returns during the first ten months of 1962. The new adverse health information contained in the 1962 Royal College of Physicians report was material to investors in Defendants' stock, who subsequently devalued the industry out of fear that

this new information would lead to reduced demand for cigarettes.

Subsequent to the publication of the British report, United States domestic cigarette sales dropped suddenly after the release of the 1964 U.S. Surgeon General's report, which concluded that smoking causes lung cancer. From 1963 to 1964, total domestic unit sales reported by cigarette manufacturers dropped 2.23%, from 516.5 billion to 505.0 billion, and per capita domestic cigarette sales dropped 3.34%, from 4,286 to 4,143, during the same period. Indeed, there is extensive academic research concluding that the adverse health information related to smoking released after 1964 reduced smoking consumption to much less than would have been predicted for the years after 1964.

In addition, published scientific studies in the 1960's began correlating high tar and nicotine levels with an increased risk of developing smoking-related diseases, which led to a growing demand for cigarettes that would deliver lower amounts of tar and nicotine. It is my understanding that Defendants met this newfound consumer demand by introducing "light" brands and marketing them as less dangerous than regular cigarettes. Since the late 1960's, the "light" cigarette has become an increasingly important segment of the cigarette industry. Between 1967 and 1981, the market share of low-tar cigarettes, including "light" cigarettes, rose from 2% to 56%, and by 2000, they accounted for 87.1% of total domestic cigarette sales. Despite the contraction of cigarette sales that occurred immediately after the Surgeon General's report in 1964, as well as a sales decline again in 1969, domestic cigarette unit sales rose every year for the period 1970 to 1981.

In 2004, the Surgeon General concluded that "light" cigarettes are no less harmful than regular cigarettes: "In this report, one major conclusion finds that cigarettes with lower machine-measured yields of tar and nicotine (i.e., low tar/nicotine cigarettes) have not produced a lower risk of smoking-related diseases." In addition, the report concludes that "[s]moking cigarettes with lower machine-measured yields of tar and nicotine provides no clear benefit to health," and "[a]lthough characteristics of cigarettes have changed during the last 50 years and yields of tar and nicotine have declined substantially, as assessed by the Federal Trade Commission's test protocol, the risk of lung cancer in smokers has not declined."

**B. The Defendants' need to introduce low-tar cigarette brands, including "light" cigarette brands, in order to bolster Defendants' sales and financial results amid new and increasing public health concerns about smoking.**

As Defendants' research on consumer sentiment demonstrates, smokers were acutely aware of the health risks they faced from higher tar and nicotine levels during the Class Period. As Brown & Williamson's advertising agency noted in 1967:

> Psychologically, most smokers feel trapped. They are concerned about health and addiction. Smokers care about what commercials say about them. Advertising may help to reduce anxiety and guilt.

A Brown & Williamson marketing study in 1977 noted, "Almost all smokers agree that the primary reason for the increasing acceptance of law 'tar' brand is based on the health reassurance they seem to offer." And a 1976 study prepared by Philip Morris found that 74% of smokers cited specific brands as "better for health" on the basis of "less/low-

er in tar and nicotine" or "less/lower in tar."

The manner in which low-tar cigarettes, including "light" cigarettes, were marketed during the Class Period points to the fact that they were publicly perceived as an alternative to quitting. As the National Cancer Institute found, "(light) brands were targeted at those smokers who were thinking of quitting in an effort to intercept the smokers and keep them smoking cigarettes." An ad for R.J. Reynolds' Vantage brand in 1974 declared, "To smoke or not to smoke, that is the question. With all the slings and arrows that have been aimed at smoking, you may be wondering why you smoke at all. The cigarettes of the past provided a lot of smoking pleasure but they also delivered a lot of the 'tar' and nicotine the critics have aimed at. But now Vantage has entered the scene. Vantage is the cigarette that succeeds in cutting down 'tar' and nicotine without compromising flavor." Along a similar theme, Lorillard's brand True was advertised with the slogan, "Considering all I'd heard, I decided to either quit or smoke True. I smoke True."

Defendants' own research of consumer sentiment demonstrates that smokers perceived low-tar cigarettes, including "light" cigarettes, as an alternative to quitting. BAT noted that "[i]t is useful to consider lights more as a third alternative to quitting and cutting down—a branded hybrid of smokers' unsuccessful attempts to modify their habit on their own." A Study prepared for Philip Morris found, "In point of fact, smoking an ultra low tar cigarette seems to relieve some of the guilt of smoking and provide an excuse not to quit."

Evidence of smokers choosing low-tar cigarettes, including "light" cigarettes, over "full-flavor" cigarettes is apparent by the trend in market share of low-tar cigarettes, including "light" cigarettes, during the Class Period. Between 1967 and 1981, the market share of low-tar cigarettes, including "light" cigarettes, rose from 2% to 56%, and by 2000, they accounted for 87.1% of total domestic cigarettes sales.

During the Class Period, investors viewed low-tar cigarettes, including "light" cigarettes, as a primary component of Defendants' earnings growth. An R.J. Reynolds executive quoted in a trade magazine in 1977 stated: "[t]he low 'tar' market is where the action is today ... and I firmly believe the company that leads in this category will lead the tobacco industry." Additionally, a Philip Morris internal marketing plan titled "Five Year Plan 1979—1983" stated that one of the company's domestic objectives was to "[o]ffer a full line of products to insure the capability to respond to changing market conditions," and to "[c]ontinue to emphasize products positioned in growth segments (such as low-tar)." This document additionally projected that "growth in the low-tar segment is expected to be the most significant category trend," and that "[n]ew products ... will all be in the low-tar category ...." Analysts following the tobacco industry for securities firms during the Class Period also had noted the importance of the low-tar segment to the Defendants. According to a securities analyst quoted in a 1977 Wall Street Journal article, "The winner of the low-tar derby will be the market leader in the next 10 years ... '[I]n the foreseeable future,' a cigarette company has to be a strong participant in the low-tar market to maintain profit margins ...."

During the Class Period, low-tar cigarettes sales, which include "light" cigarette sales, came not just from smokers

who were looking for a healthier alternative to "full-flavor" cigarettes, but from all market segments. According to another securities analyst quoted in the 1977 Wall Street Journal article noted above, "[l]ow-tar cigarettes used to be like the diet soft drinks, in vogue among the older folks who are worried about their health; now they have become a product of more general interest." This statement is consistent with the growing market share of low-tar cigarettes, including "light" cigarettes, during the Class Period, culminating with the near–90% market share they have today.

Based on the evidence cited above, public perception during the Class Period was that had Defendants not sold low-tar cigarettes, those smokers who chose to smoke low-tar cigarettes, including "light" cigarettes, would no longer have had an "excuse not to quit." In other words, investors believed that low-tar cigarettes, including "light" cigarettes, met consumer demand for a product that could mitigate existing fears about the correlation of higher tar and nicotine levels with an increased risk of developing smoking-related diseases, thereby allowing Defendants to retain otherwise lost sales and achieve high earnings growth during the Class Period.

In the absence of low-tar cigarettes, including "light" cigarettes, and the sales they generated, the present values of Defendants' expected future earnings streams would have been less than what was observed during the Class Period.

## C. The correlation of Defendants' stock prices with public announcements regarding both the dangers of smoking and the relative health aspects of smoking "light" or low-tar cigarettes.

According to the Efficient Capital Markets Hypothesis, securities prices in efficient markets incorporate all available public information. One way to determine whether prices incorporate new and relevant publicly available information is to conduct an event study to identify causes of significant changes in the price of a stock, net of market effects, and examine what information was disclosed about a company's financial condition and prospects immediately preceding these price changes. I have employed an event study in order to determine whether new public announcements regarding either the dangers of smoking or the relative health aspects of smoking "light" or low-tar cigarettes contain relevant information to Defendants' financial health, thereby significantly impacting Defendants' stock prices. The analysis entails regression analysis and an event study, which are described in the Appendix to this report.

My preliminary analysis indicates that there is a strong correlation between changes in Defendants' stock prices and public announcements regarding either the dangers of smoking or the relative health aspects of smoking "light" or low-tar cigarettes. The following examples illustrate this relationship.

On September 16, 1963, the New York Times reported that a leading Washington newsletter warned that an impending government report linking smoking to cancer and heart conditions (i.e. the January 11, 1964, U.S. Surgeon General's report) could be more severe than originally expected. The shares of Philip Morris, R.J. Reynolds, Lorillard, and American Tobacco each declined significantly on that date. Philip Morris' share price decline from $75.875 on September 13, to $74.000 on September 16, a decline of 2.5%. R.J. Reynolds share price declined from $40.250 on Septem-

ber 13, to $38.500 on September 16, a decline of 3.9%. American Tobacco's share price declined from $28.125 on September 13, to $27.250 on September 16, or a decline of 3.1%.

Later that same year, on November 11, 1963, Dr. Theodor Abelin, a Harvard epidemiologist, presented the results of his analysis, which concluded that the life expectancy of white American men 50 years of age would be 1.4 years greater if none of the smoked. Additionally, on November 11, 1963, the U.S. Surgeon General stated that the U.S. report on the relationship between smoking and disease (i.e. the January 11, 1964, U.S. Surgeon General's report) would be issued by the end of the year. Lorillard's share price declined from $45.375 on November 11, to $43.750 on November 12, a decline of 3.6%. Liggett and Myers' share price declined from $73.250 on November 11, to $70.750 on November 12, a decline of 3.4%.

Following a Federal Communications Commission announcement on January 9, 1964, that it was considering acting on its own to regulate cigarette advertising on radio and television in light of the January 11, 1964, U.S. Surgeon General's report (which warned of cigarettes' part in causing cancer and other diseases), several Defendants' shares declined significantly. Philip Morris' share price declined from $73.000 on January 17, to $70.750 on January 20, for a decline of 3.1%. R.J. Reynolds' share price declined from $40.625 on January 17, to $39.000 on January 20, a decline of 4.0%. Lorillard's share price declined from $43.000 on January 17, to $40.875 on January 20, a decline of 4.9%. Liggett and Myers' share price declined from $74.125 on January 17, to $72.250 on January 20, a decline of 2.5%. American Tobacco's share price declined from $27.625 on January 17, to $26.625 on January 17, to $26.500 on January 20, a decline of 4.1%.

On February 5, 1970, an experiment conducted by American Cancer Society scientists found that 12 out of a sample of 86 dogs taught to smoke cigarettes developed lung cancer. The ACS said the findings "effectively refute contentions by cigarette manufacturing interests that there was not cigarette-cancer link, and any claims to the contrary were only 'statistical.'" Philip Morris' share price decline from $34.000 on February 4, to $31.500 on February 5, a decline of 7.4%. R.J. Reynolds' share price declined from $41.375 on February 4, to $38.000 on February 5, a decline of 8.2%. Liggett and Myers' share price declined from $32.375 on February 4, to $31.125 on February 5, a decline of 3.9%. American Tobacco's share price declined from $33.125 on February 4, to $31.250 on February 5, a decline of 5.7%.

Not all news concerning health-related issues and smoking adversely affected Defendants' stock prices. On April 17, 1963, the New York Times reported that resurgence in tobacco shares was attributed to the favorable acceptance of Liggett and Myers' new king-size filter Lark cigarettes, which was being test-marketed in Columbus, Ohio and upstate New York. The New York Times also noted that Liggett had announced in the previous month that it believed the new brand offered more protection against the volatile ingredients in smoke. Several Defendants' shares rose significantly. Philip Morris' share price increased from $86.000 on April 16, to $88.250 on April 17, an increase of 2.6%. R.J. Reynolds' share price increased from $44.750 on April 16, to $46.250 on April 17, an increase of 3.4%. Lorillard's share price increased from $53.500 on April 16, to $54.875 on April 17, an increase of 2.6%.

Liggett and Myers' share price increased from $77.500 on April 16, to $81.125 on April 17, an increase of 4.7%. American Tobacco's share price increased from $32.500 on April 16, to $33.875 on April 17, an increase of 4.2%.

On October 13, 1966, a member of the U.S. Surgeon General's advisory committee spoke of a "breakthrough" in isolating a major cancer-causing element in cigarette smoke. Later that day, the member clarified his remarks, stating that he intended to imply that additional identification and isolation of harmful agents can generally be expected from the research efforts undertaken after the Surgeon General's report was made public, not that any specific "breakthrough" was imminent. Despite the confusion surrounding these public announcements, several of Defendants' stock prices reacted positively and significantly to the prospect of healthier cigarettes. Philip Morris' share price increased from $28.000 on October 13, to $29.750 on October 14, an increase of 6.3%. R.J. Reynolds' share price increased from $35.500 on October 13, to $37.625 on October 14, an increase of 6.0%. Liggett and Myers' share price increased from $69.000 on October 13, to $71.500 on October 14, an increase of 3.6%. American Tobacco's share price increased from $30.625 on October 13, to $32.375 on October 14, an increase of 5.7%.

Similarly, on July 12, 1967, Defendants' stock prices rose sharply on reports that Columbia University would announce a new development related to the reductions of health hazards of cigarette smoking the following day. On July 13, 1967, Columbia University officially announced that it had acquired the rights to a "revolutionary new cigarette filter which reduces inhaled tar and nicotine to one-third or less of the level attained by conventional filters." Philip Morris' share price increased from $50.375 on July 11, to $53.750 on July 12, an increase of 6.7%. R.J. Reynolds' share price increased from $39.000 on July 11, to $42.500 on July 12, an increase of 9.0%. Lorillard's share price increased from $60.000 on July 11, to $63.375 on July 12, an increase of 5.6%. Liggett & Myers' share price increased from $74.000 on July 11, to $75.750 on July 12, an increase of 2.4%. American Tobacco's share price increased from $34.000 on July 11, to $36.250 on July 12, an increase of 6.6%.

The next day, in response to the Columbia University [report], the U.S. Surgeon General said late on July 13, 1967 that no cigarette filter could give complete protection even it removed all of the tars and nicotine from the smoke. Several Defendants' stock prices declined significantly. Philip Morris' share price declined from $54.000 on July 13, to $51.750 on July 14, a decline of 4.2%. R.J. Reynolds' share price declined from $44.000 on July 13, to $42.000 on July 14, a decline of 4.5%. American Tobacco's share price declined from $37.500 on July 13, to $36.000 on July 14, a decline of 4.0%.

Event study analysis confirms that significant changes in Defendants' share prices, after netting market effects, were associated with unexpected material new information concerning both the dangers of smoking and the relative health aspects of smoking "light" or low-tar cigarettes on the dates mentioned in this section.

 This report is based upon a standard analysis. Blaine F. Nye was qualified to make the analysis and appears to have made it in good faith with an appropriate effort at accuracy. His report and proposed testimony comply with Rules 702

and 703 of the Federal Rules of Evidence. No reason proffered by defendants supports exclusion.

### m. Richard W. Pollay

Defendants continue to challenge the report of Dr. Richard W. Pollay even though the court had already found his report and proposed testimony admissible. He is currently Professor Emeritus of Marketing at the Sauder School of Business, University of British Columbia, where he is also Curator of the History of Advertising Archives. He has an MBA in Marketing and a Ph.D. in Consumer Behavior, both from the University of Chicago. He has published research extensively for over 35 years in the areas of advertising and its effects, consumer attitudes toward advertising and advertising history. He has taught courses at the undergraduate, MBA and Ph.D. levels concerning advertising and its practical management and related research methodologies, both in commercial practice and in academic research. He serves on the editorial boards of, and reviews manuscripts for, many academic journals. He lists a huge bibliography relevant to his proposed testimony, including publications on tobacco.

As Curator of the History of Advertising Archives, he is responsible for the Tobacco Industry Promotion Series (TIPS), an extensive collection of materials on cigarette promotion. TIPS includes (a) over 10,000 U.S. cigarette ads and related merchandising materials, (b) related documents obtained in the course of serving as an expert witness in various trials, (c) notes taken from both tobacco and advertising trade sources (e.g., *Advertising Age, Advertising & Selling, Marketing and Media Decisions, Printers' Ink,* and various United States tobacco journals), (d) compilations of research done by others, and (e) a special interest library on tobacco advertising, including government reports.

For the past 15 years he has been working extensively on cigarette advertising and its history, publishing over 100 research work products as working papers or in peer reviewed journals. In general these concern the promotional tactics employed by the cigarette industry and the psychology of persuasion. Of note are his contributions on the role of advertising to the United States Surgeon General's Reports on youth (1994), minorities (1998), and women (2000). He has also written on the marketing of "light" cigarettes for the National Cancer Institute ("NCI") (2000). In 2001 this included serving as a co-author of Monograph 13. Other research and reports have explored current practices and historical aspects of various aspects of cigarette marketing such as the targeting of youth, the targeting of racial minorities, the failures of self-regulation, the use of public relations, the marketing of filtered and seemingly safer "low yield" cigarettes, and event sponsorships and promotion.

Dr. Pollay's report reads in part as follows:

### SCOPE OF THE REPORT AND OVERVIEW

6. This report concerns the evidence I am aware of regarding the marketing and advertising of cigarettes and the efforts of companies in the cigarette industry to convey a health reassurance message to consumers. This is based primarily upon previously published research, my experience serving as an expert witness in both trials assessing the constitutionality of Federal Canadian law regarding cigarette advertising, and my review of advertising, marketing, and internal company documents from the sources noted above.

7. This report will show that the cigarette companies, through marketing and advertising for various cigarettes, and low tar and light cigarettes in particular, intended to convey the perception that such cigarettes were safer and/or healthier alternatives to regular or full-flavor cigarettes.

## THE FUNCTIONS AND MANAGEMENT OF CIGARETTE ADVERTISING

8. This review of the role of advertising in cigarette marketing provides: (a) definitions and descriptions of advertising and promotional management terminology; (b) an historical perspective on cigarette advertising and its impact; and (c) a systematic understanding of cigarette advertising management in the contemporary period. The principles of advertising and its management, which are universal to all jurisdictions, are illustrated by reference to internal tobacco company documents. These documents serve to illustrate examples of the industry's targeting of health concerned smokers to offer them false reassurances. Before discussing these practices in detail, some definitions and a historical overview of cigarette advertising are in order.

9. The world of advertising is immensely diverse in styles, forms, and functions. This diversity results from the range of human enterprise, the heterogeneity of consumers, the variety of situations for advertisers, the multiple advertising media, the several possible purposes for advertising, and the creativity of the professional creators of advertising. What this diversity shares is the identified sponsor and the sponsor's ultimate interest in inducing sales. Advertising is the professional execution of commercial communications.

10. Advertising has been defined by the American Marketing Association as "Any paid form of non-personal presentation and promotion of ideas, goods or services by an identified sponsor." It is derived from the Latin advertere, meaning to turn [the mind]. A prominent textbook elaborates: "Advertising is salesmanship, and it is paid for by a firm, a person or a group with a particular point of view. The message advocates that point of view, and its goal is to create awareness, attitude, or behavior that is favorable to that advocacy position. The message attempts to inform and to persuade; it is intentionally biased, and there is no intent to present a balanced point of view.'"

11. While the generation of sales and profits is the ultimate justification for corporate advertising spending, the goals of advertising are often defined in terms of intermediate goals and stages instrumental to ultimate sales. Advertising and consumer behavior texts, for example, discuss advertising to promote consumer awareness, interest and desire, to place a brand in consumers' memories, or to change consumer attitudes and images in various ways. Advertising seeks to enhance the consumers' perceptions of the product. It chooses words and pictures carefully to glamorize the product and/or its users, to induce purchase and consumption as the result.

12. Why do firms advertise? The obvious and most general answer is that firms advertise because it is profitable for them to do so. Firms spend budgets on promotional efforts if, and only if, they believe that the benefits—long term profits from that spending—outweigh the costs.

13. The selection and creation of specific advertising media and messages

will depend on a situational analysis, the nature of the target audience, and the specific goals of each component in an ad campaign. Different situations, such as the brand history, the competitive circumstances, cost constraints, or the product advantages may determine strategy. So too may knowledge of the target audience's age, brand awareness, income, attitudes, product experience or predispositions. Advertising could seek awareness (curiosity or reminder), attitudinal change (images and beliefs), changes in affect (feelings), and/or action (buying or consuming). Different audiences and goals suggest different tactical choices in messages and media.

14. Advertising creative strategy must specify at least the target market (audience), the essential and supporting message ideas, and the tone and style of the advertising. This strategy statement, also sometimes known as a creative briefing or copy platform, informs the creative staff of the advertising agency: the copywriting and art directors. Notable in most advertising creative guidelines is the emphasis on the visual component of the ads. The so-called "lifestyle" advertising provides imagery that is rich in connotations. The choice of models, setting and activities can not only display attractive people as consumers of a brand, but can also display attitudes, emotional experience, social status, etc.

15. Research plays an important role at every stage of the advertising planning process. It guides the strategic choices and tactical executions. A great variety of research techniques are commonly used, ranging from interviews and small group discussions to large surveys; from paper and pencil questionnaires to high technology covert observations. These can provide many benefits, such as analyses of the various population segments, psychological insights and profiling of target consumers, pretesting of alternative advertising concepts, shaping advertising media plans, verifying the attention getting power of advertising visuals, determining the impression created by the visual imagery, and testing the impact of an ad or campaign after deployment.

16. The results aid strategic decision making and the positioning (portraying) of various products offered, the overall strategy being to offer a great variety of products so that each consumer can find a product that seems almost custom made for his or her self image and lifestyle. Consumer research helps identify ways of "positioning" the products so that the ad target audience will perceive it as meeting their needs, fitting their self image and attractive.

## THE HISTORY OF CIGARETTE ADVERTISING AND MARKETING

17. Only a long term historical perspective allows for the full appreciation of cigarette advertising and marketing's impacts. Many of advertising's major effects are gradual and cumulative over time, effecting psychological changes such as attitudes and images. The total impact of advertising cannot be seen and appreciated in studies with a short time focus, such as studies of a single campaign or a single ad. That being said, it is necessary to review the history of cigarette marketing and advertising generally in order to understand the marketing and advertising for light cigarettes in particular.

18. As discussed in more detail below, the cigarette companies have been aware of smokers' desires for "health reassurance" since the 1950s at the latest, with some brands making health claims and using athletes and doctors

and nurses in ads in the 1930s and 1940s. The cigarette companies have targeted smokers seeking a health reassurance by marketing and advertising purportedly safer cigarettes such as filtered cigarettes, menthol cigarettes, low tar cigarettes, and ultimately light cigarettes with explicit and implicit health claims.

## A. Cigarette Companies Initially Responded to Smokers' Desires for Health Reassurance with Filtered Cigarettes

19. During the early 1950s, scientific and popular articles that presented lung cancer research findings initiated what the tobacco industry termed the "health scare," as consumers became increasingly concerned about the potential health risks incurred from smoking.

20. The cigarette companies initially responded to this health scare by introducing filtered products, which purportedly reduced harmful constituents of smoke. In 1952, Lorillard introduced Kent, in 1953 Liggett introduced L & M, and in 1954, Philip Morris, R.J. Reynolds, American Tobacco, and Brown & Williamson followed with their own filter brands. By 1954, filtered cigarettes had grown to 10% of the cigarette market. Soon thereafter, new menthol-filtered products were also introduced, such as Salem, Newport and Oasis, capitalizing on the healthful reputation that menthol already had, due to its use in cold remedies and related medicinal applications.

21. Advertising during the early 1950s promoted filters as the technological fix to the health scare and contained health-related statements that varied in explicitness. For example, a Viceroy advertisement proclaimed, "The Nicotine and Tars Trapped by Viceroy's Double–Filtering Action Cannot Reach Your Throat or Lungs!" and that it was "Bet-

ter for Your Health." Kent advertisements claimed, "sensitive smokers get real health protection with new Kent" and "[Kent] takes out more nicotine and tars than any other leading cigarette." Advertisements for other brands of cigarettes stated, "Just What the Dr. Ordered" (L & M), "Inhale to your Heart's Content" (Embassy), "No adverse effects to the nose, throat and sinuses from smoking Chesterfield," and "The Secret to Life is in the Filter" (Life) . . . .

22. In 1955, in response to conflicting claims regarding tar and filtration, the FTC published Cigarette Advertising Guides which banned all mention of tar, nicotine, and filtration when "not established by competent scientific proof." The Cigarette Advertising Guides also banned references to "throat, larynx, lungs, nose or other parts of the body," and to "digestion, energy, nerves or doctors."

23. After 1955, cigarette advertisements stressed good taste, flavor, and enjoyment using language implying relative safety such as describing filters as effective, complete, superior and yielding smoke that was described as softened, gentled, mild or smooth, and delivering "more of what you smoke a filter for" (Viceroy). Analogies were made to filtration systems for water purification, hospital operating rooms and atomic submarine air quality. Parliament sold its "extra margin" of filtration by comparisons to car seat belts, helmets and other safety gear. Because the cigarette manufacturers knew that health fears persisted, filtered brands were advertised heavily, capitalizing on the health image these cigarettes had acquired prior to imposition of the Cigarette Advertising Guides . . . .

## B. The Cigarette Companies Touted the Reduction in Tar as a Health Benefit

24. In 1957, Reader's Digest published two articles regarding the effectiveness of filters and setting forth tar and nicotine yields of various brands for the first time since 1952. These articles concluded that the tar and nicotine yields of many filtered cigarettes were no better than those of non-filtered cigarettes. These articles set off the famous "Tar Derby," a period during which Reader's Digest and Consumer Reports published regular reports on tar and nicotine yields of different cigarette brands leading cigarette manufacturers to drastically cut tar levels in order to gain a competitive advantage. After remaining virtually unchanged for three decades, sales-weighted tar and nicotine yields dropped substantially during this period.

25. Advertising during the Tar Derby shifted to emphasis on tar and nicotine reduction. The cigarette companies relied on the tar and nicotine yields reported by Reader's Digest and Consumer Reports as "scientific proof" in order to comply with the Cigarette Advertising Guides. Manufacturers took advantage of reported tar and nicotine yields to establish themselves as "healthy" during a period of intense advertising claims, with advertising containing competing claims such as "lowest tar of all low-tar cigarettes," "today's Marlboro— 22 percent less tar, 34 percent less nicotine," "significantly less tars and nicotine than any other leading filter brand," and "less tars and more taste ... they said it couldn't be done." ....

26. While the industry had explicitly catered to the general public's health fears, some began to worry that touting the health benefits of low tar cigarettes could hurt the cigarette industry as a whole. In 1958 the Tobacco Industry Research Committee ("TIRC") called upon the cigarette companies to downplay the health attributes of low tar cigarettes because of the negative implications such advertising raised for cigarettes in general. In a letter from C.C. Little, Scientific Director of the TIRC, to Tim Hartnett, Chairman of the TIRC, dated August 26, 1958, Director Little wrote: "As Scientific Director of the Tobacco Industry Research Committee it is my duty to warn the members of that body of the serious and dangerous effects on its research program if the present trend continues toward the emphasis on 'tar reduction' in advertising of cigarettes." The letter acknowledges the perceptions of the public and the scientific community that " 'tar' reduction is advanced as a specific preventive or ameliorative measure." Director Little insisted that publicity measures be taken in order to distance the tobacco industry from the very health claims that it was seeking to profit from: "Although this serious danger exists, I believe that it can and should be eliminated by prompt and unanimous action by the industry" through an announcement to the public that "the increase in manufacture of filtered cigarettes is a response to public demand and to *nothing else*."

27. Despite these concerns, the cigarette industry continued to heavily promote the filtered and reduced tar cigarettes that consumers now reasonably presumed to be healthier/safer. Advertising expenditures increased substantially during this period, rising by 179% between 1950 and 1960. Of this, a disproportionately greater amount was for these filtered and "new, improved" products as the firms withdrew advertising support for the traditional unfiltered

brands and product varieties, fading in market potential.

28. In 1960, the cigarette companies entered into a voluntary agreement with the FTC which thereafter prohibited tar and nicotine claims in advertising, concluding the Tar Derby. The conclusion of the Tar Derby resulted in another shift in advertising, as described in *Printer's Ink*, the leading trade journal of the advertising industry at the time:

> The pendulum swung back again in cigarette advertising during 1960, completely erased, at the "urging" of the Federal Trade Commission, are the boxscores on tar and nicotine. Once more the industry is back to its traditional and usually successful course—advertising flavor, taste and pleasure against a backdrop of beaches, ski slopes and languid lakes. It is a formula that works, as all-time sales show .... And this new mood in advertising will probably prevail for some time, now that the FTC has insisted that wildly competitive copy is generally distasteful.

29. For the next several years, cigarette advertising lacked references to tar and nicotine. Since there was no longer any competitive advantage to doing so, the cigarette companies stopped reducing tar and nicotine levels and, in some cases, began to increase them. Kent, for example, went from 14 mg. in 1961 to 16 mg. in 1963 and 19 mg. in 1966.

30. In response to the FTC's prohibition on explicit tar and nicotine claims, and fearing the legal consequences of explicit health claims, internal tobacco company documents began to contain discussions about the need for implied health reassurances in marketing and advertising.

## C. The Cigarette Companies Sought to Capitalize on the Perceived Health Benefit of Reduced Tar Through the Introduction of Low Tar and Light Cigarette Products

31. Another surge in the health scare occurred in 1964 when the first Surgeon General's Report on Smoking and Health established cigarette smoking as the cause of lung cancer. The cigarette companies were well aware, based upon market research they conducted, of smokers' desires for health reassurance as well as the perceived health benefit of low tar cigarettes.

32. In the late 1960s, the cigarette companies began recognizing that a large proportion of smokers had health concerns that could be assuaged by new products consumers perceived as safer. For example, Philip Morris concluded, "The illusion of filtration is as important as the fact of filtration .... Therefore any entry should be by a radically different method of filtration but need not be any more effective."

33. The cigarette companies sought to capitalize on and target smokers' health fears with the introduction of new low tar and light cigarettes that would be perceived as safer. The term "light" was intentionally chosen to mean lower tar. Within a few years the connection between "light" and "low tar" had become so solidified that "[p]erceptually, category consumers do not currently seem to differentiate between 'Lights' and 'Low Tars' as product modifiers. Each appears to communicate that the 'brand' is lower in tar than cigarettes in another sub-category." In fact, each pack of Marlboro Lights had the phrase "Lowered Tar & Nicotine" printed on it from 1971, when they were introduced to the market until 2003.

34. The cigarette companies knew that health was the motivating factor for smokers switching to lower tar brands:

Those who smoked their current brand for less than a year switched for health purposes—to reduce the tar and nicotine level instead of quitting. Most smokers ... do not really understand what tar and nicotine are, or the difference between the two. "Tar and nicotine" is a term commonly used as a single word . . . .

Those who smoke low tar and nicotine cigarettes generally do so because they believe such cigarettes are "better for you"—there is less tar and nicotine to do long-term damage.

The very fact, then, that a smoker has decided to switch from a full-flavor cigarette to a low delivery cigarette tells us something very important about him: he is concerned about his health, and he is willing to do something about it.

35. The cigarette companies also knew that successful advertising had to allay consumers' fears about smoking: "[A]dvertising for low delivery ... should be constructed so as not to provoke anxiety about health, but to alleviate it, and enable the smoker to feel assured about the habit and confident in maintaining it over time."

36. Since the introduction of low tar and light cigarettes, and continuing to the present, the cigarette companies have intentionally marketed and advertised these cigarettes to convey a health benefit over regular, full flavor cigarettes. As discussed in more detail below, the health benefits of low tar and light cigarettes have been portrayed by a variety of means, as follows: in light-colored packaging and advertisements; claiming low tar yields; with claims of technological breakthroughs; using pristine imagery; in comparison to regular, full-flavor cigarettes; as alternatives to quitting; and in analogy of other health seeking behavior.

**Light Colors.** White or pale colors have been used in advertising to communicate light and low tar brands: " 'Light-lighter-lightest' were achieved by insistence on lighter presentations—product story imagery—white packs—pale colours—mildness dominated copy." For example, through most of the 1990s, the Parliament Lights advertising campaign consistently used models dressed in all white placed in white environments. Kent, Marlboro Lights, More Lights, Pall Mall Lights, Virginia Slim Lights, Cambridge have similarly used white and pale colors in advertising. White or pale colors have similarly been used in packaging to communicate light and low tar brands: "Red packs connote strong flavor, green packs connote coolness or menthol and white packs suggest that a cigaret [sic] is low-tar. White means sanitary and safe."

**Touting Low Tar Yields.** Low tar and light cigarette ads touted low tar numbers, with some even claiming to have the lowest tar of any brand on the market: "Only 11 mg tar" (Benson & Hedges Lights); "Kent Golden Lights; Lowest in Tar of All These Low–Tar Brands"; "Only 8 mg Tar" (Kent Golden Lights Menthol); and "A third less tar than the leading filter 85" (Pall Mall Light 100). Most recently Carlton had encouraged ad viewers to "Think of Number 1."

**Science and Technology.** When Merits were introduced to the marketplace, the advertising was designed "to communicate the technological breakthrough which MERIT represented .... To achieve these goals, a bold and aggressive strategy was devised featuring

headlines and ads that had scientific substance and validity .... The ads were written in a journalistic, reportorial style to be precise, pointed, and absolutely believable .... Newspapers and magazines were utilized nationwide to get the complete product story to consumers. Massive outdoor billboard displays, subway signs, taxi-tops and exterior bus posters would be used to create brand awareness." ....

**Pristine Imagery.** Pristine imagery ... ha[s] been used [to] convey[ ] ... lightness and healthfulness. For example, ads for Marlboro Ultra Light, Pall Mall Light, Raleigh Light, Merit Ultra Lights have featured pictures dominated by fresh air, water, and mountain scenes. Merit was careful to avoid any suggestions of danger. "[I]n 1983, we adopted the sea campaign ... we showed young people on pleasure boats enjoying their leisure time and smoking Merit. We deliberately tried to avoid dangerous looking water." ....

**Comparisons to Regular, Full–Flavor Brands.** Many light cigarette advertisements stressed that the product was merely a lower tar version of the original brand, thereby implying a health benefit in comparison to the regular counterpart: "New Camel Lights 100's! The satisfaction of Camel Lights 100's solves the low tar/low taste problem"; "The spirit of Marlboro in a low tar cigarette"; "The only low tar menthol cigarette with Salem satisfaction. Enjoy the satisfying cool taste you expect from Salem. Salem Lights and Lights 100's, the Lights that say enjoy"; "What's in a name? Satisfaction. If the name is Camel. All the flavor and satisfaction that's been missing in your low tar cigarette. With a name like Camel Lights, you know exactly what to expect" ...

**Alternatives to Quitting.** Light and low tar cigarette advertisements as an alternative to quitting, thereby implying it was just as safe to smoke such cigarettes as to quit. A True advertisement proclaims, "Considering all I'd heard, I decided to either quit or smoke true. I smoke True." Similarly, a Vantage advertisement states:

> To Smoke or not to smoke. That is the question. With all the slings and arrows that have been aimed at smoking you may well be wondering why you smoke at all. If you don't smoke nobody is going to urge you to start. But if you do smoke, you may enjoy it so much you don't want to stop. There's the rub. Because if you do smoke, what do you smoke? The cigarettes of the past provided a lot of smoking pleasure but they also delivered a lot of the 'tar' and nicotine critics have aimed at. And most of the new wave brands with low 'tar' and nicotine taste like a lot of hot air. But now Vantage has entered the scene. Vantage is the cigarette that succeeds in cutting down 'tar' and nicotine without compromising flavor. While Vantage isn't the lowest 'tar' and nicotine cigarette you'll find, it certainly is the lowest one you'll enjoy smoking. If you smoke, try a pack of Vantage. And if you don't, why not show this ad to someone who does. It might settle the question.

**Comparisons to Other Health Seeking Behavior, e.g., Dieting.**

Advertisements have compared smoking low tar and light cigarettes to healthful activities as a mean of conveying a health benefit. For example, a Doral ad equated smoking low tar cigarettes to dieting:

> How I lost 700 mg. of 'tar' the first week ... without losing out on taste.

I'm not too big in the willpower department. But I lost 700 milligrams of 'tar' the first week on what I call 'The Doral Diet.' Now I can still enjoy smoking, and cut down on 'tar' and nicotine, too. Doral satisfied my appetite for smoking because it tastes good. Compared to what I used to smoke, each Doral cigarette is 5 milligrams lower in 'tar.' For a pack a day smoker like me, my Doral Diet really adds up.

\* \* \* \* \* \*

37. As evidenced above, many low tar and light cigarette advertisements use implicit, indirect, and/or incomplete claims and encourage consumers to draw their own conclusions as to products benefits. Such advertisements are likely to be more persuasive than advertisements that actually draw the conclusion for the consumer. For example, if Marlboro Lights are said to have less tar and nicotine and if it is understood that tar and nicotine have negative health consequences, the smoker is led syllogistically to the conclusion that Marlboro Lights must be healthier because they contain less of the "bad stuff."

38. The cigarette companies' enormous advertising budgets have facilitated the pervasive exposure that is critical to successful advertising . . . .

39. The nature of cigarettes both advertised and purchased changed over the decades with low tar/light cigarettes coming to dominate both categories . . . .

### CONCLUSION

40. Since the 1950s at the latest, the cigarette companies have been aware of smokers' growing health concerns and their corresponding need for health reassurance. The cigarette companies have touted the purported health benefits of new brands and technologies such as filtered cigarettes, menthol cigarettes, low tar, and ultimately light cigarettes, in order to capitalize on smokers' needs for health reassurance.

The cigarette companies used marketing and advertising to target those smokers seeking to convey health reassurance. The cigarette companies were very concerned with creating the perception of healthfulness whether or not they actually had a safer or healthier cigarette to market.

41. The advent of light cigarettes simply represented a new product development, which allowed the companies to further capitalize on smokers' health concerns. As with filtered cigarettes, menthol cigarettes, and low tar cigarettes, advertising for light cigarettes was intended to convey health and/or safety attributes, albeit through more implicit means.

■■■ Defendants contend that Dr. Pollay should not be permitted to opine about the intent of defendants based on their advertising. As an expert in marketing he is qualified to infer from the nature, timing, and intensity of an advertising campaign what the intention of the advertisers was. While this court believed on early admissions that the meaning of internal documents of defendants could not be the basis for his opinion, it now concludes that such documents, if they are the normal kinds of documents used in deciding upon an advertising campaign, may be used by the witness to support his opinions as to the nature and intention of the advertising.

Since, as Dr. Pollay concludes, skillful advertisers design their campaign to communicate ideas and feelings to the public they seek to influence, Dr. Pollay can use his expertise to infer from the content of the advertisements how the typical smoker

or potential smoker would have understood the defendants' communications.

Defendants' experts and their analysis take a position contrary to Dr. Pollay. The jury is in a position to decide. Richard W. Pollay's opinion and proposed testimony meet the requirements of Rules 702 and 703 of the Federal Rules of Evidence.

n. Robert N. Proctor

Dr. Robert N. Proctor provided a report dated February 28, 2005 and another dated December 18, 2005, elaborating on the earlier report. He is a Professor of the History of Science at Stanford University, and a tenured member of the History Department at that university. He holds a doctoral degree in the History of Science from Harvard University and is the author of four books on the history of science and dozens of articles in peer-reviewed academic journals, including journals of history, science, medicine, and public health. He has won several prizes for scholarship, including the Arthur Viseltear Prize from the American Public Health Association and the General Anthropology Award from the American Anthropological Association. He has held fellowships or grants from the Simon Guggenheim Memorial Foundation, the National Science Foundation, the National Institutes of Health, the Holocaust Memorial Museum, the National Library of Medicine, the Max Planck–Institute for the History of Science in Berlin, the Howard Foundation, the Hamburg Institute for Social Research in Germany, the National Center for Human Genome Research, the National Endowment for the Humanities, the Center for Advanced Study in the Behavioral Sciences at Stanford, the American Council of Learned Societies, the Andrew Mellon Foundation, the Woodrow Wilson Foundation (as Charlotte W. Newcome Fellow), and the Shelby Cullom Davis Center for Historical Studies at Princeton University.

He was asked by plaintiffs' attorneys to comment on the following three questions:

(1) When was there a scientific consensus established that "Light" cigarettes are no less harmful than regulars? And can we expect the public to have known Lights were no safer, prior to the establishment of this consensus?

(2) What evidence is there that the tobacco industry realized that Lights were no safer than regular cigarettes prior to the development of this consensus?

(3) What kind of activities did the tobacco industry engage in to keep people believing Lights were safer, despite a lack of evidence to support this? And when did consumers become aware of the Light cigarette fraud?

In his report Dr. Proctor states:

My opinions on these questions, in summary, are as follows: (1) The scientific consensus that Light cigarettes are no safer than regular cigarettes does not emerge until the publication of Monograph 13 by the National Cancer Institute in 2001. Prior to this time, there was no way for smokers to have known it was "no safer" smoking Lights. (2) Long before the consensus of 2001, however, tobacco industry authorities were aware of evidence that Lights were not necessarily safer than regulars; indeed they were aware of this when Lights were introduced in 1971.(3) ˙ Despite having evidence that Lights were not safer, the tobacco industry continued to market Lights with implied assurances of safety. The industry knew that smokers regarded Lights as safer and did nothing to dissuade them from this belief. Prior to the release of the inter-

nal documents in 1998, however, smokers had no way of knowing the industry had engaged in this fraud.

## A. Preliminary Note on Consensus Formation

"Consensus" is not a concept commonly used by academic science historians; the term as popularly used—as when we speak of obtaining agreement at a meeting—often applies only imperfectly to changing scientific opinions, especially where competing or even politicized factions develop alternate understandings. Scientific understandings usually develop over time, and often cannot be traced to a single Golden Event or "Eureka" moment. And even when solid evidence does eventually persuade an interested community of scholars there are often "laggards" who may not accept the emerging consensus, even years after their colleagues have followed suit. Consensus is not achieved suddenly and everywhere at the same time; and it does not imply unanimity.

In thinking about how to date the emergence of a scientific consensus, it is useful to think about the different stages we may encounter as a phenomenon becomes recognized as real. For the sake of illustration, take the case of when tobacco is recognized as a cause of lung cancer. We can distinguish the following stages:

1. When was such a link *first hypothesized?* (1898)

2. When was evidence for such a link *first published* in peer-reviewed literature? (1920s)

3. When was evidence for such a link *confirmed* by other scholars? (1930s)

4. When were such links *widely cited and discussed* in medical literature? (beginning especially in Germany in the 1930s)

5. When were *multiple methods* deployed to buttress such a link? (1930s, '40s and '50s)

6. When do influential medical authorities confirm such a link, through widely-disseminated publications and official *"consensus statements"?* (1950s in the U.S. and Britain, somewhat earlier in Germany)

7. When is *dissent from the consensus marginalized* in the scientific community? (beginning in the 1950s and 1960s)

Two caveats should be recalled in such contexts. First is that scientific communities are often heterogeneous, and different communities may have different understandings, for various reasons. Evidence available to one group might not be familiar to or even available to another—this was the case with the tobacco industry's understanding of compensation, for example: knowledge of compensation was developed first and most elaborately inside the tobacco industry (where it was largely kept quiet) and only later appeared in the broader scientific literature.

A second and related caveat is (again) that consensus does not imply unanimity. Rarely is any consensus established without dissent, which can come from numerous sources (ignorance, adherence to an alternate theory, inherent uncertainties, natural lag times due to impediments to information flow, etc.). And in coming to a proper understanding of dissent, it is often useful to look at the social forces—or "interests"—that may be involved in shaping the direction of a scientific discussion.

The point must also be made that formal organized "consensus statements" such as those presented in a Surgeon General's report or the NCI's Monograph 13 are the exception rather than the rule in science. No one had to

form a commission to decide whether E $= mc^2$, or humans evolved from lower forms of life, or an asteroid impact killed the dinosaurs. Consensus statements often are demanded when there is resistance to controversial findings; this typically happens only in a climate of "high stakes," where organized interest groups are resisting scientific conclusions. The tobacco industry has a long history of trying to influence the rhetoric, conclusions, and kinds of evidence included in public statements assessing the hazards of cigarettes. Consensus reports such as those produced by the Institute of Medicine and National Cancer Institute have been generated specifically to clear up uncertainties about whether low yield cigarettes were safer.

*Lights Are No Safer: A Scientific Consensus Emerges in 2001*

In the public scientific community (vs. the internal research communities of the tobacco industry), the recognition that Light cigarettes are no less dangerous than regulars emerges fairly recently. The turning point is not until the early years of the 21st century, the single most important event being the 2001 publication of Monograph 13 by the National Cancer Institute.

Prior to this time, it was common to encounter assertions that smokers could reduce their risk of death and disease by switching to cigarettes lower in tar, nicotine or gas as measured by standardized smoking machines. Views of this sort can already be found in the 1950s and are commonplace throughout the 1960s, '70s and '80s, and even to a certain extent into the 1990s. Ernest Wynder and Dietrich Hoffmann of the Sloan–Kettering Institute for Cancer Research in New York, for example, believed that the lowering of tar in cigarettes (by chemical elimination, filtra-

tion, ventilation/airstream dilution, blending, or increasing burn rates) would show up in reduced lung cancer rates. Wynder and Hoffman recommended the reduction of tar and nicotine levels as "the best hope for a less harmful cigarette." Public health officials voiced similar opinion. This was a plausible recommendation given that 1) epidemiological studies showed that the risk of lung cancer increased with the number of cigarettes a person smoked, and 2) laboratory experiments. showed that animals smeared with tobacco tars developed cancer in proportion to the amount of tar used and/or the duration of exposure. There was a "linear dose response" between exposure to tobacco tars and risk of cancer; consistent with other kinds of carcinogenic exposures, more tar, more cancer.

A number of epidemiological studies published in the 1960s· and '70s seemed to support this (scientific) common sense, and from that time into the 1990s circa fifty studies were published on the health impact of changing cigarette designs, many of which indicated an apparent disease-risk reduction from the use of lower-yield products. Bross and Gibson in 1968, for example, found that smokers of filter-tipped cigarettes seemed to have a relative risk about 40 percent lower than smokers of unfiltered cigarettes. Bross and Gibson's work was reported in the New York Times and endorsed in the 1969 Surgeon General's report; again, this fit with the medical common sense that lowered exposures should mean reduced risks.

A number of medical authorities endorsed such a view, pointing out that while the best course of action was to quit (or never start), use of lower-yield products was a second best. In 1981, for example, the U.S. Surgeon General

recommended that people consider switching to low yield cigarettes:

> Overall, our judgment is unchanged from that of 1966 and 1979: smokers who are unwilling or as yet unable to quit are well advised to switch to cigarettes yielding less 'tar' and nicotine, provided they do not increase their smoking or change their smoking in other ways .... Smoking cigarettes with lower yield of 'tar' and nicotine reduces the risk of lung cancer ... provided there is no compensatory increase in the amount smoked.

This is a transitional document of sorts, since the Surgeon General qualifies his remarks by noting that "compensatory behavior may negate any advantage of the lower yield product or even increase the health risk." The key shift from 1981 to 2001 is that the tentative formulation of the 1981 report ("may negate") is transformed in later reports into a more definite *will* negate.

Optimism for health benefits from low-tar cigarettes was also commonly heard from participants in the Tobacco Working Group (TWG), a joint industry-government venture established in the late 1960s to explore "safer" cigarette designs. Gio Gori, a founder of the TWG, in the 1970s made public statements that cigarettes being smoked in the 1970s were substantially safer than those smoked in the 1950s. Gori suggested that smoking a pack of 1970s low tar cigarettes would be no more dangerous than smoking one or two cigarettes from the 1950s.

Jonathan Samet in 1986 maintained that low yield cigarettes were offering a margin of safety: in an article that year in the Journal of the National Cancer Institute, Samet reported results of a study which seemed to indicate that Hispanic smokers of filter cigarettes suffered less from lung cancer than smokers of nonfilter cigarettes. (Samet later realized this was probably measuring not filter vs. nonfilter but rather filter v. "roll your own.") Also in 1986, the International Agency for Research on Cancer, a World Health Organization body, concluded that even though smokers of cigarettes with low 'tar' yields "tend to inhale to a greater extent than do smokers of cigarettes with high 'tar' yields," their intake of smoke components was nonetheless "reduced." Consistent with this "Lights are safer" consensus, the American Cancer Society in 1992 asked and then advised: "can't quit yet? Smoke less, especially low tar and nicotine cigarettes." Some scholars continued into the late 1990s believing that low tar cigarettes were reducing risks.

Gradually over time, however, it began to be realized that there were problems making such comparisons. The most important difficulty was the discrepancy that appeared to arise between the predictions of epidemiology and the actual disease rates suffered by smokers. Dramatically declining tar yields (as measured by Federal Trade Commission ratings) should have led to significantly reduced cancer mortality, but that was not happening.

A key piece of evidence came in the mid 1990s, when researchers at the American Cancer Society conducted a review of two large studies known as CPS I and CPS II (for "Cancer Prevention Study" I and II), the first covering smokers from 1960 to 1972, and the second comparing this first group with a 1980–86 follow-up. Smokers in the intervening period had shifted to lower tar cigarettes, and the expectation was that if risks were actually declining, then lung cancer rates should be lower for the later group than the earlier. In fact

the opposite was observed: smokers in CPS II had a slightly higher lung cancer mortality than smokers in the CPS I group. Some scholars speculated that part of the increase might be due to the second group's starting to smoke at an earlier age or higher rates of smoking, but the judgment of a World Health Organization review is that neither of these has been able to explain the magnitude of the discrepancy from expectations. Doll et al. in England had made similar findings in their comparison of 20- and 40-year follow-ups of British physicians: the smokers in the second group (1971 to 1991) had higher rates of lung cancer than smokers in the first cohort (1951 to 1971). This again was not what one would have expected if lowered tar yields were reducing cancer risks.

Reviews of this evidence since this time have concluded that whatever benefits may have come from low tar products must have been trivial or nonexistent. This was the conclusion of a World Health Organization's IARC Report of 2002, the Institute of Medicine's Clearing the Smoke report from 2001, the Surgeon General's Report of 2004, and Monograph 13 of the National Cancer Institute. Monograph 13 has been the most significant of these assessments.

Compiled by fourteen of the world's leading experts in the field of tobacco health science, Monograph 13 concludes that contrary to previous expectations, the risks of smoking have not in fact changed over the past half a century. Machine-measured deliveries of tar, nicotine, and other toxins in cigarette smoke have declined by more than half since the 1950s, but this has not resulted in any noticeable benefit to smokers in the form of a reduced likelihood of dying from smoking-related diseases. That is

partly because smokers when switching to lower-yield cigarettes increase the intensity with which they smoke those cigarettes; smokers are addicted, and puff harder or inhale deeper or smoke more to maintain the nicotine intake to which they've become accustomed. The industry has also designed cigarettes to be "flexible" or "elastic," allowing smokers to adjust their nicotine intake by altering their smoking behavior (by covering up the ventilation slits designed to dilute the inhaled smoke, for example). The net effect is that the lower-yield cigarettes introduced since the 1950s have not significantly reduced the hazards of smoking; indeed, in certain respects, low-tar and "Light" cigarettes are actually more dangerous.

Monograph 13 has brought about an important shift in our understanding of cancer causation; indeed it would be hard to name a more important document in the past 50 years of cancer research. Smoking remains the number one cause of preventable death in the United States, killing about 430,000 people every year. "Light" and/or low tar cigarettes have became the most popular form of tobacco consumption—accounting for more than 90 percent of all sales—which means that it won't be long before more Americans will be dying from smoking cigarettes of this sort than from any other single cause. Light cigarettes must already have killed hundreds of thousands of Americans—with an annual toll far exceeding the 16,000 who die from AIDS, for example, and probably more even than the 42,000 who die from traffic accidents. The discovery that Lights are no less lethal than regular cigarettes exceeds in historical importance even the discovery of secondhand smoke as a cancer/cardiovascular hazard (in the early 1980s). It is the

most important breakthrough in cancer research of our generation.

As with any scientific breakthrough, it is possible to trace the evidentiary roots back in time. There are several key elements in the "Lights are no less lethal" revolution:

1. The observation that cancer rates have not declined as expected from the introduction of lower-yield cigarettes (the epi/mortality mismatch).

2. Recognition of the phenomenon of biobehavioral variation in cigarette smoking—especially the phenomenon of "compensation."

3. New use of biomarkers to measure the direct impact of smoking (vs. impacts assumed from the FTC's machine-measured yields).

4. New appreciation of previously-unrecognized forms of bias in early epidemiological studies, including the ignoring of compensation but also the "healthy switcher effect" and other forms of bias.

5. Recognition of changes in lung cancer histopathology, notably the increasing prevalence of deep lung adenocarcinomas, which seem to have been caused by the deeper inhalation prompted by "compensation."

6. The production (from litigation) of millions of pages of internal documents from the tobacco industry's files beginning in 1998, allowing the discovery of a long history of efforts to obstruct public recognition of tobacco health harms and to manipulate cigarette designs to keep smokers smoking.

Each of these helped contribute to the ultimate recognition that Lights are not safer. None of this happened overnight, however, and the historical record makes it clear that the evidence leading up to the consensus builds slowly throughout the 1980s and 1990s. The pieces of the puzzle are not assembled until 2001, with the publication of Monograph 13. How did this take place? I've already mentioned the CPS I and II turnaround, so we begin with compensation.

Though scattered elements of what eventually becomes known as "compensation" can be found far back in medical literature, and occasionally even in popular magazines, the phenomenon is not widely recognized in the public health community until the 1980s. That is partly because nicotine addiction itself was slow to be recognized in certain circles. The Surgeon General's report of 1964 refused to label smoking an addiction, and a formal U.S. government report on that topic doesn't appear until 1988. Why did it take so long for addiction to be appreciated? The tobacco industry itself of course had vigorously resisted any such classification, but addiction was also often viewed as a kind of psychopathology: addicts were people who used heroin and the like, not upstanding smokers of cigarettes who could often pass as productive members of society, A third element is that smokers didn't start trying to quit in large numbers until the 1960s and '70s, revealing both to smokers and their physicians how difficult it was to quit (and the stark realities of physical withdrawal).

Compensation was well understood by the industry in the 1960s, but was not widely appreciated outside the industry until some time later. Lynn Kozlowski's studies exploring the biobehavioral aspects of smoking were crucial for this wider reception. Kozlowski was one of the first "outsiders" to look at hole-vent blocking, and showed that if you look at how much tar and nicotine smokers actually inhale—as opposed to relying on

the FTC's machine-reads for this— smokers were actually getting about the same amount of these poisons as were earlier generations of smokers.

This was an important first piece of the puzzle, and one that eventually helped explain the epidemiology/mortality mismatch. Epidemiological studies from the 1960s, '70s and '80s had most often taken machine-measured tar yields as measures of exposure, whereas later studies questioned and eventually rejected this. This was one of the mistakes of early epidemiology: failing to control for changing human smoking behavior in response to changing cigarette designs.

Biomarker studies were important in this context, showing that smokers of low tar and nicotine cigarettes did not have lower levels of nicotine and/or nicotine metabolites in their blood. This showed that people were getting a lot more tar and nicotine (and gas) from their cigarettes than was being revealed through the FTC's standardized smoking machines. Biomarker studies showed the direct effect of compensation; Benowitz et al. foregrounded their conclusion in the title of their pioneering 1983 paper: "Smokers of Low–Yield Cigarettes Do Not Consume Less Nicotine." This was crucial for the subsequent reevaluation of the earlier generation's (flawed) epidemiology: many early epidemiological studies had taken the FTC's machine yields as measures of smoke intake, whereas biomarker studies now showed that people were getting a lot more tar and nicotine out of "low tar" cigarettes. The Surgeon General's recent (2004) review of this evidence points out that biomarker studies "show little relationship between the biomarkers and tar or nicotine yields as measured by the FTC protocol. This means that smokers end up getting the same levels of tar and nicotine in their body,

regardless of whether they smoke low tar or regular cigarettes." The Surgeon General concludes that "Smoking cigarettes with lower machine-measured yields of tar and nicotine provides no clear benefit to health."

Analyses of various forms of *bias* in early epidemiology provided another piece to this puzzle. I've mentioned the fact that cancer statistics were not showing the fall-off in lung cancer rates expected from the shift to lower-yielding cigarettes; machine-measured yields of tar, for example, had dropped from about 37mg in the 1950s to less than half of that by the late 1970s, so why hadn't lung rates begun to show a proportional fall? People knew that smoking was responsible for about 90 percent of all lung cancers, so what was wrong with the epidemiology?

Monograph 13 contains a detailed analysis of the biases of early epidemiology, biases that seem to have given rise to an erroneous conclusion that reduced-tar cigarettes were safer. The volume notes that it would be surprising if people who switched to (or even started with) low tar cigarettes were not also people who tended to be more "health conscious" than smokers of "full flavor" (i.e., higher tar) cigarettes. Light cigarettes smokers might have healthier diets, for example, or get more exercise, or better protect themselves from occupational carcinogens. If this were true, then epidemiological studies indicating Lights as offering some measure of health protection might actually be simply reflecting the fact that smokers with healthier habits tend to smoke Lights. Similar biases might be introduced if people who switched to Lights were more likely to quit smoking, or to smoke less intensively. These are confounding variables rarely taken into account in

early epidemiological studies; we can call this the "healthy switcher" effect, comparable to the better known "healthy worker" and "healthy survivor" effects documented in the literature of occupational health and nuclear medicine (including studies of survivors at Hiroshima and Nagasaki).

These are not hypothetical scenarios: Monograph 13 reviews evidence that smokers of lower yield products do differ in systematic ways from smokers of higher yield cigarettes. Light smokers have generally been better educated and wealthier, for example. The tobacco industry has long been aware of such patterns: a 1981 BAT study, for example, found that low-tar brand smokers were "more likely to have tried to give up smoking and to have succeeded in quitting for longer when they have tried." This would also have biased epidemiology in the direction of making Lights appear safer.

Monograph 13 also builds on research indicating that new patterns in lung cancer histopathology (tissue type) can be linked to changes in cigarette designs. Adenocarcinoma, a glandular cancer of the epithelial lining of the lung, has shown an unexpected increase in recent years, and the most common explanation for this (since the 1990s) has been that the increased puff-size and deeper inhalation prompted by Light-design cigarettes has caused cancers to grow deeper in the lungs, in the peripheral airways and alveoli. The increased presence of tobacco-specific nitrosamines in tobacco smoke has also been blamed, which some have traced either to the use of propane gas in flue-curing or the nitrates used to accelerate the combustion of tobacco. The NCI's Monograph 7 noted that cigarettes in the 1990s had lower PAHs but higher N-nitrosamines, and that the lung carcinogen 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone (= NNK) increased substantially in cigarettes from 1970s into the 1990s. NNK has been linked more to adenocarcinomas, whereas PAHs are more often linked with squamous cell carcinomas. Monograph 7 cited evidence that the shift to adenocarcinomas from squamous cell carcinomas "may lie in the more intense smoking of the low-nicotine cigarette."

Finally: Monograph 13 also makes the important point that regardless of the risk posed by switching to lower yield cigarettes, the availability of such cigarettes and their perception as less hazardous poses in and of itself a hazard that should not be ignored. Many people must have switched to Lights rather than quitting, believing (falsely) that switching would offer some hope of a lowered disease risk. The availability of low yield cigarettes may increase rates at which young people start smoking, and deter people who already smoke from quitting. Insofar as Lights prevent people from quitting, or give them reasons to start or to resume once they've quit, they must be seen as causing mortality not detectable in epidemiological studies. Monograph 13 does not quantify how many people may have been deterred from quitting by the Light cigarette deception, but it does point out that deterrence of this sort must be figured as an additional health cost.

\* \* \* \* \* \*

Monograph 13 is a work of creative synthesis and summation, a consensus document. It is also one of the most important documents in recent tobacco health scholarship, and like other pioneering contributions to scholarship, the volume is as important for its methodo-

logical innovations as for its substantive conclusions. The authors note in their preface that for the first time "the authors who prepared the various chapters have had extensive access to the information gleaned from the internal documents of the tobacco companies," including "marketing strategies that express the growing concern among the various tobacco companies of the potential loss of new recruits." Other medical authorities started using the secret documents about this same time: the National Academy of Science in its 2001 Clearing the Smoke, for example, cites industry documents to illustrate the industry's "strategies to reassure consumers about safety." A 1977 BAT document is cited, for example, in which statements are made about the industry's need to alleviate smokers' "anxiety about health," the goal being "to enable the smoker to feel assured about the habit and confident in maintaining it over time." This new source of information, derived from litigation in the mid- and late 1990s, has enabled medical scholars to appreciate the vast scope of the industry's effort to convince smokers that they should smoke Lights rather than quit.

Part of Monograph 13's authority derives from the rigorous, multistage review process it underwent prior to publication. Each of the authors' contributions underwent an initial peer review, following which the whole was again reviewed by the NCI. Recognizing the gravity of its conclusions, a special meeting was organized in Toronto (at the Epidemiology Congress in June of 2000) to invite critical scholarly exchange; opinions were solicited from a broad range of scholars (including initial skeptics such as Richard Peto) and the manuscript was further revised. The whole document then underwent yet another final review prior

to publication. This elaborate process, involving four separate episodes of peer review, demonstrates the extraordinary care taken to ensure the document's quality prior to publication.

The conclusions of Monograph 13 have been widely endorsed by medical organizations in different parts of the world. Apart from the U.S. National Cancer Institute it has been endorsed by the World Health Organization's Scientific Advisory Committee on Tobacco Product Regulation, an expert panel reporting to the Canadian Minister of Health, and the Royal College of Physicians in Great Britain. Numerous favorable reviews have appeared in medical literature, and in 2001, Tobacco Control, an official publication of the British Medical Association, castigated what it called "the low tar lie":

> Several times in the last 50 years, the industry has developed a new cigarette, which it then has widely promoted as being safe or safer than the product it was designed to replace. Each time, large proportions of the smoking population responded to these pronouncements by switching to these products in the mistaken belief that they were reducing their health risk, and each time the public has been deliberately deceived.

Even some of the tobacco manufacturers have recognized the authority of Monograph 13: Philip Morris USA's website, for example, has a prominent link to the online version of the document (via an NCI press release) and states that smokers should not assume "that lower-yield brands are safe or safer."

Monograph 13 was not alone, however, in challenging the previous consensus on low tar's relative safety. Similar conclusions were reached by an independent review of the National Academy of

Science's prestigious Institute of Medicine, which in 2001 reported that "most current assessments of the epidemiological and toxicological data suggest ... that low-yield products are associated with far less health benefit than predicted based on FTC assay-generated tar, CO, and nicotine levels." So even though machine-measured tar and nicotine yields decreased by more than half from the 1950s into the 1990s, this has not been accompanied by "a significant or proportional change in the harm or prevalence of specific smoking-related disease." The report concludes that the impact of what it calls "potential reduced exposure products" is "unknown" and "could, in fact, be negative."

The U.S. Surgeon General's Report for 2004 concludes similarly that reduced yield cigarettes, as measured on the FTC's standardized machines, "have at most a small effect on risk." This report also reaffirms the consensus view that although yields of tar and nicotine have declined substantially over the last 50 years, "the risk of lung cancer in smokers has not declined." There is at most only a "weak relationship" between type of cigarette smoked and risk of coronary heart disease, and low-yield products may even be "a detriment to public health, if their availability unfavorably affects decisions to start or stop smoking." The report also suggests that "little public health benefit" will be gained by further research on the relationship between cigarette design and lung disease, given the unambiguous benefits from smoking cessation. Recognizing the duplicity inherent in the "Lights" label, a number of nations have taken steps to ban the "Light" brand descriptor. In May of 2001, for example, the European Union adopted a measure banning the sale of cigarettes as "Light," "Ultralight" and "Mild," on

grounds these constitute false assurances of health. This same directive established maximal machine yields of cigarettes (10 mg per cigarette for tar, 1 mg nicotine and 10mg carbon monoxide effective 2004), showing that the EU considers the "Light" label a deception above and beyond however one might interpret machine-measured tar, nicotine and gas yields.

The European ban on Lights, and the National Cancer Institute's and National Academy of Science's delving into documents produced via litigation, demonstrate the frustration of public health authorities with the limited progress made in controlling the world's largest single public health catastrophe since the bubonic plague. An estimated 100 million people died in the twentieth century from tobacco, and the global toll in the 21st century could be ten times higher—as many as a billion if current trends continue.

Medical researchers for many years have recognized that it is better to smoke less than more, and for many years believed that the goal of "smoking less" could be achieved by "smoking low tar." That consensus started to unravel in the 1980s and 1990s, and was finally overthrown and replaced in the 2000s by a new consensus, buttressed by myriad forms of evidence, that "Widespread adoption of lower yield cigarettes by smokers in the United States has not prevented the sustained increase in lung cancer among older smokers." Low tar cigarettes are not safer, but rather "part of the industry's plan to maintain and expand its consumer base."

*Prior to this Time, the Industry Knew Lights Were No Safer*

Following the 1950s establishment of a consensus that cigarettes cause cancer,

a common view among medical scholars was that low tar cigarettes might offer some margin of safety. Wynder occasionally made such claims, as did Richard Doll in England. An American Cancer Society pamphlet as late as 1992 advised that if you must smoke, smoke a law tar cigarette. Part of this was just common sense: it made sense that if you inhale less tar and/or nicotine, you will put yourself less at risk than if you inhale more. A number of very early studies showed that the risks of smoking increase with number of cigarettes smoked, and it seemed plausible that if you reduce the amount of tar and nicotine in any given cigarette, you will reduce your corresponding risk. Many people endorsed this view.

The problem, as first recognized in the 1960s by tobacco industry researchers, was that when switching to low-tar or nicotine brands, smokers do not maintain a consistent behavior. They are addicted to the nicotine in tobacco, and if offered cigarettes with a lowered nicotine content will alter their behavior to obtain the level of nicotine to which they have been accustomed. This was already known by the industry in the 1960s under the name of "compensation," the idea being that smokers would smoke more cigarettes, or smoke further down on the butt, or hold the smoke longer in their lungs or draw it deeper into their lungs, or cover up ventilation holes designed to dilute smoke—all of these being different means by which smokers would "compensate," or "self-titrate" to obtain a constant level of nicotine.

Hints of a public recognition of the possibility of compensation can be found prior even to the 1960s, but little attention was paid to the phenomenon until the 1980s, a key prompt being the 1981 Surgeon General's report, which brought compensation to the attention of a large body of medical and public health researchers. Compensation was appreciated by the industry prior to this time, however. A 1961 memo by Helmut Wakeharn at Philip Morsis noted that "all too often the smoker who switches to a hi-fi cigarette winds up smoking more units in order to provide himself with the same delivery which he had before." A 1973 Brown & Williamson confidential literature survey acknowledged that cigarettes "allow people to self-administer nicotine and at a self-determined rate." Claude Teague at Reynolds one year before this had noted that "Given a cigarette that delivers less nicotine then he desires, the smoker will subconsciously adjust his puff volume and frequency, and smoking frequency, so as to obtain and maintain his per hour and per day requirement for nicotine."

One important difference between the industry's approach to compensation and that of scholars outside the industry is that while the public health community was (eventually) quite troubled by compensation, the industry early on saw it as an opportunity, and specifically an opportunity to market cigarettes that, while advertised as being lower in tar and nicotine, actually delivered a no less potent punch. The industry deliberately developed cigarettes that would allow consumers to adjust their nicotine intake by changing how they smoke—by placing ventilation holes in such a manner that they could be covered up by the lips or fingers of the smoker, for example. A British American Tobacco document from the 1980s describes as "sensible" the idea of producing "a cigarette which can be machine smoked at a certain tar band but which, in human hands, can exceed this tar banding" (i.e., deliver more tar than specified in Britain's

League tables—their equivalent of FTC ratings.)

## Smokers, However, Were Led to Believe Lights Were Safer

The tobacco industry has long had a sophisticated understanding of tobacco and its effects on humans. Thousands of scientists have been employed in industry laboratories, and the internal archives of the industry demonstrate an early and sophisticated understanding of nicotine and smoke chemistry, including the chemical and physical properties of smoke, its cancer-causing potency, the metabolic pathways of nicotine in the body, consumer perceptions of various sorts, marketing tricks that work better or worse, and so forth. Tobacco scientists were often proud of what they knew. By 1962, for example, BAT scientists were bragging that:

> we now possess a knowledge of the effects of nicotine far more extensive than exists in published scientific literature. It is indeed so extensive and represents so much new thought that it is not easy to condense the material of these several reports and working papers without over-simplification.

Similar boasts can be found concerning knowledge of cancer hazards, cancerous components in tobacco and tobacco smoke, and many other areas. Tobacco industry scientists have long kept careful tabs on findings in the published scientific literature, and enormous (private, corporate) libraries have been established housing all of the world's tobacco science literature in many languages, with elaborate translation services. The largest companies have long had handsomely-funded laboratory facilities employing hundreds of scientists.

Recognizing the hazards of cigarettes in the 1950s (albeit only privately, never publicly), the tobacco industry sought a number of different means to reassure customers that the products they were selling were safe. Filters were introduced in the 1950s, followed by low tar and nicotine brands in the 1960s and then "Light" brands in the 1970s. With each of these innovations, smokers were assured that the industry was doing what it could to fix the health problem. Viceroy had "a thinking man's filter, a smoking man's taste"; "More scientists and educators" smoked Kent; Lorillard's "True" brand was "as easy on your mind as it is on your taste," and so forth. Consumers were led to believe that the industry was acting responsibly, conducting health research, trying to "solve" the problem.

Consumers were never told (by the industry at any rate) that filters were not very effective. They were never told that particles were dislodging from filters and entering smokers' lungs, or that fiberglass was being deliberately added to chew to elevate nicotine absorption, or that Kent's micronite filter contained asbestos, or that evidence for a health advantage from low yield cigarettes was trivial or nonexistent. Instead, advertisements continued to imply that it was sensible to shift to lower yielding cigarettes. It is hardly surprising, then, that smokers widely believed—and many still believe—that they could gain a margin of safety by switching to Lights.

The tobacco industry realized from the beginning that the appeal of Lights—as of low tar cigarettes previously—was their purported safety. A 1975 R & R document, for example, reports on focus group studies showing that whereas the industry categorized cigarettes as "Full Flavor," "Medium

Flavor" and "High Filtration," the consuming public classified them ("in their minds") as "Least Safe," "Safer" and "Safest." Many other studies conducted by the industry in 1970s and '80s show consumers perceiving Light brands as safe or safer. A 1974 study for Reynolds found that smokers were receptive to the idea of a "Light" Winston brand; consumers imagined this as offering "a 'safe' cigarette with a taste ... similar to their current brand"; the appeal was to be able to "feel safe" while smoking. The combination of lowered delivery and good taste was seen (by smokers) as "a smoker's dream"; Winston Lights "held out the possibility of a return to 'the good old days' of full flavor—but without the fear." A 1976 study for Lorillard found that low tar and nicotine brands were seen as "better for you ... less likely to cause serious problem." A 1979 Roper poll conducted for Philip Morris reported the "simple and single" appeal of low-tar cigarettes as "better for you, less harmful, easier on the lungs, throat"—noting also that this "safety" appeal was strong enough to overcome "the main objection to low tars—low taste." A 1987 study of Philip Morris' Merit brand concluded that "Lighter taste provides 'better for you' reassurance." The industry attributed the success of Lights to health concerns—evidence for this can be found in literally hundreds of industry documents.

Elaborate psychological studies were conducted to explore consumer perceptions, and the findings were that smokers believed they were safer smoking Light cigarettes. A 1976 Philip Monis study of "Smoker Psychology" found that smokers worried about their health ("health smokers") were more likely to have a positive attitude toward cigarettes advertised as lower tar. This

is a revealing study, given that it also found that people given a low tar cigarette to smoke didn't rate it as more acceptable until they were told it was lower tar. Comparing 500 smokers of a 9 mg cigarette and 500 smokers of a 15 mg cigarette, the study found that when no delivery information was provided "both cigarettes were judged equally acceptable." When test subjects were told about delivery levels, however, the 9 mg cigarette was rated higher. The people most swayed by the new information were the "health smokers." The authors of this study concluded that "a real marketing advantage" could be gained by "calling attention to the delivery values of low delivery cigarettes."

Studies of smokers' interpretations of ads also found that smokers perceived the message of Lights to be one of safety. A 1979 study of smokers' responses to Winston Lights ads asked: "What is the key point that these ads are trying to say about WINSTON LIGHTS cigarettes?" Responses varied, but the first one listed was: "A low tar cigarette that tastes good, is satisfying and safer." A 1983 study of Reynolds' "Now" brand image found similarly that when smokers were presented with the words "low" and "lowest" in ads for cigarettes:

They interpret this to mean that the two brands are 'safer' and pose less of a health hazard. Consequently, they reason, this would make the brands more appealing to younger people who are very health conscious or to older, long-time smokers who are concerned about the long-range effects of tobacco.

Participants in this study were asked to imagine who might smoke Carlton, and some of the names mentioned were Paul Newman, Johnny Carson, John F.

Kennedy, Margaret Mead, and Albert Einstein.

Similar results were obtained by studies from outside the tobacco industry. Gio B. Gori in 1990 surveyed 1200 randomly selected smokers and ex-smokers in Europe and the U.S. and found that people believed that the tar yields reported on tobacco packaging accurately represented how much was actually being delivered to the smoker. The National Academy's Institute of Medicine report (from 2001) similarly concluded that people who "switched down" to lower yielding cigarettes did so at least in part from health concerns.

It should also be made clear that smokers did not choose Lights solely because they preferred the milder taste or flavor of such cigarettes. The historical record is clear on this: Lights have almost always been viewed as a compromise, a sacrifice, a "trade-off" consumers were willing to accept because they perceived these would be less likely to kill them. Lights are often described in internal industry documents as "low flavor" or "compromise" cigarettes, whereas in advertisements the claim is often made that you "needn't" compromise, the implication being that a certain brand will provide good taste while also providing health protection. Advertising consultants for the industry in 1977 talked about how smokers' taste expectations had been "continuously reduced" with the shift to lower yield cigarettes:

> It must be assumed that Full Taste smokers come down to low "tar" expecting less taste and they are not disappointed. They are willing to compromise taste expectations for health reassurance.

A 1979 Roper study of 1367 smokers nationwide for Philip Morris made it clear that smokers chose low tar for the "single" reason of safety—but also that lack of taste was "the #1 drawback to low tars." This same survey postulated that the availability of low tar cigarettes had "stabilized" the percentage of adults who smoke at about 34 percent (halting the decline of smoking, in other words); low tar cigarettes had accomplished this by bringing about a "neutralization of the health threat," allowing also an increase in the total number of cigarettes smoked:

> The percentage of adults who smoke has stabilized for the first time since 1965—at 34%. This could well be due to the greater perceived safety of low tar cigarettes and their resultant neutralization of the health threat.
>
> Since the population is growing, a stabilized percentage means a growing number of smokers.
>
> The number of cigarettes smoked per day per smoker continues to climb, in part at least because low tar cigarettes seem to cause people to increase the number of cigarettes they smoke.

The shift to Lights and low tar cigarettes is clearly not just about taste.

\* \* \* \* \* \*

The historical record makes it clear that the industry used Light cigarettes to stop potential quitters from quitting. Low nicotine products were deliberately developed "to seduce quitters." Industry and industry consultants often characterized smokers of low tar cigarettes as "potential cigarette quitters"; this was the conclusion of a 1978 "Study of Public Attitudes" conducted by Roper for the Tobacco Institute, for example. Reynolds similarly directed its low yield "Limit" cigarette at that "large group of smokers who are on the verge of that final stop: Quitting smoking all together." Efforts were also made to target

ex-smokers with the "healthier" message: Philip Morris, for example, directed marketing efforts at "the growing population of ex-smokers," hoping that low-tar smokes with their illusions of safety would entice them to return to smoking. Cigarettes of this sort were also characterized as "Interceptor cigarettes," the point being to "intercept" people on the verge of quitting, and to coax them into smoking Lights instead.

There is evidence that many people even today continue to believe that low tar cigarettes are safer. A 2004 survey of adolescents showed that they imagined themselves to be significantly less likely to get lung cancer, have a heart attack, and die from a smoking-related disease when smoking "light" versus regular cigarettes for the rest of their lives.

*End Remarks*

For nearly eighty years, the tobacco industry has marketed cigarettes with assurances of health and safety. Smokers have been told that Old Golds had "not a cough in a carload" (1927), that Camels "don't get your wind" (1933, that "more doctors smoke Camels" (1946), that Philip Morris cigarettes have been "pasteurized for your protection" (1946). Viceroys were marketed as "better for your health" (1951); Kent was said to provide an unexcelled "degree of health protection" (1952); L & M Filters were "Just What the Doctor Ordered" (1954); Philip Morris cigarettes took "the FEAR out of smoking" (1954); and so forth. By the 1960s the assurances had become more subtle: True cigarettes delivered "less tar and nicotine than other brands" (1966); Vantage gave smokers both "good taste" and "low tar and nicotine" (1971); Fact cigarettes had "smoke scrubbers" in the filters (1978); Newports were "Alive with pleasure" (1980s); Barclays were "99% tar free"; Carltons were "lowest" in tar and nicotine according to U.S. Government Laboratory tests (1985); Winston had "no additives" (1997); Carlton asked you to "start thinking about number one" (1997); and so forth. Complaints have often been raised against such advertising, and as recently as 2001 the Institute of Medicine listed all of the above and many others as examples of some of the "misunderstandings" promoted by the industry.

Descriptors such as "mild," "light" and "smooth" came into popular use following bans on explicit health claims. Indirect reassurances have continued ever since, accompanied by a shift from verbal to visual reassurances. The point in the shift, as recognized by industry consultants as early as 1957, was to "widen the market ... to make smoking seem reasonable, justifiable, and highly desirable." For decades, industry advertising for low yield products has relied on misleading "pictures of health and images of intelligence."

Light cigarettes were introduced in 1971 in order to capitalize on smokers' growing desires for "safer cigarettes." The industry played on the obvious and convenient conflation between smoking "Lights" and being a "light smoker"; consumers were led to believe such cigarettes were safer, even though the industry had no evidence to that effect.

The public was never told, by the industry at least, that cigarettes could cause cancer. (Worse, they launched a decades-long campaign to manufacture ignorance and insinuate doubt—"doubt is our product."). Nor was the public ever told that lights did not significantly reduce risk. Instead, the industry conducted a campaign of reassurance, leading consumers to believe that switching

to Lights would reduce or even eliminate the risk of death and disease from smoking. Lights were "health reassurance" cigarettes marketed with one principal goal: to keep smokers smoking.

Industry archives reveal this deliberate playing on illusions. In 1966, for example, Philip Morris noted that "The illusion of filtration was as important as the fact of filtration," from which the company concluded that new methods of filtration "need not be any more effective." The industry realized that with smokers increasingly worried about health there was a need to provide them with "health reassurance," regardless of whether there was any basis to such a claim. A 1968 document from Brown and Williamson's Director of R & D distinguished two distinct types of "health products": (a) "health image" or "health reassurance" cigarettes (i.e., low tar/low nicotine) which the public accepts "as a healthier cigarette," and (b) "health-oriented" cigarettes with reduced biological activity, meaning cigarettes with a lowered likelihood of inducing cancers on the skin of a mouse. Health reassurance has been a key to successful sales since the 1950s; indeed as a 1972 BAT document puts it, the most successful brands have been those that have come closest "to relating the smoking benefit to being one of 'health'." A 1977 Brown and Williamson marketing plan made it clear that "taste reassurance" should be subordinated to "efforts to play up health reassurance claims."

The industry now argues that it, too, believed low tar cigarettes were safer—but it is significant that we rarely (if ever) find *explicit* assertions of this sort from the industry, at least not after the 1950s (there are many such assertions prior to this time, as the industry tried to reassure consumers in the "first wave" of disease revelations.)

\* \* \* \* \* \*

We should not lose sight of the fact that throughout the period in question (the marketing of Lights since the early 1970s) the tobacco industry was refusing to admit that cigarettes had been shown to cause any kind of disease whatsoever.

The industry was wary about making explicit claims about safety, because it didn't want to admit that any kind of cigarette caused any harm whatsoever. This part of the history should not be ignored. Bross in 1978, for example, tried to credit the industry with (what he saw as) a good deed—lowering tar yields—but a Tobacco Institute spokesman responded testily that "anyone who suggests that there is such a thing as a 'safer' cigarette is trying to draw the cigarette industry into the trap of somehow admitting that the cigarettes at the full flavor or high 'tar'-nicotine end are dangerous and unsafe"—which of course the industry was denying.

If the industry had been honest, it would have admitted that there was not yet conclusive evidence one way or another whether Lights were any less lethal than other kinds of cigarettes. The industry never presented anything close to an honest representation of the lethality of cigarettes in the 1950s, '60s, '70s, '80s, and most of the '90s. Never was there an admission its products were causing death and disease when used as intended.

The industry recently has claimed that "Light" was just a descriptor referring to taste, but a leading architect of the "Light" concept has testified to the contrary. James Morgan, who as head of marketing for Philip Morris did more than anything else to introduce and popularize Lights, in a 1974 deposition testi-

fied that when talking about "light" the company was not talking about "taste": "It's not a term that means anything in terms of taste .... It was our desire in this entire Marlboro Lights brand project to constantly position Marlboro Lights as being—as having lower tar and nicotine." Brown and Williamson similarly in 1977 concluded that "Almost all smokers agree that the primary reason for the increasing acceptance of low 'tar' brands is based on the health reassurance they seem to offer." Philip Morris in a 1987 advertising brief summarized consumer perceptions as follows: "Lights = Mild = Less Harmful."

■■■■ Defendants object to this testimony on relevancy, hearsay, and Rule 702 grounds. Dr. Proctor's conclusions that defendants committed fraud are best left to the jury. So, too, are his conclusions about defendants' alleged untruths. He may give his opinion based upon the documents showing what was known to defendants and consumers since this kind of conclusion appears to be normal for science historians who deal with developing knowledge. His testimony is useful as historical background to show the development of a scientific consensus and its gradual infusion into the general knowledge base of scientists and laypersons. This historical overview will be helpful to the jury in organizing in its mind a huge flow of documentary and other evidence over many years. It will also be helpful in understanding how scientific hypotheses are tested and verified. Particularly in light of the statute of limitations problem, what was becoming known when and to whom is important for the jury's understanding of the case.

Robert N. Proctor's testimony based on his report satisfies Rules 702 and 703 of the Federal Rules of Evidence.

o. Paul Slovic

Dr. Paul Slovic received a Bachelors Degree in Psychology from Stanford University in 1959, a Masters Degree in Psychology from the University of Michigan in 1942, and a Ph.D. in Psychology from the University of Michigan in 1964. In 1964 he become a research associate at the Oregon Research Institute. In 1976, two colleagues and he established Decision Research, a nonprofit research institute in Eugene, Oregon specializing in the study of human judgment, decision making, and risk assessment. The research conducted at the Institute is both theoretical and applied and is sponsored by United States government agencies such as the National Science Foundation, the National Cancer Institute, the National Institute of Aging, the Environmental Protection Agency, the Department of Energy, and the Forest Service, and by private foundations. In 1986, he became the President of Decision Research and became Professor of Psychology at the University of Oregon. He has served in these positions since that time. He has received many professional honors. He has been researching the psychology of judgment, decision making, and risk for more than forty years. He was one of the first social scientists to study people's perceptions of risk and he has written numerous articles and books based on his research in this area. He has conducted research on risk perception associated with smoking since about 1990. This research has examined the degree to which young people and adults understand the risks associated with smoking. He is one of the most highly cited authors in the social sciences. For example, his article, "The Perception of Risk" (Science, 1987), has been cited in almost 1,000 journal articles. Although he is a psychologist, his research on risk perception and decision making is often cited by economists.

His opinion reads in part as follows:

Psychological theory, backed by a large body of research findings, demonstrates that smoking behavior is not determined by reasoned calculations of risks, costs, and benefits, but rather by images and feelings that carry strong motivational force. The effects of imagery and associated positive or negative feelings (termed "affect") are fast and automatic, and not always above the threshold of conscious awareness. Everything that one encounters is prescreened and classified as either good or bad within a fraction of a second after encountering it. These processes occur in all sentient human beings.

The term "light" has strong positive meanings that, when connected to a cigarette brand name, will imbue that brand with positive affect that will motivate new and mature smokers to use that brand. This communication of positive affect will occur quickly, automatically, and virtually universally in our culture and will not necessarily be recognized consciously by the smoker.

Tobacco companies have known the key elements of this affect and imagery account for decades and have exploited this knowledge to manipulate people to initiate or continue smoking.

In my opinion, based on a reasonable degree of scientific certainty, virtually all light cigarette smokers would have been impacted substantially by the descriptors "light" and "lights" in their purchase and use of light cigarettes.

*Basis for Opinion: Theory and Research*

Much has been learned about the ways in which all human behavior is shaped and motivated by brain function and fundamental cognitive processes. In particular, research in cognitive psychology has demonstrated that people think and apprehend reality in two different ways. The experiential mode of thinking is intuitive, automatic, natural, and reliant upon imagery and affect. The analytic mode is deliberative, logical, and reason-based. It is a relatively slow, methodical type of thinking. These two modes are part of what have came to be known as dual-process theories of thinking, knowing, and information processing. One such dual-process theory is illustrated in Table I below.

*Table I.* **Two modes of thinking: Comparison of the experiential and analytic systems.**

| Experiential system | Analytic system |
|---|---|
| • Holistic | • Logical: reason oriented (what is sensible) |
| • Affective: pleasure-pain oriented | • Logical connections |
| • Associationistic connections | • Behavior mediated by conscious appraisal of events |
| • Behavior mediated by feelings developed through past experience | • Encodes reality in abstract symbols, words and numbers |
| • Encodes reality in concrete images, metaphors and narratives | • Slower processing: oriented towards delayed action |
| • More rapid processing: oriented towards immediate action | • Requires justification via logic and evidence |
| • Self-evidently valid: "experiencing is believing" | |

Affect plays a central role in these dual process theories, as a key element of the experiential system of thinking. As used here, "affect" means the specific quality of "goodness" or "badness" (I) experienced as a feeling state (with or without consciousness) and (ii) demarcating the positive or negative quality of a stimulus image. The images with which affect is associated include not only visual imagery but sounds, smells, tactile sensations, memories, imaginations, and words. Words are particularly powerful conveyors of imagery and feeling. Osgood, Suci, and Tannebaum (1957) demonstrated that the dominant component of meaning for a word is its evaluative (e.g., good/bad) dimension—note how quickly you sense the feelings associated with the stimulus word "treasure" or the word "hate."

Although reason-based or analytic thinking is certainly important in some decision-making circumstances, reliance on affect and emotion is a quicker, easier, and more efficient way to navigate in a complex, uncertain, and sometimes dangerous world.

\* \* \* \* \* \*

As the study of cognition has advanced, researchers have increasingly recognized the importance of affect.

\* \* \* \* \* \*

One mechanism by which feelings direct the behavior of human beings is the affect heuristic. A heuristic is a process whereby a person assesses a specified target attribute (e.g., the risk of smoking cigarettes) by substituting a related attribute (e.g., how do I feel about smoking?) for a complex analysis (detailed reasons or calculations indicating why the risk is high or low). More generally, substitution of feelings for reasoned analysis is known as the affect heuristic.

The affect heuristic grew out of the observation, in many studies, that risk and benefit tend to be negatively related in people's minds .... For many hazards, the greater the perceived benefit, the lower the perceived risk, and vice versa. Nuclear power, use of pesticides, and consumption of food additives, for example, tend to be seen as very high in risk and relatively low in benefit, whereas the use of medicines and X-rays tend to be seen as high in benefit and relatively low in risk. This negative relationship is noteworthy because it occurs even when the nature of the gains or benefits from an activity is distinct and qualitatively different from the nature of the risks. That the inverse relationship is generated in people's minds rather than learned by experience is suggested by the fact that risk and benefits generally tend to be positively (if at all) correlated in the world. Activities that bring great benefits may be high or low in risk, but activities that are low in benefit are unlikely to be high in risk (if they were, they would be proscribed). Yet the relationship between risk and benefit in people's minds is opposite to this.

\* \* \* \* \* \*

[P]eople base their judgments of an activity or a technology not only on what they think about it but also on what they feel about it. If they like an activity, they are moved to judge the risks as low and the benefits as high; if they dislike it, they tend to judge the opposite—high risk and low benefit.

These findings suggest that use of the affect heuristic guides perceptions of risk and benefit .... If so, providing information about benefit should change the perception of risk and vice versa

.... For example, information stating that benefit is high for some activity or technology should lead to more positive overall affect, which would, in turn, decrease perceived risk. When the information that was provided changed either the perceived risk or the perceived benefit, an affectively congruent but inverse effect was observed on the non-manipulated attribute .... These findings support the theory that risk and benefit judgments are causally determined, at least in part, by the overall affective evaluation.

Marketers of consumer products such as cigarettes have long been aware of the powerful influence of affect. Great effort and sophistication are expended to create a positive image for a brand. Recent studies by neuroscientists show how the brand image effects fundamental processes in the human brain .... [For example,] when people were told what brand they were drinking, their preferences changed, as did their brain activity. The study thus showed that people did not choose a drink based upon taste alone. They chose a drink based upon what the strong brand identity of the beverage did to their medial prefrontal cortex. This is viewed as a foundational study in the emerging discipline of "neuromarketing." The merger of marketing and neuroscience is raising ethical concerns because of its power to manipulate people ....

The subtlety and automatic nature of the experiential processes described above indicates why people's self reports of the reasons underlying their behavior are not entirely trustworthy. Reasons may be "created" to explain behavior that was driven by affective responses of which the explainer is unaware ....

\* \* \* \* \* \*

[S]ubjects in their studies are sometimes (a) unaware of the existence of a stimulus that importantly influences a response, (b) unaware of the existence of the response, and (c) unaware that the stimulus has affected the response.

Cigarette companies have understood the relationship between imagery, affect/emotion, and behavior for decades and have used this knowledge to get young people to initiate smoking behavior and to induce established smokers to continue smoking.

The tobacco industry spends an enormous amount of money on advertising and promotion. It is not surprising that the industry also invests heavily in market research to guide these massive expenditures. Industry aims, methods, and results in this arena are described in internal documents. They tell a story that is consistent with the conclusions from the psychological research .... The tobacco industry well knows that initiation of smoking typically takes place among children and adolescents whose decision making capabilities are immature—weighing imagery, affect, emotion, and social relationships more than logic, reason, or analysis of risk.

The industry employed talented marketing researchers, who used sophisticated methods to uncover consumer needs and motivations that could be addressed in targeted advertising and promotion campaigns. These methods included focus groups and large surveys designed to measure smoking behavior, people's attention to advertising materials, and their attitudes and emotional responses.

Opportunities for "creative exploitation" were enhanced about the middle of the last century when market researchers discovered the importance of conscious and non-conscious motivational

factors in influencing consumer decisions .... Market researchers urged tobacco companies to design advertising and promotions so as to link positive images to cigarettes.

Cigarette marketers began to assess motivational factors by means of projective techniques, designed to uncover actual and desired images of both products and consumers. The focus of many industry studies, reports, talks, and memoranda was to describe the images associated with advertising themes and brands, particularly with regard to young people ....

Among the discoveries and conclusions resulting from image analysis and related industry studies were the following:

a) Attractiveness of a brand's "user image" is a determiner of both smoking initiation and initial brand selection ....

b) A planning memorandum, addressing new brands of cigarettes for the youth market, asserted that the most important characteristics of a youth brand may be "... image and quality ..."

\* \* \* \* \* \*

c) Another analysis cites one of a company's creative directors as saying: "What about image? I think it is the whole ball game." This same document also asserted that "... response to an image may be partially subconscious."

d) Studies of peoples' recollections of cigarette advertising indicate that young smokers focus almost entirely on the visual aspects rather than on copy content .... Related to this are findings indicating the importance of emotional content ... and the need to stress emotion, not reason.

e) Positive affect was found to be particularly important: "Fundamentally,

we're not in the cigarette business at all. We're in the pleasure business." "If it feels good, do it. If it feels good, smoke it. VICEROY. It feels good."

\* \* \* \* \* \*

f) "Imagery is an important aspect of brand preference ... response to an image may be partially subconscious." Also: "An image in cigarette advertising is probably best defined as the subconscious impression smokers have of the brand."

g) One of the techniques commonly used by marketers of consumer products is to place blurbs such as "new," "natural," "improved," or "fat free" on the package. In light of the above discussion, these words can be seen as "affective tags" that enhance the attractiveness of the product and increase the likelihood that it will be purchased. "Natural" is a term that has been demonstrated to have strong positive associations and affect. An ad for Kool Natural Lights cigarettes repeats the word natural 13 times in a single half-page display.

h) Given the sophisticated manipulation of imagery by tobacco marketers, it is not surprising that affective associations between cigarettes and positive images may begin forming in children as young as thee years old.

My research questions the rationality of young people's decisions to begin smoking, finding that these decisions reflect experiential, affect-driven thinking rather than reasoned analysis. This finding is foreseen in tobacco industry studies that conclude that "... the cigarette 'decision process' is non-existent or at best superficial" or is driven by emotion, not reason. Given this discovery, an advertising development "white paper" advises a tobacco company to market their brand to "elicit an emotional

response rather than purely a rational response"

\* \* \* \* \* \*

### Implications Regarding Light Cigarettes

The analysis of experiential thinking, imagery, and affect presented above, based upon current psychological theory and research and similar knowledge exploited by tobacco companies, has clear implications for an analysis of the impact of light cigarettes.

a) Smoking behavior is initiated and maintained by positive imagery and feelings.

b) Smoking behavior is not accurately depicted as a result of reasoned calculations of risks, costs, and benefits. Rather it is determined by images and feelings that carry strong motivational force.

c) The effects of imagery and affect are fast and automatic, and not always above the threshold of conscious awareness. John Bargh, one of the leading authorities on the automaticity of behavior, asserts that "... everything that one encounters is preconsciously screened and classified as either good or bad within a fraction of a second after encountering it."

d) Processes such as the affect heuristic apply to all human thinking. In fact, it is now widely recognized that affect is essential to rational decision making. Individuals who are unable to associate affective feelings and emotions with the anticipated consequences of their actions become socially dysfunctional even though they may be capable of analytic reasoning.

e) The evaluative component of meaning for the word "light" is good or positive. Light, as a physical substance, illuminates space and helps us see or navigate the world. Note the contrast in feelings when you think of "light" versus "dark." Through its association with illumination, light has become synonymous with knowledge and understanding (e.g., to "see the light" or "shed light on a problem"). These positive qualities have been associated with religion or spiritual awareness ("follow God's light," "inner light"). A person regarded very fondly is "the light of my life."

f) Moving from nouns to adjectives, the same strong positive connotations are present.

Psychologically, light refers to being free from sadness or troubles, a "light item." Easy or nimble movements pertain to dancers who are described as "light and graceful." "Light housework" or "light exercise" demands little effort and is not burdensome.

g) When applied to foods, the descriptor light means having fewer harmful substances—particularly fat and calories. It follows that light cigarettes, implicitly and explicitly, would be associated with lesser amounts of harmful substances, particularly with a product that, unlike food, is generally viewed as harmful. This would contribute to positive affect along with the positive feelings linked more generally with the word "light" (as noted above).

h) Points a-g above lead to the conclusion that the presence of the word "light" in conjunction with a cigarette brand name will imbue the brand with positive affect that will increase the likelihood that new and mature smokers will use that brand. This communication of positive affect will occur quickly, automatically, and virtually universally in our culture, and will not necessarily be consciously recognized by the smoker. Moreover, the positivity conveyed by the

word "light" would be expected, through the operation of the affect heuristic to depress the perception of risk associated with smoking that brand.

Professor David W. Stewart, one of defendants' highly qualified experts who will be permitted to testify, has criticized the work of Dr. Slovic, as well as of plaintiffs' experts Joel Cohen, Richard Pollay, and Michael Cummings. His critique is cogent as to details of the research done by these experts, their methodology, and their conclusions. He particularly supports defendants' view that all smokers differ, making it futile to attempt to draw a general conclusion as to all of them. This approach can be presented to the jury. It does not provide a basis for excluding the contrary conclusions of the distinguished experts on the other side. *See, e.g.,* "Comments on the Affidavit of David W. Stewart," in Expert Report of Paul Slovic dated August 15, 2005, at ¶¶ 36 ff.

 The report and proposed testimony of Paul Slovic are admissible under Rules 702 and 703 of the Federal Rules of Evidence.

p. Joseph E. Stiglitz

Plaintiffs propose to introduce the testimony of Dr. Joseph E. Stiglitz supported by his revised opinion of March 28, 2005. Dr. Stiglitz is a Professor at Columbia University's Business School, Columbia's Graduate School of Arts and Sciences (in the Department of Economics), and Columbia's School of International and Public Affairs. In 2001, he was awarded the Nobel Prize in Economic Sciences. He previously served as the World Bank's Chief Economist and Senior Vice President for Development Economics. Before joining the Bank, he was the Chairman of the President's Council of Economic Advisers. He has also served as a professor of economics at Stanford, Princeton, Yale, and All Souls College, Oxford.

As an academic, he helped create a new branch of economics—"The Economics of Information"—which has received widespread application. In the late 1970s and early 1980s, he helped revive interest in the economics of technical change and other factors that contribute to long-run increases in productivity and living standards. He is also a leading scholar of competition policy. He has received many professional awards. He has published widely in fields relevant to his proposed testimony in the present case.

Dr. Stiglitz's report reads in part as follows:

### III. INTRODUCTION

The central features of the collusion in the cigarette industry stem from the same basic cause: beginning in the early 1950s the first evidence about the health hazards of smoking started to become more widely understood. The cigarette companies were facing a potential massive decline in sales as a result of the issues surrounding smoking and its impact on health. If the cigarette companies had acted in their direct interests, they would have hastened the decline of the industry as a whole. As a result, the cigarette companies maintained a united front to maintain their economic interests over the years, continuing through the light cigarette fraud. This front helped maintain the "open question" debate about the health impact of cigarettes while continuing to sell a harmful and addictive product, characteristics that the consumer negatively valued in the product. If one company had broken from the collusion and told the truth about cigarettes or marketed a less harmful cigarette as such, the economic interests of the cigarette companies could have been severely damaged.

This is similar to the classic Prisoners' Dilemma—all companies are better off cooperating (by withholding the truth about cigarettes and not developing a "safer" cigarette) rather than not cooperating (developing a "safer" cigarette), but any one company stood to gain substantial market share by not cooperating.

From 1950 through 2003, six firms were responsible for more than 96 percent of domestic shipments of cigarettes in the United states. Such a market structure is what economists term an "oligopoly." In an oligopoly, as distinct from perfect competition, firms will act strategically, each taking into account how its actions will affect the actions pursued by its competitors and the market as a whole.

Acting strategically does not, in general, require coordination nor is it evidence of anti-competitive behavior. In the cigarette industry, however, evidence shows that the cigarette oligopoly acted in a collusive and anticompetitive manner, maximizing their joint profits at the expense of consumers. There is evidence that one aspect of this collusion was coordinating prices at a higher level than would prevail under competition, although this issue is not addressed in this Declaration and is not necessary for the other conclusions. There is abundant evidence that the tobacco firms acted to harm consumers by colluding together to deny that smoking caused disease, to not compete on health issues, and to suppress research into potentially less damaging cigarettes.

Such anticompetitive acts allowed each of the firms to maintain relatively higher sales and thus higher profits at the expense of consumers. Furthermore, like the classic economic case of price collusion, at various times each of the firms had an incentive to depart from the collusive arrangement to maximize its own profits at the expense of the group. A range of explicit and strategic strategies allowed the firms to coordinate and enforce their collusive arrangement, resulting in collectively higher profits.

All of these forms of collusion were manifested in the "light cigarette fraud." The evidence shows that the large cigarette firms knowingly and deceitfully marketed a product that was no safer than existing cigarettes, did not compete with each other on safety claims, and avoided research into a genuinely less harmful cigarette.

The remainder of this Declaration contains four sections. First, I present the economic theory of oligopoly and collusion. This section supplements a discussion of the standard theory of collusion in prices and quantities with a discussion of collusion in other dimensions of competition. Second, I evaluate the cigarette industry in light of my theoretical statements about collusion. I conclude that this industry has the market characteristics that are conducive to collusion, that its behavior is consistent with collusion, and that the evidence in the record demonstrates collusion. Third, I examine the light cigarette fraud as an act of collusion. The final section offers my conclusions.

\* \* \* \* \* \*

## V. THE CASE OF THE CIGARETTE INDUSTRY

This section applies the economic theories developed in Section IV to the cigarette industry. The cigarette industry is an oligopoly: the companies that comprise this oligopoly have colluded together for at least fifty years in order to expand their profits at the expense of consumers. This collusion involved a

wide array of understandings, strategies, coordination mechanisms and enforcement mechanisms, to ensure that the cigarette companies would not act competitively in their own unilateral interests. Instead, the cigarette companies acted collectively to advance their own joint interests at the expense of consumers. They undertook this collusion in order to avoid the potentially devastating impact that increasing public awareness of the health dangers associated with smoking would have had on their profits.

\* \* \* \* \* \*

## B. The Role of Perceived Safety in the Demand for Cigarettes

All of the collusive conduct by the cigarette companies described in this declaration is based on one fundamental fact: perceived safety is an important factor in the demand for cigarettes as a whole and for the choice of particular brands. This is clear both from the extensive econometric studies of the demand for cigarettes and the behavior of the tobacco companies themselves.

The most comprehensive survey of the economics of smoking was conducted by leading economic experts Frank Chaloupka and Kenneth Warner and published in the 2000 *Handbook of Health Economics* (the *Handbook* series is the leading technical reference series in economics, it summarizes generally accepted research). They conclude:

In both the early 1950s and the mid–1960s, smoking-related 'health scares' received substantial public attention in the United States ... The impact of these 'health scares' has been the subject of extensive econometric analysis [Sumner (1971), Hamilton (1972), Schmalensee (1972), Atkinson and Skegg (1973), McGuiness and Courling (1975), Thompson and McLeod (1976), Warner (1977, 1981a, 1989), Ippolito et al. (1979), Fujii (1980), Schneider et al. (1981), Leu (1984), Porter (1986), Bishop and Yoo (1985), Kao and Tremblay (1988), Simonich (1991), Pekurinen (1989, 1991), Meier and Licari (1997) ]. In general, these and other studies concluded that cigarette smoking fell significantly in response to the new information on its health consequences. Warner (1977, 1981 a), for example, found that the public scares in the early 1950s significantly reduced smoking in 1953 and 1954, but that their negative impact diminished through the decade. He concluded that the 1964 Surgeon General's report led to an immediate 5% decline in cigarette consumption. Schneider et al. (1981) estimated that U.S. per capita tobacco consumption was about 39 percent lower in 1978 than it would have been in the absence of the two health scares.

In addition, the economic literature also finds that perceived safety is an important selling point for individual brands of cigarettes. Consumers evaluate cigarettes, like any other product, based on price and a variety of quality criteria, including taste, image, and the perception of safety. These factors are important in determining the overall quantity of cigarettes sold and also the demand for particular brands of cigarettes.

The cigarette industry has also consistently understood that safety, or the perception of safety, was an important selling point for cigarettes. [P]rior to 1953, cigarette companies advertised the purported superior health benefits of their products as compared to the products produced by rivals. After the onset of collusion in December 1953 the tobacco companies no longer marketed their cigarettes in this manner. Yet, they

continued to understand that this form of marketing would yield substantial dividends for any firm choosing to pursue it. The public record contains a wealth of examples of this mutual understanding:

> *Internal market study conducted by Philip Morris in 1963:* "It is our opinion that the results can be interpreted to mean that, among filter smokers, there are as many who will respond to a promotional story with a health theme as there are those that will respond to a story with a pleasure theme. The anxiety [that] is present among these smokers might well serve as a guide for the design and promotion of the new cigarette."

> *Liggett Group internal document that discusses industry's response to the 1964 U.S. Surgeon General Report:* "It is considered to be of prime importance that the industry maintain united front and that if one or more companies were to conduct themselves as a matter of self interest, particularly in advertising, obvious vulnerability would result."

\* \* \* \* \* \*

Note that, all else being equal, the cigarette industry had more of an incentive to market a product that was perceived to be safer than a product that was actually safer. That is because a genuinely safer product would reduce the level of nicotine and thus the addictiveness of cigarettes, resulting in falling demand over time. This incentive was at the heart of the light cigarette fraud described in Section VI below.

\* \* \* \* \* \*

## D. Strategies of Collusion in the Cigarette Industry

This Declaration examines three forms of collusion by the cigarette companies: (1) refraining from competing on safety claims; (2) developing strategies to avoid research into less harmful cigarettes; and (3) maintaining a united and misleading front on safety issues.

## 1. Refraining from Competing on Safety Claims

As described above, in the early 1950s the tobacco companies competed vigorously by making competing health claims. After the December 1953 New York meeting, however, this advertising virtually ceased. As described by Business Week,

> Faced with dropping sales, cigarette manufacturers have pulled an abrupt about face in advertising tactics ... A couple of years ago, most of them were pulling out all the stops to terrorize their customers into buying their particular brands. Today, no word of fear, no talk of throat scratch—just comfortable, reassuring phrases about how good a cigarette tastes.

This collusion can best be demonstrated by describing how it functioned in practice, including examining some of the relatively few and brief deviations from the collusion. These examples illustrate the many ways in which the collusion was enforced, including industry associations (like TIRC) and the Cigarette Advertising Code adopted by the industry in April 1964.

\* \* \* \* \* \*

## 3. Maintaining a United and Misleading Front on Safety Issues

The final example of collusion is the cigarette companies consistent denial of any adverse health effects associated with smoking, denial that nicotine was addictive, and assertion that these issues were an "open question." In the January 1954 "Frank Statement" the ciga-

rette companies had promised to support research into tobacco and health, putting the efforts under the guidance of "an Advisory Board of scientists disinterested in the cigarette industry." Instead of following up on this pledge, the evidence shows that the cigarette companies individually and jointly misled the public, concealed or suppressed scientific research findings, and destroyed documents in furtherance of their collusive arrangement.

## VI. THE LIGHT CIGARETTE FRAUD AS AN EXAMPLE OF COLLUSION

The light cigarette fraud, described in great detail in the Illinois Decision, BCBS v. PM Decision and the National Cancer Institute's Monograph 13, is best understood as an example of collusion in the economic sense. It reflects all three types of collusion analyzed in Section V(D), including the failure to compete on safety, the failure to develop genuinely less harmful products, and maintaining a united and misleading front on safety issues. Like the broader pattern of collusion, all of this collusion took place because if the cigarette companies had followed their direct, individual economic interests by catering to safety issues in their research and marketing, the result would have been seriously damaging for the industry as a whole.

Beginning in the early 1950s, it started to become clearer to the scientific community that cigarettes were harmful to health and that, in particular, this harm could be traced at least in part, to the tar produced by burning tobacco. This initial "health scare" led to a reduction in the demand for cigarettes—either because people quit smoking or chose not to start. The cigarette companies responded with the pattern of collusion described in the previous section.

Cigarette manufacturers responded by adding filters to their products and embarking in efforts to lower the machine-measured tar and nicotine yields produced by their cigarettes when tested. With some rare and previous exceptions described above, which only reinforce the conclusion about collusion, the tobacco companies did not compete by making explicit health claims about these products. Instead, tobacco advertising consistently insinuated that these cigarettes would be less harmful to health. In fact, the evidence shows that consumers chose these cigarettes because of their perceived health benefits and despite what was considered to be inferior taste. According to the National Cancer Institute, "Terms such as 'Light' and 'Ultra–Light' were added to brand names, and substantial numbers of smokers switched to these brands in an effort to reduce their disease risks."

While the cigarette companies strongly insinuated that these new cigarettes were less harmful, by at least the late 1960s they knew this to be untrue. Specifically, the cigarette companies understood that individuals engaged in "compensatory" smoking that resulted in substantially greater delivery of tar than was measured in the machine tests. Cigarette companies were also well aware that people smoke in order to consume nicotine, a highly addictive compound. Reducing tar levels also reduce nicotine levels. Smokers crave a certain amount of nicotine and "compensate" by inhaling more deeply, holding the smoke in for a longer period, or smoking more cigarettes. All of this is in an effort to get a certain level of nicotine, but the by-product is also the consumption of a greater amount of tar.

Cigarette companies not only understood the compensatory effect, but also

deliberately designed cigarettes to maximize compensation. Specifically, the cigarette companies included ventilation holes in cigarette filters (which allowed air to dilute the tar and nicotine in machine tests but were covered by the smokers lips or fingers in actual smoking), made faster burning cigarettes, and employed other techniques. All of these were designed to ensure that consumers got a high dose of nicotine and thus continued smoking. This strategy was successful—there is evidence on record of consumers switching from "high" to "low" tar cigarettes rather than quitting, and that the demand for light cigarettes increased over time. Also, a variety of studies asking smokers their reasons for choosing low-tar cigarettes show that they desire to reduce disease risk, proving that consumers believe that light cigarettes are safer.

At the same time, cigarette companies did little genuine research into less harmful cigarettes and, to the degree they did, did not market them as such. To do so could have benefited any individual company, but would have undermined the joint declaration that tobacco is not harmful to health. Furthermore, the new product would have been less addictive, resulting in more quitting, less starting, and lower profits.

This deception continues to this day. Several new studies published in the December 2004 issue of Nicotine & Tobacco Research suggest not only that current smokers continue to be misled, particularly about "light" cigarettes, but that they risk a repeat of the disaster of light and low-tar cigarettes with the introduction of a new generation of products with unsubstantiated claims about their relative safety. Two of the studies in particular highlight how claims about new products threaten to continue and

expand that deception that has characterized the cigarette industry.

Some aspects of this behavior may have occurred even in the absence of collusion. But the overall pattern of behavior in the light cigarette fraud could only have developed and continued in an oligopolistic environment where the major companies colluded to ensure that there was no genuine competition on health issues, that there was limited research into less harmful cigarettes, and in which the cigarette companies agreed to maintain a united front on safety issues, a front that continues until this day.

## VII. CONCLUSION

I have attempted to summarize the evidence concerning the behavior of the cigarette companies and interpret it using the standard tools available to economists. These tools indicate that the cigarette industry is an oligopoly that is ripe for collusion. An examination of the record indicates behavior by the cigarette companies that would be difficult, if not impossible, to explain with a standard model of competitive behavior, including competitive behavior by oligopolists. Instead, the record fits the pattern that economists describe as collusion—where the major companies acted in concert to promote their shared interests at the expense of consumers.

Collusion does not mean the entire absence of competition. Cigarette companies competed vigorously in several dimensions all of which involved trying to sell more cigarettes by encouraging brand loyalty, creating certain images, making deals with distributors, and other standard business practices.

Collusion also does not explain each and every instance of joint or similar actions by the cigarette companies. At various stages it was in the individual,

competitive interests of each cigarette company—acting independently—to make false claims about health and avoid certain promotional techniques.

But, collusion was clearly responsible for creating and sustaining a radically different business environment. Collusion involved choosing which areas to compete in (like brand images) and which areas not to compete in (like health and safety). Collusion involved restricting the scope of research in a manner that is utterly inexplicable without some joint understanding. And collusion reinforced and strengthened the joint and misleading statements about the harmfulness of tobacco, ensuring that no firm defected from the strategy.

This had profound effects on the cigarette industry. Had the cigarette companies acted in a competitive manner, smoking would have been significantly reduced as result of consumers coming to a better understanding of the health consequences of smoking. In addition, the cigarette companies might have developed and marketed a genuinely less harmful cigarette.

 The analysis and conclusions of Dr. Stiglitz are appropriate to his expertise and will be helpful to the jury. In testifying and use of the report, however, references to conclusory and derogatory words such as "monopoly," "oligopoly," "collusion," and the like shall be omitted. These are terms likely to be viewed by the jury as pejorative. They are excluded pursuant to Rule 403 of the Federal Rules of Evidence. Their exclusion should not inhibit the witness in describing in lay terms the alleged "collusion," which is a central part of the plaintiffs' case.

The testimony of Joseph E. Stiglitz and his report comply with Rules 702 and 703 of the Federal Rules of Evidence.

## 2. Challenges to Defendants' Experts

 The challenged defendants' experts have all taken a defensive role that is harder to attack on *Daubert*–Rule 702 grounds. All are highly qualified in their fields. The fact that some of them work or worked for defendant is irrelevant for purposes of admissibility, though it may be emphasized by plaintiffs on credibility grounds. Their testimony is grounded on scientific methods even though other segments of the scientific community differed with them. They need not have themselves conducted experiments, nor need they have been subject to peer review in publications. Any other rule might exclude the most knowledgeable scientists— as in the case of pharmaceuticals— who labor behind the scenes in company laboratories to produce scientific achievements that will be the basis for important patents and marketing decisions.

### a. Michael Dixon

Dr. Michael Dixon was appointed Senior Scientific Advisor to British American Tobacco (Investments) Limited ("BATCo") in London, England in March 2000. Formerly, he managed a group dealing with sensory and behavioral research relating to cigarettes and cigarette smoking at the BATCo Research and Development Centre in Southampton, England. He graduated from Loughborough University of Technology in 1972 and obtained a B.Sc. degree in Human Biology. The main elements of his course were human physiology and anatomy, biochemistry, and experimental design. In 1975, he received a Ph.D. in respiratory physiology following the completion and submission of his thesis, "The Effects of the Inhalation of Irritant Gases on the Reflex Control of Breathing in the Rabbit." After receiving his Ph.D., he did a one-year Post Doctoral Research Fellowship at Nottingham University on aspects

of work physiology on production line workers in the automobile industry. From 1977 to date the majority of his work has been as a scientist within the pharmaceutical and tobacco industries.

He will testify about in-house scientific inquiries, the influence of smoking on sensory capabilities and other effects on human beings, compensation, efforts of defendants to address tar, and other issues central to plaintiffs' case.

Michael Dixon's proposed testimony and report complies with Rules 701, 702, and 703 of the Rules of Evidence. *But see United States v. Philip Morris*, Appendix A at 449 F.Supp.2d at 446, *supra* (finding not credible Dr. Dixon's testimony on compensation).

### b. Jeffery Gentry

Dr. Jeffery Gentry is a chemist and an expert in cigarette design who is currently Executive Vice President of Research and Development at R.J. Reynolds Tobacco Company.

He received a B.A. degree in Zoology from the University of North Carolina at Chapel Hill in 1979. After working for 2 years in the private sector, he entered graduate school and received a Ph.D. degree in Analytical Chemistry from North Carolina State University in 1986. From June 1986 until the present, he has been employed by Reynolds in Winston–Salem, North Carolina, at Reynolds' research and development department. He has been involved continuously during the past twenty years in efforts relating to cigarette design, including the design of "lights" cigarettes. Among the many areas in which he has expertise and knowledge are: (1) tobacco growing, curing, and processing; (2) cigarette performance as a result of changes in various cigarette components, such as choice of papers, tobaccos, and filtration; and (3) combustion,

pyrolysis and smoke formation mechanisms inside a burning cigarette. He is also familiar with Reynolds' cigarette design efforts prior to his employment.

It is proposed that he testify that Reynolds maintains a state-of-the-art research and development department employing first-rate scientists, engineers, and technical staff and that over many decades, Reynolds has been a scientific leader in efforts to investigate cigarettes and cigarette smoke, to identify and quantify smoke constituents, to reduce or eliminate certain smoke constituents, and to develop and commercialize cigarettes with the potential to reduce the risks of smoking responding proactively to smoking and health allegations. His employer, he will state, consistently monitored the scientific literature and diligently tested theories and claims for addressing the risks of smoking. He will also criticize the conclusions of plaintiffs' expert.

Jeffery Gentry meets the requirements of Rules 701, 702, and 703 of the Rules of Evidence.

### c. Jane Y. Lewis

Dr. Lewis is an Analytical Chemist with a B.S. in Chemistry and a Ph.D. in Analytical Chemistry from the University of Cincinnati. Her Ph.D. research thesis was entitled "Quantitative Determination of Pertechnetate by Electrochemical Methods. Electrochemistry of Technetium Radiopharmaceutical Analogs." She was hired as a Chemist by Philip Morris in 1984 in the Analytical Research Division of its Research and Development Department. Her initial assignment was to develop analytical methods for measuring various analytes in tobacco. She was then transferred to the smoke analysis laboratory. There, she oversaw the physical and chemical testing of cigarette smoke. She

spent five years working with flavors. She managed the smoke analysis laboratory responsible for all aspects of tar, nicotine, and CO testing at Philip Morris. For two years, she managed research in Entomology, Microbiology, Analytical and Combustion Chemistry, Materials Science, and Mathematical Modeling. This work included oversight of the development and maintenance of standard test methods.

She directed a technology research group whose responsibility it was to utilize new technologies and conduct fundamental research for purposes of selectively reducing constituents in cigarette smoke identified as potentially harmful by public health authorities. Her next position was Vice President of Scientific Technical Services. The role of this department was to provide internal critical scientific information. The department supported new product development, manufacturing, and quality assurance. It also managed ingredient information. In 2004, she was appointed Vice President of Product Assessment. Her department is charged with the chemical and biological assessment of new and existing products. Within the department are divisions that deal with clinical testing (including smoke exposure testing); smoke chemistry analysis (including constituent analysis); product integrity (including mutagenicity and other biological testing); and federal- and state-mandated product testing and reporting.

Her proposed testimony is in the following areas: (1) the general reduction of tar and nicotine through the use of technology over the years, as well as selective reductions and nonconventional cigarettes; (2) the FTC Test Method and its relationship to the tar and nicotine deliveries of Philip Morris's cigarettes; (3) internal research on the exposure of smokers to tar and nicotine from cigarettes; (4) the chemical, physical, and biological testing of ciga-

rettes, including "light" cigarettes; and (5) Philip Morris's weight of evidence assessment concerning lower yield cigarettes and disease risk.

Jane E. Lewis's proposed testimony and report comply with Rules 701, 702, and 703 of the Rules of Evidence.

d. Arnold T. Mosberg

Dr. Arnold T. Mosberg was, until retirement in September 2003, employed by R.J. Reynolds Tobacco Company in its Research and Development Department. At the time of retirement, his job title was Vice President of Regulatory Toxicology. He is a Diplomate of the American Board of Toxicology. He is expected to testify both as an expert witness and as a fact witness. His expert opinions and testimony are based upon 22 years of direct experience working as a toxicologist, including 18 years at Reynolds, his education, professional training in toxicology, personal interactions with other scientists, as well as knowledge of the external and internal scientific information and literature generally relied upon by experts in the fields of toxicology, the toxicology of cigarette smoke, and cigarette product evaluation and testing.

He has a B.S. in Aeronautical and Astronautical Engineering and M.S. and Ph.D. degrees in Biomedical Engineering. He was employed at Battelle Columbus Laboratories from 1977 to 1985. There he was Associate Section Manager in the Toxicology and Health Sciences department and managed the Battelle Columbus Laboratories' Inhalation Toxicology Facility. In 1985, he became Reynolds Senior Staff Toxicologist in the Research and Development Department. He was involved extensively in product evaluation, and biological and toxicological testing of cigarettes and cigarette smoke, including testing of commercial cigarettes. For ten years, he

was responsible for overseeing all animal toxicology research conducted by Reynolds. His publications in tobacco and related fields are extensive.

His expert testimony will include the subjects of the toxicology of cigarette smoke; comparative biological testing of cigarettes, including cigarette designs with the potential to reduce the risks of smoking; product stewardship; cigarette ingredients; and the development of biological assays for cigarette product evaluation and testing. It is expected that he will testify that Reynolds employed many scientists with advanced degrees in a variety of disciplines, including chemistry, physics, biology, toxicology, pharmacology, and biochemistry; that it maintained a state-of-the-art research and development department employing first-rate scientists, engineers, and technical staff; and that over many decades, it has been a scientific leader in efforts to investigate cigarettes and cigarette smoke, to evaluate the biological effects of different cigarette types, including cigarettes with the potential to reduce the risks of smoking, and to develop new biological test methods for the evaluation of cigarettes. He will describe the work of Reynolds' scientists and researchers and the degree to which they advanced the state of scientific knowledge in such areas as cigarette design and manufacture, comparative biological testing of cigarettes, and the biological and toxicological effects of cigarette smoke and "tar."

Arnold T. Mosberg's proposed testimony and report comply with Rules 701, 702, and 703 of the Rules of Evidence.

e. Kenneth R. Podraza

Kenneth R. Podraza, Ph.D. is the Vice President of Research, Development & Engineering, Administration, and Compliance at Philip Morris. He received his Bachelor of Science degree in Chemistry from the University of Nebraska–Lincoln in 1980, and his Ph.D. in Chemistry from Virginia Commonwealth University in 1988. He obtained additional training in toxicology and pharmacology, taking courses on Liver Toxicology (Society of Toxicology, 2001); Food Allergy and Intolerance (Society of Toxicology, 2001); The Mid–America Toxicology Course (Kansas City, Kansas 2001); Integrating Toxicologic Pathology into Compound Evaluation and Risk Assessment (Society of Toxicology, 2002); Basic Principles and Protocols in Molecular Toxicology (Society of Toxicology, 2002); Basic Pharmacology (University of Wisconsin, 2002); Fundamentals of Risk Assessment and Application of Recent Methodologies to Difficult Problems (Society of Toxicology, 2003); Genomic and Proteomic Array Formats on the Cutting Edge (Society of Toxicology, 2003); Probabilistic Risk Analysis; Assessment, Management, and Communication (Harvard School of Public Health, 2003); and Functional Flow Cytometry: Applications in Toxicology (Society of Toxicology, 2004). He has many publications and patents.

Prior to working in the cigarette industry, he was a chemist at E.I. DuPont de Nemours, where he conducted developmental studies on automotive enamels and synthesized compounds for use as curing agents. He joined Philip Morris in 1980 and has held numerous technical positions, leading to his promotion to Senior Research Scientist, Program Leader. He has worked on research programs and projects dealing with organic and inorganic compounds potentially useful for improved or modified cigarette design. In 1997, he was named manager of Philip Morris's Product Testing Laboratory, managing approximately 100 people responsible for providing technical guidance and data in the areas of cigarette smoke collection and analysis and physical properties measure-

ments of experimental and production cigarettes for domestic, international, and regulatory purposes. In 1999, he became Director of Analytical Methods and Applications, managing a division of about 60 people responsible for providing analytical expertise to support research and development activities, and focusing on the generation, review, and communication of smoke constituent information to scientists and regulators around the world.

He is expected to offer expert testimony on issues that include the following areas: (1) the FTC Test Method and its relationship to the tar and nicotine deliveries of cigarettes; (2) cigarette design, including general reduction, selective reduction, and nonconventional cigarettes; (3) Philip Morris's use and testing of ingredients used in cigarette manufacture; (4) its use of ammonia compounds and their alleged effects on nicotine; (5) its studies of compensation and exposure; (6) smoke constituent analyses and biological activity testing of cigarettes; and (7) assessment of lower FTC yield cigarettes and the risk of certain smoking related diseases.

Kenneth R. Podraza's proposed testimony and report comply with Rules 701, 702, and 703 of the Rules of Evidence.

### f. Graham A. Read

Graham Albert Read has been employed by British American Tobacco (BATCo) since 1976, performing, managing, and organizing the research function of BATCo. He graduated from Hull University in 1971 with a Bachelor of Science degree in Biochemistry and then took up a University Demonstratorship at Leeds University for a period of four years, with teaching and research responsibilities in biochemistry and medical laboratory sciences. At BATCo, he worked initially as a bench scientist in the Inhalation Toxicology Division of the Life Sciences Department to develop a number of test methodologies for toxicological assays for product assessment purposes. Thereafter, he became head of the Animal Inhalation Toxicology Division and subsequently was assigned responsibility for the biochemistry and hematology function. From 1980 to 1985, he was head of the Human Smoking Behavior Group. From 1988 to 1991, he was first Business Development Manager and then General Manager of Advanced Technologies, Cambridge. In his current position, he is responsible for the development and coordination of BATCo's prospective long-term research programs and providing scientific guidance to senior executives in the area of reduced harm products.

He is expected to testify both as a fact witness and as an expert in the toxicology of tobacco smoke, including biological research on smoke and smoke condensate, with related expertise in human behavior, the pharmacological role of nicotine in smoking, and cigarette design, with particular reference to the development of potentially reduce risk tobacco products, including lower delivery of tar and nicotine products. He will also describe efforts to find ways to modify cigarettes to reduce health risks.

Graham A. Read's proposed testimony and report comply with Rules 701, 702, and 703 of the Rules of Evidence.

### g. Edward A. Robinson

Dr. Edward A. Robinson is the Manager of Chemistry for Lorillard Tobacco Company. Prior to joining Lorillard in 1996, he was a Postdoctoral Associate specializing in Organic and Inorganic Photophysics in the Department of Chemistry at the University of Florida. He received his doctorate in Inorganic Chemistry from Georgetown University in 1995.

As manager of Chemistry, he worked on, among other projects, the development of potentially reduced exposure products and lead a team of scientists tasked with developing and evaluating new product designs. He also monitors competitive developments in the areas of cigarette design.

While Dr. Robinson's testimony on the history of his company and the industry generally since the 1950s seems best left to documentation, he has had access to the files and the memory of other company personnel. His work within the firm puts him in a position to interpret documents and other historical materials in a way helpful to the jury.

Edward A. Robinson will be permitted to testify under Rules 701, 702, and 703 of the Federal Rules of Evidence, subject to particular rulings at trial to reduce hearsay dangers.

h. William Wecker

Dr. Wecker is a statistician and applied mathematician. He received the Bachelor of Science degree (Basic Sciences) from the United States Air Force Academy in 1963. He received both the Master of Science degree (Operations Research, 1970) and Doctor of Philosophy degree (Statistics and Management Science, 1972) from the University of Michigan. He served on the faculties of the University of Chicago, the University of California at Davis, and Stanford University, where he taught statistics and applied mathematics at the graduate level. He has performed research in statistical theory, statistical methods, and applied mathematics for thirty-three years. He is currently President of William E. Wecker Associates, Inc., an applied mathematics consulting firm located in Novato, California. He served as associate editor of the Journal of the American Statistical Association for four

years and of the Journal of Business and Economic Statistics for eighteen years. He is widely published.

Dr. Wecker was asked by counsel for defendants to review and comment on the expert reports of Drs. Jeffery Harris and John Beyer. He addresses four main areas in his report:

1. Compensatory smoking of low-yield cigarettes as reported in Monograph 13, Chapter 3;

2. Lung cancer risks among lower tar smokers as reported in Monograph 13, Chapter 4;

3. Lung cancer risks among low tar smokers as reported in Harris–Thun 2004; and

4. The damage estimates reported by John Beyer.

 In the main, he will testify to the lack of appropriate theory, methodology, and technique of plaintiffs' experts, particularly Drs. Jeffrey E. Harris and John C. Beyer. While plaintiffs' experts have attempted to meet some of the prior criticisms of the Harris and Beyer reports, Dr. Wecker will attempt to demonstrate that their conclusions remain scientifically unacceptable. The objection that other experts in the field do not support the defendants' expert is not alone a basis for exclusion. William Wecker is competent in his fields. Credibility is for the jury.

William Wecker meets the requirements of Rules 702 and 703 of the Federal Rules of Evidence.

3. *Minor or No Challenges to Plaintiffs' and Defendants' Experts*

a. Neal L. Benowitz

Neal L. Benowitz, M.D., an expert for plaintiffs, is a Professor of Medicine, Psychiatry and Biopharmaceutical Sciences at the University of California, San Francis-

co. He will testify for plaintiffs that light cigarettes have not "substantially reduced adverse health consequences of cigarette smoking." Neal A. Benowitz's proposed testimony and report comply with Rules 702 and 703 of the Federal Rules of Evidence. *See also Price,* Appendix C at ¶¶ 60, 62–63, *infra.*

### b. Michael F. Borderding

Michael F. Borderding, Ph.D.; is a principal long-time Research Scientist of Reynolds and expert for defendants. He may testify about the variability of smokers' intake of tar and nicotine, and the unsatisfactory nature of the method of estimating tar and nicotine inhaled developed in Massachusetts. He will attack the conclusions of Dr. Jeffrey E. Harris. Michael F. Borderding's proposed testimony complies with Rules 701, 702, and 703 of the Federal Rules of Evidence.

### c. Gregory N. Connolly

Gregory N. Connolly D.M.D., M.P.H., is a Professor of Public Health Practice at the Tobacco Control Program of the Massachusetts Department of Public Health. He will testify on testing methods for tar and nicotine and the dynamic nature of human smoking patterns and compensation.

One conclusion of Dr. Connolly will not be permitted at trial. At the end of his report, he concludes that "the tobacco industry purposefully designed its products to create cigarettes which have low tar and nicotine ratings on machine tests but were not shown to reduce actual exposure to toxins or disease risk." Connolly Report at 7. This is an inference that may be drawn from other facts in evidence. Dr. Connolly's report, which is concerned with tar and nicotine yields, may, however, be used by the jury to infer scienter. In all other respects Gregory N. Connolly's proposed testimony complies with Rules 701, 702, and 703 of the Federal Rules of Evidence.

### d. Richard Cox

Richard H. Cox, a former Vice President of Philip Morris in charge of research will not be relying on his own report. He has a Ph.D. from the University of Kentucky in Organic Chemistry. By stipulation, he may replace, for testimonial purposes, Drs. Lewis and Podraza. His qualifications are not challenged. For the reasons stated in connection with their reports, *supra,* he may testify.

### e. Wayne S. Desaro

Dr. Wayne S. Desaro, another of defendant's well qualified experts, is in the same position as Dr. Viscusi in his criticism of Dr. Hauser. *See infra.* He may testify, pursuant to Rules 702 and 703 of the Federal Rules of Evidence. That does not preclude Dr. Hauser's testimony.

### f. Peter C. English

Peter C. English, M.D. and Ph.D., is a member of the faculties of both history and medicine at Duke University. He will testify for defendants. He will opine that low tar yield cigarettes reduce the risk of lung cancer, that the FTC testing method was reasonable, and that the public health community was well aware of the compensation problem, but continued to recommend law yield cigarettes for those who did not quit smoking. His testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

### g. Barry E. Goodstadt

Barry E. Goodstadt, Ph.D. in Social Psychology, is a senior research executive with Wirthlin Worldwide, doing research in behavior including the effect of anti-smoking

advertising. He is retained by defendants to show that plaintiffs' surveys for damage purposes are flawed. His proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

### h. Stephen Hecht

Stephen Hecht, Ph.D., an organic chemist and expert in tobacco carcinogens, is the Wallin Professor of Cancer Prevention at the Cancer Center and Department of Laboratory Medicine and Pathology, University of Minnesota. He will testify that there is no decreased risk of lung cancer in smokers of light and ultralight cigarettes. His proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

### i. Lucy L. Henke

Lucy L. Henke, Ph.D., is Associate Professor in the Department of Marketing and Legal Studies at the University of Louisiana. She will testify on behalf of defendants that the work of plaintiffs' expert Katherine Kinsella is flawed. Lucy L. Henke's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

### j. Jack E. Henningfield

Jack E. Henningfield, Ph.D., is Adjunct Professor of Behavioral Biology at The Johns Hopkins University School of Medicine in Baltimore, Maryland, and Vice President for Research and Health Policy at Pinney Associates, a consulting firm on treatment for medical problems, including tobacco dependence. He is an expert for plaintiffs, "of the opinion that the tobacco industry purposefully designed its products to create and sustain nicotine addiction in cigarette smokers and specifically designed so-called 'light' cigarettes in a manner to deliver equivalent tar and nicotine to smokers of their regular extension counterparts while giving the appearance of being a 'safer' cigarette." Conclusion of Report dated February 27, 2005, unpaginated. He will not be permitted to testify to the intention of defendants, but he may testify that "lights" would sustain addiction and deliver tar and nicotine equivalent to traditional cigarettes, while appearing to be safer. The jury is in a position to infer intent from the documents and other testimony, including his. Jack E. Henningfield's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

### k. Jacob Jacoby

Jacob Jacoby, Ph.D. in Psychology, is Merchants Council Professor of Consumer Behavior and Retail Management at the Leonard N. Stem School of Business at New York University. He plans to testify for defendants that an R.J. Reynolds survey proffered by defendants is appropriate and demonstrates that factors other than safety—especially taste—determine why smokers choose "lights" or "ultralights." Jacob Jacoby's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

### l. James A. Langenfeld

James A. Langenfeld, Ph.D., is a Director of LEGG, an economics consulting firm, and adjunct Professor at Loyola University College School of Law. He proposes to testify for defendants that:

defendants' advertising and marketing behavior has been substantially affected by the regulations and policies of the FTC and other government entities. The FTC has specifically restricted the use of health claims in cigarette advertising, with the exception of tar and nicotine claims. The FTC, following the advice of the scientific and public health community, developed a specific policy

to encourage cigarette manufacturers, including Defendants, to compete on producing and marketing "low tar" cigarettes as measured by a standardized, government-sanctioned, testing method (the FTC Method). The FTC has also outlined specific parameters regarding the use of descriptors that are tied to FTC Method results. Defendants' behavior, with respect to the development and marketing of "low tar" and "light" cigarettes, clearly tracks FTC policy over time. Neither Dr. Stiglitz's nor Dr. Proctor's opinions adequately account for FTC and other government regulatory activity on Defendants' behavior.

James A. Langenfeld's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence. Drs. Stiglitz and Proctor may give opinions contrary to those of Dr. Langenfeld.

### m. Nancy A. Mathiowetz

Nancy A. Mathiowetz, Ph.D., is a Professor at the University of Wisconsin in the Department of Sociology and Urban Studies and has been an Associate Professor at the University of Michigan and University of Maryland. She is expected to testify for defendants with respect to the inadequacy of the surveys conducted by Knowledge Networks and relied upon by plaintiffs' expert Dr. Jeffrey Harris. She will also evaluate the work of plaintiffs' expert Dr. K. Michael Cummings.

Nancy A. Mathiowetz's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

### n. Kenneth A. Mundt

Kenneth A. Mundt, Ph.D. is by training and experience an epidemiologist. He was president and founder of Applied Epidemiology, Inc., based in Amherst, Massachusetts, until November, 2003, at which time the company merged with ENVIRON International Corporation, where he is Principal, and Director of Epidemiology. He was trained as an epidemiologist at the Master's level at the School of Public Health, University of Massachusetts, and at the doctoral level at the School of Public Health, University of North Carolina. For ten years he served on the faculty of the Department of Biostatistics and Epidemiology of the School of Public Health, University of Massachusetts, and at the doctoral level at the School of Public Health, University of North Carolina. He serves as Adjunct Associate Professor in the Department of Epidemiology, University of North Carolina at Chapel Hill and as an Adjunct Associate Professor at Georgetown University.

His opinion for defendants is summarized as follows:

a. Evaluation of health risks associated with cigarettes with different FTC tar yields is best accomplished using rigorous epidemiological methods including individual measurement of exposure and disease: other sources of information may supplement findings from these primary studies;

b. Since the 1970's numerous epidemiological studies have compared risks of smoking-related diseases (including lung cancers and heart diseases) among smokers of cigarettes with different FTC tar yields, and most of these studies report lower health risks associated with using lower-yield cigarettes compared to using higher yield cigarettes;

c. Many scientists, physicians and policy makers have relied upon the science demonstrating a benefit of lower-yield cigarettes in their public health and medical recommendations to quit, but if unable or unwilling to quit, to switch to a lower yield product. They also have suggested that manufacturers continue to lower toxicant levels of cigarettes;

d. Arguments against a lower-yield benefit, such as those found in Chapter 4 of NCI's Monograph 13, are unsubstantiated;

e. The weight of the scientific evidence, based on my critical review of the published, peer-reviewed epidemiological literature and taking into consideration the criticisms of plaintiffs' experts, indicates that there is a benefit, not limited to reduced lung cancer risks, of reduced-tar cigarettes, including Lights, and which cannot be explained by bias.

Kenneth A. Mundt is qualified to testify under Rules 702 and 703 of the Federal Rules of Evidence.

o. Kevin M. Murphy

Kevin M. Murphy, Ph.D., is George J. Stigler Distinguished Service Professor of Economics in the Graduate School of Business and Department of Economics at the University of Chicago. As an expert retained by defendants, he will criticize the work of Drs. John Beyer and Jeffrey Harris. Kevin M. Murphy's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

p. Bruce Neidle

Bruce Neidle, Director of Business Analysis at Philip Morris will testify to influences on pricing of cigarettes. His testimony complies with Rules 701, 702, and 703 of the Federal Rules of Evidence.

q. Bruce M. Owen

Bruce M. Owen, Ph.D., is the Morris M. Doyle Centennial Professor of Public Policy in the School of Humanities and Sciences and Gordon Cain Senior Fellow in the Stanford Institute for Economic Policy Research at Stanford University. He was Chief Economist of the Antitrust Division of the United States Department of Justice. As a defense witness, he is critical of the work of Drs. John C. Beyer and Jeffrey E. Harris for plaintiffs. His main conclusions are:

● In this case, compensation for economic injury is an alternative way of compensating individuals for personal injury. If personal injuries have been or will be compensated in other cases, damages resulting from this economic injury suit lead to defendants' having to pay double damages.

● Plaintiffs' proposed damages models would result in compensation of some smokers who did not rely on the alleged fraud.

● Plaintiffs' proposed damages models would result in compensation of some smokers who have not suffered economic injury because the amount of the economic loss associated with the fraud did not reduce the value of their purchases below what they paid.

● Plaintiffs' proposed class combines dissimilar smokers who have conflicting interests.

● Dr. Beyer's price impact method suffers from numerous fatal conceptual errors and estimation errors. When errors are corrected or when reasonable alternatives are considered, there is no basis to conclude that defendants' alleged fraud significantly increased the price of cigarettes.

● Dr. Harris's loss of value method is incapable of appropriately estimating causation, injury and damages. His estimate of the value of light cigarettes has fatal conceptual flaws and is exaggerated by his unsupported assumption that a "safer" cigarette would have been available but for the alleged fraud.

Bruce M. Owen's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

r. Stanley Presser

Stanley Presser, Ph.D., is a professor of sociology at the University of Maryland with more than 25 years of experience as a survey methodologist. He has been president of the main professional association for survey researchers and editor of the leading scholarly journal in the field. His report is offered in rebuttal to the report of defendants' expert David W. Stewart. He offers several criticisms of the surveys relied upon by Mr. Stewart that conclude that not all smokers of "light" cigarettes chose to smoke such cigarettes because of health concerns.

Stanley Presser's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence. *See also Price*, Appendix C at ¶¶ 52, 93–94, *infra* (finding Dr. Presser qualified and credible).

s. Michael Schaller

Michael Schaller, Ph.D., is Regents Professor of History at the University of Arizona. As an expert for defendants it is expected that his testimony will be:

> [F]or many years, the government and public health authorities disseminated a two-fold message to the public through various forms of mass media, public health pamphlets, and other educational materials. This message encouraged smokers to quit smoking, because the only truly safe cigarette is one that is not smoked. However, if they could not or would not quit, they were encouraged to switch to what was considered the somewhat safer alternative, a cigarette lower in tar and nicotine. Smokers were also cautioned that when switching to a cigarette lower in tar and nicotine, they should not alter their smoking behavior because doing so would cancel any potential reduction in hazard. In fact, the media reported on health au-

thorities' warnings that because of variations in smoking behavior that came to be known as compensation—puffing more deeply and frequently, smoking more cigarettes and covering up vent holes—low tar cigarettes might be even more dangerous than full-flavored cigarettes. At the same time as the media communicated this cautionary message, reports appeared in the press, on television and elsewhere that many public health authorities questioned the FTC method of measuring cigarette tar and nicotine content. News reports, industry statements, government and public health pamphlets, public service announcements, and textbooks carried frequent reminders that the FTC machine data on tar and nicotine levels was designed for comparative purposes only and did not predict the amount of tar and nicotine any human smoker would absorb. While smokers were encouraged to switch to low tar cigarettes, they were also exposed to warnings that this switch was almost, if not just as, risky as smoking regular cigarettes due to the limitations of low tar cigarettes and the FTC method for testing tar and nicotine content.

Michael Shaller's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

t. George Seiden

George Seiden, Ph.D., M.D., is certified in Psychiatry and Forensic Psychiatry and has been Chief of Staff in a number of hospitals, where he worked in smoking cessation programs. He will testify for defendants that the myriad of factors affecting initiation or continuance of smoking point to the need for an individual assessment of each smoker to determine whether a particular smoker is nicotine-dependent, and, if so, when they became so, whether

they demonstrated compensation, how they compensated, the extent to which they compensated, the extent to which they were aware of their compensation, what choices they made about smoking, how they made those choices, whether they demonstrated titration, and whether they had any other substance use or other psychiatric disorder that affected their smoking behavior.

George Seiden's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence.

u. Peter G. Shields

Peter G. Shields, M.D., is a professor in the Department of Oncology and Medicine and Chief of the Division of Cancer Genetics and Epidemiology at the Georgetown School of Medicine.

> His conclusion as a plaintiffs' expert is: The tobacco companies had the data to show that there was a problem with "light" cigarettes in general, and increased ventilation in particular. In addition, the phenomenon of compensation was exacerbating and increasing human exposure to mutagens. Thus, the tobacco companies' data was inconsistent with the contemporaneous perception by the general public, and sectors of the public health community, that "light" cigarettes were a safer alternative than regular cigarettes. In fact, the tobacco companies, but not the public or the public health and scientific community, understood that not all tars from cigarette smoke [were] the same. Essentially, only now do we learn from the tobacco companies that not all tars are the same. The public reporting of the tobacco companies' data might very well have had a substantial public health impact, allowing scientists to design and conduct life-saving studies, and assist the tobacco industry in their alleged attempts to de-

sign a less harmful product. The public health community would likely have delivered different and potentially life-saving messages. Over time, we have been unwitting participants in an unfortunate natural experiment observing the effects of changing cigarette smoke on lung cancer risk and in most cases attendant death, which has been evident through many types of data.

Peter G. Shield's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence. *See also Price,* Appendix C at ¶ 78, *infra.*

v. David W. Stewart

David W. Stewart, Ph.D., is Robert E. Brooker Professor of Marketing in the Gordon S. Marshall School of Business at the University of Southern California. He has been a member of the faculty of the University of Southern California School of Business since June of 1986 and have served as Chairman of the Marketing Department and Deputy Dean in the Marshall School. Prior to joining the faculty at the at the University of Southern California, he was Associate Dean and Associate Professor of Marketing in the Owen Graduate School of Management at Vanderbilt University. He also served as a research manager for a major advertising agency and has consulted for a variety of organizations on matters related to marketing, marketing research, marketing communications, marketing strategy, and consumer behavior.

As a defense expert he is prepared to demonstrate the unreliability of plaintiffs' experts Joel B. Cohen, Marvin E. Goldberg, John Hauser, Stanley Presser, and Paul Slovic. David W. Stewart is qualified under Rules 702 and 703 of the Federal Rules of Evidence. His testimony does not disqualify any of plaintiffs' experts.

### w. Charles R. Taylor

Charles R. Taylor, Ph.D. is the John A. Murphy Professor of Marketing at Villanova University and Senior Research Fellow at the Center for Marketing and Public Policy Research. He received his Ph.D. in Marketing from Michigan State University, with minors in advertising and communications. He is the immediate Past–President of the American Academy of Advertising. Since 1992, his primary research interests have included advertising effects and advertising regulation. In the course of teaching and research, he studied the Federal Trade Commission's regulation of advertising extensively.

As an expert for defendants, he will testify to the inadequacies of work for this case by plaintiffs' experts Joel B. Cohen, Marvin E. Goldberg, Stanley Presser, and Paul Slovic.

Charles R. Taylor is qualified to testify under Rules 702 and 703 of the Federal Rules of Evidence. His testimony does not provide the basis for a disqualification of any of plaintiffs' experts.

### x. Michael Thun

Michael Thun, M.D., is a physician and epidemiologist who serves as the vice president for Epidemiology and Surveillance Research at the American Cancer Society. The department he oversees conducts statistical research on cancer prevention, including several cohort studies conducted since the 1950s, the results of which have been published in over one hundred scientific publications. He has appeared in a number of tobacco litigations.

He opines that 1) changes in cigarette design over the past fifty years, such as those reflected in "light" cigarettes, have not resulted in any meaningful reduction in the disease risks associated with smoking; 2) earlier epidemiological studies compar-

ing filtered to unfiltered cigarettes do not support implicit or explicit statements that "light" cigarettes are less hazardous than regular cigarettes; and 3) research subsequent to Monograph 13 further shows that "light" cigarettes are no less hazardous than regular cigarettes with respect to lung cancer.

These opinions are relevant and appear to be reliable. They tend to show that "light" cigarettes did not provide a health benefit to those who smoked them instead of regular cigarettes—a necessary part of plaintiffs' claim that they were promised, and did not receive, reduced risk.

Michael Thun's proposed testimony complies with Rules 702 and 703 of the Federal Rules of Evidence. *See also Price*, Appendix C at ¶¶ 67–69, *infra*.

### y. Peter A. Valberg

Peter A. Valberg, Ph.D., an expert for defendants, is a public health professional specializing in health risk assessment, human toxicology (including inhalation toxicology), epidemiology, and biological modeling of human exposure to environmental chemicals, airborne gases, and airborne particles. He was a faculty member for 23 years in the Department of Environmental Health at the Harvard School of Public Health in Boston, Massachusetts. Currently, he is a Principal and Senior Health Scientist at Gradient Corporation, an environmental-health consulting firm with offices in Cambridge, Massachusetts and Seattle, Washington. He received a Ph.D. degree in physics in 1970 and an M.S. degree in human physiology in 1975 from Harvard University with postdoctoral training in Biomedical Physics and Biomaterials Science, Alveolar Macrophage Function, Pulmonary Pathology, Analytical and Quantitative Light Microscopy, and Advanced Quantitative Risk Assessment.

Among his conclusions are the following:

Different people smoke cigarettes differently, and even the same individual smokes cigarettes in different ways under different circumstances and at different times. These differences in smoking patterns result in variations in tar and nicotine intake among different smokers and by the same smoker . . . .

In a population of Lights smokers, there will be some smokers who do not compensate . . . .

Among individual smokers who compensate, the degree of compensation is highly variable. Virtually all studies of compensation have found that compensation is "incomplete" for the overwhelming majority of smokers, meaning that such smokers get lower tar and nicotine after switching to cigarettes with lower FTC yields . . . .

Whether, how much, how long, and in what ways an individual smoker compensates—whether such an individual gets lower tar and nicotine from smoking Lights—are specific to the unique circumstances of each individual and can only be determined based on information about the individual smoker.

The results, designs, methodologies, and research tools associated with internal cigarette company studies of human smoking exposure were consistent with and not materially different from what was contemporaneously known and available to the outside scientific community.

Peter V. Valberg's proposed testimony and report comply with Rules 702 and 703 of the Federal Rules of Civil Procedure.

z. W. Kip Viscusi

W. Kip Viscusi is the University Distinguished Professor of Law, Economic and Management at Vanderbilt University. His extensive qualifications have been previously reviewed by the court in this and other cases. He is obviously well qualified as an expert for the defendants. He has detailed objections to Dr. John Hauser's original report and affidavit of July 2006, which attempted to answer some of Dr. Viscusi's earlier objections. The objections and opinions of W. Kip Viscusi are admissible under Rules 702 and 703 of the Federal Rule of Civil Procedure. So, however, are those of Dr. Hauser. Credibility issues are for the jury.

aa. Errol Zeiger

Dr. Errol Zeiger performed and directed genetic toxicology (i.e., chemical mutagenicity) research at the Federal Drug Administration (FDA) for 7 years and then for 24 years at the National Institute of Environmental Health Sciences (NIEHS) of the National Institutes of Health (NIH). He retired from the government in December 2000 to work as a consultant in Chapel Hill, North Carolina. He has M.S. and Ph.D. degrees in microbiology from George Washington University in Washington, D.C., and a J.D. from North Carolina Central University School of Law. While he is a member of the North Carolina State Bar, he has never practiced law. He has more than 30 years experience in biology and toxicology as a laboratory researcher, project director, and scientific program manager.

His conclusions are summarized as follows:

The mutagenicity of a substance, as measured by the Ames test and other tests, provides an indication of its possible carcinogenicity (i.e., whether or not it will cause cancer in a laboratory animal test) but the potency of the mutagenic response does not predict the potency of the carcinogenic response either in laboratory animals or in humans. On a per cigarette basis, lower tar, Lights cigarettes are less mutagenic in the

Ames test and deliver lower yields of individual smoke constituents than higher tar, Full Flavor (Regular) cigarettes, when compared under the same smoking conditions. When smoke constituent yields are calculated on a per milligram tar (or per milligram nicotine) basis, some constituent yields increase, some decrease, and others are equivalent as between Lights and Full Flavor cigarettes. For most smoke constituents, the magnitude of these differences become smaller when these cigarettes are smoked more intensely. These differences in individual smoke constituent yields per milligram tar (or per milligram nicotine) do not establish that Lights are "more dangerous" than Full Flavor. Testing data specific to Marlboro Full Flavor and Marlboro Lights demonstrate that the mutagenicity in the Ames test of tars from these brands is equivalent. Although there are numerical differences in mutagenicity per milligram tar between Marlboro Lights and Marlboro Full Flavor, other Lights and Full Flavor brands for which data are available, and between low- and high-tar reference cigarettes with comparable FTC yields, and although some of these differences may be statistically significant, they are relatively small and not biologically relevant. Differences among positive mutagenic responses in the Ames test, even when statistically significant, cannot be used to predict differences in responses to cigarette tars in other biological systems, such as other genetic toxicity tests, rodent cancer tests, or an exposed human. Both the chemical composition of tar, and its mutagenicity on a per-milligram basis, vary based on how a cigarette is smoked. To the extent that cigarettes are smoked differently (by different people or different smoking machine protocols) the chemical composition of the tar and its mutagenicity per milligram tar will vary as well. For example, more intense smoking patterns have been shown to reduce the mutagenicity per milligram tar both in Lights and Full Flavor cigarettes. The levels of smoke constituents and mutagenicity obtained from a cigarette depend on the cigarette, itself, and on the total amount of smoke constituents (e.g., tar, nicotine, other constituents) that are produced when the cigarette is smoked. For example, a Lights cigarette that delivers less total smoke than a Full Flavor cigarette would also deliver lower amounts of smoke constituents and mutagenicity. To the extent that there is variability within and among smokers with respect to (a) their levels of total smoke intake, (b) the existence or extent of compensation, and/or (c) the various methods of compensation, I conclude to a reasonable degree of scientific certainty, that there will also be variability within and among smokers with respect to the total amounts of smoke constituents and mutagenicity that will be produced when smoking Lights. This variability, if demonstrated to exist, would preclude sweeping generalizations that all Lights smokers are exposed to higher levels of smoke constituents and mutagenicity.

The hypothesis that small differences in Ames test mutagenicity per milligram tar, or in levels of particular smoke constituents per milligram tar, demonstrate that Lights are "more dangerous" with respect to cancer than Full Flavor cigarettes would be inconsistent with any epidemiological evidence indicative of a reduction (or even no reduction) in lung cancer risk for lower tar, Lights cigarettes as compared to higher tar, Full Flavor cigarettes.

Errol Zeiger's proposed testimony and report comply with Rules 702 and 703 of the Federal Rules of Evidence.

## G. Plaintiffs' Motion to Exclude Expert Testimony that "Light" Cigarettes are Safer

Plaintiffs move to exclude all testimony by experts for defendants that "light" cigarettes are safer than regular cigarettes. In this connection they would exclude the testimony of Dr. Kenneth A. Mundt, an epidemiologist, and of two statisticians, Dr. Lawrence S. Mayer and Dr. William E. Wecker. They would also exclude defendants' proposed chemistry experts Dr. Jane Y. Lewis, Dr. Kenneth F. Podraza, Dr. Jeffery Gentry and Dr. Edward A. Robinson; and toxicologists Dr. Andrew T. Mosberg and Dr. Carr J. Smith.

The evidence on the safety of "light" cigarettes, with less tar, in general, than regular cigarettes is central to the issue of fraud in this case. Such evidence cannot be excluded without so distorting the trial as to make it administratively bizarre. Insofar as the plaintiffs are challenging the probative force of defendants' experts, they raise a *Daubert* issue. That issue is separately addressed passim, *supra.*

The motion is denied.

## H. Defendants' Motion to Exclude Expert Evidence of Impact of Marketing of "Light" Cigarettes on Smoking Rates

 Defendants move to exclude expert testimony that the marketing of "light" cigarettes has affected smoking initiation rates (by inducing nonsmokers to being smoking) or quit rates (by inducing smokers to continue smoking in lieu of quitting). They contend that plaintiffs' experts lack any scientific support for the conclusion that the marketing of "light" cigarettes has affected the prevalence of smoking. The motion is denied.

As already pointed out, expert evidence must be both relevant and reliable. *See*

Parts VIII.D, VIII.E, *supra.* "Pertinent evidence based on scientifically valid principles will satisfy those demands." *Campbell ex rel. Campbell v. Metropolitan Property and Cas. Ins. Co.,* 239 F.3d 179, 184–85 (2d Cir.2001).

Two of plaintiffs' experts, Drs. David Burns and Michael Thun, opine that smoking "light" cigarettes may increase the overall smoking prevalence rate by decreasing quit rate or increasing initiation rate. *See* Expert Report of David Burns, ¶ 71 ("Many smokers switch to lower yield cigarettes as part of an effort to quit or substantially reduce their smoking, but existing evidence suggests that they are not more likely to quit successfully than those who do not switch."); Expert Report of Michael Thun, ¶ 12 (raising the possibility that "smokers who have switched to a 'lower yield' product because of the implication that this will reduce their risk might otherwise have quit[ ]"). *See also* Thun Report ¶ 5(d) (citing article authored by Burns and Thun, discussed *infra*).

### 1. Relevance

The opinions of Drs. Burns and Thun are relevant. It is part of plaintiffs' theory that the fraudulent marketing of "light" cigarettes as more healthful encouraged existing smokers to switch to "light" cigarettes instead of quitting and induced new smokers to start smoking. *See* SAC ¶ 74(b) ("Defendants concealed the true nature of light cigarettes in order to attract new smokers and prevent current smokers from quitting, thereby preserving the cigarette market and maximizing their profits[.]"). Evidence that these marketing efforts were successful is pertinent to a finding of injury and determination of damages. *See* Parts III.B, III.D, *supra.*

### 2. Reliability

The opinions are reliable and based on sufficient data. As discussed in Parts

VIII.F.1.b and VIII.F.3.x, *supra*, Drs. Burns and Thun are qualified and their expert reports are admissible. Contrary to defendants' contentions, they have identified directly or indirectly several peer-reviewed studies that discuss the link between the marketing and use of "light" cigarettes and initiation and quit rates.

A 1998 study published in the American Journal of Preventive Medicine found that "light" smokers were overwhelmingly ignorant of the possibility that smoking a "light" cigarette could expose them to the same amount of tar and nicotine as smoking a regular cigarette (10 percent of a national sample). *See* Kozlowski, L.T., et al., *Smokers' misperceptions of light and ultra-light cigarettes may keep them smoking*, Am. J. Prev. Med.1998; 15(1):9–16 (quoted in Pls.' Resp. to Defs.' Mot. on Expert Marketing Evid., Docket No. 696, at 9). Forty percent of the "light" smokers in the sample indicated that they chose "light" cigarettes "to reduce the risks of smoking without having to give up smoking." *Id.* (quoted in Monograph 13, at 195). Movement towards quitting, reduced risk, and reduced tar and nicotine were all common reasons these smokers gave when asked why they chose "light" cigarettes—though "taste" was the most common. *Id.* Similar results were obtained in a contemporaneous state survey and another 1999 survey. *Id.* (citing Kozlowski, et al., *Smokers' misperceptions*, *supra*, and Kozlowski, et al., *Smoker reactions to a "radio message" that Light cigarettes are as dangerous as regular cigarettes*, Nicotine and Tobacco Control, 1999; 1:67–76).

Peer-reviewed surveys in 1995 and 1996 demonstrated that smokers of "light" cigarettes are more likely to acknowledge the risks of smoking and more likely to report that their health had been affected by smoking and that their doctor had advised them to quit. *See* Monograph 13 at 195 (citing Giovino, et al., *Attitudes, knowledge, and beliefs about low-yield cigarettes among adolescents and adults*, Monograph 7, National Cancer Institute (1996), and Health Canada, *Survey on Smoking in Canada* (1995)). The Giovino study also found that 38 percent of "light" smokers saw switching to "light" cigarettes as a step towards quitting, but that they were actually less likely to succeed in quitting. *Id.*

Summarizing this and other studies, one of the authors of Monograph 13 stated:

> Surveys indicate that switching to low-yield cigarettes is viewed by many smokers as a healthier choice. Given the interest in quitting among those who make this choice, their failure to quit at rates any higher than those who do not switch suggests that switching reduces the motivation to stop smoking.

Monograph 13 at 197. *See also* Tindle, et al., *Cessation Among Smokers Who Used "Light" Cigarettes: Results From the 2000 National Health Interview Survey*, Am. J. Pub. Health, 96(8): 1498–1504 (2006) (analysis of over 32,000 responses to United States National Health Interview Survey revealed that smokers who used "light" cigarettes were 54 percent less likely to quit than smokers who only smoked regular cigarettes). No data supports the contrary position that switching to "light" cigarettes increases the likelihood of quitting. Monograph 13 at 196. Monograph 13 is one of the bases of opinion identified by Dr. Thun. Dr. Burns edited the monograph. It is deemed incorporated into their opinions by reference.

Defendants' contention that, in depositions for this case and in a joint article published in 2001, the experts have disavowed the existence of any reliable evidence of a link between "light" cigarettes and smoking prevalence fails.

In their joint 2001 article, the two challenged experts wrote, "No studies have *adequately* assessed whether health claims used to market 'reduced yield' products delay cessation among smokers who might otherwise quit or increase initiation or relapse among non-smokers." Michael J. Thun & David M. Burns, *Health Impact of "Reduced Yield" Cigarettes: A Critical Assessment of the Epidemiological Evidence*, 10 Tobacco Control i4, i9 (2001) (quoted in Defs.' Reply Mem. on Expert Marketing Evid., Docket No. 735, at 1) (emphasis supplied). At deposition in this case, each again made a similar concession. *See* Deposition of David Burns (June 14, 2005), 184:3–7 ("Q: Is [your statement in the 2001 article] true today? A: Yes, with emphasis on the word adequately. *There is evidence to examine the question,* but the definitive answer that would establish it one way or the other has not been done.") (emphasis supplied); Deposition of Michael Thun (May 31, 2005), 279:19–20 ("Q: Do you believe that [statement from the 2001 article] is still true today? A: Yes.").

■■■ Drs. Burns and Thun's reasonable concessions are consistent with the elemental principle of the scientific method that hypotheses can only be disproved, never definitively proved. Expert evidence need not establish a hypothesis to a scientific certainty before an expert may offer his opinion based upon it. Were that the case, no expert would ever be permitted to testify.

What *Daubert* and the Federal Rules of Evidence demand is a "witness qualified as an expert by knowledge, skill, experience, training, or education," offering testimony that is "based upon sufficient facts or data, ... [that] is the product of reliable principles and methods, ... [that have been] applied ... reliably to the facts of the case." Fed.R.Evid. 702. Drs. Burns and Thun are qualified to offer opinions in the field. *See* Parts VIII.F.1.b, VIII.F.3.x, *supra* (finding their reports admissible). Their opinions are based upon sufficient data generated by reliable survey methods reliably applied in this instance.

As plaintiffs' experts properly concede, the cited studies do not definitively resolve the question of the link between promotion of "light" cigarettes by defendants and smoking rates. The data they contain do, however, provide a reasonable basis for the experts' inference that there is such a connection. The experts' testimony will "assist the trier of fact" by showing the jury one inference—though not the only one—it could draw from those studies. The jury need not accept the experts' opinions and will be so instructed.

Defendants also challenge plaintiffs' reliance on defendants' internal documents, which suggest that defendants were aware that "light" cigarette smokers were potential quitters, and adjusted their marketing to deter them from quitting. These documents state, for example: "[L]ow tar cigarette smokers ... are potential cigarette quitters .... And more of them than the average have tried to quit smoking. Since low tar smokers are an expanding share of the market, their greater desire to quit smoking poses a special problem for the industry." "A Study of Public Attitudes Toward Cigarette Smoking and the Tobacco Industry in 1978," May 1978, Bates 501565967–6019 at 6008 (Pls.' Class Cert. Mem. Ex. 71). And:

> Smokers remain prepossessed by exactly the same concerns that brought about the proliferation of successful lighter brands. They, presumably, remain open to and *need* new ways of delivering *LESS* .... It is useful to consider lights more as a third alternative to quitting and cutting down—a branded hybrid of smokers' unsuccessful attempts to modify their habit on their own.

"Structured Creativity Conference," June 1984, Bates 102690306–0477 at 0403 (Pls.' Resp. to Ct.'s Mem. of June 6, 2005, Ex. 19) (emphasis in original).

Defendants are correct that these documents do not purport to quantify the impact of marketing "light" cigarettes on quit or initiation rates. They are unsuitable for an expert purporting to demonstrate such a statistically determined impact. They would be admissible, however, to demonstrate defendants' beliefs. Using them, in conjunction with actions taken (e.g., advertising expenditures) and results (e.g., smoking rates, dominant position of "light" cigarettes), a jury could properly conclude that the introduction and marketing of "light" cigarettes was intended to, did, and does affect the prevalence of smoking.

Defendants' attempts to leverage some of plaintiffs' expert's ignorance of a particular topic into a "concession" by plaintiffs or "contradiction" among the experts is unavailing. That plaintiffs' experts Blaine Nye, Jeffrey Harris, John Beyer, and Kenneth Cummings were unaware of a study demonstrating that "light" cigarettes affect initiation or quit rates has no bearing on whether the studies are reliable when offered by other plaintiffs' experts.

The motion is denied. Defendants' hearsay objections to the studies proffered by plaintiffs, though dubious, *see* Fed. R.Evid. 703 ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted."), may be addressed by motions in limine.

### I. Defendants' Motion to Exclude Expert Testimony Regarding Mutagenicity of "Light" Cigarettes

Defendants' motion to exclude expert evidence of mutagenicity is denied for the reasons described in Part V.A, *supra* (denying partial summary judgment). Plaintiffs' experts do not offer the opinion that "light" cigarettes are, to a scientific certainty, more toxic than regular cigarettes or contain more mutagenic constituents. Rather, they examine defendants' internal documents and conclude that defendants were aware of the *possibility* that "light" cigarettes were more toxic, and failed to disclose this to their customers, thus fraudulently inflating the demand for their product. The motion is denied.

### J. Further Rulings as Case Develops

The *Daubert* and Rule 702 rulings are subject to modification as the proceedings develop. Further experts will be discouraged but not excluded. More precise decisions on questions which may be asked and opinions given can be expected during the course of the trial.

### IX. Management Issues

Defendants have raised several management issues of allegedly legal and constitutional dimension as bars to the prosecution of this litigation as a class action. None of them provides a basis for denial of certification. While complex, the management of the case calls only for garden-variety courtroom procedures and patience.

### A. Aggregate Proof

Plaintiff's use of aggregate proof does not violate defendants' constitutional rights. The appropriateness of such proof has been analyzed in numerous memoranda. *See, e.g., Blue Cross,* Appendix B at Part VII and D, *supra.* Experience with several years of discovery in this and related tobacco cases, and two full trials, has strengthened the conclusion that statistical

proof combined with other evidence is a necessary and pragmatic evidentiary approach that reflects full due process in this and many other massive tort cases. It is consistent with defendants' constitutional rights and legally available to support plaintiffs' RICO claims. This case, involving alleged mass market fraud on smokers whose economic injuries, if any, are calculable on an objective basis not involving individualized questions of medical harm, is even better suited than previous cases to such aggregate proof. *Cf. Blue Cross*, Appendix B, *supra* (damages sought for all increased payments made to individual insureds by health plan); *Simon II*, Appendix D, *infra* (punitive damages class sought based on estimate of compensatory damages due to personal injuries incurred from smoking).

The idea that due process and jury trial rights require a particularized traditional form of evidence for each element would make this case and cases like it impossible to try. There is little harm in retaining a requirement for "particularistic" evidence of causation and damages in sporadic individual accidents where there are but a few medical histories and witnesses; such evidence is almost always available and convenient in such litigation. *See, e.g., In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740, 832–34 (E.D.N.Y.1984). Even in such cases use of almost any experts, whether doctors or DNA experts, depends upon the implied or express probabilistic underpinning of their professional judgments.

In mass fraud cases with hundreds of thousands or millions of injured the cost of one-on-one procedures is insuperable and unsuitable for either a jury or a bench trial. The consequence of requiring individual proof from each smoker would be to allow a defendant which has injured millions of people and caused billions of dollars in damages to escape almost all liability. As Professor Rosenberg noted almost a score of years ago, such restrictions in the form of admissible evidence is impractical and unnecessary. "The concept of 'particularistic' evidence suggests that there exists a form of proof that can provide direct and actual knowledge of [the parties' conduct]. 'Particularistic' evidence, however, is in fact no less probabilistic than is the statistical evidence that courts purport to shun." David Rosenberg, *The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System*, 97 Harv. L.Rev. 851, 870 (1984) (footnotes omitted). Many commentators agree. *See, e.g.,* Peter Tillers, *Symposium: Artificial Intelligence and Judicial Proof*, 22 Cardozo L.Rev. 1365 (2001) (describing tendency of evidence scholars to rely on mathematical and quantitative methods, such as probability theory, statistics, and decision theory); Louis Kaplow & Steven Shavell, *Fairness Versus Welfare*, 114 Harv. L.Rev. 961, 1203 n.580 (2001); Laurens Walker & John Monahan, *Sampling Liability*, 85 Va. L.Rev. 329 (1999) (using statistical evidence is a reliable and practical method for mass trial); Robert G. Bone, *Statistical Adjudication: Rights, Justice, and Utility in a World of Process Scarcity*, 46 Vand. L.Rev. 561 (1993); Jonathan J. Koehler & Daniel Shaviro, *Veridical Verdicts: Increasing Verdict Accuracy Through the Use Of Overtly Probabilistic Evidence and Methods*, 75 Cornell L.Rev. 247, 248 (1990) (although courts should carefully determine the validity of probabilistic evidence, "overtly probabilistic evidence is no less probative of legally material facts than other types of evidence"); Michael J. Saks & Robert F. Kidd, *Human Information Processing and Adjudication: Trial By Heuristics*, 15 L. & Soc'y Rev. 123, 151 (1989–1990) ("Much of the testimony that is commonly thought of as particularistic only seems so.

It is far more probabilistic than we normally allow jurors (or judges) to realize."); *cf. The Evolving Role of Statistical Assessments as Evidence in the Courts* 78–79 (Report of the American Academy of Science Panel on Statistical Assessments as Evidence in the Courts) (Stephen E. Feinberg ed.1989) (noting the contradiction between some courts' insistence on evidence that seems certain, and such "probabilistic" institutions as plea bargaining, in which decisions are made on the basis of "probable" outcome). *But see* the objections (generally rejected by academics and courts) in Laurence H. Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process,* 84 Harv. L.Rev. 1329 (1971). *See generally* Federal Judicial Center, Manual for Complex Litigation (Fourth) § 11.493 (2004) (guidelines for use of sample surveys); David H. Kaye & David A. Freedman, *Reference Guide on Statistics, in* Reference Manual on Scientific Evidence (Second) 83–178 (Federal Judicial Center, 2000).

The Federal Rules of Civil Procedure and the Federal Rules of Evidence grant district judges broad authority to shape the nature and scope of admissible evidence for trial. Scientific evidence—such as sampling and statistical extrapolations—is well suited to mass tort actions. It is particularly appropriate in massive consumer fraud cases, so long as it passes the gatekeeping criteria described in the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and related cases. Many states have provided special mechanisms for handling consumer fraud claims in the aggregate, recognizing that many such claims cannot be economically tried individually. When, as in the case at bar, the plaintiffs are a widely spread group complaining of injury from a common course of conduct by defendants, statistical analysis may provide a more accurate and comprehensible form of evidence than would the testimony of millions of individual smokers. *See Blue Cross & Blue Shield of N.J., Inc.,* 133 F.Supp.2d at 172 (explaining propriety of statistical extrapolation for entity suffering damages in aggregate); *Blue Cross & Blue Shield of N.J., Inc.,* 36 F.Supp.2d at 575 (E.D.N.Y. 1999) ("The aggregation of millions of alleged injuries in the instant suit can be expected to yield more accurate results with respect to the causation issue since projections based upon a large statistical base will be available, thus reducing the size of the possible error.").

Resolving mass tort disputes on a case-by-case basis may create a systematic bias against plaintiffs because, "[w]hile defendants spread the risk of adverse judgments across all test trials, each trial decides the fate of each plaintiff party on a single roll of the dice." David Rosenberg, *Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't,* 37 Harv. J. on Legis. 393, 430 (2000); Marc Galanter, *Why the "Haves" Come out Ahead: Speculations on the Limits of Legal Change,* 9 L. & Soc'y Rev. 95 (1974) (importance of defendants' roles as repeat players). The defendant who successfully resolves a mass tort dispute with aggregate tools enjoys the economic benefit of a final resolution to all proceedings, not just a single case. *Cf. Simon v. Philip Morris Inc.,* 200 F.R.D. 21, 43–46 (E.D.N.Y.2001) (discussing public policy supporting aggregation).

### 1. *Federal Rules of Civil Procedure and Evidence*

 Claiming it was necessary for their defense of the suit, defendants sought discovery, in the form of depositions or surveys, from 650 smokers on class certification and over 40,000 smokers in preparation for trial. *See* Mem. in Sup-

port of Defs.' Mot. for Leave to Obtain Discovery from Absent Class Members, dated April 11, 2005, at 1 (Docket No. 152). The request was granted in part by the magistrate judge. *See* Mem. & Order of May 12, 2005 (Gold, M.J.) (permitting defendants to depose 40 smokers of 10 brands in anticipation of certification but denying request to depose absent class members on merits), *modified in part*, Order of June 1, 2005, at 2 (sustaining plaintiffs' objection to pre-certification depositions of smokers).

A trial court has wide discretion to manage pre-trial discovery. *See Cruden v. Bank of New York*, 957 F.2d 961, 972 (2d Cir.1992). The Federal Rules of Civil Procedure grant a district court judge flexibility to shape the type and scope of information available before and during a complex trial. *See* Manual For Complex Litigation (Fourth) § 11.422 (2004). The Rules contemplate the trial or magistrate judge's setting time limits and restrictions on the quantity, scope, and the sequencing of discovery. *See* Fed.R.Civ.P. 1 (Rules to be construed and administered to secure "just, speedy, and inexpensive determination of every action"); Fed.R.Civ.P. 16(b) (limiting the time for, and other aspects of, discovery in pretrial conference); Fed. R.Civ.P. 26(b)(2) (court to limit "frequency or extent of use of discovery methods"); Fed.R.Civ.P. 30(a), 33 (establishing presumptive limits for depositions and interrogatories); *cf. B.F. Goodrich v. Betkoski*, 99 F.3d 505, 523–24 (2d Cir.1996) (not abuse of discretion to limit discovery in CERCLA case involving numerous parties when extensive discovery would make litigation expense disproportionate to cost of cleaning up landfill).

The Manual For Complex Litigation specifically recommends "limiting discovery that is cumulative, duplicative, more convenient or less burdensome or expensive to obtain from another source, or seeks information the party has had ample opportunity to obtain." Manual For Complex Litigation (Fourth) § 11.421. A balance must be struck between the burden and expense of discovery sought and its potential benefit. Limiting discovery under the Federal Rules confronts litigants with hard choices. Some discovery necessarily must be foregone or structured in complex litigation if massive cases are to be expeditiously resolved. The goal in a federal court should be to decide fairly claims based on the merits, not on informational costs associated with the deposition of millions of witnesses. *See* Laurens Walker & John Monahan, *Sampling Liability*, 85 Va. L.Rev. 329, 350 (1999) (promoting methods to overcome high information search costs to reach merits). According to the Manual For Complex Litigation: "In determining appropriate limits, the court will need to balance efficiency and economy against the parties' need to develop an adequate record for summary judgment or trial. This task further underlines the importance of clarifying and understanding the issues in the case before imposing limits." Manual For Complex Litigation (Fourth) § 11.422 (2004). It is particularly important not to deny the courts the ability to take advantage of cost savings through modern scientific techniques for acquiring information. *See, e.g.,* Federal Judicial Center, Reference Manual, *supra;* Steven Breyer, *Introduction;* Margaret A. Berger, *The Supreme Court's Trilogy on the Admissibility of Expert Testimony;* William W. Schwarzer & Joe S. Cecil, *Management of Expert Testimony;* David H. Kaye & David A. Freedom, *Reference Guide On Statistics;* Shari Seidman Diamond, *Reference Guide on Survey Research.*

In the bulk of the third-party tobacco cases that contemplated discovery and tri-

al, courts have properly limited the level of individual proof available. *Northwest Laborers–Employers Health & Sec. Trust Fund v. Philip Morris, Inc.*, 58 F.Supp.2d 1211 (W.D.Wash.1999) (Order On Defendants' Motion to Compel Discovery Re Individual Fund Participants) ("[d]efendants' motion to compel discovery regarding individual fund participants would impose an enormous burden on all parties and effectively would bring the litigation to a halt"); *West Virginia–Ohio Valley Area IBEW Welfare Fund v. American Tobacco Co.*, No. 97–0978 (S.D.W.Va., May, 1999) (rejecting defendants' motion to depose every member of union trust fund); *In re Mike Moore, Attorney General ex rel. State of Mississippi Tobacco Litigation*, No. 94–1429 (Miss. Apr. 18, 1996) (Order on Defendant's Motion to Compel Initial Discovery Limited Number of Medicaid Recipients on Health Care Provided by the State of Mississippi) (permitting disclosure of identity and information of limited number of Medicaid recipients); *State v. Philip Morris, Inc.*, No. Cl.–94–8565 (Minn. Dec. 21, 1995) (Order to Compel Limited Depositions of Medicaid Recipients) (limiting depositions for defendants); *see* Laurens Walker & John Monahan, *Sampling Liability*, 85 Va. L.Rev. 329 (1999) (approving the use of sampling in pre-trial and at trial in tobacco litigation). Limits on individualized proof are recognized in other types of cases. *See* Howard Ross Cabot & Alan A. Matheson Jr., *The Use of Statistics to Wrest Control Over the Trial of Mass Damage Claims*, 7 Inside Litig. at 16 (Mar.1993) (dealing with approximately 17,000 property damage subrogation lawsuits arising from a chemical explosion, proposed trial plan would use stratified sampling of the insurance claims at issue). Class actions, like these last cases, provide adequate procedures and due process in aggregation of many claims.

The trial judge's role as a primary protector against excessive transactional costs in litigation extends beyond the discovery phase to trial. She or he has broad powers under the Federal Rules of Evidence to regulate the admission of expensive cumulative evidence. *See* Fed.R.Evid. 403 (restricting cumulative evidence); Fed.R.Evid. 611(a) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence."); Fed. R. Evid 1006 (allowing writings, recordings, or photographs which cannot be conveniently examined in court to be presented in the form of "chart[s], summar[ies] or calculation[s]").

Although the manner of presenting evidence is best left to counsel, Rule 611 of the Federal Rules of Evidence entrusts the trial judge with the "ultimate responsibility" for the efficient ascertainment of truth by authorizing the exercise of reasonable control over the presentation of evidence. *See* Margaret A. Berger, et al., *Evidence* § 611.02 (2000); Fed.R.Evid. 611(a) advisory committee's note ("The ultimate responsibility for the effective working of the adversary system rests with the judge."); ABA Civil Trial Practice Standard 12(b) (1998) ("Subject to the judge's ultimate responsibility to ensure a fair trial and to afford the parties a fair opportunity to be heard, the court should consider whether to ... impose reasonable limits on trial presentation ...."). The wording of Rule 611 is broad enough to authorize innovations in the presentation of evidence provided the court considers ways to limit prejudice to the parties. Berger, et al., *Evidence* § 611.02 (citing cases). Reasonable trial court decisions under Rule 611 of the Federal Rules of Evidence do not deny due process—particularly in the civil context. They are only challengeable upon a finding that the abuse of discretion substantially denigrat-

ed a party's right to a fair trial. *United States v. Vinson*, 606 F.2d 149, 155 (6th Cir.1979); *United States v. Weiner*, 578 F.2d 757, 766 (9th Cir.1978).

### 2. Appropriateness of Sampling and Survey Techniques

Sampling and survey techniques are well-accepted alternatives for the trial judge facing crippling discovery and evidentiary costs. *See* Manual for Complex Litigation (Fourth) § 11.422 (when it is necessary to limit discovery, "statistical sampling techniques [may be used] to measure whether the results of the discovery fairly represent what unrestricted discovery would have been expected to produce"), § 11.493 ("The use of acceptable sampling techniques in lieu of discovery and presentation of voluminous data from the entire population, may produce substantial savings in time and expense."). *See also* Hans Zeisel & David Kaye, *Statistics for Social Science and Public Policy, Empirical Methods in Law and Litigation* (1997) (use of statistical methods in litigation); citations to Reference Manual on Scientific Evidence in Part IX.A.1, *supra*. They have been admitted in a large variety of actions to establish key factual contentions. *See, e.g., Castaneda v. Partida*, 430 U.S. 482, 495–96, 97 S.Ct. 1272, 51 L.Ed.2d 498. 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (statistical data sufficient to establish prima facie case of discrimination in jury selection); *In re Estate of Marcos Human Rights Litig.*, 910 F.Supp. 1460, 1465 (D.Haw.1995) (using sampling to determine compensatory damages by extrapolation), *aff'd sub nom Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir.1996); *Ageloff v. Delta Airlines, Inc.*, 860 F.2d 379, 383–84 (11th Cir.1988) (in wrongful death suit by estate, evidence of decedent's life expectancy, in conjunction with projected earnings, savings, and return on investment rates used to deter-

mine damages); *G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1538–40 (11th Cir.1985) (using expert testimony for profit projections based on industry norms); *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 653–57 (5th Cir.1983) (using census data in gender discrimination case); *Exxon Corp. v. Tex. Motor Exch., Inc.*, 628 F.2d 500 (5th Cir.1980) (using statistical sampling in trademark infringement suit); *Stewart v. General Motors Corp.*, 542 F.2d 445, 449 (7th Cir.1976) (statistical evidence to establish prima facie case of racial discrimination in employment); *Zippo Mfg. Co. v. Rogers Imports*, 216 F.Supp. 670, 681–82 (S.D.N.Y.1963) (Feinberg, J.) (relying on consumer surveys and sampling methodology to determine whether defendant's product caused public confusion with plaintiff's trademarked product); *United States v. 449 Cases Containing Tomato Paste*, 212 F.2d 567, 574–75 (2d Cir. 1954) (approving health inspector's testing of samples to determine contamination, rather than requiring the opening of all cases).

The Supreme Court has spoken favorably of the use of sampling and statistical analysis. *See United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 247–48, 122 S.Ct. 2117, 153 L.Ed.2d 280 (2002) (approving Internal Revenue Service use of aggregate estimation to determine unreported tips by restaurant employees).

In some cases sampling techniques may "provide the only practicable means to collect and present relevant data." Manual for Complex Litigation (Fourth) § 11.493 (2004). *See also Harolds Stores v. Dillard Dep't Stores*, 82 F.3d 1533, 1544 (10th Cir. 1996) (survey admitted as exception to hearsay rule if it is "material, more probative on the issue than other evidence and if it has guarantees of trustworthiness") (internal citation omitted). No special or unique rules of evidence are involved when

aggregate proof of damages is used on behalf of a class. *Newberg on Class Actions* § 10.05.

Properly developed survey evidence is admissible subject to arguments regarding its weight and probative value. *Schering Corp. v. Pfizer, Inc.,* 189 F.3d 218, 224 (2d Cir.1999) (collecting cases); *McNeilab Inc. v. American Home Prods. Corp.,* 848 F.2d 34, 38 (2d Cir.1988). The question whether such surveys in combination with other evidence is sufficiently probative is to be left to the jury in accordance with the "well-established standards governing judgment as a matter of law," once the court has determined the study is viable under Federal Rule of Evidence 702. *In re Joint E. & S. Dist. Asbestos Litig.,* 52 F.3d 1124, 1133 (2d Cir.1995) (permitting statistical evidence to go to jury). *See generally* Michael O. Finklestein & Bruce Levin, *Statistics for Lawyers* vii (2d ed.2001) (wide expansion of statistics used in trials over past decade).

In *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* the court analyzed the factors central to an examination of a survey to determine its reliability. They are whether:

(1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured.

559 F.Supp. 1189, 1205 (E.D.N.Y.1983).

"The *Toys R Us* criteria are typically used by courts [in bench trials] to analyze the weight to be accorded a survey, not its admissibility under Rule 403." *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.,* 221 F.Supp.2d 457, 460 n. 1 (S.D.N.Y.2002) (applying *Toys R Us* ). In the jury trial contemplated in this case, they will provide a sound map for direct and cross-examination by counsel to aid jurors in deciding what weight, if any, to give the survey proofs offered by the parties.

Greater reliance on statistical methods is required by the profound evolution in our economic communication and data compilation and retrieval systems in recent decades. *See generally* Deborah R. Hensler & Mark A. Peterson, *Understanding Mass Personal Injury Litigation: A SocioLegal Analysis,* 59 Brook. L.Rev. 961 (1993). Manufacturers now mass-produce goods for consumption by tens of millions, creating the potential for mass injury or fraud. Modern adjudicatory tools must be adapted to allow the fair, efficient, effective, and responsive resolution of the claims of these aggrieved masses. *See, e.g., In re DES Cases,* 789 F.Supp. 548 (E.D.N.Y.1992) (market share liability applied in suits for defective design of diethylstilbestrol (DES)); *In re Joint E. & S. Dist. Asbestos Litig.,* 726 F.Supp. 426 (E.D.N.Y.1989) (computation of damages for Brooklyn Navy Yard asbestos victims); *In re Agent Orange Prod. Liab. Litig.,* 689 F.Supp. 1250 (E.D.N.Y.1988) (distribution scheme for victims of agent orange); *see also* Manual for Complex Litigation (Fourth) §§ 22.31–.318 (2004) (special issues arising from aggregated claims in mass torts). *See generally* Howard M. Erichson, *Mass Tort Litigation and Inquisitorial Justice,* 87 Geo. L.J.1983, 1985 (1999) (describing with approval the increase in court-appointed experts and settlement class actions based on "vigorous inquiries" into the merits of the claims as two "necessary" responses to the chal-

lenges of mass torts). With the passage of the Class Action Fairness Act, the obligation of federal courts to resolve such disputes will increase. *See* Pub.L. 109–2, 119 Stat. 4 § 4(a)(2) (2005), codified at 28 U.S.C. § 1332(d)(2) (expanding original federal district court jurisdiction over class actions).

State legislatures, courts, and commentators have recognized that tools for aggregation are especially helpful in the context of consumer fraud, when the relatively low value of specific claims or the litigation advantages of a well-financed defendant can discourage individuals from pressing their claims in court. Particularly incisive is the statement in *Group Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 15 (Minn.2001): "[W]e reject the view ... that our misrepresentation in sales laws require proof of individual reliance in all actions seeking damages. To impose a requirement of proof of individual reliance in the guise of causation would reinstate the strict common law reliance standard that we have concluded the legislature meant to lower for these statutory [consumer fraud] actions." (citations omitted). *See also* Samuel Issacharoff, *Group Litigation of Consumer Claims: Lessons From the U.S. Experience*, 34 Tex. Int'l L.J. 135, 142–46 (1999) (limited resources and incentives for consumers acting individually); Laurens Walker & John Monahan, *Sampling Liability*, 85 Va. L.Rev. 329 (1999).

These tools are necessitated by procedural devices such as the class action, discussed in detail in Part VII, *supra*, and subrogation statutes permitting a state agency or other institutional actor to pursue on a consolidated basis recovery for harms to many individuals. *See, e.g.,* Fla. Stat. Ann. § 409.910(4) (empowering state health agency to seek recovery from liable third parties of funds owed to Medicaid-eligible citizens); Vt. Stat. Ann. tit. 33, § 1911(f)(5) (2005) (permitting use of statistical analysis to prove causation and damages in state agency action to recover monies expended on "tobacco-related health conditions"); Md.Code Ann., Health Gen. § 15–120(e)(2) (2006) (same). *But see Agency for Health Care Admin. v. Associated Indus. of Florida*, 678 So.2d 1239 (Fla.1996) (striking statutory provision permitting statistical analysis of subrogated claims of Medicaid recipients on state due process grounds).

### 3. Due Process

 The use of statistical evidence in the instant case violates neither the Constitutional guarantee of due process nor the Constitutional right to a jury trial. " 'Due Process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (internal citation omitted). "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Id.* Whether a procedural device utilized where a private party invokes state authority to deprive another person or entity of property comports with due process is determined by a balancing of interests:

[F]irst, consideration of the private interest that will be affected by the [procedure]; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, ... principal attention to the interest of the party seeking the [procedure], with, nonetheless, due regard for any ancillary interest the government may have in provid-

ing the procedure or forgoing the added burden of providing greater protections. *Connecticut v. Doehr*, 501 U.S. 1, 11, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991); *see also Hilao*, 103 F.3d at 786.

Consideration of the private interests at issue counsels in favor of utilizing statistical methods. Tobacco companies admittedly have an interest in not paying for damages in excess of what their alleged misconduct may have caused; that interest would be furthered by their confronting (before a jury) each of the tens of millions of plaintiffs who may have been defrauded about his or her reliance on tobacco company misstatements and omissions (so as to determine whether the RICO reliance requirement was met for that plaintiff), and about his or her discovery of injury (so as to determine when the statute of limitations started to run for that plaintiff).

Practical considerations temper the weight of the tobacco companies' interest. If such an individualized process were undertaken, it would have to continue beyond all lives in being. Assuming tobacco companies were willing to expend the resources and monies necessary both in discovery and at trial to mount such an undertaking, the litigation costs in doing so would far exceed any monies saved by avoiding erroneous payments. Transactional costs would be enormous. Most of these costs would be borne by the public through financing of a court system that would require expansion.

The interest of plaintiffs in avoiding the additional litigation costs that would arise if defendants were permitted to confront each possible plaintiff at trial is weighty. The necessary additional litigation costs to plaintiffs would exceed any recovery possible from defendants, making continued pursuit of the litigation fruitless. *See, e.g., Hilao*, 103 F.3d at 786 ("[Plaintiffs'] interest in the use of the statistical method ...

is enormous[ ] since adversarial resolution of each class member's claim would pose insurmountable practical hurdles."). The interests of the injured plaintiffs must be considered. Requiring individual proof as to each claim would unnecessarily intrude on the lives of tens of millions of people. Examining each grain of sand is too burdensome in a survey of a beach.

The second element of the due process balancing test—examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards— also supports allowance of the proffered statistical proof, subject to appropriate *Daubert* challenges. *See* Part VIII, *supra* (resolving such challenges). Litigation of the RICO class claims with full debate over the merits of proffered surveys and statistical models—which the parties have begun—may provide greater safeguards to defendants than would the litigation of a single handpicked sympathetic plaintiff's case who seeks punitive damages for the conduct of defendants towards all possible plaintiffs. *Cf. International Bhd. of Teamsters, Local 734 v. Philip Morris Inc.*, 196 F.3d 818, 823 (7th Cir.1999) ("Statistical methods could provide a decent answer [to the question of RICO injury causation]—likely a more accurate answer than is possible when addressing the equivalent causation question in a single person's suit.").

Experts have developed appropriate modeling techniques for reaching statistically significant and reliable conclusions. *See* Finkelstein & Levin, *Statistics for Lawyers* §§ 5.3, 13.7 (confidence intervals), §§ 9.1–9.2 (sampling), §§ 13.1–13.9 (regression modeling); Kaye and Freedman, *Reference Guide on Statistics, supra*, at 331; Rubinfeld, *Reference Guide on Multiple Regression, supra*, at 415. *See generally* Geoffrey R. Norman & David L.

Streiner, PDQ Statistics 27–77 (1986) (statistical inference and regression analysis).

In the *Blue Cross* case, such techniques were employed to ensure that the ultimate damages projected by statistical models were within a reasonable percent, higher or lower, of the actual damage caused by defendants' alleged misconduct. *See Blue Cross*, 178 F.Supp.2d at 206–09. The jury's evaluation of this data was conservative and helpful to defendants.

In addition to statistical evidence, the parties will be permitted to present to the jury relevant lay testimony, expert testimony, and documentary evidence—and test opposing party proofs by cross-examination and argument—subject to the constraints of the Federal Rules of Evidence and the practical considerations of trial management.

The third due process consideration, regard for any interest the government may have in the proposed procedures, weighs heavily in support of allowing plaintiffs to rely on statistical evidence. A consolidated trial with full presentation of the individual facts of each of plaintiffs' beliefs about the health risks of "light" cigarettes before a single jury would be unmanageable. *See* Manual for Complex Litigation (Fourth) § 12.3 ("Although presentation of evidence is normally controlled by counsel's strategies and tactics, complex litigation presents other concerns, primarily jury comprehension and the length of the trial. These are not unrelated: A shorter trial promotes jury comprehension, and effective presentation of evidence saves time."); Joe S. Cecil, Valerie P. Hans & Elizabeth C. Wiggins, *Citizen Comprehension of Difficult Issues: Lessons from Civil Jury Trials*, 40 Am. U.L.Rev. 727, 764 (1991) ("[T]he overall picture of the jury [in complex cases] that emerges from the available data indicates that juries are capable of deciding even very complex cases,

especially if procedures to enhance jury competence are used."). Tens of millions of separate trials brought by individuals who were victims of the alleged "lights" cigarette fraud would prove unnecessarily burdensome; it would "clog the docket of the district court for years." *Hilao*, 103 F.3d at 786–87. *See also* Walker & Monahan, *Sampling Liability, supra*, at 343 ("Individualized information should be used where it is practical—i.e., cost effective—to obtain. If individual information is not practical to obtain, however, sampling should be used so that a judgment can be reached efficiently and expeditiously.").

Under the balancing test set forth in *Doehr*, the use of statistical evidence (subject to satisfaction of the *Daubert* criteria) by plaintiffs does not violate due process strictures. See Michael J. Saks & Peter David Blanck, *Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts*, 44 Stan. L.Rev. 815, 826–32 (1992) (statistical sampling is both sufficient and necessary to meet due process requirements in mass tort cases). The interests of the private parties, the accuracy of the procedures, and an efficient use of court resources argue in favor of using statistical models along with individual deposition lay testimony, expert testimony, and documentary evidence.

### 4. Jury Right

█ The use of aggregated proof on plaintiffs' claims does not violate the Seventh Amendment. A contrary view would require concluding that the Constitution establishes fixed limitations on the methods of proof a particular party may offer. Requiring such a horse-and-buggy interpretation for trials in a computer-guided-rocket age seems somewhat far-fetched. Courts cannot ignore and deny themselves

what the rest of the world relies upon in fact-finding.

The Seventh Amendment of the Constitution protects the right to a jury trial. It reads: "In suits at common law, where the value in controversy shall exceed twenty Dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. The Amendment "was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions." *See Galloway v. United States,* 319 U.S. 372, 392, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943); *Ex parte Peterson,* 253 U.S. 300, 309–12, 40 S.Ct. 543, 64 L.Ed. 919 (1920).

Over the past two centuries, the primary concern in interpreting the Seventh Amendment has been to preserve the jury's role as a finder of fact, without constitutionally freezing evidentiary and trial procedures. Justice Brandeis emphasized the necessity of adapting the jury trial right to contemporary realities in *Ex parte Peterson:*

> [The Seventh Amendment] does not prohibit the introduction of new methods for determining what facts are actually in issue, nor does it prohibit the introduction of new rules of evidence .... New devices may be used to adapt the ancient institution to present needs and to make of it an efficient instrument in the administration of justice. Indeed, such changes are essential to the preservation of the right. The limitation imposed by the Amendment is merely that enjoyment of the right of trial by jury be not obstructed, and that the ultimate

determination of issues of fact by the jury be not interfered with.

*Id.* at 309–10, 40 S.Ct. 543 (citations omitted); *see also Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 436 n. 20, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ("If the meaning of the Seventh Amendment were fixed at 1791, our civil juries would remain, as they unquestionably were at common law, twelve good men and true.") (internal citations and quotations omitted); Margaret L. Moses, *What The Jury Must Hear: The Supreme Court's Evolving Seventh Amendment Jurisprudence,* 68 Geo. Wash. L.Rev. 183, 199 ff., 207 (2000) (discussing procedural changes approved by Supreme Court; the Court has "repeatedly held that [it is] the substance of the jury trial right—the jury's fact-finding role—[which] must be preserved"); Austin Wakeman Scott, *The Reform of Civil Procedure,* 31 Harv. L.Rev. 669, 671–78 (1918) (describing historical evolution of jury trials).

The historical record demonstrates that the framers' main objective in drafting the Seventh Amendment was to limit the ability of an appellate court to overturn a civil jury's finding of fact. There is no indication they intended to constrain the trial judge's substantial discretion to employ appropriate procedural mechanisms in managing a trial so as to permit the jury to arrive at the truth—or as near to the truth as time and humankind's limitations allow. *See Simon v. Philip Morris Inc.,* 200 F.R.D. 21, 33–36 (E.D.N.Y.2001) (detailing British common law and early American understanding of the jury trial right).

The late Chief Justice Rehnquist observed that whatever procedural changes are made, they cannot be allowed to invade the "jury's province"—its fact-finding power. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 345–46, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissent-

ing). Yet, the jury has unquestionably had much of its fact-finding authority attenuated indirectly through various evolving "procedural devices." Fed.R.Evid. 104(a) (judicial discretion to bar evidence that fails conditional relevancy); Fed. R.Evid. 403 (judicial discretion to bar cumulative, irrelevant, prejudicial information); Edward J. Imwinkelried, *Trial Judges—Gatekeepers or Usurpers? Can the Trial Judge Critically Assess the Admissibility of Expert Testimony Without Invading the Jury's Province to Evaluate The Credibility and Weight of the Testimony?*, 84 Marq. L.Rev. 1, 7 (2000) (*Daubert* may limit jury's fact finding role); Lisa S. Meyer, *Taking the "Complexity" Out of Complex Litigation: Preserving the Constitutional Right to a Civil Jury Trial*, 28 Val. U.L.Rev. 337 (1993) (juries replaced by bench trials in complex cases). The increasing use of bench trials, *Daubert* hearings, summary judgments, and directed verdicts—as authorized by rules of practice and appellate courts—to limit fact finding and set aside verdicts poses a threat to the continued viability of the Seventh Amendment jury trial. The development of new fair procedures that accord with modern statistical and informational gathering techniques for making factual determinations does not.

Courts must be especially careful not to hobble the jury system by excluding potentially useful evidence. Prematurely cutting off the flow of evidence to the jury generally favors defendants, who do not have the burden of proof on most issues, leading not only to a violation of the Constitution, but a tilting of the scales of justice. *See, e.g.,* John Caher, *Court Seen As Slow In Expanding Tort Claims, Criminal Defendant's Rights*, N.Y.L.J., Jul. 24, 2001, at 1 (describing trend against private litigants in decisions by New York Court of Appeals); Margaret A. Berger, *Upsetting the Balance Between Adverse Interests: Expert Testimony in Toxic Tort Litigation*, 64 L. & Contemp. Probs. 289, 326 (2001) (discussing *Daubert*; "The Supreme Court's trilogy on expert proof has empowered federal judges to adjust the balance in toxic tort cases to favor defendants ... by ... converting rulings on the admissibility of evidence into rulings on the sufficiency of evidence. The result is that the critical issue of causation in toxic tort is being decided by federal judges, not ... jurors, and in pretrial proceedings, rather than at trial."); Kevin M. Clermont & Theodore Eisenberg, *Appeal from Jury or Judge Trial: Defendants' Advantage*, 3 Am. L. & Econ. Rev. 125, 128 (2001) (appellate courts are more inclined to overturn plaintiff's verdicts because of perceived pro-plaintiff bias by juries); Kevin M. Clermont & Theodore Eisenberg, *Anti–Plaintiff Bias in the Federal Appellate Courts*, 84 Judicature 128 (2000) (same); Lucinda M. Finley, *Guarding the Gate To The Courthouse: How Trial Judges are Using Their Evidentiary Screening Role to Remake Tort Causation Rules*, 49 DePaul L.Rev. 335, 337 (1999) (evidentiary gate-keeping "substantially increases plaintiffs' burden of proving individual causation, and it also furthers the trend in toxic tort cases to shift the allocation of power away from juries to judges"); Samuel Issacharoff & George Lowenstein, *Second Thoughts About Summary Judgment*, 100 Yale L.J. 73, 75 (1990) ("[L]iberalized summary judgment inhibits the filing of otherwise meritorious suits and results in a wealth transfer from plaintiffs as a class to defendants as a class."); Jeffrey W. Stempel, *A Distorted Mirror: The Supreme Court's Shimmering View of Summary Judgment, Directed Verdict, and the Adjudication Process*, 49 Ohio St. L.J. 95, 99 (1988) (describing Supreme Court's 1986 trilogy of summary judgment cases as "faulty and ill-conceived in light of

the purposes for which the civil litigation system exists"). Such a trend favoring defendants by limiting jury decision making power is also inconsistent with the Federal Rules of Evidence that were designed to enhance the search for truth by making more data available to the trier. Fortunately, the Court of Appeals for the Second Circuit generally has resisted this tendency towards hobbling of fact finding by juries. *See, e.g., Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 169 n. 13 (2d Cir.2001) (approving jury bifurcation for liability and remedies phases of trial); *In re Joint Eastern & Southern Dist. Asbestos Litig.,* 52 F.3d 1124, 1132 (2d Cir.1995) (permitting statistical evidence).

The essential protections of the Seventh Amendment are enhanced, not reduced, by procedures which streamline and focus jury fact-finding. The jurors in this district are generally educated and aware of current technology; they would justly feel insulted by being denied modern fact finding techniques.

Excluding information on the ground that jurors are too ignorant to evaluate it properly may have been appropriate in England at a time when a rigid class society created a wide gap between royal judges and commoner juries, but it is inconsistent "with the realities of our modern American informed citizens and the responsibility of independent thought in a working society." *United States v. Shonubi,* 895 F.Supp. 460, 493 (E.D.N.Y.1995), *rev'd on other grounds,* 103 F.3d 1085 (2d Cir.1997). *See also* James Bradley Thayer, *Select Cases on Evidence at the Common Law* 1 (1892) ("Reasoning, the rational method of settling disputed questions, is the modern substitute for certain formal and mechanical tests which flourished among our ancestors for centuries, and in the midst of which the trial by jury

emerged.") (internal quotation marks omitted).

Fidelity to equitable and legal principles requires the use of statistical proof rather than compelling individualized showings as to tens of millions of claims. *See Young v. Higbee Co.,* 324 U.S. 204, 209, 65 S.Ct. 594, 89 L.Ed. 890 (1945) ("Equity looks to the substance and not merely to the form."). *But see Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.,* 62 F.Supp.2d 236, 246 (D.Mass.1999) (union trust fund could not use unjust enrichment theory to evade requirement of individual showing of damages for costs incurred because of medical injuries suffered by its smoking members; "[t]he premise of the unjust enrichment theory—the defendants' legal responsibility for medical expenses—must be determined one participant at a time").

The equity in allowing statistical proof of reliance and causation is underscored by the massive nature of the fraud alleged. If plaintiffs' allegations are borne out, the defendants sought to mislead the whole of the American public by distorting the entire body of public knowledge on the health risks of "light" cigarettes. By carrying out this alleged widespread scheme, it was the defendants themselves who made a claim-by-claim showing virtually impossible.

### B. Distribution of Any Damages

This class action is predicated on the theory that defendants formed an association-in-fact enterprise "to defraud the public into believing that light cigarettes were a healthy alternative to regular cigarettes ... in order to maximize sales and profits." Pls.' Sec. Am. Compl. ("Compl.") ¶ 200 (Docket No. 95). Plaintiffs plan to prove defendants' liability to the class on an aggregate basis, and to distribute the total damages among individual class members through a proof of claim proce-

dure. Damages would be allocated among class members based on the number of "light" cigarettes purchased by each within the relevant geographic area and time.

Describing this proposed litigation scheme as a form of "fluid recovery," defendants contend it is illegal, requiring denial of certification and dismissal. They argue that the use of a fluid recovery is foreclosed by the Court of Appeals for the Second Circuit's decisions in *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973), *vacated on other grounds*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), and *Van Gemert v. Boeing Co.*, 553 F.2d 812 (2d Cir.1977), *aff'd on other grounds*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980).

For reasons described below, the plaintiffs' proposed use of fluid recovery is permissible. It does not require denial of certification and dismissal. Although the Court of Appeals for the Second Circuit has appeared from time to time in individual cases to deny the power of courts in this circuit to use what have been characterized as a wide variety of forms of fluid recovery, it is not the rule of the circuit or of the nation to deny fluid recovery in every case. Such a rule could not be the law under present societal conditions. *Cf.* Stephen Breyer, *Active Liberty* 57 (2005) (writing that "principle must be implemented against the backdrop of a highly complex net of technology-based social problems").

### 1. Fluid Recovery

#### a. Nature and use

The phrase "fluid recovery" has been used to refer to a number of different methods of "indirect distribution of unclaimed funds of a class monetary recovery." *Newberg on Class Actions* § 10:17 n. 7 (4th ed.2002). In addition, it refers to "the entire procedure of classwide calculation of damages and distribution of the aggregate amount or any unclaimed bal-

ance ... to injured class members or to others under cy pres ... or other doctrines." *Id.* Recoveries described as "fluid" include distribution of damages through price reductions rather than by cash to individual plaintiffs, *see, e.g., Bebchick v. Public Utilities Commission*, 318 F.2d 187 (D.C.Cir.1963); distribution of settlement or damage funds left unclaimed by individuals to nonprofit organizations or to states for uses intended to benefit class members, *see, e.g., Jones v. National Distillers*, 56 F.Supp.2d 355 (S.D.N.Y.1999); *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710 (S.D.N.Y.1970), *aff'd*, 440 F.2d 1079 (2d Cir.1971); *In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001); *Nelson v. Greater Gadsden Hous. Auth.*, 802 F.2d 405 (11th Cir.1986); *Bruno v. Superior Court*, 127 Cal.App.3d 120, 179 Cal.Rptr. 342 (Cal.Ct.App.1981); and distribution of damages calculated on a classwide basis to individual plaintiffs or through various indirect means. *See, e.g., In re Antibiotic Antitrust Actions*, 333 F.Supp. 278 (S.D.N.Y.1971); *Romero v. Philip Morris*, 137 N.M. 229, 109 P.3d 768 (2005); *Gordon v. Boden*, 224 Ill.App.3d 195, 166 Ill.Dec. 503, 586 N.E.2d 461 (Ill. App.Ct.1991); *Daar v. Yellow Cab Co.*, 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d 732 (Cal.1967). Because the phrase is used with such imprecision, care must be taken to determine whether the "fluid recovery" approved or disapproved in a particular case is at all similar to the distribution system proposed in the case at hand.

What all the cases on fluid recovery have in common is their attempt to grapple with some of the realities of modern mass litigation. *See generally* Monograph, *Individual Justice in Mass Tort Litigation* (1995) (describing the complexities of modern mass litigation and the attempts of courts to balance pragmatism requiring wholesale distribution with fairness to indi-

vidual litigants). In today's "complex modern economic system," a single harmful act may have an adverse effect on large numbers of consumers. *Escott v. Barchris Constr. Corp.*, 340 F.2d 731, 733 (2d Cir. 1965). That adverse effect is often small on the individual but large in the aggregate. Typical is a defendant's price-fixing scheme raising prices no more than a few cents or dollars per item, but allowing the defendant to reap a "substantial wrongful gain." *In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740, 840 (E.D.N.Y. 1984).

Mass cases present complex problems for courts in terms of damage calculation and damage distribution. If the defendant's liability is determined on a plaintiff-by-plaintiff basis, the court will be required to "compel a parade of individual plaintiffs" to appear before it for near-identical damage calculations. *Antibiotic Antitrust Actions*, 333 F.Supp. at 289. *See also Daar*, 67 Cal.2d at 715–16, 63 Cal.Rptr. 724, 433 P.2d 732 ("In an effort to undermine the sufficiency of the complaint, defendant argues that ... [i]t is perfectly obvious that if [plaintiff] is allowed to maintain a class action, every single claimant must appear in court and prove his claim. However, the complaint alleges that the exact amount of the overcharge ... is known to the defendant and can be ascertained therefrom. Assuming these facts to be true ... no appearance by the individual members of the class will be required to recover the full amount of the overcharges.") (internal quotations omitted). When the individual claims are small, "traditional methods of proof [may not be] worthwhile," since many consumers are unlikely to "retain records of small purchases for long periods of time." *California v. Levi Strauss & Co.*, 41 Cal.3d 460, 472, 224 Cal.Rptr. 605, 715 P.2d 564 (1986). And even when the defendant's total liability may be calculated easily—as in a settlement or under a law with statutorily fixed damages provisions—distribution to all of the affected consumers may prove impossible. *See, e.g., Mexico Money Transfer Litig.*, 267 F.3d 743; *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir.1990).

Fluid recovery often provides a reasonable and fair means to litigate these complex claims and distribute damages without an intolerable burden on courts and litigants. *See, e.g., Agent Orange*, 597 F.Supp. at 841–42; *Antibiotic Antitrust Actions*, 333 F.Supp. at 281–83; *Six Mexican Workers*, 904 F.2d at 1305; 7AA Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1784 (1972); *Developments in the Law—Class Action*, 89 Harv. L.Rev. 1454, 1565 (1976).

These mechanisms were first used as a means of distributing settlement monies where individual class members would be difficult to identify or unlikely to come forward. By distributing settlement amounts for uses that indirectly benefit members of the class, courts are able to promote the deterrent and compensatory policies of substantive laws in situations where recovery would otherwise be impracticable. *See, e.g., Levi Strauss & Co.*, 41 Cal.3d at 472, 224 Cal.Rptr. 605, 715 P.2d 564 (describing the importance of fluid recovery as a tool for fulfilling the policies of the underlying causes of action in consumer class actions).

This type of fluid recovery is more precisely referred to as a "cy pres" remedy, in reference to the "trust doctrine that if funds in a charitable trust can no longer be devoted to the purpose for which the trust was created, they may be diverted to a related purpose." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004). *See also* Black's Law Dictionary (6th ed. 1990) ("The rule of cy pres is a

rule for the construction of instruments in equity, by which the intention of the party is carried out *as near as may be,* when it would be impossible or illegal to give it literal effect.") (emphasis supplied); *Newberg on Class Actions* § 10:17 (4th ed.2002) (defining a cy pres distribution as "a distribution for the indirect prospective benefit of the class"). Key examples of cy pres remedies include distribution of damages through the market, as by price or rate reduction schemes, *see, e.g., Bebchick,* 318 F.2d 187; distribution to nonprofit organizations whose goals are related in some way to the subject of the litigation, *see, e.g., In re Agent Orange Product Liability Litigation,* 611 F.Supp. 1396 (E.D.N.Y.1985), *aff'd in relevant part,* 818 F.2d 179 (2d Cir.1987); *Mexico Money Transfer Litigation,* 267 F.3d 743; and distribution to one or more states for uses benefiting class members. *See, e.g., Chas. Pfizer & Co.,* 314 F.Supp. 710. In the discussion that follows, cases using the phrase "cy pres" are treated as fluid recovery litigations when that is appropriate.

As fluid recovery practice has evolved, it has been used in situations where liability has been decided by the court as well as in settlements. In decided cases, fluid recovery generally involves three steps. First, defendant's aggregate liability is determined in a single, class-wide adjudication and paid into a class fund. *Levi Strauss & Co.,* 41 Cal.3d at 472, 224 Cal.Rptr. 605, 715 P.2d 564. Second, "individual class members are afforded an opportunity to collect their individual shares," usually through a simplified proof of claim procedure. *Id.* Third, any residue remaining after individual claims have been paid is distributed to the class' benefit under cy pres or other doctrines. *See Gordon,* 224 Ill.App.3d at 204–205, 166 Ill.Dec. 503, 586 N.E.2d 461; *Cicelski v. Sears, Roebuck & Co.,* 132 Mich.App. 298, 304, 348 N.W.2d 685 (Ct.App.1984). This three-step proce-

dure eliminates the need for repetitive litigation of individual damage claims, while allowing courts to hold defendants liable for the full harm caused by them, and compensating those harmed. Without this use of fluid recovery, "some class actions ... would neither compensate nor deter, for to allow the defendant to insist upon proof of individual claims [would] enable it to benefit from the cumbersome nature of legal proceedings and the lack of sophistication and indolence of the consumer, and [would] reward [its] foresight in stealing from the multitude in small amounts." *Bruno,* 127 Cal.App.3d at 127, 179 Cal. Rptr. 342 (internal quotations omitted).

b. Interaction with procedural and substantive law

Fluid recovery is consistent with the text and spirit of Rule 23 of the Federal Rules of Civil Procedure controlling class actions. *See, e.g.,* 7AA Wright & Miller § 1784; Note, *Managing the Large Class Action: Eisen v. Carlisle & Jacquelin,* 87 Harv. L.Rev. 426, 447 (1973). "Rule 23 does not explicitly authorize ... fluid recovery," but "this alone can hardly be taken to mean that it is prohibited ... since the rule is silent about remedies of any nature." *Managing the Large Class Action: Eisen v. Carlisle & Jacquelin,* 87 Harv. L.Rev. at 447. The class action rule "stems from equity," *Amchem Prods. v. Windsor,* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and Rule 23(b)(3), in particular, is designed to provide justice on an equitable basis to injured parties whose cases would be impractical or impossible to litigate if handled individually. *See* Fed.R.Civ.P. 23(b)(3) advisory committee notes (1966); *see also Dolgow v. Anderson,* 43 F.R.D. 472, 484–85 (E.D.N.Y.1968), *rev'd on other grounds,* 438 F.2d 825 (2d Cir.1970) ("The class action is particularly appropriate where

those who have allegedly been injured are in a poor position to seek legal redress, either because they do not know enough or because such redress is disproportionately expensive.") (internal quotations omitted).

 While courts must stay within the bounds of due process and avoid altering substantive law in violation of the Rules Enabling Act when shaping the remedies in Rule 23(b)(3) actions, the Rule provides desirable flexibility and grants the courts broad equitable powers in litigation management. *See, e.g., Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 560 (2d Cir.1968) ("[T]he Advisory Committee on the Rules of Civil Procedure has completely redrafted Rule 23 in order to provide a thoroughly flexible remedy. Throughout the course of a proceeding courts are given complete control to give assurance that the procedures adopted are fair, reasonable and effective."); 7AA Wright & Miller § 1784 ("[C]ourts must use their discretion, and in many cases their ingenuity, to shape decrees or to develop procedures for ascertaining damages and distributing relief that will be fair to the parties but will not involve them in an unduly burdensome administration of the award."); *cf. In re Joint Eastern and Southern District Asbestos Litig.,* 129 B.R. 710, 800 (E.D.N.Y. 1991), *vacated on other grounds,* 982 F.2d 721 (2d Cir.1992) (class action is a device created to "foster[ ] judicial economy and efficiency") (internal quotes omitted).

 Whether or not fluid recovery should be employed in a particular class action is determined by reference to the need to vindicate the substantive law at issue. *Simer v. Rios,* 661 F.2d 655, 676–78 (7th Cir.1981). *See also In re Federal Skywalk Cases,* 680 F.2d 1175, 1190 (8th Cir.1982) (Heaney, J., dissenting) (permissibility of aggregation depends on policy of cause of action); *Newberg on Class Actions* § 10:23 (4th ed.2002) ("objectives of

compensation or deterrence and questions about their validity must properly focus on the substantive laws underlying any particular class action"); *Developments in the Law—Class Action,* 89 Harv. L.Rev. 1454, 1525–26 (1976) (courts should use substantive law to determine the appropriateness of fluid recovery). While fluid recovery is not an appropriate remedy in all Rule 23(b)(3) actions, *see In re Folding Carton Antitrust Litigation,* 744 F.2d 1252 (7th Cir.1984); *Simer,* 661 F.2d at 676–79; *Cicelski v. Sears, Roebuck & Co.,* 132 Mich. App. 298, 304–10, 348 N.W.2d 685 (Ct.App. 1984), it is sometimes the only practicable way to implement the goals of the substantive law under which a federal mass litigation case is prosecuted.

"The general inquiry is whether the use of ... [fluid recovery] is consistent with the policy or policies reflected by the statute violated." *Simer,* 661 F.2d at 676. This approach can be particularized into an assessment of the extent to which "the statute embodies policies of deterrence, disgorgement, and compensation," *id.,* and of the "strength and scope of the statute's concern" for those policies. *Developments in the Law—Class Action,* 89 Harv. L.Rev. 1454, 1527 (1976). The application of fluid recovery is particularly appropriate where a corporate defendant "illegally profits" through violation of a common law principle or "a statute which was intended to regulate socially opprobrious conduct such as that reflected in the antitrust or securities laws." *Simer,* 661 F.2d at 676–77. It is least appropriate where there may be a danger of overdeterrence. *See Developments in the Law—Class Action,* 89 Harv. L.Rev. 1454, 1527–28 (1976) (exploring the way in which courts should weigh concerns about deterrence).

c. General law

Fluid recovery in appropriate cases has received wide support from courts and

commentators. *See, e.g., Simer v. Rios,* 661 F.2d 655, 676–78 (7th Cir.1981) (fluid recovery should be used when it would promote statutory goals of deterrence, disgorgement, and compensation); *In re Antibiotic Antitrust Actions,* 333 F.Supp. at 282–83 (without fluid recovery, defendants would have the "freedom to keep their ill-gotten gains which, once lodged in the corporate coffers, are said to become a 'pot of gold' inaccessible to the mulcted consumers because they are many and their individual claims small"); *California v. Levi Strauss & Co.,* 41 Cal.3d 460, 472, 224 Cal.Rptr. 605, 715 P.2d 564 (1986) ("Without fluid recovery, defendants may be permitted to retain ill gotten gains simply because their conduct harmed large numbers of people in small amounts instead of small numbers of people in large amounts."); 7AA Wright & Miller § 1784; Gail Hillebrand & Daniel Torrence, *Claims Procedures in Large Consumer Class Actions and Equitable Distribution of Benefits,* 28 Santa Clara L.Rev. 747 (1988); *Developments in the Law—Class Action,* 89 Harv. L.Rev. 1454 (1976); Gregory A. Hartman, Comment, *Due Process and Fluid Class Recovery,* 53 Or. L.Rev. 225 (1974); Note, *Managing the Large Class Action: Eisen v. Carlisle & Jacquelin,* 87 Harv. L.Rev. 426 (1973). It has been used by federal and state courts in both decided and settled cases. *See, e.g., Beecher v. Able,* 575 F.2d 1010 (2d Cir.1978); *In re Agent Orange Prod. Liab. Litig.,* 611 F.Supp. 1396 (E.D.N.Y.1985), *aff'd in relevant part,* 818 F.2d 179 (2d Cir.1987); *Antibiotic Antitrust Actions,* 333 F.Supp. 278; *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir.1971); *Nelson v. Greater Gadsden Hous. Auth.,* 802 F.2d 405 (11th Cir.1986); *Democratic Cent. Comm. of D.C. v. Wash. Metro. Area Transit Comm.,* 84 F.3d 451 (D.C.Cir.1996); *Bebchick v. Pub. Util. Comm'n,* 318 F.2d 187 (D.C.Cir.1963); *Boyle v. Giral,* 820 A.2d 561 (D.C.2003); *Daar v. Yellow Cab Co.,* 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d 732 (1967). *See also Craft,* 2003 WL 23355745 at *10 (noting with approval possible use of fluid recovery in "light" cigarettes fraud action) (citing *Buchholz Mortuaries, Inc. v. Dir. of Revenue,* 113 S.W.3d 192, 196 n. 1 (Mo.2003) (Wolff, J., concurring)); *Price,* Appendix C at Judgment ¶ 7 (same).

Some federal appellate courts have evinced concern about fluid recovery. In particular cases the Second, Third, Fourth, Eighth, and Ninth Circuit Courts of Appeals have all expressed opposition to the use of fluid recovery. *See Van Gemert v. Boeing Co.,* 553 F.2d 812, 815 (2d Cir. 1977), *aff'd on other grounds,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005, 1018 (2d Cir.1973), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Windham v. Am. Brands, Inc.,* 565 F.2d 59 (4th Cir.1977); *Kline v. Coldwell, Banker & Co.,* 508 F.2d 226 (9th Cir.1974); *In re Hotel Tel. Charges,* 500 F.2d 86, 89–90 (9th Cir.1974), *Dumas v. Albers Med.,* No. 03–0640–CV–W–GAF, 2005 WL 2172030 (W.D.Mo. Sept. 7, 2005); *Al Barnett & Son, Inc. v. Outboard Marine Corp.,* 64 F.R.D. 43, 55 (D.Del.1974). The Second, Fourth, and Ninth Circuit Courts of Appeals have made a few sweeping statements that have been misunderstood by some commentators as wholesale rejections of the concept. *See Eisen,* 479 F.2d at 1018 (in dicta, describing fluid recovery as "illegal, inadmissible ... and wholly improper"); *Kline,* 508 F.2d at 236 n. 8 (responding to a "suggestion" that fluid recovery might be used with the dicta that it would alter substantive law in violation of the Rules Enabling Act); *Windham,* 565 F.2d at 72 (citing the above quoted language from *Eisen* to reject fluid recovery). While the

Court of Appeals for the Seventh Circuit has explicitly endorsed the use of fluid recovery in appropriate cases, *see Simer* 661 F.2d at 676–77, recent dicta from that court described some cy pres forms of recovery as "purely punitive." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir.2004).

Courts that have declined to approve fluid recovery have been concerned that such mechanisms might violate the due process clause, *see Eisen*, 479 F.2d at 1018; *Barnett*, 64 F.R.D. at 55, or that they might alter substantive law in violation of the Rules Enabling Act. *See Eisen*, 479 F.2d at 1014; *Windham*, 565 F.2d at 66; *Kline*, 508 F.2d at 236 n. 8; *In re Hotel*, 500 F.2d at 90. Others have expressed concern that fluid recovery might deprive defendants in class actions of their Seventh Amendment right to trial by jury. *Kline*, 508 F.2d at 236 n. 8. Because appellate courts have often been oracular in their discussion of fluid recovery, it can be difficult to determine the precise source and dimensions of their anxiety. Objections appear to arise primarily out of the perception that fluid recovery "relieve[s] plaintiff classes of the burden of individual proof of damages," *Nelson*, 802 F.2d at 409, and therefore violates the due process clause and the Seventh Amendment by denying the defendant an opportunity to challenge the plaintiffs' claims on an individual basis before the jury. *See Kline*, 508 F.2d at 236 n. 8. Insofar as "individual" proof of damages is thought to be an essential element of a claim, any perceived lessening of the plaintiffs' burden on this point may be said to "eliminat[e] or erod[e]" traditional or statutory requirements and thereby to alter substantive law in violation of the Rules Enabling Act. *In re Hotel*, 500 F.2d at 90; *see also Eisen*, 479 F.2d at 1014; *Barnett*, 64 F.R.D. at 50.

Despite these occasional misgivings, fluid recovery has been accepted in a wide variety of contexts by nearly all federal circuits that have considered it. It is most commonly employed by federal courts for damage distribution in settled cases. *See, e.g., Beecher*, 575 F.2d 1010; *Chas. Pfizer & Co.*, 314 F.Supp. 710; *Jones v. Nat'l Distillers*, 56 F.Supp.2d 355 (S.D.N.Y. 1999); *Agent Orange*, 611 F.Supp. 1396; *In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir.2001); *Powell v. Georgia–Pacific Corp.*, 119 F.3d 703 (8th Cir. 1997); *In re Motorsports Merch. Antitrust Litig.*, 160 F.Supp.2d 1392 (N.D.Ga.2001); *Colson v. Hilton Hotels Corp.*, 59 F.R.D. 324 (N.D.Ill.1972). But courts have also utilized fluid recovery in decided cases. *See, e.g., Antibiotic Antitrust Actions*, 333 F.Supp. 278; *Democratic Cent. Comm.*, 84 F.3d 451; *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir.1990); *Nelson*, 802 F.2d 405; *Am. Int'l Pictures v. Price Enter.*, 636 F.2d 933 (4th Cir.1980) (expressing disapproval of "fluid recovery" while applying an aggregate damage determination and distribution scheme that most would describe as "fluid"); *L.C.L. Theatres v. Columbia Pictures*, 421 F.Supp. 1090 (N.D.Tex.1976) (same); *Bebchick*, 318 F.2d 187.

Federal cases involving fluid recovery have been brought under a wide range of substantive laws, including the Clayton Act, *see, e.g., Chas. Pfizer & Co.*, 314 F.Supp. 710; *Motorsports*, 160 F.Supp.2d 1392, the Securities and Exchange Act, *see, e.g., Beecher*, 575 F.2d 1010; *National Distillers*, 56 F.Supp.2d 355, civil RICO, *see Mexico Money Transfer Litig.*, 267 F.3d 743, Title VII, *see Powell*, 119 F.3d 703, the Farm Labor Contractor Registration Act, *see Six Mexican Workers*, 904 F.2d 1301, and state contract laws. *See Nelson*, 802 F.2d 405.

Most federal courts that have approved the use of fluid recovery have not found it

necessary to discuss the constitutional issues. At least one federal court, however, has faced the due process argument head-on. In a well-conceived pretrial decision in the *Antibiotic Cases,* the District Court for the Southern District of New York responded to the defendants' contention that their right to due process would be "clearly and seriously impair[ed]" by an inability to defend against individual consumers who might be unable to prove their purchases of the defendants' pharmaceuticals. *Antibiotic Antitrust Actions,* 333 F.Supp. at 288–89 (Miles W. Lord, J.). Observing that the trial plan was specifically designed to avoid the need for individual damage claims, the court explained that the defendants' argument in opposition missed the point. *Id.* at 289. Contrary to defendants' presentation, the due process issue rested not on the specific manner in which the defendants' liability was proved—the defendants were, in any case, not "constitutionally entitled to compel a parade of individual plaintiffs to establish damages"—but rather on the accuracy with which the damage calculation reflected the defendants' total liability. *Id.* And as to that, the court concluded that the requirements of due process would be met:

> Most important management decisions in the business world in which these defendants operate are made through the intelligent application of statistical and computer techniques and these class members should be entitled to use the same techniques in proving the elements of their cause of action. The court is confident that they can be successfully utilized in the courtroom and that their application will allow the consumers to protect their rights while freeing the court and the defendants from the specter of unmanageability.

*Id.*

Of the eleven states that have confronted the issue, at least nine have endorsed the use of fluid recovery. *See, e.g., Buchholz Mortuaries, Inc. v. Dir. of Revenue,* 113 S.W.3d 192, 195–96 (Mo.2003) (Wolff, J., concurring); *Boyle,* 820 A.2d at 563; *Ritter, Laber & Assocs. v. Koch Oil, Inc.,* 623 N.W.2d 424 (N.D.2001); *Daar,* 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d 732; *Romero v. Philip Morris Inc.,* 137 N.M. 229, 109 P.3d 768 (2005); *Muise v. GPU, Inc.,* 371 N.J.Super. 13, 851 A.2d 799 (Ct. App.Div.2004) (fluid recovery is applied under N.J.R. Civ. P. 4:32–2(c) only when identities of class members are not known); *Gordon v. Boden,* 224 Ill.App.3d 195, 166 Ill.Dec. 503, 586 N.E.2d 461 (Ill. App.Ct.1991); *Cicelski v. Sears, Roebuck & Co.,* 132 Mich.App. 298, 348 N.W.2d 685 (Ct.App.1984) (approving use of fluid recovery in appropriate cases, although finding its use unwarranted in the case at hand, given that specific deterrence was not a concern); *Bruno v. Superior Court,* 127 Cal.App.3d 120, 179 Cal.Rptr. 342 (Ct. App.1981); *Lieberman v. Howard Johnson's, Inc.,* 68 Pa. D. & C.2d 129 (Com.Pl. 1973); *cf. Dallas County Cmty. Coll. Dist. v. Bolton,* 89 S.W.3d 707, 722 (Tex. App.2002) (no Texas court has held fluid recovery to be unlawful; the issue need not be reached, however, because the award under dispute is not "fluid"). *But see Jacksonville v. Venhaus,* 302 Ark. 204, 210, 788 S.W.2d 478 (1990) (rejecting fluid recovery in a tax recovery case on the ground that "monies collected for one purpose cannot be used for another"); *Reader v. Magma–Superior Copper Co.,* 110 Ariz. 115, 515 P.2d 860 (1973) (in a case brought under state environmental laws, affirming trial court's dismissal of suit as a class action because the Second Circuit Court of Appeals' decision in *Eisen,* insofar as it disapproves of the use of fluid recovery, "effectively disposes of any previously existing possibility that the instant case

could proceed as a class action"). Three states—California, New Jersey, and North Dakota—have procedural rules explicitly permitting the use of fluid recovery in class actions. *See* Cal.Civ.Proc.Code § 384; N.J.R. Civ. P. 4:32–2(c); N.D.R. Civ. P. 23(*o*)(3)(E).

State courts have embraced fluid recovery as a means of fulfilling the promise of class actions as a consumer protection device and as a way of ensuring that corporate wrongdoers do not retain "ill gotten gains" simply because of the administrative difficulties associated with proving and distributing small individual damage claims. *Bruno*, 127 Cal.App.3d at 127, 179 Cal.Rptr. 342; *see also Levi Strauss & Co.*, 41 Cal.3d at 471–72, 224 Cal.Rptr. 605, 715 P.2d 564; *Gordon*, 224 Ill.App.3d at 204–05, 166 Ill.Dec. 503, 586 N.E.2d 461 (in a "large and impersonal society, class actions are often the last barricade of consumer protection," providing redress for "frauds that cause small damages to large groups") (internal quotations omitted). A significant percentage of fluid recovery cases in the state courts are brought under state antitrust and consumer protection laws. *See, e.g., Boyle*, 820 A.2d 561 (District of Columbia antitrust and consumer protection laws); *Levi Strauss & Co.*, 41 Cal.3d 460, 224 Cal.Rptr. 605, 715 P.2d 564 (California antitrust law); *In re Vitamin Cases*, 107 Cal.App.4th 820, 132 Cal. Rptr.2d 425 (Ct.App.2003) (California antitrust and unfair competition laws); *Romero*, 137 N.M. 229, 109 P.3d 768 (New Mexico Antitrust Act); *Corbett v. Superior Court*, 101 Cal.App.4th 649, 125 Cal. Rptr.2d 46 (Ct.App.2002) (California's Unfair Competition Law); *Gordon*, 224 Ill. App.3d 195, 166 Ill.Dec. 503, 586 N.E.2d 461 (Illinois' Consumer Fraud and Deceptive Business Practices Act); *but see Madrid v. Perot Sys. Co.*, 130 Cal.App.4th 440, 30 Cal.Rptr.3d 210 (Ct.App.2005) (non-restitutionary fluid recovery not an available remedy in a class action under California's Unfair Competition Law); *Prata v. Superior Court*, 91 Cal.App.4th 1128, 111 Cal. Rptr.2d 296 (Ct.App.2001) (same). Fluid recovery has also been approved in a number of state common law contract and conversion actions to recover overcharges by corporations. *See, e.g., Daar*, 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d 732 (class suit to recover overcharges made by defendant taxicab company); *Lieberman*, 68 Pa. D. & C.2d 129 (users of the Pennsylvania Turnpike suing as third-party beneficiaries to recover overcharges by restaurant and oil companies under contract with the state); *Ritter, Laber & Assocs.*, 623 N.W.2d 424 (conversion action regarding companies' acquisition of oil).

A number of state courts have addressed the possible due process issues raised by fluid recovery. Assuming that courts' unexplained due process objections to fluid recovery must rest upon concerns about aggregate proof of damages, the Michigan Court of Appeals concluded that defendants "hardly seem[ ] prejudiced by being restricted to only one hearing on common issues. Even though the calculation of damages might involve issues on which a hearing would … be required[,] … it has never been thought that due process required multiple hearings when there was one full and fair adjudication of the merits." *Cicelski*, 132 Mich.App. at 307, 348 N.W.2d 685; *see also Daar*, 67 Cal.2d at 715–16, 63 Cal.Rptr. 724, 433 P.2d 732 (denying defendant's contention that "every single claimant must appear in court and prove his claim"); *Gordon*, 224 Ill.App.3d at 205, 166 Ill.Dec. 503, 586 N.E.2d 461 (citing *Cicelski* for the proposition that a defendant is not prejudiced by only being allowed "one hearing on common issues"). The California Court of Appeals has persuasively explained that "[u]p until the time when damages are distribut-

ed, a class action with fluid class recovery is the same as any other ... The class is certified the same way, the burden of proof ... is no different, and the calculation of the total amount of damages is accomplished in no less precise a manner." *Bruno,* 127 Cal.App.3d at 128–29, 179 Cal. Rptr. 342. As the court observed, a "class action which affords due process of law ... through the time when the amount of [the defendant's] liability is calculated cannot suddenly deprive him of his constitutional rights because of the way the damages are distributed." *Id.* at 129, 179 Cal.Rptr. 342. So long as the trial plan provides for an accurate means of assessing a defendant's liability, that defendant has no grounds to object to the absence of individual proceedings or to the way in which damages are distributed once they have been determined.

### 2. Second Circuit Law on Fluid Recovery

Although the Second Circuit Court of Appeal's decision in *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005 (2d Cir.1973), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), has been cited by some as the foundation of some federal court objections to fluid recovery, *see, e.g., Windham v. Am. Brands, Inc.,* 565 F.2d 59, 72 (4th Cir.1977); *In re Hotel Tel. Charges,* 500 F.2d 86, 90 (9th Cir. 1974); *Reader v. Magma–Superior Copper Co.,* 110 Ariz. 115, 116, 515 P.2d 860 (1973), the actual state of Second Circuit law concerning the use of fluid recovery is itself somewhat fluid. *See Developments in the Law—Class Action,* 89 Harv. L.Rev. 1454, 1535 (1976).

Fluid recovery was first used in the Second Circuit in *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y. 1970), *aff'd,* 440 F.2d 1079 (2d Cir.1971) and the *Antibiotic Cases,* 333 F.Supp. 278

(S.D.N.Y.1971), both of which involved civil antitrust actions brought against pharmaceutical companies by government entities, hospitals, drug retailers, and individual consumers. In *Pfizer,* the District Court for the Southern District of New York approved a settlement agreement between the defendants and several of the plaintiffs that called for the states to recover damages on behalf of consumers who had not filed individual claims. *See Pfizer,* 314 F.Supp. at 728. Any part of the recovery that was not claimed by individual consumers was to be held by the states subject to the court's order, and "[i]t was anticipated that the court might consider ways in which to apply the excess funds to achieve socially desirable objectives." 7AA Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1784 (1972). Approval of the settlement was upheld by the Court of Appeals. *Pfizer,* 440 F.2d 1079.

In the *Antibiotic Cases,* the District Court for the Southern District of New York held that seven states that had refused the *Pfizer* settlement were entitled to maintain their actions against the pharmaceutical companies as class actions on behalf of individual consumers. *Antibiotic Antitrust Actions,* 333 F.Supp. at 284. The actions were certified on the assumption that the issues of liability, fact of damages, and quantum of damages could all be calculated on a class-wide basis, with individual claims made against the judgment awarded to the class and the disposition of any residue left for later determination. *Id.* at 287–90. While the case presented some management difficulties, the district court found that these problems did not "preclude a finding that the class action is 'superior to *other available methods* for the fair and efficient adjudication of the controversy.'" *Id.* at 282 (emphasis in original). According to the court,

difficulties in management are of significance only if they make the class action a *less* "fair and efficient" method of adjudication than other available techniques. This perspective is particularly important in the present cases where the defendants, after reciting potential manageability problems, seem to conclude that no remedy is better than an imperfect one. The court would be hesitant to conclude that conspiring defendants may freely engage in predatory price practices to the detriment of millions of individual consumers and then claim the freedom to keep their ill-gotten gains which, once lodged in the corporate coffers, are said to become a "pot of gold" inaccessible to the mulcted consumers because they are many and their individual claims small.

*Id.* at 282–83 (emphasis in original).

The court also responded to the defendants' due process objections to class-wide proof of damages. It found that the use of such a procedure did not impinge upon the defendants' constitutional rights. *Id.* at 289. This section of the court's opinion has already been adverted to.

Denying the defendants' motion for a writ of mandamus, the Court of Appeals for the Second Circuit declined an opportunity to forestall the district court's proposed use of fluid recovery in the *Antibiotic Cases. Pfizer, Inc. v. Lord,* 449 F.2d 119, 119 (2d Cir.1971). The Court of Appeals observed that the procedures approved by the lower court were essentially identical to those used in the *Pfizer* settlement and presented even less of a due process problem than they had in *Pfizer,* given the plaintiffs' proposal to employ actual rather than publication notice. *Id.* It is important to note that the Court of Appeals was not expressing approval of a fluid recovery resulting from settlement, but rather one that assumed a trial.

The ostensible turning point regarding the use of fluid recovery in the Second Circuit came in 1973, when the Court of Appeals handed down its decision in *Eisen v. Carlisle & Jacquelin.* The plaintiff in *Eisen* brought suit on behalf of himself and all other buyers and sellers of odd lot shares on the New York Stock Exchange, alleging that two firms—Carlisle & Jacquelin and DeCoppet & Doremus—had conspired to fix the odd lot price differential and had charged excessive fees in violation of the Sherman Act. *Eisen v. Carlisle & Jacquelin,* 41 F.R.D. 147, 148 (S.D.N.Y.1966), *rev'd,* 391 F.2d 555 (2d Cir. 1968). The District Court for the Southern District of New York initially dismissed the suit as a class action on the grounds that the rights and interests of each of the several hundred thousand to several million class members were far too diverse and Eisen's individual interest far too small for Eisen to adequately represent the interests of the class or for common questions to predominate. *Id.* at 150–51. In addition, the district court expressed concern about the notice requirements of Rule 23(c)(2), given that Eisen had proposed providing only press advertisements and notices to stock exchange firms. *Id.* at 151.

Eisen appealed, and the Court of Appeals for the Second Circuit reversed. *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (2d Cir.1968). Its first reaction was to recognize the realities of mass litigation and approve fluid recovery as one device available in the law's armory. The Court of Appeals held that the high number of potential class members and the small value of Eisen's individual claim were not adequate grounds for a finding of inadequate representation. *Id.* at 563. It also held that there had been "an adequate demonstration that common questions of law or fact predominate." *Id.* at 566.

While varying fact patterns would underlay each individual odd-lot transaction, "the same allegedly unlawful differential is charged to all buyers and sellers." *Id.* at 562. The differences among the class members' claims would "bear only on the computation of damages, a factor which, by itself, does not justify dismissal of the class action." *Id.* at 566. Advocating a more flexible approach to Rule 23, *id.* at 560, the Court of Appeals remanded the case to the district court to re-determine if the suit could proceed as a class action and, if so, how notice and recovery would be handled. The court shared the district court's concern about the adequacy of notice by publication, especially if individual members of the class could be identified. *Id.* at 568–70. In addition, while it noted the "desirability of providing small claimants with a forum in which to seek redress for alleged large scale anti-trust violations," the Court of Appeals made it clear that it was reluctant to allow the suit to proceed if the high cost of administering the action made it unlikely that those injured by the alleged violations would actually share in the damages. *Id.* at 567. On this point, the Court observed that "other courts in similar cases" had been able to avoid problems of administration by establishing "formulas of procedure for recovery ... applicable to an entire class." *Id.*

On remand, the district court determined that the requirements of a Rule 23(b)(3) class action had been met. *Eisen v. Carlisle & Jacquelin,* 52 F.R.D. 253, 272 (S.D.N.Y.1971), *rev'd* 479 F.2d 1005 (2d Cir.1973), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The court found that the case was manageable as a class action. *Id.* at 261–65. As the Court of Appeals had indicated, the most difficult problem facing the district court on this point was the issue of recovery. The class was defined as "all public individuals, institutions, and intermediaries who bought and/or sold odd-lots ... on the NYSE" from May 1, 1962 to June 30, 1966. *Id.* at 261. This group consisted of roughly 6,000,000 people, only 2,000,000 of whom were readily identifiable. *Id.* at 257. Estimated class members' individual damage claims averaged around three dollars and ninety cents. *Eisen,* 479 F.2d at 1010. It seemed unlikely that more than a few individuals would come forward to prove and claim their individual damages. As a result, if the defendants' liability was calculated by summing individually submitted claims, the final judgment was likely to total less than the administrative costs of litigation. In order to avoid this problem, the district court proposed that the class' damages be determined in the aggregate, from defendants' own records and from industry reports. *Eisen,* 52 F.R.D. at 262. Once aggregate damages had been determined, a scheme of fluid recovery would be employed. *Id.* at 264–65. Those individual class members who came forward would have their claims satisfied and the residue would be distributed in some manner to "the class as a whole." *Id.* at 264. The court left the exact manner of this distribution undecided, but noted that one possibility would be to lower the future cost of odd-lot trading. *Id.* at 265.

The district court also proposed a method of providing notice consonant with both Rule 23 and due process. *Id.* at 265–68. Although Eisen's initial proposal of publication notice combined with mailed notice to stock exchange firms was insufficient to meet the requirements of Rule 23(c)(2), considering that 2,000,000 individual class members were readily identifiable, the court did not find that either the Rule or due process required Eisen to mail notice to each one of these identifiable individuals. *Id.* at 267. Instead, the court directed that individual notice be mailed to the

roughly 2,000 identifiable class members who had ten or more odd-lot transactions, to 5,000 other randomly chosen class members, to all NYSE member firms, and to all commercial banks with large trust departments. *Id.* Additionally, advertisements were to be placed once a month for two months in five newspapers. *Id.* at 268. If the defendants were ultimately found liable to the class, individual notice mailed to all of the 2,000,000 identifiable class members would be combined with publication notice in the two newspapers of largest circulation in each state and in several foreign newspapers. *Id.* at 263.

In 1973, on defendants' appeal of the class certification, the Second Circuit Court of Appeals again reversed, holding that Eisen's suit was unmanageable as a class action. *Eisen v. Carlisle & Jacquelin,* 479 F.2d 1005 (2d Cir.1973), *vacated on other grounds,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The Court of Appeals was not unanimous in its evaluation of the second *Eisen* appeal. Circuit Judge Hays concurred only in the result on notice grounds and dissented from a denial of a rehearing en banc, while Oakes, with whom Timbers concurred, filed an opinion dissenting from the denial of a rehearing en banc. *Id.* at 1020–26. Judges Kaufman, Feinberg, Mansfield, and Mulligan thought an en banc hearing was not necessary because the Supreme Court would almost certainly grant certiorari. *Id.* at 1020. In fact, the Supreme Court did grant certiorari, but decided the case on the question of notice, not fluid recovery. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). *See* the discussion of *Eisen* in the Supreme Court, *infra.* Judge Hays' brief and careful opinion refusing to adopt the majority's anti-fluid recovery stance seems to have been informed by his many years of teaching civil procedure as a tenured member of Columbia Law School's faculty.

The Court of Appeals' primary objection to the district court's order concerned notice. Because 2,000,000 members of the class could be readily identified, the district court was required to order individual notice to these class members. *Id.* at 1015. According to the Court of Appeals, the district court's failure to do so not only jeopardized the rights of the absent class members, but was in direct conflict with Rule 23(c)(2)'s command that "for any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Id.* As for the district court's proposed system of publication notice, the Court of Appeals declared that a "farce," considering the widespread, diverse nature of the class and the relatively limited scope of the first round of publication. *Id.* at 1017. In support of this conclusion, the Court cited the views of "lawyers specializing in class actions," who had "stated that the only effective way to induce any reasonable number of members of the class to file claims is to conduct full-scale campaigns on TV and radio, solicit appearances by advocates of consumers' rights such as Ralph Nader," and obtain "coverage in various news media, union newsletters, and the like." *Id. But cf. Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (notice by publication is constitutionally sufficient as to trust beneficiaries whose names and addresses are unknown).

Although the Court of Appeals' primary concern was the district court's failure to provide for individual notice—a ruling which it held "alone compel[led] a reversal of the order appealed from and the dismissal of the case as a class action," *Eisen,* 479 F.2d at 1015—the court reserved its

strongest language for the proposed fluid recovery, declaring the concept "illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper." *Id.* at 1018. Turning to Rule 23, the Court of Appeals found that fluid recovery was not "contemplat[ed]" by the Rule and that, even if it were, it would alter substantive rights under the Clayton Act and therefore violate the Rules Enabling Act. *Id.* at 1014, 1018. Finally, "[e]ven if amended Rule 23 could be read so as to permit any such fantastic procedure, the courts would have to reject it as an unconstitutional violation of the requirement of due process of law." *Id.* at 1018. The Court of Appeals acknowledged previous applications of fluid recovery both within the Second Circuit and without, but distinguished these cases from the case before it: *Pfizer* involved a settlement, the District of Columbia Circuit's decision in *Bebchick v. Pub. Util. Comm'n*, 318 F.2d 187 (D.C.Cir.1963), was not in the context of a class action, and the California Supreme Court's approval of fluid recovery in *Daar v. Yellow Cab Co.*, 67 Cal.2d 695, 63 Cal.Rptr. 724, 433 P.2d 732 (Cal.1967), arose under a state class action statute "different" from Rule 23. *Eisen*, 479 F.2d at 1012. The result of the decision was that the defendant—who at that stage of the litigation was assumed to have acted illegally on a wide scale—escaped scot free and no one who had been mulcted received compensation.

While the broadest possible reading of *Eisen* would bar all applications of fluid recovery in non-settled cases, such a reading is not justified. *See Jones v. Nat'l Distillers*, 56 F.Supp.2d 355, 357 (S.D.N.Y. 1999) (concluding that *Eisen* does not forbid all fluid recoveries), discussed *infra; cf. Developments in the Law—Class Actions*, 89 Harv. L.Rev. 1454, 1532–35 (1976) (arguing that the *Eisen* court's reasoning does not fully justify the broad conclusion it appears to have reached). *But see Six Mexican Workers v. Arizona Citrus Grow-*

*ers*, 904 F.2d 1301, 1305 (9th Cir.1990) (reading *Eisen* as a wholesale rejection of fluid recovery); *Windham*, 565 F.2d at 72 (same); *Reader*, 110 Ariz. at 116, 515 P.2d 860 (same).

First, the *Eisen* court did not make clear the foundation for its objections to fluid recovery. *See Cicelski v. Sears, Roebuck & Co.*, 132 Mich.App. 298, 306, 348 N.W.2d 685 (Ct.App.1984) ("[T]he statement by the *Grigg* Court that it found *Eisen's* reasoning persuasive is mysterious because the *Eisen* Court did not explain why it found fluid recovery offensive to due process."). While the Court of Appeals declared that fluid recovery would alter substantive rights in violation of the Rules Enabling Act, *Eisen*, 479 F.2d at 1014, and was a "violation of the requirement of due process of law," *id.* at 1018, the court did not explain its reasoning on either of these points. Insofar as grounds for the appellate court's objection can be discerned, it appears to rest on its belief that the district court saw fluid recovery in part as a way to dispense with individualized notice, *id.* at 1010, and on the court's conclusion, described below, that the specific means of recovery to be employed in the case would benefit no more than a few of the 6,000,000 estimated class members. *Id.* at 1010–11. Neither of these concerns, however, will be present in all fluid recoveries and neither serves as justification for declaring all fluid recovery "illegal." Nor did the majority opinion support its use of the pejoratives "inadmissible," "wholly improper," and "fantastic." The opinion was not in the highest intellectual tradition of the Second Circuit Court of Appeals.

Second, it is unclear what exactly the majority of the Court of Appeals panel thought they were barring when they condemned the use of "fluid recovery." The fluid recovery plan proposed by the district court involved both the classwide cal-

culation of damages and a fluid distribution of that aggregate sum. *Eisen*, 52 F.R.D. at 262–65. The Court of Appeals' discussion of fluid recovery focuses on concerns about distribution. Given the massive size of the proposed 6,000,000–person class and the small value of the class members' average claim, the Court of Appeals doubted that more than a few claimants would step forward to recover their share of the damages. *Eisen*, 479 F.2d at 1010. Furthermore, the Court apparently thought it likely that many of the class members—those who had ceased trading on the odd-lot market—would receive no benefit at all from the recovery, while many "new traders[ ] who had no transactions in the period" would receive some benefit from the reduction in trading costs. *Id.* at 1011.

This discussion, combined with the Court of Appeals' initial expression of reluctance to allow the suit to proceed if the class members would not share in the damages, *Eisen*, 391 F.2d at 567, has led at least one commentator to conclude that, while the *Eisen* decision may have foreclosed the use of at least some fluid distribution schemes, it did not necessarily bar classwide calculation of damages. *Developments in the Law—Class Action*, 89 Harv. L.Rev. 1454, 1535 (1976). *But see Dumas v. Albers Med.*, No. 03–0640–CV–W–GAF, 2005 WL 2172030, at *7 (W.D.Mo. Sept. 7, 2005) (reading *Eisen* as rejecting aggregate damage calculation but allowing fluid distribution in appropriate cases). At the same time, however, courts in the Second Circuit have shown themselves open to the application of fluid distribution in decided as well as settled cases, casting doubt on any interpretation of *Eisen* that would completely prohibit such remedies. *See, e.g., In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 185 (2d Cir.1987) (distinguishing the distribution approved in *Agent Orange* from the

distribution in *Eisen* in part based on the fact that the *Agent Orange* distribution would more narrowly target the injured class); *Jones*, 56 F.Supp.2d at 357.

Third, while the Court of Appeals distinguished *Pfizer* on the grounds that *Pfizer* involved a settlement fund and was thus "a consensual affair made possible by the agreement of the parties," *Eisen*, 479 F.2d at 1012, this distinction appears insufficient, considering the District Court for the Southern District of New York's class certification order in the *Antibiotic Cases*. *See Antibiotic Antitrust Actions*, 333 F.Supp. at 281–83. As noted above, when the Court of Appeals for the Second Circuit was given an opportunity to foreclose the district court's application of a fluid recovery scheme, it not only declined to do so—denying both the defendants' motion for a writ of mandamus and their motion for rehearing—but also expressed its confidence that the district court's plan would not impinge on the defendants' due process rights. *Pfizer v. Lord*, 449 F.2d at 119. Far from finding that fluid recovery was acceptable only in settled cases, the Court of Appeals in fact opined that "if anything," fluid recovery would present less of a due process problem in the litigated *Antibotic Cases* than in the *Pfizer* settlement. *Id.*

As already noted, the Supreme Court granted certiorari in the second *Eisen* appeal. While vacating the Second Circuit Court of Appeals' decision, the Court agreed that the case should be dismissed as a class action on the grounds that the district court's decision regarding individual notice failed to comply with the notice requirements of Rule 23(c)(2). *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173–77, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The Supreme Court noted the Court of Appeals' discussion of fluid recovery, but did not reach the issue, since it—like the

Court of Appeals—found the notice requirements of Rule 23 "to be dispositive of petitioner's attempt to maintain the class action." *Id.* at 172 n. 10, 94 S.Ct. 2140. The Court also suggested that the issues of manageability and fluid recovery may not have been "properly before" the Court of Appeals. *Id.See also Nelson,* 802 F.2d at 409 (defendant's reliance upon the Second Circuit Court of Appeals' decision in *Eisen* is "misplaced" because the issue of fluid recovery "may not have been properly before the court"). In short, following the Supreme Court's decision, the Court of Appeals for the Second Circuit's discussion of fluid recovery in *Eisen* can properly be characterized as obiter dictum.

Post-*Eisen* caselaw on fluid recovery has been mixed. At least two Second Circuit cases have nominally relied on *Eisen* to reject the application of fluid recovery in non-settled cases. In *Van Gemert v. Boeing Co.,* 553 F.2d 812 (2d Cir.1977), *aff'd on other grounds,* 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), the Second Circuit Court of Appeals rejected the appellants' request to distribute the unclaimed residue of a class recovery pro rata to those class members who had filed proof of claims. *Id.* at 815–16. Stating that it saw "no reason to change ... [its] position, firmly stated in *Eisen v. Carlisle & Jacquelin,* disallowing a fluid class recovery," the Court of Appeals concluded that the distribution proposed in *Van Gemert* had "even less to recommend" it than that in *Eisen:* "This method expressly contemplates that silent class members will not receive any compensation, even indirectly. The claims of the silent class members would be expropriated and a windfall might result for those who appear and collect their share of the damages." *Id.* at 815–16 (internal citations omitted). The Court was not apparently concerned about the windfall to the defendant which

would be permitted to retain its possibly ill-gotten gains.

In *Abrams v. Interco Inc.,* 719 F.2d 23 (2d Cir.1983), the Second Circuit Court of Appeals affirmed the District Court for the Southern District of New York's denial of class certification in a private antitrust action alleging that Interco, a manufacturer of footwear and apparel, had engaged in illegal price-fixing. *Id.* at 28–32. The district court's denial was based on the fact that common questions would not predominate over individual ones: the suit involved numerous Interco stores and dealers, "scores of different products," and "varying local market conditions." *Id.* at 31. In affirming the district court's decision, the Court of Appeals pointed to the numerous individual issues of fact involved in damage determination and distribution, observing that the only way that had been suggested to avoid these issues, "fluid class recovery," had "not found favor in this circuit." *Id.*

In both *Van Gemert* and *Abrams* the Second Circuit Court of Appeals took a step back from its strongest statements in *Eisen.* While the *Van Gemert* court rejected the use of fluid recovery, the court expressly withheld a decision on its constitutionality, simply holding that "the circumstances here ... do not call for this extraordinary remedy." *Van Gemert,* 553 F.2d at 816. Likewise, while the *Abrams* court expressed concerns about the numerous individual issues present in the case before it, it also made clear that it was not going so far as to hold that "in order to support damage recovery by a nationwide class plaintiffs would be obligated to show conduct by Interco violating [the law] with respect to each of its 3500 dealers." *Abrams,* 719 F.2d at 29–30.

Fluid recovery continues to be widely used in the settlement context. *See, e.g., Beecher v. Able,* 575 F.2d 1010 (2d Cir.

1978); *Fears v. Wilhelmina Model Agency, Inc.,* No. 02 Civ. 4911(HB), 2005 WL 1325297 (S.D.N.Y. June 6, 2005); *Jones,* 56 F.Supp.2d 355; *New York v. Keds Co.,* No. 93 Civ. 6708(CSH), 1994 WL 97201 (S.D.N.Y. Mar. 21, 1994); *County of Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1428 (E.D.N.Y.1989), *aff'd in relevant part,* 907 F.2d 1295 (2d Cir.1990); *In re Agent Orange Prod. Liab. Litig.,* 611 F.Supp. 1396 (E.D.N.Y.1985), *aff'd in relevant part,* 818 F.2d 179 (2d Cir.1987).

In *Agent Orange,* the District Court for the Eastern District of New York approved a 180 million dollar settlement ($300 million) in a class action brought by Vietnam veterans and their families against seven chemical companies for injuries believed to be caused by exposure to Agent Orange and related phenoxy herbicides. *Agent Orange,* 611 F.Supp. at 1400. The court found that implementation of any distribution plan based on "traditional tort principles" was "impossible because of a virtual absence of proof of causation, financially impracticable because of administrative costs, and not feasible for other compelling reasons." *Id.* at 1402–03. Although the settlement fund was large, it was not large enough to provide a meaningful individual award for every class member; distribution of thousands of small individual payments would have "trivialize[d] the beneficial impact of the settlement fund on the needs of the class." *Id.* at 1431. As a result, a fluid distribution was required.

Individual awards were reserved for exposed veterans who suffered from total disabilities and the surviving spouses and children of exposed veterans who had died. *Id.* at 1410–11. In order to claim their awards, these class members were required to present some evidence of possible exposure to Agent Orange, but did not have to show that the disability or death had resulted from exposure. Although

clearly unrelated injuries—such as those caused predominately by trauma—would not be compensated, all other cases of total disability or death would qualify for individual awards. *Id.* at 1412. The remainder of the settlement was earmarked for a "class assistance foundation" that would "fund projects and services that will benefit the entire class." *Id.* at 1432. Because the foundation would "direct the spending of a large pool of money to fund services," the court found that it would have a much "greater impact on the problems of the class than if thousands of small, individual payments were made." *Id.* Although expressing a few concerns about the court's control over the class assistance foundation, the Court of Appeals affirmed the district court's plan for distribution of the settlement. *See Agent Orange,* 818 F.2d at 183–86. *See also In re Agent Orange Prod. Liab. Litig.,* 689 F.Supp. 1250, 1269–70 (on remand, altering settlement to involve "class assistance program" rather than "class assistance foundation" and increasing control over distribution in response to the Court of Appeals' concerns); Peter G. Schuck, Agent Orange on Trial, Mass Toxic Disasters in the Courts 206–22, 299 ff. (enlarged ed.1987) (fluid recovery for children and spouses of veterans of Vietnam war).

Similarly, in *County of Suffolk v. Long Island Lighting Co.,* the District Court for the Eastern District of New York approved a settlement in a series of complex civil RICO suits arising out of the construction of the Shoreham atomic energy plant on Long Island. The settlement provided for compensation to current ratepayers of the defendant utility through a ten-year rate reduction scheme, *see id.* at 1456–57, and to former ratepayers through a proof of claim procedure. *See Long Island Lighting Co.,* 710 F.Supp. at 1457. Some of the current ratepayers who benefited from the rate reduction had never

been overcharged, and some of the former ratepayers never took advantage of the proof of claim procedure. The settlement also established a "Citizens Advisory Panel" to help improve electric and gas service on Long Island. *See id.* at 1459. Six years later, the district court approved a request from the Citizens Advisory Panel that its life be extended and additional financing be provided from the unclaimed portion of the fund for former ratepayers. *See County of Suffolk v. Long Island Lighting Co.,* No. 87 CIV 0646, 1995 WL 761828 (E.D.N.Y. Dec. 19, 1995).

The Court of Appeals affirmed the district court's approval of the settlement in *Long Island Lighting Co. See County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295 (2d Cir.1990). It also found unobjectionable the later cy pres distribution of the unclaimed portion of the fund. *See County of Suffolk v. Stone & Webster Eng'g Corp.,* 106 F.3d 1112 (2d Cir.1997).

The fact that fluid recovery has been so widely used in settled cases—and that its use has been repeatedly affirmed by appellate courts throughout the country, including the Court of Appeals for the Second Circuit—is important evidence of the continued necessity of fluid recovery in this country and Circuit. *See, e.g., Beecher,* 575 F.2d 1010; *Long Island Lighting Co.,* 907 F.2d 1295; *Agent Orange,* 818 F.2d 179. While courts have particularly "broad supervisory powers over the administration of class-action settlements," *Beecher,* 575 F.2d at 1016, settlements do not stand separate and apart from decisional law. Settlements represent the view of industry, consumers, and the legal profession of what is necessary and desirable in mass consumer cases. It is entirely appropriate for courts to reflect this practice and to respect the modes used by private litigants in disposing of mass actions through aggregation and fluid recov-

ery. *See generally* Samuel Issacharoff & John Fabian Witt, *The Inevitability of Aggregate Settlement: An Institutional Account of American Tort Law,* 57 Vand. L.Rev. 1571 (2004).

The courts' approach to fluid recovery in many of the post-*Eisen* settled cases suggests a continued willingness to apply fluid recovery beyond the settlement realm. In *Jones v. National Distillers,* a securities fraud class action, the District Court for the Southern District of New York approved a proposed donation of settlement residue to the Legal Aid Society. *Jones,* 56 F.Supp.2d at 356. Noting that the Court of Appeals for the Second Circuit had "cautioned ... against a 'fluid recovery' scheme that creates a class fund but deviates too much from principled individual damage calculations and pro rata distributions to class members," the district court nevertheless concluded that "*Eisen* does not forbid all fluid recoveries based on cy pres principles; it only cautions against going to excess in creating class funds that do not meaningfully benefit the class as a whole." *Id.* at 357. Likewise, while the Second Circuit Court of Appeals' approval of fluid distribution in the *Agent Orange* settlement was based in part on the fact that it was a settlement, the Court also found comfort in the fact that the distribution in that case, unlike the distributions in *Eisen* and *Van Gemert,* would benefit a class "essentially equivalent" to the class that claimed injury. *Agent Orange,* 818 F.2d at 185. According to the Court of Appeals, the distribution plan adopted by the district court "simply lack[ed] the sort of 'fluidity' between the class claiming injury and the class receiving recovery that existed in *Eisen* and *Van Gemert.*" *Id.*

*3. Application of Law to Facts*

▮ The plaintiffs' proposed use of fluid recovery in this case would effectuate

the policies of civil RICO, a law which was enacted both to provide compensation to injured people and to increase enforcement of federal law through the creation of "private attorneys general." *See, e.g., Rotella v. Wood,* 528 U.S. 549 557, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) ("The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity."); *Malley–Duff Assocs.,* 483 U.S. 143, 151, 107 S.Ct. 2759, 97 L.Ed.2d 121 (civil RICO "bring[s] to bear the pressure of 'private attorneys general' on a serious national problem for which public prosecutorial resources are deemed inadequate"); *Sedima v. Imrex Co.,* 473 U.S. 479, 493, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (describing the "private attorney general provision" in civil RICO as "designed to fill prosecutorial gaps").

While the class members' estimated individual damages are significantly higher than those in *Eisen,* they are still low enough to make individual lawsuits cost-prohibitive. If the members of this class are to have a fair chance of receiving compensation for their alleged economic injuries—and if they are to hold responsible those corporations whose deliberate actions allegedly caused those injuries—they must make use of the Rule 23(b)(3) class action device. And, as in many large-scale consumer class actions, classwide damage determination and fluid distribution are necessary in order to effectively and fairly administer this litigation. Given the size of plaintiffs' purported class and the nature of the purchases involved—cigarettes are, like many other consumer products, relatively inexpensive and repeatedly consumed and replaced—"traditional methods of proof [may not be] worthwhile." *California v. Levi Strauss & Co.,* 41 Cal.3d 460, 472, 224 Cal.Rptr. 605, 715 P.2d 564 (1986). If plaintiffs' allegations regarding

the defendants' actions are proved, then to "allow the defendant[s] to insist upon proof of individual claims [would] enable [them] to benefit from the cumbersome nature of legal proceedings and the lack of sophistication and indolence of the consumer," and would "reward [their] foresight in stealing from the multitude in small amounts." *Bruno v. Superior Court,* 127 Cal.App.3d 120, 127, 179 Cal.Rptr. 342 (1981).

The application of fluid recovery in this case does run the risk of overcompensating some and undercompensating other members of the class who relied differently on the "lights" designation and acted differently and for diverse reasons. In terms of damage calculation, these important factual issues can be resolved by a jury with the aid of experts and statistical proof. *See* Parts VII.D.1.a.ii, X.A, *supra.* In terms of distribution, concerns about over- and undercompensation may be at least partially allayed through requiring claimants to submit affidavits regarding their understanding of the health issues surrounding "light" cigarettes and their reliance on the "lights" descriptor in addition to information regarding their cigarette purchases. While a court must be alert to issues of due process and must not value efficiency over fairness to both parties, illegally injured plaintiffs should not be fobbed off on the basis of real and imagined management problems that can be circumvented in a fair adjudication.

a. *Eisen* and *Van Gemert*

Considering the Court of Appeals for the Second Circuit's failure to clarify or articulate the nature of its objections to fluid recovery, *Eisen* is best read as confined to its particular facts. The validity of this approach is confirmed by post-*Eisen* case law in the Second Circuit. *See In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 179, 185 (2d Cir.1987) (distinguishing the

distribution approved in *Agent Orange* from the distribution in *Eisen* in part based on the fact that the *Agent Orange* distribution would more narrowly target the injured class); *Van Gemert v. Boeing Co.*, 553 F.2d 812, 816 (2d Cir.1977), *aff'd on other grounds*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) (expressly withholding a decision on the constitutionality of fluid recovery); *Jones*, 56 F.Supp.2d at 357. Given a sensible view of what is necessary for a viable and fair administration of the instant litigation, the fluid recovery proposed by the plaintiffs in this case is not barred by *Eisen*.

Unlike the case in *Eisen*, fluid recovery will not serve in the case at bar as a means of dispensing with individual notice to identifiable class members. While individual notice is not practicable here, that impracticability stems not from concerns about its expense relative to the value of the estimated recovery, *see Eisen v. Carlisle & Jacquelin*, 41 F.R.D. 147, 151 (S.D.N.Y.1966), but rather from the fact that an appreciable number of the class members cannot be identified in advance. The plaintiffs' proposed plan of widespread paid media notice is the "best notice practicable under the circumstances," Fed. R.Civ.P. 23(c)(2), and is therefore consonant with the requirements of both Rule 23 and the due process clause. *See, e.g., Mullane v. Cent. Hanover*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

More importantly, the class members in this case are in fact "likely . . . to share in an eventual judgment," as opposed to those in *Eisen. Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 567 (2d Cir.1968). In *Eisen*, very few members of the class were expected to come forward to claim their share of the total damages, and the Court of Appeals thought it likely that many of the class members would receive no benefit at all from the recovery, while many

new traders who were not members of the class would receive some benefit from the proposed reduction in trading costs. *Eisen*, 479 F.2d at 1010–11. Although class members' estimated recoveries in the present case may be too low to justify the cost of individual litigation, they are significantly higher than the average damage claim of three dollars and ninety cents predicted in *Eisen. Id.* at 1010. As a result, a large number of class members can be expected to come forward to claim damages. Furthermore, while there are legitimate concerns about over- and undercompensation of class members because of individual reliance on the defendants' alleged misrepresentation, these concerns can be dealt with through requiring the kind of affidavit from claimants described above.

For much the same reason, the fluid distribution proposed in the present case does not run afoul of the Court of Appeals' decision in *Van Gemert*. In *Van Gemert*, class members who had already received their share of a total damage recovery requested that the court allow distribution of the unclaimed residue to them on a per capita basis. *Van Gemert*, 553 F.2d at 815. The Second Circuit Court of Appeals rejected this as an impermissible "windfall" to the claiming plaintiffs and an "expropriation" of the claims of the silent class members, who would receive no benefit at all from the distribution. *Id.* at 816. In the present case, no such windfall will occur. Damages can be distributed to claiming class members on the basis of the number of "light" cigarettes purchased in the relevant geographic locations during the relevant time period. The residue—if any—can be distributed on the basis of cy pres principles to be determined at a later time.

b. Due process and Seventh Amendment issues

 The plaintiffs' proposed use of fluid recovery would not deprive the defen-

dants of their right to due process or of their Seventh Amendment right to a trial by jury, for all of the reasons set forth by the District Court for the Southern District of New York in the *Antibiotic Cases,* 333 F.Supp. 278 (S.D.N.Y.1971), and by the Michigan and California courts of appeals in *Cicelski v. Sears, Roebuck & Co.,* 132 Mich.App. 298, 348 N.W.2d 685 (Ct. App.1984), and *Bruno v. Superior Court,* 127 Cal.App.3d 120, 179 Cal.Rptr. 342 (Ct. App.1981). The defendants are not "constitutionally entitled to compel a parade of individual plaintiffs to establish damages." *Antibiotic Antitrust Actions,* 333 F.Supp. at 289. Rather, they are entitled to a full and fair hearing—by a jury if they so request—of all of the issues relevant to their liability to the plaintiff class.

Aggregate determination of the plaintiff class' damages would provide adequate protection. In an aggregate determination, defendants would be able to challenge the plaintiffs' offers of proof regarding the extent of reliance by class members and the amount of their economic damages. If the jury does not find that the plaintiffs have proved the economic damages they allege the defendants caused them, the defendants will not be held liable. And if defendants are held liable, they will, as required by federal substantive law, be held liable for no more than treble the amount of the economic damages proved to have been caused by their actions. The fact that the proof is on a classwide rather than individual basis would not change this result. *See Antibiotic Antitrust Actions,* 333 F.Supp. at 288–89; *see also In re Agent Orange Prod. Liab. Litig.,* 597 F.Supp. 740, 839 (E.D.N.Y.1984) ("No matter what system is used the purpose is to hold a defendant liable for no more than the aggregate loss fairly attributable to its ... conduct. As long as that goal is met a defendant can have no valid objection that its rights have been violated.").

Fluid distribution poses no due process or Seventh Amendment concerns. As the California Court of Appeals persuasively explained in *Bruno,* "a class action which affords due process of law ... through the time when the amount of [the defendant's] liability is calculated cannot suddenly deprive him of his constitutional rights because of the way the damages are distributed." *Bruno,* 127 Cal.App.3d at 129, 179 Cal.Rptr. 342. If the defendants are held liable to the plaintiffs, they will be held liable only to extent of the "aggregate loss fairly attributable to their ... conduct." *Agent Orange,* 597 F.Supp. at 839. The method by which the damages are then distributed has no bearing on the defendants' constitutional rights.

c. Rules Enabling Act

 The plaintiffs' proposed use of fluid recovery would not alter the substantive requirements of RICO, and would not, therefore, violate the Rules Enabling Act. *See* 28 U.S.C. § 2072(b) (2000) (general rules of practice and procedure promulgated by the Supreme Court "shall not abridge, enlarge or modify any substantive right"). Under the civil RICO statute, the plaintiffs are required to prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275. In addition, plaintiffs must prove that they have been injured in their "business or property by the conduct constituting the violation." *Id.* Although the actual probative force of the plaintiffs' proposed classwide proof remains to be determined at trial, these elements are not inherently less provable on a classwide than on an individual basis, and the plaintiff class will be held to exactly the same standard of proof as in individual trials. *See* Note, *Managing the Large Class Action,* 87 Harv. L.Rev. at 448–49.

The rights of the plaintiff class members are not enlarged by the classwide nature of the damage determination. If the defendants' liability is established, total damages should be equivalent to what they would be if each class member were required to come forward and prove his or her damages separately. *Id.* at 449. Nor are the rights of the class members abridged by classwide adjudication. By submitting a claim, each individual member of the class will be able to receive his or her treble damages, "just as if he [or she] had brought an individual action." *Id.*

A question under the Rules Enabling Act is posed by the danger of overcompensation inherent in the plaintiffs' fluid distribution plan. It is possible that some claimants will benefit from the plaintiff class' recovery despite the fact that they did not rely on defendants' alleged misrepresentations regarding "light" cigarettes and were not, therefore, injured in their business or property by defendants' actions. *See Metromedia v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992) (in the context of an alleged RICO predicate act of mail fraud, requiring proof of reliance in order to establish the necessary causal connection between the defendant's actions and the plaintiff's injury). The risk of such overcompensation can be limited by requiring proof through claim forms from claimants concerning the extent of their reliance during the distribution stage.

Ultimately, the risk of some overcompensation cannot be determinative. It is the large scale of the defendants' alleged fraud that makes fluid recovery necessary to fully effectuate the substantive law in this case. It would be paradoxical if civil RICO—a law which was enacted by Congress both to compensate victims and to increase enforcement of federal laws against organizations acting illegally—could not be applied precisely where defendants' fraud caused the broadest harm. *See, e.g., Rotella,* 528 U.S. at 557, 120 S.Ct. 1075; *Malley–Duff & Associates, Inc.,* 483 U.S. at 151, 107 S.Ct. 2759; *Sedima,* 473 U.S. at 493, 105 S.Ct. 3275.

RICO's "policy of compensation is ... better advanced" by the use of a fluid distribution in this case than by "permitting the defendant[s] to retain profits that [they] procured in violation of the substantive statute[ ] from which the policy derives." Natalie A. DeJarlais, Note, *The Consumer Trust Fund: A Cy Pres Solution to Undistributed Funds in Consumer Class Actions,* 38 Hastings L.J. 729, 745 (1987). The fact that a relatively few uninjured individuals may also benefit from that distribution "should no more make such relief improper than does the fact that third parties may benefit from injunctions make that relief improper." *See* Note, *Managing the Large Class Action: Eisen v. Carlisle & Jacquelin,* 87 Harv. L.Rev. 426, 450 (1973); *see also Newberg on Class Actions* § 10:22 (4th ed. 2002) ("To the extent that cy pres distribution actually benefits a sufficient number of injured class members, the monies paid to third parties are an incidental but necessary cost that must be accepted in order to confer the benefits in a feasible way to a large proportion of the injured class members.").

### 4. Conclusion on Fluid Recovery

The use of fluid recovery is appropriate in the instant case. It alone does not merit denial of certification and dismissal. The detailed methods of fixing damages and distribution, if necessary, will be left to determination after a jury verdict.

### C. Allocation of Damages Among Defendants

Total damage computation is covered in Part III.D, *supra.* Distribution among

members of the class is described in Part IX.B, *supra.* The parties have not adequately briefed or argued the question of applicable rules for assessment of the damages, if any, among the individual defendants; that subject is covered preliminarily in the present section.

### 1. National Common Law

 This litigation requires application of federal substantive RICO law and with it federal statutes covering mail and wire fraud. *See* Part III, *supra.* Federal law of damages controls. If no legislation covers the matter, common law principles developed by the court apply. *See McDermott, Inc. v. AmClyde,* 511 U.S. 202, 207, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994) (formulating a rule for damage division where "none of th[e applicable substantive] statutes provides us with any policy guidance or imposes any limit on our authority to fashion the rule that will best answer the question presented by this case"). *See also, e.g.,* Richard H. Fallon, Jr., Daniel J. Meltzer & David L. Shapiro, *Hart and Wechsler's The Federal Courts and The Federal System* 72 (2006 Supplement) (federal courts formulating rules of decision not clearly specified by statute "typically turn to the general common law, canvassing the law of multiple jurisdictions, in seeking guidance for the particular rule"); Jay Tidmarsh & Brian J. Murray, *A Theory of Federal Common Law,* 100 Nw. U.L.Rev. 585 (2006); Caleb Nelson, *The Persistence of General Law,* 106 Colum. L.Rev. 503 (2006).

*McDermott* was a case in admiralty. Its holding in this federal substantive area controlled only damages in admiralty cases. Nevertheless, Justice Stevens' opinion for the court considers competing modern available rules. *See id.* at 211–17, 114 S.Ct. 1461 (considering in detail the "consistency with the [binding federal maritime law], promotion of settlement, and judicial economy" promoted by three possible approaches to damages division). It adopts an equitable rule for locating responsibility and dividing damages among defendants by relative fault. *See id.* at 208, 114 S.Ct. 1461 (the equitable rule serves "the interest in fairness promoted by the proportionate fault rule").

Since it is assumed for the purposes of this discussion that none of the defendants will settle, the complex rules for crediting non-settling defendants on a *pro tanto* or other basis for any prior settlement need not be considered. What is clear from *McDermott* is that, where there is no definite statutory or case law rule for dividing damages among defendants, the courts must provide the rule in the common law tradition. There are a large number of possible ways of dealing with the issue. Two main ones, joint and several liability and market share, are covered below.

### 2. Joint and Several Liability

 Joint and several liability is the traditional rule that would apply. It is based upon the concept that all who participate in a single conspiracy are individually liable for the harm done by any or all of the conspirators while attempting to meet its goals. Application of this approach would permit plaintiffs as a class to collect all damages assessed against all defendants from any one or more of the defendants arbitrarily chosen by the class attorneys. *See* Restatement (Third) of Torts, Apportionment of Liability § 10 ("[T]he injured person may ... recover the full amount of recoverable damages from any jointly and severally liable person."). Theoretically, the least culpable might then be forced to shoulder the largest burden, an inequitable result. Nevertheless, authority supports this rule.

 "Under the doctrine of joint and several liability, when two or more persons' torts together cause an injury, each tortfeasor is liable to the victim for the total damages." *In re Masters Mates & Pilots Pension Plan & IRAP Litig.,* 957 F.2d 1020, 1028 (2d Cir.1992). "Joint and several liability is rooted in the principle that a wrongdoer is liable for the reasonably foreseeable acts of his fellow wrongdoers committed in furtherance of their joint undertaking." *United States v. Philip Morris USA,* 316 F.Supp.2d 19, 26 (D.D.C.2004) (citing *Paper Sys. Inc. v. Nippon Paper Indus. Co.,* 281 F.3d 629, 633 (7th Cir.2002)). The joint and several rule serves to both maximize deterrence of defendants and prevent double recoveries by plaintiffs. *Id.* "Holding RICO conspirators jointly and severally liable for the acts of their co-conspirators reflects the notion that the damage wrought by the conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Oki Semiconductor Co. v. Wells Fargo Bank,* 298 F.3d 768, 775 (9th Cir.2002).

Every Court of Appeals that has addressed the issue has found that both civil and criminal RICO offenses require imposition of joint and several liability. *See United States v. Corrado,* 227 F.3d 543, 553 (6th Cir.2000) (finding that "joint and several liability is not only consistent with the statutory scheme [of RICO] but in some cases will be necessary to achieve the aims of the legislation" because the "entire scheme would not have succeeded without the support of [the] enterprise"); *United States v. Infelise,* 159 F.3d 300 (7th Cir. 1998) (co-defendants were correctly held jointly and severally liable); *Beneficial Standard Life Ins. Co. v. Madariaga,* 851 F.2d 271 (9th Cir.1988) (civil RICO liability assessed jointly and severally). *See also Kashi v. Gratsos,* 790 F.2d 1050, 1054–55 (2d Cir.1986) (under New York state common law, "[p]roof of a civil conspiracy . . . connects a defendant with the transaction and charges him with the acts and declarations of his co-conspirators and exposes that defendant to joint and several liability for the victim's losses") (internal citations, quotation marks, and alterations omitted). *See also* Restatement (Third) of Torts, Apportionment of Liability § A18.

While the Court of Appeals for the Second Circuit has not yet ruled on the issue in the context of civil RICO, it has affirmed at least one district court judgment holding civil RICO defendants jointly and severally liable. *See Abou–Khadra v. Mahshie,* 4 F.3d 1071, 1073 n. 1 (2d Cir. 1993) (noting joint and several liability).

Equity does not support joint and several liability in the context of the instant case for reasons described in *McDermott.* Since the Court of Appeals for the Second Circuit has not addressed the matter, it is appropriate to consider alternate approaches.

### 3. Market Share

A market share approach provides a relatively simple method of assessing damages on the basis of proportionate fault, the modern equitable doctrine adopted by *McDermott.* This is the basic approach taken in the diethylstilbestrol (DES) cases, the Agent Orange cases, many asbestos matters, the *Blue Cross* cigarette case, and in most structured settlements where a number of defendants may have contributed to the injuries of one person or a group. *See, e.g.,* Paul D. Rheingold, *Mass Tort Litigation* § 10:9 (1996); Monograph, *Individualized Justice in Mass Tort Litigation,* passim (1995); Aaron D. Twerski, *Market Share—A Tale of Two Centuries,* 55 Brook. L.Rev. 869 (1989) (approving market share in DES cases, but raising problems in broader applications); Sympo-

sium, *The Problem of the Indeterminate Defendant: Market Share Liability Theory,* 55 Brook. L.Rev. 863 ff. (1989); Robert A. Baruch Bush, *Between Two Worlds: The Shift From Individual to Group Responsibility in the Law of Causation of Injury,* 33 UCLA L.Rev. 1473 (1986).

The DES cases provide a good example. *See, e.g., Sindell v. Abbott Labs.,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (Cal.), *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980); *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (N.Y.), *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989); *In re DES Cases,* 789 F.Supp. 552 (E.D.N.Y.1992). Though the cases were brought by individuals rather than a class, the rule of damages, in effect, treated all plaintiffs as a class and all defendants as a class in arriving at a substantive solution. Market share was the basis for dividing damages among defendants. Individual cases were tried to determine cause and damages, with almost all ultimately being settled on a matrix basis with the aid of a special master appointed by this court. The DES analogy is particularly useful in the present case, since market share changed slightly over the years in DES, as it did with cigarettes.

The *Blue Cross* cigarette case involved only one plaintiff, a health insurer, on one side, and many cigarette manufacturers on the other. *See Blue Cross,* 178 F.Supp.2d 198 (E.D.N.Y.2001), *rev'd on other grounds,* 344 F.3d 211 (2d Cir.2003) and 393 F.3d 312 (2d Cir.2004), Appendix B, *infra.* Yet *Blue Cross* was a suit by the insurer on behalf of each of its many subscriber-smokers whose cigarette habit caused medical problems. In effect, there was, as in the present case, a large body of smokers pitted against the cigarette industry. The verdict form required the jury to attribute a portion of total damages to each defendant based on approximations of market share, and it did so.

The Agent Orange case was settled. *See, e.g., In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145 (2d Cir.1987). Damages for the entire potential class of millions of members of the armed forces were divided among defendants based on market share modified to take account of the variations in estimated percentages of dioxin in each manufacturer's product. *See, e.g.,* Peter H. Schuck, *Agent Orange on Trial: Mass Toxic Disasters in the Courts* 86 (enlarged ed.1987). In the present case, since the medical damage caused by "light" cigarettes is not at issue (as dioxin potency and its alleged health effects was in Agent Orange) a simple market share of "light" cigarettes sold in applicable geographic areas, imputed year by year during the liability period and summed up, would suffice.

In many of the Brooklyn asbestos cases tried on a consolidated basis, the juries dealt with plaintiffs who could not prove which of many manufacturers' asbestos they had inhaled while constructing ships during World War II. In effect, the jury assessed responsibility for asbestos-caused illnesses on the percentage of each defendant's product supplied during the construction of ships on which each plaintiff worked. *See In re E. & S. Dists. Asbestos Litig.,* 772 F.Supp. 1380 (1991). The jury verdicts in scores of trial cases were then used in providing settlement matrices for thousands of other cases with the help of a settlement master. *But cf.* Rheingold, *Mass Tort Litigation* § 10:10 (victims have had less success with market share in asbestos and other product suits than in the DES cases).

Market share apportionment is a rule tested before juries and in extensive settlements. It comports with *McDermott* and

should be applied to the present case. As Justice Stevens pointed out:

> In the *Reliable Transfer* case [*United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975)] we decided to abandon a rule that had been followed for over a century in assessing damages when both parties to a collision are at fault. We replaced the divided damages rule, which required an equal division of property damage whatever the relative degree of fault may have been, with a rule requiring that damages be assessed on the basis of proportionate fault when such an allocation can reasonably be made. Although the old rule avoided the difficulty of determining comparative degrees of negligence, we concluded that it was "unnecessarily crude and inequitable" and that "[p]otential problems of proof in some cases hardly require adherence to an archaic and unfair rule in all cases." *Id.*, at 407, 95 S.Ct. at 1714. Thus the interest in certainty and simplicity served by the old rule was outweighed by the interest in fairness promoted by the proportionate fault rule.

311 U.S. at 207–08, 61 S.Ct. 204. This rationale is applicable to the present case, where degree of fault is equivalent to percentage of market share of "light" cigarettes.

#### 4. *Other Systems*

Variations on the above methods, particularly where some defendants settle, may be proposed by the parties. *See* Restatement (Third) of Torts, Apportionment of Liability, *passim.* The complex problems of proof which would be presented by some of the variations make the simplest solution preferable. For example, the factors the Restatement suggests for assigning shares of responsibility include:

> (a) the nature of the [liable] person's risk-creating conduct, including any awareness or indifference with respect to the risks created by the conduct and any intent with respect to the harm created by the conduct; and

> (b) the strength of the causal connection between the person's risk-creating conduct and the harm.

*Id.* § 8. In the instant case, involving a single conspiracy, it is easier and more in accord with both law and equity to assume the risk-creating conduct and the strength of causal connections are proportionate to market share in developing a particular substantive rule of damages.

### X. Certification of Interlocutory Appeal

 Section 1292(b) of title 18 of the United States Code provides that a district court judge may certify an order that is "not otherwise appealable" if the judge is "of the opinion that such order involves [1] a controlling question of law [2] as to which there is a substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation ...." 18 U.S.C. § 1292(b). Absent certification, an order denying summary judgment is not appealable. *See Sira v. Morton*, 380 F.3d 57, 66 (2d Cir. 2004) ("It is settled law that a denial of summary judgment is ordinarily not a final judgment from which an appeal will lie.").

The Court of Appeals for the Second Circuit has repeatedly counseled that certification under Section 1292(b) should be sparingly granted. *See, e.g., Flor v. BOT Fin. Corp.*, 79 F.3d 281, 284 (2d Cir.1996) (Section 1292(b) certification should be "strictly limited"); *Westwood Pharms., Inc. v. Nat'l Fuel Gas Distrib.*, 964 F.2d 85, 89 (2d Cir.1992) ("[W]e urge the dis-

trict courts to exercise great care in making a § 1292(b) certification.").

■■■■■ An appeal here would not satisfy the criteria required for certification under section 1292(b). As already noted, the difficulties in this case lie with the sufficiency of plaintiffs' proof, not with their legal theory. The "controlling questions" emphasized by defendants are the ability of plaintiffs to muster satisfactory proofs of causation, injury, and damages. These questions are resolved for the present by the conclusion that plaintiffs have proffered sufficient admissible expert and other evidence to survive summary judgment. Appellate review of qualification of experts under *Daubert* are highly deferential. *See Amorgianos,* 303 F.3d at 264 ("We review a district court's determination to admit or exclude expert testimony under *Daubert* for abuse of discretion.").

The probability that an interlocutory appeal would require lengthy appellate consideration and the likelihood that continued district court proceedings without appeal might moot the issues also counsel against 1292(b) certification. *See* Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. 1292(b),* 88 Harv. L.Rev. 607, 614 (1975) ("The district court's familiarity with the record and the original order permits it to screen applications for appeal with little additional effort and puts it in the best position to determine whether an appeal will further the goal of efficiency [behind Section 1292(b) ]."). In short, an appeal at this time likely would not lessen "the total burdens of litigation on the parties and the judicial system" and thus would not materially advance the ultimate termination of the litigation. *See TCF Banking and Savs., F.A. v. Arthur Young & Co.,* 697 F.Supp. 362, 366 (D.Minn.1988) ("Section 1292(b) is designed to allow for sparing exceptions to the final judgment rule when interlocutory appeal can minimize 'the total burdens of litigation on the parties and the judicial system.' "). The enormous record would seriously add to the burdens of the Court of Appeals for the Second Circuit without adequate justification.

Should the Court of Appeals under Rule 23(f) of the Federal Rules of Civil Procedure accept an interlocutory appeal from the decision to certify the class it will, in effect, be deciding the case, leaving unnecessary a separate certification under section 1292(b). Denial of certification will sound the death knell of this suit.

## XI. Stay

Because an interlocutory appeal of the denial of summary judgment is not certified, a stay of proceedings is not appropriate. The Court of Appeals may grant a stay if it takes an appeal under Rule 23(f) of the Federal Rules of Civil Procedure.

Defendants have a right to seek an appeal of the class certification order under Rule 23(f); the Court of Appeals "may in its discretion permit [the] appeal ... if application is made to it within ten days after entry of the order. *An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders."* Fed.R.Civ.P. 23(f) (emphasis supplied).

This suit has been pending for almost two and a half years. Discovery is essentially complete. Legal questions antecedent to trial have been resolved. Further delay would run afoul of the first mandate of the Federal Rules of Civil Procedure: the courts shall "secure the just, *speedy, and inexpensive* determination of every action." Fed.R.Civ.P. 1 (emphasis supplied).

## XII. Conclusion

Jury selection is set for January 22, 2007, with trial to begin immediately

thereafter. The parties, magistrate judge, and court shall meet on October 30, 2006 and November 29, 2006 to address in limine motions, details of notice, and other class action matters. The parties shall meet before then to attempt to agree insofar as they can. Proposed jury questionnaires, voir dire, and verdict sheets shall be submitted by October 27, 2006. The parties shall also brief and be prepared to argue the issue of assessment of damages. *See* Part IX.C, *supra.* If the parties cannot arrange for a briefing schedule, the magistrate judge is respectfully requested to do so, adjusting trial and reporting dates if necessary.

The class is certified as follows:

All United States residents who purchased in the United States, not for resale, cigarettes labeled as "Lights" and/or "Light" (collectively "light cigarettes") that were manufactured and/or sold by Defendants during the period commencing on the first date that Defendants began selling light cigarettes until the date trial commences (the "Class Period"), and who are not, as of the date of trial, members of a certified state class seeking economic damages stemming from their purchases of light cigarettes or having obtained an award of, or a denial of, such damages. Excluded from the Class are individuals who are directors and officers of the Defendants' corporations, their parents, subsidiaries and/or affiliates.

At or before the October 30 meeting, plaintiffs must inform the court and defendants if they intend to amend their pleadings to seek damages up to the time of trial instead of, as is now the case, up to the time of filing the complaint. *See* Fed. R.Civ.P. 15(a) (amendments permitted "by leave of court"). After trial has begun, amendments to conform to the evidence, *id.* 15(b); relation back of amendments,

*id.,* 15(c); and supplemental pleadings, *id.,* 15(d), will be strongly discouraged. Nevertheless, subject to notice requirements, the court will entertain a motion to extend the class to, for example, encompass smokers of all "low tar" brands rather than "lights" alone, if that would assist the parties in negotiating a global settlement of all excess price claims.

Defendants' motion to dismiss claims for equitable relief is granted. All other motions for summary judgment are denied.

No interlocutory appeal is certified. No stay is imposed.

SO ORDERED.

## APPENDIX A

Excerpts from *United States v. Philip Morris USA. Inc., et al.,* 449 F.Supp.2d 1 (D.D.C.2006), 2006 WL 2380622, 2006 WL 2380648, 2006 WL 2380632, 2006 WL 2381449, 2006 WL 2380650 and 2006 WL 2380681 (D.D.C. Aug. 17, 2006).

[Ed. Note: Since this appendix is available on Westlaw and in the Federal Supplement, it has been deleted here for purposes of publication.]

## APPENDIX B

Excerpts from *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc., et al.,* 178 F.Supp.2d 198 (E.D.N.Y.2001), *rev'd on other grounds,* 344 F.3d 211 (2d Cir.2003) and 393 F.3d 312 (2d Cir.2004).

[This opinion was issued after a full trial in which the jury found damages against defendants. The discussion which follows resulted in a denial of defendants' motion to overturn the verdict.]

[178 F.Supp.2d at 208]

[Ed. Note: Since this appendix is available on Westlaw and in the Federal Supple-

ment, it has been deleted here for purposes of publication.]

## APPENDIX C

Findings of fact in *Price v. Philip Morris*, No. 00–L–112, 2003 WL 22597608 (Ill. Cir. Mar. 21, 2003), *rev'd on other grounds*, 219 Ill.2d 182, 302 Ill.Dec. 1, 848 N.E.2d 1 (Ill.2005) (suit barred by provision of state statute).

[The findings of fact and law in this opinion were made by the presiding judge after a full non-jury trial.]

1. ... Specifically, the Court finds that the Class is defined as follows:

All persons who purchased Defendant's Cambridge Lights and Marlboro Lights cigarettes in Illinois for personal consumption, between the first date the Defendant placed its Cambridge Lights and Marlboro Lights cigarettes into the stream of commerce through-February 8, 2001.

Excluded from the Class is Defendant, any parent, subsidiary, affiliate, or controlled person of Defendant, as well as the officers, directors, agents, servants, or employees of Defendant, and the immediate family members of such persons. Also excluded is any trial judge who may preside over this case.

2. This Class Action is brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/_et seq._ ("Illinois Consumer Fraud Act"). Based upon the findings and conclusions herein, the Court finds that Defendant Philip Morris has violated the Illinois Consumer Fraud Act (815 ILCS 505/2) and the Uniform Deceptive Trade Practices Act (815 ILCS § 510/2). As a direct and proximate result of Defendant's violation of these statutes, Plaintiffs and the Class have suffered compensatory damages in the amount of $7.1005 Billion.

3. The trial in this case commenced on January 21, 2003 and continued through March 6, 2003. The findings contained within this Order are based upon the trial testimony in this action and evidence admitted during trial.

4. This Court has presided over this action since its inception and is familiar with the issues of fact and law it presents. The Court has heard, read and considered all of the admitted evidence and testimony pertinent to the Consumer Fraud Act Claims at issue in this case. The Court has had the opportunity to consider the documents and materials admitted into evidence and to observe the demeanor, evaluate the credibility and weigh the testimony of the parties' fact and opinion witnesses and the arguments of counsel.

5. The Court, after considering all of the evidence, the demeanor and the credibility of the witnesses, makes the overall observation that the expert and fact witnesses who testified for the Plaintiffs in this case were credible and reputable. Specifically, many of the experts who offered opinions on behalf of the Plaintiffs in this case are leaders in their scientific fields, and national leaders of the public health community. The Court did not find the expert and fact testimony of Philip Morris' witnesses to be as credible as the testimony of witnesses for the Plaintiffs in this case.

6. During the course of this trial, the Court allowed both parties latitude with respect to their offer of expert testimony based upon their disclosures of opinion testimony under Illinois Supreme Court Rule 213. Both parties were permitted to offer opinion testimony over opposing counsel's objection in this regard. Although the Court allowed this evidence into the record, the Court finds (as a matter of fact) that my rulings in this case would be unchanged in any respect in the

event the Court had disallowed the opinion testimony that was objected to by either party on the basis of alleged inadequate Rule 213 disclosure.

\* \* \* \* \* \*

10. Based upon the facts, testimony and evidence presented at trial, the Court first revisits its prior Certification Order entered on February 8, 2001.

Under 735 ILCS 5/2–801, a Class may be certified under Illinois Law if:

1. the Class is so numerous that joinder of all members is impracticable;

2. there are questions of fact or law common to the Class, which common question predominate over any questions affecting only individual members;

3. the representative parties will fairly and adequately protect the interests of the Class; and,

4. the Class Action is an appropriate method for the fair and efficient adjudication of the controversy.

The Court finds that each of the prerequisites for the maintenance of a Class Action has been met.

11. With respect to numerosity, the Court finds Plaintiff have met their burden that the Class in this case includes over one million members and finds, based on the evidence introduced, that this Class is so numerous that joinder of all members is not only impracticable but virtually impossible. In addition, individual actions by each Class member would be impracticable.

12. Based upon the evidence introduced at trial, commonality has been demonstrated, because the claims of all Class members are based upon both common questions of law and fact which predominate over any questions affecting individual Class members. *Miner v. Gillette Co.,*

87 Ill.2d 7, 56 Ill.Dec. 886, 428 N.E.2d 478 (1981). Philip Morris has engaged in a course of conduct that affects this Class in such a way that all members share various elements of this cause of action.

13. The common issues of law predominate because the Illinois Consumer Fraud Act applies to the claims of all Class members.

14. In addition, the Court finds, based upon the evidence introduced at trial, that the following common issues applicable to the entire Class:

a. whether Class members understood the descriptor "lights" and "lowered tar and nicotine" to mean less harmful, safer and/or delivering less tar;

b. whether these representations were false and/or misleading to Class members;

c. whether Defendant Philip Morris intended for the Class to rely upon these representations;

c. [sic] whether Philip Morris' conduct violated the Illinois Commerce Fraud Act and whether this violation was willful and wanton; and

d. whether Class members sustained damages as a result of Philip Morris' deceptive conduct.

15. Based upon the testimony of the representative parties-Sharon Price and Michael Fruth-offered during the trial of this action as well as these Class Representatives' attendance and participation in the trial of this matter, the Court finds that these representative parties have claims which are typical of claims of the Class members, that there is a substantial alignment between their interests and the interests of the Class in prosecuting this action, and that they have indeed fairly and adequately protected the interest of the Class.

16. Based upon the trial in this matter, the Court finds that the law firm of Carr Korein Tillery was and is competent Class Counsel and adequately represents the interests of the Class in this action.

17. Based upon the evidence introduced at trial, a Class Action is not only the appropriate method for the fair and efficient adjudication of this controversy but is the only practicable method for such adjudication.

\* \* \* \* \* \*

20. The elements of Plaintiffs' claim under the Illinois Consumer Fraud Act are as follows:

 a. a deceptive act or practice by Philip Morris;

 b. Philip Morris' intent that the Plaintiffs rely on the deception;

 c. the occurrence of the deception in the course of conduct involving trade or commerce; and,

 d. actual damage to the Plaintiffs;

 e. proximately caused by the deception.

See *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002).

21. With respect to Marlboro Lights, two specific representations are at issue: (1) the descriptor "Lights" in the name and (2) the "Lowered Tar and Nicotine" representation. Both of these representations appeared on every pack of Marlboro Lights sold in Illinois from 1971 through the end of the Class Period.

22. With respect to Cambridge Lights, the representation at issue is the descriptor "Lights" in the brand name. This descriptor appeared on every package of Cambridge Lights from 1986 through the end of this Class Period.

23. The representations at issue in this case are alleged by Plaintiffs to have violated the Illinois Consumer Fraud Act in two distinct ways. First, Plaintiffs allege that the representations of "Lights" and "Lowered Tar and Nicotine" are material and false. Second, Plaintiffs allege that the representation of lower tar explicitly contained within "Lowered Tar and Nicotine" representation and implicitly communicated by the descriptor "Lights" is false and misleading because members of the Class did not receive lower tar and nicotine and, even if some few members of the Class did receive some small reduction in tar, this representation is still fraudulent and misleading because it does not state matters which materially qualify the statement as made.

24. The matters not stated are that the "tar" from Marlboro Lights and Cambridge Lights cigarettes is higher in toxic substances and more mutagenic than the tar from regular Marlboro and Cambridge cigarettes. Therefore, even if it were possible that for some Class members the representation of "lowered tar" were true, the representation (without the material qualification that the delivered tar is more harmful) is fraudulent.

\* \* \* \* \* \*

27. With respect to the definition of a "deceptive act" under the Act, 815 ILCS 501/1 *et seq.* provides in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practices described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 6, 1965, in conduct of any trade or commerce are hereby de-

clared unlawful; whether any person has in fact been mislead, deceived, or damaged thereby.

28. Plaintiffs offered credible testimonial and documentary evidence to establish that prior to the release of Marlboro Lights and Cambridge Lights, Philip Morris recognized that smokers had become increasingly concerned about the health issues related to smoking beginning in the 1950's. Specifically, Dr. Joel Cohen, a Professor at the University of Florida who has studied consumer behavior (specifically in the context of tobacco) for over twenty years, established as a factual matter that Philip Morris fully understood (prior to the launch of Marlboro Lights and Cambridge Lights) smokers' concerns regarding the negative health impact of smoking.

29. The testimony and documents offered at trial demonstrate that Philip Morris' initial response to this growing health concern was to create a disinformation environment wherein Philip Morris through its own public statements (and through its participation in the Tobacco Institute) knowingly and falsely disputed scientific conclusions that established a connection between smoking and diseases. Philip Morris' strategy was to create doubt about the negative health implications of smoking without actually denying these allegations. The evidence offered at trial establishes that Philip Morris continued this disinformation campaign through the mid–1990's.

30. Dr. Cohen and several other witnesses who testified in this case also offered credible testimony (based in part upon internal Philip Morris documents) that Philip Morris intentionally marketed Marlboro Lights with the descriptor "Lights" and the representation "Lowered Tar and Nicotine" on every package of Marlboro Lights with the intention of communicating to consumers that the Marlboro Lights cigarette was less harmful or safer than a regular Marlboro cigarette.

31. The Court finds, based upon the evidence introduced at trial, that Marlboro Lights and Cambridge Lights were introduced into the market by Philip Morris with the intent to provide smokers who were concerned about their health with a product that could reduce the cognitive dissonance associated with smoking and thereby allow them to continue to smoke cigarettes.

32. The Court finds, based upon the evidence introduced at trial, that Philip Morris' implicit health representations embodied by the descriptor "Lights"-although clearly understood by all Class members in this case-were not explicit, because Philip Morris (while at the same time intentionally and falsely misrepresenting these cigarette products as less harmful or less hazardous than their regular counterparts) was engaged in a disinformation campaign whereby it disputed that any cigarette was harmful or hazardous. As a consequence, Philip Morris chose to make implicit health claims for these products rather than explicit claims so as not to contradict its separate and contemporaneous disinformation efforts directed to the smoking public.

33. The internal Philip Morris documents and testimony introduced as evidence at trial conclusively demonstrate that, as a factual matter, Philip Morris intended to deceive consumers into believing that Marlboro Lights and Cambridge Lights cigarettes were less harmful or safer than their regular counterparts.

34. This Court finds that based upon the expert testimony and documentary evidence introduced at trial, the positive health attribute associated with Marlboro Lights and Cambridge Lights created by Philip Morris' misrepresentations constitutes a universally positive and desirable

product attribute for the Class members in this case in the form of a health reassurance.

35. Marlboro Lights and Cambridge Lights were health reassurance cigarettes in that they expressly and impliedly conveyed the notion of a positive health attribute through the representations of "Lights" (with respect to Marlboro Lights and Cambridge Lights) and the representation of 'Lowered Tar and Nicotine" (with respect to Marlboro Lights).

36. The Court finds that the term "Lights" not only conveyed a message of reduced harm and safety, but also conveyed to Class members that the "Lights" cigarette product was lower in tar and nicotine.

37. The Court finds that the representation of "Lowered Tar and Nicotine" on the package of Marlboro Lights not only conveyed the message to all consumers that Marlboro Lights possessed a positive health attribute as compared to a regular Marlboro, but also explicitly communicated that the Marlboro Lights cigarette would deliver less tar and nicotine to the consumer than a regular Marlboro.

38. Although Philip Morris' misrepresentations in this case were not in the form of an explicit statement that Marlboro Lights and Cambridge Lights were healthier or safer, the Court finds that Class members universally understood the message of reduced risk from these products.

39. Based upon the information environment existing at the time of the launch of Marlboro Lights and existing throughout the Class Period, the phrase "Lowered Tar and Nicotine" inescapably communicates that the Marlboro Lights cigarette is safer. The evidence at trial demonstrates that all consumers who chose a Marlboro Lights cigarette understood that tar and

nicotine were the "bad" components in cigarette smoke and, therefore, lower levels of these components would reduce negative health affects of the cigarette product.

40. Although Philip Morris introduced evidence at trial in an attempt to contradict the universal reliance by Class members on the health representations implicit and explicit in the descriptors "Lights" and "Lowered Tar and Nicotine", this evidence does not persuade the Court. If anything, this evidence only demonstrates that Class members may have relied to different degrees or in different ways upon these health representations. In all events, however, the testimony at trial demonstrates that all Class members in this case understood the positive health attribute associated with "Lights" on both the Marlboro Lights and Cambridge Lights package and "Lowered Tar and Nicotine" on the Marlboro Lights package. The testimony and evidence also establishes that this understanding was relied upon as a causative or determining factor for all Class members even if the degree or extent may have varied between Class members.

41. Class members' belief that Marlboro Lights and Cambridge Lights cigarettes were healthier than their regular counterparts was reinforced by the feel or impact of the smoke from these cigarettes in a person's mouth, throat and lungs. Although Philip Morris contends that some smokers preferred the taste of Marlboro Lights and Cambridge Lights, the evidence indicates that this preference was actually an additional health reassurance enforcement.

42. Plaintiffs also offered the credible expert testimony of Robert Cialdini, a Professor of Psychology with special expertise in human behavior, social influence and persuasion focusing specifically on persuasion and influence in the consumer context.

Dr. Cialdini testified that the words "Lights" and "Lowered Tar and Nicotine" on the cigarette products at issue in this case meant "less hazardous" to all Class members. Dr. Cialdini also explained the various psychological principles influencing Class members' purchase decision in this case.

43. Dr. Cialdini credibly testified that the four Principles of Influence: association, consistency, authority and social proof, all reinforced and reaffirmed the association of these Light cigarettes with improved health. As a consequence of these Principles of Influence, Dr. Cialdini concluded that improved health was at least one of the determinative reasons for every Class Member to purchase either Marlboro Lights or Cambridge Lights during the Class Period (with the possible exception of individuals with an irrational death wish).

44. In addition to the internal Philip Morris documents that demonstrate Philip Morris' specific intent to market Marlboro Lights and Cambridge Lights as healthier and less harmful cigarette products, many of the current and former marketing executives at Philip Morris also testified that these products were, indeed, intentionally marketed to the health conscious consumer with the intent that consumers rely upon the implicit representation of safety. This testimony includes, but is not limited to, statements of intent from the decision-makers at Philip Morris at the time of the launch of Marlboro Lights and internal Philip Morris documents demonstrating such intent.

45. The Court finds the testimony and argument presented by Philip Morris that these Light cigarettes were at least in part marketed based upon taste characteristics as not credible and unconvincing. Evidence, including testimony from Philip Morris' own personnel, was introduced at trial that at the time of the launch of Marlboro Lights, Philip Morris and the advertising agency responsible for marketing Marlboro Lights understood the taste of Marlboro Lights to be a negative product attribute that needed to be overcome by the implicit health representation.

46. As Defendant has correctly pointed out, the individual Class members who testified in this case started smoking at different ages, smoked different amounts, and varied in other respects in their smoking behavior. In my view, this would certainly be expected. However, some very important common facts came out in the testimony of all Class members: while acknowledging that all cigarettes are unsafe, they all believed that buying and smoking a Light cigarette would be a safer or healthier alternative to a regular cigarette. All Class members who were asked the question thought that the words "Lowered Tar and Nicotine" meant just that-that they were getting less tar and nicotine when they smoked Marlboro Lights than they would get from a regular Marlboro. Most importantly, they all testified that their belief that Marlboro Lights (or Cambridge Lights) were safer or healthier or contained less of the "bad stuff" than the regular cigarette counterparts resulted from their being denominated "lights" and contributed to their decision to buy Marlboro Lights and Cambridge Lights cigarettes.

47. The testimony of Defendant's expert, Dr. Timothy Meyer, that people may smoke for a variety of reasons and may also choose Lights cigarettes for a variety of reasons misses the crux of Plaintiffs' case and is, therefore, unpersuasive. As a threshold matter, the mere existence of potential other reasons for a consumer to prefer the products at issue in this case does not vitiate or eliminate the fraud

associated with the health representation as a causative influence on all Class members' purchase decisions. "A person is liable for his or her conduct whether it contributed wholly or partly to the plaintiffs' injury as long as it was one of the proximate causes of the injury." *Leonardi v. Loyola of Chicago,* 168 Ill.2d 83, 212 Ill.Dec. 968, 658 N.E.2d 450, 455 (1995).

48. Dr. Meyer testified that the belief that Marlboro Lights and Cambridge Lights are safer was not a factor in the cigarette choice of all Class members because the health hazards of smoking are irrelevant to some smokers and some young smokers are actually attracted to the health hazard of smoking. The Court finds it altogether implausible that any smokers who have no concerns about the hazards of smoking or who actually want to defy death by smoking the most hazardous cigarettes available would choose specifically to smoke a low tar cigarette like Marlboro Lights and Cambridge Lights. Indeed, in making these assertions, Dr. Meyer had no empirical or other data specifically with respect to Marlboro Lights or Cambridge Lights and he had failed to avail himself of any of the relevant internal studies and documentation accumulated by the Defendant on whose behalf he was testifying.

\* \* \* \* \* \*

50. Based upon the testimony and evidence introduced at trial, the Court finds that the term "Lights" and the phrase "Lowered Tar and Nicotine" universally communicated a reduced harm message to all Class members in this case and that all Class members relied upon this representation as at least one of the determining factors for their purchase decision.

51. Philip Morris offered survey evidence in an attempt to establish that only a portion of the Class was deceived by the misrepresentations of "Lights" and "Lowered Tar and Nicotine". On rebuttal, Plaintiffs offered the testimony of Dr. Stanley Presser to explain the significance and meaning of the survey data offered by Philip Morris.

52. The Court finds Dr. Stanley Presser to be one of the preeminent survey researchers and methodologists in this country and the court finds his testimony to be credible. Dr. Presser explained that none of the survey data presented by Philip Morris was informative of the question as to what percentage of Light smokers believed Light cigarettes were safer. In addition, none of the survey data offered by Philip Morris is informative of the question relating to what percentage of Light smokers purchased Light cigarettes for health or safety-related reasons. Dr. Presser explained that most of these surveys measured the wrong population. The surveys relied upon by Philip Morris included both non-smokers and smokers of cigarette products other than Lights cigarettes. Therefore, the survey data was not representative of any percentage of Light smokers specifically. Other survey data offered by Philip Morris asked questions not related in any way to the critical questions at issue in this case.

53. Based upon the comparative credibility and persuasiveness of the evidence and testimony presented by Philip Morris in opposition to Plaintiffs' testimony that all Class members understood "Lights" and "Lowered Tar and Nicotine" to mean safer and all Class members purchased their cigarettes based at least in part upon this representation, the Court finds Philip Morris' evidence and testimony to be neither credible nor persuasive on this issue.

54. Philip Morris argued at trial that these representations were not the only source of information regarding Marlboro Lights and Cambridge Lights being safer

than their regular counterparts. Philip Morris specifically argued that the public health community as a whole, and specific components of the public health community (including the authors of the Reports of the Surgeon General and statements issued by the American Cancer Society) were the reasons some consumers believed these products to be safer. The Court finds this testimony and evidence neither credible nor persuasive as a defense to liability in this Action. As a threshold matter, the fact that the public health community recommended to those smokers who could not quit that a lower delivery cigarette would reduce risk is not misleading. There is apparently no dispute that actual lower delivery of toxic substances may reduce harm. The fact that Marlboro Lights and Cambridge Lights did not reduce the actual delivery of harmful toxins does not convert the message from the public health community into a defense to Philip Morris' intentional fraudulent conduct.

55. Moreover, a significant body of credible evidence was introduced at trial demonstrating that Philip Morris had specific scientific and cigarette design knowledge that the public health community did not possess related to Lights cigarettes generally as well as Marlboro Lights and Cambridge Lights cigarettes specifically. This demonstrates that although Philip Morris knew their Lights cigarettes were not safer, the public health community did not know this fact. The Court finds that Philip Morris took advantage of the message of the public health community in selling their cigarettes which delivered neither lower tar and nicotine, nor less harm to the Class members in this case.

56. The testimony from Dr. William Farone (a high ranking scientist within Philip Morris from 1976 through 1984),

demonstrates credibly that Philip Morris knew Light cigarettes (and specifically Marlboro Lights and Cambridge Lights) did not reduce the delivery of tar or nicotine to the consumer compared to their regular counterparts and that these cigarettes were not designed to reduce actual delivery to smokers.

57. Philip Morris internal documents and the testimony offered at trial demonstrate that Philip Morris, prior to the launch of Marlboro Lights and Cambridge Lights, knew that smokers adjusted their smoking behavior through largely unconscious means so as to receive the same dose of nicotine and tar from a Light cigarette as from a regular cigarette. In fact, the testimony and evidence clearly establish that Marlboro Lights and Cambridge Lights were specifically designed in such a way as to reduce the machine-measured tar and nicotine delivery while at the same time allowing consumers to extract the same levels of tar and nicotine from these products as they would extract from their regular Marlboro and Cambridge counterparts.

58. The evidence establishes that the primary design distinction between Marlboro Lights and Cambridge Lights as compared to their regular counterparts is increased ventilation. Ventilation is measured by Philip Morris as the percent of air that is drawn in through the filter to dilute the smoke of the cigarette when smoked. This design distinction of ventilation provides for a lower machine measurement of tar and nicotine for "Lights" cigarettes, while still allowing the consumer to receive the same delivery of tar and nicotine from the "Lights" and regular cigarettes.

59. Although Philip Morris offered factual testimony through Willie Houck as to Philip Morris' intent and purpose in designing Marlboro Lights, the Court finds this testimony to not be credible. At the

time of the design of Marlboro Lights, Willie Houck was a sophomore in college attending night school. He was an extremely junior member of the filter design group and did not have responsibility or authority to design and create Marlboro Lights (which is the way his testimony was offered by Philip Morris). Furthermore, he admittedly had absolutely no involvement in marketing these cigarettes in any fashion, particularly as "Lights," or representing them to deliver "lowered tar and nicotine" on the packaging.

60. Plaintiffs offered testimony and documentary evidence credibly demonstrating that the representations of "Lights" and "Lowered Tar and Nicotine" were false for all Class members in this case. For example, Dr. Neal Benowitz testified that Class members who smoked Marlboro Lights and Cambridge Lights would receive the same amount of tar and nicotine from these products as they would receive from a regular Marlboro or a regular Cambridge respectively. Dr. Benowitz specifically concluded, based upon his extensive scientific research, that smokers of these Marlboro Lights and Cambridge Lights cigarettes engage in what is called compensatory smoking behavior so as to receive 100% of the tar and nicotine that would be received by this smoker from the regular counterpart cigarette.

61. Compensatory smoking behavior consists of unconscious acts-including but not limited to inhaling deeper, more frequent puffs, larger puffs and holding the smoke in the lungs for a longer period of time-that enable the smoker to regulate the amount of nicotine, and hence tar, received by the smoker. Dr. Benowitz credibly testified that these unconscious acts result in there being no difference for an individual smoker between the tar and nicotine delivery from a Marlboro Lights cigarettes as compared to a regular Marlboro cigarette (the same being true of Cambridge Lights cigarettes and regular Cambridge cigarettes).

62. Dr. Benowitz and other expert witnesses explained that the reason compensation occurs is that smokers regulate their intake of nicotine, a pharmacologically active drug. Smokers change their smoking behavior in largely unconscious ways, particularly with respect to the products at issue in this case, to obtain the dose of nicotine required by each individual smoker. Although the nicotine level required by each smoker may vary among smokers, the fact that each smoker will obtain the same amount of nicotine and tar from these Lights cigarettes as from their regular counterparts does not vary.

63. Dr. Benowitz is the leading researcher in the fields of nicotine, addiction and compensatory smoking behavior. He analyzed several different kinds of scientific studies measuring compensatory smoking behavior, including: forced switching studies, cross-sectional studies and spontaneous brand switching studies. Based upon all of his research, experience and his expertise in these scientific areas, Dr. Benowitz offered the scientific conclusion that compensation for this Class is 100%. Significantly, this conclusion was never rebutted by the Defendant.

64. In fact, Philip Morris has publicly taken the position as of November 2002 that people who switch to Light cigarettes are likely to inhale the same levels of cancer-causing toxins. In addition, Philip Morris' own scientific expert, Dr. Richard Carchman, agreed that Philip Morris' public position regarding compensatory smoking behavior means that consumers are compensating 100% when they switch from a regular cigarette like Marlboro to a Light cigarette like Marlboro Lights.

65. Philip Morris' own internal research regarding compensatory smoking behavior demonstrates that Philip Morris knew since before the launch of Marlboro Lights and Cambridge Lights that smokers will adjust their behavior to receive the same level of tar and nicotine from these Light cigarettes as they would receive from the their regular cigarette counterparts. Although Philip Morris attempted to contradict its own internal studies through the factual testimony of Barbro Goodman, this Court finds this testimony to be not credible and unpersuasive.

66. Based in part upon the fact that smokers of Marlboro Lights and Cambridge Lights engage in complete compensatory smoking behaviors, the Court finds that Marlboro Lights and Cambridge Lights are just as harmful as regular Marlboro and regular Cambridge for all Class members in this case.

67. Plaintiffs also demonstrated that Light cigarettes are just as harmful as regular cigarettes through the unrebutted testimony of Dr. Michael Thun. Dr. Thun is a medical doctor, an expert in epidemiology, and also a co-author of Chapter 4, Monograph 13 (discussed below). Dr. Thun has specifically studied epidemiology for the past twenty-five years while working at the Centers for Disease Control and the American Cancer Society.

68. Dr. Thun testified, based upon all of his epidemiological experience and all of the studies that he has reviewed, that the machine-measured tar difference between Marlboro Lights and Marlboro (as well as Cambridge Lights and Cambridge) does not lead to any disease reduction whatsoever among these comparative smoking populations. The evidence also establishes that the same is true for the population of Class members in this case. The Court

finds this testimony to be both credible and persuasive, as well as un-rebutted on this record.

69. Dr. Thun (along with other witnesses) also credibly testified that Light cigarettes have had other negative impacts on disease risk. Specifically, the false perception that a smoker is reducing risk may cause smokers to delay cessation and cessation has been proven to reduce risk from all forms of disease caused by cigarette smoke. In addition, Dr. Thun testified that Light cigarettes may have impacted initiation rates in a way that has led to negative health consequences for the Class.

70. The evidence at trial demonstrates not only that Marlboro Lights and Cambridge Lights are just as harmful as their regular counterparts, but that these products are actually more harmful and more hazardous than their regular counterparts. The Court finds that Philip Morris was aware of the increased harm from these Light cigarettes based upon their own scientific testing. Philip Morris' knowledge and understanding of increased harm from Lights cigarettes is also demonstrated by Philip Morris' refusal to conduct any additional testing to reconfirm this scientific conclusion of increased harm.

71. Philip Morris' documents, as well as the testimony of Dr. William Farone and Dr. Peter Shields, establish as a factual matter that Philip Morris has known for over twenty-five years that Lights cigarettes like Marlboro Lights and Cambridge Lights-with increased ventilation-are more mutagenic than cigarettes with less ventilation.

72. Philip Morris conducted mutagenesis studies as part of its toxicological evaluation in order to predict the carcinogenic potential of their products and product design changes. The testimony at trial established that Philip Morris believed its

biological test results (in the form of Ames mutagenicity testing) to be both meaningful and predictive of carcinogenesis. In fact, several of Philip Morris' scientists testified that the Ames test was the primary biological test relied upon by Philip Morris. This testing was and is used by Philip Morris to demonstrate reduced harm from cigarettes. It is therefore quite significant that their test results have consistently demonstrated for the past twenty five years that increased ventilation (the primary design distinction between Light cigarettes and their regular counterparts) increases the specific mutagenicity of cigarette smoke.

73. Although Philip Morris attempted to reduce the evidentiary significance of its own testing through the testimony of Dr. Richard Carchman, the Court does not find this testimony to be credible. The biological testing over the past twenty five years has consistently demonstrated an increase in specific mutagenicity associated with an increase in ventilation.

74. The fact that Philip Morris intentionally prevented its scientists in the United States from performing additional testing does not undermine the credibility and reliability of the testing that Philip Morris did perform. In fact, this intentional failure to conduct additional testing further demonstrates Philip Morris' belief that Light cigarettes were and are more harmful than their regular counterparts.

75. Plaintiffs also introduced credible testimony regarding the specific toxicity levels of cigarette smoke comparing Marlboro Lights cigarettes to regular Marlboro. Based upon the constituent toxicity testing results performed by Philip Morris itself and other tobacco manufacturers in the context of the Massachusetts Benchmark Study ("MBS"), Plaintiffs demonstrated through Dr. Jeffrey Harris that

Marlboro Lights has higher specific toxicity levels for almost all of the toxic substances measured in cigarette smoke in the MBS.

76. This testimony and evidence is particularly persuasive and disturbing. These toxicity levels measured in the MBS study demonstrate that even if a smoker does not compensate completely (a fact itself which is contrary to the evidence presented), a smoker of Marlboro Lights will receive higher levels of most of the toxic substances found in cigarette smoke from a Marlboro Lights than they will receive from a regular Marlboro. The Court notes that the constituent toxicity testimony was completely unrebutted.

77. Specifically with respect to the two toxic substances Philip Morris itself has targeted for reduction as a means of demonstrating harm reduction (Acrolein and 1,3–Butadiene), a smoker of Marlboro Lights need only compensate 14% to receive higher levels of these two specific toxic substances. Therefore, the Court finds that Marlboro Lights and Cambridge Lights, based upon the similar design distinction of increased ventilation, are more harmful for every Class Member than a regular Marlboro or a regular Cambridge cigarette.

78. Plaintiffs introduced credible scientific and epidemiological evidence that connected the dramatic increase in adenocarcinomas (lung cancer of the peripheral lung cells) to the increased prevalence of Light cigarettes like Marlboro Lights and Cambridge Lights. The unrebutted expert testimony of Dr. Peter Shields and Dr. Michael Thun establish that Marlboro Lights and Cambridge Lights have contributed to the dramatic rise in adenocarcinoma cancer rates, thereby demonstrating another line of evidence that establishes increased harm from these "Light" cigarette products.

79. Plaintiffs offered extensive evidence, both documentary and through expert witnesses, relating to the October 2001 consensus public health publication entitled *Monograph 13–Risks Associated with Smoking Cigarettes with Low Machine–Measured Yields of Tar and Nicotine*-published by the United States Department of Public Health and Human Services–Public Health Service–National Institutes of Health–National Cancer Institute. Monograph 13 represents the first public health community consensus that cigarettes with lower machine-measured yields of tar and nicotine (including Light cigarettes like Marlboro Lights and Cambridge Lights) do not lower the risk of disease as compared to higher yield cigarettes (like regular Marlboro and regular Cambridge).

80. Philip Morris made no attempt to rebut the testimony that Monograph 13 represented the first scientific consensus regarding the lack of any harm reduction associated with Light cigarettes. In fact, Philip Morris made no attempt to contradict any of the conclusions within Monograph 13. Based upon the fact that Monograph 13 represents the first consensus within the public health community as to the lack of any harm reduction from Light cigarettes, the Court finds that Class in this case could not have known of the fraud associated with Marlboro Lights and Cambridge Lights prior to the publication of Monograph 13 in October 2001. Further, the conclusions of Monograph 13 itself establish that Philip Morris recognized the inherent deception of offering cigarettes as "Light" and "Lowered Tar and Nicotine".

81. Although Philip Morris offered isolated references in scientific publications prior to the issuance of Monograph 13 of the potential for the benefit of low tar cigarettes to have been overestimated, the first public community consensus on the lack of any benefit from Light cigarettes as compared to regular cigarettes occurred after the Class Period in this case. As discussed previously, Philip Morris' contention that the public health community should somehow be blamed for the fraud associated with Lights cigarettes is both morally abhorrent and factually incorrect. At all times since the inception of their Lights products, Philip Morris was aware of their deception and was aware that the public health community was among those deceived by the fact that their products did not deliver the promised lower tar and nicotine and were not "light" as represented. Yet, it was not until the fall of 2002 that they disseminated this knowledge. As such, they cannot assert that the Class should have known information which they chose not to publicly reveal until November 2002. The fact that Philip Morris found it necessary to reveal this information so prominently on their website, in newspaper inserts, and by placing onserts in their cigarette packs demonstrates that Philip Morris understood that consumers of their product were not aware of the information contained in these materials.

82. The proper measure of damages under the Illinois Consumer Fraud Act is to measure the difference between the value the product would have had at the time of the sale if the representations had been true and the actual value to the consumer of the property sold. *See Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill.2d 179, 131 Ill.Dec. 155, 538 N.E.2d 530, 537–38 (1989). *See also Munjal v. Baird & Warner, Inc.*, 138 Ill.App.3d 172, 92 Ill. Dec. 809, 820, 485 N.E.2d 855 (2nd Dist. 1985).

83. Both Plaintiffs and Defendant offered testimony from economists regarding the proper economic method to meas-

ure the damages to the Class. Plaintiffs offered the testimony of Dr. Jeffrey Harris, an expert economist from MIT who is not only a Professor of Economics but also a full time practicing physician. Defendant offered Dr. Kip Viscussi, a Professor of Law and Economics at Harvard Law School. Both of these economic experts were qualified to render opinions regarding economic theory. However, the Court finds the testimony of Dr. Jeffrey Harris more credible and more persuasive than the testimony of Dr. Kip Viscussi.

84. Dr. Harris and Dr. Viscussi essentially agree that the correct economic model for measuring damages in this case should be the difference between the price paid by the consumers in the Class and the value to the consumer of the "misrepresented" cigarette they actually received. The critical distinction between the two models proposed by the two economists in this case is whether the promised product with the promised attributes is made available when determining the value to the consumer (or willingness to pay) for the "misrepresented" Lights.

85. Dr. Harris testified that the only way to accurately measure the damages at the time of the sale or transaction caused by the fraud is to provide as an alternative in the comparative valuation of the product that was promised by Philip Morris.

86. There is no dispute that the promised product in this case is a "genuine" harm reducing "Light" cigarette. Dr. Harris credibly testified that if you do not include the product that was promised in the comparative valuation, you cannot measure the value of the promise, i.e. the harm reduction promise of Marlboro Lights and Cambridge Lights.

87. Dr. Viscussi testified that because the promised product does not exist in the "real world," it should not exist in the valuation measure for this case. This Court rejects the testimony of Dr. Viscussi in this regard. The reason the promised product (i.e. a "real" light cigarette that actually reduces the harm from cigarettes and delivers lowered tar and nicotine) does not exist in the "real world" is that Philip Morris never offered a "real" Marlboro Light or Cambridge Light cigarette to the Class. Philip Morris cannot escape liability in this case from its fraud because of the fact that it never created the product that it promised in Marlboro Lights and Cambridge Lights.

88. Philip Morris acknowledges as of November 2002 that it has never and does not now sell or market any "safer" cigarettes. The newspaper insert distributed throughout the United States through major newspapers and the "onsert" placed on packages of Marlboro Lights for a very brief time in November 2002 both state unequivocally that there is no such thing as a safer cigarette and a consumer should not believe that Lights cigarettes are safer. This Court finds that this disclosure does not minimize but rather dramatizes the deception which took place throughout the Class period. This disclosure certainly cannot serve to avoid liability made, as it was, long after this case was filed. However, these disclosures do establish that even Philip Morris agrees that Marlboro Lights and Cambridge Lights are not any safer than their regular counterparts.

89. In order to measure the damages proximately caused by Philip Morris' misrepresentation, Plaintiffs offered into evidence a valuation study conducted by Dr. Dennis of Knowledge Networks. Knowledge Networks has created a web-enabled probability sample of nationally representative survey respondents in the United States population. Within that population, Dr. Dennis conducted a survey for pur-

poses of this case of Marlboro Lights smokers to measure the value of the health attribute aspect of Marlboro Lights to consumers in order to determine the damage caused by Philip Morris' fraud.

90. The Court finds that the measured value of this health attribute is the damage proximately caused by Philip Morris' fraud in this case Philip Morris implicitly represented Marlboro Lights and Cambridge Lights as less harmful or safer. The Knowledge Networks survey provided an accurate measure of damages to the Class members in this case by measuring the difference between the price paid for the cigarettes purchased during the Class Period and the value to the Class members of the product actually received-a product that not only was just as harmful as a regular cigarette but in fact could be more harmful. The aggregate diminution in value measured by the Knowledge Networks survey caused by Philip Morris' fraud was calculated to be 92.3%.

91. Although the Knowledge Networks survey measured damages as an aggregate average for a representative sample of Marlboro Lights smokers and not for Cambridge Lights smokers, the Court finds, based upon all of the testimony offered in this case, that there is no reason to believe that Cambridge Lights smokers would have a different aggregate average valuation of the health attribute of their Light cigarette than Marlboro Lights smokers. In fact, this Court finds as a factual matter that the damages from the fraud relating to the "Lights" descriptor for Class members who purchased Marlboro Lights is, in the aggregate average, the same as the aggregate average damages to Class members who purchased Cambridge Lights.

92. The Court finds, based in part upon the testimony of Dr. Dennis who designed and implemented the Knowledge Networks valuation survey, that the survey conducted by Knowledge Networks did provide an accurate measure of the damage suffered by the Class members in this case.

93. Philip Morris attempted to challenge the accuracy of the survey measurement through the testimony of Dr. Nancy Mathiowetz. However, the Court finds that the survey criticisms offered by Dr. Nancy Mathiowetz were neither credible nor persuasive. In fact, Dr. Mathiowetz admitted that she had no opinion whatsoever as to the directional impact of any of the criticisms she identified with respect to this data. Moreover, the criticisms identified by Dr. Mathiowetz were specifically refuted by Dr. Stanley Presser. The Court finds the testimony of Dr. Presser on the issues relating to survey data to be credible and persuasive.

94. Philip Morris offered the testimony of Dr. Viscussi to also criticize the survey data and to try to establish that a report conducted for the National Oceanic and Atmospheric Administration ("NOAA") contained relevant survey guidelines for this case. However, Dr. Presser credibly testified that these NOAA criteria have no applicability to the Knowledge Networks survey conducted to measure damages in this case.

95. Based upon the diminution in value measured by Dr. Dennis' survey, Dr. Jeffrey Harris, a qualified medical doctor and economist with over 25 years experience in health economics, calculated the total damages to Class members in this case.

96. First, Dr. Harris calculated the total consumer expenditure for Class members on both Marlboro Lights and Cambridge Lights for the relevant portion of the Class period. Because the private cause of action under Section 2 of the Illinois Consumer Fraud Act was not ef-

fective until October 1973, the Court finds the appropriate period for damages calculation in this case to be from October 1973 through February 8, 2001. Dr. Harris calculated the relevant total consumer expenditure to be $7.6298 Billion. None of this consumer expenditure testimony was rebutted in any way by Philip Morris.

97. The next step in Dr. Harris' damages calculation was to compute the aggregate damages by multiplying the appropriate diminution in value (92.3%) times the relevant total consumer expenditure of Class members in this case. Based upon this time period for determining the relevant total consumer expenditure, Dr. Harris calculated the compensatory damages to Class members to be $7.1005 billion.

98. This compensatory damage calculation includes a 5% non-compounded prejudgment interest component-in the amount of $2.1137 Billion. The Court finds under the circumstances of this case (and under the Illinois Consumer Fraud Act) that prejudgment interest is appropriate generally to this case and for this amount to be appropriate specifically.

\* \* \* \* \* \*

105. Philip Morris' First Affirmative Defense–Statute of Limitations-is denied as legally insufficient because none of the allegations relate to knowledge that would trigger a Statute of Limitations for the claims in this case. Philip Morris has the burden of establishing that Class members knew of the fraud and failed to act on that knowledge. However, even if Class members knew all of the facts alleged here, they did not have knowledge of the fraud. With respect to subparagraphs (a) through (e), these allegations are legally insufficient because they relate to alleged knowledge of the general dangers of smoking as opposed to the fraud allegations related to Marlboro Lights and Cambridge Lights.

Sub-paragraph (f) is legally insufficient because whether Class members knew the intention of the FTC machine measurements is not relevant to the claims at issue in this case. As to sub-paragraph (g), even if these factual allegations were known to some Class members, this knowledge is legally insufficient for the Statute of Limitations Affirmative Defense, because it does not establish knowledge of the increased harm relating to Marlboro Lights and Cambridge Lights cigarettes.

106. Philip Morris' Statute of Limitations Affirmative Defense also fails based upon the discovery rule. The discovery rule, which "delays the commencement of the relevant statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury has been wrongfully caused[,]" applies to consumer fraud cases. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill.2d 72, 209 Ill.Dec. 684, 651 N.E.2d 1132, 1135–36 (1995).

107. "When a plaintiff uses the discovery rule to delay commencement of the statute of limitations, the plaintiff has the burden of proving the date of discovery." *Id.* at 1138. Both Plaintiffs allege that they were "without knowledge of the conduct by Defendant alleged in this Complaint, or of any facts from which it might reasonably be concluded that Defendant was so acting, or which would have lead to the discovery of such action, until after the filing of this action." Second Amended Complaint ¶ 13, 14. The Court finds that neither Plaintiffs nor Class members had either actual or constructive knowledge prior to the filing of this case of the essential injury which is the subject of Plaintiffs' Complaint: economic loss caused by Philip Morris' descriptors representing that Marlboro Lights and Cambridge Lights are safer than their regular counterparts

when, in fact; these Lights cigarettes are more harmful than regular cigarettes.

108. Philip Morris' Second Affirmative Defense of Laches is an equitable defense and does not apply to Plaintiffs' claims under the Illinois Consumer Fraud Act. Even if such a defense would apply, the factual basis for laches is insufficient as a matter of law for the reasons identified in the discussion regarding their proposed Statute of Limitations defense.

\* \* \* \* \* \*

110. Philip Morris' Fourth Affirmative Defense–Impermissible Claims Splitting–is denied for the reasons identified in this Court's Certification Order entered on February 8, 2001.

111. Philip Morris' Fifth Affirmative Defense–Federal Preemption–is denied. Philip Morris has argued in its summary judgment briefs and throughout this trial that Plaintiffs claims in this case are preempted by the Federal Cigarette Advertising and Labeling Act, 15 U.S.C. § 1331, *et seq.* ("FCLAA"). 1334(b) of the FCLAA which provides that "no requirement or prohibition based on smoking and health shall be imposed under state law with respect to the advertising or promotion of any cigarettes, the packages of which are labeled in conformity with the provisions of this Act." 15 U.S.C. 1334(b). Philip Morris contends that this provision expressly preempts the claims brought by Plaintiffs in this case. The Court finds that none of Plaintiffs' claims in this case are expressly preempted by the FCLAA.

112. The United States Supreme Court in *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), in interpreting the FCLAA, held that claims relating to Philip Morris' failure "to provide adequate warnings of the health consequences of cigarette smoking"

and claims that Philip Morris attempted to "neutralize the warning labels" would both be preempted. 505 U.S. at 510, 524 & 528, 112 S.Ct. 2608. However, Plaintiffs claims in this case are neither based upon a failure of Philip Morris to provide adequate warnings nor based upon a neutralization claim. Instead, Plaintiffs claims in this case "are predicated not on a duty, based on smoking and health, but rather on a more general obligation-the duty not to deceive." *Id.* at 528–29, 112 S.Ct. 2608.

113. The Illinois Consumer Fraud Act makes unlawful "unfair or deceptive acts or practices including but not limited to the use or employment of any deception, fraud, pretense, false promise, misrepresentation or concealment, suppression or omission of any material fact ... in the conduct of any trade or commerce[.]" 815 ILCS 505/2. The Court finds that Plaintiffs' claims in this case are based upon the independent duty not to deceive under state law. "[T]he predicate of this claim is a state-law duty not to make false statements of material fact or to conceal such facts." *Cipollone,* 505 U.S. at 528, 112 S.Ct. 2608.

114. Plaintiffs have alleged essentially two types of misrepresentation claims under the Illinois Consumer Fraud Act. First, Plaintiffs have asserted that Philip Morris' representations that their Marlboro Lights and Cambridge Lights cigarettes are "Light" and that Marlboro Lights are "Lowered Tar and Nicotine" are false. The Court finds this claim to be wholly unrelated to any failure to warn claim and, therefore, not preempted.

115. Plaintiffs second type of misrepresentation claim relates to Philip Morris' representations of lower tar (both explicitly and implicitly through the use of the descriptor "Lights" which communicates lower tar). Here, even if for some consumers the statements relating to lower

tar could be technically true as far as that statement goes (which is contrary to the evidence presented), these statements are nevertheless fraudulent and misleading, because the tar from these "light" cigarettes is more harmful and higher in toxic substances. Therefore, this claim, whether characterized as an omission or simply as a false and misleading statement, does not implicate a failure to warn claim as Philip Morris contends and is not preempted.

116. Philip Morris is not under any obligation to warn or provide any additional information regarding the tar content in its cigarettes based upon Plaintiffs' misrepresentation / omission claims. Philip Morris' representations regarding the lower tar level of Light cigarettes (while knowing that the tar from these cigarettes is actually more harmful and of a different constituency) is false and misleading and violates Philip Morris' independent state law duty not to deceive. In *Cipollone,* the Supreme Court noted that "Congress offered no sign that it wished to insulate cigarette manufacturers from long standing rules governing fraud." 505 U.S. at 529, 112 S.Ct. 2608.

117. Therefore, the Court holds that Plaintiffs' claims regarding the fraudulent misrepresentations of lower tar-without materially qualifying that statement-are not preempted. It is irrelevant for this analysis whether this claim is characterized as an omission or not. In either event, no failure to warn is being claimed in this context. Instead, all of Plaintiffs' claims are "intentional fraud and misrepresentation both by false representation of a material fact and by concealment of a material fact"[.] *See Cipollone,* 505 U.S. at 528, 112 S.Ct. 2608.

118. Philip Morris also contends that Plaintiffs' claims in this case somehow conflict with the regulations and policies of the Federal Trade Commission ("FTC"). In support of this position, Philip Morris offered testimony of John Peterman, an economist formerly with the .FTC Bureau of Economics. The Court finds this testimony to be unpersuasive on the issue of conflict preemption. Further, the Court finds the testimony of Mr. Peterman to be unrelated to any potential areas of his expertise. Instead, he offered a narrative summary of historical facts. The Court finds that he has no expertise in assessing FTC involvement in regulation of the issues surrounding the allegations of Plaintiffs' Complaint. Based upon the evidence presented in this case, both in the form of testimony and documents, the Court finds that Plaintiffs' claims in this case do not conflict with the FCLAA or with any regulations or policies of the Federal Trade Commission.

119. Neither the FCLAA nor any regulation of the FTC governs the conduct at issue in this case-Philip Morris' voluntary use of "Lights" and "Lowered Tar and Nicotine" descriptors on its cigarette packages. Under the facts and circumstances in this case, the fact that the FTC has not adopted regulations regarding the use of the "Lights" and "Lowered Tar and Nicotine" descriptors (even if the FTC has at certain points in time considered such regulations) does not create conflict preemption. See *Sprietsma v. Mercury Marine,* 537 U.S. 51, 123 S.Ct. 518, 527–29, 154 L.Ed.2d 466 (2002).

\* \* \* \* \* \*

121. Philip Morris has failed to demonstrate through evidence offered at trial that the FTC has some specific specialized or technical expertise such that this Court should defer to the FTC rather than adjudicating this matter. In fact, the Court finds that the evidence and testimony at trial demonstrates that the FTC lacks such

expertise and has publicly acknowledged this lack of expertise on numerous occasions. The claims in this case concern fraud and deception under the Illinois Consumer Fraud Act and the Uniform Deceptive Trade Practices Act. This Court is well equipped to determine these issues. See *Crain v. Lucent Technologies,* 317 Ill. App.3d 486, 495, 250 Ill.Dec. 876, 739 N.E.2d 639 (5th Dist.2000).

122. The Court notes that Philip Morris has attempted to mis-characterize Plaintiffs' claims in an attempt to succeed on its affirmative defenses. Plaintiffs' claims in this case are not based upon any challenge to the FTC machine measuring procedures or the tar and nicotine ratings published based upon those testing procedure. Plaintiffs' claims in this case are related to Philip Morris' specific intentional misrepresentations on the packages of Marlboro Lights and Cambridge Lights.

123. The fact that Philip Morris intentionally designed these "Lights" products to register lower on the FTC machine measurements than actually delivered to the consumer is only relevant to the extent Philip Morris has used these lower FTC machine measurements as an attempted justification for the use of its fraudulent descriptors. Based upon the evidence introduced at trial, the lower machine measurements of tar and nicotine on the FTC machine do not justify Philip Morris' use of these descriptors. In any event, the fact that Philip Morris attempted to defend its fraudulent misrepresentations based upon FTC measurements does not convert Plaintiffs' claims into claims based upon those measurements.

124. Philip Morris' Seventh Affirmative Defense–Compliance with Government Regulations-is denied. The false and misleading use of the descriptors "Lights" and "Lowered Tar and Nicotine" has never been specifically authorized by law. Philip Morris voluntarily chose to use these terms on its packages of Marlboro Lights and Cambridge Lights. No regulatory body has ever required (or even specifically approved) the use of these terms by Philip Morris. The Court finds that Philip Morris has not established that its conduct is "specifically authorized" by law. See *Aurora Firefighter's Credit Union v. Harvey,* 163 Ill.App.3d 915, 114 Ill.Dec. 873, 516 N.E.2d 1028, 1036 (1987).

125. Philip Morris' Eighth Affirmative Defense–First Amendment to the United States Constitution-is denied. Philip Morris' claims that the descriptors "Lights" and "Lowered Tar and Nicotine" provide accurate information regarding the FTC machine-measured tar and nicotine yields of Marlboro Lights and Cambridge Lights cigarettes. Here again, Philip Morris attempts to inject the FTC measurements as an apparent justification for the fraudulent use of these descriptors.

\* \* \* \* \* \*

129. Philip Morris' Eleventh Affirmative Defense–Failure to Mitigate-is denied as a matter of law. The Court finds as a threshold matter that this contention of Class members' failure to mitigate has no applicability to the facts and circumstances of this case. Moreover, Philip Morris has failed to offer evidence that establishes Class members knew about the fraud during the Class Period and failed to take reasonable steps to prevent new harm or damages.

130. Philip Morris' Twelfth Affirmative Defense–Assumption of the Risk-is denied. Even if Class members knew all of the factual allegations identified in paragraph 43, any risk related to the fraud at issue in this case would not be "assumed." These allegations relate largely to the harmful aspects of cigarettes generally as opposed

to the fact that Light cigarettes are more harmful than their regular counterparts.

131. Philip Morris' Thirteenth Affirmative Defense–Common Knowledge-is denied. Even if Class members knew of these facts, this would not establish the defense of common knowledge to the claims in this case. Moreover, this is not a proper Affirmative Defense but simply a recharacterization of Philip Morris' defense against causation.

132. Philip Morris' Fourteenth Affirmative Defense–Information in the Public Domain-is denied for the same reasons as the Thirteenth Affirmative Defense.

133. Philip Morris' Fifteenth Affirmative Defense–Inappropriate Retroactive Application of the Law-is granted only to the extent that Plaintiffs' claims for damages on sales prior to October 1, 1973 are denied.

* * * * * *

137. Philip Morris' Nineteenth Affirmative Defense–Master Settlement Agreement Release-is denied. The Court holds that the claims at issue in this case were not released under the Master Settlement Agreement.

138. Philip Morris' Twentieth Affirmative Defense–Comparative Fault-is denied. Even if the allegations in support of this Affirmative Defense were true, Plaintiffs and Class members did not violate any duty to exercise reasonable care and caution to prevent the harm alleged in Plaintiffs' Complaint.

* * * * * *

146. After considering all the testimony and evidence admitted at trial, the Court finds that the Plaintiffs have proven that Philip Morris has violated the Consumer Fraud Act through the deceptive act of misrepresenting its Cambridge Lights and Marlboro Lights products as "Lights" and misrepresenting Marlboro Lights as "Lowered Tar and Nicotine". The Court further finds that Philip Morris intended that the Class members in this case rely upon the deception created by these misrepresentations. These misrepresentations occurred in the course of conduct involving trade or commerce and caused actual damage to the Plaintiffs in the amount of $7,1005 Billion. This actual damage to the Plaintiffs was proximately caused by the misrepresentations of Philip Morris.

* * * * * *

157. The Court is mindful of the fact that in determining the amount of a punitive damages award, the Court should consider the nature and enormity of the wrong in addition to the Defendant's financial status and potential liability in other cases. The Court has considered these factors and determined that an award of three billion dollars ($3 billion) is appropriate under the facts and circumstances of this case. This entire sum of punitive damages is, hereby, awarded to the State of Illinois.

* * * * * *

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That the Plaintiffs in this Illinois Consumer Fraud Act Class Action shall recover from Defendant Philip Morris the sum of $7.1005 billion in compensatory damages.

2. That Philip Morris is ordered to pay punitive damages in the amount of three billion dollars ($3 billion). The entire amount of punitive damages is awarded to the State of Illinois.

* * * * * *

4. That the Court reserves continuing jurisdiction over this action to enforce all provisions of this judgment and to admin-

ister and distribute the judgment award among the Class members, based upon appropriate proof of Class membership and claims and to oversee the distribution of all unclaimed funds as provided in Par. 7 hereinbelow.

\*　　\*　　\*　　\*　　\*　　\*

7. That in the event there should remain unclaimed funds in the compensatory award rendered herein; then, under the Doctrine of Cy Pres, all said unclaimed funds, when so finally determined by this Court, hereby, are ordered then to be distributed to the following institutions through the Illinois Bar Foundation. Whereupon, the Illinois Bar Foundation is, hereby, appointed to receive, account, protect and so distribute said funds.

\*　　\*　　\*　　\*　　\*　　\*

### APPENDIX D

Excerpts from *In re Simon II Litigation,* 211 F.R.D. 86 (E.D.N.Y.2002), *vac'd on other grounds,* 407 F.3d 125 (2d Cir.2005).

[This opinion was issued before trial, granting plaintiffs' class certification motion and denying defendants' motion to dismiss.]

[211 F.R.D. at 114–131] [Ed. Note: Since this appendix is available on Westlaw and in F.R.D., it has been deleted here for purposes of publication.]

### APPENDIX E

Excerpts from *Monograph 13: Risks Associated with Smoking Cigarettes with Low Machine–Measured Yields of Tar and Nicotine,* by United States Department of Health and Human Services, Public Health Service, National Institutes of Health, National Cancer Institute (2001).

[Some references, some charts, and most footnotes omitted.]

[Pages 1–10]

### Chapter 1. Public Health Implications of Changes in Cigarette Design and Marketing

David M. Burns, Neal L. Benowitz

**Introduction**

Cigarettes have changed dramatically over the last 50 years, but the data contained in this volume make it clear that the disease risks associated with smoking have not. Following the demonstration that cigarettes could cause cancer in the 1950s (Wynder and Graham, 1950; Doll and Hill, 1952, 1954; Hammond and Horn, 1958), cigarette manufacturers added filters to their products. They also embarked on an effort to lower the machine-measured tar and nicotine yields produced by their cigarettes when tested under a protocol specified by the Federal Trade Commission (FTC) (Pillsbury, 1996). These changes led to more than a 60–percent reduction in machine-measured tar yields of U.S. cigarettes over the last 50 years (see Figure 1–1).

However, it appears that many of the same changes in cigarette design that reduced machine-measured tar yields also led to a disassociation between the machine-measured yield of the cigarette and the amount of tar and nicotine actually received by the smoker (see Chapters 2 and 3). As a result, tar and nicotine measurements made by the FTC method for current cigarettes have little meaning for the smoker, either for how much he or she will receive from a given cigarette or for differences in the amount of tar and nicotine received when he or she smokes different brands of cigarettes.

Figure 1-1
Sales-Weighted Tar and Nicotine Values for U.S. Cigarettes as Measured Using the FTC Method 1954*-1998

*Values before 1968 are estimated from available data, D. Hoffmann personal communication.

The absence of meaningful differences in smoke exposure when different brands of cigarettes are smoked (see Chapter 3) and the resultant absence of meaningful differences in risk (see Chapter 4) make the marketing of these cigarettes as lower-delivery and lower-risk products deceptive for the smoker (see Chapters 6 and 7). The reality that many smokers chose these products as an alternative to cessation—a change that would produce real reductions in disease risks—makes this deception an urgent public health issue.

**How Did it Happen?**

Epidemiological studies established an increased risk of lung cancer among cigarette smokers in the 1950s (Wynder and Graham, 1950; Doll and Hill, 1952, 1954; Hammond and Horn, 1958). At the same time, it was discovered that painting tobacco tar on the backs of mice could produce cancers (Wynder et al., 1953). Wide-spread public dissemination of the results of these studies led many smokers to quit (Burns et al., 1997), but the majority of smokers were addicted and were unable to quit or unwilling to try. Faced with the continuing exposure of large numbers of smokers to the cancer-causing substances in tobacco smoke, public health authorities made the valid conclusion that cigarettes that delivered less tar to smokers would be likely to produce less cancer as well (U.S.Congress, 1967), and the effort to produce and market low-tar cigarettes began to gather momentum.

The recommendations by public health authorities to produce low-tar cigarettes failed to appreciate two important realities. First, smokers were powerfully addicted to the nicotine in cigarettes. They actively changed the way they smoked individual cigarettes (see Chapters 2 and 3)—and some smokers increased the number of

cigarettes they smoked per day (see Chapter 4)—in order to preserve their moment-to-moment and daily intake of nicotine. Because cigarettes deliver smoke with a relatively fixed ratio of tar to nicotine, smokers also preserved their dose of tar when they preserved their dose of nicotine.

Second, public health authorities dramatically underestimated the ability of cigarette manufacturers to engineer cigarettes that would yield very low tar and nicotine values when machine smoked, but yielded much higher levels of tar and nicotine when smoked by the smoker. Cigarettes were designed with an elasticity of delivery that allowed smokers to get much higher yields of tar and nicotine by altering their pattern of puffing. Smokers may also obtain higher yields of tar and nicotine by blocking ventilation holes in the filters with their fingers or lips (see Chapter 2). Low-yield cigarettes were designed in such a way that the same alterations in puff profile (e.g., larger, faster puffs) that resulted from a smoker's effort to compensate for a reduced nicotine delivery also generated much higher deliveries of tar and nicotine from the cigarette. In addition, the ventilation holes in cigarette filters were placed in locations where they could easily be blocked by smokers' lips or fingers. The combination of these two phenomena—compensation on the part of the smoker and elasticity of delivery in the cigarette—meant that most, perhaps nearly all, smokers who switched to these low-yield brands did not substantially alter their exposure to tar and nicotine and, correspondingly, did not lower their risk.

## Compensation in Smokers

Nicotine intake is a principal reason why most smokers smoke (U.S. DHHS, 1988). In the absence of nicotine, smokers do not continue the compulsive use of cigarettes that characterizes addiction. Tobacco companies recognized early in the process of developing lower yield cigarettes that smokers would attempt to preserve the amount of nicotine derived from smoking (Wakeham, 1961). Compensation for reduced delivery of nicotine takes many forms and develops over time after shifting to lower yield cigarettes (see Chapter 3). Smokers may take larger puffs, inhale more deeply, take more rapid or more frequent puffs, block ventilation holes in the filters with their fingers or lips, or increase the number of cigarettes they smoke per day.

The most important question on compensatory smoking is the extent to which it occurs when smokers actually switch brands of cigarettes through their own choice. Unfortunately, this is also the most difficult circumstance under which to obtain detailed measurements of large numbers of smokers. Many studies have examined smokers when smoking in a laboratory setting or when asked to switch at specific points in time or to specific brands of cigarettes. These studies offer some insight into how smokers compensate, but may not reflect smokers' behavior when they are switching of their own volition to a brand of their choice.

Some compensatory smoking changes are evident immediately upon switching to lower yield cigarettes, but it is common for smokers to require some time to learn how to smoke lower yield cigarettes in ways that increase the delivery of nicotine to the smoker. Even under laboratory conditions, when smokers are rapidly switched to lower yield cigarettes, considerable compensation is evident. The extent of compensation increases in smokers who are allowed longer periods to adapt to smoking the new cigarettes or who are switched under conditions that more closely mimic the voluntary switching of smokers to lower yield cigarettes. When smokers of cig-

arettes with different machine-measured nicotine yields from the general population are examined, there is little or no relationship between the nominal nicotine yield of the cigarette smoked and measures of nicotine intake by the smoker, such as blood cotinine levels (Benowitz et al., 1983: Benowitz, 1996; Jarvis et al., 2001). These observations suggest that, at least when considering modern cigarettes, switching from higher to lower yield cigarettes per se is not likely to reduce tar intake and resultant disease risks.

**Elasticity of Demand in the Cigarette**

Early in the 1950s, cigarette manufacturers began to place filters on the end of the cigarette rod. Many different filters were developed, but the most common type used in the United States was made of cellulose acetate. A variety of other approaches to tar reduction was also utilized, including "puffing" the tobacco to reduce the weight of tobacco in a cigarette, altering the blends of tobacco and porosity of the paper wrapper, changing the density of the tobacco rod, using tobacco stems and reconstituted tobacco sheet, and using a wide variety of filter materials (see Chapter 5).

In exploring these approaches, cigarette manufacturers recognized that approaches to reduction of tar yields that actually reduced the nicotine (and tar) delivery to smokers resulted in smokers discontinuing the use of those brands of cigarettes. This led to an effort to design into the cigarette an elasticity of delivery so that smokers could extract from the cigarette as much nicotine as they needed by changing the pattern of puffing on the cigarette (see Chapter 2). The goal of this effort was to develop cigarettes that would produce very low yields of tar when tested by machine smoking using the FTC protocol, but would deliver a much higher dose of nicotine when these cigarettes were smoked by actual smokers with the puffing profiles the companies knew they would use.

An important cigarette design feature allowing a low machine-measured yield with a higher actual yield is the use of ventilated filters. Holes are cut into the paper wrapping the filter in locations where they are not covered when the cigarettes are placed into the smoking machine. However, the lips or fingers of the smoker can easily cover the holes. When the holes are uncovered and the low draw rates specified by the FTC protocol are used, air is drawn into the smoking machine, diluting the smoke coming through the rod of tobacco and lowering the machine-measured tar values. When the holes are covered or when the smoker draws more rapidly on the cigarette, much more of the puff volume is composed of smoke drawn through the rod of tobacco and much less is composed of air drawn from the ventilation holes. The result is a dramatic rise in the tar and nicotine delivered to the smoker by the cigarette.

A given cigarette can be made to deliver any lower level of tar in machine measurements by increasing the size or number of the ventilation holes in the filter. The amount of nicotine in the unburned tobacco is similar for cigarettes with a wide range of machine-measured nicotine yields, as is the tar-to-nicotine ratios of the smoke from these cigarettes when they are smoked under conditions that mimic those of actual smokers (see Chapter 3). This combination of factors, plus the learned compensatory behaviors of the smoker, allows most cigarettes to deliver similar amounts of tar and nicotine to cigarette smokers without regard to the amount of tar and nicotine reported using the FTC method.

This effort by cigarette manufacturers to design cigarettes that could yield very

low levels of tar when smoked by the machine while delivering full doses of tar and nicotine to smokers was not the only option available to the cigarette manufacturers. Internal tobacco company documents are replete with descriptions of filters that could selectively remove toxic smoke constituents, of treatments of tobacco with catalysts like palladium that reduced levels of carcinogens in the smoke, and of other promising modifications of cigarette toxicity. Many of the changes in cigarette design developed by cigarette manufacturers lowered levels of the toxic constituents in cigarette smoke, at least as the cigarettes were smoked using the FTC protocol. However, these paths were not pursued to the point of bringing products to market with scientifically established reductions in toxicity or carcinogenicity for smokers. The principal marketing advantage of a cigarette design scientifically established to cause less harm would be the reduced toxicity of the product. Because cigarette manufacturers persistently maintained that cigarette smoking did not cause any disease, they could not advertise a product as safer since it would be necessary to acknowledge the risks of their existing products.

One unfortunate outcome of the tobacco companies' position that cigarettes had not been established to cause any disease is the lost opportunity to develop cigarettes that have actual reductions in biological toxicity rather than simply the ability to reassure smokers concerned about the risk of smoking. The more unfortunate outcome of this position was the marketing of cigarettes with no real difference in disease risks as "safer" products.

## Marketing of Low–Yield Cigarettes

The link between tar and cancer risk also led to marketing of cigarettes with lower machine-measured tar yields as reduced-risk cigarettes. Terms such as 'Light' and 'Ultra–Light' were added to brand names, and substantial numbers of smokers switched to these brands in an effort to reduce their disease risks (see Chapter 6). Marketing this illusion of risk reduction would have been of concern even if the target for these brands had been confined to continuing smokers. Instead, these brands were targeted at those smokers who were thinking of quitting in an effort to intercept the smokers and keep them smoking cigarettes (see Chapter 7). The switch to low machine-measured-yield cigarettes with the illusion of risk reduction was, therefore, substituted for a real risk reduction that would have occurred had the smoker quit smoking altogether.

Beginning in the 1950s, filter cigarettes were advertised using claims of scientific discoveries, modern pure materials, and implied endorsements from medical and scientific organizations. These claims were not supported by testing that demonstrated lower deliveries of tar and nicotine to smokers or by studies of actual disease risks. However, the clear message delivered to smokers by the advertising was that these cigarettes were safer.

With the endorsement of lower tar cigarettes by public health authorities in the 1960s (U.S.Congress, 1967), cigarette marketing began to focus on machine-measured tar deliveries. Tobacco industry research and engineering efforts recognized that at least two directions were possible with the development of either a health-image (health reassurance) cigarette or a cigarette with minimal biological activity (one that would actually produce less disease) (Green, 1968). Unfortunately, the dominant direction taken was the production of health reassurance cigarettes engineered so that they would deliver low yields of tar under FTC machine-smoking conditions. These low machine yields

were touted in the advertisements and incorporated into cigarette brand names with terms such as 'Light' and 'Ultra–Light'. However, the promise of low tar delivery was only valid for the smoking machine. Smokers received a much higher dose of tar and enough nicotine to satisfy their addiction.

This dichotomy of delivery between smokers and machines was the intended result of the engineering effort to design elasticity of delivery into cigarettes. Testing of these design concepts on actual smokers revealed that Light and Regular cigarettes delivered the same levels of tar and nicotine when smoked by smokers (Goodman, 1975) and that advertising these cigarettes as low-tar-yield cigarettes was deceptive (Peeples, 1976). But these cigarettes satisfied the demand for cigarettes that could be marketed as low-tar cigarettes with full flavor or taste (See Figure 1–2). The low-tar claim presented in the ad only existed for machine smoking and the full flavor received by the smoker was accompanied by full yields of tar and full disease risks.

Figure 1-2
Low Tar is Important to Me

## Disease Risks

Having demonstrated that smokers derive similar amounts of nicotine from cigarettes with a wide variety of machine-measured nicotine yields because those cigarettes were designed to deliver a full dose of nicotine (and tar) to the smoker, one might expect that there would be little or no difference in disease risks among groups of smokers who smoke cigarettes with different machine-measured tar and nicotine yields. However, epidemiological studies have demonstrated that smokers of lower tar or filtered cigarettes had lower lung cancer risks (see Chapter 4). These findings, made in the late 1960s and 1970s, were particularly exciting since smokers had been smoking these reduced-yield cig-

arettes for only short periods of time. As more individuals used these products for longer periods of time, the reduction in disease risk would be expected to increase and national lung cancer death rates would fall.

Use of lower yield cigarettes grew until they were the dominant type of cigarette on the U.S. market, with 97 percent of the cigarettes currently sold in the United States being filtered cigarettes, but lung cancer rates continued to rise. Lung cancer death rates finally peaked in 1990 among White males; they continue to rise among women in spite of a higher prevalence of low-yield cigarette use among females. Examination of these trends show that they are explained by changes in smoking prevalence without postulating reductions in disease risks due to changes in cigarette design (Mannino et al., 2001; see Chapter 4).

In addition, prospective mortality studies examining smokers in the United States (Thun and Heath, 1997; Thun et al., 1997) and the United Kingdom (Doll et al., 1994) revealed an increase—rather than a decrease—in the risk of smoking over a period when tar and nicotine yields of cigarettes were declining. Data from two large prospective mortality studies conducted by the American Cancer Society (ACS) more than 20 years apart are partic-

ularly compelling (Thun and Heath, 1997). Machine-measured tar and nicotine yields of U.S. cigarettes declined dramatically in the interval between these two studies (see Figure 1–1), and the machine-measured yields of the cigarettes actually smoked by the participants in these two studies were dramatically different as a result (see Figure 1–3). Despite the substantive reduction in tar yield of the cigarettes smoked in CPS (Cancer Prevention Study)-II, lung cancer disease risks increased, rather than decreased, compared to CPS–I, even when controlled for differences between the two studies in number of cigarettes smoked per day and duration of smoking.

The risk reduction with use of lower yield cigarettes demonstrated in epidemiological studies and the absence of a risk reduction in U.S. lung cancer mortality trends or in the two ACS studies with changing cigarette design are observations that offer apparently conflicting interpretations of the likely disease consequences of smoking lower yield cigarettes. The epidemiological observation of lower risks with use of filtered and lower tar cigarettes has been reproduced in multiple populations and cannot be dismissed as an artifact of a single analysis or a single population. Similarly, national death rate trends are real observations not easily dismissed.

Figure 1-3
Percentage Distribution of Tar Content, as Measured by Machine Smoking, of the
Cigarette Brand Smoked at Enrollment

Epidemiological studies and national death rates both measure the impact of low-yield cigarettes in somewhat different ways. Epidemiological studies of disease risks compare disease rates among populations of smokers who use cigarettes with

different characteristics. These studies can define whether the disease experiences of smokers of different types of cigarettes are different. However, attributing differences in disease experience to the type of cigarette smoked requires careful consideration of, and adjustment for, characteristics of the two groups that may influence disease risks other than the type of cigarette smoked.

National mortality rate trends are the cumulative result of all of the changes in smoking behavior over time, changes in cigarette design, demographic changes, and changes in smoking behavior. However, smokers of different types of cigarettes cannot be examined directly for their contribution to these trends.

The marketing of low-yield cigarettes as less risky (see Chapters 6 and 7) results in smokers switching from higher to lower yield cigarettes in an effort to reduce their disease risks (Cohen, 1996a & b; see Chapters 6 and 7), in an effort to quit, or in an effort to substantially reduce their smoking (Giovino et al., 1996). Because of these health concerns and an ongoing interest in cessation, these same low-yield cigarette smokers may also have higher rates of successful long-term smoking cessation or may voluntarily reduce the amount that they smoke for health reasons. Risk reductions that accompany cessation or lowered smoking intensity may appear to be related to the tar level of the cigarette smoked when a population is followed longitudinally for assessment of disease risk without repeated follow-up assessment of smoking status. This effect and other differences in health-related behaviors linked to low-yield cigarette use may confound the analysis of disease risk in prospective studies of low yield cigarettes.

Many published epidemiological studies of low-yield cigarettes have adjusted for the number of cigarettes smoked per day because it is the most readily available quantitative measure of smoking intensity. The potential for smokers to increase the number of cigarettes they smoke per day when they switch to lower yield cigarettes can confound analyses of disease risks among smokers of different types of cigarettes in both case-control and prospective epidemiological evaluations (see Chapter 4). Data presented in Chapter 4 show that smokers who switched to low-yield cigarettes in the ACS CPS–I increased the number of cigarettes that they smoked per day, and that smokers of ultralow-nicotine-yield cigarettes smoked more cigarettes per day in recent California tobacco surveys.

The differences between self-selected populations of smokers of different types of cigarettes and the potential for confounding between type of cigarette smoked and the number of cigarettes smoked per day may explain why epidemiological studies have demonstrated a risk difference when one has not appeared in national death rates.

However, it is clear that the expected lung cancer risk reduction offered by the reduction in lung cancer rates in epidemiological studies has not been realized in national lung cancer death rate trends. When all of the epidemiological evidence is considered in the context of what is currently known about cigarette design and compensation, it does not support the conclusion that a reduction in disease risks has occurred in the population of smokers due to the design changes that occurred in cigarettes over the last 50 years.

This report reviews evidence on the FTC method for measuring tar and nicotine yields and the disease risks of machine-measured low-tar cigarettes. The

evidence is derived from research on human behavior and exposures, cigarette design and yields, smoke chemistry, epidemiological other and population-based data on human disease risk. In conducting this review, the objective was to determine whether the evidence taken as a whole shows that the cumulative effect of engineering changes in cigarette design over the last 50 years has reduced disease risks in smokers. Traditional scientific judgment requires compelling evidence of a difference before concluding that use of lower yield products reduces disease risk. These judgments are especially important for harm reduction claims, as they may deter smokers from cessation of tobacco use. Moreover, there have been previous public policy statements on the likely benefits of lower yield products. These prior statements may lead to confusion by creating an implication that the appropriate standard for judgment would require proof of the absence of an effect before the policy recommendations should be withdrawn. Given the consequences of being wrong on the advice given to smokers, the burden of proof should not be shifted from proving the presence of an effect. The perspective of this report is whether the existing evidence is sufficient to support claims that disease risks are reduced when smokers switch to lower yield cigarettes and policy recommendations that smokers who cannot quit should switch to these products. The answers to these questions are that current evidence does not support either claims of reduced harm or policy recommendations to switch to these products.

Many questions remain unanswered. For example, the disease risks of recently introduced cigarettes or cigarette-like products are not known. Similarly, the cancer risks for individuals who have only used low and ultra-low cigarettes, and who may have different intensities of smoking as a result, have yet to be fully described. Changes in age-specific lung cancer death rates at younger ages in the United Kingdom suggest that the future lung cancer experiences of these young smokers may differ from that of prior generations of smokers. In addition, the possibility exists that individual product design changes, or future changes in tobacco industry produced nicotine delivery devices, may reduce disease risks in the future. However, the burden of proof for these benefits must remain with those who would make the claims. The proof must integrate both measurements of dose and measures of actual biological effect. The very real probability that addicted smokers will seek out and rely upon the promised potential of reduced risk for products that allow continued smoking creates an obligation to require clear scientific proof of harm reduction claims before they are communicated to potential product users.

## Conclusions

1. Epidemiological and other scientific evidence, including patterns of mortality from smoking-caused diseases, does not indicate a benefit to public health from changes in cigarette design and manufacturing over the last fifty years.

2. For spontaneous brand switchers, there appears to be complete compensation for nicotine delivery, reflecting more intensive smoking of lower-yield cigarettes.

3. Widespread adoption of lower yield cigarettes in the United States has not prevented the sustained increase in lung cancer among older smokers.

4. Many smokers switch to lower yield cigarettes out of concern for their health, believing these cigarettes to be less risky or to be a step toward

quitting. Advertising and marketing of lower yield cigarettes may promote initiation and impede cessation, more important determinants of smoking-related diseases.

5. Measurements of tar and nicotine yields using the FTC method do not offer smokers meaningful information on the amount of tar and nicotine they will receive from a cigarette. The measurements also do not offer meaningful information on the relative amounts of tar and nicotine exposure likely to be received from smoking different brands of cigarettes.

[Pages 13, 34]

### Chapter 2. Cigarette Design

Lynn T. Kozlowski, Richard J. O'Connor, Christine T. Sweeney

\* \* \* \* \* \*

### Conclusions

1. Several design changes in the way that cigarettes are manufactured have led to a substantial reduction in the machine-measured tar and nicotine yields of U.S. cigarettes over the last several decades.

2. Many of the same design changes that have reduced machine-measured tar yields, particularly placing ventilation holes in the cigarette filters, also create an elasticity of delivery for the cigarette, allowing a wide range of tar and nicotine deliveries from the same cigarette when a smoker alters his or her smoking behavior.

3. Increasing puff volume and frequency, covering the ventilation holes with fingers or lips, and other changes in smoking behavior known

to occur with use of low machine-measured-tar cigarettes can dramatically increase the tar and nicotine delivery of low- and ultralow-yield brands.

4. Variations in the tar and nicotine delivery that result from the known compensatory alterations in smoking behaviors make the current U.S. cigarette tar and nicotine yields as measured by the FTC method not useful to the smoker either for understanding how much tar and nicotine he or she is likely to inhale from smoking a given cigarette or for comparing the tar and nicotine intake that is likely to result from smoking different brands of cigarettes.

[Page 39]

### Chapter 3. Compensatory Smoking of Low–Yield Cigarettes

Neal L. Benowitz

### Introduction

Most smokers are addicted to nicotine (U.S.DHHS, 1988). Nicotine addiction results in smokers seeking to take in a constant level of nicotine from smoking each day (Benowitz, 1988; U.S. DHHS, 1988). Consequently, when faced with low-yield cigarettes, smokers tend to take in more nicotine and other tobacco smoke constituents from these cigarettes than would be predicted by machine testing in order to sustain optimal levels of nicotine intake. This phenomenon of taking in similar levels of nicotine from day to day has been termed 'regulation' or 'titration' of nicotine intake. The behavior of smoking cigarettes of different machine yields more or less intensively, and/or smoking more or fewer cigarettes to achieve a particular intake of nicotine, has been called 'compensation'. If regulation of nicotine intake is

precise, that is, compensation is complete, then switching to low-yield cigarettes would not be expected to reduce exposure to tobacco toxins, nor to reduce the risk of disease from smoking.

Earlier chapters have described the nature of low-yield cigarettes and the ways in which smokers can modify their smoking behaviors to take in more tobacco smoke from their cigarettes than predicted by the standard smoking-machine test. In brief review—when faced with lower yield cigarettes, smokers can smoke more cigarettes per day, can take more and deeper puffs, can puff with a faster draw rate, and/or can block ventilation holes. Using these last four techniques, a smoker can increase his or her smoke intake from a particular cigarette several fold above the machine-predicted yields.

This chapter will review nicotine addiction and the evidence that smokers regulate their intake of nicotine from cigarettes. The focus will be on primarily studies in which human exposure has been biochemically assessed. Evidence from both experimental and cross-sectional studies will be examined. The question of whether or not tar exposure might be reduced despite compensation for nicotine itself when switching to low-yield cigarettes will also be examined.

[Pages 65, 146]

## Chapter 4. Smoking Lower Yield Cigarettes and Disease Risks

David M. Burns, Jacqueline M. Major, Thomas G. Shanks, Michael J. Thun, Jonathan M. Samet

\* \* \* \* \* \*

## Conclusions

1. Changes in cigarette design and manufacturing over the last fifty years have substantially lowered the sales-weighted, machine-measured tar and nicotine yields of cigarettes smoked in the United States.

2. Cigarettes with low machine-measured yields by the FTC method are designed to allow compensatory smoking behaviors that enable a smoker to derive a wide range of tar and nicotine yields from the same brand, offsetting much of the theoretical benefit of a reduced-yield cigarette.

3. Existing disease risk data do not support making a recommendation that smokers switch cigarette brands. The recommendation that individuals who cannot stop smoking should switch to low yield cigarettes can cause harm if it misleads smokers to postpone serious efforts at cessation.

4. Widespread adoption of lower yield cigarettes by smokers in the United States has not prevented the sustained increase in lung cancer among older smokers.

5. Epidemiological studies have not consistently found lesser risk of diseases, other than lung cancer, among smokers of reduced yield cigarettes. Some studies have found lesser risks of lung cancer among smokers of reduced yield cigarettes. Some or all of this reduction in lung cancer risk may reflect differing characteristics of smokers of reduced-yield compared to higher-yield cigarettes.

6. There is no convincing evidence that changes in cigarette design between 1950 and the mid 1980s have resulted in an important decrease in the disease burden caused by cigarette use either for smokers as a group or for the whole population.

1310

[Pages 193–198]

## Chapter 6. Public Understanding of Risk and Reasons for Smoking Low–Yield Cigarettes

Neil D. Weinstein

### Introduction

Few members of the public understand the probabilities and odds that form the vocabulary scientists use to discuss risk (Weinstein, 1999). Thus, lay people rely upon other cues, such as the cigarette labels 'Light' and 'Ultra Light', to help them make decisions about smoking and other hazards (see Chapter 7). This chapter examines public perceptions of Light cigarettes, reasons for smoking Lights, and the relationship between smoking Lights and quitting.

### Perceptions of Light Cigarettes

The labels 'Light' and 'Ultra Light', when applied to cigarettes, imply a variety of benefits. These include lower levels of tar and nicotine, less risk to health, and milder taste. Cigarette advertising, including the way in which these labels are used in the advertising, further modifies and shapes public perceptions of these products. What 'Light' and 'Ultra Light' come to mean to members of the public is an empirical question that can be revealed by careful survey research.

A substantial portion of smokers believe that low-tar cigarettes are less risky than Regular cigarettes. For example, a nationwide 1987 survey (Giovino et al., 1996, p. 49) found that 45.7 percent of Ultra–Light smokers, 32.2 percent of Light smokers, and 29.4 percent of Regular smokers said that low-tar cigarettes reduce the risk of cancer. Nevertheless, smokers' knowledge about low-tar cigarettes is quite limited.

In 1995, a random sample of 12,371 Canadians adults were asked by telephone interviewers what the word "light" means in relation to cigarettes (Health Canada, 1995). The most frequently mentioned topics were: "less tar" (20.1 percent), "less nicotine" (36.2 percent), "safer" or "less addictive" (3.2 percent), "milder taste" (6.7 percent), "different filter" (2.3 percent), and "nothing" or "ad gimmick" (14.1 percent). A further 21.2 percent had no idea what the term meant. The meanings ascribed to "light" were generally similar among various subgroups of smokers, although former and never smokers were more likely than current smokers to say that they had no idea what the term meant (17.8 percent and 28.7 percent versus 12.2 percent, respectively), and former smokers were more likely than current and never smokers to state that "light" was a meaningless advertising term (22.2 percent versus 16.0 percent and 10.6 percent, respectively).

A 1994 national random telephone survey found that 95% of regular smokers could identify that they were "somewhat certain" or "very certain" that they smoked a Regular, Light, or Ultra–Light cigarette (Kozlowski et al., 1998a & b). However, when asked how much tar their cigarettes contained, few smokers knew the answer to this question. For example, Cohen (1996a, p. 128) reported that 79% of smokers answered that they did not know the answer to the question. Comparing the estimates given by smokers to the actual figures for their brands, Kozlowski and colleagues (1998b) found that only 3% of smokers could correctly state (within 2 mg) the amount of tar in their cigarettes. In fact, few knew where to look to learn the tar content (Kozlowski et al., 1998b). Although 67% of smokers said that they would look on their cigarette package to find the tar content, only 6.3% of ciga-

rettes sold have this information on the package. When asked how many Light cigarettes someone would have to smoke to get the same amount of tar as from one Regular cigarette, the most common response from about half of those surveyed was, "don't know"; about 40 percent said two cigarettes or more and less than 10 percent said one cigarette (Kozlowski et al., 1998a).

There are significant differences in knowledge and reported use of tar numbers among different types of smokers. For example, when Ultra–Light, Light, and Regular cigarettes were compared, the members of the first group were found to be somewhat more accurate about their cigarette's tar number (Kozlowski et al., 1998b). Accuracy was shown by 17% of Ultra–Light smokers, 2% of Light smokers, and 1% of Regular smokers. Ultra–Light smokers were also much more likely to say they used this number in making judgments about cigarette safety (Cohen, 1996a, p. 132). Thus, although only 14% of Cohen's overall sample said that they used tar numbers to make such judgments, 56% of the smokers of 1– to 5–mg tar cigarettes said that they determined safety from advertised tar values. Ultra–Light smokers also saw a much bigger difference between the risk of Regular and Light cigarettes than did other smokers (Cohen, 1996a, p. 130). A large majority (83%) of Ultra–Light smokers said that switching from a 20–mg to a 5–mg tar cigarette would significantly reduce health risks, whereas only about 50% of other smokers shared this belief.

Clearly, knowledge about the reported tar values of their chosen brands, about where these values can be found, and about vent holes in cigarettes is largely absent among smokers. Of particular importance is the finding that a large proportion of smokers believe that switching to a lower tar cigarette reduces one's health risks, and since most smokers are only aware of a cigarette's advertised type— 'Regular', 'Light', or 'Ultra Light'—and not its tar number, this classification is used as a surrogate to indicate risk. Attention to tar numbers is particularly true among Ultra–Light smokers, a majority of whom say they use these numbers to judge a cigarette's safety.

## Reasons for Smoking or Switching to Light Cigarettes

A variety of studies have asked smokers about their reasons for choosing to smoke Light or Ultra Light cigarettes or their reasons for switching to such cigarettes. The results show that the desire to reduce disease risk is one of the main factors guiding these choices. Although it would be desirable to distinguish in this section between initial cigarette choices, switching as a prelude to quitting, switching as a substitute for quitting, and switching following an unsuccessful quit attempt, the available data do not permit such a fine-grained analysis. In the 1987 National Health Interview Survey (Giovino et al., 1996, p. 45), 44 percent of current smokers said that they had at some time switched to a low-tar/low-nicotine cigarette in order to reduce their health risk. Similarly, a national survey found that about 60 percent of Ultra–Light smokers and approximately 40 percent of Light smokers said that they smoked reduced-tar cigarettes "to reduce the risks of smoking without having to give up smoking" (Kozlowski et al., 1998a)[.]

In this same national telephone survey, the reasons given by current daily smokers for why they chose to smoke Ultra–Light/Light cigarettes were: step toward quitting (49/30 percent), reduce risk (58/39 percent), reduce tar (73/57 percent), reduce nicotine (72/50 percent), and prefer

the taste (69/80 percent) (Kozlowski et al., 1998a). Very similar figures were obtained in telephone interviews of 266 randomly selected Massachusetts smokers (Kozlowski et al., 1998a). In a recent experiment involving a randomly selected sample of 568 smokers of Light cigarettes, the reasons given for smoking Light cigarettes by people in the control or delayed intervention groups were: step toward quitting (25 percent), reduce risk (43 percent), reduce tar or nicotine (70 percent), and prefer taste (81 percent) (Kozlowski et al., 1999). In these same groups, 39 percent said that Light cigarettes decreased their risk of having health problems.

A national survey of adolescents and young adults in 1993 found somewhat less of an emphasis on health issues, with smokers of Light or Ultra–Light cigarettes saying that they chose their brand because of taste (33 percent), because they were less irritating (29 percent), because they were healthier than other brands (21 percent), and because they "just liked them" (19 percent) (Giovino et al., 1996, p. 49).

Not surprisingly, national survey of adults in 1986 showed that those who have ever switched in order to reduce tar or nicotine are more likely than those who never switched to believe that some brands are more hazardous than others (54 percent versus 40 percent, respectively) and to believe that their current brand is less hazardous than other brands (33 percent versus 16 percent, respectively) (Giovino et al., 1996, p. 50). Although most smokers recognize that smoking is risky to one's health, those who chose Light and Ultra–Light cigarettes are more likely to acknowledge the risk than smokers of Regular cigarettes. For example, 85 percent of those who had switched to lower tar/nicotine brands said they were concerned about the health effects of smoking, compared to 70 percent of those who had never made this switch (Giovino et al., 1996, p. 50). People who had switched were also more likely to say that their health had been affected by smoking and that a doctor had advised them to quit (Giovino et al., 1996, p. 48).

Similarly, when the previously mentioned Canadian smokers were asked about the likelihood of developing health problems such as emphysema, asthma, lung cancer, or stroke from smoking for many years, those who had switched from Regular to Light cigarettes cited more problems as very likely than those who started and continued smoking Regular cigarettes (2.13 v. 1.94 problems, respectively) (data from Health Canada, 1995).

Overall, the data are consistent in showing that smokers of Light and Ultra–Light cigarettes are especially concerned about protecting their health. The majority of these smokers choose Light or Ultra–Light cigarettes in the belief that this will reduce their health risks and/or make it easier to quit.

## The Relationship of Switching to Quitting

Smokers of low-yield cigarettes not only express greater concern about the risks of smoking, but they also show more interest in quitting. In fact, 38 percent of the smoker respondents to the 1987 National Health Interview Survey who switched to Light cigarettes saw this change as a step toward quitting (Giovino et al., 1996, p. 49), and people who smoked Light or Ultra–Light cigarettes tended to have tried more quitting strategies than those who smoked Regular cigarettes (Giovino et al., 1996, p. 51). Among those smokers who had never attempted to quit, smokers of low-tar cigarettes were more likely to say that they had considered quitting.

Similar interest in both quitting and healthy behavior comes from a study of U.S. Air Force trainees (Haddock et al., 1999). These researchers reported that individuals who said that they had "switched to a lower tar/nicotine cigarette just to reduce their health risk" were more likely to have experienced a successful 24-hour quit attempt in the past, had more healthy diets, and were less likely to take other kinds of risks. These switchers were also less likely to say that they were addicted to cigarettes.

However, there are no data that show switching to reduced-tar cigarettes increases the likelihood of quitting. In fact, given the perceived reduction in risk from smoking Light cigarettes, a switch to such brands may well weaken the motivation to quit. In the Health Canada survey, 32.0 percent of those who started with, and continued to, smoke Light cigarettes made a quit attempt in the previous 3 months, compared to 15.1 percent of those who started with, and continued to, smoke Regular cigarettes. But of those who started with Regular cigarettes and were currently Light cigarette smokers, only 16.7 percent had tried to quit recently (data from Health Canada, 1995).

A large 1986 national study of adults in the United States who had ever smoked found that those who smoked low-yield cigarettes, regardless of whether they had ever switched to lower yield cigarettes, were less likely to have quit than those who smoked high-yield brands (Giovino et al., 1996, p. 49). Persons who had ever switched brands to reduce their level of tar and nicotine also were less likely to have quit than those who had never switched brands to reduce their level of tar and nicotine.

When Air Force trainee smokers—who had been required to abstain from smoking throughout their basic military training—were contacted 12 months later, only 12.5 percent of switchers and 11.1 percent of nonswitchers were still abstinent (Haddock et al., 1999). Controlling for demographic factors and smoking history, this difference was not statistically significant (odds ratio = 1.04, p > .5). Among Air Force trainees, switchers did report smoking fewer cigarettes than nonswitchers. However, in the 1995 Health Canada survey, people who had started smoking Regular cigarettes and currently smoked Light cigarettes did not smoke fewer cigarettes per day than those who stayed with Regular cigarettes.

Thus, even among individuals who had switched specifically because they were concerned about health risks, who had been assisted in long-term quitting by a mandatory abstinence period, or who said they were less addicted to cigarettes than did the nonswitchers, the switch to Light cigarettes prior to the abstinence period did not help them stay abstinent. Switching to Light cigarettes does not seem to be any more of a route toward quitting than simply staying with Regular cigarettes.

Thus, no data exist that indicate switching to Light or Ultra–Light cigarettes actually assists smokers in quitting.

## Summary

Overall, the accumulated data are quite consistent. They show that many consumers use the terms 'Light' and 'Ultra Light' as a guide to the riskiness of particular brands of cigarettes. To a considerable extent, smokers choose Light and Ultra–Light brands because they think that these cigarettes are not as harmful and cause fewer health problems. Particularly, individuals who are most concerned about smoking risks and most interested in quitting adopt low-yield brands.

To determine whether switching helps people to smoke less or to quit, one would ideally examine two groups with the same interest in quitting and the same smoking history. One would compare the group that switched with the group that did not, looking at both cessation and smoking rates over time. In reality, however, those who switch are different from nonswitchers in numerous ways, all of which should facilitate their quitting and reduce the amount that they smoke. Despite these facilitating factors, the data show that switchers to a Light or Ultra–Light cigarette are not more likely to become nonsmokers than are nonswitchers.

Surveys indicate that switching to low-yield cigarettes is viewed by many smokers as a healthier choice. Given the interest in quitting among those who make this choice, their failure to quit at rates any higher than those who do not switch suggests that switching reduces the motivation to stop smoking. Thus, the advertising of brands designated as 'Light' or 'Ultra Light' misleads smokers as to the benefits these brands offer.

The data collected since publication of the 1996 NCI monograph only reinforce the conclusion reached by Giovino and colleagues (1996) in that volume that the existence of so called 'Light' and 'Ultra Light' cigarettes has kept many smokers interested in protecting their health from quitting. "The net effect of the introduction and mass marketing of these brands, then, may have been and may continue to be an increased number of smoking-attributable deaths."(Giovino et al., 1996.)

**Conclusions**

1. Many consumers use the terms 'Light' and 'Ultra–Light' as a guide to the riskiness of particular brands of cigarettes.

2. Many smokers choose Light and Ultra–Light brands because they believe that such cigarettes are less likely to cause health problems.

3. Individuals who are most concerned about smoking risks and most interested in quitting adopt low-yield brands.

[Pages 199–233]

## Chapter 7. Marketing Cigarettes with Low Machine–Measured Yields

Richard W. Pollay, Timothy Dewhirst

### Introduction

During the early 1950s, scientific and popular articles that presented lung cancer research findings initiated what the tobacco industry termed the "health scare," as consumers became increasingly concerned about the potential health risks incurred from smoking. Companies initially responded to this health scare by introducing filtered products that were accompanied by advertisements with explicit health-related statements. For example, Viceroy® maintained that it provided "Double–Barreled Health Protection" and also claimed that it was "Better for Your Health" in ad copy.

In time, the industry became aware that explicit health claims had the undesirable effects of making health concerns salient or predominant in the minds of consumers, and encouraged consumers to use "healthfulness" as the criterion by which they judged cigarettes. Motivation researchers and other trade analysts advised the industry to shift from explicit verbal assertions of health toward implied healthfulness, an approach that incorporated the use of visual imagery (Pollay, 1989a).

January of 1964 marked the release of the first Surgeon General's Report on smoking, and this event reawakened public concerns about the potential health conse-

quences of smoking. Tobacco manufacturers needed to reduce consumer concerns and the ensuing anxious feelings. Quitting was not an easy option for smokers because nicotine is highly addictive. Switching to a lower (tar and nicotine) yield cigarette became an attractive alternative for many smokers once they were convinced by advertising that this would be a meaningful step toward health and away from risk. Thus, there was a ready market for "new and improved" cigarettes, or at least for those that seemed to be that way.

This chapter will review recently released documents from the tobacco industry and its consultants, produced during litigation, as well as excerpts from the relevant trade press, for insights into the firms' intentions and actions in marketing their products. Particular attention will be paid to the period of the mid–1970s, the launch period for most of the new generation of low-yield products. It will be shown that advertising for reduced-yield products led consumers to perceive filtered and low-tar delivery products as safer alternatives to regular cigarettes.

### The 1950s

### Filters Debut as Health Protection

Advertising during the 1950s promoted filters as the technological fix to the health scare. Filters were heralded with various dramatic announcements featuring 'news' about: scientific discoveries; modern pure materials; research and development breakthroughs; certification by the United States Testing Company; implied endorsement by the American Medical Association (see Figure 7–1); "miracle tip" filters; and descriptions of "20,000 filter traps" or filters made of activated charcoal, "selectrate," "millecel," "cellulose acetate" or "micronite" that were variously described as effective, complete, superior, and producing mildness, gentleness, smoothness, etc. In 1958, for example, a press conference was held at New York's Plaza Hotel to launch Parliament® and its new filter, called "Hi–Fi" ("high filtration," as in high-fidelity state-of-the-art sound reproduction of the 1950s).

> "In the foyers, test tubes bubbled and glassed-in machines smoked cigarettes by means of tubes. Men and women in long white laboratory coats bustled about and stood ready to answer any questions. Inside, a Philip Morris executive told the audience of reporters that the new Hi–Fi filter was an event of 'irrevocable significance'. The new filter was described as 'hospital white'." (See Whelan, 1984, p.90)

1316

Figure 7-1
Kent—Implied AMA Endorsement
(Circa 1953)

"The American Medical Association voluntarily conducted in their own laboratory a series of independent tests of Kents and filter cigarettes. As reported in the Journal of the American Medical Association, these tests proved that of all ... the most effective ... The ... filter ... by Kent ..."

KENT

The purported product benefit of this new filtration was obviously the perceived reduction, if not elimination, of cancer and other health risks. Health benefits were implied through various slogans, such as "Just What the Dr. Ordered" (L & M®), "Inhale to your Heart's Content" (Embassy®), "The Secret to Life is in the Filter" (Life®), "Extra Margin" (of safety protection; analogy to helmets, seat belts, and other safety gear—Parliament®), and "Thinking Man's Filter" (Viceroy®). Other slogans were more implicit, but still provided health inferences to consumers (See Pollay, 1989b).

If nothing else, the high technology attributes of filtration, and its ability to produce healthful conditions in other media such as water, were communicated (see Figure 7–2).

"The speed with which charcoal filters penetrated the health cigarette market shows the effectiveness of a new concept. The public had been conditioned to accept the filtering effects of charcoal in other fields, and when charcoal was added to cigarette filters it proved to be an effective advertising gimmick." (See Johnston, 1966, p. 16)

"Claims or assurances related to health are prominent in the (cigarette) advertising. These claims and assurances vary in their explicitness, but they are sufficiently patent to compel the conclusion that much filter and menthol-filter advertising seeks to persuade smokers and potential smokers that smoking cigarettes is safe or not unhealthful." (See the Federal Trade Commission, 1964, p. 72)

The result in the marketplace was a dramatic conversion from 'regular' (short length; unfiltered) products to new prod-

uct forms (filtered; king sized; 100 mm). Spending on advertising nearly tripled from 1952 to 1959, largely through promoting the virtues of the new filtered products, thereby enticing smokers to switch from their regular unfiltered products to filtered and, presumably, safer brands or product-line variants.

"He had abandoned the regular cigarette, however, on the ground of reduced risk to health.... A further consequence of the 'tar derby' was the rapid increase in advertising expenditures during this period. Advertising expenditures in selected media jumped from over $55 million in 1952 to approximately $150 million in 1959." (See Pepples, 1976, p. 1)

Figure 7-2
Tareyton—Charcoal Filter (1972)

Filter for better taste the Tareyton way with activated charcoal.

## Females and Older Smokers as Early Filter Smokers

Gender and age were predictors of who adopted the new filtered products. Females converted more readily than males, and older concerned smokers adapted more readily than young starters (O'Keefe and Pollay, 1996). Thus, Philip Morris anticipated that females would be the largest potential market for a "health cigarette" following the release of the 1964 Surgeon General's Report:

"Women, and particularly young women, would constitute the greatest potential market for a health cigarette." (See Johnston, 1966, p. 1)

Psychology-based consumer research conducted for Brown & Williamson implied that the females who smoked filters were normal, whereas the males seemed unusually anxious. In 1967, this research described women who smoked filter cigarettes as "neither rebels (like women who smoke plain cigarettes), nor insecure (like

females who smoke menthols)." The males who smoked filter cigarettes were described as "... apprehensive and depressive. They think about death, worry over possible troubles, are uneasy if inactive, don't trust others." (See Oxtoby–Smith, Inc., 1967, pp. 24–25.)

### Filter Cigarette Marketing to Males

Once the public accepted filters as an adequate response to at least assuage their worst fears, there was a market opportunity in providing males with filtered products that delivered 'full flavor':

> "... [O]nce the consumer had been sufficiently educated on the virtues of filters, a vacuum was created for a filter with taste; this vacuum was filled by Winston and Marlboro." (See Latimer, 1976, p. 5.)

Some internal industry documents from the 1970s portray the filters of the 1950s and the associated risk reduction as essentially 'cosmetic':

> "... [T]he public began to accept filters as a way to reduce the *cosmetic* risks of smoking and the attendant 'ego-status' risk of appearing to have an immoral, unclean habit." [Emphasis added.] (See Latimer, 1976, p. 3.)

### The Early Tar Wars

The period from the mid–1950s until the mid–1960s was tumultuous for the industry. Various new filter products were launched, many competitive advertising claims used different standards of measurement, and the Federal Trade Commission (FTC) guidelines concerning what was permissible in cigarette advertising changed as well. Episodes of intense competitive rivalry of claims and counterclaims about cigarette yields were dubbed the "tar derby" or "tar wars" within the trade, and the ensuing publicity in the popular press affected the marketplace.

Some manufacturers took advantage of these dynamics to present their cigarettes as "healthy" to the public during a period of intense advertising claims, then capitalized on such reputations while selling products that were actually quite high in tar and nicotine yields.

> "In 1955, the FTC, reacting to conflicting claims as to tar and filtration, has imposed 'Cigarette Advertising Guides' banning all mention of tar, nicotine and filtration 'when not established by competent scientific proof'. This put a stop to such claims in advertising. In July and August of 1957, the Reader's Digest published two articles with figures on tar and nicotine mentioning Kent by name. The August article, written with Kent's assistance was practically an ad for Kent. In 90 days, Kent's sales leaped from 300 million to 3 billion per month. This article broke the dike and set off the famous Tar Derby. Over the next 4 years, tar levels were drastically cut. Marlboro dropped from 34 mg. tar in 1957 to 25 mg. in 1958 and 19 mg. in 1961." (See Cunningham and Walsh, 1980, p. 11)

Kent®, whose advertising of its asbestos-based "Micronite" filter had been very effective, engaged in a series of product revisions in the 1950s. With each iteration, the Kent® product yielded more and more tar and nicotine, and this pattern continued into the 1960s. Similar filter "loosening" was the subject of U.S. Congressional inquiry (Blatnik, 1958).

> "In mid 1960, the FTC called off the Tar Derby, rigidly prohibiting tar and nicotine claims. Some of the new low tar brands disappeared. Soon thereafter, the brands stopped reducing tar levels and, indeed, began to raise them. Kent, for example, went from 14 mg. in 1961 to 16 mg. in 1963 and 19 mg. in 1966. The FTC prohibition ended March 25, 1966

initiating a new phase in Hi–Fi development. Lorrillard [sic] decided not to reduce Kent's tar level again. Instead it put out True." (See Cunningham and Walsh, 1980, p. 12.)

## Medicinal Menthol

During this tar derby period, new menthol-filtered products were introduced, such as Salem®, Newport®, and Oasis®. Manufacturers of these new products capitalized on the reputation that menthol already had, due to its use in cold remedies and related medicinal applications, and the history of "pseudo-health" claims made in earlier menthol cigarette advertising. The Kool® brand had long been promoted as a medicinal product with would-be remedial properties that could make the cigarette suitable when smokers were suffering from coughs, colds, sore throats, etc.:

> "Kool not only remained, but was actively positioned as a remedial/medicinal type product throughout the 1950's." (See Cunningham and Walsh, 1980, p. 9.)

Salem® was introduced in 1956 as the "first truly new smoking advance" (see Figure 7–3).

Figure 7-3
**Salem—First Truly New Smoking Advance (1956)**

"Salem created a whole new meaning for menthol. From the heritage of solves-the-negative-problems-of-smoking, menthol almost instantly became a positive smoking sensation. Menthol in the filter form in the Salem advertising was a 'refreshing' taste experience. It can be viewed as very 'reassuring' in a personal concern climate. Undoubtedly, the medicinal menthol connotation carried forward in a therapeutic fashion, but as a positive taste benefit." (See Cunningham and Walsh, 1980, p. 9.)

"During the 'tar derby', menthol styles were perceived as healthier, low 'tar' smokes due to the quasi-medical health claims in menthol advertising... the first true menthol hi-fi was True Green, introduced in 1967... By 1974, menthol hi-fi styles had a 27% share of the hi-fi category—close to the proportion of menthols to all styles." (See Chambers, 1979.)

## The 1960s

### Implications of the 1964 Surgeon General's Report

The first Surgeon General's Report on smoking and health in 1964 established cigarette smoking as a cause of lung cancer, at least in males. Philip Morris expressed some regret that the 1964 report did not strongly endorse the filtered products that had been sold to the public as a technological fix:

"The health value of filters is undersold in the report and is the industry's best extant answer to its problem. The Tobacco Institute obviously should foster the communication of the filter message by all effective means." (See Wakeham, 1964, p. 8.)

## Consumer Guilt and Anxiety

Brown & Williamson's advertising agency and market research contractors recognized consumers' mass sense of being addicted, as well as the ensuing conflict, guilt, anxieties, and need for reassurance:

"Most smokers see themselves as addicts ... the typical smoker feels guilty and anxious about smoking but impotent to control it." (See Oxtoby–Smith, Inc., 1967, p. 6.)

"Psychologically, most smokers feel trapped. They *are* concerned about health and addiction. Smokers care about what commercials say about them. Advertising may help to reduce anxiety and guilt... Brand user image may be critical in influencing shifts in brand loyalty." [Emphasis in original.] (See Oxtoby–Smith, Inc., 1967, p. 14.)

[People who smoke filter cigarettes] "... may be receptive to advertising which helps them escape from their inner conflicts about smoking." (See Oxtoby–Smith, Inc., 1967, p. 23.)

"While unquestionably smokers are concerned about the tar and nicotine contents and the filtration effectiveness of their brands, nevertheless, both on the surface and even to some extent unconsciously, they appear to be resisting open involvement with this 'frightening' element of smoking." (See Alex Gochfeld Associates, Inc., 1969, p. 9.)

Figure 7-4
Kent—Voice of Wisdom (1955)

Some brands were less successful than others when trying to directly address consumer conflicts. Kent®, for example, used a visual portrayal of a smoker's conscience, and risked their ad being experienced as a nagging message (see Figure 7–4).

"[T]he psychological blinders that smokers have donned, consciously or unconsciously ... advertising which stresses tar and nicotine content was received less enthusiastically ... even in the Silva Thins commercial where this theme was the major aspect of the spoken message, a large number of people effectually [sic] blocked it out of their consciousness retaining only the total image of the story shown on the screen." (See Alex Gochfeld Associates, Inc., 1969, pp. 72–73.)

### Segments of Concerned Consumers

In order to provide a "foundation upon which marketing and advertising executions can be built," Lorillard did a market segmentation analysis.

*"One of the most important revelations of the present study was the identification of four market segments in the smoker market who are distinct in terms of their desires in cigarettes and their psychological profile."*

The fundamental basis upon which the market segments were divided was their desires in the 'ideal cigarette'. After the market segments were divided in terms of their smoking needs, they were then further analyzed in terms of their demography, smoking behavior, and their personality profile. [Emphasis in original.] (See Kieling, 1964, p. 2.)

The consumer segment most appropriate for Kent® was described in substantial psychological detail. Despite the label of "social conformist," of central concern to these smokers were health consequences:

*"Segment B, the social conformists, represents the prime potential market for development of Kent's share."*

Compared with the rest of the market, Segment B is less concerned about smoking enjoyment and more concerned about the health aspect of cigarettes. He cares particularly about a cigarette's filter, its king size, and its association with health.

Type B is a self-controlled person who is willing to compromise and give up immediate physical gratification for longer range objectives; he is a thinking person who acts deliberately, and is most likely to sacrifice some of the enjoyment of smoking in the interest of health, about which he is highly concerned... These requirements appear to be compatible with Kent's current image.

The other psychological requirement of Type B is the need for social benefits through association with 'educated moderns'... 'educated moderns' include the active, modern people, college graduates, and professionals such as lawyers, doctors, etc. [Emphasis in original.] (See Kieling, 1964, pp. 3–5.)

Given that Kent® had a long established association with 'health' from more than a decade's worth of health-themed advertising, the advertising deliberately offered reassurances to targeted consumers of being seen as "educated moderns," with the health promises subtly made:

*"In the present climate of opinion after the Surgeon General's Report, it may be desirable to offer reassurance on 'association with .health' in Kent's advertising."* [Emphasis in original.] (See Kieling, 1964, p. 14.)

### The "Illusion of Filtration"

In their 1966 analysis of the market potential for a 'health' cigarette, Philip

Morris recognized that while a large proportion of smokers had health concerns, they could be assuaged by products with largely illusory filtration systems. This was helpful since Philip Morris also knew that they had to keep delivering nicotine to those already addicted, as well as to those that they hoped would become addicted. The report's conclusions include the following:

1. A large proportion of smokers are concerned about the relationship of cigarette smoking to health...

9. Mere reduction in nicotine and TPM [total particulate matter] deliveries by conventional methods of filtration would not be a sufficient basis for launching a new cigarette.

10. The illusion of filtration is as important as the fact of filtration.

11. Therefore any entry should be by a radically different method of filtration but need not be any more effective. (See Johnston, 1966, pp. 1–2.)

Within this report, Philip Morris' analyst captured the dilemma between health concerns and nicotine delivery felt by both smokers and manufacturers:

"... [A]ny health cigarette must compromise between health implications on the one hand and flavor and nicotine on the other ... flavor and nicotine are both necessary to sell a cigarette. A cigarette that does not deliver nicotine cannot satisfy the habituated smoker and cannot lead to habituation, and would therefore almost certainly fail." (See Johnston, 1966, p. 5.)

Many early brands had been sold with filters that were essentially cosmetic, without meaningful filtration. U.S. Congressional investigations in 1958 found reversals in which some firms' filtered products delivered even more tar and nicotine than their unfiltered traditional products. Reversals occurred even within brand families, with Brand X filtered versions yielding higher tar and nicotine than the unfiltered Brand X products that they ostensibly improved upon (Blatnik, 1958, pp. 45–49).

## Fear that Low–Yield Cigarettes Would Allow the Consumer to Wean from Nicotine

In 1969, R.J. Reynolds articulated concerns about reducing nicotine delivery and also maintaining a continuing profitable enterprise. The company saw nicotine as the sine qua non of smoking satisfaction and worried that reducing the delivery of nicotine to consumers might have the "self-defeating consequences" of weaning them away from smoking and letting them off the nicotine hook:

"In its search for 'safer' cigarettes, the tobacco industry has, in essentially every case, simply reduced the amount of nicotine ... perhaps weaning the smoker away from nicotine habituation and depriving him of parts of the gratification desired or expected... Thus, unless some miraculous solution to the smoking-health problem is found, the present 'safer' cigarette strategy, while prudent and fruitful for the short term, may be equivalent to long term liquidation of the cigarette industry." (See Teague, 1969, pp. 9–10.)

This concern with possible 'weaning' was still being expressed later by the British American Tobacco Co. when looking ahead to the 1980s:

"Taking a long-term view, there is a danger in the current trend of lower and lower cigarette deliveries—i.e., the smoker will be weaned away from the habit... Nicotine is an important aspect of 'satisfaction', and if the nicotine delivery is reduced below a threshold 'satisfaction' level, then surely smokers will

question more readily why they are indulging in an expensive habit." (See British American Tobacco Company, 1976, p. 2)

## The 1970s

### Early High–Filtration (Hi–Fi) Brands

"Carlton and True appeared in the mid 1960's, and Doral and Vantage followed shortly after... Lights and milds [sic] versions of full-taste brands proliferated in the early '70's, accounting for 31.6% of hi-fi business by 1975." (See Chambers, 1979.)

By 1973, it was clear to industry participants that a significant number of brands shared certain characteristics that led them to be described as a "new low-delivery segment." Precise relevance to tar and nicotine levels was elusive, in part because some brands like Kent® and Parliament® were perceived by consumers as being low in delivery due to their product and advertising histories, even though they were no longer in fact low in delivery. Listed below are some of the guidelines used by Philip Morris to define low-delivery brands for that company's internal purposes:

"2. All brands in the segment have advertising, if any, focused on low delivery. No other brand has advertising focused on low delivery."

3. Some brands in the segment have tar and nicotine numbers on their packs. No brand not in the segment has tar and nicotine numbers on its pack.

4. Some brands in the segment have unusual construction filters or dilution holes. No brand not in the segment has either of these characteristics...

6. Brands in the segment which are extensions of 'flavor' brands have names which imply low delivery: Marlboro *Light,* Kool *Mild,* Pall Mall *Extra Mild,* Lucky *Ten,* etc.

Note that Kent and Parliament do not qualify for this new low delivery segment on any of the criteria above. One can still argue, however, that in the minds of consumers Kent and Parliament are low delivery cigarettes ... consumer opinion should be the ultimate criterion for market segmentation. [Emphasis in original.] (See Tindall, 1973, p. 16.)

### Nicotine as a Product Design Feature

During the early 1970s, Philip Morris was internally expressing confidence in its ability to selectively reduce tar yield while continuing to deliver the all-important nicotine:

"... [T]he tar deliveries of the currently best selling cigarettes might be reduced somewhat, leaving nicotine as it is, without any significant overall decrease in the cigarettes' acceptability." (See Schori, 1971, p. 1.)

R.J. Reynolds was following a similar line of thought in focusing its product development on nicotine delivery:

"If nicotine is the *sine qua non* of tobacco products and tobacco products are recognized as being attractive dosage forms of nicotine, then it is logical to design our products—and where possible, our advertising—around nicotine delivery rather than 'tar' delivery or flavor." [Emphasis in original.] (See Teague, 1972b, p. 3.)

"In today's market it is reasonable to believe that, given the choice, the typical smoker will chose [sic] and use the cigarette which delivers the desired, required amount of nicotine, with satisfactory flavor, mildness and other attrib-

utes, accompanied by the *least* amount of 'tar'." [Emphasis in original.] (See Teague, 1972a, p. 4.)

By 1976, the R.J. Reynolds Market Research Department (MRD) had joined the research and development (R & D) effort with a clear statement of their intent to maximize the nicotine satisfaction while maintaining high profitability by using conventional filters and packaging:

"MRD and R & D have been working on a sophisticated consumer product testing program to help us ensure that we select the best blend alternative for our brands to optimize physiological satisfaction." (See Fitzgerald et al., 1976, p. 1.)

"Our top priority is to develop and market low 'tar' brands (12 mg. 'tar' and under) that: Maximize the physiological satisfaction per puff—the single most important need of smokers... [and] yield higher profitability which means conventional filters and soft packaging for high speed production efficiencies." (See Fitzgerald et al., 1976, p. 38.)

A few years later in 1981, British American Tobacco, the parent company of Brown & Williamson, maintained that, "... effort should *not* be spent on designing a cigarette which, through its construction, denied the smoker the opportunity to compensate or oversmoke [sic] to any significant degree." [Emphasis added.] (See Oldman, 1981, p. 2.)

## Consumer Reactions and Behavior

### Consumer Ignorance and Confusion

During the 1970s, additional evidence of consumer confusion, misinformation, rationalizations, and the corresponding role played by advertising was gathered by multiple firms. Market researchers for industry members and their advertising agencies were not even confident that consumers knew what they were talking about when referring to the 'taste' of a cigarette:

"... [I]t is almost impossible to know if the taste smokers talk about is something which they, themselves attribute to a cigarette or just a 'play-back' of some advertising messages." (See Marketing and Research Counselors, Inc., 1975, p. 2.)

Apparently, even the so-called 'taste' of a product is greatly influenced by the brand and its reputation. Merit®, as a free-standing brand, had difficulties in being perceived as flavorful, whereas in contrast, product line extensions like Marlboro Light® had the advantage of being perceived as more flavorful due to the taste reputation of the 'parent' brand:

"... [W]e talked to consumers about Merit's image and advertising. They told us that Merit, like other free standing low tar brands such as Kent, Vantage, Carlton, etc., were perceived to be weaker and have less taste than the line extension low tars: like Marlboro Lights, Winston Lights, Camel Lights. Apparently, these line extension low tars share the taste heritage of their parent full flavor brands." (See Philip Morris, 1990, pp. 13–14.)

In 1974, Kenyon & Eckhardt Advertising studied "recently starting smokers" for Brown & Williamson:

"The purpose of this research was to gain insight into the perceptions, attitudes and behavior of younger, recently starting smokers regarding initial product usage, current smoking and health concerns. In addition, an effort was made to determine reactions to alternative product positionings [sic]." (See Kenyon & Eckhardt, 1974, p. 1).

"Health concerns exist among younger smokers... One type of smoker rationalized smoking as a pleasure that outweighed the risks. Another felt that they didn't smoke enough to be danger-

ous. A third type rationalized his use of cigarettes by feeling he would quit before it was 'too late'. A final smoker group said that science would come to his rescue." (See Kenyon & Eckhardt, 1974, p. 2).

"In talking to these young smokers about the different brands of cigarettes they have smoked, we found that they have little knowledge and, in fact, a great deal of misinformation on brand yields. In all of the sessions, not a single respondent know [sic] the tar and nicotine level of the cigarette he or she smoked." (See Kenyon & Eckhardt, 1974, p. 7).

Lorillard and their ad agency had the same experience when studying consumers for Kent®. Lorillard, along with Foote, Cone & Belding, encouraged scores of targeted smokers to talk about their lives, their cigarettes, their perceptions, and their feelings about tar content for Kent Golden Light®. They, like Brown & Williamson, found that "practically no one knew" the tar content of their own regularly smoked brands. This implied to these firms the need for ads showing comparative packages and data (O'Toole, 1981, pp. 94–95).

Philip Morris also knew about smokers' ignorance of yield levels in the 1970s. Most consumers were not only ignorant of the facts, but even their general impressions were "not too accurate," despite their faith in the technology of filters as displayed by shifts to filters and hi-fi products:

"As yet, there is low awareness among smokers of the tar content of their brand. When asked if they knew the specific milligram tar content of their brand, the vast majority (89%) said they didn't know... smokers' impressions of whether their brand has high, moderate or low tar content is more on the mark—although still not too accurate." [Emphasis in original.] (See The Roper Organization, Inc., 1976, p. 14.)

*Filters Are Still Perceived as Feminine*

As in the 1950s and 1960s, females and older, health-concerned smokers most readily adopted the new, seemingly low-yield products of the 1970s:

"The modern low 'tar' market began in the 1960's with such brands as True, Carlton, and Doral ... initial gains were from females and older smokers." (See Brown & Williamson, circa 1977, p. 4.) "The hi-fi smoker demographics tend to be female, older, and have switched from a full flavor style to its counterpart in the hi-fi segment." (See Brown & Williamson, circa 1977, p. 13.)

This was so much the case that the males who smoked these products were suspected of being 'weak' and somehow wimpish or unmasculine in the eyes of consumers who were studied for Brown & Williamson:

"Only women and weak men smoke True or any of those low tar and nicotine cigarettes." (See Marketing and Research Counselors, Inc., 1975, p. 9.)

In 1974, advertising agency advisors to Lorillard tried to counter this problem with a style of advertising for the True® brand that they felt was more masculine in its tonality (see Figure 7–5).

"In order to obtain a greater share of males... logical, rational approaches... a 'reasoning' empathetic approach... masculine, 'macho' tonality and appeal. Vantage's tonality can be described as 'laying it on the line' in an aggressive, possibly masculine, open fashion." (See DeGarmo, Inc., 1974.)

This problem of low-yield products being perceived as highly feminine seems to have led R.J. Reynolds to design a marketing

strategy that attracted males to a low-yield cigarette that they were developing in 1976:

> "What we want is to portray the feeling and image projected by Marlboro and Kool advertising on a Vantage/Merit type of cigarette. In other words, put 'balls' (two of them) on a low 'tar' and nicotine cigarette and position." [Parenthetical clarification of the male genitalia meaning of "balls" as in original.] (See Hind et al., 1976, p. 63.)

Figure 7-5
Vantage "Don't Cop Out"—Macho Tonality (1971)

While young male consumers understood that filters seemingly offered improved health prospects, this was in conflict with their desires to appear bold and daring:

> "In discussing how a smoker can limit the risks of serious disease without actually giving up smoking, the respondents clearly recognized the role of high filtration cigarettes... the underlying mechanism working against acceptance of high filtration brands in this age group is that the image of these cigarettes is contrary to one of the initial motivations for smoking—to look manly and strong."

(See Kenyon & Eckhardt Advertising, 1974, p. 10.)

*Continuing Consumer Conflicts*

Consumers' conflicted feelings about smoking cigarettes were such that they became poor respondents to Brown & Williamson's research efforts:

> "... [S]mokers themselves falter badly when asked to comment on the rewards accruing to them from smoking... Smokers are so overwhelmed by the addictive properties of cigarettes and the potential health hazard that they wax virtually inarticulate when asked to

present a case for the other side. They become guilty and shame-faced." (See Kalhok and Short, 1976, p. 8.)

Smokers were not even aware and/or willing to admit how much they smoked: "Smokers' own estimates of their daily consumption levels are extremely unreliable. Many smokers underestimate their actual consumption and certain segments of many populations, notably young people and women, are often reluctant to admit they smoke." (See British American Tobacco Co., 1979, p. 1.)

Brown & Williamson blamed consumer confusion on advertising, in part. When contemplating a possible "index of safety" for cigarettes, Brown & Williamson commented that:

"Such an index would have merit for the health-conscious smoker, who otherwise may well become confused and increasingly dismayed if one alleged hazard follows another, coupled with the manufacturers' 'prescription for health' through advertising." (See Kalhok and Short, 1976, p. 11.)

Additional market research conducted for Brown & Williamson and its advertising agency, Ted Bates, indicated that ads needed to be carefully designed, lest they challenge consumer denials and rationalizations and trigger consumer defensiveness:

"... [S]mokers have to face the fact that they are illogical, irrational and stupid ... *while an ad that depicts an exciting, invigorating situation could be interesting to the smoke-viewer, the very thin line separating positive excitement from negative-creating situation should never be crossed.*" [Emphasis in original.] (See Marketing and Research Counselors, Inc., 1975, pp. 1–2.)

"... [C]ommunication with the smoker that either directly or indirectly violates and belittles this rationalized need will meet smoker's objection—it destroys the rationalization and the smoker would feel naked and rather stupid." (See Marketing and Research Counselors, Inc., 1975, p. 5.)

One of the problems that advertising could address was the declining social esteem of smokers, helping them to avoid shame and guilt:

"Over the period of 20 years, the public and the private image of the smoker (though exceptions may be found among teenagers starting to smoke) has changed from being one of an individual exulting in his positive strength, masculinity and acceptance in the community, to that of a weak and dependent slave, with prospects of illness, however distant these may be, unnerved by his children's forebodings [sic], and without strength to quit." (See Kalhok and Short, 1976, p. 14.)

In discussing the "elements of good cigarette advertising or how to reduce objections to a cigarette," this point was reiterated while stating that "there are not any real, absolute, positive qualities and attributes in a cigarette," as noted in the following:

"Most advertising for other products presents real, or at least accepted, benefits, values, attributes, end-results, etc., of the product it 'pushes,' sells. Cigarette advertising can not do the same. There are not any real, absolute, positive qualities and attributes in a cigarette and no one, even the most devout smokers, could believe any glorification or lies about it... The more a cigarette ad is disbelieved, the more it 'fights' the defense mechanism of the smoker—the more the smoker feels challenged...

The picture, situation presented and the copy should be ambiguous enough to allow the reader to fill-in his/her illogical-logic which are the results of each individual defense-mechanism." (See Marketing and Research Counselors, Inc., 1975, pp. 12–13.)

### Image of Health

It was important to the industry that certain cigarette brands continued to appear to be 'healthy', even if this was an image or illusion, and even if the manufacturing technology did not yet allow for the control of smoke toxicity:

"Looking further down the road, the possibility exists that ... filters might offer a selective means of controlling smoke toxicity. Well before that date, however, **opportunities exist for filter and cigarette designs which offer *the image* of 'health re-assurance'.**" [Emphases added.] (See British American Tobacco Co., 1976, p. 6.)

### New Product Activity

Philip Morris had seen the competitive value of a so-called "health cigarette" following the first Surgeon General's Report on cigarettes in 1964. Over the course of the next 12 years, Philip Morris worked on such a product, culminating in the 1976 product launch of the Merit® brand. Just as with Philip Morris' earlier efforts in the 1950s to develop and consumer-test the Marlboro® product, packaging, and promotion, the product development process for Merit® was as much focused on consumer and market testing as on product technologies, per se. The final market launch strategies used in 1976 gave particular emphasis to the choice of the name Merit®, obviously communicating apparent virtue, and used an advertising style that made this product development seem eminently scientific and newsworthy and less like an ad (see Figure 7–6). The product launch strategy included a very high level of advertising investment ($45 million in 1976) to support a "multi-media blitz."

Figure 7-6
**Merit Science Works—"Enriched Flavor" (1979)**

"The objective of the advertising campaign was to establish enough credibility to overcome smoker skepticism towards low-tar good taste claims. The name 'MERIT' was chosen because it was short, to the point, and it reflected the consumer appeal of good taste at low tar." (See John and Wakeham, 1977, p. 13.)

"Merit was the primary focus of the sales force for a full year... We spent $45 million on advertising—remember $45 million in 1976! This was a record amount for a new brand introduction... Creatively, we used provocative headlines and important looking copy which looked like it had real news value. *Tar/taste theory exploded!—Smoke cracked!—Taste barrier broken!*" [Emphasis in original.] (See Philip Morris, 1990, p. 4.)

This Merit® launch effort, and its stunning success, led to a rash of similar competitive efforts:

"Merit's introduction gave birth to a series of me-too's... 'Fact' was introduced in 1976... RJR tried to counter Merit's technological enriched flavor story with their all natural 'Real' launched in mid 1976... 'Decade', which was launched on the platform of 'the cigarette that took 10 years to create' ... Later, Barclay was introduced." (See Philip Morris, 1990, p. 5.)

Figure 7-7
Introducing Fact—Low Gas (Before—1976)

*Marketing of Reduced Gas Phase Cigarettes*

Brown & Williamson's introduction of the Fact® brand was described by a company spokesman as "a typical new product introduction as compared to Philip Morris' sudden national blitz for Merit... Fact is directed to the educated, concerned smoker. Our copy is straightforward and direct, and there is no gender differentiation or symbolism." (See Brand Report 12, 1976, p. 146.) Fact® was using the "Purite" filter to filter gases, but needed to first inform consumers that gases were an issue. Their initial effort (see Figure 7-7) was test-marketed in New England and the North Central States, but did not perform well in the marketplace, despite advertising support of about $30 million over 1976–1977. The senior brand manager of Brown & Williamson explained:

"The low gas benefit of the product wasn't of interest to the public, and wasn't understood. The advertising and packaging failed to reinforce the flavor aspect of the brand... The package was perceived by customers as medicinal, like a prescription bottle of Geritol. The tar level wasn't low enough by mid–1976 to allow it to be a talking point in advertising." (See Brand Report 23, 1977, p. 152.)

Brown & Williamson's reconsideration of its Purite gas filter showed a recognition that in having to educate consumers about gas in smoke, they might raise more anxiety than they could resolve with this type of product:

"While low gas does offer the opportunity to make positive health statements to active and passive smokers alike, it does run the category risk of raising another health issue and perceptively offering

lower taste/satisfaction... past experiences with Lark and FACT (i.e., good taste and greater health reassurance via a new method) demonstrate the inability to immediately proceed with either of these options." (Brown & Williamson, circa 1977, p. 1.)

*Marketing Cigarettes Without Additives*

R.J. Reynolds' 1976 assessment for their 3–year action plan acknowledged that they were not yet technologically capable of producing products that had reduced tar without the undesirable effect of also having reduced nicotine:

"In general, methods used to reduce 'tar' delivery in cigarettes lead to a proportionate reduction in nicotine... It would be more desirable from our standpoint, i.e., providing satisfaction to the smoker and maintaining his allegiance to smoking if we could reduce 'tar' to whatever target we choose without a proportionate drop in nicotine... It will take some time to get there by the approaches we visualize." (See Fitzgerald et al., 1976, p. 91.)

Nonetheless, R.J. Reynolds wanted to participate in the rapidly expanding category of concerned consumers, referred to as "worriers" by the company:

"[The]... 'worrier' segment of the market (17% of smokers are so classified)... 'Numbers' products have a growing appeal to these smokers. Products in the 1–6 mg. 'tar' range will continue to build successful long-term franchises (e.g., Carlton's growth rate, NOW's immediate acceptance—fostered by the intense industry commitment in 1976 to hi-fi brands)." (See Fitzgerald et al., 1976.)

R.J. Reynolds' product offering was the Real® brand, with a "natural—no additives" claim (see Figure 7–8). This 'natural' position was thought to convey positive features to both full-flavor smokers and those seeking effective filtration and health protection. The Real® concept was described as having, "Broad appeal based primarily on 'natural'/no additives claim. Connotes taste to full flavor smokers, low numbers to hi-fi smokers. No significant negatives." (See Fitzgerald et al., 1976.)

Figure 7-8
Real Natural (1977)

Only Real
the natural cigarette
can taste so rich
yet be low tar.

Follow your taste to Real.

When the Real® brand was launched by R.J. Reynolds in 1977, it had a budget of $40 million for "boxcar loads of display materials, more than 25 million sample packages, the biggest billboard overlooking Times Square, the summer long services of 2,000 salesmen... and advertising, according to the agency running the campaign, on everything but painted rocks." (See Crittenden, 1977, p. 1ff.)

That same year, Brown & Williamson was scheduled to spend $50 million through the Ted Bates advertising agency on just the product-line extension of Kool Super Light®. The Kool Super Light® campaign was to appear "in every conceivable non-broadcast medium, and even an inconceivable one"—1,500 Beetleboards, i.e., painted up Volkswagen Beetle® cars (Dougherty, 1977).

## Promotional Patterns

### Disproportionate Advertising Budgets

The enormous advertising budgets used to launch the new low-yield products com-manded a very disproportionate share of the firms' total advertising budgets (share of voice, or SOV), and were seen as creating marketplace demand for low-yield products. The advertising spending for new products in 1976–1978 was awesome. New brands and product-line extensions (variations on familiar brands) were introduced with major budgets as follows (Source: Lorillard, Inc., 1980):

| Product | Budget | Year |
|---|---|---|
| Merit® | $44 million | (1976) |
| Now® | $23 million | (1976) |
| Fact® | $20 million | (1976) |
| Real® | $29 million | (1977) |
| Decade® | $24 million | (1977) |
| Camel Light® | $25.3 million | (1978) |
| Carlton® | $15.3 million | (1976) |
| Vantage® | $20.6 million | (1976–1977) |
| Kent Golden Light® | $21.0 million | (1976–1978) |
| Marlboro Light® | $20.1 million | (1976–1978) |

"The phenomenal growth of hi-fi brands is, in part, a self-fulfilling prophecy. Hi-fi expenditures have grown from 7% SOV in 1972 to 45% in 1977, much faster than actual segment growth. Spending

per share point now equals $8.3MM." (See Brown & Williamson, circa 1977, p. 14.)

"[The]... low tar revolution [of 1976ff] is not ignited by a particular event, such as a Reader's Digest article, a Surgeon General's Report, etc.; it happens quietly based on technologically improved products and consumers' desire for a reasonable compromise and the industry's massive advertising support leading category development." (See Cunningham and Walsh, 1980, p. 55.)

"Lo Fi advertising now (Feb 1980) accounts for only 21% of total—less than a third of 1974's share of voice. Reduced tar brands have increased to 79% share of voice—with ULT's (Ultra Low Tar's) now accounting for 19% of the total. ULT advertising is growing at a faster rate than any other category." (See Lorillard, Inc., 1980.)

*Executional Aspects*

The advertising executions that communicated the "lightness" theme were 'light' in many dimensions:

> " 'Light-lighter-lightest' were achieved by insistance [sic] on lighter presentations—product story imagery—white packs—pale colours—mildness dominated copy." (See British American Tobacco Company, circa 1985, p. 13.)

This tactic of using color and imagery to connote product 'lightness' had been used earlier with the introduction of Marlboro Light® in 1971 (see Figure 7–9).

> "... [W]hen Marlboro Lights was first introduced in 1971... the advertising was dramatically different... first using water color executions, then, big pack shots, a lot of white space and a small cowboy visual." (See Philip Morris, 1990, p. 6.)

**Figure 7-9**
**Marlboro Lights (1972)**

This means of communicating 'lightness' with white or pale-colored props, settings, and pristine environments wasn't new with Marlboro Light® , and has proven to be a durable execution tactic. For example, Kent® in the early 1960s showed models all dressed in white, with both white props and in a pure white, interior studio environment (see Figure 7–10).

Through most of the 1990s, the Parliament® campaign consistently used models dressed all in white placed in white environments as well as in outside pristine environments (see Figure 7–11).

Artwork for Marlboro Ultra Light® has featured a pristine environment dominated by fresh air and water, with only minimally sized cowboys or horses (see Figure 7–12).

**Figure 7-10**
**Kent—Black Smokers in Pure White**
**Environment (1964)**

Even the packaging design is important in affecting perceptions of relative safety, as well as taste:

> "Red packs connote strong flavor, green packs connote coolness or menthol and white packs suggest that a cigaret [sic] is low-tar. White means sanitary and safe. And if you put a low-tar cigaret [sic] in a red package, people say it tastes stronger than the same cigaret [sic] packaged in white." (See Koten, 1980, p. 22)

Because of its importance, Brown & Williamson tested 33 packages before choosing the blue, gold, and red design used for its Viceroy Rich Light® brand. Philip Morris heightened the social status appeal of its Benson & Hedges® brand by printing the company's Park Avenue address on the front and back of each pack. R.J. Reynolds gave Now® a "modern, chrome-and-glass look designed to appeal to upscale city and suburban dwellers." Philip Morris' successful Merit® connotes a

"flamboyant, young-in-spirit image" (to off-set low tar's dull image) with big yellow, brown, and orange racing stripes (Koten, 1980). Most "Light" and "Ultra Light" cigarettes are presented in pure white packaging with minimal adornments.

To supplement and reinforce their advertising efforts, Brown & Williamson conceived of public relations and political activities that encouraged consumers to perceive apparently independent endorsements of low-yield products. This would reinforce advertising impressions about the virtues of low-tar products with seemingly independent "news" from credible sources.

Figure 7-11
Parliament Lights White on White in
Pristine Environment (1998)

"B & W will undertake activities designed to generate statements by public health opinion leaders which will indicate tolerance for smoking and improve the consumer's perception of ultra low 'tar' cigarettes (5 mg. or less)... Through political and scientific friends, B & W will attempt to elicit... statements sympathetic to the concept that generally less health risk is associated with ultra low delivery cigarette consumption... B & W would seek to generate spontaneous mainstream media articles dealing with component deliveries, much as the old Readers Digest [sic] articles." (What are the obstacles/enemies of a swing to low "tar" and what action should we take? Minnesota Trial Exhibit 26,185, 1982.)

**Capturing Consumer Concerns**

The continuation of intensive promotion into 1977 involved "a numbers game that boggles the mind while promising to relieve the lungs" (Brand Report 23, 1977, p.

150). Competition was intense, due in part to the high stakes and the relatively few number of switchers. Said Lorillard's Tom Mau several years later:

> "The vast majority of the cigarette consumers are brand loyal... Only somewhere around 10% of people switch brands annually. That's not a lot of people... To come out with something new and successful is difficult." (See Gardener, 1984, p. 176.)

It was clear to industry observers that the pace of new product launches in the mid–1970s was seeking to capitalize on the health concerns of smokers:

> "The current duel between True and Vantage and between Carlton and Now are other examples of competitive efforts to capitalize on the smoking/health controversy." (See Pepples, 1976, p. 9.)

Figure 7-12
Marlboro Ultra Light Pristine Environment (1998)

When the motivations for smoking ultra-low-tar cigarettes were studied by Philip Morris' contractors in 1978, representatives of the Brand Management Group, Marketing Research Department, and the advertising agency all observed the discussion groups from behind a two-way viewing mirror and tape recordings were made available. The discussions were guided by a detailed outline with extensive probing. The findings were that all of the reasons for selecting this product form were health-related:

> "... [W]ith respect to ultra low tar brands there appear to be particular additional motivations for smoking this type of cigarette." These include:

A—Voluntary desire for a safer cigarette.

B Increasing awareness and concern about possible hazards of smoking.

C Health problem forcing a change to a safer cigarette (as an alternative to not being able to quit).

D Peer and family pressure to smoke a safer cigarette (as an alternative to not being able to stop smoking).

E Mental commitment to do something about smoking habits. (See Goldstein/Krall Marketing Resources, Inc., 1979.)

Many consumers considered, tried, and even switched to the nominally lower yield

products, and did so primarily in pursuit of better health:

"More people have switched brands in the past year, and the largest group of switchers have gone to low tars. Even among those who have not switched to a low tar brand, there is fairly high disposition among smokers to consider switching to one. This is probably attributable to the continuing concern over smoking and health." (See The Roper Organization, Inc., 1976, p. 3.)

"Results show that almost two-thirds of smokers are 'impressed' by the talk of how cigarettes can seriously affect their health... Women are more concerned about smoking and health than men, young people more than older people, whites more than blacks, and the college educated more than those less well educated." [The growth among low tar brands was] "... particularly strong among two groups who have traditionally been trend setters in the cigarette market—women and the college educated." (See The Roper Organization, Inc., 1976, pp. 8, 12.)

When asked if and why some brands were thought to be better for health, smokers had believed the idea that the nominally low yields were meaningful:

"The low tar brands have cornered opinion that to the extent any brands are better for your health, they are. All smokers were asked whether they thought any particular brands were better for your health than others, and if so, which brands. Three in ten of all smokers said some brands were better for health than others, and almost half of the low tar brand smokers said this. The brands named were almost exclusively low tar brands, with the older low tar brands (Vantage, True and Carlton) getting most mentions. Considering the short length of time they have been on the market, both Merit and Now had comparatively good mention." (See The Roper Organization, Inc., 1976, p. 19.)

"... [I]t is the lower tar content of these brands that make people say they are better for health. When asked why the brands they named were better for your health, answers overwhelmingly were concerned with lower tar content." (See The Roper Organization, Inc., 1976, p. 20.)

The reassurance of apparent low yields led many smokers to switch rather than quit:

"Smokers *needed* light brands for tangible, practical, understandable reasons... It is useful to consider lights more as a third alternative to quitting and cutting down—a branded hybrid of smokers' unsuccessful attempts to modify their habit on their own." [Emphasis in original.] (See British American Tobacco Co., circa 1985, pp. 9, 13.)

[Many said] "... they had tried to quit smoking at some point in time, they do not appear to have cut down the number of cigarettes they are smoking. The only concession that has been made is the switch to an ultra low tar brand. These smokers seemed to be either resigned to the fact or satisfied that they will probably never quit smoking. In point of fact, smoking an ultra low tar cigarette seems to relieve some of the guilt of smoking and provide an excuse not to quit." (See Goldstein/Krall Marketing Resources, Inc., 1979, p. 12.)

The True® campaign in the 1970s spoke directly to the desire to quit, portraying quitting and smoking True® as equivalent alternatives (see Figure 7–13).

An important strategic reason for adding low-yield products to a product line, also known as a brand family, was to retain the patronage of consumers as they

aged and became more concerned about their health:

> [Developing] "... new products in the higher end of the reduced tar category... is especially important for Lorillard's long term growth. Younger smokers (less than 35) are smoking products in the higher end of the reduced tar segment and lo-fi. These consumers will move down the tar spectrum, as they get older, with the probability of staying with the line extensions of products consumed in their youth." (See Mau, 1981, p. 7.)

**Figure 7-13**
**Quit or Smoke True as Equivalent Options (1976)**

## Lessons Learned About Advertising

Tobacco manufacturers saw advertising, and marketing efforts more generally, as vital to how consumers perceived the products and themselves; these efforts ultimately determined how well various firms succeeded. Lorillard listed marketing's psychological import right alongside of the product's capacity to deliver the physiological stimulation of nicotine.

> "... [L]et me try to define the elements of product acceptance (given sales distribution and trial) as they relate to tobacco products... The value or price of the product is a factor... The second element in acceptance is psychological. One principle component of this element arises from our marketing effort... The third element in acceptance is physiological, being comprised largely of the nicotine-induced stimulation." (See Spears, 1973, pp. 2–3.)

With experience, members of the industry realized that the best advertising gave filter smokers ego reinforcement, and didn't focus solely on nominal filter effec-

tiveness. This might be appropriate when introducing new product concepts (e.g., filters), but once the concept was understood, it was better to avoid any direct addressing of health aspects.

*"1964–1972—The beginning of the high filtration derby*... In this type of environment, good new product copy directly addressed the health arguments by focusing on lowered tar and nicotine while also claiming to retain real tobacco taste." [Emphasis in original.] (See Latimer, 1976, p. 4.)

"Less effective copy during this period continued to focus on the filtration process (e.g., selectrate filter, charcoal filters, accu-ray, etc.) or vacillated between emphasis on taste and emphasis on filter." (See Latimer, 1976, p. 3.)

Brown & Williamson articulated the dual objectives of good advertising—providing reassurance about healthfulness (without, of course, doing so in a heavy-handed way to induce defensiveness) and also providing a socially attractive brand image that the smoker could acquire when buying and displaying the package:

"... [T]he average smoker often seeks self-justification for smoking." Good cigarette advertising in the past has given the average smoker a means of justification on the two dimensions typically used in anti-smoking arguments: 1. *High performance risk dimension....* 2. *Ego/status risk dimension.*

*Cigarette advertising... provides only justification/rationalization for those who already smoke...* The smoker's cigarette brand choice process is largely an exercise in risk reduction. For some smokers reduction in physical performance risk is paramount, for others reduction in 'ego/status' risk comes first... All good cigarette advertising has either directly addressed the anti-

smoking arguments prevalent at the time or has created a strong, attractive image into which the besieged smoker could withdraw. [Emphasis in original.] (See Latimer, 1976, pp. 1–2.)

The international headquarters of Brown & Williamson's parent firm, the British American Tobacco Co., counseled that new marketing approaches should:

"... [C]reate brands and products which reassure consumers, by answering to their needs. Overall marketing policy will be such that we maintain faith and confidence in the smoking habit." (See Short, 1977, p. 1.)

The advertising campaigns and related communications were central to how this was to be done:

"All work in this area [communications] should be directed towards providing consumer reassurance about cigarettes and the smoking habit... by claimed low deliveries, by the perception of low deliveries and by the perception of 'mildness'. Furthermore, advertising for low delivery or traditional brands should be constructed in ways so as not to provoke anxiety about health, but to alleviate it, and enable the smoker to feel assured about the habit and confident in maintaining it over time." [Emphasis in original.] (See Short, 1977, p. 3.)

This attempt to reassure, but not so bluntly as to raise defensiveness, and to simultaneously offer positive, ego-satisfying, brand imagery, seems to have been a key to the success of some of the pioneering filter products. Even the firms being dominated by the more successful marketing efforts of other firms recognized this. In 1969, American Tobacco noted that:

"... [T]hose ads which make a special point of stressing low tar and nicotine appear to enjoy less attention and seem to have less positive impact than those whose advertising has an enjoyment,

fun, or 'story' orientation." (See Alex Gochfeld Associates, Inc., 1969, p. 18.)

Figure 7-14
Carlton Box "Phantom Brand" (1985)

Latest U.S.Gov't Laboratory test confirms, of all cigarettes:

**Carlton is lowest.**

## The 1980s

### Policing Deceptive Advertising

*Carlton ®*

Some very deceptive practices went totally unchecked. Carlton® had the technology for delivering very low machine-measured tar yields, and used these low-yield test results in its advertising. A very desirable brand image was created while promoting Carlton® in a hard box, emphasizing its very low numbers (see Figure 7–14). Unfortunately, the boxed product seems to have been a "phantom brand" and consumers who bought Carlton® in the store got soft packs. Although consumers might well have expected that they were getting the same product in a different box, it was in fact a very different product—one that at times was delivering many, many more times the tar and nicotine than indicated in the ads.

"FTC's present system further contributes to consumer deception because it allows some cigarette companies to promote heavily a 'box' brand, without adequately distinguishing it from the soft pack of the same brand name, which delivers considerably more 'tar'. In fact, however, the companies produce such a small volume of the box brand as to make it a phantom brand that is rarely found in the marketplace. On the other hand, the soft-pack version bearing the identical brand name and package design but testing at a considerably higher 'tar' level, is the version readily available to the consumer." [Emphasis in original.] (See Pepples, 1982, p. 4.)

Now®, like Carlton®, also featured its very low-yield hard box product in the advertising, while its other product forms delivered many, many more times higher yield rates (see Figure 7–15).

Figure 7-15
Now Box with Substantially Lower Yield
Than Soft Pack (1980)

The only effective policing of deceptive advertising of low-tar products came from competitors, rather than the FTC or any other agency. In one case, Lorillard used their data from a taste comparison test to imply a consumer preference for its Triumph® brand over Merit® (see Figure 7-16) and other brands. Both Philip Morris and R.J. Reynolds objected, and had data of their own to support their claims. In the court proceedings, it was learned that the Lorillard survey showed 36 percent favored Triumph® over Merit®, 24 percent rated them even, and 40 percent favored Merit®; these preferences were obtained after subjects had been informed of the products' tar levels. Although nearly a quarter of the subjects had no preference, the enjoined statement took advantage of this and stated, "An amazing 60% said 3 mg Triumph tastes as good or better than 8 mg Merit." (See Philip Morris, Inc., v. Loew's Theatres, Inc., 1980, p. 1.)

*Barclay* ®

With the FTC yield data providing an apparent accreditation, consumers were likely to perceive these yield numbers as valid and meaningful. When Brown & Williamson brought the Barclay® product to market in 1981, it did so with an ad campaign that called the product 99 percent tar free (see Figure 7-17). The product's structure, which was described as "extremely easy to design and produce," allowed for so much dilution of the smoke column when tested on machines that it generated phenomenally low-yield data in the FTC test. This caused alarm among Brown & Williamson's competitors, who petitioned the FTC for help. Because of the competitive threat posed by Barclay®, its competitors disclosed to authorities their awareness that the FTC testing procedure was flawed and that the yield data were invalid for human smokers.

Figure 7-16
Triumph Beats Merit with Deceptive
Data (1980)

"The next generation of 'Barclay competitors' will be spawned (indeed has already been spawned) in the minds of R & D and marketing people throughout the industry and its suppliers. This generation of products, or the next, could easily be products which will deliver NO 'tar' or nicotine when smoked by the FTC method, and yet when smoked by humans essentially be unfiltered cigarettes. Such products could (and would) be advertized [sic] as 'tar-free', 'zero milligrams FTC tar', or the 'ultimate low-tar cigarette', while actually delivering 20–, 30–, 40–mg or more 'tar' when used by a human smoker! They will be extremely easy to design and produce . . . .

Such cigarettes, while deceptive in the extreme, would be very difficult for the consumer to resist, since they would provide everything that we presently believe makes for desirable products: taste, 'punch', ease of draw and 'low FTC tar'." [Emphasis in original.] (See Reynolds et al., 1982, p. 1.)

[As to the threat Barclay represented:] "Here was a 1 mg. tar product that delivered the taste of a much stronger cigarette. Of course we know how they did it, but to consumers the 99% tar free claim was intriguing . . . Merit responded by supporting Merit Ultra Lights with an $80 million media budget." (See Philip Morris, 1990, p. 8.)

Figure 7-17
Barclay—99% Tar Free (1981)

99% tar free. BARCLAY
The pleasure is back.

## Important Imagery

Once the product concept of low-yield filtration had been communicated, and the previously discussed brands had established some corresponding reputation, their advertising strategies tended toward more visual, image-oriented forms, as these could convey enviable lifestyles, healthy behavior, rewarded risk-taking, and the social class and 'intelligence' of brand users.

When Merit Ultra Light® was introduced in 1983, the advertising program had an $80 million media budget, which did not account for retail promotional efforts. This advertising series featured imagery of large sailing ships in what was termed the "sea" campaign (see Figure 7–18). The executions not only showed young people in an enviable, carefree, affluent lifestyle amidst a pristine environment, they also were careful to avoid any suggestions of danger.

### Vantage®—An Intelligent Choice

Images and ad copy had to be carefully selected, lest the ads reinforce fears rather than offer reassurance. In 1980, one Vantage® ad made direct reference to "what you may not want" from a cigarette, only to discover that it alarmed some readers about cancer:

"The fact that a Vantage ad dares to raise the issue of 'what you may not want' generates defensiveness toward smoking in general, and a feeling of discomfort. The reference to the taste of Vantage is lost; overpowered by the implications of tar, nicotine and cancer." (See R.J. Reynolds–MacDonald, 1980.)

Figure 7-18
Merit Ultra Light "Sea" Campaign (1986)

The target Vantage® smoker was "female, white collar, extremely concerned about their health, and would like to quit smoking." A Vantage® ad headlined "To Smoke or Not to Smoke" (see Figure 7–19) ran in both the United States and Canada. It stated that, "Vantage is the cigarette for people who may have second thoughts about smoking and are looking for a way to do something about it." According to an R.J. Reynolds operational plan (1983) and strategic plan (1983–1987), the basic strategy was to present Vantage® as an intelligent choice, "positioning Vantage as the only contemporary choice for intelligent smokers." (See Pollay, 2000.) The tactic was to influence consumer perceptions. A 1983 R.J. Reynolds media plan sought "to establish a consumer perception that Vantage is a contemporary cigarette for intelligent smokers." (See Pollay, 2000.) Apparently, this aim was accomplished because, in 1987, an R.J. Reynolds media plan briefing document stated that the goal for a target audience with a "high amount of quitters" was "to maintain consumer perception that Vantage is a contemporary cigarette for intelligent smokers." (See Pollay, 2000.)

Figure 7-19
Vantage "To Smoke or Not To Smoke"
(1974)

### Psychoanalyzing Merit® and Vantage® Smokers

No doubt envious of the success of Merit® among "concerned smokers," as well as that of Marlboro® among starters, R.J. Reynolds commissioned in-depth psychological research from Social Research, Inc., in 1982. The purpose of the survey was to compare the smokers of Vantage® and Merit® based on their smoking histories, their beliefs about the filter and other responses to advertising, and their personalities. In-depth interviews elicited insights into some of the psychological subtleties of respondents from Atlanta, Indianapolis, Denver, Phoenix, and San Francisco. R.J. Reynolds gleaned some useful information from the research:

"Both Vantage and Merit smokers have similar early smoking histories... moving from non-filters to filters, switching to lighter cigarettes to relieve physical symptoms and as an acknowledgement of increased concerns about alleged health hazards." [Emphasis in original.] (See Levy and Robles, 1982, p. 5.)

"Vantage smokers believe that the filter itself is strong enough to catch these impurities and that the hole structure is such that they will not see so much of the resulting discoloration. These ideas make them think the end product is a milder and more 'healthful' smoke." (See Levy and Robles, 1982, p. 16.)

"Merit smokers... have been influenced by Merit advertising which so single-mindedly proclaims the brand's lowered tar and nicotine... Vantage smokers... the advertising influenced them by promising real smoking satisfaction from a cigarette, by not focusing so much on the low tar aspect." (See Levy and Robles, 1982, p. 89.)

1346

Figure 7-20
Parliament—Endorsement of United
States Testing Co. (1958)

THE FIRST FILTER CIGARETTE
IN THE WORLD THAT MEETS
THE STANDARDS OF
UNITED STATES TESTING CO.

NEW HI-FI FILTER
PARLIAMENT

NOW - POPULAR PRICE

## Discussion

### The Value of Official Government Ratings

Some members of the industry have long found the appearance of Federal Government vetting to be a desirable factor usable in advertising. For example, the 1958 advertising for Parliament® boasted that it was "the first filter cigarette in the world that meets the standards of the United States Testing Co." (see Figure 7–20). The ad showed the organization's official seal, which included a microscope, and although the ad was generated by a private firm, the seal was readily perceived as acceptance by a Government agency.

Note, too, the Carlton® use of a headline stating that the "Latest U.S. Gov't [sic] Laboratory test confirms... Carlton is lowest" in 1985, as seen earlier in Figure 7–14.

The Federal Government's adoption of a "uniform and reliable testing procedure" consistent with the methodology of Philip

Morris also seemed beneficial to that corporation. Philip Morris foresaw in 1964 that such test results could be used in advertising copy, as they could communicate that an official Government agency had vetted the products, as well as the possibility that data with a competitive advantage angle could be provided:

"Apart from possible legal requirements, such a policy would enhance advertising opportunities." (See Wakeham, 1964, p. 6.)

Later, Brown & Williamson saw the benefit to them, even if not to the public, in using Government evaluations and rating procedures. While the industry preferred to go unregulated, regulation offered some benefits, namely prospects for greater stability and the appearance of Government approval of their products by official testing procedures.

"The tobacco industry, of course, would prefer no regulation at all. If there must be regulation, the industry is probably better off to have it at the federal

level... Even expanded regulatory efforts may be shared by the industry to [illegible word] stability in the market or by individual manufacturers to bolster market positions—for example, by capitalizing on official tar and nicotine ratings in cigarette advertising." (See Pepples, 1976, p. 8.)

The promotional value of the FTC data meant that the industry recognized protecting the credibility of the FTC procedure was in its own interests:

"Inherent limitations of the FTC cigarette testing program, and borderline low-'tar' advertising practices resulting from the way the test results are reported have contributed to substantial consumer confusion and misunderstanding. This situation threatens to erode public confidence in both the FTC's test reports and the industry's advertising claims." (See Pepples, 1982, p. 1.)

## Poor Information, But Rich Imagery

Cigarette advertising is notoriously uninformative, with characteristic forms using veiled health implications and pictures of 'health' along with vague promises of taste and satisfaction (Pollay, 1994, pp. 179–184). Occasionally, ads for new technological developments in filter design called attention to the filter, with allusions to filter effectiveness, but almost always without being specific about what constituents of tobacco or its smoke were being filtered, what degree of filtration effectiveness was being realized, or what health or safety consequences were warranted. Only the tar and nicotine information—as mandated by regulation and generated by conventional test methods—is given, without interpretation. For example, Carlton® now encourages smokers to start "thinking about number 1" and smoke its "Ultra Ultra Light" cigarette (see Figure 7–21).

Figure 7-21
Carlton—"Isn't It Time You Started Thinking About Number One?" (1999)

Many cigarette ads contain no information whatsoever, save for the implicit reminder that a brand exists, e.g., many Marlboro® ads. Some contemporary ads, like a recent campaign for Merit Ultra Light®, take a humorous visual approach to convey that it might be lighter than expected (see Figure 7–22).

## Consumer Information

The cigarette industry has not voluntarily employed its advertising to inform consumers in a consistent and meaningful way about any of the following: 1) the technologies employed in fabricating the products, 2) the constituents added in the manufacturing processes, 3) the residues and contaminants that may be present in the combustible column, 4) the constituents of smoke that may be hazardous, 5) the addictiveness of nicotine, or 6) the health risks to which its regular consumers and their families are inevitably exposed. Instead, their advertising for low-yield products has relied on pictures of health and images of intelligence, and has misled consumers into believing filtered products in general, and low-tar products in specific, to be safe or safer than other forms without explaining exactly why.

### Figure 7-22
### Merit Ultra Lights—Sumo Ballet Lighter Than Expected (1999)

## Marketing/Advertising Gives Cigarettes Vitality

While the technological means to produce low-yield products might seem important, to industry insiders it was the marketing sophistication that was even more crucial in determining the relative success of various firms:

[In contrast to the import of marketing] "... technology in the tobacco industry

has had virtually no effect on the relative success of the six companies... the industry has become so sophisticated in marketing that nontechnical developments, while they might have a large influence on the industry in terms of the types of cigarettes available, would probably do little to shift shares from one company to another." [Emphasis added.] (See Ennis et al., 1984.) Michael Miles, Chairman and Chief Executive Officer of Philip Morris, defended advertising eloquently in a trade ad:

"Those of us in the business of building brands don't have to be sold on the importance of advertising or on the necessity for advertising. For me, there is still nothing more exciting in business than to watch effective advertising work its magic in the marketplace. For when a brand is acknowledged and accepted by the consumer, it becomes something much more than what it really is... we invest $2 billion annually in advertising. It's worth every penny. For we believe that a strong brand gives the consumer another whole set of reasons—emotional and personal—to act." (See Miles, 1992, p. 16.)

### Summary

This chapter has reviewed many tobacco industry documents and marketing trade sources. The review revealed the importance of marketing and advertising to the vitality of this industry, and the many means used to create an appearance of healthfulness for various cigarette products, especially those with nominally low yields. Several tactics were employed by the tobacco industry that misled consumers to perceive filtered and low-tar delivery products as safe or safer and as a viable alternative to quitting.

Nicotine delivery is a design feature of cigarette products, and an essential part of the design. Tobacco company documents reflect a fear of consumers becoming weaned from smoking if they are not maintained with sufficient nicotine. Consumer acceptance of products that fail to deliver adequate nicotine satisfaction is also difficult to maintain.

Health concerns of a serious nature have been present among some smokers since at least the 1950s. Females, older, and more highly educated smokers have long been more likely to manifest health concerns. The ramifications of these health concerns are anxieties, conflicts, shame, and guilt, leading to a need for reassurance from advertising. In the 1950s, the promotion of filters provided this reassurance with very explicit verbal representations about the health protection that they offered. Once the nominal purpose of filtration was well understood by the consuming public, the healthfulness of filters was represented by more implicit means. For example, thinly veiled language ("hospital white" filters; "Alive with Pleasure") and visual "pictures of health" images were used, displaying bold and robust behavior in pristine environments.

The image or illusion of filtration is essential to the selling of cigarettes, whereas the fact of filtration is not. Consumer (smoker) opinion and perceptions are what governs their behavior, not the medical or technological facts known to manufacturers and experts.

Many deceptive practices have been employed over the years (some continue to this date) that foster and perpetuate the illusion that various cigarette brands and product forms are relatively healthy. These tactics include:

- Using Medicinal Menthol. Menthol was introduced into some products capitalizing on its "pseudo-health" ben-

efit, a consumer perception derived from experiencing menthol elsewhere in the medicinal context of cough and cold remedies.

- Loosening Filters. Once established in the public's mind as having effective filtration, Kent® offered several successive generations of product in the 1950s and 1960s that were heralded as "new and improved," but in fact contained ever more tar and nicotine.

- Using High–Tech Imagery. New filters were offered that seemed to be the fruits of scientific research and to have meaningful technological innovations, such as charcoal filters, dual filters, chambered filters, recessed "safety zoned" filters, gas trap filters, etc. Almost none of these specified the hazardous elements being filtered.

- Using Virtuous Brand Names and Descriptors. Brands were given names to imply state-of-the-art technology and/or a virtuous product, e.g., Life®, Merit®, Now®, True®, or Vantage®. Product variations are described in technically meaningless, but seemingly quantitative, descriptors like "Mild," "Ultra," "Light," or "Super–Light."

- Adding a Very Low–Yield Product to a Product Line. Some product lines had wide-ranging tar and nicotine deliveries in the same brand family. The best of these levels was used for advertising purposes to reassure consumers while selling other product varieties. In some cases, the best product variant was rarely sold and was known as a phantom brand.

- Fooling the Machines and Using the Data to Fool Smokers. Filters and cigarette papers were developed starting in the 1950s that "air-conditioned" the smoke by diluting the smoke col-

umn with side-stream air. When smoked by machines as in the FTC tests, low-tar and low-nicotine numbers resulted, a desirable outcome for promotional purposes—but higher yields were ingested by real smokers, a desirable outcome for maintaining nicotine addiction.

Low-yield cigarettes were heavily promoted. Promotional programs for cigarettes have been lavishly funded in general, with advertising in multiple media. A disproportionate amount of this funding promoted low-yield products when they were introduced in the 1970s.

Little or no meaningful information is contained in promotions for a given cigarette, such as its ingredients and additives, the technology of filtration, the hazardous constituents of smoke, or the health consequences of smoking. Consumer ignorance and confusion has been persistent over many decades. While smokers who switch to low-yield brands manifest faith in their relative healthfulness, few consumers know the true delivery characteristics of the brands that they smoke, and even their general impressions are not very accurate.

Finally, testing of products by official Government agencies, such as the FTC, imbues the industry with a certain level of credibility, while providing Government-rated data that can be used for promotional purposes.

### Conclusions

1. Advertisements of filtered and low-tar cigarettes were intended to reassure smokers (who were worried about the health risks of smoking) and were meant to prevent smokers from quitting based on those same concerns.

2. Advertising and promotional efforts were successful in getting smokers

to use filtered and low-yield cigarette brands.

3. Internal tobacco company documents demonstrate that the cigarette manufacturers recognized the inherent deception of advertising that offered cigarettes as "Light" or "Ultra–Light," or as having the lowest tar and nicotine yields.

## APPENDIX F

Excerpts from *Change in Nicotine Yields 1998–2004: Data Submitted in Accordance with Massachusetts General Laws Chapter 94: Section 307B, 105 CMR 660, .000,* a report by the Massachusetts Tobacco Control Program, Massachusetts Department of Health (August 2006), available at http://mass.gov/dph/mtcp/wn_mctp.htm, and from the fact sheet accompanying the report, entitled *Changes in Nicotine Yield: 1998–2004.*

### The Importance of Nicotine Disclosure

The Massachusetts Tobacco Control Program has analyzed data from 1998–2004 and has found that the amount of nicotine inhaled by the average smoker has increased 10% over the seven year period.

Although per capita consumption of cigarettes has declined, the amount of nicotine consumed per cigarette has increased.

\* \* \* \* \* \*

The 10% increase in nicotine delivered noted in the report is a significant finding because nicotine is highly addictive drug that affects nearly every organ in the body.

### Summary

The amount of nicotine the smoker receives has increased over time. Data reveal significant increases in nicotine yield from 1998 to 2004 for all three tobacco companies (Lorillard, Philip Morris, and RJ Reynolds) and for all types of cigarettes—full flavor, light, mild/medium, ultra-light; and menthol and non-menthol.

\* \* \* \* \* \*

When compared to 1998 data, 92 of the 116 sub-brands had increased nicotine yields by 2004. Twelve (12) sub-brands decreased and twelve (12) remained unchanged. The average number of milligrams of nicotine delivered increased by 9.9% during this period (from 1.72 milligrams in 1998 to 1.89 milligrams in 2004) . . . .

Similar increases were found for each type of cigarette tested (full flavor, light, mild/medium, and ultra-light), for both menthol and non-menthol cigarettes, for filtered cigarettes and for all companies (PM, RJR, Lorillard).

The total nicotine content of the sub-brands tested increased 16.6%, from 12.9 milligrams in 1998 to 14.3 milligrams in 2004 . . . . Similarly, the milligrams of nicotine per gram of tobacco increased 11.3% from 17.4 in 1998 to 19.4 in 2004 . . . .

### Greater Than Ten Percent (10%) Increase in Nicotine Yield

Fifty-two (52) of the 116 sub-brands had increases in nicotine yield above 10% for the seven (7) year period. Analysis revealed that RJR's Doral brand had the largest percent increase (36%) in nicotine yield from 1998–2004. Next was RJR's King Size Kool Lights with an increase in nicotine yield of 30%.

\* \* \* \* \* \*

### Implications of Increased Nicotine Levels

● Increased levels of nicotine may make it more difficult for the average smoker to quit.

● Similarly, physicians may not be able to determine the proper dosage for Nico-

tine Replacement Therapy as nicotine levels increase.

- Increased levels of nicotine consumed by pregnant women can lead to developmental delays in childhood as well as low birth weight infants.

- Insulin absorption may be slowed by nicotine leading to increased risk for Type 2 diabetes and increased hospitalizations.

- Medications designed to treat asthma, high blood pressure, and depression can lose their effectiveness in combination with nicotine.

- Exposure to nicotine from second hand smoke has profound effects on children, including cognitive deficits.

*　*　*　*　*　*

[The report itself follows. Footnotes and highlighting omitted; sidebars transferred to text or omitted; all emphases in original.]

### Summary

Since 1997, cigarette manufacturers have delivered nicotine reporting information using testing methods established by the Massachusetts Department of Public Health (MDPH). Massachusetts General Law chapter 94 section 307B and Department of Public Health Regulations 105 CMR 660, .000 mandate that cigarette companies report each year to the Department the nicotine yield ratings for all cigarette brands with a U.S. market share of greater than 1.5%.

### Nicotine Yield Testing

For all brands tested in both 1998 and 2004 (N = 116), the total amount of nicotine delivered to the smoker has increased significantly: 1.72 mg in 1998 compared to 1.89 mg in 2004. These data were also evaluated by manufacturer. For each of the major manufacturers (i.e., Brown & Williamson, Lorillard, Phillip Morris, and RJ Reynolds), the increases in nicotine delivered were significant.

Each manufacturer markets many brands of cigarettes and this data was analyzed by brand. Once again, the increases in nicotine delivered were significant. With the exception of Winston cigarettes, all brands that were tested in both 1998 and 2004 had significant increases in nicotine delivered to the smoker. This includes Basic, Camel, Doral, Kool, Marlboro, and Newport cigarettes.

Cigarette brand families (e.g. Marlboro) with a U.S. market share of greater than 1.5% were required to submit nicotine yield information. In 2004, a total of 179 brands were tested from the four major cigarette manufacturers—Brown & Williamson (now owned by RJ Reynolds), Lorillard, Philip Morris, and RJ Reynolds.

For over 30 years, nicotine yields have been reported from tests using smoking machines. The operation of the machine was an attempt to mimic the smoking behavior of a typical smoker. However, these historical methods have been found to be inadequate 1,2 because the machine's puff duration is too short, too little smoke is inhaled, and none of the filter ventilation holes is covered. The MDPH testing method better simulates the smoking behavior of the typical smoker under typical smoking conditions. Using the Massachusetts' method, the amount of smoke inhaled with each puff is increased and the amount of time between puffs is reduced. In addition, 50% of the cigarette filter is covered.

Testing for nicotine yield using the MDPH method revealed levels that are more than twice as high as those found by the historical method. For the typical smoker, 'low yield' cigarettes in almost every case deliver moderate to high doses of nicotine. These levels are sufficient to

cause and maintain heavy dependence. For all brands tested in both 1998 and 2004 (N = 116), the average from using the historical method was 0.90mg/cigarette while the average from the Massachusetts method was 1.89mg/cigarette.

## Nicotine Ranges

Massachusetts has rated different brands of cigarettes based on the nicotine that a cigarette delivers under typical smoking conditions. The nicotine ratings range from high, moderate, low, or nicotine free. These ranges were created in order to allow smokers to compare nicotine levels among brands of cigarettes.

Ninety-three percent of the cigarettes tested in 2004 fell into the highest nicotine range. This compares to 84% in 1998. Of 179 cigarette brands tested in 2004, 166 were rated as *high nicotine*. This includes 59 brands that the manufacturers label as 'light' cigarettes, 12 brands labeled as 'mild' or 'medium', and 14 labeled as 'ultra-light'. All remaining brands fell into the moderate range. Cigarettes with moderate and high yields can cause heavy dependence on nicotine.

## Nicotine Content of Whole Tobacco

For all brands tested in both 1998 and 2004, there were no significant differences in the total nicotine content between 'full flavor,' 'medium,' 'mild,' 'light,' or 'ultra-light' cigarettes.

Whether a cigarette is classified by the manufacturer as being 'full flavor,' 'medium,' 'mild,' 'light,' or 'ultra-light,' it is likely to contain similar amounts of nicotine in the unsmoked tobacco. Smokers who switch to 'lower yield' cigarettes to reduce their intake of nicotine are faced with similar levels of nicotine content.

## Percent Filter Ventilation

For all brands tested in 2004, cigarettes ranged from 0% to 83% filter ventilation, emphasizing the extreme differences in cigarette design.

When smokers place their lips and fingers over the vents, they keep outside air from diluting the smoke. As a result, they take in higher levels of tar and nicotine.

Based on information provided by the manufacturers, there is a strong correlation between the percent of filter ventilation and total nicotine content for *ultra-light* cigarettes. When the nicotine content is low, there is relatively little filter ventilation. When it is high, there tends to be much more ventilation. Under typical smoking conditions, the amount of filter ventilation reduces the amount of nicotine delivered to the smoker. Despite lower nicotine content for some ultra-light cigarettes, these same cigarettes tend to have correspondingly low levels of filter ventilation. This means that a much higher proportion of the nicotine in the cigarette enters a smoker's lungs.

### *Background*

The national standard for testing tar and nicotine in mainstream smoke by use of a smoking machine was developed over thirty years ago. The nicotine yield ratings produced by this historical method were meant to serve as a relative measure of nicotine yield between cigarette brands. They are not reliable measures of how much nicotine a smoker actually takes into their body under normal smoking conditions.

Cigarette design has undergone significant changes over the last 30 years. Technology has altered the manner in which tar and nicotine are delivered to the smoker, and the smoking practices of consumers have shifted accordingly. Since the introduction of 'low yield' cigarettes (i.e. light

and ultra-light cigarettes) in the late 1970's, smokers have been found to compensate for lower levels of nicotine yield by smoking more frequently, by smoking more cigarettes, smoking more deeply, and increasing puff volume. These changes in smoking behavior result in much higher relative nicotine levels being delivered to the body from lower yield cigarettes than what is calculated using the historical testing method.

A recent report of the National Cancer Institute's Ad Hoc Committee of the President's Cancer Panel on the historical test method concluded that current ratings from this method provide little information for consumers who wish to know how much nicotine they actually take into their body when smoking. MDPH testing standards, developed in 1997, draw heavily on that report and reflect current scientific knowledge about compensatory smoking behaviors and nicotine intake.

\* \* \* \* \* \*

### Nicotine Yield Testing

### What Is Nicotine Yield?

A cigarette does not deliver fixed amounts of tar and nicotine in the manner that a capsule delivers a fixed dose of medicine. In part, it is how a person smokes that determines the amount of tar and nicotine that is delivered from the cigarette into the body.

Nicotine yield is a measure of the amount of nicotine in the smoke that a smoker inhales. It does *not* measure the amount of nicotine in a cigarette.

The amount of nicotine which smokers inhale is based on how long and how deeply they breathe in with each puff (puff volume), the amount of time between puffs (puff interval), and the percent filter ventilation of the smoke they breathe (the amount of pure air which is drawn in through vent holes in the filter tip during smoking and allowed to mix with the smoke, lessening its concentration).

When compared to the historical method of testing cigarettes, the Massachusetts method better simulates the smoking behavior of the typical smoker under normal smoking conditions. The Massachusetts method increases the amount of smoke inhaled with each puff by the smoking machine, reduces the amount of time taken between puffs, and requires that 50% of the cigarette filter be covered.

### What Do Nicotine Yield Ratings Reflect?

The historical method of measuring nicotine yield uses a smoking machine to simulate the way in which a smoker smokes. Nicotine yields and tar levels using the historical method are determined on the basis of the amount of smoke which is inhaled by the machine.

Because nicotine yield is based on the way in which an individual smokes, ratings based on the historical method reflect what you take into your body only if you smoke a cigarette in exactly the same way as the testing machine.

Ratings based on the historical method cannot accurately reflect the effects of vent blocking—blocking ventilation holes in the filter. A typical smoker is likely to cover the vents placed around the filter, raising the levels of tar and nicotine which they inhale. The filter vents are left open when nicotine yields are measured using the historical method.

The Massachusetts testing method was developed to reflect compensation techniques—such as vent blocking, puffing more frequently, and inhaling more deeply. If smokers employ these compensation behaviors, they will inhale increased amounts of nicotine.

## What Were the Results of Massachusetts Nicotine Yield Testing?

By adjusting parameters to more accurately reflect typical smoking conditions, 2004 Massachusetts testing for nicotine yield produced numbers that were about twice as high as those found using the historical method. The typical smoker receives much greater levels of nicotine than is suggested by historical methods ratings.

Table 1: Nicotine yield from Massachusetts method compared to historical method

| Cigarette Type | MA Method Nicotine Yield (mg/cigarette) | Historical Method Nicotine Yield (mg/cigarette) | % Difference |
|---|---|---|---|
| Full (Regular) | 2.16 | 1.09 | 98% |
| Medium/Mild | 2.01 | 0.93 | 116% |
| Light | 1.71 | 0.80 | 114% |
| Ultra–Light | 1.21 | 0.43 | 181% |

Compensation techniques used by smokers alter levels of nicotine received from 'light' or 'ultra-light' cigarettes to a much greater degree than with regular cigarettes. All cigarettes ('light', 'ultra-light', etc.) are based on nicotine yield ratings using the historical method, but 'low yield' cigarettes depend more heavily on design factors such as filter ventilation which are not accounted for by the historical testing method.

For the typical smoker, 'low yield' cigarettes deliver moderate to high doses of nicotine. These levels are sufficient to cause and maintain heavy dependence. No brand tested produced nicotine yields of less than 0.5 mg per cigarette when smoked under typical smoking conditions.

### Nicotine Content of Whole Tobacco

### What Is Nicotine Content?

The nicotine content of a cigarette is an important element in its design. Nicotine content is the amount of nicotine contained in the tobacco before it is burned and inhaled. A smoker extracts the nicotine contained within the tobacco by inhaling nicotine which is released into the smoke when the tobacco is burned.

A cigarette with a higher nicotine content has a greater amount of nicotine, which may potentially be extracted by the smoker and inhaled during smoking.

Consumers may believe that 'light' and 'ultra-light' cigarettes contain less nicotine than full flavor cigarettes. However, such classifications do not reflect the amount of nicotine in the cigarette—they are based solely on ratings of nicotine yield using the historical method.

### Why Is Nicotine Content Important?

According to 2004 data, there were no statistically significant differences in the nicotine content of 'full flavor,' 'medium,' 'mild,' 'light,' or 'ultralight' cigarettes. Whether a cigarette is classified as 'full flavor,' 'medium,' 'mild,' 'light,' or 'ultra-light', it is likely to contain similar amounts of nicotine in the unsmoked tobacco.

Nicotine yield ratings from the historical method are based on the amount of nicotine 'inhaled' by a smoking machine. These data suggest that light cigarettes contain less nicotine than regular cigarettes. In reality, the difference in nicotine content across types is not statistically significant. Light and regular cigarettes offer similar amounts of nicotine to the smoker.

Compensation techniques such as vent blocking or taking longer and deeper puffs on a cigarette are used by smokers as means of extracting a greater amount of nicotine. When a cigarette has a high level of nicotine content, the smoker may be able to extract high levels of nicotine even when smoking cigarettes labeled with lower nicotine yields.

A cigarette classified as 'light' according to the amount of nicotine which a standard smoking machine will extract from it, will contain levels of nicotine similar to that of a regular cigarette.

Smokers who switch to 'lower yield' cigarettes in order to reduce their intake of nicotine, can be faced with similar levels of nicotine content in the 'low yield' cigarettes. By simply smoking harder and longer on light and ultra-light cigarettes, smokers can achieve the same impact and the same level of nicotine as they did from 'higher' nicotine yield brands.

### Percent Filter Ventilation

### What Is Vent Blocking?

Many cigarettes are made with tiny holes around the filter which allow air that has not been drawn through the end of the cigarette to mix with the tobacco smoke during smoking.

When smokers place their mouth or fingers over the vents, they keep outside air from diluting the mixture and so take in higher levels of tar and nicotine.

### How Can a Smoker Tell If They Are Vent Blocking?

It is difficult for smokers to know if they are covering up the vents. Many brands have vents that are so tiny they are invisible to the naked eye. Often the placement of the holes makes it difficult if not impossible for a smoker to smoke a cigarette without blocking some or all of the vents.

Cigarettes are designed in such a way that normal smoking behaviors results in covering some or all of the filter vents. Thus, normal smoking behaviors result in heavier amounts of tar and nicotine delivered to a smoker.

### What Does Vent Blocking Mean for 'Light' and 'Ultra-light' Cigarettes?

Filter vents are more often found in 'light' and 'ultra-light' cigarettes.

The filter vents reduce the amount of nicotine and tar measured by the historical testing method, without reducing the amount of tar and nicotine in the cigarette.

A smoker will likely block at least some of the filter vents on a 'light' or 'ultra-light' cigarette, breathing in more of the dangerous and addictive substances in the smoke.

For cigarettes tested in 2004, filter ventilation ranged from 0% to 83%. This emphasizes the significant differences in cigarette design between brands of cigarettes.

### Nicotine Yield Ratings

### Why Publish Nicotine Ranges?

Massachusetts is publishing the range of nicotine which a cigarette delivers under typical smoking conditions. All brands are classified as either high, moderate, low, or nicotine free. Since individual smoking behaviors vary, these ranges will allow smokers to compare nicotine levels among

brands of cigarettes without suggesting specific amounts of nicotine delivered.

Because of the differences in individual smoking patterns, no number is truly representative of the amount of nicotine any smoker will receive from a cigarette. Therefore, Massachusetts has developed ranges which classify levels of nicotine relative to each other. These ranges are high (>1.2 mg), moderate (>0.2–1.2), low (.01–.2) or nicotine free (<.01).

**What Do the Classifications Show?**

Of 179 cigarette brands tested, 166 were rated as high, including most of the 'light' cigarettes tested, and even some of the 'ultra-light' cigarettes tested.

Of the remaining 13 brands (7% of cigarettes tested), all were rated moderate by MDPH standards. This suggests that virtually all cigarettes on the marketplace today deliver moderate to high doses of nicotine sufficient to cause and maintain heavy dependence.

Eighty-five (85)—or more than half of the all brands rated as high were classified as 'ultralight,' 'light,' or 'medium.'

No brand tested fell into the 'low' classification.

The results tests performed in accordance with MDPH regulations demonstrates the highly addictive potential of nearly all brands of cigarettes—whether full flavor, 'light,' or 'ultra-light.' Brands rated as low in nicotine according to the historical method are shown to deliver significantly greater levels of nicotine and to be potentially more addictive than the ratings would suggest.